JOHN M. McCOY, III, Cal. Bar No. 166244
Email: mccoyj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
Email: bendells@sec.gov
LYNN M. DEAN, Cal. Bar. No. 205562
Email: deanl@sec.gov
SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
PARIS A. WYNN, Cal. Bar No. 224418
Email: wynnp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>       vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>       Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ANGELO MOZILO'S MOTION TO DISMISS**<br><br>Date:     October 19, 2009<br>Time:    1:30 p.m.<br>Place:   Courtroom 16<br>          (Hon. John F. Walter) |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................1

II.   SUMMARY OF FACTUAL ALLEGATIONS ...............................3

    A.   The Material Omissions From Countrywide's
        Periodic Filings .................................................................3

    B.   Mozilo's Affirmative Misstatements To Investors ...............4

    C.   Mozilo's Role In The Preparation Of Countrywide's
        Filings ..............................................................................9

    D.   The Omissions And Misstatements Were Material And
        Should Have Been Disclosed ............................................10

III.  MOZILO'S MOTION TO DISMISS SHOULD BE DENIED ...................11

    A.   The Misrepresentations And Omissions Alleged In
        The Complaint State A Legally Viable Claim For Fraud ...................12

        1.   Regulation S-K Required That Countrywide Disclose
            Its Widened Underwriting Guidelines And Exception
            Loans In Its Periodic Filings .......................................13

        2.   Mozilo Improperly Requests The Court To
            Determine The Materiality Of Information Extraneous
            To The Complaint .....................................................16

        3.   The Extraneous Material Cited By Mozilo Does
            Not Cure The Misrepresentations And Omissions
            Alleged In The Complaint ..........................................18

            a.   Statistical Data Mined From Countrywide's
                MBS Filings And Releases Is Not A Substitute
                For MD&A ....................................................18

            b.   Countrywide's Disclosures About Its Pay-Option
                ARMS Were Misleading ...............................20

i

c. Mozilo's Public Statements Were Misleading ...............21

B. The Misrepresentations And Omissions Were Material.....................23

C. Mozilo Acted With Scienter ................................................24

1. The Alleged Omissions Were Not Disclosed
Elsewhere ...................................................................24

2. Mozilo Cannot Assert That He Relied Upon Others.................26

D. Mozilo Committed Insider Trading ......................................29

1. The Commission Has Adequately Alleged That
Mozilo Possessed Material Inside Information ........................29

2. Mozilo's Stock Sales Were Made With Scienter .....................29

E. Violation of Rule 13a-14(b) Is A Stand Alone Cause Of
Action In This Circuit ...........................................................30

IV. CONCLUSION............................................................................31

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

4

## <u>CASES</u>

5

*Aaron v. SEC*
6
    446 U.S. 680 (1980)...............................................................24

7

*Atlas v. Accredited Home Lenders Holding Co.*
8
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)..........................................23

9

*Basic Inc. v. Levinson*
10
    485 U.S. 224 (1988)........................................................ 13, 23

11

*Bd. of Trustees of Knox County Hosp. v. Shalala*
12
    959 F. Supp. 1026 (S.D. Ind. 1997)............................................15

13

*Brody v. Transitional Hosps. Corp.*
14
    280 F.3d 997 (9th Cir. 2002) ....................................................6

15

*Chevron USA, Inc. v. N.R.D.C.*
16
    467 U.S. 837 (1984)........................................................ 14, 15

17

*Chiarella v. United States*
18
    445 U.S. 222 (1980)...............................................................29

19

*Ernst & Ernst v. Hochfelder*
20
    425 U.S. 185 (1976)...............................................................24

21

*Fecht v. Price Co.*
22
    70 F.3d 1078 (9th Cir. 1995) ...................................................12

23

*Ganino v. Citizens Utils. Co.*
24
    228 F.3d 154 (2d Cir. 2000)....................................................17

25

*Hollinger v. Titan Capital Corp.*
26
    914 F.2d 1564 (9th Cir. 1990) ................................................24

27

*Howard v. Everex Systems, Inc.*
28
    228 F.3d 1057 (9th Cir. 2000) ............................................ 27, 28

*In re Apple Computer*
    886 F.2d 1109 (9th Cir. 1989) ........................................................18

*In re Cabletron Systems, Inc.*
    311 F.3d 11 (1st Cir. 2002).............................................................17

*In re Columbia Sec. Lit.*
    155 F.R.D. 466 (S.D.N.Y 1994) ....................................................18

*In re Countrywide Fin. Corp. Derivative Litig.*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................23

*In Re Gilead Sciences Sec. Litig.*
    536 F.3d 1049 (9th Cir. 2008) ..................................... 11, 25, 26, 30

*In re Homestore.com, Inc. Sec. Litig.*,
    347 F. Supp. 2d. 790 (C.D. Cal.), *aff'd*, 452 F.3d 1040 (9th Cir. 2006) .......27

*In re Homestore.com, Inc., Sec. Litig.*
    252 F. Supp. 2d 1018 (C.D. Cal. 2003) .........................................28

*In re Software Toolworks Sec. Lit.*
    50 F.3d 615 (9th Cir. 1994) ...........................................................27

*In re Stac Electronic Sec. Litig.*
    89 F.3d 1399 9th Cir. 1996).............................................................17

*In re Stellent, Inc. Sec. Lit.*
    326 F. Supp. 2d 970 (D. Minn. 2004)..............................................18

*In re Wells Fargo Sec. Litig.*
    12 F.3d 922 (9th Cir. 1993) ...........................................................23

*Johnson v. Riverside Healthcare System, LP*
    534 F. 3d 1116 (9th Cir. 2008) .......................................................11

*Kaplan v. Rose*
    49 F.3d 1363 (9th Cir. 1994) .........................................................12

*Madison v. GMAC Mortgage, LLC*
    2009 U.S. Dist. LEXIS 22294 (D. Ariz. Mar. 19, 2009)..............................12

*Marks v. CDW Computer Centers, Inc.*
    122 F.3d 363 (7th Cir. 1997) ........................................................17

*Navellier v. Sletten*
    262 F.3d 923 (9th Cir. 2001) ......................................................14

*Neubronner v. Milken*
    6 F.3d 666 (9th Cir. 1991) .........................................................12

*Odom v. Microsoft Corp.*
    486 F.3d 541 (9th Cir. 2007) ......................................................12

*Pacific Coast Medical Enters. v. Harris*
    633 F.2d 123 (9th Cir. 1980) ......................................................14

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) .....................................................18

*SEC v. Black*
    2008 WL 4394891 (N.D. Ill. Sept. 24, 2008) .................................30

*SEC v. Brady*
    2006 U.S. Dist. LEXIS 29086 (N.D. Tex. May 12, 2006) ...........................31

*SEC v. Enterprises Solutions, Inc.*
    142 F. Supp. 2d 561 (S.D.N.Y. 2001) .........................................28

*SEC v. Goldfield Deep Mines Co. of Nevada*
    758 F.2d 459 (9th Cir. 1985) ............................................... 26, 28

*SEC v. Pham*
    500 F.3d 895 (9th Cir. 2007) ......................................................13

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) .......................................................18

*SEC v. Sandifur*
    2006 U.S. Dist. LEXIS 12243 (W.D. Wash. Mar. 2, 2006) .........................30

*SEC v. Savoy Industries, Inc.*
    665 F.2d 1310 (D.C. Cir.1981)....................................................26

*SEC v. Seaboard Corp.*
    677 F.2d 1301 (9th Cir. 1982) ....................................................................27

*SEC v. Texas Gulf Sulphur Co.*
    401 F.2d 833 (2d Cir. 1968)........................................................................13

*Shapiro v. UJB Fin. Corp.*
    964 F.2d 272 (1st Cir. 1992).......................................................................23

*Simpson v. AOL Time Warner*
    452 F.3d 1040 (9th Cor. 2006) ...................................................................27

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group*
    2009 U.S. Dist. LEXIS 31832 (D. Ariz. Mar. 31, 2009)...............................12

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976)........................................................................... 17, 23

*United States v. Erickson*
    601 F.2d 296 (7th Cir. 1979) ......................................................................28

*United States v. Naftalin*
    441 U.S. 768 (1979)...................................................................................13

*United States v. O'Hagan*
    521 U.S. 642 (1997)...................................................................................28

*Vess v. Ciba-Geigy Corp.*
    317 F.3d 1097 (9th Cir. 2003) ....................................................................12

*Warden v. Coolidge Unified School District*
    2008 U.S. Dist. LEXIS 101323 (D. Ariz. Dec. 15, 2008)............................11

## **FEDERAL STATUTES**

### **Securities Act of 1933**

Section 17(a)
    [15 U.S.C. § 77q(a) ........................................................................ 9, 12, 13

vi

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)] .................................................................24

**Securities Exchange Act of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)] ..................................................... 9, 13, 24, 27

# FEDERAL REGULATIONS

17 C.F.R. § 229.303 .................................................................. 13, 15

17 C.F.R. § 229.303(a)(3)(ii) .........................................................19

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ............................................. 9, 13, 24, 27

Rule 13a-14(b)
    [17 C.F.R. § 240.13a-14(b)].........................................................30

# FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 8(a)(2).................................................................1

Fed. R. Civ. P. 9(b) ............................................................... 1, 12

Fed. R. Civ. P. 12(b)(6)........................................................... 1, 11

# COMMISSION RELEASES

*In re Caterpillar*
    Exchange Act Rel. No. 30532 (Mar. 31, 1992) ............................15

*Interpretation:  Commission Guidance Regarding Management's Discussion
    and Analysis of Financial Condition and Results of Operations*
    Exchange Act Rel. No. 48960 (Dec. 29, 2003) ................................ 14, 15, 19

*Report of Investigation Pursuant to Section 21(a) of the Securities Act*
*of 1934 Concerning the Conduct of Certain Former Officers and*
*Directors of W.R. Grace & Co.*
Rel. No. 34-39157 (Sept. 30, 1997).............................................................28

## I.   __INTRODUCTION__

Plaintiff Securities and Exchange Commission ("Commission") filed a detailed Complaint in this matter alleging that defendant Angelo Mozilo, the former CEO of Countrywide Financial Corporation, made false and misleading statements and omissions in 2005, 2006, and 2007 in connection with Countrywide's Forms 10-Q and 10-K, in earnings calls and meetings with analysts, and in Countrywide's 2006 and 2007 securities offerings.  Specifically, the Complaint alleges that Mozilo recklessly failed to disclose critical facts about Countrywide's deteriorating underwriting quality, his knowledge that borrowers and/or brokers were taking advantage of that laxity to commit fraud, and his grave concern that Countrywide's defaults and delinquencies would rise as a result of these factors and adversely affect Countrywide's ability to access the secondary mortgage market, its primary source of revenue.  The Complaint also alleges that Mozilo committed insider trading violations in adopting his 10b5-1 plans while he possessed the above material non-public information.

In response to the Complaint's detailed allegations, Mozilo has filed a motion to dismiss the Complaint in which he argues that the Commission's allegations fail to state a claim under Rules 12(b)(6), 9(b), and 8(a)(2) of the Federal Rules of Civil Procedure.  Mozilo argues that (1) the Complaint does not allege any misrepresentation that significantly altered the mix of information available to investors; (2) the Complaint does not allege that the claimed misrepresentations and omissions were material to Countrywide investors; (3) Countrywide's contemporaneous disclosures negate any inference of scienter; and (4) the Commission's insider trading allegations are invalid because the Complaint does not state a cognizable fraud claim and Mozilo lacked scienter.  None of Mozilo's arguments have merit.

First, as demonstrated in detail in Sections II. A. and B. below, the Complaint specifically alleges a series of omissions and affirmative

misrepresentations that were false when made.  As explained in section III.A.3 below, none of the extraneous contemporaneous materials that Mozilo now cites in his motion to dismiss were sufficient to cure those misrepresentations, either because the information was not readily accessible to Countrywide's equity investors, or because the data provided was insufficient to convey the serious deterioration in Countrywide's underwriting and the corresponding risks and contingencies foreseen by Mozilo:  that defaults and delinquencies would rise because of Countrywide's business practices and ultimately curtail Countrywide's access to the secondary market, its primary funding source.  Moreover, Mozilo's attempts to refer to material extraneous to the complaint to negate any inference of materiality or scienter are little more than a thinly disguised "truth on the market" defense, which is inappropriate in the context of a motion to dismiss both because it requires consideration of substantial evidence outside the Complaint and because it requires the Court to make a determination of the materiality of that evidence, also inappropriate at this stage in the proceedings.

Second, the Complaint adequately pleads the materiality of Mozilo's misstatements by alleging both the increase in Countrywide's share price attributable to the fraud (CMPL ¶ 23), and the substantial decline in Countrywide's share price in late 2007 and early 2008 as corrective disclosures were made to the market.  CMPL ¶¶ 103-08.  Specifically, the Complaint ties the 11% share price decline following Countrywide's earnings call on July 24, 2007 to its credit risk disclosures (CMPL ¶ 103), and ties the approximately 11% decline in Countrywide's share price on August 16, 2007 to Countrywide's drawdown of its $11.5 billion credit facility, an event necessitated by the over 97% decline in Countrywide's revenue from mortgage securitizations from 2006 to 2007 and Countrywide's inability to bridge the gap by issuing commercial paper. CMPL ¶ 104.  Indeed, the Complaint alleges Countrywide's own disclosure in its Form 10-K for the year-ended December 31, 2007 that the contraction in the

secondary market had increased Countrywide's financing needs and caused it to draw down its $11.5 billion credit line to maintain liquidity.  CMPL ¶ 108.

Third, Mozilo's arguments regarding the contemporaneous disclosures that purportedly negate his scienter are unavailing for the same reasons set forth regarding his arguments regarding materiality, above.  To the extent that Mozilo attempts to use that section of his motion to argue that he was not personally responsible for the misstatements and omissions alleged in the Complaint (Motion at 33), the Complaint more than adequately alleges Mozilo's substantial participation in the preparation of the filings at issue, including his review of the draft documents, his signing of the Forms 10-K for the years ended 2005, 2006, and 2007, and his signing of Sarbanes-Oxley certifications for all of the filings from 2005 through 2007.  CMPL ¶¶ 73-77.

Fourth, Mozilo's arguments regarding the insider trading allegations are nothing more than a reiteration of his arguments regarding the allegations against him for failure to disclose, and are equally unavailing.  The Complaint alleges Mozilo's knowledge of the increased credit risk at Countrywide and his fear that Countrywide's underwriting practices would result in detrimental financial impact to the company, together with his concurrent sale of over five million stock options for gains of over $139 million.  CMPL ¶¶ 7, 9, 40, 45-53, 54, 56, 60, 63-72, 111, 114-124.

For all of the foregoing reasons, Mozilo's motion to dismiss should be denied.

## II.      SUMMARY OF FACTUAL ALLEGATIONS

### A.      The Material Omissions From Countrywide's Periodic Filings

The Complaint alleges material omissions from Countrywide's periodic filings in 2005, 2006, and 2007, specifically, that Mozilo had knowledge of the following facts, but failed to ensure that they were disclosed to Countrywide's investors in the periodic filings that he reviewed and signed, or in Countrywide's 2006 and 2007 securities offerings:

(1) Countrywide was widening its underwriting guidelines to unprecedented

1  levels (CMPL ¶¶ 4, 8, 14, 24, 25, 27, 33, 34, 52, 83, 88, 89);

2       (2) Countrywide was issuing numerous loans that failed to meet even those

3  aggressively widened guidelines (CMPL ¶¶ 8, 29, 30, 56);

4       (3) there was evidence of widespread borrower and/or broker fraud in

5  Countrywide's stated income loan products (CMPL ¶¶ 40, 90);

6       (4) the deteriorating quality of the loans that Countrywide was writing would

7  increase its risk of defaults and delinquencies to dangerous levels (CMPL ¶¶ 4, 5, 27,

8  48-50, 52, 53); and

9       (5) the poor quality of Countrywide's loans threatened to curtail the

10 company's ability to sell those loans in the secondary mortgage market (CMPL ¶¶

11 4, 5, 45, 46, 69).

12       In fact, the Complaint specifically alleges that Mozilo was so concerned about

13 the deterioration in Countrywide's loan quality that in internal company emails he

14 called its subprime second loans "toxic," warned that Countrywide was "flying blind"

15 with regard to the credit performance of its Pay-Option Arm loans, and urged the sale

16 of the Pay-Option ARM portfolio, all while selling over $139 million worth of

17 Countrywide stock.  (CMPL ¶¶ 7, 48-50, 53, 63-72, 124).

18       **B.    Mozilo's Affirmative Misstatements To Investors**

19       Moreover, the Complaint specifically alleges that Mozilo made false and

20 misleading affirmative statements, including:

21       (1) statements in Countrywide's Forms 10-K for 2005, 2006, and 2007 that

22 Countrywide "manage[d] credit risk through credit policy, underwriting, quality

23 control and surveillance activities" and touting the Company's "proprietary

24 underwriting systems . . . that improve the consistency of underwriting standards,

25 assess collateral adequacy and help to prevent fraud."  CMPL ¶ 85.  These

26 statements were false, because Mozilo knew that a significant portion of

27 Countrywide's loans were being made as exceptions to Countrywide's already

28 extremely lax underwriting guidelines (CMPL ¶¶ 4, 5, 40, 48-49, 56, 63-72);

(2) statements in Countrywide's 2005 and 2006 Form 10-K that Countrywide ensured its ongoing access to the secondary mortgage market by consistently producing quality mortgages.[1]  CMPL ¶ 86.  These statements were false.  Mozilo knew that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines, and Mozilo feared that one adverse event would be enough to foreclose Countrywide's access to the secondary market for Pay-Option ARM loans (CMPL ¶¶ 4, 5, 8, 40, 48-49, 56, 63-72);

(3) a statement in Countrywide's 2006 Form 10-K that "[w]e believe we have prudently underwritten" Pay-Option ARM loans.  CMPL ¶ 90.  These statements were false because Mozilo had begun sounding internal alarms about the underwriting of the Pay-Option portfolio at least as early as April 4, 2006, citing his knowledge that a significant percentage of borrowers were misstating their incomes on stated income loans such as the Pay-Option ARM (CMPL ¶¶ 40, 63-71);

(4) deceptive descriptions of "prime loans" in Countrywide's 2005, 2006, and 2007 Forms 10-K that did not inform investors that Countrywide's definition

---

[1]     Mozilo makes two arguments regarding the Commission's allegations about Countrywide's statements about access to the secondary markets.  First, he accuses the Commission of misquoting Countrywide's statement regarding access to the secondary markets.  Motion at 28.  He is incorrect.  The Complaint correctly quotes the language of the 2005 Form 10-K, and goes on to state that the 2006 Form 10-K contains a "substantially similar" disclosure.  It does, as set forth in Mozilo's Motion at 28.  Mozilo argues that the addition of the word "strategy" renders the 2006 statement aspirational.  Whether aspirational or not, there can be no dispute that Countrywide intended to convey to investors that it was attempting to ensure access to the secondary markets by writing mortgages that met secondary market standards.  Neither the 2005 nor the 2006 Form 10-K contain language sufficient to inform investors that Countrywide had all but abandoned prudent underwriting standards – whether as a reality or an "aspiration."  Second, Mozilo argues that the 2006 Form 10-K contained language that informed investors that its access to the secondary markets might be at risk.  Motion at 29.  This is untrue.  The 2006 Form 10-K, which was filed in March 2007, contained a disclosure that the secondary market **in 2007** was requiring increased investor yields on **nonprime** loans and that trend **"may"** affect Countrywide's willingness to **sell** such loans.  Motion at 29.  There is nothing in that statement that discloses Mozilo's concern, expressed internally in September 2006, that the secondary market might no longer want to **buy** Countrywide's Pay-Option loans.  CMPL ¶ 46.

of such loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality and with additional credit risk factors such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and higher[2] (CMPL ¶¶ 8, 20-21, 87-88);

(5) the misleading use of the term "nonprime" in Countrywide's periodic filings because Countrywide failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this category included loans with significant additional layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or combined loan to value ratios of 95% and higher; and (5) loans made to borrowers with recent bankruptcies and late mortgage payments (CMPL ¶¶ 8, 22, 87-89);

(6) a statement in an April 26, 2005 earnings call that "We don't see any change in our protocol relative to the quality of loans that we're originating."  This statement was false, because Mozilo was aware that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines, and Countrywide's guidelines were continuously expanding from at least 2004 until the end of 2006. (CMPL ¶¶ 4, 5, 8, 24, 25, 27, 29, 30, 33-40, 45, 46, 48-50, 52, 53, 56, 63-72, 92);

---

[2]      Mozilo argues that Countrywide's use of the terms "prime" and "nonprime" in its periodic filings is not actionable because these terms were merely "incomplete."  Motion at 15-16, citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  But *Brody* itself makes it clear that an omission can be actionable where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Id.*  The Complaint alleges that Mozilo, along with other senior Countrywide managers, knew that the company was originating poor quality loans with increased risks factors and underwriting exceptions, including underwriting loans to borrowers with subprime FICO scores and calling them prime.  (CMPL ¶¶ 4-8, 20-21).  Under those circumstances, the failure to clarify that Countrywide's "prime" loans were not in fact prime credit quality was misleading, and is actionable.

(7) a statement in a July 26, 2005 earnings call that Mozilo was "not aware of any change of substance in [Countrywide's] underwriting policies" and that Countrywide had not "taken any steps to reduce the quality of its underwriting regimen." CMPL ¶ 93. In that same call, Mozilo touted the high quality of Countrywide's Pay-Option ARM loans by stating that "[t]his product has a FICO score exceeding 700. . . . the people that Countrywide is accepting under this program . . . are of much higher quality. . . that [sic] you may be seeing . . . for some other lender." CMPL ¶ 93. This statement was false, because Mozilo was aware that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines (CMPL ¶¶ 4, 5, 8, 25, 27, 29, 33-40, 45-46, 48-50, 52, 53, 56, 63-72);

(8) a statement in a January 31, 2006 earnings call that "It is important to note that [Countrywide's] loan quality remains extremely high." CMPL ¶ 93. This statement was false, because Mozilo was aware that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines (CMPL ¶¶ 4, 5, 8, 25, 27, 29, 33-40, 45-46, 48-50, 52, 53, 56, 63-72).

(9) a statement in an April 27, 2006 earnings call that Countrywide's "pay option loan quality remains extremely high" and that Countrywide's "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period." CMPL ¶ 94. This statement was false when made, because as early as April 4, 2006 Mozilo was internally warning of Countrywide's pay-option portfolio, "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies." CMPL ¶ 63-72.

(10) a statement on May 31, 2006, at the Sanford C. Bernstein Strategic Decisions Conference, where Mozilo told the audience that despite recent scrutiny

of Pay-Option loans, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers." CMPL ¶ 95. Mozilo added that the "performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments." CMPL ¶ 95. These statements were false when made, because Mozilo had just written to Sambol and Sieracki in a May 19, 2006 email that Pay-Option loans would continue to present a long-term problem "unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen." CMPL ¶ 96. Moreover, one day after the conference, on June 1, 2006, Mozilo warned Sambol in an email that he knew that the Pay-Option portfolio was largely underwritten on a reduced documentation basis, and believed there was evidence that borrowers were lying about their income in the application process. CMPL ¶ 96. Mozilo concluded: (1) in an environment of rising interest rates, borrowers would reach the 115% negative amortization cap sooner than they expected; (2) borrowers would suffer payment shock because of the substantially higher payments upon reset, particularly those with FICO scores below 700 who "are going to experience a payment shock which is going to be difficult if not impossible for them to manage"; and (3) "we know or can reliably predict what's going to happen in the next couple of years" so the company must act quickly to address these issues. CMPL ¶ 96. In addition, Mozilo failed to disclose that by the time he made the statement about the 20-year history of pay-options, the history that he was referring to, that of World Savings, no longer provided him any comfort about the future performance of the portfolio. CMPL ¶ 96.

(11) a statement at a Fixed Income Investor Forum on September 13, 2006, where Mozilo remarked that "[t]o help protect our bond holder customers, we engage in prudent underwriting guidelines" with respect to Pay-Option loans. CMPL ¶ 97. This statement was false when made because:

- On July 10, 2006, after reviewing data on an internal flash report,

Mozilo learned that, from September 2005 through June 2006, the percentage of Pay-Option borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%. This was the key metric by which Mozilo measured the performance of the Pay-Option portfolio;

- On August 16, 2006 Mozilo received an e-mail asking whether the company anticipated any significant problems with the Pay-Option portfolio. Mozilo responded that rising interest rates would cause the loans to reset much faster than the borrowers expected with accompanying payment shock. The only solution, Mozilo wrote, was to refinance the loans before reset, but this would be difficult, in light of decreasing home values and rising interest rates. Only unlikely events, such as a dramatic rise in home values or a dramatic drop in interest rates, would alleviate future payment shock; and

- On September 26, 2006 Mozilo advised Sambol and Sieracki in an email that "[w]e have no way, with any reasonable certainty, to assess the real risk of holding [Pay-Option] loans on our balance sheet. The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico. In my judgement, [sic] as a long time lender, I would always trade off fico for equity. The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."

CMPL ¶ 97.

## C.    Mozilo's Role In The Preparation Of Countrywide's Filings

The Complaint also alleges that Mozilo substantially participated in the preparation of Countrywide's filings with the Commission. Mozilo reviewed drafts of the documents, signed Sarbanes-Oxley certifications for each Form 10-Q from Q1 2005 through Q3 2007 and each Form 10-K for the years ended 2005, 2006, and 2007, and signed the Forms 10-K for the years ended 2005, 2006, and 2007. CMPL ¶¶ 73-77. The Complaint further alleges that Mozilo violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 because he directly participated in Countrywide's 2006 and 2007 securities offerings, but failed to take any action to correct false and misleading statements in the offering documents, which he signed. Specifically, Countrywide's materially false and misleading periodic reports were incorporated by reference in the February 9, 2006 Form S-3 and the November 15, 2007 Form S-3 signed by Mozilo. CMPL ¶ 110.

9

Mozilo recklessly failed to disclose the correct information regarding Countrywide's mortgage business and to discuss in Countrywide's MD&A the known negative trends it was experiencing.  He was also reckless in making false and misleading statements regarding Countrywide's mortgage business and financial results during earnings calls and investor conferences.

### D.  The Omissions And Misstatements Were Material And Should Have Been Disclosed

The information that Mozilo omitted or misrepresented would have been important to a reasonable investor.  As set forth in detail in the Complaint, Countrywide's periodic filings trumpeted that Countrywide was a primarily prime lender with "prudent" underwriting guidelines and a strict quality control process.  CMPL ¶¶ 4, 6, 85-88, 90.  At the same time, Mozilo knew of substantial negative information relating to Countrywide's loan production and predicted that the probable defaults and delinquencies from Countrywide's loans would have a material unfavorable impact on Countrywide's revenues.[3]  CMPL ¶¶ 4-5, 7-8, 27, 45-46, 47-50, 52-53, 56, 63-72.  But Mozilo did not disclose the critical facts about Countrywide's deteriorating underwriting standards, his knowledge that borrowers and/or brokers were taking advantage of reduced underwriting guidelines to commit fraud, and his conclusion that Countrywide's defaults and delinquencies would rise as a result of these factors and adversely affect Countrywide's ability to access the secondary mortgage market, its primary source of revenue.  CMPL ¶¶ 73-77, 83-98.  Without this critical information, disclosure of positive information regarding Countrywide's loan production and the risks associated with those loans

---

[3]      Notably, the Complaint also alleges that Countrywide's internal Chief Risk Management Officer also identified these trends, and predicted their consequences as early as September 2004, repeatedly warned of the danger of Countrywide's underwriting strategy during the relevant time period, and requested that management add a discussion of these trends to Countrywide's filings.  CMPL ¶¶ 33-39, 41-47, 54, 78-82.  These warnings went unheeded, and the required disclosures were never made.

1    was misleading, leaving investors with an incomplete picture of Countrywide's

2    financial condition.

3           Such information was clearly material to investors.  As the information

4    trickled into the markets in mid-2007, Countrywide experienced a series of

5    significant declines in stock price.  There was an 11% share price decline

6    following Countrywide's July 24, 2007 earnings call, when it provided investors

7    with statistical information regarding its portfolio of loans held for investment that

8    revealed that its definition of prime loans included loans to borrowers with FICO

9    scores as low as 500, and that 80% of its Pay-Option loans were based upon

10   reduced documentation.  CMPL ¶ 103.  There was an additional approximately

11   11% decline in Countrywide's share price on August 16, 2007 after Countrywide

12   was forced to drawdown its $11.5 billion credit facility, an event Countrywide

13   acknowledged was necessitated by the over 97% decline in Countrywide's revenue

14   from mortgage securitizations from 2006 to 2007 and Countrywide's inability to

15   bridge the gap by issuing commercial paper.  CMPL ¶¶  104, 108.

16   **III.    MOZILO'S MOTION TO DISMISS SHOULD BE DENIED**

17          Dismissal pursuant to Rule 12(b)(6) is proper only where there is a "lack of

18   cognizable legal theory" or "the absence of sufficient facts alleged under a

19   cognizable legal theory."  *Johnson v. Riverside Healthcare System, LP*, 534 F. 3d

20   1116, 1121-22 (9th Cir. 2008).  There is a strong presumption against dismissing

21   an action for failure to state a claim, as the issue is not whether a plaintiff will

22   ultimately prevail on the merits but whether the claimant is entitled to offer

23   evidence in support of its claims.  *Warden v. Coolidge Unified School District*,

24   2008 U.S. Dist. LEXIS 101323, * 5-6 (D. Ariz. Dec. 15, 2008).  As such, a court

25   must accept as true all material allegations in the complaint, as well as all

26   reasonable inferences to be drawn from them, construing the complaint in the light

27   most favorable to the plaintiff.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049,

28   1055 (9th Cir. 2008).

Rule 9(b) is satisfied by allegations indicating the "who, what, where, when and how" of the fraudulent conduct.  *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see also Fecht v. Price Co*., 70 F.3d 1078, 1082 (9th Cir. 1995).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The ultimate test for pleading sufficiency under Rule 9(b) is whether the complaint identifies the circumstances constituting the fraud such that a defendant can prepare an adequate answer.  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994); *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group,* 2009 U.S. Dist. LEXIS 31832, * 47-48 (D. Ariz. Mar. 29, 2009) (the purpose of Rule 9(b)'s heightened pleading standard is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong") (*quoting Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1991) (internal quotations and citation omitted)); *Madison v. First Magnus Fin. Corp.*, 2009 U.S. Dist. LEXIS 22294, * 12-13 (D. Ariz. Mar. 19, 2009) (same).  Here, the Commission has satisfied the requirements of Rule 9(b) by identifying the circumstances of the alleged fraud so that Mozilo can answer the Complaint.   The Complaint alleges Mozilo's distinct role in the fraud by alleging his participation in the preparation of Countrywide's periodic reports to the Commission (CMPL ¶¶ 73-77), his failure to ensure that management's view of the increased credit risk that Countrywide was taking on was explained in those filings (CMPL ¶¶ 83-90), and his affirmative misstatements to investors about Countrywide's loan quality (CMPL ¶¶ 91-98).  Moreover, the Complaint sets forth in detail the alleged misrepresentations and omissions.  (CMPL ¶¶ 83-98).

## A.   The Misrepresentations And Omissions Alleged In The Complaint State A Legally Viable Claim For Fraud

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of

securities, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security.  A person commits fraud "in connection with" the purchase or sale of any security if he or she makes a misrepresentation or omission in a periodic report filed with the Commission, a press release, other public statement.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860-62 (2d Cir. 1968).  A person commits fraud in the offer and sale of a security if he or she makes the misrepresentation or omission in offering and selling in an initial distribution or in secondary market trading of the security.  *See United States v. Naftalin*, 441 U.S. 768, 777-78 (1979).

To state a claim alleging material misstatements or omissions under Section 17(a) and Section 10(b) and Rule 10b-5, the Commission must allege and prove essentially the same elements: (1) a material misstatement or omission; (2) in connection with the offer or sale, and in connection with the purchase or sale, of a security; (3) by means of interstate commerce.  *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007).   The Commission has properly alleged all of those elements here.

**1.** **Regulation S-K Required That Countrywide Disclose Its Widened Underwriting Guidelines And Exception Loans In Its Periodic Filings**

Countrywide's widened underwriting guidelines and its increasing use of exceptions to make loans were known trends that should have been identified in Countrywide's periodic filings.  The conclusions reached by Mozilo and Countrywide's Chief Risk Officer that these trends would likely cause defaults and delinquencies to rise and impact Countrywide's access to the secondary markets were, at a minimum, known uncertainties that should have likewise been disclosed to investors.  Item 303 of Regulation S-K requires MD&A in periodic reports.  17 C.F.R. § 229.303.  Among other things, Item 303 requires MD&A disclosures of:

any known trends or uncertainties that have had or that

the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues
or income from continuing operations.  [17 C.F.R. §
229.303(a)(3)(ii)]  The discussion and analysis shall
focus specifically on material events and uncertainties
known to management that would cause reported
financial information not to be necessarily indicative of
future operating results or of future financial condition.
[17 C.F.R. § 229.303(a), Instruction 3]

The Commission has made it clear that the purpose of MD&A disclosures is (1) "to give the investor the opportunity to see the company **through the eyes of management**;" (2) enhance the overall financial disclosure and **provide the context within which financial information should be analyzed**; and (3) provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.  *Interpretation:  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Exchange Act Rel. No. 48960, Section I.B (Dec. 29, 2003) ("MD&A Release") (emphasis added)[4]; *In the Matter of Caterpillar, Inc.*, Exchange Act Rel.

---

[4]     Courts have recognized that "the SEC's reasonable interpretation of a statute that it administers, including its promulgation of rules and regulations interpreting or implementing the statute, is entitled to deference."  *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir. 2001) (*citing Chevron USA, Inc. v. N.R.D.C.*, 467 U.S. 837 (1984)).  Further, the Ninth Circuit has stated that, in general:

> when the meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction.  In such cases, the agency's expertise make it particularly suited to interpret the language. This is especially true when an agency's own regulation is involved, and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation.

*See Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980).

No. 30532, *12-177 (Mar. 31, 1992).  To further these objectives, Item 303 of Regulation S-K sets forth the information required in the MD&A disclosure that must be included in Forms 10-K and 10-Q.  *See* 17 C.F.R. § 229.303.

Accordingly, the materiality standard for MD&A discussions is different than the general materiality test under *Basic v. Levinson*, 485 U.S. at 231-232.  A two-part test determines when disclosure of known trends or uncertainties under Regulation S-K is required:  (1) is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required; and (2) if management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event, or uncertainty, on the assumption that it will come to fruition.  **Disclosure is then required**, even if the information is disclosed elsewhere, unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.  *In the Matter of Bank of Boston Corp.*, SEC Admin. Proc. File No. 3-8270, 1995 WL 757874 at *13 (Dec. 22, 1995) (the "existence of information in other filings, unless it was incorporated by reference, is irrelevant to whether disclosure in a particular [periodic filing] was sufficient"); *see also MD&A Release*, Exchange Act Release No. 48960 at Section II.B.3 (Dec. 29, 2003); *In the Matter of Caterpillar, Inc.*, Exch. Act Rel. 30532 at *16-17 (Mar. 31, 1992).  Here, Countrywide's most senior officer and its Chief Risk Officer had both identified a **known trend** which each believed was reasonably likely to negatively impact

---

Moreover, so long as the agency's interpretation of its own regulation is reasonable, "[a] court may not substitute its own judgment or 'its own construction of a statutory provision.'" *See Bd. of Trustees of Knox County Hosp. v. Shalala*, 959 F. Supp. 1026, 1030 (S.D. Ind. 1997) (*citing Monsanto v. E.P.A.*, 19 F.3d 1201, 1206-07 (7th Cir. 1994) (*quoting Chevron*, 467 U.S. at 844).  When Congress empowers an agency, such as the Commission, "to elucidate a specific provision of the statute by regulation," "such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *See Chevron*, 467 U.S. at 843-44.

Countrywide's revenue, yet no disclosure of either the known trend or its consequences ever made it into Countrywide's periodic filings.

The Complaint alleges that Mozilo knew of Countrywide's departure from prudent underwriting, the likelihood that its defaults and delinquencies would rise as a result, and his concern that Countrywide's access to the secondary markets would be impacted by these trends.  CMPL ¶¶ 45-46, 48-53, 63-72.  Mozilo does not – because he cannot – argue that he believed the dire events he warned of in the emails cited in the Complaint were not reasonably likely to occur.  To the contrary, he believed that only an unlikely external event could prevent them.  CMPL ¶ 64.  Yet these facts, trends, and conclusions were not included in Countrywide's MD&A in any quarter from 2005 through the end of 2007.  CMPL ¶¶ 27, 31, 32. 35, 45, 57, 72, 82, 84-90.  Moreover, despite his knowledge of the looming potential for disaster in Countrywide's strategy, Mozilo continued to make statements in earnings and investor calls that touted the quality of Countrywide's underwriting and the high quality of its Pay-Option ARM portfolio.  CMPL ¶¶ 91-98.

Investors would have considered it important in making an investment decision that Countrywide was writing increasingly risky loans, because the increasing losses on such loans would directly result in higher repurchase expenses and lower net income.  Moreover – as Mozilo privately anticipated – the poor performance of its shoddily underwritten loans was likely to imperil Countrywide's continued ability to rely on the secondary mortgage market as a source income and liquidity.  Without the disclosure of such material known negative trends, Countrywide's disclosures were misleading and did not comply with the MD&A disclosure requirements of Item 303 of Regulation S-K.

### 2.   Mozilo Improperly Requests The Court To Determine The Materiality Of Information Extraneous To The Complaint

Notably, Mozilo does not argue that the critical information regarding known deterioration in Countrywide's underwriting standards was in fact included

1   in Countrywide's filings.  Instead, he improperly asks this Court to conclude that

2   the omitted information would not have been material to investors.  Motion at 11-

3   14; 30-31.  But the "'materiality' of an omission is a fact-specific determination

4   that should ordinarily be assessed by a jury."  *In re Stac Electronic Sec. Litig.*, 89

5   F.3d 1399, 1405 (9th Cir. 1996), quoting *Fecht,* 70 F.3d at 1080-81 ("[o]nly if the

6   adequacy of the disclosure or the materiality of the statement is so obvious that

7   reasonable minds could not differ are these issues appropriately resolved as a

8   matter of law.").  Thus, materiality is rarely appropriate for review on a motion to

9   dismiss.  *See, e.g., In re Cabletron Systems, Inc.*, 311 F.3d 11, 34 (1st Cir. 2002)

10  ("the materiality of a statement or omission is a question of fact that should

11  normally be left to a jury rather than resolved by the court on a motion to

12  dismiss").  "The determination of materiality requires delicate assessments of the

13  inferences a 'reasonable [investor]' would draw from a given set of facts and the

14  significance of those inferences to him, and these assessments are peculiarly ones

15  for the trier of fact; thus a materiality determination is rarely appropriate at the

16  summary judgment stage, let alone on a motion to dismiss."  *Marks v. CDW*

17  *Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (citing *TSC Indus., Inc.*

18  *v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).  Mozilo cannot meet that burden

19  here, and even if such materiality arguments were appropriate in a motion to

20  dismiss, Mozilo's arguments would fail.

21          Mozilo's argument that the omissions would not have changed the total mix

22  of information available to investors fails for the further reason that he appears to

23  be asserting a thinly veiled "truth-on-the-market" defense.  The "truth-on-the-

24  market" defense posits that a misrepresentation "is immaterial if the information is

25  already known to the market because the misrepresentation cannot then defraud the

26  market."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  But this

27  defense is not appropriate in a Commission action because the fraud-on-the-market

28  theory, to which the "truth-on-the-market" defense may be asserted, is a means for

a private securities law plaintiff to prove reliance on a material misstatement.  *See In re Apple Computer*, 886 F.2d at 1113-14.  But unlike a private plaintiff, the Commission is not required to prove reliance in a securities fraud case, and the truth-on-the-market defense is therefore inapposite.  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993).

Moreover, like materiality, the truth-on-the-market defense is not appropriately considered on a motion to dismiss because an analysis of the merits of the defense would require consideration of substantial evidence outside the complaint.  *See, e.g., Ganino,* 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality").  Mozilo would have to show, for instance, that "material omissions were 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression.'"  *In re Stellent, Inc. Sec. Lit.*, 326 F. Supp. 2d 970, 986 (D. Minn. 2004) (quoting *In re Apple Computer*, 886 F.2d 1109, 1116 (9th Cir. 1989)); *see also Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).  Thus, a defendant's burden in establishing this defense is "extremely difficult, perhaps impossible, to meet" even at the summary judgment stage.  *In re Columbia Sec. Lit.*, 155 F.R.D. 466, 482 (S.D.N.Y 1994).  Accordingly, Mozilo's arguments regarding materiality are unavailing.

### 3. The Extraneous Material Cited By Mozilo Does Not Cure The Misrepresentations And Omissions Alleged In The Complaint

#### a. Statistical Data Mined From Countrywide's MBS Filings And Releases Is Not A Substitute For MD&A

The material omissions and misstatements alleged in the Complaint go to the heart of Mozilo's view of the quality of Countrywide's loan production and his conclusions about what the effects of the deteriorating quality of that production would be on Countrywide's bottom line.  CMPL ¶¶ 4-7, 45-53, 56, 63-72.  The

1    statistical data about Countrywide's loan originations referenced at pages 4-8 and

2    12-15 of Mozilo's motion does not include any discussion about Countrywide's

3    unprecedented widening of underwriting guidelines, the percentage of exception

4    loans Countrywide was making, or the deteriorating quality of Countrywide's loans,

5    and therefore cannot be a substitute for the disclosure in MD&A of management's

6    analysis of known trends and uncertainties that have a material effect on financial

7    conditions or results of operations.  Indeed, requiring (or expecting) investors to go

8    prospecting among Countrywide's MBS filings and other data sources ignores the

9    very point of Regulation S-K's requirement that MD&A in periodic filings provide

10   investors with a view of the company through the eyes of management.  *MD&A*

11   *Release*, Exchange Act Release No. 48960 (Dec. 29, 2003).

12        Moreover, Mozilo's argument ignores the fact that prospectuses for the MBS

13   securitizations were not readily available to purchasers of Countrywide's equity

14   securities.  As Mozilo admits in footnote 2 of the Motion, Countrywide sold its

15   mortgage pools through four **indirect** subsidiaries, CWALT, LLC, CWABS, LLC,

16   CWMBS, LLC, or CWHEQ, LLC.  The prospectus supplements and disclosures

17   cited by Mozilo were therefore not filed on Edgar under the Countrywide name,

18   but rather under the name of these various special purpose entities.  Thus, investors

19   in Countrywide could not reasonably be expected to know that the MBS

20   prospectuses of issuers named CWALT, LLC, CWABS, LLC, CWMBS, LLC, or

21   CWHEQ, LLC contained information that was relevant to a decision to invest in

22   Countrywide Financial Corporation.  Moreover, even if an investor were to

23   stumble upon the raw data about loans contained in the MBS prospectuses, that

24   information would not relieve Countrywide of its obligation under Item 303 of

25   Regulation SK to provide MD&A disclosures of "any known trends or

26   uncertainties that have had or that the registrant reasonably expects will have a

27   material favorable or unfavorable impact on net sales or revenues or income from

28   continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Nor do the MBS

1   disclosures provide information about the loans that Countrywide held for

2   investment on its balance sheet, loans as to which it bore the entire credit risk.

3         Likewise, statements and statistical data in Countrywide's earnings releases

4   regarding its origination volumes and delinquency trends were insufficient to

5   adequately inform investors of the known trends and uncertainties that Mozilo had

6   internally identified regarding Countrywide's underwriting.  None of the

7   alternative sources of information cited by Mozilo in the Motion disclosed

8   Countrywide's effective abandonment of prudent underwriting from 2005 through

9   2006 through unfettered guideline expansion and underwriting exceptions.  For all

10  the above reasons, Mozilo's attempt to argue that MBS prospectuses and

11  Countrywide press releases cure the omissions and misrepresentations alleged in

12  the Complaint fails.

13              **b.     Countrywide's Disclosures About Its Pay-Option**

14                       **ARMS Were Misleading**

15        Mozilo makes much of the fact that Countrywide made disclosures about the

16  "additional risks" presented by Pay-Option Arm loans in its periodic filings.

17  Motion at 23-28.  The Commission does not dispute that Countrywide's

18  disclosures regarding the generalized risks associated with Pay-Option loans

19  improved over time.  But Mozilo is disingenuous when he argues that the

20  Commission has not identified any material fact about those loans that was

21  misrepresented or omitted.  Motion at 26.  The Complaint makes plain that

22  Countrywide's Pay-Option disclosures, which were no more than a description of

23  the possible features of the loans, e.g., that borrowers could chose a payment which

24  did not fully cover the accrued interest, the loans had the potential to negatively

25  amortize, and borrowers might suffer payment shock on reset (Motion at 24-25),

26  did not disclose the facts about the Pay-Option loans that Mozilo actually knew. [5]

27

28  [5]     It is true that Countrywide disclosed in the second quarter 2006 Form 10-Q
        and the third quarter 2006 Form 10-Q the fact that substantially all of its Pay-

1   The descriptions of the loan features could not and did not convey to investors

2   what Mozilo himself had already concluded and was warning about in his emails –

3   borrowers were **in fact** misrepresenting their income in stated documentation loans

4   like the Pay-Option (CMPL ¶¶ 40, 69, 90),[6] the loans **were in fact** negatively

5   amortizing at a higher than expected rate (CMPL ¶¶ 63-65); borrowers would **in**

6   **fact** suffer payment shock that would be "difficult if not impossible for them to

7   manage" (CMPL ¶ 65), and as early as 2006 Mozilo wanted Countrywide to stop

8   holding Pay-Option loans for investment at Countrywide Bank.  CMPL ¶¶ 68-71.

9          Representing to investors that Pay-Option loans are "prudently underwritten"

10   while at the same time exhorting your subordinates to immediately divest the company

11   of them is the very definition of a fraudulent and misleading statement.

12                      c.      **Mozilo's Public Statements Were Misleading**

13          As for the remaining public statements regarding Pay-Options noted by

14   Mozilo in the Motion at page 24 and footnote 14, a plain reading of the statements

15   reveals that they were in fact misleading, because they were clearly intended to lull

16   investors into believing that Countrywide's Pay-Option loans were prudently

17   underwritten.  For example, on July 26, 2005, Mozilo did not merely state that the

18   Pay-Option "product has a FICO score exceeding 700."[7]  CMPL ¶ 93.  He

---

Option were based on reduced documentation, but that disclosure was deleted from the 2006 Form 10-K, and did not reappear until the second quarter 2007 Form 10-Q.  None of the defendants had plausible explanations this vanishing disclosure.  One rational inference is that management simply did not want the information in the Form 10-K, which generally receives more scrutiny from investors than a Form 10-Q.  In any event even that disclosure was insufficient to convey to the public what Mozilo was warning about internally – Countrywide's Pay-Option loans were not "prudently underwritten," and the loans would eventually "badly hurt" the company.  CMPL ¶ 71.

[6]      Contrary to Mozilo's assertion in footnote 11 of his Motion, informing investors that Countrywide did not validate information it received from investors in stated income loans is not the same this as informing investors that you have actual knowledge borrowers are in fact lying about their incomes.

[7]      Mozilo argues that the Complaint does not allege facts showing that this statement was false.  To the contrary, the Complaint alleges a later statement by Mozilo that demonstrates he knew that at least 20% of Countrywide's Pay-Option borrowers had FICO scores below 700.  CMPL ¶ 65.

continued, ". . . the people that Countrywide is accepting under this program . . . are of much higher quality. . . that [sic] you may be seeing . . . for some other lender." CMPL ¶ 93. Likewise, at the May 31, 2006 Sanford C. Bernstein Conference, Mozilo did not just tell investors that the Pay-Option loan had a twenty-year history in "stress environments," he told the audience that "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers." CMPL ¶ 95. But just a few weeks earlier, on April 4, 2006, Mozilo wrote in an internal email: "[s]ince over 70% [of Pay-Option borrowers] have opted to make the lower payment it appears that it is just a matter of time that [sic] we will be faced with much higher resets and therefore much higher delinquencies." CMPL ¶ 65. And on June 1, 2006, he wrote that the payment shock on these loans was "going to be difficult if not impossible" for borrowers to manage. CMPL ¶ 65. Mozilo simply cannot explain these inconsistencies away.

Likewise, Mozilo's attempts to provide "context" for the other public statements discussed at pages 17-20 of the Motion does not change their basic falsity. For example, Mozilo argues that his April 26, 2005 statement that "We don't see any change in our protocol relative to the quality of loans that we're originating" is somehow not false because it was limited to a comparison of loan underwriting between 2004 and 2005. Motion at 17. Even with that limitation, the statement is still false, because the Complaint alleges that Countrywide's underwriting guidelines were continuously expanding from at least 2004 until the end of 2006, and that Countrywide's credit risk management group spent over 90% of its time evaluating requests for guideline expansion. CMPL ¶¶ 24, 35. Similarly, Mozilo argues that his July 26, 2005 statements that he was "not aware of any change of substance in [Countrywide's] underwriting policies" and that Countrywide had not "taken any steps to reduce the quality of its underwriting regimen" were taken out of context because he admits that Countrywide was writing

Pay-Option and interest only loans in the next sentence.  Motion at 18.  But as Mozilo admits in the Motion, he then went on to state that "I'm not aware of any loosening of underwriting standards that creates a less of a quality loan than we did in the past."  Motion at 18.  This statement was also false when made, because Mozilo had actual knowledge that Countrywide's underwriting standards were deteriorating.  CMPL ¶ 5, 7, 8, 40, 46-53, 56, 63-72.

### B.    The Misrepresentations And Omissions Were Material

The antifraud provisions require that misstatement or omission be material. *See Basic Inc. v. Levinson*, 485 U.S. at 231-32.  A fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  *See TSC Indus., Inc.*, 426 U.S. at 449. The omissions and misstatements alleged in the Complaint concern facts that would be material to investor.  A reasonable investor would want adequate and accurate disclosures regarding Countrywide's loan underwriting, loan quality, and credit risk. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[I]f a defendant represents that its lending practices are 'conservative' . . ., the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations."); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors."); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1072 (C.D. Cal. 2008) (allegedly false "statements included representations, for example, that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMS, and only retained high credit quality mortgages in its loan portfolio.  The importance of the quality of Countrywide's loans held for both sale and investment underscores the materiality of these statements."); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993) ("Where a defendant affirmatively

1    characterizes management practices as 'adequate' or loans as 'substantially

2    secured,' 'a defendant declares the subject of its representation to be material to the

3    reasonable shareholder, and thus is bound to speak truthfully.'")

4         Here, as outlined in detail in Section II.B. above, Mozilo made numerous

5    public statements about the quality of Countrywide's underwriting that were belied

6    by his own frequently expressed internal concerns about both the Pay-Option and

7    subprime 80/20 loans originated by Countrywide.  CMPL ¶¶ 40, 46-63, 63-71.

8    The Pay-Option loans alone were a material percentage of Countrywide's total

9    loan originations, comprising 21% of Countrywide's total loan production by Q2

10   2005.  CMPL ¶ 24.  Mozilo's knowledge of the borrower fraud associated with

11   stated income loans such as the Pay-Option, and his concern that loans were being

12   underwritten with disregard for guidelines, are precisely the sort of material facts

13   necessary to render his public statements not misleading.

14        **C.    Mozilo Acted With Scienter**

15        Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act

16   and Rule 10b-5 thereunder also require a showing of scienter.  *Aaron v. SEC*, 446 U.S.

17   680, 701-02 (1980).  Scienter is defined as a "mental state embracing intent to deceive,

18   manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

19   In the Ninth Circuit, scienter may be established by a showing of recklessness.

20   *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990).

21        **1.    The Alleged Omissions Were Not Disclosed Elsewhere**

22        The gravamen of Mozilo's argument that he lacked scienter is that the

23   information that the Commission alleges he failed to disclose was available to

24   investors elsewhere in the marketplace.  Motion at 32.  As set forth in detail above,

25   the statistical information that Mozilo cites to from Countrywide's MBS filings

26   and press releases on loan originations is not a substitute for the management

27   discussion of known trends and uncertainties mandated by Regulation S-K.

28   Moreover, as explained above at section III.A.3, the MBS data was not in a format

or location where it was reasonable to expect that Countrywide's equity investors would find it.  Simply put, the anticipated audiences for the MBS prospectuses and Countrywide's Forms 10-Q and 10-K were different populations of investors, to whom different facts may have been material.[8]

The Commission has alleged that Mozilo recklessly kept from investors the critical facts that (1) throughout 2005 and 2006 Countrywide was widening its underwriting guidelines to unprecedented levels (CMPL ¶¶ 4, 8, 14, 24, 25, 27, 33, 34, 52, 83, 88, 89); (2) was making exceptions even to its widened guidelines (CMPL ¶¶ 8, 29, 30, 56); (3) there was evidence of borrower fraud in Countrywide's stated income loan products (CMPL ¶¶ 40, 90); (4) management knew that the deteriorating quality of the loans that Countrywide was writing would cause increased defaults and delinquencies (CMPL ¶¶ 4, 5, 27, 48-50, 52); and (5) the poor quality of these loans would ultimately curtail the company's ability to sell those loans in the secondary mortgage market (CMPL ¶¶ 4, 5, 45, 46, 69).

The Complaint is replete with references to Mozilo's detailed knowledge of Countrywide's increased, undisclosed credit risk.  Not only did Mozilo have actual knowledge regarding Countrywide's widened underwriting guidelines, as set forth in the Complaint, he personally believed that Countrywide's strategy could lead to disaster.  For example, in April 2006, Mozilo wrote of Countrywide's subprime 80/20 loans that he had "personally observed a serious lack of compliance within [Countrywide's] origination system as it relates to documentation and generally a deterioration in the quality of the loans originated. . ."  CMPL ¶ 49.  In that same

---

[8]     Mozilo's argument about the MBS prospectuses begs the question:  If Mozilo and other Countrywide executives were not intent on obscuring the truth, why disclose the statistics on Countrywide's loan originations to secondary mortgage market investors, but not to the purchasers of Countrywide's equity securities?  Plaintiff is entitled to the reasonable inference that Mozilo was trying to hide the truth.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1055 (a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff).

month, Mozilo correctly identified the trend of borrowers allowing negative amortization to accrue on their Pay-Option loans as a harbinger of increased defaults and delinquencies.  CMPL ¶ 63.  And in September 2006, he wrote that he believed that Countrywide's ability to sell Pay-Option loans into the secondary market, a practice that was critical to Countrywide's liquidity, was at risk because the credit spread was likely to disappear.  CMPL ¶ 69.  None of the statistical information now touted by Mozilo as full disclosure was sufficient to cure his failure to disclose such fundamental facts to investors, and the Commission is entitled to the inference that his failure to do so was willful.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1055 (a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff).

## 2.    Mozilo Cannot Assert That He Relied Upon Others

A subset of Mozilo's argument regarding his lack of scienter is his startling contention that he was not responsible for drafting the filings because he merely relied on the disclosure process at Countrywide.[9]  Motion at 33.  Because Mozilo had actual knowledge of the omissions and misstatements alleged in the Complaint, he cannot now argue that he reasonably relied upon the Countrywide disclosure committee or other professionals to ensure the accuracy of

---

[9] To the extent that Mozilo is attempting to assert a reliance on professionals defense, it is inappropriate for determination in the context of a motion to dismiss, since reliance on professionals is an affirmative defense that requires the court to make determinations of facts extrinsic to the Complaint.  Mozilo would have to demonstrate that he (1) made complete disclosure to the professional, (2) requested the professional's advice as to the appropriate disclosure issue, (3) received advice that the disclosure was adequate, and (4) actually relied in good faith on that advice.  *See SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985) (citing *SEC v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n. 28 (D.C. Cir. 1981)).

Countrywide's periodic reports.  Indeed, the applicable standard for primary liability is not whether Mozilo drafted the filings, but whether he substantially participated or was intricately involved in their preparation.[10]  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); *see also In re Software Toolworks Sec. Lit.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994).  Mozilo does not dispute that he signed Countrywide's periodic filings.  Motion at 33.

Courts have not hesitated to hold reviewers, signers, and certifiers of misleading statements responsible for their content.  In *SEC v. Tenet Healthcare Corp.*, CV 07-2144 (DSF) (C.D. Cal. Oct. 3, 2007), the court held that signing a sub-certification was sufficient to establish substantial participation in the preparation of a fraudulent statement.  *SEC v. Tenet Healthcare Corp.*, CV 07-2144 (DSF) at 9 (C.D. Cal. Oct. 3, 2007), citing to *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1048-49 (9th Cir. 2006) and *Howard*, 228 F.3d at 1061 (signing and attesting to a statement, such that for all intents and purposes the signor-attestor made the statement, is sufficient to be considered a primary violator); *In re Homestore.com, Inc. Sec. Litig. (Homestore II)*, 347 F. Supp. 2d. 790, 803 (C.D. Cal. 2004), *aff'd*, 452 F.3d 1040 (9th Cir. 2006) (auditor's review of quarterly statements constitutes substantial participation); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1312 (9th Cir. 1982) (same holding with respect to prospectus materials).

Those principles are even more apt where, as here, the defendant is a key corporate insider.  Mozilo was at all relevant times Countrywide's CEO.  As the Ninth Circuit observed in *Howard*, "key corporate officers should not be allowed to make important false financial statements knowingly and recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements.  Otherwise, the securities law would be

---

[10]   In addition, Mozilo's Section 10(b) and Rule 10b-5 liability can be predicated on the registration statements he signed, which incorporated the false periodic filings by reference.

significantly weakened…." *Howard*, 228 F.3d at 1062. For that reason, "courts have no trouble finding liability where the actor is a corporate insider, even when that actor claims not to have committed the actual fraudulent statement or act." *In re Homestore.com, Inc., Sec. Litig.*, 252 F. Supp. 2d 1018, 1038 (C.D. Cal. 2003).

Nor can Mozilo rely on the fact that others sub-certified the disclosures to absolve himself of his own responsibility for assuring the accuracy and completeness of Countrywide's disclosures. Corporate executives have an independent duty to insure that proper disclosures are made. *SEC v. Enterprises Solutions, Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001). Management's responsibility to ensure the accuracy of information filed with the Commission cannot be delegated. *See Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934 Concerning the Conduct of Certain Former Officers and Directors of W.R. Grace & Co.* ("W. R. Grace Release"), Rel. No. 34-39157 at *19-21 (Sept. 30, 1997). Because Mozilo had actual knowledge of the true facts regarding Countrywide's lax underwriting, he cannot credibly claim to have relied in good faith on others. *Goldfield Deep Mines*, 758 F.2d at 467 ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance") quoting *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979). Mozilo cites no case law to support the proposition that he could disregard his own knowledge and simply rely on other more junior executives to determine the adequacy and accuracy of Countrywide's disclosures. As set forth in detail in the Complaint, Mozilo knew or should have known that Countrywide was failing to adequately disclose the risks that it was taking on in its periodic reports.

Finally, Mozilo's decision to sell Countrywide stock during the relevant period gave rise to an additional duty on his part to disclose all material information. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (holding that corporate

28

insiders who obtain material nonpublic information in the course of their duties, have a duty to disclose that information or abstain from trading to avoid taking unfair advantage of stockholders) citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980).  Nevertheless, Mozilo failed to disclose these material facts in Countrywide's periodic filings.  Instead Mozilo signed Forms 10-K for the years ended 2005, 2006, and 2007, and Forms 10-Q for each quarter in 2005, 2006, and 2007 that falsely led investors to believe Countrywide's loans were of good quality.

### D. Mozilo Committed Insider Trading

#### 1. The Commission Has Adequately Alleged That Mozilo Possessed Material Inside Information

Mozilo urges the dismissal of the Commission's insider trading cause of action on the grounds that the Commission has not adequately alleged that Mozilo possessed material non-public information at the time that he entered into his 10b5-1 trading plans.  But the Complaint specifically alleges that Mozilo entered into the plans while in possession of all of the negative information about Countrywide set forth in paragraphs 32-72 of the Complaint.  CMPL ¶¶ 114-115. For all of the reasons set forth herein, the Commission has more than adequately alleged that Mozilo possessed material non-public information on the dates that he established his trading plans and Mozilo's motion to dismiss this cause of action should be denied.

#### 2. Mozilo's Stock Sales Were Made With Scienter

Mozilo argues that certain of his public statements in late 2006 and mid-2007 somehow negate any inference of scienter on his part.  They do not. Specifically, his September 2006 comment that he was "shocked" to learn the percentage of borrowers who were making minimum payments on Pay-Option loans (Motion at 34), was simply insufficient to actually apprise investors that Mozilo had concluded that the consequences of that choice by the borrowers would be "higher resets and therefore much higher delinquencies."  CMPL ¶ 63.

1   Similarly, Mozilo's 2006 comment that he had never seen the larger housing

2   market experience a "soft landing" (Motion at 35), was a far cry from actually

3   disclosing that the company of which he was then CEO had widened its

4   underwriting guidelines to the point that it was "flying blind" with respect to the

5   performance of the product that comprised one-fifth of its loan production, the

6   Pay-Option ARM.  CMPL ¶¶ 7, 68.

7        Mozilo gave final approval to create his October 2006 10b5-1 trading plan

8   on September 25, 2006, a mere one day before he sent the e-mail stating that

9   Countrywide was "flying blind" regarding the performance of Pay-Option loans.

10   CMPL ¶¶ 68, 118.  Because Mozilo was in possession of material non-public

11   information when he set up his trading plans, the Commission is therefore entitled

12   to the reasonable inference that he did so with scienter, and Mozilo's motion to

13   dismiss this claim must be denied.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d at

14   1055 (a court must accept as true all material allegations in the complaint, as well

15   as all reasonable inferences to be drawn from them, construing the complaint in

16   the light most favorable to the plaintiff).

17        **E.    Violation of Rule 13a-14(b) Is A Stand Alone Cause Of Action In**

18             **This Circuit**

19        At footnote 18 of his Motion, Mozilo argues that the Commission's Rule 13a-

20   14(b) cause of action should be dismissed for the further reason that it cannot

21   constitute a stand alone cause of action.  Mozilo's sole support for this contention is

22   an unreported case from of the Northern District of Illinois, *SEC v. Black*, 2008 WL

23   4394891 (N.D. Ill. Sept. 24, 2008).  Other courts, including one in this Circuit, have

24   allowed stand alone causes of action for violation of Rule 13a-14(b).  *SEC v.

25   Sandifur*, Fed. Sec. L. Rep. (CCH) P93,728; 2006 U.S. Dist. LEXIS 12243 at *23-25

26   (W.D. Wash. Mar. 2, 2006) (cause of action for violation of Rule 13a-14(b) pled with

27   sufficient particularity to withstand a motion to dismiss); *SEC v. Brady*, Fed Sec. L.

28   Rep. (CCH) P93,885; 2006 U.S. Dist. LEXIS 29086 at *17-18 (N.D. Tex. May 12,

1  2006) ("SEC has adequately pleaded that. . . [defendant] committed a primary

2  violation of Rule 13a-14(b)").  Accordingly, Mozilo's motion to dismiss this cause of

3  action must be denied.

4  **IV.    CONCLUSION**

5        For all the foregoing reasons, Mozilo's motion to dismiss should be denied.

6

7  Dated:  September 18, 2009            Respectfully submitted,

8

9                                       /s/ Lynn M. Dean
                                        John M. McCoy III
10                                      Lynn M. Dean
                                        Attorneys for Plaintiff
11                                      Securities and Exchange Commission

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On September 18, 2009, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ANGELO MOZILO'S MOTION TO DISMISS** on all the parties to this action addressed as stated on the attached service list:

[X]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]   **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

[X]   **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date:  September 18, 2009            /s/ Lynn M. Dean
                                   Lynn M. Dean

<u>SEC v. ANGELO MOZILO, et al.</u>
**United States District Court – Central District of California**
**Case No. CV 09-3994 VBF (AJWx)**
**(LA-3370)**

<u>SERVICE LIST</u>

Daniel P. Lefler, Esq.
David Siegel, Esq.
Randall L. Jackson, Esq.
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Email:  dlefler@irell.com
Email:  dsiegel@irell.com
Email:  rjackson@irell.com
***Counsel for Angelo Mozilo***

William R. McLucas, Esq.
Joseph K. Brenner, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Email:  william.mclucas@wilmerhale.com
Email:  joseph.brenner@wilmerhale.com
***Counsel for Angelo Mozilo***

David C. Marcus, Esq.
Caroline E. Kane, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Email:  david.marcus@wilmerhale.com
Email:  caroline.kane@wilmerhale.com
***Counsel for Angelo Mozilo***

Walter F. Brown, Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Email:  wbrown@orrick.com
***Counsel for David Sambol***

Nicolas Morgan, Esq.
DLA Piper
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6023
Email:  nicolas.morgan@dlapiper.com
***Counsel for Eric Sieracki***

33