1  JOHN M. McCOY, III, Cal. Bar No. 166244
   Email: mccoyj@sec.gov
2  SPENCER E. BENDELL, Cal. Bar No. 181220
   Email: bendells@sec.gov
3  LYNN M. DEAN, Cal. Bar. No. 205562
   Email: deanl@sec.gov
4  SAM S. PUATHASNANON, Cal. Bar No. 198430
   Email: puathasnanons@sec.gov
5  PARIS A. WYNN, Cal. Bar No. 224418
   Email: wynnp@sec.gov
6
   Attorneys for Plaintiff
7  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
8  Michele Wein Layne, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
9  Los Angeles, California 90036
   Telephone:  (323) 965-3998
10 Facsimile:   (323) 965-3908

11               **UNITED STATES DISTRICT COURT**

12               **CENTRAL DISTRICT OF CALIFORNIA**

13
14 SECURITIES AND EXCHANGE            Case No. CV 09-3994 JFW (MANx)
   COMMISSION,
15                                    **PLAINTIFF SECURITIES AND**
                Plaintiff,            **EXCHANGE COMMISSION'S**
16                                    **OPPOSITION TO DEFENDANT**
          vs.                         **DAVID SAMBOL'S MOTION TO**
17                                    **DISMISS**
   ANGELO MOZILO, DAVID SAMBOL,
18 AND ERIC SIERACKI,                 Date:        October 19, 2009
                                      Time:        1:30 p.m.
19              Defendants.           Place:       Courtroom 16
                                                   (Hon. John F. Walter)
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ........................................................................1

II.     SUMMARY OF FACTUAL ALLEGATIONS ................................3

    A.    The Material Omissions From Countrywide's Periodic
         Filings........................................................................................3

    B.    Sambol's Affirmative Misstatements To Investors ...........................4

    C.    Sambol's Role In The Preparation Of Countrywide's
         Filings........................................................................................6

    D.    The Omissions And Misstatements Were Material And
         Should Have Been Disclosed....................................................7

III.    SAMBOL'S MOTION TO DISMISS SHOULD BE DENIED ....................8

    A.    The Commission Has Asserted A Legally Viable Claim
         For Securities Fraud Against Sambol ....................................10

    B.    The Commission's Allegations Are Plausible....................................11

         1.    Countrywide's Description Of Its Loan Originations
              Was Misleading ...........................................................13

         2.    Countrywide's Disclosures About Its Pay-Option
              ARMS Were Misleading .............................................15

         3.    Countrywide's Definition Of Prime Loans Was
              Misleading....................................................................16

         4.    The Misrepresentations And Omissions Alleged
              In The Complaint Were Material................................17

         5.    Countrywide's MBS Filings And Press Releases Do
              Not Cure The Misrepresentations And Omissions
              Alleged In The Complaint ...........................................18

6.      Sambol's Statements In Investor Presentations Do Not Cure The Material Misrepresentations And Omissions Alleged In The Complaint ......................................22

7.      Sambol Substantially Participated In Making The Misrepresentations And Omissions Alleged In The Complaint .............................................................23

C.      The Misrepresentations And Omissions Alleged In The Complaint Are Not Merely Incomplete ...............................................25

1.      The Alleged Affirmative Misrepresentations Were Misleading...................................................................................25

2.      Sambol Had A Duty To Disclose Countrywide's Deteriorating Underwriting Standards And The Anticipated Consequences Of That Deterioration....................26

a.      Regulation S-K Requires Disclosure Of "Known Trends And Uncertainties"..................................26

b.      Countrywide's Internal Disclosure Policy Required Disclosure Of Known Trends And Uncertainties .........................................................28

c.      Sambol's Stock Sales Gave Rise To An Independent Duty To Disclose .......................................30

D.      Sambol's Statements At Countrywide's Earnings Calls Were Misleading.................................................................................30

E.      The Commission Has Adequately Alleged Sambol's Scienter.................................................................................................32

F.      Sambol Aided And Abetted Countrywide's Securities Violations .............................................................................................32

G.      Dismissal With Prejudice Is Not Warranted.......................................33

IV.     CONCLUSION..............................................................................................34

ii

# TABLE OF AUTHORITIES

Page

## CASES

*Atlas v. Accredited Home Lenders Holding Co.*
556 F. Supp. 2d 1142 (S.D. Cal. 2008).........................................................18

*Basic Inc. v. Levinson*
485 U.S. 224 (9th Cir. 1988)................................................. 10, 17

*Bd. of Trustees of Knox County Hosp. v. Shalala*
959 F. Supp. 1026 (S.D. Ind. 1997)................................................27

*Brody v. Transitional Hosps. Corp.*
280 F.3d 997 (9th Cir. 2002) .......................................................25

*Chevron USA, Inc. v. N.R.D.C.*
467 U.S. 837 (1984)......................................................................27

*Chiarella v. United States*
445 U.S. 222 (1980)......................................................................30

*Church of Scientology of Calif. v. Flynn*
744 F.2d 694 (9th Cir. 1984) .......................................................34

*Conley v. Gibson*
355 U.S. 41 (1957)................................................. 13, 34

*Fecht v. Price Co.*
70 F.3d 1078 (9th Cir. 1995) ........................................... 3, 9, 32

*Ganino v. Citizens Utils. Co.*
228 F.3d 154 (2d Cir. 2000)..........................................................21

*In re Cabletron Systems, Inc.*
311 F.3d 11 (1st Cir. 2002)...........................................................21

*In re Clearly Canadian Sec. Litig.*
875 F. Supp. 1410 (U.S. Dist. N. Cal. 1995).................................34

iii

*In re Countrywide Fin. Corp. Derivative Litig.*
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................18

*In re Downey Sec. Litig.*
CV 08-3261-JFW (RZx) (March 18, 2009)...................................................16

*In Re Gilead Sciences Sec. Litig.*
536 F.3d 1049 (9th Cir. 2008) ......................................................... 9, 13

*In re Glenfed, Inc. Sec. Litig.*
42 F.3d 1541 (9th Cir. 1994) ........................................................32

*In re Stac Electronic Sec. Litig.*
89 F.3d 1399 9th Cir. 1996)........................................................20

*In re Stellent, Inc. Sec. Lit.*
326 F. Supp. 2d 970 (D. Minn. 2004)........................................................21

*In re Wells Fargo Sec. Litig.*
12 F.3d 922 (9th Cir. 1993) ........................................................18

*In the Matter of Bank of Boston Corp.*
1995 WL 757874 (Dec. 22, 1995) ........................................................28

*Johnson v. Riverside Healthcare System, LP*
534 F. 3d 1116 (9th Cir. 2008) ........................................................9

*Kaplan v. Rose*
49 F.3d 1363 (9th Cir. 1994) ........................................................9

*Madison v. GMAC Mortgage, LLC*
2009 U.S. Dist. LEXIS 22294 (D. Ariz. Mar. 19, 2009)................................9

*Marks v. CDW Computer Centers, Inc.*
122 F.3d 363 (7th Cir. 1997) ........................................................21

*Monsanto v. E.P.A.*
19 F.3d 1201 (7th Cir. 1994) ........................................................27

*Navellier v. Sletten*
262 F.3d 923 (9th Cir. 2001) ........................................................27

iv

*Neubronner v. Milken*
     6 F.3d 666 (9th Cir. 1991) ...................................................................9

*Odom v. Microsoft Corp.*
     486 F.3d 541 (9th Cir. 2007) ..............................................................9

*Pacific Coast Medical Enters. v. Harris*
     633 F.2d 123 (9th Cir. 1980) ............................................................27

*Provenz v. Miller*
     102 F.3d 1478 (9th Cir. 1996) ..........................................................22

*SEC v. Fehn*
     97 F.3d 1276 (9th Cir. 1996) ............................................................33

*SEC v. Pham*
     500 F.3d 895 (9th Cir. 2007) ............................................................10

*SEC v. Rana Research, Inc.*
     8 F.3d 1358 (9th Cir. 1993) ..............................................................21

*SEC v. Texas Gulf Sulphur Co.*
     401 F.2d 833 (2d Cir. 1968).............................................................10

*Shapiro v. UJB Fin. Corp.*
     964 F.2d 272 (1st Cir. 1992)............................................................17

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group*
     2009 U.S. Dist. LEXIS 31832 (D. Ariz. Mar. 31, 2009)................9

*TSC Indus., Inc. v. Northway*
     426 U.S. 438 (1976)................................................................. 17, 21

*United States v. Naftalin*
     441 U.S. 768 (1979).........................................................................10

*United States v. O'Hagan*
     521 U.S. 642 (1997).........................................................................30

*Vess v. Ciba-Geigy Corp.*
     317 F.3d 1097 (9th Cir. 2003) .......................................................3, 9

v

*Warden v. Coolidge Unified School District*
    2008 U.S. Dist. LEXIS 101323 (D. Ariz. Dec. 15, 2008) ...............................9

## FEDERAL STATUTES

### Securities Act of 1933

Section 17(a)
    [15 U.S.C. § 77q(a)]........................................................................ 6, 10

### Securities Exchange Act of 1934

Section 10(b)
    [15 U.S.C. § 78j(b)] .................................................................. 6, 10, 33

## FEDERAL REGULATIONS

17 C.F.R. § 229.303 ................................................................... 26, 27, 30

17 C.F.R. § 229.303(a)(3)(ii) ...............................................................29

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ............................................................ 6, 10

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(6)........................................................................8

Fed. R. Civ. P. 9(b) .........................................................................3, 9

## COMMISSION RELEASES

*In re Caterpillar*
    Exchange Act Rel. No. 30532 (Mar. 31, 1992) ....................................... 27, 28

*Interpretation:  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*
     Exchange Act Rel. No. 48960 (Dec. 29, 2003) ................................ 19, 27, 28


## **OTHER AUTHORITIES**

Scott Frame, et al., *A Snapshot of Mortgage Conditions with an Emphasis on Subprime Mortgage Performance* (August 27, 2008) ..............................16

*The Handbook of Mortgage-Backed Securities*
     368 (Frank J. Fabozzi ed., 6th ed. 2006)........................................................16

## I.   **INTRODUCTION**

The gravamen of the Commission's Complaint in this matter is that quarter after quarter, and year after year, former Countrywide COO David Sambol and the other defendants in this matter misled investors by failing to disclose both the deteriorating underwriting standards and loan quality at Countrywide, and the dire implication of that decline in loan quality for Countrywide's largest revenue stream, its revenue from loan securitizations.  As a result of defendants' misleading conduct, Countrywide's share price rose over 68% from December 31, 2003 to December 31, 2006, and Sambol himself was able to cash out over $40 million in stock options.

In response to the Commission's detailed Complaint, Sambol argues that the Commission's allegations are implausible, (1) because the omissions and misrepresentations the Commission complains of were cured by other disclosures, including Countrywide's disclosed loss reserves; and (2) Sambol, who was head of loan production and sold $40 million of his stock holdings between April 2005 and December 2007, was not a substantial participant in crafting Countrywide's disclosures, and therefore cannot be responsible for any misleading statements in them.  Notably, Sambol does not argue that Countrywide was actually producing the "quality" mortgages it touted to investors.  The Commission has alleged sufficient facts to establish causes of action against Sambol for violations of the anti-fraud provisions of the federal securities laws and aiding and abetting Countrywide's violation of the reporting provisions.  Sambol's Motion to Dismiss ("Motion") lacks merit and should be denied.

Sambol makes three separate plausibility arguments:

First, Sambol argues that the omissions and misrepresentations alleged in the Complaint were cured by information that was available to investors about Countrywide's loan production in its periodic reports and MBS filings.  Motion at 1, 16-17. But the Complaint alleges that Sambol failed to disclose information that could not be distilled from Countrywide's earnings calls, periodic filings, and MBS

prospectuses.  The Complaint alleges that (1) Countrywide had widened its underwriting guidelines to historically unprecedented levels; (2) Countrywide was making exceptions even to those already widened guidelines in order to keep its origination numbers high; (3) Countrywide had evidence that borrowers were misrepresenting their income on stated income loans; and (4) Sambol had been warned by Countrywide's Credit Risk Management and Angelo Mozilo that defaults and delinquencies would rise as a result of these practices and impair Countrywide's access to the secondary securitization markets.  The statistical detail regarding loan originations and other statements regarding loan production Countrywide's in periodic filings cited by Sambol do not cure these material omissions.

Second, Sambol argues that the Commission's decision not to allege that Countrywide's loss reserves were misstated is "at odds" with its allegations that defendants concealed material information regarding Countrywide's underwriting standards.  Motion at 2.  This argument defies common sense.[1]  The Commission's decision not to charge a particular violation is neither an admission that no violation has taken place nor an admission that the statements in any filing are in fact correct.  Moreover, for all of the reasons set forth herein, loss reserves alone did not tell the full story of the deteriorating underwriting standards at Countrywide, and cannot be a substitute for the management discussion and analysis required by Regulation S-K.

Third, Sambol argues that the Commission's allegations do not establish that he substantially participated in the preparation of the misleading statements.  Motion at 2, 7-13.  As set forth in Section II.C and III.B.7, below, the Commission has in fact alleged Sambol's substantial participation, both as a signer of the documents beginning in late 2006, and as a reviewer who had the power to "trump" changes proposed by others.  To the extent that further facts are required, the Commission

---

[1]    Sambol himself seems to doubt the merits of this argument, since it appears in the introduction to the Motion, but is not argued elsewhere.

can allege that Sambol sub-certified the 2005 and early 2006 filings, and substantially participated in making decisions regarding Countrywide's MD&A for the 2006 Form 10-K.

Finally, Sambol argues that the Commission's Complaint fails to meet the particularity requirements of Federal Rule of Civil Procedure 9(b).  Sambol is incorrect.  Rule 9(b) is satisfied by allegations indicating the "who, what, where, when and how" of the fraudulent conduct.  *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see also Fecht v. Price Co*., 70 F.3d 1078, 1082 (9th Cir. 1995).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.  Fed. R. Civ. P. 9(b).  The Commission has satisfied the requirements of Rule 9(b) by alleging Sambol's participation in the preparation of Countrywide's periodic reports (CMPL ¶¶ 73-77), his knowledge of the omissions and misrepresentations in those filings (CMPL ¶¶ 4, 5, 8, 24-29, 35-46, 48-55, 62-72), and his failure to disclose management's view of the increased credit risk that Countrywide was taking on (CMPL ¶¶ 78-82, 83-90).  Moreover, as set forth in Section II, below, the Complaint sets forth in detail the alleged misrepresentations and omissions.  (CMPL ¶¶ 83-90).

Accordingly, Sambol's motion to dismiss should be denied in its entirety.

## II.   SUMMARY OF FACTUAL ALLEGATIONS

### A.   The Material Omissions From Countrywide's Periodic Filings

The Complaint alleges material omissions from Countrywide's periodic filings in 2005, 2006, and 2007, and further alleges that Sambol had knowledge of the material omitted facts, but failed to ensure that they were conveyed to Countrywide's investors in the periodic filings that he either reviewed or signed or in Countrywide's 2006 and 2007 securities offerings.  Specifically the Complaint alleges that:

(1) Countrywide was widening its underwriting guidelines to unprecedented levels (CMPL ¶¶ 4, 5, 8, 14, 24, 33-35, 36-40, 41-44, 52, 83, 88, 89);

(2) Countrywide was issuing numerous loans that failed to meet even those

1   aggressively widened guidelines (CMPL ¶¶ 8, 28-30, 49, 54-55);

2       (3) there was evidence of widespread borrower and/or broker fraud in its

3   stated income loan products (CMPL ¶¶ 37, 40, 90);

4       (4) the deteriorating quality of the loans that Countrywide was writing would

5   increase its risk of defaults and delinquencies to dangerous levels (CMPL ¶¶ 4, 5,

6   27, 38-40, 41-46, 48-50, 54-55, 63-65, 71); and

7       (5) the poor quality of Countrywide's loans threatened to curtail the

8   company's ability to sell those loans in the secondary mortgage market (CMPL ¶¶

9   4, 5, 45, 46, 69).

10      **B.    Sambol's Affirmative Misstatements To Investors**

11      Moreover, the Complaint specifically alleges that Sambol made false and

12  misleading affirmative statements, including:

13      (1) statements in Countrywide's Forms 10-K for 2005, 2006, and 2007 that

14  Countrywide "manage[d] credit risk through credit policy, underwriting, quality

15  control and surveillance activities" and touting the Company's "proprietary

16  underwriting systems . . . that improve the consistency of underwriting standards,

17  assess collateral adequacy and help to prevent fraud."  CMPL ¶ 85.  These

18  statements were false, because Sambol knew that Countrywide was originating

19  increasing percentages of poor quality loans, and loans made as exceptions to

20  Countrywide's already extremely lax underwriting guidelines (CMPL ¶¶ 4, 5, 24,

21  28-30, 33-35, 36, 40, 41-46, 48-50, 52, 54-55, 63-65, 71, 83, 88, 89);

22      (2) statements in Countrywide's 2005 and 2006 Form 10-K that Countrywide

23  ensured its ongoing access to the secondary mortgage market by consistently

24  producing quality mortgages.  These statements were false.  Sambol knew that

25  Countrywide was originating increasing percentages of poor quality loans that did

26  not even comply with Countrywide's own wide underwriting guidelines. (CMPL

27  ¶¶ 4, 5, 8, 31, 35-38, 40, 45, 46, 49, 52, 54, 55, 60-62, 69, 86, 90);

28      (3) a statement in Countrywide's 2006 Form 10-K that "[w]e believe we

4

have prudently underwritten" Pay-Option ARM loans. CMPL ¶¶ 59, 90. This statement was false because Sambol had knowledge that the risks of the Pay-Option loan to the company were severe, and the median time to reset on the loans was getting shorter as negative amortization on them increased (CMPL ¶¶ 61-62, 64, 65-71, 90);

(4) deceptive descriptions of "prime loans" in Countrywide's 2005, 2006, and 2007 Forms 10-K that did not inform investors that Countrywide's definition of such loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality and with additional credit risk factors such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and higher (CMPL ¶¶ 8, 18, 20-21);

(5) the misleading use of the term "nonprime" in Countrywide's periodic filings because Countrywide failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this category also included loans with significant additional layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or combined loan to value ratios of 95% and higher; and (5) loans made to borrowers with recent bankruptcies and late mortgage payments (CMPL ¶¶ 8, 22);

(6) a statement at a May 24, 2005 investor day presentation, where Sambol reassured analysts that Countrywide addressed the higher credit risk associated with adjustable rate mortgage programs by enforcing different underwriting criteria such as "higher credit scores or lower loan to value ratios (CMPL ¶ 99);" and

(7) a statement at a September 13, 2006 Fixed Income Investor Forum, where Sambol downplayed Countrywide's participation in originating subprime loans by falsely stating that Countrywide had been "on the sidelines" of the subprime market. CMPL ¶ 99.

1

**C.**     **Sambol's Role In The Preparation Of Countrywide's Filings**

2        The Complaint also alleges that Sambol substantially participated in the

3   preparation of Countrywide's Forms 10-Q and 10-K.  Sambol received and

4   reviewed drafts of the documents, signed the Forms 10-Q for the third quarter of

5   2006 and each quarter in 2007, and signed the Form 10-K for the year ended 2007.

6   CMPL ¶¶ 73-77.  In addition, Sambol was an active participant in decisions about

7   disclosures regarding Countrywide's widened underwriting standards (CMPL ¶

8   78), and is identified in the Complaint as a reviewer whose decisions trumped the

9   disclosures requested by Countrywide's Chief Credit Risk Officer in the second

10   quarter of 2007.[2]  CMPL ¶¶ 79-81.

11        The Complaint further alleges that Sambol violated Section 17(a) of the

12   Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 because he

13   directly participated in Countrywide's 2006 and 2007 securities offerings, but

14   failed to take any action to correct the false and misleading statements in the

15   offering documents, which he signed.  Countrywide's materially false and

16   misleading periodic reports were incorporated by reference in the February 9, 2006

17   Form S-3 and the November 15, 2007 Form S-3 signed by Sambol.[3]  CMPL ¶ 110.

18

19   [2]       The Commission inadvertently omitted from the Complaint allegations that

20   Sambol sub-certified the filings prior to his becoming COO in September 2006,
and participated in a discussion regarding whether to make additional disclosures

21   regarding underwriting guidelines in connection with the 2006 Form 10-K.  The
Commission is prepared to allege these matters if an amendment is required.

22   [3]       Sambol argues that these allegations are insufficient in part because the
Commission did not allege which periodic filings were incorporated in which Form

23   S-3 registration statement.  Motion at 31, fn. 22.  The Commission believes it has
alleged sufficient facts to establish this Cause of Action, but to the extent that the

24   Court disagrees, the Commission can allege that the February 9, 2006 Form S-3
incorporated by reference the Form 10-K for the year-ended 2005, and the

25   November 15, 2007 Form S-3 incorporated by reference the Form 10-K for the
year ended 2006.  Sambol's other arguments regarding this cause of action, that the

26   Commission has not identified the allegedly false statements that were
incorporated by reference and has failed to allege "negligence" in connection with

27   this claim, are simply incorrect.  Motion at 31, fn. 22.  As set forth in Section II. A.
and B. herein, the Complaint specifically identifies the alleged  misrepresentations

28   and omissions in the periodic filings.  Moreover, the Commission has alleged that
Sambol acted with scienter in connection with the material omission and

6

Moreover, the Complaint alleges that Sambol received warnings about Countrywide's expanded credit risk as early as May 2005 (CMPL ¶¶ 36, 61), received additional warnings throughout 2006 and 2007 (CMPL ¶¶ 5, 8, 35, 38-40, 41-44, 48-53, 54-55, 62, 64, 68-72, 78-81, 83), was on a notice that a material percentage of borrowers were misstating their incomes on stated income loans (CMPL ¶ 40, 90), and directly participated in decisions to overrule revisions to the credit risk disclosures in Countrywide's periodic filings which were proposed by Countrywide's Chief Credit Risk Officer as part of his obligation to report known trends and uncertainties to senior management for inclusion in Countrywide's periodic filings.  (CMPL ¶ 78-82).

By ignoring the many warnings about the consequences of underwriting guideline expansion, and the potential for increased defaults and delinquencies that were being sounded by Mozilo, the Chief Credit Risk Officer, and the Credit Risk Department, Sambol recklessly failed to disclose correct information regarding Countrywide's declining underwriting standards and to discuss in Countrywide's MD&A the known negative trends it was experiencing.

**D.    The Omissions And Misstatements Were Material And Should Have Been Disclosed**

The omissions and misrepresentations detailed in the Complaint would have been material to a reasonable investor.  As set forth in detail in the Complaint, Countrywide's periodic filings portrayed Countrywide as a primarily prime lender with "prudent" underwriting guidelines and a strict quality control process.  CMPL ¶¶ 4, 6, 18 (e.g., statistics stating that 77.1% of Countrywide's loan production in 2006 was prime).  But Sambol, as the "head of the production divisions" at Countrywide (CMPL ¶¶ 11, 51 and Motion at 4), knew that Countrywide had widened its underwriting guidelines beyond any historical precedent, and had been

misrepresentations contained in the periodic filings incorporated by reference into the registration statements.  CMPL ¶ 126.

warned that the defaults and delinquencies that would arise from that change in guidelines would have a material unfavorable impact on Countrywide's revenues. Indeed, the Complaint alleges that Countrywide's internal Chief Risk Management Officer had identified these trends, predicted their consequences as early as September 2004, repeatedly warned of the danger of Countrywide's underwriting strategy during the relevant time period, and requested that management add a discussion of these trends to Countrywide's filings.  CMPL ¶¶ 33-39, 41-47, 54, 78-82.  These warnings went unheeded, and the required disclosures were never made. Without this information, disclosure of positive information regarding Countrywide's loan production and the risks associated with those loans was misleading, leaving investors with an incomplete picture of Countrywide's financial condition.

The market's reaction to the eventual disclosures of Countrywide's underwriting deficiencies demonstrates how material this information was to investors.  As the information trickled into the markets in mid-2007, Countrywide experienced a series of stock price losses.  There was an 11% share price decline following Countrywide's July 24, 2007 earnings call, when it provided investors with statistical information regarding its portfolio of loans held for investment that revealed that its definition of prime loans included loans to borrowers with FICO scores as low as 500, and that 80% of its Pay-Option loans were based upon reduced documentation.  CMPL ¶ 103.  There was an additional approximately 11% decline in Countrywide's share price on August 16, 2007 after Countrywide was forced to drawdown its $11.5 billion credit facility, an event Countrywide acknowledged was necessitated by the over 97% decline in Countrywide's revenue from mortgage securitizations from 2006 to 2007 and its inability to bridge the gap by issuing commercial paper.  CMPL ¶¶ 104, 108.

## III.    SAMBOL'S MOTION TO DISMISS SHOULD BE DENIED

Dismissal pursuant to Rule 12(b)(6) is proper only where there is a "lack of cognizable legal theory" or "the absence of sufficient facts alleged under a

1    cognizable legal theory." *Johnson v. Riverside Healthcare System, LP*, 534 F. 3d

2    1116, 1121-22 (9th Cir. 2008). There is a strong presumption against dismissing

3    an action for failure to state a claim, as the issue is not whether a plaintiff will

4    ultimately prevail on the merits but whether the claimant is entitled to offer

5    evidence in support of its claims. *Warden v. Coolidge Unified School District*,

6    2008 U.S. Dist. LEXIS 101323, * 5-6 (D. Ariz. Dec. 15, 2008). As such, a court

7    must accept as true all material allegations in the complaint, as well as all

8    reasonable inferences to be drawn from them, construing the complaint in the light

9    most favorable to the plaintiff. *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049,

10    1055 (9th Cir. 2008).

11      Rule 9(b) is satisfied by allegations indicating the "who, what, where, when

12    and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097,

13    1106 (9th Cir. 2003); *see also Fecht v. Price Co.*, 70 F.3d at 1082. Malice, intent,

14    knowledge, and other conditions of a person's mind may be alleged generally."

15    Fed. R. Civ. P. 9(b). The ultimate test for pleading sufficiency under Rule 9(b) is

16    whether the complaint identifies the circumstances constituting the fraud such that

17    a defendant can prepare an adequate answer. *Odom v. Microsoft Corp.*, 486 F.3d

18    541, 553 (9th Cir. 2007); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994);

19    *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group,* 2009 U.S. Dist.

20    LEXIS 31832, * 47-48 (D. Ariz. Mar. 29, 2009) (the purpose of Rule 9(b)'s

21    heightened pleading standard is "to give defendants notice of the particular

22    misconduct which is alleged to constitute the fraud charged so that they can defend

23    against the charge and not just deny that they have done anything wrong") (*quoting*

24    *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1991) (internal quotations and

25    citation omitted)); *Madison v. First Magnus Fin. Corp.*, 2009 U.S. Dist. LEXIS

26    22294, * 12-13 (D. Ariz. Mar. 19, 2009) (same). Here, the Commission has

27    satisfied the requirements of Rule 9(b). The Complaint alleges Sambol's role in

28    the fraud by alleging his participation in the preparation of Countrywide's periodic

1   reports (CMPL ¶¶ 73-77), his knowledge of the omissions and misrepresentations
2   in those filings (CMPL ¶¶ 5, 24-29, 35-38, 55, 61), and his failure to ensure that
3   management's view of the increased credit risk that Countrywide was taking on
4   was explained in those filings (CMPL ¶¶ 83-90).  Moreover, as set forth in Section
5   II, above, the Complaint sets forth in detail the alleged misrepresentations and
6   omissions.  (CMPL ¶¶ 83-90).

7       **A.**     **The Commission Has Asserted A Legally Viable Claim For**
8                  **Securities Fraud Against Sambol**

9       Section 17(a) of the Securities Act prohibits fraud in the offer or sale of
10  securities, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
11  prohibit fraud in connection with the purchase or sale of any security.  A person
12  commits fraud "in connection with" the purchase or sale of any security if he or
13  she makes a misrepresentation or omission in a periodic report filed with the
14  Commission, a press release, other public statement.  *See Basic Inc. v. Levinson*,
15  485 U.S. 224, 231-32 (9th Cir. 1988); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d
16  833, 860-62 (2d Cir. 1968).  A person commits fraud in the offer and sale of a
17  security if he or she makes a misrepresentation or omission in offering and selling
18  in an initial distribution or in secondary market trading of the security.  *See United*
19  *States v. Naftalin*, 441 U.S. 768, 777-78 (1979).

20      To state a claim alleging material misstatements or omissions under Section
21  17(a) and Section 10(b) and Rule 10b-5, the Commission must allege and prove
22  essentially the same elements: (1) a material misstatement or omission; (2) in
23  connection with the offer or sale, and in connection with the purchase or sale, of a
24  security; (3) by means of interstate commerce.  *SEC v. Phan*, 500 F.3d 895, 907-08
25  (9th Cir. 2007).   The Commission has properly alleged all of those elements here.
26  In response, Sambol argues that the Complaint fails to allege particularized facts
27  showing that he made any actionable misstatement regarding loan quality because:
28  (1) he did not substantially participate in making Countrywide's disclosures; (2)

the alleged misstatements are merely "incomplete;" and (3) Countrywide's other public disclosures somehow cured any alleged deficiencies in those statements. But Sambol's arguments ignore the material misrepresentations alleged by the Complaint, and rely on reference to materials that (1) are not properly considered in a motion to dismiss; and (2) cannot cure the defects in Countrywide's disclosures alleged in the Complaint.

### B.   The Commission's Allegations Are Plausible

Despite Sambol's arguments to the contrary, the Complaint's allegations as to Sambol are plausible. The Complaint alleges that Sambol knew that Countrywide's underwriting standards were declining, knew what the consequences of that decline would be, and made no effort to ensure investors were informed of these risks. Specifically, the Complaint alleges that:

- Sambol, as head of the loan production divisions, was on notice of the correlation between reduced documentation underwriting and higher default rates. CMPL ¶¶ 35;

- Sambol was on notice of the increased risk of defaults and delinquencies in loans made on an exception basis. CMPL ¶¶ 54-55;

- Sambol was a member of Countrywide's Credit Risk Committee and attended meetings of the Asset and Liability Committee, and at meetings held throughout 2005 and 2006, members of those committees were advised of the increasing balance sheet risk that Countrywide was taking on through widened underwriting guidelines and loans made on an exception basis. CMPL ¶¶ 36, 38;

- Sambol was a member of the Countrywide committee charged with approving underwriting guideline expansions and in late 2006, approved a guideline expansion known internally as "Extreme Alt-A," which permitted 100% financing layered with additional credit risk factors such as stated income, low FICO scores, and non-owner occupied collateral. CMPL ¶¶ 39, 43;

- Sambol was on notice as early as June 2006 that 50% of the stated

11

1   income loans evaluated in a quality control audit at Countrywide Bank showed an

2   income disparity of greater than 10% from the borrower's IRS tax records.  CMPL

3   ¶ 40.  Of those, 69% had an income disparity of greater than 50%.  CMPL ¶ 40;

4        •      Sambol was repeatedly cautioned by Countrywide's Chief Credit Risk

5   Officer that as a result of its "matching" strategy, Countrywide's underwriting

6   guidelines were a "composite of the outer boundaries across multiple lenders" and

7   "likely among the most aggressive in the industry."  CMPL ¶¶ 41-44;

8        •      Sambol was on notice as early as April 2006 that Countrywide's

9   subprime underwriting was not in compliance with guidelines and that loan quality

10  had deteriorated to the point where loan pricing was not mitigating the risk, yet

11  Sambol opposed Credit Risk Management's suggestion that Countrywide increase

12  the minimum FICO score on the product.  CMPL ¶¶ 49-52;

13       •      Sambol was on notice that as early as December 2006 Countrywide

14  was already internally predicting that its 2006 vintage of subprime loans would be

15  the worst performing on record.  CMPL ¶ 52; and

16       •      Sambol was on notice as early as April 2006 that Pay-Option loans

17  were negatively amortizing at a higher than expected rate resulting in sooner than

18  anticipated payment shock for borrowers and higher defaults and delinquencies.

19  CMPL ¶¶ 63-65, 68-69, 71;

20       •      Sambol substantially participated in preparing Countrywide's

21  disclosures.  CMPL ¶¶ 78-81;

22       •      Sambol made at least two affirmative misstatements about

23  Countrywide's underwriting standards in an earnings call and an investor forum.

24  CMPL ¶ 99;

25  ///

26  ///

27  ///

28  ///

1    •    Beginning in 2006, the Chief Credit Risk Officer unsuccessfully urged

2    that Countrywide disclose more information about its widened underwriting standards,

3    and Sambol participated in at least one  decision not to do so.[4]  CMPL ¶¶ 78, 80-81;

4    •    From May 9, 2005 through the end of 2007, Sambol exercised stock

5    options and sold the shares for a total return of over $40 million.  CMPL ¶ 109.

6    Accordingly, the Complaint has alleged specific facts that show that Sambol

7    knew or was reckless in not knowing of the serious deterioration in Countrywide's

8    underwriting standards and the anticipated consequences of that deterioration, had

9    an affirmative duty to disclose that information to investors both by virtue of his

10   participation in the disclosure process and because of his stock sales, and yet not

11   only made no effort to apprise investors of the true state of affairs at Countrywide,

12   but actively sought to conceal it.  One rational inference from that failure is that he

13   sought to prop up the value of his Countrywide stock in order to allow him to

14   divest himself of as much of his holdings as possible in advance of Countrywide's

15   collapse.  The Commission is entitled to the benefit of this reasonable inference on

16   a motion to dismiss.  *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957) (a court must

17   accept as true all material allegations in the complaint, as well as all reasonable

18   inferences to be drawn from them, construing the complaint in the light most

19   favorable to the plaintiff); *In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1055 (the

20   court must "accept the plaintiffs' allegations as true and construe them in the light

21   most favorable to plaintiffs").

22       1.    <u>**Countrywide's Description Of Its Loan Originations Was**</u>

23            <u>**Misleading**</u>

24   Despite Sambol's knowledge of the true state of affairs at Countrywide, as

25   set forth in Section II.B and III.B above, the Complaint alleges that Sambol made

26   no effort to disclose these facts to investors.  Rather, Sambol allowed Countrywide

27

28   _____

[4]    As noted elsewhere herein, the Commission can allege Sambol's
participation in another such discussion in connection with the 2006 Form 10-K.

13

to make affirmative misrepresentations in its periodic filings regarding its loan "quality," including statements that it (1) "managed credit risk through credit policy, underwriting, quality control and surveillance activities;" (2) "consistently produc[ed] quality mortgages;" and (3) believed it had "prudently underwritten" its Pay-Option loans.  In addition, the Complaint alleges that Countrywide represented on a percentage basis that the majority of its loans were "prime" mortgage loans (CMPL ¶ 18), without disclosing the material fact that what it called "prime" loans included loans made to borrowers with subprime FICO scores.  CMPL ¶¶ 20-21.

Sambol makes much of the disclosures regarding environmental and general market risk that began appearing in Countrywide's periodic reports in 2007. Sambol argues that disclosures in the First Quarter Form 10-Q regarding the "contraction in the housing markets" and a "slowdown in home price appreciation" (Motion at 21), and disclosures in the second and third quarter Forms 10-Q regarding disruptions in the secondary market caused by "reduced investor demand for mortgage loans" (Motion at 23) were curative of the material omissions alleged by the Commission.  While external events such as these no doubt exacerbated the problems at Countrywide, references to such events cannot be a substitute for full and complete disclosure regarding the internally identified Countrywide-specific trends toward lower underwriting standards and increased defaults that had been identified by Countrywide management as early as 2004.

It was materially false and misleading to assure investors that Countrywide was managing its credit risk through, "underwriting;" was practicing "prudent underwriting;" and was producing "quality mortgages" through that underwriting, when Sambol was on notice of facts to the contrary.  CMPL ¶¶ 83-90.  As alleged in the Complaint, Countrywide had arguably the "most aggressive" underwriting guidelines in the market (CMPL ¶ 41), had "ceded [its] risk standards and balance sheet to whoever ha[d] the most liberal [underwriting] guidelines" (CMPL ¶ 44), was relying on making exceptions to those guidelines to prop up its market share,

had guideline exceptions that were increasing its credit risk, expected defaults and delinquencies to rise as a result of its deteriorating underwriting standards, and was headed by a CEO who internally acknowledged in June 2006 that the company was "flying blind" with respect to its attempts to assess the future performance of its loan portfolio.  CMPL ¶¶ 4-5, 7-8, 35-38, 49, 52, 53, 55, 61-62, 64, 68-69, 75, 78-79, 81.  Accordingly, the Commission has more than adequately alleged Countrywide's misstatements regarding its loan quality, as well as its attempts o distinguish itself as a prime quality mortgage lender.

## 2.    Countrywide's Disclosures About Its Pay-Option ARMS Were Misleading

Sambol also argues that Countrywide's generic disclosures about the risk characteristics of the Pay-Option ARM loan in its 2006 third quarter Form 10-Q were sufficient to apprise investors of the inherent risks in Countrywide's underwriting strategy.  Motion at 20-21.  The Commission does not dispute that Countrywide's periodic filings began describing the Pay-Option loan more fully in 2006, nor does it dispute that Countrywide's disclosures regarding Pay-Options became more fulsome over time.  But disclosures regarding the **general** risks associated with Pay-Option ARM loans, coupled with bare statistics regarding the average original loan to value ratio, FICO score, amount of negative amortization, and delinquencies in the portfolio held for investment at Countrywide Bank do not cure the misrepresentation made by Countrywide with Sambol's participation – "[w]e believe we have prudently underwritten" Pay-Option loans.[5]

The Complaint alleges that Countrywide's CEO, its Chief Credit Risk Officer, and its Credit Risk department issued repeated warnings about (1) Countrywide's widened underwriting guidelines; (2) the increased use of

---

[5]    This portfolio held at Countrywide Bank was a subset of Countrywide's Pay-Option originations, as it sold Pay-Option loans into secondary market securitizations.  No statistics on those loans were disclosed in the Forms 10-K.

1  underwriting exceptions; (3) the rapidly rising rate of negative amortization and the

2  consequent risk of payment shock on Pay-Option loans; (4) the anticipated rise in

3  defaults and delinquencies in Countrywide's loans, including the Pay-Option, and

4  (5) the dire consequences to Countrywide's ability to sell loans into the secondary

5  market, yet these material facts were never disclosed to investors.

6      The descriptions of the Pay-Option loan features simply did not convey to

7  investors what Countrywide's management knew about these loans – borrowers

8  were **in fact** misrepresenting their income in stated documentation loans like the

9  Pay-Option (CMPL ¶¶ 40, 90), the loans **were in fact** negatively amortizing at a

10 higher than expected rate (CMPL ¶¶ 62-65); borrowers would **in fact** suffer

11 payment shock that would be "difficult if not impossible for them to manage"

12 (CMPL ¶ 65), and as early as 2006 Mozilo wanted Countrywide to stop holding

13 Pay-Option loans for investment at Countrywide Bank.  CMPL ¶¶ 68-71.

14         **3.    Countrywide's Definition Of Prime Loans Was Misleading**

15     "Prime credit quality" is a widely used term in the credit granting industry

16 and it is generally understood to mean borrowers with a FICO score above 620.

17 CMPL ¶ 21.  *In re Downey Sec. Litig.*, CV 08-3261-JFW (RZx) at 7 (March 18,

18 2009), citing Scott Frame, et al., *A Snapshot of Mortgage Conditions with an*

19 *Emphasis on Subprime Mortgage Performance*, at 2 (August 27, 2008) ("A

20 subprime mortgage is one made to a borrower with a poor credit history (e.g., a

21 FICO score below 620)"); and *The Handbook of Mortgage-Backed Securities* 368

22 (Frank J. Fabozzi ed., 6th ed. 2006) ("FICO scores below 620 place borrowers

23 squarely in the subprime category.").  Yet the Complaint alleges that no FICO

24 score was too low to be categorized as prime at Countrywide, and that

25 Countrywide's definition of "prime loans" included loans with increased credit risk

26 characteristics such as reduced documentation, stated income, high loan to value

27 (reduced equity), and negative amortization (Pay-Options).  CMPL ¶¶ 20-21.  This

28 made the statistics that Countrywide disclosed regarding the percentages of its loan

production that were prime or non-prime materially misleading.[6]  See CMPL ¶ 18.

Sambol argues that this definition was not misleading because Countrywide disclosed in its July 24, 2007 earnings call that its definition of prime loans included subprime FICO scores.  Motion at 27.  The Commission acknowledged this fact in its Complaint.  CMPL ¶¶ 21, 103.  But Sambol's admission that some disclosure was finally made in July 2007 cannot cure the fact that the definition of prime was misleading in the 2005 and 2006 10-Ks.  Nor does the fact that this piece of information was disclosed in July 2007 cure the other material omissions in the third quarter 2007 Form 10-Q or the 2007 Form 10-K – specifically, Countrywide (1) had widened its guidelines to historically unprecedented levels; (2) was making significant exceptions even to those widened guidelines; and (3) knew that a shocking percentage of its borrowers on stated income loans were misrepresenting their incomes.  Countrywide's definition of "prime" loans was misleading, as was Countrywide's attempt to hold itself out as a prime lender.

### 4.    The Misrepresentations And Omissions Alleged In The Complaint Were Material

A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  *See Basic Inc. v. Levinson*, 485 U.S. at 231-32; *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976).  The omissions and misstatements alleged in the Complaint concern facts that would be material to investor.  A reasonable investor would want adequate and accurate disclosures regarding Countrywide's loan underwriting, loan quality, and credit risk.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[I]f a defendant represents that its lending practices are 'conservative' . . ., the securities laws are clearly implicated if it nevertheless

---

[6]    It also rendered another statement in Form 10-K misleading:  Countrywide's Forms 10-K for 2005, 2006, and 2007 all specifically stated that "[t]he majority of our loan production consists of Prime Mortgage Loans."

1    intentionally or recklessly omits certain facts contradicting these representations.");

2    *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D.

3    Cal. 2008) ("as a mortgage lender, Accredited's underwriting practices would be

4    among the most important information looked to by investors."); *In re Countrywide*

5    *Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1072  (C.D. Cal. 2008) (allegedly

6    false "statements included representations, for example, that Countrywide actively

7    managed credit risk, applied more stringent underwriting standards for riskier loans

8    such as ARMS, and only retained high credit quality mortgages in its loan portfolio.

9    The importance of the quality of Countrywide's loans held for both sale and

10   investment underscores the materiality of these statements."); *see also In re Wells*

11   *Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993) ("Where a defendant

12   affirmatively characterizes management practices as 'adequate' or loans as

13   'substantially secured,' 'a defendant declares the subject of its representation to be

14   material to the reasonable shareholder, and thus is bound to speak truthfully.'")

### 5.   Countrywide's MBS Filings And Press Releases Do Not Cure The Misrepresentations And Omissions Alleged In The Complaint

18        Sambol argues that statistical data in Countrywide's monthly press releases

19   regarding the percentage of Pay-Option and nonprime loans Countrywide was

20   originating and statistics contained in Countrywide's MBS prospectuses cured the

21   material omissions and misstatements alleged in the Complaint.  Motion at 16-17.

22   But the statistics about Countrywide's loan originations referenced in Sambol's

23   Motion do not include any discussion about Countrywide's relaxing underwriting

24   guidelines, the percentage of exception loans Countrywide was making, the

25   evidence that borrowers were misstating their income on stated income loans, or the

26   deteriorating quality of Countrywide's loans, and therefore cannot be a substitute for

27   the disclosure of management's analysis of known trends and uncertainties required

28   by Regulation S-K.  Expecting investors to locate and review MBS prospectuses and

other disparate data sources ignores the very point of Regulation S-K's requirement that MD&A in periodic filings provide investors with a picture of the company through the eyes of management. *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Exchange Act Rel. No. 48960 at Section I.B (Dec. 29, 2003) ("MD&A Release"). Nor does the disclosure of such statistics negate the inference that Sambol's failure to apprise investors of these important facts was deliberate.

The prospectuses for the MBS securitizations were not readily available to purchasers of Countrywide's equity securities. Sambol argues that the MBS prospectuses were readily available to investors simply because they were filed on Edgar, and the SEC's website is a recognized distribution channel. Motion at 16, fn 15. That argument, while correct as far as it goes, ignores the fact that these prospectus supplements were not filed under the Countrywide Financial name. Countrywide sold its mortgage pools through four **indirect** subsidiaries, CWALT, LLC, CWABS, LLC, CWMBS, LLC, or CWHEQ, LLC. The prospectus supplements and disclosures for these securitizations were therefore not filed on Edgar under the Countrywide name, but rather under the name of these various special purpose entities. Thus, investors in Countrywide could not reasonably be expected to know that the MBS prospectuses of issuers named CWALT, LLC, CWABS, LLC, CWMBS, LLC, or CWHEQ, LLC contained information relevant to their decision to invest in Countrywide Financial Corporation. Moreover, even if an investor did know about the raw data about loans contained in the MBS prospectuses, that information would not relieve Countrywide of its obligation under Item 303 of Regulation SK to provide MD&A disclosures of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Nor do the MBS disclosures provide information about the loans that Countrywide held for

investment on its balance sheet, loans as to which it bore the entire credit risk.

Likewise, statements and statistical data in Countrywide's earnings press releases regarding its origination volumes and delinquency trends were insufficient to adequately inform investors of the known trends and uncertainties regarding Countrywide's underwriting that Credit Risk Management and Mozilo had warned Sambol about.  None of these alternative sources of information adequately disclosed Countrywide's deteriorating underwriting standards.  The Complaint alleges that Sambol had actual knowledge of the deteriorating quality of Countrywide's loan production and its consequences, but that information does not appear in the periodic reports he reviewed and signed.  Sambol cannot rely on the MBS filings and Countrywide press releases to cure the omissions and misrepresentations alleged in the Complaint.

Moreover, none of these materials are the proper basis for a dismissal at this stage of the proceedings.[7]  In citing to these extraneous materials, which are not referenced in the Complaint, Sambol improperly asks this Court to make a factual assessment that the information which the Complaint alleges was omitted from Countrywide's periodic filings would not have changed the total mix of information available to investors, because other information regarding Countrywide's loan originations was available in the marketplace.  But the "'materiality' of an omission is a fact-specific determination that should ordinarily be assessed by a jury." *In re Stac Electronic Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996), quoting *Fecht v. The Price Co.,* 70 F.3d 1078, 1080-81 (9th Cir. 1995) ("[o]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law."). *See also. In re Cabletron Systems, Inc.*, 311 F.3d

---

[7]    Nor is the media coverage cited by Sambol.  Motion at 19.  For all the reasons cited in Section III.C.2 below, such coverage cannot be an adequate substitute for disclosure about the material deterioration in underwriting standards and its consequences alleged in the Complaint.

11, 34 (1st Cir. 2002) ("the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss").  "The determination of materiality requires delicate assessments of the inferences a 'reasonable [investor]' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450.

Sambol's apparent assertion of a "truth on the market" defense implicitly asks the Court to determine what information a reasonable investor would deem important in making an investment decision.  The "truth-on-the-market" defense posits that a misrepresentation "is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  This asserted defense, however, is not appropriately considered on a motion to dismiss because an analysis of the merits of the defense would require consideration of substantial evidence outside the complaint.[8]  *See, e.g., Ganino,* 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality").  Sambol would have to show, for instance, that "material omissions were 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression.'"  *In re Stellent, Inc. Sec. Lit.*, 326 F. Supp. 2d 970, 986 (D. Minn. 2004)

---

[8]    It is also not appropriate in a Commission action for the further reason that the fraud-on-the-market theory, to which the "truth-on-the-market" defense may be asserted, is a means for a private securities law plaintiff to prove reliance on a material misstatement.  *See In re Apple Computer*, 886 F.2d at 1113-14.  But unlike a private plaintiff, the Commission is not required to prove reliance in a securities fraud case, and the fraud-on-the-market cases are therefore inapposite. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993).

1    (quoting *In re Apple Computer*, 886 F.2d at 1116); *see also Provenz v. Miller*, 102

2    F.3d 1478, 1492-93 (9th Cir. 1996).  Accordingly, a defendant's burden in

3    establishing this defense is "extremely difficult, perhaps impossible, to meet" even at

4    the summary judgment stage.  *In re Columbia Sec. Lit.*, 155 F.R.D. 466, 482

5    (S.D.N.Y 1994).  Sambol has not and cannot meet that burden here.

6         **6.    Sambol's Statements In Investor Presentations Do Not Cure**

7              **The Material Misrepresentations And Omissions Alleged In**

8              **The Complaint**

9         In addition to arguing that Countrywide made appropriate disclosures

10   regarding its credit risk in the company's MBS prospectus supplements, earnings

11   calls, and investor presentations, Sambol argues that he personally made

12   statements to equity investors and analysts that cured Countrywide's misstatement

13   and omissions.  Motion at 18.  Specifically, Sambol cites statements he made that

14   indicated that Countrywide had a matching strategy and sought to maintain the

15   broadest product line in the industry.  Motion at 18.  But the statements identified

16   by Sambol cannot cure Sambol's failure to apprise investors that throughout 2005

17   and 2006 Countrywide was widening its underwriting guidelines to unprecedented

18   levels, was making exceptions even to its widened guidelines, and that

19   management knew that the deteriorating quality of the loans that Countrywide was

20   writing would ultimately curtail the company's ability to sell those loans in the

21   secondary mortgage market.

22        Statements in analyst forums and earnings calls that Countrywide sought to

23   have the broadest product line in the industry were insufficient to cure the material

24   misstatements in Countrywide's periodic filings.  Such statements, which Sambol

25   admits were qualified by references to "genuinely" qualifying for a loan and loans

26   "legitimately" offered by competitors (Motion at 18), simply do not convey

27   Countrywide's virtual abandonment of underwriting standards from 2005 through

28   2006 through guideline expansion and underwriting exceptions.  Likewise, an

admission that Countrywide was writing more non-conforming, reduced
documentation and non-prime loans does not convey what the Complaint alleges
Sambol knew to be the case as of April 2005: (1) Countrywide's underwriting
guidelines were a composite of the outer boundaries across multiple lenders
(CMPL ¶¶ 38, 41); (2) Countrywide's non-conforming loan quality had deteriorated
to the point that such loans were twice as likely to default as loans originated in
earlier periods (CMPL ¶ 36); and (3) Countrywide was a market leader in subprime
loans (CMPL ¶ 36).  Thus, the Complaint more than amply alleges the falsity of
Sambol's statements at the time that he made them.

### 7.   Sambol Substantially Participated In Making The Misrepresentations And Omissions Alleged In The Complaint

Sambol argues that he made no actionable misrepresentation because he did
not prepare, draft, or sign Countrywide's filings before the third quarter of 2006,
and because he did not sign the 2006 Form 10-K, and the Commission has failed to
allege that he substantially participated in the preparation of filings he did not sign.
Motion at 7-13.  As Sambol correctly notes, the applicable standard for primary
liability is not whether Sambol drafted or signed the filings, but whether he
substantially participated or was intricately involved in their preparation.  *Howard
v. Everex*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); *see also In re Software
Toolworks*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994).  Here, the Commission has
alleged (and Sambol admits) that Sambol signed the Forms 10-Q for the third
quarter of 2006 and all quarters of 2007, as well as the Form 10-K for the year-
ended 2007.  CMPL ¶ 77.  In addition, the Commission has alleged that Sambol
was a reviewer whose comments were sufficiently important that they could
"trump" the suggestions of the Chief Credit Risk officer in the second quarter of
2007.  CMPL ¶ 80.  Moreover, as Sambol is well aware, the Commission can
allege that Sambol reviewed and sub-certified the periodic filings filed prior to his

assuming the role of president and COO in September 2006.  Moreover, the Commission can allege that he was involved in the decision not to disclose Countrywide's deteriorating underwriting standards in the 2006 Form 10-K.

Courts have not hesitated to hold reviewers and certifiers of misleading statements responsible for their content.  In *SEC v. Tenet Healthcare Corp.*, CV 07-2144 (DSF) (C.D. Cal. Oct. 3, 2007), the court held that signing a sub-certification was sufficient to establish substantial participation in the preparation of a fraudulent statement.  *SEC v. Tenet Healthcare Corp.*, CV 07-2144 (DSF) at 9 (C.D. Cal. Oct. 3, 2007), citing to *Simpson v. AOL Time Warner,* 452 F.3d 1040, 1048-49 (9th Cor. 2006) and *Howard,* 228 F. 3d at 1061 (signing and attesting to a statement, such that for all intents and purposes the signor-attestor made the statement, is sufficient to be considered a primary violator); *In re Homestore.com, Inc. Sec. Litig. (Homestore II)*, 347 F. Supp. 2d. 790, 803 (C.D. Cal.), aff'd, 452 F.3d 1040 (9th Cir. 2006) (rejecting defendant auditor's argument that "mere 'review' of quarterly statements cannot form the basis of a primary violation because it does not represent substantial participation in the drafting, creation, or editing of the statements); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1312 (9th Cir. 1982) (rejecting defendant auditor's argument that it did not violate Rule 10b-5(b) because it only reviewed prospectus materials before they were filed and holding that "[a]n accountant may be liable for direct violation of [Rule 10b-5(b) if its participation in the misrepresentation is direct and if it knows or is reckless in not knowing that the facts reported in the prospectus materially misrepresent the condition of the issuer).

Those principles are even more apt where, as here, the defendant is a key corporate insider.  Even before his promotion to president and COO, Sambol was the head of the Countrywide loan production, loan servicing, and capital markets divisions.  As the Ninth Circuit observed in *Howard*, "key corporate officers should not be allowed to make important false financial statements knowingly and recklessly, yet still shield themselves from liability to investors simply by failing to

1  be involved in the preparation of those statements.  Otherwise, the securities law

2  would be significantly weakened…."  *Howard*, 228 F.3d at 1062.  For that reason,

3  "courts have no trouble finding liability where the actor is a corporate insider, even

4  when that actor claims not to have committed the actual fraudulent statement or act."

5  *In re Homestore.com, Inc., Sec. Litig.*, 252 F. Supp. 2d 1018, 138 (C.D. Cal. 2003).

6      Sambol substantially participated in Countrywide's preparation of its

7  periodic reports, in 2005 and the first two quarters of 2006 as a reviewer and sub-

8  certifier, and for the third quarter of 2006, and all the quarters in 2007, as a

9  reviewer and signer of the reports.

10      C.   **The Misrepresentations And Omissions Alleged In The Complaint**

11           **Are Not Merely Incomplete**

12           1.   **The Alleged Affirmative Misrepresentations Were**

13                **Misleading**

14      Sambol also argues that the affirmative misrepresentations alleged in the

15  Complaint are not actionable under the securities laws because there is no "rule of

16  completeness" for periodic filings.  Motion at 2, 13-15.  But, the Commission has

17  alleged more than that Sambol's statements were "incomplete."  As set forth in

18  Section II. B, above, the Complaint alleges material affirmative misrepresentations

19  regarding Countrywide's loan quality and underwriting standards.  *Brody v.*

20  *Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002), makes it clear that an

21  omission can be actionable where it "affirmatively create[s] an impression of a state

22  of affairs that differs in a material way from the one that actually exists."  *Id.*  The

23  Complaint alleges that Sambol knew that the company was originating poor quality

24  loans with increased risks factors and underwriting exceptions, including underwriting

25  loans to borrowers with subprime FICO scores and calling them prime.  (CMPL ¶¶ 4-

26  8, 20-21).  Under those circumstances, the failure to clarify the statements in

27  Countrywide's periodic filings regarding its loan quality and its definition of "prime"

28  was misleading, and the alleged misrepresentations are actionable.

1

2       **2.      Sambol Had A Duty To Disclose Countrywide's**

3               **Deteriorating Underwriting Standards And The**

                **Anticipated Consequences Of That Deterioration**

4          Sambol argues that in order to prevail in a case based on omissions, the

5   Commission must show that he had a legal duty to disclose.  Motion at 14.  There

6   is no requirement that the Commission plead law in its Complaint, however, and,

7   in any case, the Commission can establish that Sambol had such a duty based on

8   the requirements of Regulation S-K, 17 C.F.R. § 229.303, Countrywide's own

9   internal disclosure policy, and Sambol's stock sales.

10      **a.      Regulation S-K Requires Disclosure Of "Known**

11              **Trends And Uncertainties"**

12         Countrywide's widened underwriting guidelines and its increasing use of

13  exceptions to make loans were known trends that should have been identified in

14  Countrywide's periodic filings, and the conclusions reached by Mozilo and

15  Countrywide's Chief Risk Officer that these trends would likely cause defaults and

16  delinquencies to rise and impact Countrywide's access to the secondary markets

17  were at a minimum known uncertainties that should have likewise been disclosed

18  to investors.  Item 303 of Regulation S-K requires MD&A in periodic reports.  17

19  C.F.R. § 229.303.  Among other things, Item 303 requires MD&A disclosures of:

20               any known trends or uncertainties that have had or that

21               the registrant reasonably expects will have a material

22               favorable or unfavorable impact on net sales or revenues

23               or income from continuing operations.  [17 C.F.R. §

24               229.303(a)(3)(ii)]  The discussion and analysis shall

25               focus specifically on material events and uncertainties

26               known to management that would cause reported

27               financial information not to be necessarily indicative of

28               future operating results or of future financial condition."

26

1      [17 C.F.R. § 229.303(a), Instruction 3]

2      The purpose of MD&A disclosures is (1) "to give the investor the

3   opportunity to see the company **through the eyes of management**;" (2) to

4   enhance the overall financial disclosure and provide the context within which

5   financial information should be analyzed; and (3) to provide information about the

6   quality of, and potential variability of, a company's earnings and cash flow, so that

7   investors can ascertain the likelihood that past performance is indicative of future

8   performance.  *MD&A Release*, Exchange Act Rel. No. 48960 at Section I.B (Dec.

9   29, 2003) (emphasis added);[9] *In the Matter of Caterpillar, Inc.*, Exchange Act Rel.

10  No. 30532 at *12-17 (Mar. 31, 1992).  To further these objectives, Item 303 of

11  Regulation S-K sets forth the information required in the MD&A disclosure that

12  must be included in Forms 10-K and 10-Q.  *See* 17 C.F.R. § 229.303.

13      Accordingly, the materiality standard for MD&A discussions is different

14  than the general materiality test under *Basic v. Levinson*, 485 U.S. at 231-232.  A

15  two-part test determines when disclosure of known trends or uncertainties under

16  Regulation S-K is required:  (1) is the known trend, demand, commitment, event or

17

18  _____

19  [9] "[T]he SEC's reasonable interpretation of a statute that it administers, including
    its promulgation of rules and regulations interpreting or implementing the statute,
20  is entitled to deference."  *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir. 2001)
    (*citing Chevron USA, Inc. v. N.R.D.C.*, 467 U.S. 837 (1984)).  Further, the Ninth
21  Circuit has stated that, in general:

22          when the meaning of a provision within the expertise of
            an agency is involved, the courts will afford deference to
23          that agency's construction.  In such cases, the agency's
            expertise make it particularly suited to interpret the
24          language. This is especially true when an agency's own
            regulation is involved, and ordinarily its construction will
25          be affirmed if it is not clearly erroneous or inconsistent
            with the regulation.

26  *See Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980).

27      Moreover, so long as the agency's interpretation of its own regulation is
    reasonable, "[a] court may not substitute its own judgment or 'its own construction
28  of a statutory provision.'"  *See Bd. of Trustees of Knox County Hosp. v. Shalala*,
    959 F. Supp. 1026, 1030 (S.D. Ind. 1997) (*citing Monsanto v. E.P.A.*, 19 F.3d
    1201, 1206-07 (7th Cir. 1994) (*quoting Chevron*, 467 U.S. at 844).

uncertainty **likely** to come to fruition?  If management determines that it is not
reasonably likely to occur, no disclosure is required; and (2) if management cannot
make that determination, it must evaluate objectively the consequences of the
known trend, demand, commitment, event, or uncertainty, on the assumption that it
**will** come to fruition.  **Disclosure is then required**, even if the information is
disclosed elsewhere, unless management determines that a material effect on the
registrant's financial condition or results of operations is not reasonably likely to
occur.  *In the Matter of Bank of Boston Corp.*, SEC Admin. Proc. File No. 3-8270,
1995 WL 757874 at *13 (Dec. 22, 1995); *MD&A Release*, Exchange Act Release
No. 48960 at Section II.B.3 (Dec. 29, 2003); *In the Matter of Caterpillar, Inc.*,
Exch. Act Rel. 30532 at *16-17 (Mar. 31, 1992).  Here, Countrywide's most senior
officer and its Chief Risk Officer had both identified known trends – widened
underwriting guidelines, exception loans, and deteriorating loan quality – which
each believed was reasonably likely to negatively impact Countrywide's revenue,
yet no disclosure of either the known trends or their consequences was included in
Countrywide's periodic filings.

> **b.** **Countrywide's Internal Disclosure Policy Required**
> **Disclosure Of Known Trends And Uncertainties**

Countrywide's own internal disclosure controls and procedures ("Disclosure
Guidelines") acknowledged the requirement to disclose known trends and
uncertainties.  CMPL ¶ 73.  The Disclosure Guidelines required that Countrywide
disclose on a timely basis **any information that would be expected to affect the**
**investment decision of a reasonable investor or alter the market price of the**
**Company's securities**."  CMPL ¶ 73 (emphasis added).  To assure that such
information was considered in the preparation of the periodic reports,
Countrywide's financial reporting staff was required to:

> seek input from and discuss with the Divisional Officers
> information pertaining to the past and current

28

performance and prospects for their business unit, **known**

**trends and uncertainties related to the business unit**,

[and] significant risks and contingencies that may affect

the business unit. . .

CMPL ¶ 73 (emphasis added). The bolded language above directly mirrors the

requirement in Regulation S-K that requires management to disclose:

any known trends or uncertainties that have had or that

the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues

or income from continuing operations.

17 C.F.R. § 229.303(a)(3)(ii).

As a Divisional Officer, indeed, **the** officer responsible for loan production,

Sambol had a duty to disclose the known trends and uncertainties in the loan

production units. The Complaint alleges that Sambol knew of Countrywide's

widened guidelines, knew the likelihood that its defaults and delinquencies would rise

as a result, and had been warned that Countrywide's access to the secondary markets

would be impacted by these trends. CMPL ¶¶ 4-5, 8, 35-38, 49, 52, 54-55, 62, 64, 68-

70. Yet these disclosures were not included in Countrywide's MD&A in any quarter

from 2005 through the end of 2007, and the Complaint alleges that Sambol

participated in the decision to exclude such disclosures. CMPL ¶¶ 73-79, 81-82.

Investors would have considered it important in making an investment

decision that Countrywide was writing increasingly risky loans and holding

increased credit risk as a result, because the increasing losses on such loans would

in the future directly result in higher repurchase expenses and lower net income.

Moreover the poor performance of its loans would likely imperil Countrywide's

continued ability to rely on the secondary mortgage market as a source of income

and liquidity. Without the disclosure of such material information about negative

trends, Countrywide's disclosures were materially misleading, and did not comply

29

with the MD&A disclosure requirements of Item 303 of Regulation S-K.  17
C.F.R. § 229.303.

### c. Sambol's Stock Sales Gave Rise To An Independent Duty To Disclose

Sambol's sales of Countrywide stock during the relevant period gave rise to
an additional independent duty on his part to disclose all material non-public
information in his possession.  *See United States v. O'Hagan*, 521 U.S. 642, 652
(1997) (holding that corporate insiders who obtain material nonpublic information
in the course of their duties, have a duty to disclose that information or abstain
from trading to avoid taking unfair advantage of stockholders) citing *Chiarella v.
United States*, 445 U.S. 222, 228 (1980).  Nevertheless, Sambol failed to ensure that
the material facts regarding Countrywide's deteriorating underwriting standards
were included in Countrywide's periodic filings.  Instead, Sambol made affirmative
misrepresentations in earnings calls about Countrywide's lending standards,
reviewed and sub-certified the periodic filings for 2005 and the first two quarters of
2006, and signed Forms 10-Q for the third quarter of 2006, each quarter in 2007, and
the 2007 Form 10-K that falsely led investors to believe Countrywide's loans were
of good quality.

### D. Sambol's Statements At Countrywide's Earnings Calls Were Misleading

Sambol argues that the two public statements identified by the Commission
were not materially misleading.  Motion at 29-31.  Sambol's arguments are not
supported by even the more complete versions of these statements included in the
Motion.  Motion at 29-31.

First, Sambol argues that the statement that Countrywide mitigated the risk
associated with adjustable rate and Pay-Option mortgages was true when made
because Sambol was only stating that Countrywide used a variety of tools,
including pricing, to mitigate the risk of compared to guidelines for traditional

fixed rate agency products.  Motion at 29-30.  The Commission does not disagree that Sambol was making a comparison between adjustable rate and fixed rate loan underwriting.  Sambol was attempting to disingenuously assure analysts that Countrywide was mitigating the higher risk of the adjustable rate, Pay-Option and interest only products relative to fixed rate agency loans by, among other things, applying more stringent underwriting criteria than were applied to agency loans.  But as set forth in detail above, whatever Countrywide's aspirations may have been in this regard, the Complaint alleges that Countrywide's underwriting standards were deteriorating overall, Countrywide made numerous exceptions to those widened guidelines, and Sambol had been warned that those exceptions would lead to higher defaults and delinquencies, and would ultimately affect Countrywide's access to the secondary securitization market.  CMPL ¶¶ 4, 5, 8, 14, 24, 27, 33-40, 41-44, 52, 54-55, 62-71.  These facts are simply not consistent with public assertions that Countrywide mitigated its risks by applying more rigorous underwriting criteria to these loans.

        Second, Sambol argues that the entirety of his comment regarding subprime lending at the September 13, 2006 Fixed Income Investor Forum render his statement that Countrywide remained "on the sidelines" with respect to subprime not misleading.  Sambol claims that by noting that subprime was "an important part of [Countrywide's] menu" and Countrywide was "committed to having a subprime presence," he cured the falsity of the statement.  Motion at 30-31.  But the Complaint alleges that when Sambol made that statement in September 2006, (1) Countrywide's definitions of "prime" loans included loans with subprime FICO scores, thereby rendering statistics about the percentages of subprime loans Countrywide was writing misleading (CMPL ¶¶ 18, 20-21); and (2) Countrywide had been continuously expanding its underwriting standards and writing lower quality loans since at least 2003.  CMPL ¶¶ 4, 5, 8, 14, 24, 33-40, 41-44, 52, 54-55, 62-71.  These facts are not consistent with Sambol's assertion that Countrywide

1    was "on the sidelines" with respect to subprime.

2         **E.    The Commission Has Adequately Alleged Sambol's Scienter**

3         Sambol also argues that the Commission has failed to adequately allege

4    scienter on his part because the Complaint does not plead facts that would show

5    Sambol intended to defraud or acted with extreme recklessness.[10]  Although Sambol

6    is correct when he states that the Commission must plead facts to establish fraud,

7    intent may be pled generally.  Thus, the Commission "need 'simply . . . say [] that

8    scienter existed' to satisfy . . . Rule 9(b)."  *Fecht*, 70 F.3d at 1082 n.4 (quoting *In re*

9    *Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc)).  Here, the

10   Commission has alleged much more.  As set forth in Section III.C above, the

11   Commission has alleged a series of facts that establish not only Sambol's intimate

12   knowledge of the deteriorating quality of Countrywide's loan underwriting during

13   the relevant time period, but also establish his participation in the disclosure

14   process, and an affirmative duty to speak based on his own stock sales.

15   Accordingly, the Commission has adequately alleged scienter on Sambol's part.

16        **F.    Sambol Aided And Abetted Countrywide's Securities Violations**

17        Sambol maintains that the Commission has not alleged a tenable claim

18   against him for aiding and abetting Countrywide's violations of the reporting

19   provisions of Section 13, because the Complaint does not allege that he had actual

20   knowledge of the primary violations and his role in furthering them.  Motion at 33-

21   35.  As set forth at length above, however, the Complaint alleges that Sambol had

22   the requisite knowledge and participation.

23        Sambol argues that he lacked actual knowledge that Countrywide's

24   Commission filings did not contain sufficient disclosure regarding Countrywide's

25

26   [10]    In support of his scienter argument, Sambol avers that the Commission
     attempts to establish scienter through a "cursory recitation of Mr. Sambol's
27   executive titles and committee memberships."  Motion at 32.  This contention is
     nonsensical in light of the numerous facts pled in the Complaint that demonstrate
28   Sambol's knowledge of the deterioration of Countrywide's underwriting during the
     relevant period.

widened underwriting guidelines and increased credit risk.  But the Complaint alleges that he did.  As the head of loan production and later the COO of Countrywide, it simply strains credulity to suggest that Sambol did not know that Countrywide's guidelines had widened to unprecedented levels, that it was writing a significant percentage of loans on an exception basis, that its borrowers were misrepresenting their income on stated income loans and that the company risked both rising defaults and delinquencies and curtailed access to the securitization market as a result.  But the Complaint alleges more than Sambol's passive knowledge of these facts.  It alleges in great detail communications made directly to Sambol on these matters by the Chief Credit Risk Officer, Credit Risk Management and Angelo Mozilo.  In addition, the Complaint alleges that Sambol reviewed and signed periodic filings that did not disclose these matters, and even participated in discussions regarding whether changes to Countrywide's MD&A proposed by the Chief Credit Risk Officer should be included in Countrywide's filings.

The Ninth Circuit has held that failure to act in connection with the review and editing of a report filed with the Commission constitutes substantial assistance to a primary violation of Section 10(b) of the Exchange Act.  *SEC v. Fehn*, 97 F.3d 1276, 1293-94 (9th Cir. 1996) (attorney who reviewed and edited quarterly report and failed to properly advise his clients of material omissions lent substantial assistance to primary violations).  Accordingly, the Complaint alleges that Sambol both had the requisite knowledge and provided substantial assistance to Countrywide's violations.

### G.   Dismissal With Prejudice Is Not Warranted

Sambol urges that the Complaint should be dismissed with prejudice, on the grounds that amendment would be futile.  As set forth at length herein, the Commission has properly alleged causes of action against Sambol for violation of the antifraud provisions of the federal securities laws and for aiding and abetting Countrywide's violation of the reporting requirements of Section 13 of the

33

Exchange Act.  Sambol's arguments to the contrary are unavailing, as the Commission has adequately alleged Sambol's scienter, pled with specificity the misstatements and omissions at issue, and pled Sambol's participation in making those statements.  The balance of Sambol's arguments – that the omitted information was known in the marketplace – are defenses which are inappropriate in the context of a motion to dismiss, because they would require the Court to make judgments regarding the materiality of materials extrinsic to the Complaint.

"[T]he conditions that must be met before a motion may be granted under Fed. R. Civ. P. 12(b)(6) are quite strict." *Church of Scientology of Calif. v. Flynn*, 744 F.2d 694, 695-96 (9th Cir. 1984).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Indeed, the remedy of dismissal without prejudice has been described as "draconian." *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1416 (N.D. Cal. 1995).  Sambol's arguments simply do not establish that the Commission "can prove no set of facts in support of [its] claim[s] which would entitle [it] to relief." *Conley*, 355 U.S. at 45-46.  Accordingly, Sambol has not established that dismissal with prejudice is appropriate.

## IV.  <u>CONCLUSION</u>

For all the foregoing reasons, Sambol's motion to dismiss should be denied.

Dated:  September 18, 2009          Respectfully submitted,

/s/ Lynn M. Dean
John M. McCoy III
Lynn M. Dean
Attorneys for Plaintiff
Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On September 18, 2009, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT DAVID SAMBOL'S MOTION TO DISMISS** on all the parties to this action addressed as stated on the attached service list:

[X]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]   **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

[X]   **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date:  September 18, 2009                    /s/ Lynn M. Dean
                                             Lynn M. Dean

**SEC v. ANGELO MOZILO, et al.**
**United States District Court – Central District of California**
**Case No. CV 09-3994 VBF (AJWx)**
**(LA-3370)**

<u>SERVICE LIST</u>

Daniel P. Lefler, Esq.
David Siegel, Esq.
Randall L. Jackson, Esq.
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Email:  dlefler@irell.com
Email:  dsiegel@irell.com
Email:  rjackson@irell.com
***Counsel for Angelo Mozilo***

William R. McLucas, Esq.
Joseph K. Brenner, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Email:  william.mclucas@wilmerhale.com
Email:  joseph.brenner@wilmerhale.com
***Counsel for Angelo Mozilo***

David C. Marcus, Esq.
Caroline E. Kane, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Email:  david.marcus@wilmerhale.com
Email:  caroline.kane@wilmerhale.com
***Counsel for Angelo Mozilo***

Walter F. Brown, Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Email:  wbrown@orrick.com
***Counsel for David Sambol***

Nicolas Morgan, Esq.
DLA Piper
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6023
Email:  nicolas.morgan@dlapiper.com
***Counsel for Eric Sieracki***

36