1  JOHN M. McCOY, III, Cal. Bar No. 166244
   Email: mccoyj@sec.gov
2  SPENCER E. BENDELL, Cal. Bar No. 181220
   Email: bendells@sec.gov
3  LYNN M. DEAN, Cal. Bar. No. 205562
   Email: deanl@sec.gov
4  SAM S. PUATHASNANON, Cal. Bar No. 198430
   Email: puathasnanons@sec.gov
5  PARIS A. WYNN, Cal. Bar No. 224418
   Email: wynnp@sec.gov
6
7  Attorneys for Plaintiff
   Securities and Exchange Commission
8  Rosalind R. Tyson, Regional Director
   Michele Wein Layne, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
9  Los Angeles, California 90036
   Telephone: (323) 965-3998
10 Facsimile: (323) 965-3908

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14 SECURITIES AND EXCHANGE          Case No. CV 09-3994 JFW (MANx)
   COMMISSION,
15                                  PLAINTIFF SECURITIES AND
              Plaintiff,            EXCHANGE COMMISSION'S
16                                  OPPOSITION TO DEFENDANT
       vs.                          ERIC SIERACKI'S MOTION TO
17                                  DISMISS
   ANGELO MOZILO, DAVID SAMBOL,
18 AND ERIC SIERACKI,               Date:    October 19, 2009
                                    Time:    1:30 p.m.
19            Defendants.           Place:   Courtroom 16
                                             (Hon. John F. Walter)
20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ......................................................................................1

II.  SUMMARY OF FACTUAL ALLEGATIONS ..............................................4

    A.   The Material Omissions From Countrywide's Periodic
        Filings.........................................................................................4

    B.   Sieracki's Affirmative Misstatements To Investors ..............................4

    C.   Sieracki's Role In The Preparation Of Countrywide's
        Filings.........................................................................................6

    D.   The Omissions And Misstatements Were Material And
        Should Have Been Disclosed.................................................................7

III. SIERACKI'S MOTION TO DISMISS SHOULD BE DENIED...................8

    A.   The Complaint Alleges Material Misrepresentations And
        Omissions Regarding Countrywide's Loan Underwriting
        And The Consequent Risks.................................................................9

        1.   Countrywide's Public Description Of Its Loan
            Originations Was Misleading .....................................10

        2.   Countrywide's Disclosures About Its Pay-Option
            ARMS Were Misleading ............................................12

        3.   Countrywide's Definition Of Prime Loans Was
            Misleading..................................................................13

        4.   The Misrepresentations And Omissions Alleged In
            The Complaint Were Material ....................................14

        5.   Regulation S-K And Countrywide's Own Internal
            Policy Required That Countrywide Disclose Its
            Deteriorating Underwriting Standards And The
            Anticipated Consequences Of That Deterioration....................15

i

a.    Regulation S-K Requires Disclosure Of "Known Trends And Uncertainties".................................15

b.    Countrywide's Internal Disclosure Policy Required Disclosure Of Known Trends And Uncertainties ...............................................................18

c.    The Commission Need Not Allege That Countrywide's Failure Was "Inevitable" .......................19

d.    The Commission Need Not Allege Financial Statement Fraud ...............................................................20

6.    Countrywide's MBS Filings And Press Releases Do Not Cure The Misrepresentations And Omissions Alleged In The Complaint .........................................21

B.    The Misrepresentations And Omissions In The Complaint Were Not Mere Opinion ..........................................................24

C.    The Misrepresentations And Omissions Not Merely Incomplete.............................................................................27

D.    The Commission's Allegations Meet The Plausibility Standard Of Rule 8(a) ....................................................28

E.    Dismissal With Prejudice Is Not Warranted.........................................30

IV.    CONCLUSION.............................................................................32

# TABLE OF AUTHORITIES

Page

## CASES

*Atlas v. Accredited Home Lenders Holding Co.*
    556 F. Supp. 2d 1142 (S.D. Cal. 2008).........................................15

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988)...................................................... 10, 14

*Bd. of Trustees of Knox County Hosp. v. Shalala*
    959 F. Supp. 1026 (S.D. Ind. 1997)..............................................17

*Brody v. Transitional Hosps. Corp.*
    280 F.3d 997 (9th Cir. 2002) .................................................. 2, 27

*Chevron USA, Inc. v. N.R.D.C.*
    467 U.S. 837 (1984)........................................................ 16, 17

*Church of Scientology of Calif. v. Flynn*
    744 F.2d 694 (9th Cir. 1984) ......................................................30

*Conley v. Gibson*
    355 U.S. 41 (1957)...................................................... 29, 30, 32

*Ganino v. Citizens Utils. Co.*
    228 F.3d 154 (2d Cir. 2000)................................................. 23, 24

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir.1992) ......................................................28

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990) .....................................................31

*In re Apple Computer Sec Litig*
    886 F2d 1109 (9th Cir 1989), *cert denied,* 496 U.S. 943 (1990) ........... 24, 31

*In re Cabletron Systems, Inc.*
    311 F.3d 11 (1st Cir. 2002)........................................................23

*In re Clearly Canadian Sec. Litig.*
   875 F. Supp. 1410 (U.S. Dist. N. Cal. 1995) ...................................................30

*In re Columbia Sec. Lit.*
   155 F.R.D. 466 (S.D.N.Y 1994) ......................................................................24

*In re Countrywide Fin. Corp. Derivative Litig.*
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................................15

*In re Downey Sec. Litig.*
   CV 08-3261-JFW (RZx) (March 18, 2009).....................................................14

*In Re Gilead Sciences Sec. Litig.*
   536 F.3d 1049 (9th Cir. 2008) ................................................................ 8, 29

*In re Glenfed, Inc. Sec. Litig.*
   42 F.3d 1541 (9th Cir. 1994) ..........................................................................31

*In re Stac Electronic Sec. Litig.*
   89 F.3d 1399 9th Cir. 1996)............................................................................23

*In re Stellent, Inc. Sec. Lit.*
   326 F. Supp. 2d 970 (D. Minn. 2004)...............................................................24

*In re Time Warner Sec. Litig*
   9 F. 3d 259 (2d Cir 1993)................................................................................31

*In re Wells Fargo Sec. Litig.*
   12 F.3d 922 (9th Cir. 1993) ............................................................................15

*In re Worlds of Wonder Sec. Litig.*
   35 F.3d 1407 (9th Cir.1994) ...........................................................................28

*Johnson v. Riverside Healthcare System, LP*
   534 F. 3d 1116 (9th Cir. 2008) .........................................................................8

*Kaplan v. Rose*
   49 F.3d 1363 (9th Cir. 1994) ............................................................................9

*Madison v. GMAC Mortgage, LLC*
   2009 U.S. Dist. LEXIS 22294 (D. Ariz. Mar. 19, 2009)...................................9

iv

*Marks v. CDW Computer Centers, Inc.*
    122 F.3d 363 (7th Cir. 1997) ...................................................................23

*Navellier v. Sletten*
    262 F.3d 923 (9th Cir. 2001) ...................................................................16

*Neubronner v. Milken*
    6 F.3d 666 (9th Cir. 1991) ........................................................................9

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
    320 F.3d 920 (9th Cir. 2003) ............................................................ 2, 28

*Odom v. Microsoft Corp.*
    486 F.3d 541 (9th Cir. 2007) .....................................................................9

*Pacific Coast Medical Enters. v. Harris*
    633 F.2d 123 (9th Cir. 1980) ...................................................................17

*Pirraglia v. Novell, Inc.*
    339 F.3d 1182 (10th Cir. 2003) ...............................................................28

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) .................................................................24

*SEC v. Pham*
    500 F.3d 895 (9th Cir. 2007) ...................................................................10

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) .....................................................................24

*SEC v. Texas Gulf Sulphur Co.*
    401 F.2d 833 (2d Cir. 1968).....................................................................10

*Shapiro v. UJB Fin. Corp.*
    964 F.2d 272 (1st Cir. 1992).....................................................................14

*Simpson v. AOL Time Warner Inc.*
    452 F.3d 1040 (9th Cir. 2006) .................................................................30

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group*
    2009 U.S. Dist. LEXIS 31832 (D. Ariz. Mar. 31, 2009)................................9

*TSC Indus., Inc. v. Northway*
  426 U.S. 438 (1976).............................................................................. 14, 23

*United States v. Naftalin*
  441 U.S. 768 (1979)......................................................................................10

*Vess v. Ciba-Geigy Corp.*
  317 F.3d 1097 (9th Cir. 2003) ......................................................................8

*Warden v. Coolidge Unified School District*
  2008 U.S. Dist. LEXIS 101323 (D. Ariz. Dec. 15, 2008) ..............................8


## FEDERAL STATUTES

**Securities Act of 1933**

Section 17(a)
  [15 U.S.C. § 77q(a)].......................................................................... 6, 9, 10

**Securities Exchange Act of 1934**

Section 10(b)
  [15 U.S.C. § 78j(b)] .......................................................................... 6, 9, 10


## FEDERAL REGULATIONS

17 C.F.R. § 229.303 ................................................................... 1, 2, 16, 17, 25

17 C.F.R. § 229.303(a).................................................................................. 20, 26

17 C.F.R. § 229.303(a)(3)(ii) ...................................................................... 19, 22

Rule 10b-5
  [17 C.F.R. § 240.10b-5] ..................................................................... 6, 9, 10


## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(6)................................................................................8

Fed. R. Civ. P. 8(a)..................................................................... 2, 28

Fed. R. Civ. P. 9(b) ...................................................................8, 9

## **COMMISSION RELEASES**

*In re Caterpillar*
     Exchange Act Rel. No. 30532 (Mar. 31, 1992) ...................................... 17, 18

*Interpretation:  Commission Guidance Regarding Management's Discussion and*
     *Analysis of Financial Condition and Results of Operations*
     Exchange Act Rel. No. 48960 (Dec. 29, 2003) .......................... 16, 17, 20, 21

# I.    INTRODUCTION

Former Countrywide CFO Eric Sieracki's Motion to Dismiss ("Motion") lacks merit and should be denied.  The Commission has alleged more than sufficient facts to establish causes of action against Sieracki for violations of the anti-fraud provisions of the federal securities laws.

First, although Sieracki argues both that the Complaint fails to quote any public statements regarding Countrywide's loan quality and that there was sufficient public information available for investors to glean what Countrywide's actual loan origination standards were (Motion at 1, 7-8, 10-11), the Complaint in fact alleges five separate misstatements regarding loan quality and alleges more than a mere failure to disclose statistical data regarding the origination percentages of various loan types.  *See* Section II.B. below.  Moreover, the Complaint alleges that Sieracki failed to disclose information that could **not** be distilled from Countrywide's press releases, periodic filings, and MBS prospectuses.  The Complaint alleges that Countrywide (1) had widened its underwriting guidelines to historically unprecedented levels; (2) was making exceptions even to those already widened guidelines in order to keep its origination numbers high; and (3) that senior management, including Sieracki, had been warned by Countrywide's Credit Risk Management Group and Angelo Mozilo that defaults and delinquencies would rise as a result of these practices and impair Countrywide's access to the secondary securitization markets.  These are all matters that Sieracki had a duty to ensure were disclosed to Countrywide's investors, and which were not in fact disclosed.

Second, although Sieracki argues that the material omissions alleged in the Complaint were mere opinion (Motion at 1, 14-18), the matters alleged in the Complaint, such as (1) widened underwriting guidelines; and (2) increased reliance on exceptions to underwriting, were not matters of "opinion," as Sieracki argues.  They were known trends that Regulation S-K requires be disclosed to investors in the MD&A in Countrywide's periodic filings.  17 C.F.R. § 229.303.  Likewise, the

1    anticipated consequences of that lax underwriting, including (1) increased defaults

2    and delinquencies; and (2) possible loss of access to the secondary markets, were

3    also potential consequences that should have been disclosed pursuant to Regulation

4    S-K.  17 C.F.R. § 229.303.

5         Third, although Sieracki argues that the affirmative misrepresentations

6    alleged in the Complaint were merely "incomplete," and therefore not actionable

7    under the securities laws (Motion at 2, 25-28), as set forth in Section II. B, below,

8    the Complaint alleges affirmative material misrepresentations regarding

9    Countrywide's loan quality and underwriting standards.  *Brody v. Transitional*

10   *Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) makes it clear that an omission can be

11   actionable where it "affirmatively create[s] an impression of a state of affairs that

12   differs in a material way from the one that actually exists."  *Id.* at 1006.  The

13   Complaint alleges that Sieracki knew that the company was originating poor

14   quality loans with increased risk factors and underwriting exceptions, including

15   underwriting loans to borrowers with subprime FICO scores and calling them

16   prime.  (CMPL ¶¶ 4-8, 20-21).  Under those circumstances, the failure to clarify

17   the statements in Countrywide's periodic filings regarding its loan quality and its

18   definition of "prime" was misleading, and is actionable.

19        Fourth, although Sieracki argues that the allegations against him fail to meet

20   the plausibility standards for a claim under Federal Rule of Civil Procedure 8(a),

21   based on his failure to sell Countrywide stock during the relevant time period, that

22   failure alone is not dispositive here.  *No. 84 Employer-Teamster Joint Council*

23   *Pension Trust Fund*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be

24   established even if the officers who made the misleading statements did not sell

25   stock during the class period.  In other words, the lack of stock sales by a

26   defendant is not dispositive as to scienter").  The complaint alleges that Sieracki, a

27   member of Countrywide's Disclosure Committee, was on notice of the known

28   trends and uncertainties associated with Countrywide's widened underwriting

2

guidelines, yet failed to take steps to disclose them.  There are several inferences that can be drawn from Sieracki's conduct, including the inference that he acted to prop up the value of his own holdings of Countrywide stock.  Accordingly, the Complaint alleges a plausible cause of action against Sieracki for fraud.

Finally, Sieracki relies on a series of distortions of what is alleged in the Complaint.  Indeed, Sieracki appears to have read a different Complaint from the one filed by the Commission.  Sieracki spends a significant portion of his Motion attacking the Commission for selective quotation, but himself misquotes the Commission's Complaint and ignores those portions of it which undercut his arguments for dismissal.  Specifically:

o   Sieracki argues that the Commission has not alleged any "**actual** public statements about loan origination standards" in Countrywide's periodic filings, and further, that the Commission relies on selective citation to improperly distort the only public statements about loan quality that Countrywide made, "statements to the effect that Countrywide's standards were tied to the standards of the secondary (securitization) market."  Motion at 1, 7-8 (emphasis original).  This contention is obviously false, and ignores not only the five specific misstatements enumerated in detail in the Complaint and in Section II. B. below, but also the material omissions regarding loan standards alleged in the Complaint and listed in Section II.A. below.

o   Sierarcki argues that the Commission has misquoted the 2006 Form 10-K discussion regarding Pay-Option arm loans, in part because he incorrectly posits that the Commission failed to quote the introductory remark "we believe" before the phrase "we have prudently underwritten" Pay-Option ARM loans.[1]  But the language Sieracki

---

[1]   Sieracki's additional arguments regarding this misrepresentation are addressed in Section III.A.2, below.

claims was omitted does in fact appear in the Complaint.  CMPL ¶ 90. Accordingly, Sieracki's Motion to Dismiss should be denied.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

### A.    The Material Omissions From Countrywide's Periodic Filings

The Complaint alleges material omissions from Countrywide's periodic filings in 2005, 2006, and 2007, and further alleges that Sieracki had knowledge of the material omitted facts, but failed to ensure that they were conveyed to Countrywide's investors in the periodic filings that he reviewed and signed or in Countrywide's 2006 and 2007 securities offerings.  Specifically the Complaint alleges that:

(1) Countrywide was widening its underwriting guidelines to unprecedented levels (CMPL ¶¶ 4, 8, 14, 24, 25, 27, 33, 34, 37, 52, 83, 88, 89);

(2) Countrywide was issuing numerous loans that failed to meet even those aggressively widened guidelines (CMPL ¶¶ 8, 29, 30, 56);

(3) there was evidence of widespread borrower and/or broker fraud in its stated income loan products (CMPL ¶¶ 37, 40, 90);

(4) the deteriorating quality of the loans that Countrywide was writing would increase its risk of defaults and delinquencies (CMPL ¶¶ 4, 5, 27, 48-50, 52); and

(5) the poor quality of Countrywide's loans threatened to curtail the company's ability to sell those loans in the secondary mortgage market (CMPL ¶¶ 4, 5, 45, 46, 69).

### B.    Sieracki's Affirmative Misstatements To Investors

Moreover, the Complaint specifically alleges that Sieracki made false and misleading affirmative statements, including:

(1) statements in Countrywide's Forms 10-K for 2005, 2006, and 2007 that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touting the Company's "proprietary underwriting systems . . . that improve the consistency of underwriting standards,

4

assess collateral adequacy and help to prevent fraud." (CMPL ¶85) These statements were false, because Sieracki knew that a significant portion of Countrywide's loans were being made as exceptions to Countrywide's already extremely lax underwriting guidelines (CMPL ¶¶ 4, 5, 8, 35-37, 49, 52, 55, 61-62, 64, 68-69, 79, 81);

(2) statements in Countrywide's 2005 and 2006 Form 10-K that Countrywide ensured its ongoing access to the secondary mortgage market by consistently producing quality mortgages. These statements were false. Sieracki knew that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines. (CMPL ¶¶ 4, 5, 8, 31, 35-38, 49, 52, 54-55, 60-62, 69, 86);

(3) a statement in Countrywide's 2006 Form 10-K that "[w]e believe we have prudently underwritten" Pay-Option ARM loans. CMPL ¶¶ 59, 90. This statement was false because the Sieracki had knowledge, obtained through his attendance at meetings of the Credit Risk Management Committee and through emails from Mozilo, that the risks of the Pay-Option loan to the company were severe, and the median time to reset on the loans was getting shorter as negative amortization on them increased (CMPL ¶¶ 61-62, 64, 68-70);

(4) deceptive descriptions of "prime loans" in Countrywide's 2005, 2006, and 2007 Forms 10-K that did not inform investors that Countrywide's definition of such loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality and with additional credit risk factors such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and higher (CMPL ¶¶ 8, 20-21, 87-88);

(5) the misleading use of the term "nonprime" in Countrywide's periodic filings because Countrywide failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this

5

category included loans with significant additional layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or combined loan to value ratios of 95% and higher; and (5) loans made to borrowers with recent bankruptcies and late mortgage payments (CMPL ¶¶ 8, 22, 87-89).

### C.    <u>Sieracki's Role In The Preparation Of Countrywide's Filings</u>

The Complaint also alleges that Sieracki substantially participated in the preparation of Countrywide's filings with the Commission. Sieracki was a member of Countrywide's Disclosure Committee, reviewed drafts of the documents, signed the Forms 10-Q for each quarter in 2005, 2006, and 2007, signed Sarbanes-Oxley certifications for each Form 10-Q from Q1 2005 through Q3 2007 and each Form 10-K for the years ended 2005, 2006, and 2007, and signed the Forms 10-K for the years ended 2005, 2006, and 2007. CMPL ¶¶ 73-77. The Complaint further alleges that Sieracki violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 because he directly participated in Countrywide's 2006 and 2007 securities offerings, but failed to take any action to correct false and misleading statements in the offering documents, which he signed. Countrywide's materially false and misleading periodic reports were incorporated by reference in the February 9, 2006 Form S-3 and the November 15, 2007 Form S-3 signed by Sieracki. CMPL ¶ 110.

Moreover, the Complaint alleges that Sieracki received warnings about Countrywide's expanded credit risk as early as June 2005 (CMPL ¶¶ 37, 61), received additional warnings throughout 2006 and 2007 (CMPL ¶¶ 5, 8, 35, 49, 52, 55, 62, 64, 68, 69, 83), and directly participated in decisions to overrule revisions to the credit risk disclosures in Countrywide's periodic filings which were proposed by Countrywide's Chief Credit Risk Officer as part of his obligation to report known trends and uncertainties to senior management for inclusion in Countrywide's periodic filings.  (CMPL ¶ 78-82).

By ignoring the many warnings about the consequences of underwriting guideline expansion, and the potential for increased defaults and delinquencies that were being sounded by Mozilo, the Chief Credit Risk Officer, and the Credit Risk Department, Sieracki recklessly failed ensure that Countrywide disclosed correct information regarding its mortgage business and to discuss in Countrywide's MD&A the known negative trends it was experiencing.

**D.** **The Omissions And Misstatements Were Material And Should Have Been Disclosed**

The omissions and misrepresentations detailed in the Complaint would have been material to a reasonable investor.  As set forth in detail in the Complaint, Countrywide's periodic filings held Countrywide out as a primarily prime lender with "prudent" underwriting guidelines and a strict quality control process. CMPL ¶¶ 4, 6, 18 ("prime loans totaled 77.1% of loan production in 2006").  But Sieracki knew that Countrywide had relaxed its underwriting standards below any historical precedent, and had been warned that the defaults and delinquencies that would arise from that change in guidelines would have a material unfavorable impact on Countrywide's revenues.  Indeed, the Complaint alleges that Countrywide's internal Chief Risk Management Officer had identified these trends, predicted their consequences as early as September 2004, repeatedly warned of the danger of Countrywide's underwriting strategy during the relevant time period, and requested that management add a discussion of these trends to Countrywide's filings.  CMPL ¶¶ 33-39, 41-47, 54, 78-82.  These warnings went unheeded, and the required disclosures were never made.  Without disclosure of these negative trends, disclosure of positive information regarding Countrywide's loan production was misleading, leaving investors with an incomplete picture of Countrywide's financial condition.

The market's reaction to the eventual disclosures regarding Countrywide's underwriting demonstrates how material this information was to investors.  As the

1   information trickled into the markets in mid-2007, Countrywide experienced a

2   series of stock price losses.  There was an 11% share price decline following

3   Countrywide's July 24, 2007 earnings call, when it provided investors with

4   statistical information regarding its portfolio of loans held for investment that

5   revealed that its definition of prime loans included loans to borrowers with FICO

6   scores as low as 500, and that 80% of its Pay-Option loans were based upon

7   reduced documentation.  CMPL ¶ 103.  There was an additional approximately

8   11% decline in Countrywide's share price on August 16, 2007 after Countrywide

9   was forced to drawdown its $11.5 billion credit facility, an event Countrywide

10  acknowledged was necessitated by the over 97% decline in Countrywide's revenue

11  from mortgage securitizations from 2006 to 2007 and Countrywide's inability to

12  bridge the gap by issuing commercial paper.  CMPL ¶¶  104, 108.

13  **III.    SIERACKI'S MOTION TO DISMISS SHOULD BE DENIED**

14          Dismissal pursuant to Rule 12(b)(6) is proper only where there is a "lack of

15  cognizable legal theory" or "the absence of sufficient facts alleged under a

16  cognizable legal theory."  *Johnson v. Riverside Healthcare System, LP*, 534 F. 3d

17  1116, 1121-22 (9th Cir. 2008).  There is a strong presumption against dismissing

18  an action for failure to state a claim, as the issue is not whether a plaintiff will

19  ultimately prevail on the merits but whether the claimant is entitled to offer

20  evidence in support of its claims.  *Warden v. Coolidge Unified School District*,

21  2008 U.S. Dist. LEXIS 101323, * 5-6 (D. Ariz. Dec. 15, 2008).  As such, a court

22  must accept as true all material allegations in the complaint, as well as all

23  reasonable inferences to be drawn from them, construing the complaint in the light

24  most favorable to the plaintiff.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049,

25  1055 (9th Cir. 2008).

26          Rule 9(b) is satisfied by allegations indicating the "who, what, where, when

27  and how" of the fraudulent conduct.  *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097,

28  1106 (9th Cir. 2003); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir.

1995).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The ultimate test for pleading sufficiency under Rule 9(b) is whether the complaint identifies the circumstances constituting the fraud such that a defendant can prepare an adequate answer.  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994); *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group,* 2009 U.S. Dist. LEXIS 31832, * 47-48 (D. Ariz. Mar. 29, 2009) (the purpose of Rule 9(b)'s heightened pleading standard is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong") (*quoting Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1991) (internal quotations and citation omitted)); *Madison v. First Magnus Fin. Corp.*, 2009 U.S. Dist. LEXIS 22294, * 12-13 (D. Ariz. Mar. 19, 2009) (same).  Here, the Commission has satisfied the requirements of Rule 9(b).  The Complaint alleges Sieracki's role in the fraud by alleging his participation in the preparation of Countrywide's periodic reports (CMPL ¶¶ 73-77), his knowledge of the omissions and misrepresentations in those filings (CMPL ¶¶ 4, 5, 8, 24-29, 35-37, 49, 52, 55, 61-62, 64, 68-69, 79, 81), and his failure to ensure that management's view of the increased credit risk that Countrywide was taking on was explained in those filings (CMPL ¶¶ 83-90).  Moreover, as set forth in Sections II.A and II.B, above, the Complaint sets forth in detail the alleged misrepresentations and omissions. (CMPL ¶¶ 83-90).

A. **The Complaint Alleges Material Misrepresentations And Omissions Regarding Countrywide's Loan Underwriting And The Consequent Risks**

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security.  A person

9

commits fraud "in connection with" the purchase or sale of any security if he or she makes a misrepresentation or omission in a periodic report filed with the Commission, a press release, other public statement. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860-62 (2d Cir. 1968). A person commits fraud in the offer and sale of a security if he or she makes the misrepresentation or omission in offering and selling in an initial distribution or in secondary market trading of the security. *See United States v. Naftalin*, 441 U.S. 768, 777-78 (1979).

To state a claim alleging material misstatements or omissions under Section 17(a) and Section 10(b) and Rule 10b-5, the Commission must allege and prove essentially the same elements: (1) a material misstatement or omission; (2) in connection with the offer or sale , and in connection with the purchase or sale of a security; (3) by means of interstate commerce. *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007). The Commission has properly alleged all of those elements here. In response, Sieracki argues both that the Complaint fails to allege any actionable misstatement regarding loan quality, and that Countrywide's other public disclosures somehow cured these deficiencies. But Sieracki's argument ignores and misconstrues the serious misrepresentations alleged by the Complaint, and it relies on reference to materials that are (1) not properly considered in a motion to dismiss; and (2) fail to cure the defects in Countrywide's disclosures alleged in the Complaint.

### 1. Countrywide's Public Description Of Its Loan Originations Was Misleading

Sieracki argues that the Commission has created a "strawman" by alleging the Countrywide held itself out as a primarily "prime quality" mortgage lender, and that the Complaint does not point to any such statement. Motion at 7. To the contrary, the Complaint alleges that Countrywide represented on a percentage basis that the majority of its loans were "prime" mortgage loans (CMPL ¶ 18), without disclosing the material fact that what it called "prime" loans included loans made

1    to borrowers with subprime FICO scores.  CMPL ¶ 20-21.

2          In addition, Sieracki argues that the only actual statements alleged in the

3    Complaint regarding loan quality are (1) that Countrywide's underwriting

4    standards were tied to those of the secondary market and (2) that Countrywide

5    "managed" its credit risk.  Motion at 7-8.  On the basis of this tortured reading of

6    the Complaint, Sieracki then accuses the Commission of misrepresenting

7    Countrywide's disclosures.  Motion at 9 and fn. 6.  But, as set forth in Section II.B,

8    above, the Complaint alleges that Countrywide made several affirmative

9    misrepresentations in its periodic filings regarding its loan "quality," including

10   statements that it (1) "managed credit risk through credit policy, underwriting,

11   quality control and surveillance activities;" (2) "consistently produc[ed] quality

12   mortgages;" and (3) believed it had "prudently underwritten" its Pay-Option loans.

13   These statements were materially misleading in light of the omissions set forth in

14   the Complaint, to wit, Countrywide's increasingly lax underwriting guidelines, its

15   reliance on exceptions to those guidelines, and the internal alarms being sounded

16   by credit risk management regarding deteriorating loan quality and the anticipated

17   consequences of that deterioration.

18         The Commission does not allege that managing credit risk means eliminating

19   it altogether, as suggested by Sieracki.  Motion at 8.  Rather, the Commission

20   alleges that it is materially false to assure investors that you are managing risk

21   through, *inter alia*, "underwriting;" are practicing "prudent underwriting;" and are

22   producing "quality mortgages" though that underwriting, all while your CEO and

23   your Credit Risk Management professionals are informing you that your

24   underwriting guidelines are as wide as they have been historically, your reliance on

25   guideline exceptions is increasing your credit risk, your defaults and delinquencies

26   are anticipated to rise as a result of these practices, and you are "flying blind" with

27   respect to your attempts to assess the future performance of your portfolio of loans

28   held for investment.  Compare CMPL ¶¶ 83-90 with CMPL ¶¶ 4-5, 7-8, 35-38, 49,

52, 53, 55, 61-62, 64, 68-69, 75, 78-79, 81.  Thus, the Commission's allegation that Countrywide failed to disclose its widened underwriting guidelines is not simply a *post hoc* criticism of Countrywide's business strategy, as Sieracki suggests.  Motion at 11.  It is an allegation of what Countrywide management recognized internally at the time, but failed to disclose to investors.

The Commission believes that it has more than adequately alleged Countrywide's misstatements regarding its loan quality, as well as its attempts o distinguish itself as a prime quality mortgage lender.  To the extent that the Court believes that an additional "quoted" statement is required, the Commission can provide one.  Countrywide's Forms 10-K for 2005, 2006, and 2007 all specifically stated that "[t]he majority of our loan production consists of Prime Mortgage Loans" – a statement which was knowingly false when made, since Countrywide included loans with subprime FICO scores in its statistics regarding "prime" loans.

## 2.   Countrywide's Disclosures About Its Pay-Option ARMS Were Misleading

Sieracki makes much of the fact that Countrywide made generic disclosures about the "additional risks" presented by Pay-Option ARM loans in its periodic filings, and accuses the Commission of improperly failing to make note of those additional disclosures in its Complaint.  Motion at 18-21.  The Commission does not dispute that the 2005 and 2006 Form 10-K contain disclosures regarding the general risks associated with Pay-Option ARM loans, as well as statistics regarding the average original loan to value, FICO score, amount of negative amortization, and delinquencies in the portfolio held for investment at Countrywide Bank.[2]  Motion at 19-20.  Nor does the Commission dispute that in two quarters in 2006, Countrywide disclosed that substantially all of its Pay-Option were based on reduced

---

[2]     This population was merely a subset of Countrywide's Pay-Option originations, as it sold Pay-Option loans into secondary market securitizations.  No statistics on those loans were disclosed in the Forms 10-K.

documentation.[3]  Motion at 21.  But the Commission did not reference these disclosures in its Complaint for the simple reason that the additional disclosures do not cure the misrepresentation made by Countrywide in the 2006 Form 10-K with Sieracki's participation – "[w]e believe we have prudently underwritten" Pay-Option loans.  CMPL ¶ 90.

The Complaint alleges that Countrywide's CEO, its Chief Credit Risk Officer, and its Credit Risk department issued repeated warnings about (1) Countrywide's widened underwriting guidelines; (2) the increased use of underwriting exceptions; (3) the rapidly rising rate of negative amortization and the consequent risk of payment shock on Pay-Option loans; (4) the anticipated rise in defaults and delinquencies in Countrywide's loans, including the Pay-Option, and (5) the dire consequences to Countrywide's ability to sell loans into the secondary market, all warnings that were apparently ignored by Sieracki.

The descriptions of the Pay-Option loan features simply did not convey to investors what Countrywide's management knew about these loans – borrowers were **in fact** misrepresenting their income in stated documentation loans like the Pay-Option (CMPL ¶¶ 40, 90), the loans were **in fact** negatively amortizing at a higher than expected rate (CMPL ¶¶ 63-65); borrowers would **in fact** suffer payment shock that would be "difficult if not impossible for them to manage" (CMPL ¶ 65), and as early as 2006 Mozilo wanted Countrywide to stop holding Pay-Option loans for investment at Countrywide Bank.  CMPL ¶¶ 68-71.

### 3. Countrywide's Definition Of Prime Loans Was Misleading

Sieracki also argues that the Complaint does not allege that the term "prime"

---

[3]   Notably, that disclosure was deleted from the 2006 Form 10-K, and did not reappear until the second quarter 2007 Form 10-Q.  One rational inference that can be drawn from this vanishing disclosure is that management simply did not want the information in the Form 10-K, which generally receives more scrutiny from investors than a Form 10-Q.  In any event even that disclosure was insufficient to convey to the public what Sieracki already knew – Countrywide's Pay-Option loans were not "prudently underwritten."  CMPL ¶ 71.

is defined under GAAP, or indeed that it has any authoritative definition.  Sieracki then proceeds to argue that a fraud claim cannot be predicated on the misapplication of ambiguous accounting rules.  Motion at 26-27 and fn. 20.  To borrow a term from Sieracki, this GAAP argument is a strawman, since the Complaint does not allege that Countrywide or Sieracki misapplied an accounting principle.  "Prime credit quality" is not an accounting term – it is a widely used term in the credit granting industry – and it is generally understood to mean borrowers with a FICO score above 620.  CMPL ¶ 21.  *In re Downey Sec. Litig.*, CV 08-3261-JFW (RZx) at 7 (March 18, 2009), citing Scott Frame, et al., *A Snapshot of Mortgage Conditions with an Emphasis on Subprime Mortgage Performance*, at 2 (August 27, 2008) ("A subprime mortgage is one made to a borrower with a poor credit history (e.g., a FICO score below 620)"); and *The Handbook of Mortgage-Backed Securities* 368 (Frank J. Fabozzi ed., 6th ed. 2006) ("FICO scores below 620 place borrowers squarely in the subprime category.").  What Sieracki's argument cannot and does not address is the fact that despite the general understanding in the credit industry that a FICO score below 620 is considered subprime, Countrywide included such loans in its statistics regarding prime loan originations.  CMPL 20-21

### 4.       The Misrepresentations And Omissions Alleged In The Complaint Were Material

A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  *See Basic Inc. v. Levinson*, 485 U.S. at 231-32; *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976).  The omissions and misstatements alleged in the Complaint concern facts that would be material to investor.  A reasonable investor would want adequate and accurate disclosures regarding Countrywide's loan underwriting, loan quality, and credit risk.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[I]f a defendant represents that its

1    lending practices are 'conservative' . . ., the securities laws are clearly implicated if

2    it nevertheless intentionally or recklessly omits certain facts contradicting these

3    representations."); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d

4    1142, 1155 (S.D. Cal. 2008) ("as a mortgage lender, Accredited's underwriting

5    practices would be among the most important information looked to by

6    investors.").  False statements regarding the management of credit risk have been

7    deemed material.  *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d

8    1044, 1072  (C.D. Cal. 2008) (allegedly false "statements included representations,

9    for example, that Countrywide actively managed credit risk, applied more stringent

10   underwriting standards for riskier loans such as ARMS, and only retained high

11   credit quality mortgages in its loan portfolio.  The importance of the quality of

12   Countrywide's loans held for both sale and investment underscores the materiality

13   of these statements."); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th

14   Cir. 1993) ("Where a defendant affirmatively characterizes management practices

15   as 'adequate' or loans as 'substantially secured,' 'a defendant declares the subject

16   of its representation to be material to the reasonable shareholder, and thus is bound

17   to speak truthfully.'")  Accordingly, the Complaint has alleged material

18   misrepresentations.

19              **5.**   **Regulation S-K And Countrywide's Own Internal Policy**
20                       **Required That Countrywide Disclose Its Deteriorating**
21                       **Underwriting Standards And The Anticipated**
22                       **Consequences Of That Deterioration**

23                   **a.**   **Regulation S-K Requires Disclosure Of "Known**
24                            **Trends And Uncertainties"**

25          Countrywide's widened underwriting guidelines and its increasing use of

26   exceptions to make loans were known trends that should have been identified in

27   Countrywide's periodic filings, and the conclusions reached by Mozilo and

28   Countrywide's Chief Risk Officer that these trends would likely cause defaults and

delinquencies to rise and impact Countrywide's access to the secondary markets were at a minimum known uncertainties that should have likewise been disclosed to investors.   Item 303 of Regulation S-K requires MD&A in periodic reports.  17 C.F.R. § 229.303.  Among other things, Item 303 requires MD&A disclosures of:

> any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  [17 C.F.R. § 229.303(a)(3)(ii)]  The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

> [17 C.F.R. § 229.303(a), Instruction 3]

The purpose of MD&A disclosures is (1) "to give the investor the opportunity to see the company **through the eyes of management**;" (2) enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (3) provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.  *Interpretation:  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Exchange Act Rel. No. 48960 at Section I.B (Dec. 29, 2003) ("MD&A Release") (emphasis added); [4] *In the Matter of Caterpillar, Inc.*, Exchange Act Rel. No.

---

[4]     Courts have recognized that "the SEC's reasonable interpretation of a statute that it administers, including its promulgation of rules and regulations interpreting or implementing the statute, is entitled to deference." *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir. 2001) (*citing Chevron USA, Inc. v. N.R.D.C.*, 467 U.S. 837 (1984)).  Further, the Ninth Circuit has stated that, in general:

30532 at *12-17 (Mar. 31, 1992).  To further these objectives, Item 303 of Regulation S-K sets forth the information required in the MD&A disclosure that must be included in Forms 10-K and 10-Q.  *See* 17 C.F.R. § 229.303.

Accordingly, the materiality standard for MD&A discussions is different than the general materiality test under *Basic v. Levinson*, 485 U.S. at 231-232.  A two-part test determines when disclosure of known trends or uncertainties under Regulation S-K is required:  (1) is the known trend, demand, commitment, event or uncertainty **likely** to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required; and (2) if management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event, or uncertainty, on the assumption that it **will** come to fruition.  **Disclosure is then required**, even if the information is disclosed elsewhere, unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.  *In the Matter of Bank of Boston Corp.*, SEC Admin. Proc. File No. 3-8270, 1995 WL 757874 at *13 (Dec. 22, 1995); *see also MD&A Release*, Exchange Act Release No. 48960 at Section II.B.3 (Dec. 29, 2003); *In the Matter of Caterpillar,*

> when the meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction.  In such cases, the agency's expertise make it particularly suited to interpret the language. This is especially true when an agency's own regulation is involved, and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation.

*See Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980).

Moreover, so long as the agency's interpretation of its own regulation is reasonable, "[a] court may not substitute its own judgment or 'its own construction of a statutory provision.'" *See Bd. of Trustees of Knox County Hosp. v. Shalala*, 959 F. Supp. 1026, 1030 (S.D. Ind. 1997) (*citing Monsanto v. E.P.A.*, 19 F.3d 1201, 1206-07 (7th Cir. 1994) (*quoting Chevron*, 467 U.S. at 844).  When Congress empowers an agency, such as the Commission, "to elucidate a specific provision of the statute by regulation," "such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *See Chevron*, 467 U.S. at 843-44.

*Inc.*, Exch. Act Rel. 30532 at *16-17 (Mar. 31, 1992).  Here, Countrywide's most senior officer and its Chief Risk Officer had both identified known trends – widened underwriting guidelines, exception loans, and deteriorating loan quality – which each believed was reasonably likely to negatively impact Countrywide's revenue, yet no disclosure of either the known trends or their consequences was included Countrywide's periodic filings.

### b. Countrywide's Internal Disclosure Policy Required Disclosure Of Known Trends And Uncertainties

Countrywide's own internal disclosure controls and procedures ("Disclosure Guidelines") acknowledged the requirement to disclose known trends and uncertainties.  CMPL ¶ 73.  The Disclosure Guidelines required that Countrywide disclose on a timely basis **any information that would be expected to affect the investment decision of a reasonable investor or alter the market price of the Company's securities**."  CMPL ¶ 73 (emphasis added).  To assure that such information was considered in the preparation of the periodic reports, Countrywide's financial reporting staff was required to:

> seek input from and discuss with the Divisional Officers information pertaining to the past and current performance and prospects for their business unit, **known trends and uncertainties related to the business unit**, [and] significant risks and contingencies that may affect the business unit. . .

CMPL ¶ 73 (emphasis added).  The bolded language above directly mirrors the requirement in Regulation S-K that requires management to disclose:

> any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

1 | 17 C.F.R. § 229.303(a)(3)(ii).

2 |      Despite Countrywide's own internal adoption of the Regulation S-K

3 | requirement that known trends and uncertainties be disclosed, Sieracki argues that

4 | Countrywide had no duty to disclose the impact of its widened underwriting

5 | because it was a prediction of a future event.  Motion at 11-12.  While Sieracki is

6 | correct that there is no duty to disclose mere forecasts, the Complaint alleges more.

7 | The Complaint alleges that Sieracki knew of Countrywide's widened guidelines,

8 | knew the likelihood that its defaults and delinquencies would rise as a result, and

9 | had been warned that Countrywide's access to the secondary markets would be

10 | impacted by these trends.  CMPL ¶¶ 4-5, 8, 35-37, 49, 52, 55, 61-62, 64, 68-70, 79,

11 | 81.  Yet these disclosures were not included in Countrywide's MD&A in any

12 | quarter from 2005 through the end of 2007, and the Complaint alleges that Sieracki

13 | participated in the decision to exclude such disclosures.  CMPL ¶¶ 73-79, 81-82.

14 |      Investors would have considered it important in making an investment

15 | decision that Countrywide was writing increasingly risky loans and holding

16 | increased credit risk as a result, because the increasing losses on such loans would

17 | in the future directly result in higher repurchase expenses and lower net income.

18 | Moreover the poor performance of its loans would likely imperil Countrywide's

19 | continued ability to rely on the secondary mortgage market as a source income and

20 | liquidity.  Without the disclosure of such material information of negative trends,

21 | Countrywide's disclosures were misleading and did not comply with the MD&A

22 | disclosure requirements of Item 303 of Regulation S-K.

23 |     **c.**    **The Commission Need Not Allege That**

24 |     **Countrywide's Failure Was "Inevitable"**

25 |      Sieracki's Motion argues on the one hand that the Commission's theory

26 | requires that ultimate collapse of Countrywide have been "inevitable" (Motion at 3),

27 | while at the same time arguing that the Commission's Complaint is defective

28 | because it does **not** in fact allege that Countrywide's failure was "inevitable."

Motion at 12.  Sieracki cites to no authority for the proposition that the Commission must allege the "inevitable" failure of a business to state a claim, and with good reason, as no such legal requirement exists.  As set forth in detail above, Regulation S-K requires that management provide sufficient discussion and analysis in a company's periodic filings to identify trends and **uncertainties** known to management so that investors may see the company's business prospects through the eyes of management.  *MD&A Release*, Exchange Act Release No. 48960 at Section I.B (Dec. 29, 2003).  Instruction 3 to section 303 of Regulation S-K instructs that management's "discussion and analysis shall focus specifically on material events and **uncertainties** known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. § 229.303(a), Instruction 3 (emphasis added).  Accordingly, the Commission is not required to allege that Countrywide's ultimate failure was inevitable; it merely has to allege, as it has done here, that management was aware of significant undisclosed uncertainty with respect to Countrywide's future results due to its widened underwriting guidelines and reliance on exception loans.  CMPL ¶¶ 4-5, 8, 35-37, 49, 52, 55, 61-62, 64, 68-70, 79, 81.

### d.   The Commission Need Not Allege Financial Statement Fraud

Sieracki also argues that the Commission's failure to allege a financial statement misstatement is fatal to its claims.  Motion at 12-14.  In support of this, he cites to two district court cases for the proposition that loss reserves are an indicator of the health of a loan portfolio and an estimate of the risk of future loan defaults.  Motion at 13.  He then argues that the Commission's decision not to charge Countrywide or any of the defendants with misstating their loss reserves is a tacit admission that the reserves were correct and were sufficient to make investors "knowledgeable about the risks of mortgage defaults."  Motion at 14. This specious argument ignores the fact that the Commission's decision to charge a

20

1  particular violation is within the Commission's discretion, and failure to charge a

2  violation is neither an admission that no violation has taken place nor an

3  affirmative statement that the statements in any filing are in fact correct.

4  Moreover, Sieracki's argument defies both logic and common sense.  If Sieracki's

5  position were correct, and loss reserves were in themselves a sufficient predictor of

6  potential defaults, a mortgage lender such as Countrywide would need to do no

7  more in its periodic filings than report its loss reserves to make its discussion of its

8  loan portfolio complete.  But such a practice would obviously not comply with the

9  requirements of regulation S-K, and loss reserves alone could not tell the full story

10  of the deteriorating underwriting standards at Countrywide.

   **6.   Countrywide's MBS Filings And Press Releases Do Not**
11
   **Cure The Misrepresentations And Omissions Alleged In The**
12
   **Complaint**
13

14        Sieracki also urges that the material omissions and misstatements alleged in

15  the Complaint were somehow cured by Countrywide's disclosure of certain

16  statistical data regarding the percentage of Pay-Option and Nonprime loans

17  Countrywide was originating on a monthly basis and from the statistics contained

18  in Countrywide's MBS prospectuses.  Motion at 5, 8, 21, and 30.  But the statistics

19  about Countrywide's loan originations referenced in Sieracki's motion do not

20  include any discussion about Countrywide's widening of underwriting guidelines,

21  the percentage of exception loans Countrywide was making, or the deteriorating

22  quality of Countrywide's loans, and therefore cannot be a substitute for the

23  disclosure of management's analysis of known trends and uncertainties required by

24  Regulation S-K.  Expecting investors to seek out Countrywide's MBS filings and

25  other data sources ignores the very point of Regulation S-K's requirement that

26  MD&A in periodic filings provide investors with a picture of the company through

27  the eyes of management.  *MD&A Release*, Exchange Act Release No. 48960 at

28  Section I.B (Dec. 29, 2003).

1         In addition, the prospectuses for the MBS securitizations were not readily

2    available to purchasers of Countrywide's equity securities.  Countrywide sold its

3    mortgage pools through four **indirect** subsidiaries, CWALT, LLC, CWABS, LLC,

4    CWMBS, LLC, or CWHEQ, LLC.  The prospectus supplements and disclosures

5    for these securitizations were therefore not filed on Edgar under the Countrywide

6    name, but rather under the name of these various special purpose entities.  Thus,

7    investors in Countrywide could not reasonably be expected to know that the MBS

8    prospectuses of issuers named CWALT, LLC, CWABS, LLC, CWMBS, LLC, or

9    CWHEQ, LLC contained information that relevant to a decision to invest in

10   Countrywide Financial Corporation.  Moreover, even if an investor did know about

11   the raw data about loans contained in the MBS prospectuses, that information

12   would not relieve Countrywide of its obligation under Item 303 of Regulation SK

13   to provide MD&A disclosures of "any known trends or uncertainties that have had

14   or that the registrant reasonably expects will have a material favorable or

15   unfavorable impact on net sales or revenues or income from continuing

16   operations."  17 C.F.R. § 229.303(a)(3)(ii).  Nor do the MBS disclosures provide

17   information about the loans that Countrywide held for investment on its balance

18   sheet, loans as to which it bore the entire credit risk.

19        Likewise, statements and statistical data in Countrywide's earnings press

20   releases regarding its origination volumes and delinquency trends were insufficient

21   to adequately inform investors of the known trends and uncertainties regarding

22   Countrywide's underwriting that Credit Risk Management and Mozilo had warned

23   Sieracki about.  None of these alternative sources of information disclosed

24   Countrywide's expansion of underwriting guidelines from 2005 through 2006.

25   The Complaint alleges that Sieracki had actual knowledge of the deteriorating

26   quality of Countrywide's loan production and its consequences, but that

27   information does not appear in the periodic reports he reviewed and signed.

28   Sieracki cannot rely on the  MBS filings and Countrywide press releases to cure

1  the omissions and misrepresentations alleged in the Complaint.

2        Moreover, none of these materials are the proper basis for a dismissal at this

3  stage of the proceedings.  In citing to these extraneous materials, which are not

4  referenced in the Complaint, Sieracki improperly asks this Court to make a factual

5  assessment regarding the materiality of the omissions at issue here.  Materiality is

6  rarely appropriate for review on a motion to dismiss.  The "'materiality' of an

7  omission is a fact-specific determination that should ordinarily be assessed by a

8  jury." *In re Stac Electronic Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996),

9  quoting *Fecht,* 70 F.3d at 1080-81 ("[o]nly if the adequacy of the disclosure or the

10  materiality of the statement is so obvious that reasonable minds could not differ are

11  these issues appropriately resolved as a matter of law.").  *See, also, In re Cabletron*

12  *Systems, Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) ("the materiality of a statement or

13  omission is a question of fact that should normally be left to a jury rather than

14  resolved by the court on a motion to dismiss").  "The determination of materiality

15  requires delicate assessments of the inferences a 'reasonable [investor]' would

16  draw from a given set of facts and the significance of those inferences to him, and

17  these assessments are peculiarly ones for the trier of fact; thus a materiality

18  determination is rarely appropriate at the summary judgment stage, let alone on a

19  motion to dismiss."  *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370

20  (7th Cir. 1997) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450).

21        This defense is also unavailing for the further reason that Sieracki appears to

22  be asserting a "truth on the market" defense.  The "truth-on-the-market" defense

23  posits that a misrepresentation "is immaterial if the information is already known

24  to the market because the misrepresentation cannot then defraud the market."

25  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  The fraud-on-the-

26  market theory, to which the "truth-on-the-market" defense may be asserted, is a

27  means for a private securities law plaintiff to prove reliance on a material

28  misstatement.  *See In re Apple Computer*, 886 F.2d at 1113.  But unlike a private

23

1    plaintiff, the Commission is not required to prove reliance in a securities fraud

2    case, and the fraud-on-the-market cases are therefore inapposite.  *See SEC v. Rana*

3    *Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993).

4         Moreover, this defense is not appropriately considered on a motion to dismiss

5    because an analysis of the merits of the defense would require consideration of

6    substantial evidence outside the complaint.  *See, e.g., Ganino,* 228 F.3d at 167 ("The

7    truth-on-the-market defense is intensely fact-specific and is rarely an appropriate

8    basis for dismissing a § 10(b) complaint for failure to plead materiality").  Sieracki

9    would have to show, for instance, that "material omissions were 'transmitted to the

10   public with a degree of intensity and credibility sufficient to effectively counter-

11   balance any misleading impression.'"  *In re Stellent, Inc. Sec. Lit.*, 326 F. Supp. 2d

12   970, 986 (D. Minn. 2004) (quoting *In re Apple Computer Sec Litig*, 886 F.2d 1109,

13   1116 (9th Cir 1989), *cert denied,* 496 U.S. 943 (1990)); *see also Provenz v. Miller*,

14   102 F.3d 1478, 1492-93 (9th Cir. 1996).  Accordingly, a defendant's burden in

15   establishing this defense is "extremely difficult, perhaps impossible, to meet" even

16   at the summary judgment stage.  *In re Columbia Sec. Lit.*, 155 F.R.D. 466, 482

17   (S.D.N.Y 1994).   Sieracki has not and cannot meet that burden here.

18   **B.    The Misrepresentations And Omissions In The Complaint Were**
19        **Not Mere Opinion**

20        Sieracki argues that the omissions and misstatements alleged in the

21   Complaint are not actionable both because they were mere "opinion," and because

22   the Complaint either does not allege that Sieracki shared the concerns of Mozilo

23   and Countrywide's Credit Risk Management, or because "no material

24   communications referenced in the Complaint were made to Mr. Sieracki."  Motion

25   at 15-18, 21-24.  The latter point is flatly incorrect.  The Complaint alleges that

26   Sieracki was the recipient of numerous communications from Mozilo and Credit

27   Risk Management which put him on notice that Countrywide's underwriting

28   guidelines were wider than they had ever been historically, Countrywide's reliance

24

1    on guideline exceptions was increasing its credit risk, Countrywide's defaults and

2    delinquencies were anticipated to rise as a result of these practices, and

3    Countrywide was "flying blind" with respect to its attempts to assess the future

4    performance of its portfolio of loans held for investment.  CMPL ¶¶ 4-5, 7-8, 35-

5    38, 49, 52, 53, 55, 61-62, 64, 68-69, 75, 78-79, 81.

6         In addition, the facts alleged in the Complaint, (1) widened underwriting

7    guidelines; (2) increased reliance on exceptions to underwriting; and (3) declining

8    loan quality, were not matters of "opinion," as Sieracki argues.  They were known

9    and internally identified trends in Countrywide's loan production that Regulation

10   S-K and Countrywide's own Disclosure Guidelines required be disclosed to

11   investors in the MD&A in Countrywide's periodic filings.  17 C.F.R. § 229.303;

12   CMPL ¶ 73.  Likewise, the anticipated consequences of that lax underwriting, (1)

13   increased defaults and delinquencies; and (2) possible loss of access to the

14   secondary markets, were also potential consequences that should have been

15   disclosed pursuant to Regulation S-K and the Disclosure Guidelines.  17 C.F.R. §

16   229.303; CMPL ¶ 73.

17        Finally, it was not necessary that Sieracki "share" the opinion of the CEO

18   and Chief Risk Officer regarding these matters.  Sieracki was a member of

19   Countrywide's Disclosure Committee from December 2005.  CMPL ¶ 73.

20   Countrywide's own internal disclosure controls and procedures ("Disclosure

21   Guidelines") required be disclosed to investors in the MD&A in Countrywide's

22   periodic filings.  17 C.F.R. § 229.303; CMPL ¶ 73.  The Disclosure Guidelines

23   required that Countrywide disclose on a timely basis **any information that would**

24   **be expected to affect the investment decision of a reasonable investor or alter**

25   **the market price of the Company's securities**."  CMPL ¶ 73 (emphasis added).

26   To assure that such information was considered in the preparation of the periodic

27   reports, Countrywide's financial reporting staff was required to:

28              seek input from and discuss with the Divisional Officers

information pertaining to the past and current

performance and prospects for their business unit, **known**

**trends and uncertainties related to the business unit**,

[and] significant risks and contingencies that may affect

the business unit. . .

CMPL ¶ 73 (emphasis added).  The bolded language above directly mirrors the

requirement in Regulation S-K that requires management to disclose:

any known trends or uncertainties that have had or that

the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues

or income from continuing operations.  [17 C.F.R. §

229.303(a)(3)(ii)]  The discussion and analysis shall

focus specifically on material events and uncertainties

known to management that would cause reported

financial information not to be necessarily indicative of

future operating results or of future financial condition."

17 C.F.R. § 229.303(a), Instruction 3.

The Complaint alleges that starting in the first quarter of 2006, the Chief

Risk Officer provided an MD&A questionnaire to the financial reporting group

which included information about the changes in Countrywide's underwriting

guidelines and the deterioration in its loan quality.  CMPL ¶¶ 74-75, 78.  Moreover,

the Complaint alleges that Countrywide's Credit Risk Management and its Chief

Risk Officer, the individuals expressly charged with monitoring credit risk,

repeatedly warned Sieracki and others from as early as 2004 about the

consequences of Countrywide's widened underwriting guidelines, matching

strategy, and exception loans.  *See, e.g.,* CMPL ¶¶ 5, 24-29, 35-38, 55, 61.  Finally,

the Complaint alleges that Sieracki actively participated in decisions to exclude the

disclosures that the Chief Credit Risk Officer was recommending regarding

1  Countrywide's widened underwriting guidelines.  CMPL ¶¶ 78-79, 81.  Based on

2  those allegations, the Commission has more than adequately alleged Sieracki's

3  obligation – and his failure – to disclose material facts to Countrywide's investors.[5]

4  **C.    The Misrepresentations And Omissions Not Merely Incomplete**

5  Sieracki also argues that the affirmative misrepresentations alleged in the

6  Complaint were merely "incomplete," and therefore not actionable under the

7  securities laws.  Motion at 2, 25-28.  But, as set forth in Section II. B, above, the

8  Complaint alleges material affirmative misrepresentations by Countrywide

9  regarding its loan quality and underwriting standards.  To the extent that those

10  statements were misleading because they omitted material facts, they are in fact

11  actionable where they "affirmatively create an impression of a state of affairs that

12  differs in a material way from the one that actually exists."  *Brody*, 280 F.3d at

13  1006.  The Complaint alleges that Sieracki knew that the company was originating

14  poor quality loans with increased risks factors and underwriting exceptions,

15  including underwriting loans to borrowers with subprime FICO scores and calling

16  them prime.  (CMPL ¶¶ 4-8, 20-21, 35-37, 49, 52, 55, 61-62, 64, 68-70, 79, 81).

17  Under those circumstances, the failure to clarify the statements in Countrywide's

18

19

20  [5]    As set forth herein, the Commission believes that it has more than
21  adequately pled both Sieracki's knowledge of the declining underwriting standards
   at Countrywide and his duty to disclose that information, irrespective of his
22  personal opinion.  To the extent that the Court believes that facts must be pled to
   show that Sieracki himself subscribed to the belief that underwriting standards
23  were declining, the Commission can do so.  For example, in a September 2007
   presentation to Countrywide's Finance Steering Committee, Sieracki made a
24  presentation about market conditions in which he expressly acknowledged that (1)
   the was a 'boom" in non-agency securitizations that began in 2002; (2)
25  Countrywide capitalized on this boom to establish its own underwriting guidelines,
   independent of those established by the government sponsored agencies such as
26  Fannie Mae and Freddie Mac; (3) the trend toward non-agency securitizations
   adversely affected Countrywide's front-end liquidity as early as 2006; (4) the new
27  underwriting guidelines resulted in the "aggressive" approval of "marginal"
   customers; (5) this flood of "marginal" loans diluted the quality of investments in
28  MBS; and (6) the rise in defaults and delinquencies from these marginal loans
   "tested" Countrywide's liquidity.

1    periodic filings regarding its loan quality and its definition of "prime" was

2    misleading, and is actionable.

3         **D.**    <u>**The Commission's Allegations Meet The Plausibility Standard Of**</u>

4                    <u>**Rule 8(a)**</u>

5         Sieracki argues at that the Complaint fails to allege facts that meet the

6    plausibility standards of Rule 8(a) of the Federal Rules of Civil Procedure because

7    Sieracki purchased and held Countrywide stock during the relevant time period.

8    But Sieracki's failure to sell Countrywide stock does not negate an inference of

9    scienter on his part.  Indeed, Sieracki's arguments about his lack of stock sales

10   ignore the other evidence of scienter alleged by the Commission, and overstate the

11   cases he relies upon.  Sieracki argues that a failure to sell stock rebuts an inference

12   of scienter, and relies in part on a lengthy quote from *In re Worlds of Wonder Sec.*

13   *Litig.,* 35 F.3d 1407, 1424-25 (9th Cir. 1994), in support of his position.  Tellingly,

14   Sieracki fails to quote that part of the opinion in which the Court noted that

15   plaintiffs had failed to cite any direct evidence of scienter on the part of the

16   defendants, and instead relied upon speculative inference based upon the

17   defendants' "suspicious conduct."  *Id.* at 1425.

18        The mere fact that Sieracki did not sell his stock is insufficient to negate the

19   substantial evidence of his scienter.  *No. 84 Employer-Teamster Joint Council*

20   *Pension Trust Fund*, 320 F.3d at 944 ("Scienter can be established even if the

21   officers who made the misleading statements did not sell stock during the class

22   period.  In other words, the lack of stock sales by a defendant is not dispositive of

23   scienter"); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir. 1992)

24   (defendant corporation's continued investment of millions of dollars in its product

25   and corporate officers' failure to sell their stock during the class period does not

26   negate evidence of scienter plaintiff produced and, therefore, there was a genuine

27   issue of material fact regarding scienter precluding summary judgment); *Pirraglia v.*

28   *Novell, Inc.*, 339 F.3d 1182, 1191 n. 12 (10th Cir. 2003) (declining to negate scienter

or infer lack of motive to defraud from fact defendants did not sell their stock).

As noted in detail above, the Complaint alleges that Sieracki knew that Countrywide's underwriting standards were declining, knew what the consequences of that decline would be, and made no effort to assure than any disclosure of that risk was included in Countrywide's periodic filings.  Sieracki was a member of Countrywide's Disclosure Committee, Credit Risk Committee and Asset and Liability Committee.  CMPL ¶¶ 36, 38, 73.  At meetings held throughout 2005 and 2006, members of those committees were advised of the increasing balance sheet risk that Countrywide was taking on through widened underwriting guidelines and loans made on an exception basis.  CMPL ¶¶ 36-38.  In addition, beginning in 2006, the Chief Credit Risk Officer unsuccessfully urged that Countrywide disclose more information about its widened underwriting guidelines.  CMPL ¶ 78.  In January 2007, he wrote directly to Sieracki and explained that Countrywide's delinquencies would increase in the future due to a weakening real estate market and what he characterized as credit guidelines that were "wider than they have ever been."  CMPL ¶ 79.  In the second quarter of 2007, the Chief Credit Officer qualified his Sarbanes-Oxley certification, a fact that was called to Sieracki's attention by the deputy CFO.  CMPL ¶ 81.  Yet Sieracki made no effort to disclose this information, and one rational inference from that failure is that he intentionally failed to do so to prop up the value of his holdings of Countrywide stock.  The Commission is entitled to the benefit of this reasonable inference on a motion to dismiss.  *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957) (a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff); *In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1055 (the court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs").

///

**E.**     **Dismissal With Prejudice Is Not Warranted**

Sieracki also argues that the Complaint should be dismissed with prejudice, on the grounds that no proposed amendment can cure the defects with the Commission's Complaint.  Sieracki is wrong as a matter of both fact and law.

As set forth herein, the Commission has properly alleged causes of action against Sieracki for violation of the antifraud provisions of the federal securities laws.  Sieracki's arguments to the contrary are based both on a tortured construction of the Complaint that ignores the material misrepresentations alleged therein, or alternatively, amount to a series of defenses which are inappropriate in the context of a motion to dismiss, because they would require the Court to make judgments regarding the materiality of materials extrinsic to the Complaint.

"[T]he conditions that must be met before a motion may be granted under Fed. R. Civ. P. 12(b)(6) are quite strict."  *Church of Scientology of Calif. v. Flynn*, 744 F.2d 694, 695-96 (9th Cir. 1984).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. at 45-46.  Indeed, the remedy of dismissal with prejudice has been described as "draconian," and dismissal without leave to amend is improper unless it is clear that plaintiff could not propose an amended complaint that states a valid claim.  *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1416 (N.D. Cal. 1995) (dismissal with prejudice is draconian); *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1054 (9th Cir. 2006) (dismissal without leave to amend is improper unless it is clear that plaintiff could not propose an amended complaint that states a valid claim).

The court in the *Clearly Canadian Securities Litigation* declined to dismiss a complaint based on arguments such as those made by Sieracki here.  First, defendants in that matter argued that plaintiffs were unable to attribute a motive to the defendants to commit fraud because the corporate insiders traded little stock

and none of the trading coincided with the alleged fraudulent statements.  *Clearly Canadian* at 1417.  The court found these arguments insufficient to defeat plaintiffs' scienter allegations, which included allegations that defendants made public statements about Clearly Canadian's short term performance while in possession of internal reports that showed their predictions lacked a reasonable basis.  *Id.*  The Court held that, "under the Ninth Circuit's interpretation of the securities laws, these allegations were sufficient to support plaintiffs' claim of scienter at the pleading stage."  *Id.* citing *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir. 1990); *see also In re Time Warner Sec. Litig*, 9 F. 3d 259, 268 (2d Cir. 1993) (noting scienter can be supported by claims of conscious disregard for the truth).  Second, defendants argued that Clearly Canadian's statements were not materially misleading as a matter of law, because (1) Clearly Canadian adequately disclosed the information plaintiffs' claimed was concealed; (2) the company's descriptions of its business strategy did not create an impression of future growth and therefore did not mislead the market; and (3) the statements plaintiffs complained were misleading were expressions of optimism that were not actionable as a matter of law.  *Id.* at 1417-18.  The Court declined to dismiss the Complaint based on these arguments, noting that "[w]hen a corporation chooses to disclose information, it must reveal any information in its possession necessary to render the disclosure not misleading" and that "[t]his rule applies to statements of future projections as well as statements of past performance."  *Id.* at 1418 citing *In re Apple Computer Sec Litig,* 886 F.2d at 1113, *cert denied,* 496 U.S. 943 (1990). The Court reasoned that even if the investment community knew that demand for Clearly Canadian's products had decreased based on market factors such as the proliferation of competitors, "defendants' forecasts could still have been materially misleading if one of three implicit factual assertions contained in the forecasts were false: (1) that the statement was genuinely believed; (2) that there was a

reasonable basis for the belief; and (3) that the speaker was not aware of any undisclosed facts that undermined the accuracy of the statements." *Id.* Finding that the plaintiffs had alleged sufficient facts to show that defendants lacked a reasonable basis for the optimistic projections complained of by plaintiffs, the Court held that the Complaint contained sufficient allegations of material misstatements to support 10b-5 liability and denied defendants' motion to dismiss**.** *Id.* at 1419.

Creative though they may be, Sieracki's arguments simply do not establish that the Commission "can prove no set of facts in support of [its] claim[s] which would entitle [it] to relief." *Conley*, 355 U.S. at 45-46. Under the standards governing motions to dismiss in this Circuit, Sieracki has not established that dismissal is appropriate, let alone dismissal with prejudice.

## IV.   CONCLUSION

For all the foregoing reasons, Sieracki's motion to dismiss should be denied.


Dated:  September 18, 2009                    Respectfully submitted,


                                        /s/ Lynn M. Dean
                                        John M. McCoy III
                                        Lynn M. Dean
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission

32

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]    U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On September 18, 2009, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ERIC SIERACKI'S MOTION TO DISMISS** on all the parties to this action addressed as stated on the attached service list:

[X]    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]    **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

[X]    **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.


Date:  September 18, 2009                    /s/ Lynn M. Dean
                                             Lynn M. Dean

33

**SEC v. ANGELO MOZILO, et al.**
**United States District Court – Central District of California**
**Case No. CV 09-3994 VBF (AJWx)**
**(LA-3370)**

<u>SERVICE LIST</u>

Daniel P. Lefler, Esq.
David Siegel, Esq.
Randall L. Jackson, Esq.
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Email:  dlefler@irell.com
Email:  dsiegel@irell.com
Email:  rjackson@irell.com
***Counsel for Angelo Mozilo***


William R. McLucas, Esq.
Joseph K. Brenner, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Email:  william.mclucas@wilmerhale.com
Email:  joseph.brenner@wilmerhale.com
***Counsel for Angelo Mozilo***


David C. Marcus, Esq.
Caroline E. Kane, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Email:  david.marcus@wilmerhale.com
Email:  caroline.kane@wilmerhale.com
***Counsel for Angelo Mozilo***


Walter F. Brown, Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Email:  wbrown@orrick.com
***Counsel for David Sambol***


Nicolas Morgan, Esq.
DLA Piper
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6023
Email:  nicolas.morgan@dlapiper.com
***Counsel for Eric Sieracki***

34