UNITED STATES DISTRICT COURT                  **PRIORITY SEND**
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES -- GENERAL**

Case No.   **CV 09-3994-JFW (MANx)**                    Date: November 3, 2009

Title:     Securities and Exchange Commission *-v-* Angelo Mozilo, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Shannon Reilly** | **None Present** |
| **Courtroom Deputy** | **Court Reporter** |

| | |
|---|---|
| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
| None | None |

PROCEEDINGS (IN CHAMBERS):    **ORDER DENYING DEFENDANT ANGELO MOZILO'S MOTION TO DISMISS THE COMPLAINT [filed 8/14/2009; Docket No. 42]**;

**ORDER DENYING DEFENDANT DAVID SAMBOL'S MOTION TO STRIKE [filed 8/14/2009; Docket No. 44]**;

**ORDER DENYING DEFENDANT ERIC P. SIERACKI'S MOTION TO DISMISS THE COMPLAINT [filed 8/14/2009; Docket No. 47]**;

**ORDER DENYING DEFENDANT DAVID SAMBOL'S MOTION TO DISMISS THE COMPLAINT [filed 8/14/2009; Docket No. 50]**

On August 14, 2009, Defendant Angelo Mozilo filed a Motion to Dismiss the Complaint. On August 14, 2009, Defendant Eric P. Sieracki filed a Motion to Dismiss the Complaint. On August 14, 2009, Defendant David Sambol filed a Motion to Dismiss the Complaint, and a Motion to Strike. On September 18, 2009, Plaintiff Securities and Exchange Commission (the "SEC") filed its Oppositions. On October 2, 2009, Defendants Mozilo, Sieracki, and Sambol filed their Replies. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's October 19, 2009 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

Initials of Deputy Clerk _sr_

I.    **PROCEDURAL AND FACTUAL BACKGROUND**

The SEC's Complaint alleges that three senior executives of Countrywide Financial Corporation ("Countrywide") committed securities fraud, and that Countrywide's former chairman of the board and chief executive officer engaged in insider trading.  Essentially, the Complaint alleges that Defendants Mozilo, Sambol, and Sieracki (collectively "Defendants") made misleading statements and omissions from 2005 through 2007, reassuring investors that Countrywide was mainly a maker of prime quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices.  Complaint ¶¶ 4, 6.  However, during this same time period, Countrywide allegedly undertook an unprecedented loosening or expansion of its underwriting guidelines, to the point of virtually abandoning its guidelines by matching products offered by any competitor, writing riskier and riskier loans, and making exceptions to its already lax underwriting guidelines.  Complaint ¶ 4.  As a result, the SEC alleges that Defendants defrauded Countrywide's investors.

A.    **Defendants**

1.    **Angelo Mozilo**

Angelo Mozilo was a founder of Countrywide, and served as its chairman of the board and chief executive officer ("CEO") from Countrywide's formation in 1969 until it was acquired by Bank of America in 2008.  Complaint ¶ 10.  He signed the Forms 10-K for the years ended 2005, 2006, and 2007, the Sarbanes-Oxley certifications, and each of the offerings alleged in the Complaint which incorporated the most recent Form 10-K.  Complaint ¶¶ 77, 110.  From November 2006 through August 2007, Mozilo exercised over 5.1 million stock options and sold the underlying shares resulting in total proceeds of over $139 million, pursuant to 10b5-1 plans adopted in late 2006 and amended in early 2007.  Complaint ¶ 9.

2.    **David Sambol**

David Sambol was Countrywide's president and chief operating officer ("COO") from September 2006 until Countrywide was acquired by Bank of America in 2008.  Complaint ¶ 11.  Sambol was Countrywide's executive managing director for business segment operations from April 2006 until September 2006, and executive managing director and chief of mortgage banking and capital markets from January 2004 until April 2006.  Complaint ¶ 11.  Sambol was a member of Countrywide's Board of Directors from 2007 until July 2008.  Complaint ¶ 11.  He signed the Forms 10-Q for the third quarter of 2006 and all of the quarters in 2007, the Form 10-K for the year ended 2007, and each of the offerings alleged in the Complaint which incorporated the most recent Form 10-K.  Complaint ¶¶ 77, 110.  From May 2005 through 2007, Sambol exercised stock options and sold the underlying shares resulting in total proceeds of at least $40 million, pursuant to various 10b5-1 plans.  Complaint ¶ 109.

3.    **Eric Sieracki**

Eric Sieracki was Countrywide's chief financial officer ("CFO") from the first quarter of 2005 until Countrywide was acquired by Bank of America in 2008.  Complaint ¶ 12.  He signed all of the Forms 10-Q and 10-K beginning in the first quarter of 2005 and throughout 2007, and each of the

offerings alleged in the Complaint which incorporated the most recent Form 10-K.  Complaint ¶¶ 77, 110.

## B.    Overview of Countrywide's Business and Lending Practices

Countrywide was a mortgage lender based in Calabasas, California, originating, selling, and servicing both prime and subprime (or "nonprime") mortgage loans.[1]   Complaint ¶ 15.  By 2005, Countrywide was the largest U.S. mortgage lender in the United States, originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007. Complaint ¶ 15.  Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively, and a pre-tax loss of $1.5 billion in its loan production division in 2007.  Complaint ¶ 15.

As alleged in the Complaint, Countrywide pooled most of the loans it originated and sold them in secondary mortgage market transactions, either selling them through whole loan sales or securitization.  Complaint ¶ 16.  In whole loan sales, Countrywide sold the loans to investors and recorded gains on the sales.  In securitizations, Countrywide sold interests in the pooled loans, i.e., mortgage-backed securities ("MBS").   The sale of mortgages into the secondary market was administered by Countrywide's capital markets division, and was an important source of revenue and liquidity for Countrywide.  Complaint ¶¶ 16, 31.  In 2005, Countrywide recognized $451.6 million in pre-tax earnings from capital market sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax earnings, and in 2007 it recognized $14.9 million in pre-tax earnings from that division, reporting a pre-tax loss overall.  Complaint ¶ 16.

Historically, Countrywide's primary business involved originating prime conforming loans that qualified for purchase by the Government Sponsored Entities ("GSEs").  Complaint ¶ 17. However, beginning as early as 2003, Countrywide systematically moved away from its historical core business of prime mortgage underwriting, and aggressively loosened or expanded its underwriting guidelines and wrote more non-conforming, subprime, and home equity loans. Complaint ¶¶ 18, 24.

Specifically, Countrywide allegedly adopted a "matching strategy" or "supermarket strategy," which committed the company to offering any product or matching any underwriting guideline available from at least one "competitor," which included subprime lenders. Complaint ¶ 25.  In other words, if Countrywide did not have a product offered by a competitor, Countrywide invoked the matching strategy and added that product to Countrywide's menu.  Complaint ¶ 25.  For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, Countrywide would reduce its minimum to 560 in order to match its competitor and make the loan.  Complaint ¶ 25.  The adverse impact of the matching strategy was allegedly intensified by Countrywide's no-brokering policy, which precluded Countrywide's loan officers from

---

[1]On July 1, 2008, Countrywide merged with Bank of America and is now a wholly owned subsidiary of Bank of America.  Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009.

referring risky loan applicants to other brokers or institutions.  Complaint ¶ 26.  In addition, largely as a result of Countrywide's matching strategy, Countrywide made a high number of exceptions to its already expanded underwriting guidelines, thereby writing a high number of so-called "exception" loans.  Complaint ¶ 29.

Because of the matching strategy and the loosening of Countrywide's underwriting guidelines, Countrywide's product mix changed, and included more loans with a high risk of default, such as loans with high loan to value ratios, Adjustable Rate Mortgage ("ARM") loans, interest only loans, reduced documentation loans, and loans with layered risk factors.  Complaint ¶ 33.  The Pay-Option ARM loan was a particularly risky product offered by Countrywide.  The Pay-Option ARM loan allowed borrowers to choose among four payment options: (1) a minimum payment which was insufficient to cover accruing interest; (2) an interest-only payment; (3) a fully amortizing payment with a thirty year pay-off; and (4) a fully amortizing payment with a twenty year pay-off.  If the minimum payment was selected, the accruing interest was added to the loan's principal balance, otherwise known as negative amortization.  According to the Complaint, Countrywide's Pay-Option ARM loans typically permitted negative amortization until the principal balance reached 115% of the original loan balance, at which time the payment would reset to an amount necessary to repay principal and interest during the remaining term of the loan.  This resulted in a much higher monthly payment and, as described by Countrywide, "payment shock" to many of its borrowers.  Even if the borrower never reached the 115% threshold, the loan would typically reset after five years to a higher, fully amortizing payment.  Complaint ¶ 58.

Another particularly risky product offered by Countrywide was the "80/20" loan, which allowed a borrower with a subprime FICO score to simultaneously take out two loans to purchase a home: a first lien loan (typically 80% of the purchase price), and a second lien loan (typically 20% of the purchase price).  Complaint ¶ 47.  Because the borrower financed the entire purchase price, the borrower had no equity in the home, which substantially increased the risk that the borrower would default on the loan.  Complaint ¶ 47.

As a result of Countrywide's supermarket strategy and expansion of its underwriting guidelines, Countrywide was able to dramatically increase its market share between 2003 and 2007.  However, because of the increasingly poor quality of loans originated by Countrywide from 2004 though 2007, Countrywide faced a greater risk of defaults and delinquencies than it had in the past, and a greater risk that these loans could not be profitably sold into the secondary mortgage market.  Complaint ¶¶ 31, 32.  As alleged by the SEC, these risks rendered Countrywide's business model unsustainable and eventually culminated in Countrywide's extensive credit and liquidity problems, and Countrywide's highly publicized collapse between 2007 and 2008.

**C.    Alleged Misrepresentations and Omissions**

The mere fact that Countrywide allegedly engaged in a risky or flawed business strategy does not violate the securities laws.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp.2d 1132, 1144 (C.D. Cal. 2008) ("The federal securities laws do not create liability for poor business judgment or failed operations.").  Rather, liability attaches when false or misleading statements or omissions are made in connection with the offer or sale of securities.  *Id.*

The SEC alleges that Defendants made misleading statements in periodic filings and during earnings calls, conferences, and investor presentations, that reassured investors that Countrywide was mainly a maker of prime quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices. The alleged misleading statements can be separated into three main categories: (1) statements regarding the quality of Countrywide's underwriting guidelines and loan portfolio; (2) statements describing Countrywide's loans as "prime" or "subprime;" and (3) statements regarding Countrywide's Pay-Option ARM loans.

### 1.    Misleading statements regarding the quality of Countrywide's underwriting guidelines and loan portfolio

The SEC alleges that Defendants made various misleading statements regarding the quality of Countrywide's underwriting guidelines and loan portfolio.

For example, in Countrywide's Forms 10-K for 2005, 2006, and 2007, Countrywide stated that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." Complaint ¶ 85.

In Countrywide's Form 10-K for 2005, Countrywide also stated: "We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages. . . . We make significant investments in personnel and technology to ensure the quality of our mortgage loan production."  A nearly identical representation appears in Countrywide's 2006 Form 10-K. Complaint ¶ 86.

In addition to the statements in Countrywide's periodic filings, Defendant Mozilo allegedly made numerous public statements from 2005 through 2007, praising the quality of Countrywide's underwriting and distinguishing Countrywide from subprime lenders, stating, for example:

- "[w]e don't see any change in our protocol relative to the quality of loans that we're originating;"
- he "was not aware of any change of substance in [Countrywide's] underwriting policies;"
- "Countrywide had not taken any steps to reduce the quality of its underwriting regimen;"
- Countrywide "backed away from the subprime area because of our concern over credit quality;" and
-  it would be a "mistake" to compare monoline subprime lenders to Countrywide.

Complaint ¶¶ 92, 93, 98.

Sambol also allegedly made a public statement, downplaying Countrywide's participation in originating subprime loans by stating that Countrywide had been "on the sidelines" of the risky subprime market.  Complaint ¶ 99.

The SEC alleges that these statements regarding the quality of Countrywide's underwriting

Initials of Deputy Clerk  _sr_

guidelines and loan portfolio were false because Defendants were aware that Countrywide was originating an increasing percentages of poor quality, subprime loans that did not comply with Countrywide's already lax underwriting guidelines.  Complaint ¶¶ 85, 86, 100.

        2.    <u>Misleading statements describing Countrywide's loans as "prime" or "subprime"</u>

The SEC alleges that Countrywide, in its Forms 10-K for 2005, 2006, and 2007, categorized loans as "prime" even though they were issued to borrowers with FICO scores below 620.

This categorization was allegedly misleading because guidance issued by the banking regulators considered loans to be "subprime" when issued to borrowers with FICO scores 660 or below (although some within the banking industry considered loans to be "subprime" when issued to borrowers with FICO scores 620 or below).  Complaint ¶ 21.  Countrywide, however, did not consider any FICO score too low to be included in its "prime" category.  Complaint ¶¶ 21, 88.

        3.    <u>Misleading statements regarding Pay-Option ARM loans</u>

The SEC also alleges that Defendants made misleading statements regarding Pay-Option ARM loans.  In 2005 and 2006, Mozilo made public statements touting Countrywide's Pay-Option ARM loans, stating, for example, that:

-   "pay option loan quality remains extremely high,"
- Countrywide's "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period," and
- "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for customers."

Complaint ¶¶ 94, 95.

In addition, Countrywide's 2006 Form 10-K stated "[w]e believe we have prudently underwritten" Pay-Option ARM loans.  Complaint ¶ 90.

The SEC alleges that these statements were misleading because Defendant Mozilo and other members of senior management internally expressed grave concerns about the quality or viability of these loans.  For example, on April 4, 2006, in an internal email to Sambol regarding Pay-Option ARM loans, Mozilo stated "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."  Complaint ¶¶ 63, 94.  Shortly thereafter, on May 19, 2006, Mozilo wrote an email to Sambol and Sieracki, stating that Pay-Option loans presented a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."  Complaint ¶ 64.  On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process.  Complaint ¶¶ 40, 65.  On September 25, 2006, Mozilo wrote another email to Sambol and Sieracki, stating "[w]e have no

way with reasonable certainty, to assess the real risk of holding these loans on our balance sheet." Complaint ¶ 68.  Indeed, in the fall of 2006, Mozilo and Countrywide's Chief Information Officer even recommended selling Countrywide's portfolio of Pay-Option ARM loans, recognizing the risks of retaining them on Countywide's balance sheet.  Complaint ¶¶ 69, 70

        4.    <u>Omissions</u>

The securities laws make it unlawful "to omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).  Thus, the SEC alleges, in light of the misleading statements described above, that Defendants were required to and failed to disclose material information to investors, including: (1) Countrywide's increasingly lax underwriting guidelines; (2) Countrywide's pursuit of a "matching strategy;" (3) the high percentage of exception loans originated by Countrywide; (4) Countrywide's categorization of loans as "prime" that were made to borrowers with FICO scores well below the industry standard definition of prime credit quality; (5) the high percentage of Countrywide's subprime originations having a loan to value ratio of 100%; and (6) factors that increased the likelihood of default on Countrywide's subprime originations in addition to the subprime credit history of the borrower, such as reduced documentation, stated income piggyback loans, and loan to value ratios in excess of 95%. Complaint ¶ 8.

    **D.**    **The Claims**

The Complaint alleges the following claims for relief: (1) violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); (2) violation of Section 10(b) of the Securities Exchange Act of 1934  ("Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (3) aiding and abetting violations of Section 13(a) of the Exchange Act,15 U.S.C. §78m(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13; and (4) violation of Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14 (against Defendants Mozilo and Sieracki only).

Defendants have each filed motions to dismiss the Complaint, and Defendant Sambol has filed a motion to strike the SEC's prayer seeking a disgorgement remedy.
.

**II.**    **LEGAL STANDARD**

    **A.**    **Motion to Dismiss**

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"  *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).  "[F]actual allegations must be enough to raise a right to relief above the

Initials of Deputy Clerk __sr_

speculative level." *Id.* at 1965.

A heightened pleading standard applies to claims of fraud. Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The heightened pleading standard of Rule 9(b) is designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). In order to meet this standard, the plaintiff must allege the "who, what, where, when and how" of the fraudulent conduct." *Vess v. Ciba-Geigy Corp.,* 318 F.3d 1097, 1106 (9th Cir. 2003). The complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1066 (9th Cir. 2004) (internal quotations and citations omitted). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess,* 318 F.3d at 1106. However, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology,* 922 F. Supp. at 304 (citing *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied,* 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment.[2] *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994). Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *See Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir. 1996).

## B.    Motion to Strike

Federal Rule of Civil Procedure 12(f) provides "upon motion made by a party before responding to a pleading . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

---

[2]Defendants request that the Court take judicial notice of 58 exhibits, including SEC filings, transcripts of earnings conference calls and investor forums, newspaper articles, emails referenced in the Complaint, stock price data, and other miscellaneous documents. The objections raised in the SEC's Memorandum of Points and Authorities in Opposition to Defendants' Joint Request for Judicial Notice are overruled, and the Court grants Defendants' Joint Request for Judicial Notice.

Initials of Deputy Clerk _sr_

The purpose of a motion to strike is to avoid the expenditure of time and money that will arise from litigating "spurious issues" by eliminating those issues prior to trial. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994). Generally, "motions to strike are regarded with disfavor because they are often used as delaying tactics, and because of the limited importance of pleadings in federal practice." *Bureerong v. Uvawas*, 922 F.Supp. 1450, 1478 (C.D. Cal. 1996); *accord Stanburn Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000). "Courts must view the pleadings under attack in the light more favorable to the pleader." *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D. Cal. 2000). Motions to strike are generally not granted unless it is clear that the matter at issue could have no possible bearing on the subject matter of the case. *Id.*

## III.    DISCUSSION

### A.    Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder)

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder expressly prohibit misrepresentations and omissions of material fact as well as any manipulative or deceptive devices or conduct which operate as a fraud or deceit upon investors. *See* 15 U.S.C. § 77q(a);15 U.S.C. §78j(b); 17 C.F.R. § 240.10b-5. Section 17(a) of the Securities Act prohibits fraud in connection with the offer or sale of securities; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, prohibit fraud in connection with the purchase or sale of securities.[3]

In order to state a claim under these provisions, the SEC must allege facts showing that the defendant made: "(1) a material misstatement or omission (2) in connection with the offer or sale of a security (3) by means of interstate commerce. . . . Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require scienter. . . . Violations of Sections 17(a)(2) and (3) require a showing of negligence." *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007).

Defendants primarily argue that the SEC has failed to state a claim under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder because (1) the alleged misstatements or omissions were not misleading or material; and (2) that any inference of scienter has been negated. In addition, Defendant Sambol argues that the SEC has failed to adequately allege that he made the misstatements or omissions in Countrywide's 2005 and 2006 Forms 10-K.

### 1.    **The SEC has adequately alleged that Defendants made false or**

---

[3]The SEC's Securities Act § 17(a) claim is based on Countrywide's filing of two registration statements. The initial filing was a shelf registration, and it was followed by 180 prospectus supplements identifying the securities offered for sale. Each of these offerings incorporated one of the allegedly false Form 10-Ks by reference. Accordingly, the alleged misleading statements in the Forms 10-K serve as a basis for both the claim under Section 10(b) of the Exchange Act and the claim under Section 17(a) of the Securities Act, and therefore the Court will collectively address these claims.

Initials of Deputy Clerk _sr_

**misleading statements or omissions of material fact.**

In order to be actionable under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the alleged misstatements or omissions must be false or misleading.  A statement or omission is misleading if it "affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A statement, although literally true, can be misleading.  *See In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (quotations and citation omitted) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

In addition, in order to be actionable, the statement or omission must be material.  "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See id.* at 231-32.  Further, "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *See id.* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Both the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact.  *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."); *id* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)) ("Whether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'"); *Siracusano v. Matrixx Initiatives, Inc.*, __ F. 3d __, 2009 WL 3448282, at *9 (9th Cir. 2009) (quotations and citations omitted) ("Questions of materiality . . . involv[e] assessments peculiarly within the province of the trier of fact.").  "Therefore, only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht,* 70 F.3d at 1081 (quotations and citations omitted).

Defendants in large part argue that the majority of the misstatements and omissions were not material or misleading as a matter of law in light of Countrywide's extensive disclosures and the context of the alleged misstatements or omissions.  *See e.g.,* Mozilo's Memorandum of Points and Authorities, pp. 13-15; 20-22; Sambol's Memorandum of Points and Authorities, pp. 15-19; Sieracki's Memorandum of Points and Authorities, pp. 10-11.  However, the materiality and misleading nature of a misstatement or omission is usually a question for the trier of fact, and such an argument is rarely successful on a motion for summary judgment, and even more rarely successful on a motion to dismiss.  *See SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement.").  Indeed, neither Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law.

Accordingly, the Court concludes that the SEC on the whole has adequately alleged that Defendants have made false or misleading statements or omissions of material fact.[4]

> (a)    Misleading statements describing Countrywide's loans as "prime" or "subprime" in Countrywide's Forms 10-K

The SEC has adequately pled that Countrywide's descriptions of its loan categories, "prime non-conforming" and "subprime," constitute misleading statements.  Despite Defendants' argument that the descriptions of Countrywide's loan categories were simply incomplete, the SEC adequately alleges how Countrywide's descriptions "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Because the banking industry and regulators viewed 660 or 620 as the dividing line between prime and subprime loans, by using the word "prime," Countrywide affirmatively created the impression that it used the same dividing line, and only included loans with a credit score of 660 or above, or at the very least, 620 or above, within that category.  *See* Complaint ¶¶ 21, 88.  The Court agrees with Judge Pfaelzer's analysis of substantially similar allegations, and concludes that the allegations are sufficient to survive a motion to dismiss.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1146-47 (C.D. Cal. 2008) (finding that complaint adequately alleged a misleading definition of "subprime" given allegations that industry custom regarded 660 as the prime-subprime dividing line).

The SEC also adequately alleges the materiality of the misleading descriptions of Countrywide's loan categories.  Specifically, the Complaint states: "On July 24, 2007, in the earnings release teleconference, Countrywide disclosed for the first time that its definition of 'prime' loans included loans made to borrowers with FICO scores as low as 500 . . . .After the disclosures regarding its credit risk on July 24, 2007, Countrywide's share price dropped from the previous day's close of $34.06 to $30.50 on July 24, an 11% decline." Complaint ¶ 103.  *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (finding plaintiffs had sufficiently pled materiality relying in part on stock price decline after the facts were fully disclosed to the market).

Defendants argue that the misleading descriptions of Countrywide's loan categories were immaterial, because Countrywide's prospectus supplements, filed each time Countrywide sold mortgage-backed securities, disclosed the FICO scores of its loans.   In other words, Defendants claim that a reasonable investor would not view the information – that Countrywide's prime category included loans to borrowers with FICO scores below 620 –  as having "significantly altered the 'total mix' of information available."  However, the "total mix" of information only includes information that is "readily" or "reasonably" available to an investor.  *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2nd Cir. 1999) ("The 'total mix' includes only information 'reasonably available to shareholders.'")*; Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) ("The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders.").  Defendants'

---

[4]Although the Court has not discussed every alleged statement or omission in detail, the Court is unable to conclude at the pleading stage that any of the alleged statements or omissions were not material or misleading as a matter of law.

argument is based on prospectuses, not filed by Countrywide itself, but by four indirect subsidiaries, CWALT, CWABS, CWMBS, and CWEQ. An investor would not only need to know each subsidiary's name but would also have to decipher complex raw data to understand that Countrywide's prime category included borrowers with FICO scores below 620.[5] In this case, the Court cannot conclude at the motion to dismiss stage that this information was "readily" or "reasonably available," especially given the substantial 11% decline in the stock price after the July 24, 2007 announcement.

> (b)  Misleading statements regarding the quality of Countrywide's underwriting guidelines and loan portfolio

The SEC has adequately alleged that Defendants made misleading statements of material fact regarding the quality of Countrywide's underwriting systems and loan portfolio.

For example, in Countrywide's Forms 10-K for 2005, 2006, and 2007, Countrywide stated that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." Complaint ¶ 85. In addition, in its Form 10-K for 2005, Countrywide stated: "We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages. . . . We make significant investments in personnel and technology to ensure the quality of our mortgage loan production." A nearly identical representation appears in Countrywide's 2006 Form 10-K. Complaint ¶ 86.

Several recent district court cases in the Ninth Circuit have concluded that nearly identical statements were adequately alleged to be materially false and misleading. *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1153 (C.D. Cal. 2008) (finding complaint adequately alleged that these exact statements in Countrywide's Forms 10-K were materially false or misleading in private securities class action); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (finding that Complaint adequately alleged material misstatements regarding loan quality and underwriting, including statements that described the company as having "higher credit quality," "improved underwriting controls an appraisal review process," "a strategy of [selecting borrowers with increasing credit scores]," "strict underwriting and risk management disciplines," and "better credit quality"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149 (S.D. Cal. 2008) (finding complaint adequately alleged that statements describing company as focused on credit quality, and touting company's procedures as better and more conservative than those of other sub-prime mortgage lenders were materially false and misleading); *In re Washington Mutual, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 99727, at *18-21, 25-27 (W.D. Wash.

---

[5]Defendant Sambol claims in his Reply that the names of the four subsidiaries can be found by typing "Countrywide" into the search field on EDGAR, the SEC's computer database. The Court tested Sambol's claim by typing "Countrywide" into the search field on EDGAR. However, the search result only identified the name of one of these subsidiaries. *See also* Harold S. Bloomenthal, *Securities Class Actions and the Mortgage Crises – Part 1*, 31 No. 3 Sec. and Fed. Corp. L. Rep. 1, Mar. 2009, at 9 ("We would add that without the name of the [Special Investment Vehicle] it is difficult to find these prospectuses on EDGAR.").

Initials of Deputy Clerk  _sr_

Oct. 27, 2009) (finding complaint adequately alleged that statements describing company as "disciplined and vigilant in [its] underwriting standards," and as having "excellent processes, policies, underwritings, standards" and "appropriate policies, standards, and limits designed to maintain risk exposures within the Company's risk tolerance" were false and misleading).

Likewise, the Court concludes that the Complaint in this case adequately demonstrates that these statements were materially false and misleading.  The specific allegations of the Complaint relied on by the SEC describe in great detail the virtual abandonment of prudent underwriting guidelines and the resulting proliferation of poor quality loans, during the same period Countrywide was touting the superior quality of its underwriting guidelines and its loan portfolio.  Moreover, given that Countrywide's core business, i.e., selling mortgages into the secondary market, admittedly depended upon the quality of its loan production, it is certainly not difficult for the Court to conclude that the poor quality of Countrywide's underwriting practices and loan portfolio would be material to investors.  *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149 (S.D. Cal. 2008) ("[A]s a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors.").

Defendants again argue that Countrywide's extensive disclosures make these statements not misleading or material.  However, the Court cannot conclude as a matter of law at the pleading stage that those disclosures adequately communicated the extent and magnitude of Countrywide's departure from its underwriting guidelines and its entry into the subprime market.  Indeed, it appears that some of the disclosures relied on by Defendants may have themselves included misleading statements that concealed the true extent of the poor quality of Countrywide's loans. For example, to support his conclusion that investors were aware that Countrywide's product mix had deteriorated, Defendant Mozilo cites to data that segregates Countrywide's loan production by category ("prime conforming," "prime non-conforming," "non prime," etc.).  However, as alleged by the SEC, these categories were inherently misleading to investors and designed to disguise the actual number of subprime loans that Countrywide had originated.  Moreover, Defendants again rely on the prospectus supplements issued by four indirect subsidiaries, to argue that Countrywide had disclosed its underwriting standards to the market.  However, as discussed *supra*, the Court cannot conclude at the motion to dismiss stage that this information was reasonably or readily available to investors.

Accordingly, the SEC has adequately alleged that Defendants made misleading statements of material fact regarding the quality of Countrywide's underwriting guidelines and loan portfolio.

(c)    Misleading statements regarding Pay-Option ARM loans

The Court also concludes that the SEC has adequately pled that Defendants have made false or misleading statements regarding Pay-Option ARM loans.

For example, the SEC alleges that the statement in Countrywide's 2006 Form 10-K, that "[w]e believe we have prudently underwritten" Pay-Option ARM loans, constituted a false or misleading statement of material fact.  Defendants accuse the SEC of taking this statement out of context, and that when considered in context, it is not false or misleading.   The statement appears in a paragraph that reads:

Initials of Deputy Clerk  _sr_

These [pay-option ARM] loans are different than "traditional" loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in the early periods of a loan's life.  While we believe that we have prudently underwritten these loans, such loans present additional risks.

Request for Judicial Notice ("RJN"), Exh. 4 at 61.  Countrywide then described those additional risks, including the potential for negative amortization, the risk that defaults would increase when the loans "reset," and the potential for "payment shock."

However, even considering Countrywide's disclosure regarding Pay-Option ARM loans in context, Defendants fail to show that the statement was not false or misleading as a matter of law. Despite Countrywide's disclosure of some of the additional risk factors associated with Pay-Option ARM loans, a reasonable investor could be reassured or misled into believing that Countrywide had minimized those risks through adherence to strict underwriting standards.  Moreover, the SEC adequately alleges that Defendants did not actually believe that Countrywide had prudently underwritten Pay-Option ARM loans, and thus the statement could be considered false, and not just misleading.  *See, e.g.,* Complaint ¶ 40 ("On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process."); ¶ 64 ("[On] May 16, 2006, Mozilo wrote another email to Sambol and Sieracki, noting that Pay-Option ARM loans presented a long term problem 'unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."); ¶ 68 (alleging that on September 25, 2006, Mozilo sent an email to Sambol and Sieracki, stating in part: "[w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet . . . .The bottom line is that we are flying blind on how these loans will perform . . . ."); ¶¶ 69-70 (alleging that Mozilo and the Chief Information Officer recommended selling off Countrywide's portfolio of Pay-Option ARM loans to eliminate the risks of retaining them on Countrywide's balance sheet).  Accordingly, the Court cannot conclude that the statement, that  "[w]e believe we have prudently underwritten" Pay-Option ARM loans, standing alone or even when considered in context, was not false or misleading as a matter of law.

In addition, the SEC has adequately pled that this misstatement was material, given the allegations that Pay-Option ARM loans ranged between 17% and 21% of Countrywide's total loan originations in 2005 and 2006, and that Countrywide's share price dropped 11% after its disclosure that 80% of its portfolio of Pay-Option ARM loans held for investment were underwritten based upon reduced documentation.  Complaint ¶¶ 21, 103.

## 2.    The SEC has adequately pled that Defendant Sambol made false or misleading statements or omissions of material fact.

Defendant Sambol argues that the SEC has failed to adequately plead that he made the false or misleading statements or omissions in Countrywide's 2005 and 2006 Form 10-Ks discussed in the previous section,  because the allegations are insufficient to demonstrate that he "substantially participated or was intricately involved in the preparation of and dissemination of" those fraudulent statements, or that he signed a public filing containing those statements.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).

Initials of Deputy Clerk __sr__

However, the SEC may satisfy its pleading burden under Federal Rule of Civil Procedure 9(b) by relying on the "group published information" presumption to allege that Defendant Sambol "made" a statement:[6]

> In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*In re Glenfed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995) (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)). Because Defendant Sambol was Countrywide's President and COO, and was involved in the day-to-day operations of the company, the SEC is entitled to this presumption, at least while he held these positions. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441-42 (9th Cir. 1987) (applying the presumption to an individual who held the office of Senior Vice President/Chief Operating Officer). Thus, the SEC has adequately alleged that Defendant Sambol "made" the misleading statements in the 2006 Form 10-K, filed while Defendant Sambol was President and COO, as discussed in the previous section.[7]

Moreover, although neither party addresses the issue, even if the "group published information" presumption is not applicable, Defendant Sambol signed public filings containing misleading statements, and thus "made" those misleading statements. According to the Complaint, Sambol signed registration statements which incorporated the 2005 and 2006 Forms 10-K by reference.[8] *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000) (holding

---

[6]Although this Court has previously concluded that the "group published information" presumption did not survive the Private Securities Litigation Reform Act ("PSLRA"), the Court notes that the PSLRA does not apply to SEC enforcement actions. *See, e.g., SEC v. ICN Pharmaceuticals, Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC."); *SEC v. Mercury Interactive, LLC*, 2009 WL 2984769, at *3 n.4 (N.D. Cal. Sept. 15, 2009) ("[T]he PSLRA does not apply to actions brought by the SEC.").

[7]Of course, Defendant Sambol will have an opportunity to rebut this presumption on a motion for summary judgment or at the time of trial. *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 759 (N.D. Cal. 1997) ("On summary judgment, a defendant may rebut the group pleading presumption by producing evidence that he had no involvement in creating the challenged document.").

[8]Although the SEC does not specifically identify which Form 10-K each registration statement incorporated by reference, the Court takes judicial notice of the Form S-3ASR dated February 9, 2006, the Post-Effective Amendment to that Form S-3ASR dated October 30, 2006, and the Form S-3ASR dated November 16, 2007. Each statement clearly identifies the Form 10-K incorporated by reference.

Initials of Deputy Clerk _sr_

signers of SEC documents responsible for the statements they sign); *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) (SEC can state a fraud claim under both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act for statements in S-8 form even though the transaction registered did not involve distribution of shares to the public market because the form was publicly disseminated).[9]

### 3.    The SEC has adequately alleged scienter.

Under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, the SEC must allege that Defendants made the alleged misstatements and omissions with "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud," or at a minimum, deliberate or conscious recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).

However, unlike a private action governed by the PSLRA, which requires a plaintiff to plead facts giving rise to a strong inference of scienter, the SEC is only required to comply with Federal Rule of Civil Procedure 9(b) and thus may allege scienter generally. *See* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *SEC v. Small Cap Research Group, Inc.*, 226 F. App'x 656, 657 (9th Cir. 2007) (explaining that because the action was brought by the SEC, allegations of scienter may be averred generally); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 n.4 (9th Cir.1995) (internal quotations, ellipsis, and brackets omitted) ("[P]laintiffs need simply say that scienter existed to satisfy the requirements of Rule 9(b)."). Of course, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Here, Defendants argue that any inference of scienter arising from the SEC's allegations is negated by Countrywide's and Defendants' extensive disclosures, and in the case of Defendant Sieracki, by his stock purchases and lack of stock sales. To support their arguments, however, Defendants only rely on decisions which applied the heightened pleading standard of the PSLRA, or which did not involve a motion to dismiss. *See In re Downey Securities Litigation*, 2009 WL 736802, at *9 (C.D. Cal. 2009) (applying the PSLRA heightened pleading standard); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp.3d 944, 956 (C.D. Cal. 2003) (applying the PSLRA heightened pleading standard); *Sakhrani v. Brightpoint, Inc.*, 2001 WL 395752, at *17 (S.D. Ind.

---

[9]In addition, aside from Defendant Sambol's alleged misleading statements in periodic filings, the SEC has adequately alleged that Defendant Sambol made at least one other misleading statement to investors. Specifically, at the September 13, 2006 Fixed Income Investor Forum, Defendant Sambol stated that Countrywide had been "on the sidelines" of the subprime market, notwithstanding the fact that Countrywide's "matching strategy" committed it to matching any underwriting guideline or product offered by its competitors, even subprime lenders. After considering the statement in context, as suggested by Defendant Sambol, the Court concludes that the statement was even more misleading because Defendant Sambol also represented that "subprime represents less than 10% of our total production." Because Countrywide did not use the industry's customary prime/subprime dividing line in categorizing its loans, Sambol's statement minimized and thereby effectively concealed the true extent of Countrywide's entry into the subprime market.

Initials of Deputy Clerk _sr_

Mar. 29, 2001) (applying the PSLRA heightened pleading standard)*; Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (setting forth the PSLRA heightened pleading standard); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (applying the PSLRA heightened pleading standard); *In re Dothill Systems Corp. Sec. Litig.*, 2009 WL 734296, at *9 (S.D. Cal. Mar. 18, 2009) (applying the PSLRA heightened pleading standard); *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992) (applying heightened pleading standard for scienter inapplicable in the Ninth Circuit prior to the enactment of the PSLRA); *SEC v. Alpha Telecom*, 187 F. Supp. 2d 1250, 1261 (D. Or. 2002) (decision after bench trial); *SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) (appeal from decision granting permanent injunction)*; In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) (appeal from decision on motion for summary judgment). Not a single case cited by Defendants dismissed a complaint for failure to *plausibly* allege scienter.

Here, accepting the allegations of the Complaint as true and construing them in the light most favorable to the SEC, the Complaint plausibly supports a finding of scienter as to each of the Defendants. Based on their positions within Countrywide and internal emails, Defendants plausibly had contemporaneous knowledge that their statements were misleading when made, which in turn plausibly supports a finding that Defendants acted with the intent to deceive or defraud.

## B.    Defendant Mozilo's Insider Trading

As part of its Section 10(b) and Rule 10b-5 claim, the SEC alleges that Defendant Mozilo engaged in insider trading, i.e., that he traded in the securities of Countrywide on the basis of material, nonpublic information. *See United States v. O'Hagan*, 521 U.S. 642, 651 (1997) ("Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.").

Defendant Mozilo argues that the insider trading claim must be dismissed because (1) the Complaint fails to adequately allege any material misstatements or omissions; and (2) Defendant Mozilo repeatedly made disclosures that were inconsistent with an intent to deceive. However, as the Court has concluded, the Complaint adequately alleges that Defendant Mozilo made material misstatements or omissions, and plausibly supports a finding that Defendant Mozilo acted with scienter.

Accordingly, in light of the fact that from November 2006 through August 2007, Mozilo allegedly exercised over 5.1 million stock options and sold the underlying shares resulting in total proceeds of over $139 million, pursuant to 10b5-1 plans adopted or amended while Mozilo was in possession of material nonpublic information, the Court concludes that the SEC has adequately stated a claim for insider trading against Mozilo under Section 10(b) and Rule 10b-5.

## C.    Aiding and Abetting Violations of Section 13(a) of the Exchange Act (and Rules 12b-20, 13a-1, and 13a-13 thereunder)

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder require issuers of securities registered pursuant to Section 12 of the Exchange Act, such as Countrywide, to file with the SEC accurate periodic and current reports. An issuer violates these provisions if it files a report that contains materially false or misleading information. *SEC v. Yuen*, 2006 WL

Initials of Deputy Clerk  _sr_

1390828, at *41 (C.D. Cal. Mar. 16, 2006).  In addition, Rule 12b-20 requires these reports to contain any "further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. 240.12b-20.

In order to allege a claim against Defendants for aiding and abetting a company's violation of these provisions, the SEC must allege facts demonstrating that: (1) Countrywide violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; (2) Defendants had knowledge of the primary violation and of his or her own role in furthering it; and (3) Defendants provided substantial assistance in the primary violation.  *See Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003).

Although all Defendants move to dismiss this claim for relief, only Defendant Sambol specifically argues that the SEC has failed to adequately plead these three elements.  As the Court already concluded, the SEC has adequately alleged that Countrywide's periodic reports contained materially false or misleading statements, and specifically, that Defendants actually made those false or misleading statements with scienter.   As a result, the SEC has adequately alleged that Defendants aided and abetted violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## D.    Violation of Rule 13a-14 of the Exchange Act

The SEC alleges that Defendants Mozilo and Sieracki violated Rule 13a-14 of the Exchange Act, requiring them to certify that Countrywide's 2005, 2006, and 2007 Forms 10-K, did not contain any material misstatements or omissions.

In a footnote, Defendants Mozilo and Sieracki argue that a violation of Rule 13a-14 of the Exchange Act cannot be pled as an independent claim for relief, citing one district court opinion from the Northern District of Illinois.  Because there are no appellate decisions addressing the issue and because resolution of this issue will not impact the course of discovery in this litigation, the Court denies the motions to dismiss this claim without prejudice, to re-raising this issue during the course of litigation.

## E.    Sambol's Motion to Strike the SEC's Request for Disgorgement Remedy

Defendant Sambol moves to strike the SEC's request that the Court order that he "disgorge all ill-gotten gains from [his] illegal conduct, together with prejudgment interest thereon," arguing that the Complaint does not allege facts supporting the requested relief.

A district court has broad equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of the securities laws. *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir.1998). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Id.* The amount to be disgorged need only be "a reasonable approximation of profits causally connected to the violation." *Id.* at 1192 n. 6 (internal quotations omitted).

The Complaint adequately alleges facts supporting the requested relief, i.e., that Defendant Sambol received ill-gotten gains through violation of the securities laws.  More specifically, the

Initials of Deputy Clerk  _sr_

Complaint sufficiently alleges that Defendant Sambol's actions artificially inflated Countrywide's stock price, and that during the time Countrywide's stock price was inflated, Defendant Sambol realized gross proceeds of over $40 million from stock sales.  Complaint ¶¶ 23, 109

Accordingly, the disgorgement request is not "redundant, immaterial, impertinent, or scandalous," and Defendant Sambol's Motion to Strike is **DENIED.**

## V.    CONCLUSION

For the foregoing reasons, Defendant Angelo Mozilo's Motion to Dismiss the Complaint, Defendant Eric P. Sieracki's Motion to Dismiss the Complaint, and Defendant David Sambol's Motion to Dismiss the Complaint and Motion to Strike are **DENIED.**[10]

IT IS SO ORDERED.

---

[10]The Court found it unnecessary to specifically address each of the arguments made by Defendants, as they were irrelevant to the disposition of these motions, and in some cases were extremely unpersuasive.  *See, e.g.,* Defendant Mozilo's Memorandum of Points and Authorities, p. 23 n.11 (arguing that Countrywide's disclosure that "in deciding whether to extend credit to borrowers under certain loan programs, we assume that the information provided by a customer is accurate and complete and we do not independently verify the information" somehow magically revealed to investors that Countrywide knew that a significant number of borrowers were in fact committing fraud by misstating their income).