IRELL & MANELLA LLP
David Siegel (101355) (dsiegel@irell.com)
Daniel P. Lefler (151253) (dlefler@irell.com)
Randall L. Jackson (244545) (rjackson@irell.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

WILLIAMS & CONNOLLY LLP
Brendan V. Sullivan, Jr. (*Pro Hac Vice*)
David D. Aufhauser (*Pro Hac Vice*)
Tobin J. Romero (*Pro Hac Vice*)
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

Attorneys for Defendant
Angelo Mozilo

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>                    Defendants. | Case No. CV 09-03994 JFW (MANx)<br><br>**JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OR ADJUDICATION**<br><br>Date:     August 30, 2010<br>Time:     1:30 p.m.<br>Ctrm:     16<br>Judge:   Hon. John F. Walter<br><br><br>Pre-Trial Conf:     October 1, 2010<br>Trial:               October 19, 2010 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................1

II.    STATEMENT OF FACTS ....................................................................4

    A.     Countrywide's "Originate-to-Distribute" Business Model .................4

    B.     Countrywide Disclosed An Enormous Amount Of Information About The Credit Attributes Of Its Loan Originations ............................................................................6

        1.     Countrywide Disclosed That Credit Guidelines Were Driven By Secondary Market Standards .........................6

        2.     Countrywide Disclosed That It Offered A Wide Product Menu...............................................................7

        3.     Countrywide Disclosed Detailed Information Regarding The Loans Originated Under Its Disclosed Strategies .................................................8

        4.     Countrywide Disclosed Increasing Delinquencies ..................11

    C.     Countrywide Did Not Lose "Access" To The Secondary Mortgage Market – The Secondary Mortgage Market Evaporated..................................................................12

    D.     Countrywide Disclosed the Material Facts Concerning its Portfolio of Pay-Option Loans ............................................13

        1.     Countrywide Disclosed The Unique Risks Of Pay-Option Loans ..............................................................13

        2.     Countrywide Disclosed The Facts Concerning Its Pay-Option Loan Portfolio ......................................15

III.   ARGUMENT ......................................................................................16

    A.     Defendants Are Entitled To Summary Adjudication Of The Falsity Theories Concerning Countrywide's Originate-To-Distribute Business ........................................17

        1.     The Undisputed Evidence Establishes – And The SEC Now Admits – That Stockholders Understood Countrywide's Underwriting Guidelines Expanded Over Time .................................................18

        2.     The Undisputed Facts Establish That The Disruption Of Countrywide's Originate-To-Distribute Business Had Nothing To Do With The Quality Of Its Mortgages ......................................21

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

<u>Page</u>

3.  The Challenged Statements About "Credit Management," "Quality," and "Prudent Underwriting" Are Inactionable Puffery .......................23

4.  The SEC's Reliance On Regulation S-K Item 303 Is Insufficient As A Matter Of Law To Establish A Fraud Claim .......................25

5.  The Undisputed Evidence Establishes That Countrywide's Use Of The Terms "Prime" And "Nonprime" Was Not Misleading .......................27

B.  Defendants Are Entitled To Summary Adjudication Of Each Of The SEC's Theories Of Falsity Concerning Countrywide Bank's Held-For-Investment Portfolio .......................29

1.  Mozilo's "Flying Blind" Concern – That The Performance Of Countrywide's Pay-Option Loans Was Untested – Was Disclosed Repeatedly .......................30

2.  The Other Concerns Expressed In Mozilo's Emails Were Also Disclosed .......................33

C.  Countrywide's Unchallenged Financial Statements And Extensive Disclosures Are Inconsistent With An Intent To Deceive .......................35

D.  Rule 13a-14 Does Not Give Rise To A Cause Of Action .......................36

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992.15  05

## TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

*Aaron v. SEC*,
    446 U.S. 680, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980) .............................. 16

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006) ........................................ 26

*Alfus v. Pyramid Tech. Corp.*,
    745 F. Supp. 1511 (N.D. Cal. 1990) ........................................ 36

*American Italian Pasta Co. v. New World Pasta Co.*,
    371 F.3d 387 (8th Cir. 2004) ............................................... 23

*Anunziato v. eMachines, Inc.*,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) .................................. 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................ 22

*ECA Local 134 IBEW v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .......................................... 23, 24

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................ 17

*Ferber v. Travelers Corp.*,
    802 F. Supp. 698 (D. Conn. 1992) .................................... 36

*Frota v. Prudential-Bache Sec., Inc.*,
    639 F. Supp. 1186 (S.D.N.Y. 1986) ................................... 35

*In re Caere Corp. Sec. Litig.*,
    837 F. Supp. 1054 (N.D. Cal. 1993) .................................. 26

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) .................................. 35

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ........................................ 21, 26

*In re Countrywide Fin. Corp. Mortgage Mkt'g & Sales Practice Litig.*,
    601 F. Supp. 2d 1201 (S.D. Cal. 2009) ................................ 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................... 24

*In re Cutera Sec. Litig.*,
    __ F.3d ____, 2010 WL 2595281 (9th Cir. June 30, 2010) .................. 23, 31

*In re Downey Sec. Litig.*,
    2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ............................. 25

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

Page(s)

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................................ 24

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ............................................................... 23, 25

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ................................................... 19, 36

*In re Verifone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ............................................................... 22, 26

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................... 36

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ............................................................. 21, 36

*Kane v. Madge Networks N.V.*,
    2000 WL 33208166 (N.D. Cal. May 26, 2000) ......................................... 23

*Oran v. Stafford*,
    26 F.3d 275 (3d Cir. 2000) .................................................................... 26

*Oxford Asset Mgt, Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ............................................................. 36

*Ponce v. SEC*,
    345 F.3d 722 (9th Cir. 2003) ................................................................ 16

*Rubke v. Capital Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .............................................................. 31

*SEC v. Black*,
    2008 WL 4394891 (N.D. Ill. Sept. 24, 2008) .......................................... 36

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ................................................................ 16

*SEC v. Kearns*,
    691 F. Supp. 2d 601 (D.N.J. 2010) ....................................................... 23

*SEC v. Todd*,
    2007 WL 1574756 (S.D. Cal. May 30, 2007) .......................................... 26

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
    2010 WL 2473595 (S.D.N.Y. June 17, 2010) .............................. 3, 31, 32

*Tuchman v. DSC Commc'ns Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ............................................................... 31

|  |  | Page(s) |
|---|---|---|

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ........................................................26

**Statutes**

15 U.S.C. § 77q(a) ...........................................................................16, 17

15 U.S.C. § 78j(b).......................................................................16, 17, 26

15 U.S.C. § 78m(a) ...................................................................................17

**Regulations**

17 C.F.R. § 229.1100 *et seq.*.......................................................................9

17 C.F.R. § 229.303 ...........................................................17, 25, 26

17 C.F.R. § 240.10b-5 .........................................................................26

17 C.F.R. § 240.13a-14...........................................................................36

**Rules**

Fed. R. Civ. P. 56(d)(1) ...........................................................................4

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992.15  05

# I.   **INTRODUCTION**

Allegations are easy; proof is hard.  The facts developed in discovery in this case disprove the allegations the Securities and Exchange Commission ("SEC" or "Commission") made a year ago.  The SEC alleged that Countrywide Financial Corporation ("Countrywide" or the "Company") "hid from investors" that it had "engaged in an unprecedented expansion of its underwriting guidelines from 2005 and into 2007."  But discovery shows without question that the "expansion of underwriting guidelines" – an industry-wide phenomenon not exclusive to Countrywide – was no secret at all.  On the contrary, Countrywide extensively disclosed the risk characteristics of mortgages it originated, including in its periodic filings, on free Company-sponsored websites and in prospectus supplements issued for the sale of mortgage backed securities.

Far from squaring Countrywide's mountain of disclosure with its concealment theory, the SEC engaged in a stunning about-face during discovery.  Last year, when opposing Defendants' motions to dismiss, the Commission urged the Court to ignore the prospectus supplements, arguing that they were not "readily available to purchasers of Countrywide's equity securities" – notwithstanding that these documents were (and are) available on the SEC's own EDGAR website.  Dkt. No. 57 at 19.  In a complete reversal, the SEC admitted – albeit only after losing a motion to compel – that equity investors in fact did take the prospectus supplement information into account in setting Countrywide's common stock price. Additionally, the SEC's economics expert witness opined that both the prospectus supplement information and the information contained on the Company's websites were reflected in its stock price.  These admissions, together with Countrywide's extensive disclosures, leave no plausible argument that stockholders were unaware of guideline expansion.

The SEC has also essentially given up on its theory that Countrywide's ability to sell loans into the secondary mortgage market was "curtailed" due to supposed

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 1 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

loan quality problems.  Countrywide sold nearly all of the mortgages it originated, thereby minimizing the Company's exposure to the risks of delinquencies and defaults.  Trying to make the supposed "secret" of expanding underwriting guidelines important to Countrywide stockholders, the SEC conceived the theory that poor quality mortgages "ultimately curtail[ed] the company's ability to sell [its] loans in the secondary mortgage market" thereby supposedly rendering the Company's "business model . . . unsustainable."  This theory, however, is fiction, not fact.  And the SEC simply abandoned it in discovery:  The Commission adduced no percipient testimony or expert opinion that loan quality problems unique to Countrywide foreclosed it from participating in some active secondary market enjoyed by others.  Rather, the undisputed record establishes that by August 2007 a liquidity crisis affecting the entire financial sector – not just the mortgage industry, let alone just Countrywide – resulted in an implosion of the secondary mortgage market that the SEC's own expert admits made the sale of non-agency mortgages "virtually impossible" for anyone in the industry.  Without its theory that loan quality problems "curtail[ed]" Countrywide's ability to sell mortgages in the secondary market, the SEC is left with no explanation for why the risk attributes of sold loans were material to Countrywide stockholders.

Unable to prove that guideline expansion was a secret or that loan quality problems caused Countrywide's liquidity problem, the SEC's case today – in contrast to what it pled a year ago – boils down to a puffery claim.  Countrywide routinely said in its SEC filings (and its executives said publicly) that it "manage[d] credit risk," that it produced "quality mortgages" and that it "prudently underwrote" pay-option loans.  The SEC has devoted most of its effort in discovery trying to prove that Countrywide mortgages became riskier over time – all the while ignoring the contemporaneous disclosures and widespread public commentary to that effect.  The SEC apparently intends to contrast this evidence with general statements about management, quality and prudence and argue that investors were somehow misled.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 2 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

These statements, however – while they are factually true – are too soft and immaterial as a matter of law to mislead investors, particularly in light of the mountain of public information about Countrywide's mortgages.

The SEC's additional argument that Countrywide misled stockholders about the portfolio of pay-option loans at Countrywide Bank has fared no better over the last year.  A keystone of this theory is an email written by Countrywide's Chief Executive Officer, Angelo Mozilo, worrying that the Company was "flying blind" concerning the performance of its pay-option loans in a stressed economic environment.  In *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 2010 WL 2473595 (S.D.N.Y. June 17, 2010), Judge Berman – after reviewing Countrywide's relevant public disclosures – dismissed a securities lawsuit alleging, as the SEC does here, that this email showed an undisclosed risk to Countrywide's business, holding as a matter of law that both the Company and Mozilo disclosed the risks of the pay-option portfolio.  The record developed in this case only reinforces this decision.  The undisputed facts establish that Countrywide told stockholders the very facts that the SEC alleges were concealed, including the untested nature of the Bank's pay-option loans, the number of borrowers opting for the minimum payment, and the fact that "substantially all" of these loans were underwritten on a reduced documentation basis.  The SEC does not challenge the accuracy of Countrywide's factual disclosures about its pay-option loans (such as FICO scores, loan-to-value ratios, etc.), or of its financial statements which disclosed the current carrying value and anticipated losses on the portfolio.

The SEC wants to try a case that the loans originated by Countrywide – and by the industry as a whole – were too risky.  The securities laws, however, do not allow for second-guessing business judgments, nor do they provide a forum for debating the wisdom of mortgage products that were offered by the entire industry.  To win its case, the SEC must prove that Defendants fraudulently misled investors.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 3 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

*See* November 3, 2009, Order (hereinafter "Order") at 4. The undisputed evidence precludes any such conclusion. Summary judgment should therefore be entered.[1]

## II.   STATEMENT OF FACTS[2]

This is a purported securities fraud case. The Defendants are Mozilo; David Sambol, who became Countrywide's President and COO in September 2006; and Eric Sieracki, Countrywide's CFO. The SEC asserts that from early 2005 through July 24, 2007, Defendants intentionally misled stockholders regarding the credit characteristics of mortgages sold into the secondary market under the Company's originate-to-distribute model; the "sustainability" of that business model in light of an evolution towards riskier mortgages; the use of the words "prime" and "subprime"; and the risks of pay-option loans held in the Bank's investment portfolio. The SEC alleges that Mozilo and Sieracki signed false reports on Form 10-K for Fiscal Years 2005 and 2006 (Cmplt. ¶¶ 85-90);[3] and that Mozilo and Sambol made a few allegedly false oral statements about loan quality (*id.* ¶¶ 92-99). The SEC also generally complains that Countrywide concealed the expansion of underwriting guidelines and the risks of the Bank's pay-option loans. *Id.* ¶¶ 7-8.

### A.   Countrywide's "Originate-to-Distribute" Business Model

Traditional mortgage lenders such as savings and loans lend money to homebuyers and hold the loans as investments. Under this "portfolio lending"

---

[1] Should the Court not grant summary judgment *in toto*, Defendants request that it separately consider the evidence concerning each of the SEC's falsity allegations and summarily adjudicate each alleged misrepresentation and omission discussed below so as to focus the genuine issues for trial. Fed. R. Civ. P. 56(d)(1).

[2] The evidence in support of this Motion is attached as exhibits to the Declaration of Daniel P. Lefler ("Lefler Declaration"), a number of which are the subject of Defendants' Joint Request for Judicial Notice. To provide context for the Court, this Motion discusses certain facts that are not necessary to the outcome of the Motion. The citations to such facts are directly to the Lefler Declaration as "Ex. __." The uncontroverted facts upon which the Motion is based are cited as "UF __" for "Uncontroverted Fact." The evidence supporting each Uncontroverted Fact is described in the Statement of Uncontroverted Facts submitted concurrently herewith, which cross-references to the evidence attached to the Lefler Declaration.

[3] The Complaint alleged that Countrywide's 2007 Form 10-K, filed on February 29, 2008, was also misleading. Cmplt. ¶ 85. The SEC has now abandoned that contention, as its economist expert witness opines that Countrywide's stock price was not inflated after August 24, 2007. Ex. 3 at 095.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 4 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

model, the lender is directly exposed to borrower defaults.  Countrywide's mortgage banking business followed a different model: The Company originated mortgages and sold them to investors, either as mortgage backed securities or as whole loans. Under this "originate-to-distribute" model, Countrywide sold approximately 96% of the mortgage loans it produced into the secondary mortgage market.  UF 1.  Thus, for most of its business Countrywide functioned as a financial intermediary between homebuyers and mortgage investors.[4]  Countrywide successfully executed this model for the nearly 40 years between its founding in 1969 and the events of 2007. Between 2002 and 2006 earnings grew from $841 million to $2.674 billion, with 2006 being the Company's most profitable year ever.  Ex. 4 at 121.

While minimizing direct exposure to defaults, the originate-to-distribute model carried with it the risk that the appetites of mortgage investors might change. As the SEC acknowledges, Countrywide's dependence on the secondary mortgage market was "an important fact it disclosed to investors."  Cmplt. ¶ 5.  The Company routinely said that "[n]early all of the mortgage loans that we originate … are sold into the secondary mortgage market."  UF 1.  It further explained that its ability to sell loans at acceptable margins "is affected by many factors including the relative demands for such loans and mortgage backed securities evidencing interests in such loans, the cost of credit enhancements, investor perceptions of such loans and mortgage backed securities and the risks posed by such products."  UF 2.  The risk of decreasing investor appetite was more acute for relatively higher risk mortgages, such as subprime, interest only or adjustable rate mortgages.  Morgan Stanley explained in October 2004, that:

---

[4] The originate-to-distribute model did not completely eliminate credit risk for sold loans.  Countrywide disclosed to stockholders that it frequently retained a residual interest in mortgage backed securities, and that it made representations and warranties to mortgage buyers that created potential liabilities.  Ex. 4 at 135.  The SEC does not challenge Countrywide's disclosures on these topics, or the accuracy of its financial statements, which disclosed its position in residual securities and the reserve established for representation and warranty exposure.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

- 5 -

The risk [of new loan products] to Countrywide and other originators would be that 1) these new loans don't perform as well as traditional collateral and 2) as a result, capital markets investors and rating agencies tighten underwriting and pricing standards.  If this happened, then some portion of current production would turn out to be unsustainable.

UF 3.  Thus, Countrywide's exposure to secondary market appetites – and the particular risk of newer and riskier loan products – was no secret.

**B.** **Countrywide Disclosed An Enormous Amount Of Information About The Credit Attributes Of Its Loan Originations**

The SEC does not argue that Countrywide affirmatively misrepresented the credit guidelines it applied when underwriting loans.  Instead, the Commission argues that Countrywide participated in industry trends towards riskier lending (such as loans granted based on exceptions to guidelines, high loan-to-value ratio loans, reduced documentation loans, loans to borrowers with relatively low credit scores, etc.) without telling stockholders. *See* Cmplt. ¶ 8.  The SEC also argues that the Company's statements that it "manage[d] credit risk" or generated "quality" loans were false and misleading in light of the expansion in credit guidelines that was occurring. *Id*. ¶¶ 6, 85, 86. The undisputed facts show otherwise.

       1.   <u>Countrywide Disclosed That Credit Guidelines Were Driven By Secondary Market Standards</u>

Because its originate-to-distribute business depended on selling loans to others, Countrywide's credit guidelines were determined largely by investor demand.  That is what the Company told stockholders.  Roughly half the loans originated between 2002 and 2006 were so-called "conforming" loans sold through securities guaranteed by government sponsored entities ("GSEs") such as Fannie Mae and Freddie Mac.  Countrywide's guidelines for conforming loans were based on GSE requirements (Ex. 4 at 105), a fact the SEC does not contest.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 6 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

For non-GSE loans, Countrywide's policy was to originate mortgages that investors wanted to buy.  As the Company disclosed in its 2005 and 2006 10-Ks, its underwriting guidelines for such loans "have been designed so that these loans are salable in the secondary mortgage market.  We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers."  UF 4.  Thus, Countrywide did not hold itself out as offering credit based on any particular set of guidelines.  Instead, its credit criteria evolved based on investor demand.  As industry credit criteria became more liberal, Countrywide participated in this evolution.  UF 5.  The SEC has adduced no evidence and does not argue that the underwriting standards Countrywide applied were different from those required by secondary market investors.

>2.  <u>Countrywide Disclosed That It Offered A Wide Product Menu</u>

Under the originate-to-distribute model, volume was an important driver of profitability.  Accordingly, Countrywide offered a wide product menu.  This strategy was repeatedly disclosed to investors.  UF 6.  For example, the 2005 Annual Report to stockholders said that its market share growth initiatives were "supported by one underlying theme – ubiquity.  [Our] long-range goal is not only to participate in, but to be a leader in, every channel and segment of the mortgage market – whether these channels or segments are defined by geography, consumer demographic profile or product preference."  *Id*.  Similarly, at a May 24, 2005, investor conference, Sambol told investors that Countrywide intended to "maintain[] the broadest and most comprehensive product line in the marketplace," meaning that "if a consumer … genuinely qualifies for a home loan anywhere else in the US, they will qualify at Countrywide and if that customer has a product preference, that product will reside on our product menu."  *Id.*  These disclosures dispose of the SEC's allegation that the "matching strategy" was not disclosed to investors.  *See e.g.*, Cmplt. ¶ 8 ("Defendants misled investors by failing to disclose . . . the company's pursuit of a 'matching strategy'").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 7 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

### 3.   Countrywide Disclosed Detailed Information Regarding The Loans Originated Under Its Disclosed Strategies

Countrywide's twin policies of underwriting to secondary market standards and of offering a wide product menu resulted in an evolution of its product mix towards relatively riskier mortgages.  The Company told stockholders that "[t]he continuing evolution of the secondary mortgage market and demand by borrowers has resulted in a proliferation of mortgage products."  UF 7.  The industry's evolution towards more lenient credit standards was a well known fact in America, widely discussed in the popular press.  UF 8.

Consistent with this industry trend, Countrywide's 2006 10-K disclosed the following loan production statistics:

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Conventional Conforming | 59.2% | 53.9% | 37.1% | 32% | 31.9% |
| Conventional Non-Conforming | 24.9% | 31.7% | 39.8% | 47.2% | 45.2% |
| Prime Home Equity | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| Nonprime | 3.7% | 4.6% | 10.9% | 8.9% | 8.7% |
| FHA/VA | 7.6% | 5.6% | 3.6% | 2.1% | 2.8% |
| Commercial | 0.0% | 0.0% | 0.1% | 0.8% | 1.2% |

UF 9.  Thus, investors could, at a glance, easily determine that between 2002 and 2006, the proportion of loans Countrywide sold to GSEs (conventional conforming) declined by roughly half from 59.2% to 31.9%, while the relatively more risky loans sold in the non-GSE private investor market (non-conforming, prime home equity, and nonprime) roughly doubled from 33.2% to 64.1%.

Countrywide disclosed similar product mix information on a monthly basis in "13-month reports" filed with the SEC on Form 8-K and still on its website.  UF 10.  These reports disclosed Countrywide's loan production for the prior 13 months by category:  Government, Adjustable Rate Mortgage, Home Equity or Nonprime.  *Id.*  They allowed investors to monitor the evolution of the Company's product mix, including the increasing originations of subprime or pay-option loans.  UF 11

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

2263992

- 8 -

("[p]ay-option fundings for [October 2005] were $8.5 billion, as compared to $3.4 billion in October 2004"). These reports also contained performance data including delinquency and pending foreclosure statistics. UF 12.

In addition to the trend information in periodic SEC filings and 13-month reports, Countrywide also published detailed information concerning the particular credit attributes of its sold loans. Specifically, pursuant to the SEC's own regulations (17 C.F.R. § 229.1100 *et seq.*), each time one of Countrywide's subsidiaries sold non-GSE mortgage backed securities into the secondary market a prospectus supplement was filed with the SEC. These documents – and there are hundreds of them from 2004 through 2007 – are each available online on the SEC's EDGAR system.[5] UF 13. The prospectus supplements described the underwriting guidelines applied to the particular pool of mortgages being sold, as well as detailed information about the actual attributes of the loans, including FICO score, documentation level, loan-to-value ratio, and geographical distribution, as follows:

CREDIT BUREAU RISK SCORES(1)

| RANGE OF CREDIT BUREAU RISK SCORES | NUMBER OF STATISTICAL MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | % OF STATISTICAL MORTGAGE LOANS | AVERAGE PRINCIPAL BALANCE OUTSTANDING ($) | WEIGHTED AVERAGE CURRENT MORTGAGE RATE (%) | WEIGHTED AVERAGE REMAINING TERM TO MATURITY (MONTHS) | WEIGHTED AVERAGE CREDIT BUREAU RISK SCORE | WEIGHTED AVERAGE ORIGINAL COMBINED LOAN-TO-VALUE RATIO (%) |
|---|---|---|---|---|---|---|---|---|
| 781 - 800 ................... | 8 | $ 364,767 | 0.23% | 45,596 | 11.181 | 178.68 | 791 | 98.5 |
| 761 - 780 ................... | 20 | 1,276,916 | 0.81 | 63,846 | 11.342 | 178.79 | 771 | 99.0 |
| 741 - 760 ................... | 32 | 1,897,150 | 1.21 | 59,286 | 11.419 | 179.01 | 750 | 100.0 |
| 721 - 740 ................... | 63 | 3,318,065 | 2.11 | 52,668 | 11.114 | 179.20 | 730 | 99.5 |
| 701 - 720 ................... | 110 | 6,364,934 | 4.05 | 57,863 | 11.240 | 181.09 | 710 | 99.4 |
| 681 - 700 ................... | 239 | 13,361,808 | 8.50 | 55,907 | 11.208 | 180.39 | 689 | 99.3 |
| 661 - 680 ................... | 393 | 19,925,800 | 12.67 | 50,702 | 11.424 | 180.05 | 670 | 98.9 |
| 641 - 660 ................... | 543 | 25,879,479 | 16.46 | 47,660 | 11.714 | 181.41 | 649 | 98.0 |
| 621 - 640 ................... | 672 | 30,533,541 | 19.41 | 45,437 | 11.869 | 180.79 | 630 | 97.5 |
| 601 - 620 ................... | 605 | 24,568,537 | 15.62 | 40,609 | 11.959 | 183.18 | 610 | 95.4 |
| 581 - 600 ................... | 620 | 23,004,137 | 14.63 | 37,103 | 12.126 | 182.61 | 590 | 95.8 |
| 561 - 580 ................... | 162 | 5,966,203 | 3.79 | 36,828 | 12.173 | 185.95 | 572 | 88.5 |
| 541 - 560 ................... | 18 | 647,331 | 0.41 | 35,963 | 12.167 | 190.11 | 554 | 96.0 |
| 521 - 540 ................... | 3 | 139,936 | 0.09 | 46,645 | 12.223 | 195.53 | 527 | 87.2 |
| 500 or Less ................. | 1 | 19,962 | 0.01 | 19,962 | 12.500 | 179.00 | 480 | 75.3 |
| Total ................... | 3,489 | $157,268,567 | 100.00% | | | | | |

---

[5] The mortgage pools were sold by four indirect Countrywide subsidiaries: CWABS (securitizations of credit blemished loans), CWALT (alternative loans, including pay-option and interest only loans), CWHEQ (home equity lines of credit) and CWMBS (pay-option and fixed-rate non-conforming loans). The 10-K disclosed that these companies were Countrywide subsidiaries. UF 14.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 9 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

ORIGINAL COMBINED LOAN-TO-VALUE RATIOS(1)

| RANGE OF ORIGINAL COMBINED LOAN-TO-VALUE RATIOS (%) | NUMBER OF STATISTICAL MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | % OF STATISTICAL MORTGAGE LOANS | AVERAGE PRINCIPAL BALANCE OUTSTANDING ($) | WEIGHTED AVERAGE CURRENT MORTGAGE RATE (%) | WEIGHTED AVERAGE REMAINING TERM TO MATURITY (MONTHS) | WEIGHTED AVERAGE CREDIT BUREAU RISK SCORE | WEIGHTED AVERAGE ORIGINAL COMBINED LOAN-TO-VALUE RATIO (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50.00............... | 12 | $ 378,106 | 0.24% | 31,509 | 12.108 | 175.93 | 604 | 33.9 |
| 50.01 - 55.00............... | 10 | 355,768 | 0.23 | 35,577 | 12.398 | 200.93 | 608 | 53.0 |
| 55.01 - 60.00............... | 25 | 1,134,910 | 0.72 | 45,396 | 11.700 | 178.53 | 613 | 57.6 |
| 60.01 - 65.00............... | 21 | 911,184 | 0.58 | 43,390 | 11.759 | 191.44 | 609 | 62.8 |
| 65.01 - 70.00............... | 31 | 1,298,830 | 0.83 | 41,898 | 11.437 | 192.95 | 611 | 67.7 |
| 70.01 - 75.00............... | 49 | 2,188,788 | 1.39 | 44,669 | 11.955 | 183.47 | 606 | 72.8 |
| 75.01 - 80.00............... | 81 | 3,160,064 | 2.01 | 39,013 | 12.176 | 195.28 | 603 | 78.2 |
| 80.01 - 85.00............... | 89 | 4,088,058 | 2.60 | 45,933 | 11.575 | 192.18 | 616 | 83.2 |
| 85.01 - 90.00............... | 113 | 4,559,846 | 2.90 | 40,353 | 11.349 | 189.73 | 627 | 88.9 |
| 90.01 - 95.00............... | 86 | 3,972,599 | 2.53 | 46,193 | 11.541 | 180.05 | 644 | 94.3 |
| 95.01 - 100.00............... | 2,972 | 135,220,415 | 85.98 | 45,498 | 11.754 | 180.50 | 644 | 99.9 |
| Total................... | 3,489 | $157,268,567 | 100.00% | | | | | |

UF 15.  Where a loan pool consisted of relatively riskier loans – including loans with more than one credit risk factor – additional disclosures were made.  For example, prospectus supplements for credit blemished second lien loans sold by CWABS disclosed that the pool included borrowers with "impaired credit histories, which may include a record of major derogatory credit items such as outstanding judgments or prior bankruptcies," that it "expected that a significant number of the mortgage loans [in the securitization] will have been originated based on underwriting exceptions," and that "the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner."  UF 16.

Countrywide also maintained two websites that included the information disclosed in the prospectus supplements (*e.g.*, loan and product type, FICO score, loan-to-value ratio, occupancy type, and documentation type) as well as each pool's performance to date by month (including delinquencies and losses suffered).  UF 17. This information can still be accessed for free on one of these websites simply by registering at www.mortgageinvestorcountrywide.com.[6]  UF 18.

_____

[6] The other website – www.countrywidedealsdata.com – also contains extensive information about Countrywide's sold mortgages.  This website requires the user to enter a URL provided in the offering document for a particular mortgage backed security.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 10 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Countrywide also periodically provided details about the credit attributes of its loan originations at investor conferences.  UF 19.  These presentations included detailed statistical charts showing summary loan-level detail for the Company's pay-option loan production, as well as its other adjustable rate and fixed non-conforming loan production, by FICO score, loan-to-value ratio, occupancy type, and documentation type.  *Id.*

### 4. Countrywide Disclosed Increasing Delinquencies

As noted above, Countrywide routinely disclosed delinquency statistics, both in the 13-month reports and on its website.  UF 12, 17.  These delinquencies were increasing over time and, as delinquencies increased, Countrywide and the defendants made timely disclosures of that fact, the causes for the increasing delinquencies and expectations for continued increases in delinquencies.

It was well-known that subprime loans originated in 2006 were performing more poorly than loans originated in recent years.  In a front page story in December 2006, The Wall Street Journal said, among other things, that "[b]ased on current performance, 2006 is on track to be one of the worst ever for subprime loans. . . Delinquency rates have been rising steadily since the middle of 2005.  But the trend has accelerated sharply in the past two to three months."  UF 20.  The trend in Countrywide's delinquency rates was obvious from its monthly delinquency disclosures.  Additionally, as delinquencies rose, the Company explained that relaxed underwriting standards were a contributing factor (among others, most notably declining home prices).  UF 21.  For example, when reporting third quarter 2006 results the Company explained that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency."  *Id.*; *see also id.* (stating that the "increase in delinquencies and foreclosures" resulted from "product mix").  Additionally, during the conference call reporting results for the fourth quarter of 2006, Sambol said that "for the most part a liberal credit environment over the last several years all of which is now – as rates are

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 11 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

going up, as credit is tightening, is going to contribute in our view to continued pressure on delinquencies and defaults and associated credit cost." *Id*.  And Mozilo warned "we are also preparing for increased delinquencies. . . ." *Id.*  The 2006 10-K disclosed that Countrywide "had observed a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006," and that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency."  UF 22.  Thus, the increasing delinquencies and defaults were both disclosed by Countrywide and well-known.

**C.    Countrywide Did Not Lose "Access" To The Secondary Mortgage Market – The Secondary Mortgage Market Evaporated**

The disclosed risk that secondary market demand for mortgages might change materialized in the second half of 2007.  Throughout the industry, rating agencies such as S&P and Moody's provided ratings for mortgage backed securities, many of which were deemed investment grade.  As housing prices declined and economic conditions worsened in 2007, the rating agencies in June and July downgraded their investment grade ratings on hundreds of securities issued by the industry (although relatively few issued by Countrywide).  UF 23.  In early August 2007 short-term liquidity disappeared for borrowings based on mortgage collateral.  UF 24.  This phenomenon was not specific to Countrywide: it affected the entire mortgage industry and indeed extended well beyond the mortgage industry.  UF 25.  Moreover – as the SEC's own expert acknowledges – in this same time it was "virtually impossible" for anyone in the mortgage industry to sell non-GSE mortgages.  UF 26.[7]  This event was also not specific to Countrywide.  UF 27.  The changes in investor demand for mortgages did not result from new information about the risk

---

[7] The GSE portion of the secondary market continued to function during this period and Countrywide continued to produce and sell conforming loans to the GSEs.  The SEC does not contend to the contrary.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992                                                    - 12 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

characteristics of Countrywide mortgages, but rather the manifestation of economic forces beyond Countrywide's control.  UF 28.

The SEC alleged that Countrywide's originate-to-distribute business "was unsustainable" because "deteriorating quality" and "poor performance" of its loans "would ultimately curtail the company's ability to sell those loans in the secondary mortgage market."  Cmplt. ¶ 5.  The undisputed facts, however, establish – and the SEC's expert has admitted – that there was no active secondary market for non-GSE mortgages after August 2007.  UF 27.  The SEC therefore cannot prove its allegation that loan quality problems unique to Countrywide "curtailed" the Company's ability to sell loans.

**D.      Countrywide Disclosed the Material Facts Concerning its Portfolio of Pay-Option Loans**

As Countrywide grew, it aimed to become a diversified financial institution. To this end, the Company purchased Treasury Bank (later renamed Countrywide Bank) in 2001.  Like a traditional portfolio lender, the Bank held mortgages on its balance sheet as investments.  Starting in 2004, the Bank's loan portfolio became more heavily concentrated in a particular type of mortgage known as the pay-option loan.  Because it was directly exposed to default risk for these loans, the Company provided extensive disclosures about their credit attributes in its periodic reports. The SEC does not challenge the factual accuracy of these statements, nor does it contend that the Company's financial statements – particularly the reserve for loan losses – misrepresented the value of, or default risks in, the portfolio.

1.      Countrywide Disclosed The Unique Risks Of Pay-Option Loans

Countrywide informed stockholders that in 2005 and 2006, the Bank's held-for-investment portfolio was becoming concentrated in pay-option loans.  Ex. 4 at 155.  Due to this concentration, Countrywide made extensive risk disclosures.  It explained that pay-options "are different than 'traditional' loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 13 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

the early periods of a loan's life," and therefore presented "additional risks."  UF 29. The Company then described these "additional risks."

First, the Company explained that pay-option loans "have interest rates that adjust monthly and minimum required payments that adjust annually, resulting in the potential for negative amortization" (UF 30), industry jargon for the notion that a loan's balance will increase if a borrower pays less than full interest costs.  Because the interest due on the loans fluctuated monthly while the minimum payment was fixed, negative amortization accelerated when interest rates rose.

Second, Countrywide disclosed the "reset" feature of pay-option loans.  After the initial period when borrowers were permitted to pay less than the full interest cost, "a new monthly payment amount adequate to repay the loan over its remaining contractual life [would be] established."  UF 31.  The Company explained that defaults might increase when loans reset because "[t]he resulting payment adjustment could be substantial" (UF 32) – a phenomenon known as "payment shock."  It further explained that "negative amortization" was capped at 115% of the original loan, meaning that the loan would automatically "reset" if a borrower's balance increased to 115% of the initial balance.  UF 33.

Third, Countrywide disclosed its own lack of experience with the pay-option product.  Pay-option loans had been offered by others in the industry since the 1980s.  UF 34.  During the product's history, pay-option lenders had been exposed to several instances of depressed housing prices, including the decline in real estate values in Southern California in the late 1980s and early 1990s.  UF 35. Countrywide's particular portfolio of loans, however – most of which were originated in between 2004 and 2006 – had not been exposed to a stressed real estate environment.  Accordingly, the Company warned investors that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of these [pay-option] loans has not been established for the Company."  UF 36.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 14 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

2. <u>Countrywide Disclosed The Facts Concerning Its Pay-Option</u>
<u>Loan Portfolio</u>

Not only did Countrywide disclose the types of risks associated with pay-option loans, but it also disclosed the material facts about its portfolio of these loans. Countrywide's periodic filings regularly updated investors concerning the amount of negative amortization in the portfolio, as well as the outstanding loan balance, average loan-to-value ratio and average FICO score, as follows:

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in thousands) | |
| Total pay-option ARM loan portfolio | $    32,732,581 | $    26,101,306 |
| Total principal balance of pay-option ARM loans with accumulated negative amortization | $    28,958,718 | $    13,963,721 |
| Accumulated negative amortization (from original loan balance) | $    653,974 | $    74,748 |
| Average original loan-to-value ratio(1) | 75% | 75% |
| Average combined original loan-to-value ratio(2) | 78% | 78% |
| Average original FICO score(3) | 718 | 720 |
| Loans delinquent 90 days or more | 0.63% | 0.10% |

UF 37.  Countrywide also routinely updated investors concerning delinquency trends.  *Id.*  In addition, Countrywide explained that "[m]anagement expects the delinquency rate in the Company's pay-option ARM loan portfolio to increase as this product continues to season."  UF 38.  Furthermore, Countrywide's periodic filings (including the chart excerpted above) and quarterly earnings releases also updated investors concerning the amount of negative amortization in the portfolio. UF 39.  In addition, the Company frequently provided supplemental information on this topic.  For example, during Countrywide's April 2006 earnings conference call Mozilo disclosed that 70% of pay-option borrowers were making the minimum payment and therefore accruing negative amortization.  UF 40.  Subsequently, at a September 2006 investor conference, Mozilo stated that the percentage had risen to 78% of the borrowers and that he had been "shocked" by this figure.  UF 41.

Management also regularly discussed with stockholders the uncertainties associated with payment shock and, more generally, the performance of the loans in a more stressed environment.  UF 42.  For example, during a July 2006 earnings conference call, in response to a question about the pay-option portfolio, Mozilo

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

2263992

- 15 -

stated, "[w]ell, I don't know where it's going to end up because it will depend upon interest rates. . . . [D]epending upon where rates are the resets could be significant and we just need time to see how this is going to play out.  If rates continue to rise significantly, then these resets and payment shocks will be substantial." *Id.*

Countrywide also communicated the risks of its pay-option portfolio through its financial statements.  The Company explained that "[t]he allowance for loan losses is our best estimate of the credit losses incurred in our loan investment portfolio."  UF 43.  As the portfolio grew, the provision for loan losses nearly doubled from approximately $81.6 million in 2005 to approximately $154 million in 2006.  UF 44.  Countrywide explained that "[t]his increase reflects increased delinquencies and loss levels resulting from seasoning of loans acquired during the past years of rapid portfolio growth, as well as prevailing real estate and market conditions."  UF 45.  As market conditions worsened in 2007, increases to Countrywide's provision for loan losses accelerated.  In the first quarter alone, Countrywide increased the provision for loan losses by $95.9 million and in the second quarter by $231 million.  UF 46.  These increases were *not* due to higher defaults resulting from "payment shock" associated with resets.  On the contrary, most loans in the portfolio did not even begin resetting until two years later in 2009.  UF 47.  Notably, the SEC does not challenge Countrywide's accounting for loan losses.  *See* Dkt. No. 59 at 14 (SEC acknowledgement that "the Complaint does not allege that Countrywide or Sieracki misapplied an accounting principle").

### III.   <u>ARGUMENT</u>

The SEC must prove that Defendants (or, in the case of its aiding and abetting claim, Countrywide) made an "untrue statement of a material fact" or omitted "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *See SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996) (§ 10(b)); *Aaron v. SEC*, 446 U.S. 680, 695-96, (1980) (§ 17(a)); *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003) (aiding and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 16 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

abetting of § 13(a) violation requires proof that primary violator's filings were "false and misleading").  Claims under Section 10(b) and Section 17(a)(1) further require proof that the alleged misstatements or omissions were made with scienter, a mental state "embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

We advance three main arguments.  First, there is no triable issue of fact concerning each of the SEC's theories of falsity regarding Countrywide's originate-to-distribute business.  Second, there is no triable issue of fact concerning each of the SEC's theories of falsity regarding the held-for-investment portfolio of pay-option loans at Countrywide Bank.  Third, Countrywide's extensive disclosures – including its admittedly accurate financial statements – preclude any inference of scienter as a matter of law.

**A.      Defendants Are Entitled To Summary Adjudication Of The Falsity Theories Concerning Countrywide's Originate-To-Distribute Business**

The SEC's case that Defendants misled stockholders about Countrywide's originate-to-distribute business consists of five main arguments: (1) that Countrywide "hid from investors" the trend towards risky underwriting (Cmplt. ¶ 4), (2) that as a result, stockholders were misled about the risk that Countrywide would find itself unable to sell loans in the secondary mortgage market (*id*. ¶ 5), (3) that Countrywide's general statements regarding "credit management" and loan "quality" were misleading (*e.g.*, *id*. ¶¶ 85, 86, 92), (4) that a technical violation of the Management's Discussion & Analysis ("MD&A") rules found in Item 303 of Regulation S-K is sufficient to establish a fraud claim, even if the relevant information is disclosed elsewhere, and (5) that Countrywide's use of the terms "prime" and "nonprime" was misleading (*id*. ¶¶ 87-89).  The evidence does not give rise to a triable issue of fact on any of these liability theories.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 17 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1.   <u>The Undisputed Evidence Establishes – And The SEC Now</u>
     <u>Admits – That Stockholders Understood Countrywide's</u>
     <u>Underwriting Guidelines Expanded Over Time</u>

When it filed this lawsuit a year ago, the SEC alleged that Countrywide "hid from investors" that it had "engaged in an unprecedented expansion of its underwriting guidelines from 2005 and into 2007." Cmplt. ¶ 4; *see also id*. ¶¶ 14, 27 (same). The mountain of information Countrywide disclosed about its loan originations – not to mention the widespread general understanding of guideline expansion as reflected in the popular press (UF 6, 8) – disproves this core tenet of the SEC's case.

Discovery has confirmed this undeniable fact. In response to an interrogatory the Commission admitted – albeit only after losing a motion to compel – that the extensive information about Countrywide's non-GSE loans contained in the mortgage backed securities prospectus supplements was, in fact, reflected in Countrywide's stock price. UF 48. This admission is reinforced by the SEC's own expert witness, who opines that "all publicly available information, including material information . . . concerning Countrywide's activities in mortgage and mortgage securitization markets, was quickly and fully incorporated into the market price of Countrywide's stock." UF 49.[8] At deposition, this witness specifically conceded that the prospectus supplement information was incorporated in the Company's stock price. UF 50. The SEC further admitted in discovery that one of the purposes for requiring documents to be filed on EDGAR was to make them available to investors. UF 51.

This is a complete reversal from the position the Commission took a year ago. In opposing Defendants' motions to dismiss, the SEC urged this Court to disregard

---

[8] It was common knowledge that prospectus supplements contained detailed information about credit characteristics throughout the industry. As the Chicago Tribune noted: "Anyone can look at prospectuses for mortgage backed securities on the Securities and Exchange Commission's EDGAR Web site and see that defaults and foreclosures were bound to increase." Ex. 113 at 1956.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

2263992                                    - 18 -

1   the prospectus supplements, arguing that they were not "readily available to

2   purchasers of Countrywide's equity securities" because they were filed by

3   subsidiaries rather than the parent company.  Dkt. No. 57 at 19.  This Court, in turn,

4   relied on the Commission's argument, reasoning that the SEC's proffered dispute

5   over whether stockholders considered this information raised factual questions

6   inappropriate for resolution at the pleading stage.  Order at 12 ("the Court cannot

7   conclude at the motion to dismiss stage that this information was 'readily' or

8   'reasonably available'"); *see also id.* at 13.  The SEC's admission makes clear that

9   its argument never had a basis in fact:  Stockholders considered the prospectus

10  supplement disclosures when setting the price for the Company's stock.  Thus, the

11  disclosures about loan attributes in the prospectus supplements – which cover

12  "nearly all" of the non-GSE loans originated and sold by Countrywide (Ex. 4 at 105)

13  – were part of the total mix of information available.  *See In re The First*

14  *Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155-56 (D. Mass. 2009)

15  (rejecting claim that defendant concealed existence of lowered credit guidelines

16  where prospectus supplements filed by securitization trusts disclosed detailed loan

17  origination data).  These disclosures refute any argument that Countrywide "hid

18  from investors" the expansion in underwriting guidelines between 2005 and 2007.

19  Cmplt. ¶ 4.

20       But the record does not end there.  As shown above, Countrywide disclosed

21  information about its loan originations in many additional ways, none of which is in

22  dispute.  It disclosed information about its product mix and about the particular

23  credit characteristics of its sold loans in the 13-month reports and at numerous

24  investor forums.  *Supra* at II.B.3.  Since 2005, it has maintained a free website,

25  available to anyone who registers, at www.mortgageinvestorcountrywide.com.  UF

26  18.  This free website includes copies of the prospectus supplements, as well as

27  "complete historical information on deal performance on a month-by-month basis,

28  including the percentage of loans within each pool that are 30 days delinquent, 60

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 19 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

days delinquent, 90 days delinquent, in foreclosure, in bankruptcy and real estate owned." UF 17. Registered users included the major investment banks that provided coverage of Countrywide's equity and/or debt securities. *Id*. The SEC's economics expert witness acknowledges that information on Company websites was incorporated into Countrywide's stock price. UF 52. Thus, it is beyond dispute that stockholders had access to the very information the SEC says was concealed.

Unable to prove the case it pled, the SEC has focused on developing evidence to prove that Countrywide's credit risk criteria loosened over time. In particular, the Commission has adduced evidence – and commissioned expert testimony – concerning Countrywide's use of "exception" underwriting, reduced documentation loans, subprime loans with "layered" risk characteristics and loans with high loan-to-value ratios. Establishing that Countrywide's loans became riskier over time, however, does not prove the SEC's case. On the contrary, Countrywide told investors that its credit criteria evolved with secondary market standards.

Moreover, the undisputed record shows that the "high risk" credit criteria of which the SEC (and its experts) now disapproves, were disclosed through the various channels discussed above. For example, 82 of the Countrywide prospectus supplements stated that "a significant number of the mortgage loans [in the securitization] will have been originated based on underwriting exceptions" (UF 53), and as noted above, prospectus supplements for certain of Countrywide's subprime securitizations stated that as a result of underwriting factors such as the use of exceptions*,* the loans in the pool were likely to experience higher – if not substantially higher – rates of delinquency, foreclosure and bankruptcy than traditionally underwritten mortgages. *Supra* at II.B.3. The detailed disclosures in the prospectus supplements and on the Company-sponsored website also made clear that Countrywide originated loans (both prime and nonprime) with combinations of risk factors such as low FICO scores, high loan-to-value ratios, or reduced or stated

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 20 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

documentation.  UF 54.  Indeed, using the Company's website, an equity analyst prepared and presented to investors a graph showing such risk layering.  UF 55.[9]

This case is no longer at the pleading stage.  Therefore, the Commission's absurd argument that investors in Countrywide securities were unaware of disclosures made outside of the parent company's periodic SEC filings can no longer save its case.  The record indisputably establishes – and the SEC has finally admitted – the contrary.  Defendants are entitled to summary adjudication of the claim that Countrywide "hid from investors" that the Company had "engaged in an unprecedented expansion of its underwriting guidelines from 2005 and into 2007."  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415-20 (9th Cir. 1994) (summary judgment affirmed as to claims that defendants hid liquidity shortfalls and decline in sales demand where debenture prospectus contained "specific references to WOW's continuing cash shortfall and borrowing requirements" and "warned that WOW expected lower net sales"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515-16 (9th Cir. 1991) (summary judgment affirmed where plaintiff alleged that defendants were "concealing from the market certain cost and production problems regarding Convergent's NGEN product line," when in fact defendants "continued during the class period to warn investors of the risks posed by NGEN").

    2. <u>The Undisputed Facts Establish That The Disruption Of</u>
      <u>Countrywide's Originate-To-Distribute Business Had Nothing</u>
      <u>To Do With The Quality Of Its Mortgages</u>

With respect to the mortgages Countrywide sold into the secondary market, the SEC does not argue that credit risk directly harmed Countrywide investors.  Instead, it alleges that "Mozilo expected that the deteriorating quality of the loans that Countrywide was writing, and the poor performance over time of those loans,

---

[9] Additionally, the Company's Chief Risk Officer, John McMurray, made presentations to investors in September 2006 in which he clearly demonstrated that prime and nonprime loans included risk factors such as high loan-to-value ratios and reduced documentation.  UF 56.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992    - 21 -    JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

would ultimately curtail the company's ability to sell those loans in the secondary
mortgage market." Cmplt. ¶ 5. Thus, the SEC alleges that Defendants foresaw and
failed to disclose that Countrywide's originate-to-distribute business model "was
unsustainable." *Id.*

The SEC has adduced no evidence in support of this claim, and in fact the
undisputed facts refute it for two principal reasons. First, the vulnerability of
Countrywide's originate-to-distribute model to changes in the risk appetite of the
secondary market was well known. *Supra* at II.C. Second, Countrywide did not
lose access to the secondary market due to the "deteriorating quality" or "poor
performance" of its loans. Rather, the undisputed evidence establishes that the
entire market for non-GSE mortgage backed securities essentially evaporated, and
that the change in investor demand for mortgages was not the result of new
information about the risks of Countrywide mortgages, but rather the manifestation
of economic forces outside of Countrywide's control. UF 26-28. The SEC's own
expert admits that by August 2007 it was "virtually impossible" for anyone to sell
non-GSE mortgages in the secondary market. UF 26.

As the party charging Defendants with fraud for failing to disclose that loan
quality problems unique to Countrywide would ultimately "curtail the company's
ability to sell those loans in the secondary mortgage market" (Cmplt. ¶ 5), the SEC
bears the burden of proving that this actually happened. The SEC's failure to
adduce evidence entitles Defendants to summary adjudication on this issue. A
moving party need merely "point[] out" the absence of evidence on an issue where
the adverse party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,
325 (1986). This shifts the burden to the SEC of coming forward with significant
probative evidence sufficient to create a genuine issue for trial. Since the SEC has
no evidence on these points – on the contrary, its own expert refutes them – it
cannot bear this burden and summary adjudication is therefore warranted.[10]

---

[10] Countrywide, of course, had no duty to predict and then disclose that the
entire secondary mortgage market would collapse. *In re Verifone Sec. Litig.*, 11

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992                                    - 22 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

3.   <u>The Challenged Statements About "Credit Management,"</u>

<u>"Quality," and "Prudent Underwriting" Are Inactionable Puffery</u>

Stripped of its twin allegations that Countrywide "hid" its expansion of underwriting guidelines and that this supposedly hidden expansion caused Countrywide's originate-to-distribute business model to stop functioning, the SEC is reduced to the argument that investors were somehow misled by vague statements, such as that Countrywide "mange[d] credit risk" (Cmplt. ¶¶ 6, 85), had "quality" loans (*id.* ¶¶ 86, 92-94), or had "prudently underwritten" mortgages (*id.* ¶¶ 59, 90, 97). These statements, however, are inactionable puffery.

It is well-established that:

> Puffery and statements of fact are mutually exclusive. If a statement is a specific, measurable claim or can be reasonably interpreted as being a factual claim, i.e., one capable of verification, the statement is one of fact. Conversely, if the statement is not specific and measurable, and cannot be reasonably interpreted as providing a benchmark by which the veracity of the statement can be ascertained, the statement constitutes puffery.

*American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004). As the Ninth Circuit observed, "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, __ F.3d ____, 2010 WL 2595281, at *5 (9th Cir. June 30, 2010); *see also SEC v. Kearns*, 691 F. Supp. 2d 601, 617 (D.N.J. 2010) ("vague and general statements about management discipline" are puffery "because no reasonable investor would have relied on them").

The puffery doctrine has been applied to statements that are indistinguishable from those alleged by the SEC here. For example, in *ECA Local 134 IBEW v. JP*

_____

F.3d 865, 869 (9th Cir. 1993); *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930-31 (9th Cir. 1996) (no duty to give up and admit failure); *Kane v. Madge Networks N.V.*, 2000 WL 33208166, *8 (N.D. Cal. May 26, 2000) (company was not required to "predict that [its] future operations will fail").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 23 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

*Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), shareholders alleged that an investment bank misrepresented its risk management processes. *Id.* at 193-95. Plaintiffs pointed to the bank's statements that it had "risk management processes [that] are highly disciplined," that it "set the standard" for "integrity," and that it would "continue to reposition and strengthen [its] franchises with a focus on financial discipline." *Id.* at 205-06. The court concluded that these statements were puffery because "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements." *Id.* at 206; *see also*, *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1140-41 (C.D. Cal. 2005) ("high-quality" and "quality" are puffery).[11]

Last year, when denying Defendants' motions to dismiss, this Court understandably relied on Judge Pfaelzer's puffery analysis in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), since she was evaluating the same statements. Order at 12-13. Judge Pfaelzer recognized that statements about "quality" "are generally not actionable" because they are classic puffery. 588 F. Supp. at 1144. She nevertheless denied the motion to dismiss in the shareholder class action because in her view the complaint alleged the "extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws." *Id.* Judge Pfaelzer cautioned, however, that "[i]t cannot be emphasized enough that in the vast majority of cases such statements would be nonactionable puffery." *Id.* at 1153.

This case is no longer at the pleading stage, and the Commission can therefore no longer rely on presumptions or unsupported assertions. The undisputed

---

[11] The puffery doctrine has also been applied regularly in recent mortgage cases. *See In re Countrywide Fin. Corp. Mortgage Mkt'g & Sales Practice Litig.*, 601 F. Supp. 2d 1201, 1217-18 (S.D. Cal. 2009) (representations that loans were "the best" or "ideal" for borrowers deemed puffery); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (dismissing as puffery statements that loan acquisitions and originations, as well as the company's fundamentals, were expected to remain "solid").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 24 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

factual record demonstrates that this is not the rare or "extraordinary case" in which the company's actual practices were "so at odds" from its public disclosures that terms such as "manage[d] credit risk," "quality loans" or "prudent underwriting" could be considered materially misleading by the trier of fact.[12]  To the contrary, Countrywide extensively disclosed – including in the very same filings containing the words to which the SEC objects – the trends in its product mix, the actual risk attributes of its sold loans, delinquency rates and its exposure to changes in the risk appetites of secondary market investors.[13]  *See In re Downey Sec. Litig.*, 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (alleged false statements must be "viewed in context" of other disclosures); *see also  In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 933 (9th Cir. 1996)(same).  In short, discovery has demolished the foundation for Judge Pfaelzer's hypothesis that Countrywide might present the rare case in which such generalized statements might be actionable.  Therefore, this Court should grant summary adjudication with respect to these alleged misstatements.

> ### 4.    The SEC's Reliance On Regulation S-K Item 303 Is Insufficient As A Matter Of Law To Establish A Fraud Claim

Against the backdrop of Countrywide's mountain of disclosure, the SEC has contended that Countrywide violated Item 303 of Regulation S-K by failing to disclose the trend toward riskier underwriting in the MD&A section of its 10-Q and 10-K Reports.  Dkt. No. 57 at 13.  The Commission argued that non-disclosure of a trend in the MD&A discussion is sufficient to establish a fraud claim "even if the information is disclosed elsewhere." *Id.* at 15.  This argument is wrong as a matter of law.

---

[12] Underscoring the point that "high quality" is too indefinite to deceive, the Commission's counsel has objected to deposition questions on the grounds that the phrase "high quality" is "vague and ambiguous."  Ex. 116-117.

[13] These statements about risk management and underwriting quality were true.  While not a basis for the present motion, the evidence establishes that Countrywide maintained an elaborate credit risk management function and that it invested considerable resources in technology and in people to maintain a quality underwriting organization.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 25 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1    The case law clearly establishes that an Item 303 violation is not sufficient to

2 establish a legally viable fraud claim.  As the SEC earlier admitted, "the materiality

3 standard for MD&A discussions is different than the general materiality test under

4 *Basic v. Levinson.*"  *Id.*  Because "SK-303's disclosure obligations extend

5 considerably beyond those required by Rule 10b-5," a violation "of SK-303's

6 reporting requirements does not automatically give rise to a material omission under

7 Rule 10b-5." *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).  This is the correct

8 outcome because the mere fact that disclosures were not made in the MD&A section

9 of periodic filings does not mean that investors were misled – particularly when the

10 facts were disclosed elsewhere. *See SEC v. Todd*, 2007 WL 1574756, at *6 (S.D.

11 Cal. May 30, 2007) ("regardless of whether the [alleged omission] constitutes a

12 known trend under SK-303, the SEC must show that the omission would have

13 'significantly altered the total mix of information'") (citation omitted).[14]

14    In this case, not only does the undisputed evidence show that the facts were

15 disclosed elsewhere, but the SEC has also expressly admitted that information

16 outside the MD&A section of the periodic filings was considered by investors in

17 setting the Company's stock price.  The SEC's Item 303 argument is intended to

18 sidestep the substance of Countrywide's comprehensive disclosures concerning its

19 mortgage originations and secondary market conditions.  The argument is a

20 technical quibble about disclosure geography, not a substantive claim of fraud.

21

22    _____

[14] *See also  Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815,

23 828 (S.D. Cal. 2006)("[p]laintiffs' allegations based on SEC Regulation S-K 303 are insufficient to state a Rule 10b-5 claim"); *Wietschner v. Monterey Pasta Co.*, 294 F.

24 Supp. 2d 1102, 1118 (N.D. Cal. 2003) ("even if Plaintiffs could demonstrate a breach of [Item 303], this would not assist in stating a cause of action under section

25 10(b)"); *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1061 n.4 (N.D. Cal. 1993) ("[t]he fact that Defendants may or may not have violated Item 303 is irrelevant to

26 Plaintiffs' Rule 10b-5 claims").  The Ninth Circuit has expressly rejected the argument that Item 303 requires issuers to disclose predictions of future events. *See,*

27 *e.g., Convergent*, 948 F.2d at 516 (while not "passing on the relevance of Regulation S-K," stating that the provision would not require disclosure of internal projections);

28 *see also VeriFone*, 11 F.3d at 869-70 (Regulation S-K does not require disclosure of internal forecasts).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992                                    - 26 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

5.     The Undisputed Evidence Establishes That Countrywide's Use

Of The Terms "Prime" And "Nonprime" Was Not Misleading

The SEC alleges that Countrywide's use of the term "prime" in its 2005 and 2006 10-Ks was false or misleading.  Countrywide stated that its Prime Mortgage Loans "include[d]" conventional mortgage loans, a significant portion of which qualified for inclusion in mortgage backed securities guaranteed by the GSEs.  Cmplt. ¶ 20.  The SEC argues that this statement was misleading because it allegedly did not inform investors that prime loans "included loan products with increasing amounts of credit risk," such as sub-620 FICOs, reduced documentation and stated income loans, and some loans with loan-to-value ratios above 95%.  The SEC further argues Countrywide did not disclose that pay-option loans were included in the prime category.  *Id.* ¶¶ 21, 88; *see also* Ex. 118 at 2004.  The SEC's contention that Countrywide misled investors about what loans were included in the prime category fails for four principal reasons.

First, the undisputed evidence establishes that there is no commonly accepted, industry-wide definition of the term "prime."  UF 58.  This hardly comes as a surprise since loan quality is affected by many different factors.  For example, a loan might be considered "prime," even if the borrower had a very low FICO score, if the loan-to-value ratio were 50%.  In such circumstances, the equity in the home would virtually assure repayment of the loan even in the event of default.  The point that the terms "prime" and "nonprime" are indefinite was perhaps made best by the Commission's counsel when they objected to deposition questions on the ground that the term "prime" is vague.  Ex. 116 at 1986.[15]  Echoing this theme, the SEC's own expert identified at least five different ways to define "subprime," admitted that there is no one agreed upon definition of "subprime," and opined that Countrywide's use of the term "nonprime" in its public disclosures was not false or

---

[15] McMurray presented to stockholders a chart showing the considerable overlap in FICO scores among prime and nonprime borrowers.  UF 59.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 27 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

misleading.  UF 60.  All of this contrasts starkly with the SEC's allegation and argument last year that the difference between "prime" and "subprime" is simply a matter of FICO score.  *See* Cmplt. ¶ 21.  This Court relied on this argument in denying Defendants' motions to dismiss,[16] but there was never any factual basis for the SEC to assert it and the undisputed record now establishes that.

Second, the detailed information in Countrywide's prospectus supplements disclosed to investors the prime loans that had FICO scores lower than 620.  UF 61.  Moreover, for all of the attention the SEC has given this issue, such loans only approximated between 1-2% of Countrywide's prime production.  UF 62.  Similarly, the prospectus supplements made clear that many prime loans included risk factors such as reduced documentation, high loan-to-value ratios, or both.  UF 63.

Third, even apart from Countrywide's disclosures, the undisputed evidence affirmatively establishes that it was well-understood that "prime" loans could and did contain some relatively risky credit attributes.  There is no dispute that a "conforming" loan eligible for sale to a GSE is generally accepted as a "prime" loan.  Yet, the largest of the GSEs – Fannie Mae – itself disclosed in its 2006 10-K that: (a) 16-17% of its loans in 2005-2006 reflected sub-660 FICOs; (b) in 2005-2006, 5-6% of its loans were issued to sub-620 FICO borrowers; and (c) in 2005-2006, 9-10% of its loans featured loan-to-value ratios above 90%.  UF 64.  Given that the GSEs accepted loans with relatively high-risk characteristics, the fact that some Countrywide "prime" loans contained those characteristics cannot render the Company's use of the term "prime" misleading.

Finally, the undisputed evidence plainly establishes that Countrywide disclosed that it included pay-option loans in its "prime" category.  UF 65.  For example, in its January 2006 earnings press release Countrywide stated, "[p]rime

---

[16] Order at 11 ("[b]ecause the banking industry and regulators viewed 660 or 620 as the dividing line between prime and subprime loans, by using the word 'prime,' Countrywide affirmatively created the impression that it used the same dividing line").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

margins declined [in the 4th quarter of 2005].  The decline from the third quarter was largely attributable to weaker secondary market sales, primarily related to pay-option loans."  *Id*.  Similarly, the Company reported that in 2005 and 2006 "nonprime" loans constituted a little less than 9% of overall production, while it separately disclosed that pay-options constituted 19% of production in 2005 and 14% in 2006.  *Id*.  Since the Company originated more pay-option loans than it did "nonprime" loans, it was obvious that Countrywide was not categorizing pay-option loans as "nonprime."  Countrywide made clear that it included pay-option loans in its "prime" loan category and there is no triable issue of fact to the contrary.

In short, Defendants are entitled to summary adjudication of the SEC's argument that Countrywide's use of the term "prime" was misleading.

**B.    Defendants Are Entitled To Summary Adjudication Of Each Of The SEC's Theories Of Falsity Concerning Countrywide Bank's Held-For-Investment Portfolio**

Besides its theories concerning Countrywide's originate-to-distribute model, the SEC also argues that stockholders were misled concerning the supposedly "poorer than expected performance of the Countrywide PayOption loans" that were held for investment at Countrywide Bank.  Ex. 118 at 2007.  This claim is significant for what the SEC does not allege.  It does not allege that *any* of Countrywide's factual disclosures about the credit attributes of its pay-option loans was false.  These disclosures included detailed information, including FICO scores, loan-to-value ratios, geographic exposure, and reduced documentation risk.  *Supra* at II.D.  Nor does the SEC challenge the accuracy of Countrywide's financial statements.  This is important because the financial statements – and in particular the loan loss reserve – were a key means through which the Company communicated to the market how changes in home prices and the economy were affecting the value of the pay-option portfolio.  Ex. 4 at 124.  Nor does the SEC cite any formal analysis or

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 29 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1  projection by Countrywide's management that contradicted the Company's public

2  statements.

3      Instead, the basis for the Commission's claims is a handful of emails Mozilo

4  wrote in 2006 expressing his personal concerns about the well-known risks of the

5  portfolio, and challenging his management team to address those risks in light of

6  possible changes in economic conditions – namely, rising interest rates (they

7  eventually began to fall), declining home prices and a weakening economy.  The

8  SEC contends that Mozilo's emails evidence risks in the portfolio that supposedly

9  were not disclosed to investors (Cmplt. ¶¶ 94-96), and contradicted Countrywide's

10  statement that it believed it had "prudently underwritten" pay-option loans (*id.*

11  ¶ 90).  In light of Countrywide's unchallenged factual disclosures and accounting

12  for its pay-option loan portfolio, none of the SEC's arguments concerning the pay-

13  option disclosures can withstand summary judgment.

14      1.   Mozilo's "Flying Blind" Concern – That The Performance Of

15           Countrywide's Pay-Option Loans Was Untested – Was

16           Disclosed Repeatedly

17      In an email to three of Countrywide's senior executives on September 26,

18  2006, Mozilo wrote the following:

19      I would like you . . . to seriously consider the following . . . We have no way,

20      with any reasonable certainty, to assess the real risk of holding these [pay-

21      option] loans on our balance sheet.  . . . The bottom line is that we are flying

22      blind on how these loans will perform in a stressed environment of higher

23      unemployment, reduced values and slowing home sales.

24  Ex. 134.  This email is a focus of the SEC's case.  When it issued its press release

25  touting the filing of this lawsuit, the Commission took the extraordinary step of

26  posting this email on its website.

27      A federal district court, however, recently held that this email does not give

28  rise to a fraud claim because the uncertainties referenced therein were in fact

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 30 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

disclosed.  Countrywide stated in its periodic SEC filings that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of these [pay-option] loans has not been established for the Company."  UF 36.  Based on this disclosure – and others – the court in *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, *supra*, recently dismissed a lawsuit brought by a Countrywide stockholder who, like the SEC, argued that the "flying blind" email established an undisclosed risk to Countrywide's business.  Just as in this case, the plaintiff in *SRM* did not "explain why or how this Form 10-K disclosure was deficient" in communicating uncertainties about the pay-option portfolio.  2010 WL 2473595, at *8.  The court held that Countrywide had "clearly disclosed" the relevant facts and that "[w]hile the term 'flying blind' may more colorfully convey Countrywide's 'lack of significant historical experience' with pay-option ARMs, 'the [D]efendants were under no duty to 'employ the adjectorial characterization' that the [P]laintiff[ ] believe[s] is more accurate.'"  *Id.* at *8-9 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994)).  The *SRM* decision follows well-established law that there is no requirement that external disclosures contain the same verbiage as internal communications when the material facts are disclosed.  *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (dismissing allegation that "merely squabbles about the adverbs used in the registration statement, and fails to indicate that the language used was false"); *see also In re Cutera*, __ F.3d ____, 2010 WL 2595281, at *5 (allegedly inadequate disclosure was "not materially different" in substance from later, and wordier, disclosures about shortfalls in company's sales force).

In addition to the "lack of historical experience" statement in Countrywide's periodic SEC filings referenced by the Court in *SRM*, the undisputed facts establish that Mozilo personally disclosed his concerns about the risks of the pay-option portfolio – particularly the uncertainty associated with negative amortization and payment shock.  For example, during Countrywide's July 2005 earnings call Mozilo

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 31 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

stated that although pay-options were Countrywide's "lowest delinquency product at

the moment . . . you have to wait some time for loans to mature a year, two years,

even three years to determine how they're going to perform." UF 66. Similarly,

during Countrywide's July 2006 quarterly earnings call, Mozilo stated that the pay-

option loans were:

> complicated in that there are resets here, and depending upon where rates are,
> the resets could be significant and we just need time to see how this is going
> to play out. If rates continue to rise significantly, then these resets and
> payment shocks will be substantial. . . . The test will be when the resets take
> place and I'm not certain exactly what's going to happen there.

UF 67. The court in *SRM* cited these statements in support of its conclusion that

Countrywide "clearly disclosed" the risks of the pay-option portfolio. *SRM Global

Fund L.P.*, 2010 WL 2473595, at *9. Thus, the uncertainties about how

Countrywide's pay-option loans would perform were disclosed frequently.

Investors knew this from other sources as well. On September 29 – just a few days

after the "flying blind" email – federal banking agencies, including the Federal

Reserve Board, the OCC, the OTS and the FDIC, issued "Interagency Guidance on

Nontraditional Mortgages" – public drafts of which had been available since

December 20, 2005. This document states: "To manage the risks associated with

nontraditional mortgage loans, management should: Recognize that many

nontraditional mortgage loans . . . [a]re untested in a stress environment." UF 68.

Thus, it was well-known, and publicly disclosed by the SEC's sister government

agencies that regulated the mortgage industry, that many nontraditional mortgages

were "untested in a stressed environment."[17]

---

[17] The SEC apparently finds Mozilo's use of the colorful phrase "flying blind"
to be sinister and noteworthy. But this phrase was neither new nor of Mozilo's
creation. On the contrary, in an October 2004 article, the Wall Street Journal quoted
the chief economist of the Mortgage Bankers Association as saying "[w]e're flying
blind" with respect to the payment shock associated with interest only loans. UF 69.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992                                                          - 32 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Ignoring all of these disclosures, the SEC argues that the September 2006 "flying blind" comment somehow rendered false a statement Mozilo made four months earlier in May about pay-option products generally, *i.e.*, that "the performance profile of th[e pay-option] product is well understood because of its twenty year history, which includes stress tests in difficult environments."  Ex. 118 at 2000.  This statement was true:  pay-option loans had been in existence for over 20 years, issued by such lenders as Washington Mutual, Downey Savings and World Savings.  UF 34.  This 20 year history included experiences in difficult economic environments – particularly the declining California housing market in the late 1980s and early 1990s.  UF 35.  The true statements made in May 2006 do not conflict with Mozilo's comment four months later that Countrywide's *particular* portfolio of loans (of recent vintage) was untested – a fact that he and others had repeatedly communicated to the market.

In short, the undisputed facts refute any claim that the concern expressed in Mozilo's "flying blind" email was withheld from the market.  Accordingly, summary adjudication of this issue is appropriate.

> 2.   The Other Concerns Expressed In Mozilo's Emails Were Also Disclosed

In his internal emails (Ex. 134, 142-145, 193), Mozilo also expressed personal concerns about: (a) the fact that most of Countrywide's pay-option loans were underwritten on a reduced documentation basis; (b) the number of borrowers who were using the minimum payment; and (c) the results of a mid-2006 analysis that compared income claimed by borrowers in their loan applications with income reported to the Internal Revenue Service (the "4506 Audit").  The undisputed facts, however, refute any fraud claim based on these concerns.

Regarding reduced documentation, Countrywide expressly stated in both its 2Q and 3Q 2006 10-Qs that "substantially all" of its pay-option loans were issued on the basis of reduced borrower documentation.  UF 70.  In addition to disclosing the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 33 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

*fact* that substantially all pay-option loans were based upon reduced documentation, Countrywide also disclosed the *risks* of reduced documentation.  For example, Mozilo said in February 2006 "[t]here's no question that the no doc loan or stated income is, you know, there's some exaggeration going on."  UF 71.  He then starkly stated his personal view:  "I believe there's a lot of fraud."  *Id.*  Moreover, at a September 2006 Equity Investor Forum, McMurray, disclosed Countrywide's estimation of the relationship between reduced documentation and default – *i.e.*, that, depending on the nature of the program, reduced documentation loans were 1.5 to 3.5 times more likely to go into delinquency than full documentation loans.  UF 72.[18]  McMurray made this same disclosure on numerous occasions.  *Id.*

With respect to the minimum payment feature, the SEC argues that Mozilo privately expressed concern that approximately 70% of Countrywide's pay-option borrowers were electing in 2006 to make the minimum payment.  Cmplt. ¶ 94.  This, however, is no basis for a fraud claim, since Mozilo expressly disclosed this fact more than once.  *Supra* at II.D.2.  Furthermore, as shown above, the Company disclosed each quarter the portion of borrowers who, based on outstanding principal balance, were accruing negative amortization, and the total amount of negative amortization that had accrued on the portfolio.  *Id.*

Finally, the fact that the SEC does not challenge the accuracy of Countrywide's financial statements defeats any claim that the results of a limited scope 4506 Audit (showing discrepancies between income stated on loan applications as compared to income reported to the IRS) somehow required disclosure to shareholders.  The risk of borrowers misrepresenting their income in their applications – and the corresponding risk that any such misrepresentation

---

[18] Moreover, while not a basis for this motion, it was common knowledge that pay-option loan programs generally – not just Countrywide's pay-option program – were reduced documentation programs.  For example, in an October 13, 2006, article *Forbes* wrote that pay-option loans were "popular but deadly" in part due to their "low documentation standards."  Ex. 141.  Similarly, the risks of reduced documentation loan programs were also discussed extensively in the popular press.  UF 73.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 34 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

would result in higher delinquencies – was one of the many factors that Countrywide took into account when setting its loan loss reserves.  UF 74.  As a matter of law, companies are not required to disclose all of the details of every factor relevant to the establishment of accounting reserves.  *See In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1459 (N.D. Cal. 1996) ("ongoing adjustments to reserves that otherwise comply with GAAP need not be disclosed").  Thus, there is no legal basis to any claim that Countrywide was required to disclose the results of the 4506 Audit.

The SEC has argued that the 4506 Audit results rendered materially false or misleading the statement in the Company's periodic filings that "[w]e believe we have prudently underwritten" pay-option ARM loans.  Cmplt. ¶90.  This argument is meritless as a matter of law.  First, as already discussed, the phrase "prudently underwritten" is a classic statement of puffery that is not actionable as a matter of law.  *See Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1188-89 (S.D.N.Y. 1986) (broker's claim that investors' account would be "properly and prudently managed" was puffery).  Additionally, Countrywide disclosed the actual risk attributes (FICO scores, loan-to-value ratios, geographic concentration) of its pay-option portfolio (*supra* at II.D.2) that formed the basis for this statement of belief, so investors were free to draw their own conclusions as to whether the Company's underwriting was "prudent."

In short, the undisputed facts refute the SEC's contention that Countrywide omitted material facts concerning the risks of the pay-option portfolio.  Defendants are therefore entitled to summary adjudication of these claims.

## C.    Countrywide's Unchallenged Financial Statements And Extensive Disclosures Are Inconsistent With An Intent To Deceive

The undisputed facts are flatly inconsistent with scienter.  A company bent on misleading its investors simply would not have prepared accurate financial statements and disclosed the mountain of information that Countrywide disclosed.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 35 -

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

1    Courts recognize that such exhaustive disclosures are the antithesis of an

2  intent to deceive investors or conceal material facts from them.  As the Ninth Circuit

3  reasoned in affirming summary judgment, if a company's "officers were bent on

4  committing fraud, it is not likely that they would have provided such detailed risk

5  disclosure." *In re Worlds of Wonder Sec. Litig*., 35 F.3d at 1424.  In a similar

6  context, *In re First Marblehead Corp. Sec. Litig.*, considered a lawsuit alleging that

7  a student loan company secretly lowered credit standards while concealing

8  increasing defaults and cancellations.  639 F. Supp. 2d at 149-50.  The SEC filings

9  of the company and its securitization trusts disclosed the FICO scores of borrowers,

10  that the company did not require a FICO score of at least 700, that default rates had

11  risen, and other facts plaintiffs claimed had been concealed.  The court reasoned that

12  these "detailed disclosures negate any inference of scienter."  *Id*. at 154-56, 163.[19]

13    In view of the volume, specificity and nature of Countrywide's disclosures,

14  no reasonable fact finder could conclude that Defendants intended to conceal the

15  "truth" about origination standards from investors – even assuming, contrary to

16  reality, that it would have been possible to deceive investors, given the voluminous

17  information that was already in the market.

18  **D.    Rule 13a-14 Does Not Give Rise To A Cause Of Action**

19    Mozilo and Sieracki are entitled to summary judgment of the Complaint's

20  fourth cause of action for allegedly false financial certifications pursuant to Rule

21  13a-14 because this rule simply creates a filing obligation that does not give rise to

22  an independent cause of action.  *See SEC v. Black*, 2008 WL 4394891, at *16-17

23  (N.D. Ill. Sept. 24, 2008).

24  _____

[19] *See also Oxford Asset Mgt, Ltd. v. Jaharis*, 297 F.3d 1182, 1193 (11th Cir. 2002) (claim that company misrepresented safety of drug lacked support and was negated by the "candid statements" about patient adverse reactions in company's prospectus); *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 706 (D. Conn. 1992) ("defendants' provision of adverse information to the securities analysts negates an inference that the company acted with an intent to defraud"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1164-1165 (C.D. Cal. 2007) (detailed risk disclosures negate scienter); *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1520 (N.D. Cal. 1990) ("It is implausible that a person intent on fraud" would provide adverse information to investors) (citation & quotation omitted).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2263992

- 36 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1

2    Dated:  August 2, 2010          IRELL & MANELLA LLP

3                                    WILLIAMS & CONNOLLY LLP

4

5                                    By:   /s/ David Siegel
                                         _____
6                                        David Siegel
                                         dsiegel@irell.com
7                                        1800 Avenue of the Stars, Suite 900
                                         Los Angeles, California 90067
8                                        Telephone: 310-277-1010
                                         Facsimile: 310-203-7199

9                                        *Attorneys for Defendant Angelo Mozilo*

10

11   Dated:  August 2, 2010          ORRICK, HERRINGTON & SUTCLIFFE LLP

12

13                                   By:   /s/ Walter F. Brown, Jr.
                                         _____
14                                       Walter F. Brown, Jr.
                                         wbrown@orrick.com
15                                       The Orrick Building
                                         405 Howard Street
16                                       San Francisco, California 94105
                                         Telephone: 415-773-5700
17                                       Facsimile: 415-773-5759

18                                       *Attorneys for Defendant David Sambol*

19   Dated:  August 2, 2010          DLA PIPER LLP (US)

20

21                                   By:  /s/ Shirli Fabbri Weiss
                                         _____
22                                       Shirli Fabbri Weiss
                                         shirli.weiss@dlapiper.com
23                                       401 B Street, Suite 1700
                                         San Diego, CA 92101-4297
24                                       Telephone: 619-699-2700
                                         Facsimile: 619-699-2701

25                                       *Attorneys for Defendant Eric Sieracki*

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2263992

- 37 -

JOINT MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT