WALTER F. BROWN, JR. (SBN 130248)
*wbrown@orrick.com*
JAMES A. MEYERS (Admitted *pro hac vice*)
*jmeyers@orrick.com*
ERIC M. HAIRSTON (SBN 229892)
*ehairston@orrick.com*
RANDALL S. LUSKEY (SBN 240915)
*rluskey@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

MARK E. BECK (SBN 65163)
*mbeck@orrick.com*
MICHAEL C. TU (SBN 186793)
*mtu@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:   (213) 629-2020
Facsimile:   (213) 612-2499

Attorneys for Defendant David Sambol

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV 09-3994-JFW (MANx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DAVID SAMBOL'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION** |
| vs. | |
| ANGELO MOZILO, DAVID SAMBOL AND ERIC SIERACKI, | Date:        August 30, 2010<br>Time:        1:30 p.m.<br>Judge:       Hon. John F. Walter<br>Ctrm.:       Courtroom 16<br>             Spring Street Courthouse |
| Defendants. | Pre-Trial Conf:        October 1, 2010<br>Trial:                 October 19, 2010 |

# TABLE OF CONTENTS

INTRODUCTION AND FACTS RELATING TO MR. SAMBOL ........................ 1

ARGUMENT .................................................................................................... 2

I.     THE SEC HAS NOT ADDUCED SIGNIFICANT PROBATIVE EVIDENCE CREATING A GENUINE ISSUE OF MATERIAL FACT THAT MR. SAMBOL ACTED WITH SCIENTER ........................................ 2

     A.     The Evidentiary Record Negates Any Finding That Mr. Sambol Acted With Scienter ................................................................ 3

     B.     The SEC's Theory And Evidence Are Insufficient .............................. 5

II.    THERE IS NO SIGNIFICANT PROBATIVE EVIDENCE CREATING A GENUINE ISSUE OF MATERIAL FACT THAT MR. SAMBOL PERSONALLY MADE A FALSE OR MISLEADING STATEMENT ........................................................................................... 8

     A.     The May 24, 2005 Statement ................................................. 8

     B.     The September 13, 2006 Statement ...................................... 10

CONCLUSION ............................................................................................... 13

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alfus v. Pyramid Tech. Corp.*
745 F. Supp. 1511 (N.D. Cal. 1990)...................................................................2

*In re Convergent Tech. Sec. Litig.,*
948 F.2d 507 (9th Cir. 1991)..........................................................10, 11, 13

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) ....................2, 3

*Ferber v. Travelers Corp.,*
802 F. Supp. 698 (D. Conn. 1992) ................................................................4

*Gebhart v. SEC,*
595 F.3d 1034  (9th Cir. 2010)......................................................................3

*Ponce v. SEC,*
345 F.3d 722 (9th Cir. 2003)........................................................................13

*SEC v. Fehn,*
97 F.3d 1276 (9th Cir. 1996)........................................................................13

*SEC v. Platforms Wireless Int'l Corp.,*
2010 WL 2902393 (9th Cir. July 27, 2010) ............................................3

*SEC v. Rubera,*
350 F.3d 1084 (9th Cir. 2003)........................................................................3

*SEC v. Todd,*
2007 WL 1574756 (S.D. Cal. May 30, 2007) ......................................7, 8

*In re Worlds of Wonder Sec. Litig.,*
35 F.3d 1407 (9th Cir. 1994)........................................................................11

## <u>INTRODUCTION AND FACTS RELATING TO MR. SAMBOL</u>

David Sambol devoted almost all of his professional life to Countrywide Financial Corporation, and was equally devoted to making it one of the most successful mortgage companies in the nation.  By 2005, the start of the SEC's alleged relevant period, Mr. Sambol had become Executive Managing Director and Chief of Mortgage Banking and Capital Markets.  In April 2006, he was promoted to Executive Managing Director for Business Segment Operations.[1]

In September 2006, Mr. Sambol became Countrywide's President and Chief Operating Officer.  Before his promotion, Countrywide's CFO, Chief Investment Officer, Chief Risk Officer, as well as the heads of the Secondary Marketing department and the Financial Reporting and Investor Relations groups reported to the Company's predecessor COO, as did Mr. Sambol himself.  Before September 2006, Mr. Sambol had no oversight responsibility or authority over these executives or their departments.  The SEC acknowledges that Mr. Sambol did not sign any of Countrywide's periodic SEC filings before September 2006, but instead only provided "sub-certifications" (as to the part of the filings relating to the areas of Countrywide's operations that he oversaw; these did not include credit risk).

Almost immediately after becoming President in September 2006, Mr. Sambol was thrust into a maelstrom facing Countrywide and the rest of the mortgage lending industry – as everyone in the market (and the nation) knew, interest rates were rising and housing prices were softening.  Everyone, including the sophisticated institutional investors that comprised the vast majority of Countrywide stockholders, knew the obvious risks these twin forces presented.  Countrywide's CEO, Angelo Mozilo, himself had publicly discussed two months earlier the potential impact of those risks on the largest component of the Company's held for

---

[1] As Chief of Mortgage Banking and Capital Markets, Mr. Sambol oversaw the Company's origination and servicing operations and its capital markets subsidiaries, principally an NASD-registered securities firm.  Upon his promotion in April 2006, he assumed additional oversight responsibility of Countrywide Bank and certain other administrative departments.

1    investment loan portfolio, pay-option loans, and the government agencies regulating

2    the industry were warning that nontraditional mortgages were untested in a stressed

3    environment.  Then, in August 2007, the secondary financing markets evaporated in

4    unprecedented fashion.  Countrywide had long disclosed its dependence on these

5    secondary markets, which purchased nearly all of its loans.  Countrywide was able to

6    weather this storm longer than many of its competitors but, ultimately, decided to

7    sell itself to Bank of America in January 2008.

8        In the face of all this, the SEC's case has boiled down to the accusation that

9    Mr. Sambol defrauded investors because he "did not assure" that Countrywide

10    adequately disclosed the risks of expanding underwriting guidelines in its 2005 and

11    2006 10-K filings.  Never mind that Mr. Sambol did not sign either of those filings

12    or, prior to September 2006, do more than provide sub-certifications with respect to

13    the production areas under his oversight.  Never mind that two high-level financial

14    reporting group executives testified that they had responsibility for the final content

15    of Countrywide's disclosures.  And never mind that Mr. Sambol himself frequently

16    disclosed in 2005-2006 that Countrywide's core business strategy was to

17    aggressively expand underwriting guidelines by offering any qualifying customer

18    any product that any competitor offered – a disclosure publicly described by one

19    analyst as "jolting" in nature.  The notion that Mr. Sambol intended to or did deceive

20    investors under these circumstances is untenable, and the SEC's allegations against

21    him have no basis as a matter of fact, law, or logic.  The SEC cannot create a

22    genuine issue of material fact for trial, and accordingly Mr. Sambol is entitled to

23    summary judgment on all claims against him.

24                 **ARGUMENT**

25   **I.     THE SEC HAS NOT ADDUCED SIGNIFICANT PROBATIVE EVIDENCE CREATING A GENUINE ISSUE OF MATERIAL FACT**

26         **THAT MR. SAMBOL ACTED WITH SCIENTER**

27        Scienter is a mental state "embracing intent to deceive, manipulate, or

28    defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed.

2d 668 (1976).  The Ninth Circuit permits "recklessness" to satisfy this requirement, but only if the conduct is "highly unreasonable" and involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) (affirming judgment against SEC for failure to prove scienter).  The Ninth Circuit has made clear time and again, including in cases involving the SEC and as recently as last week, that recklessness is "a form of intentional or knowing misconduct," i.e., it comprises *deliberate* or *conscious* misbehavior.  *SEC v. Platforms Wireless Int'l Corp.*, 2010 WL 2902393, *13 (9th Cir. July 27, 2010) (quotation omitted) (and cases cited therein).  In so holding, the Court squarely rejected the SEC's view "that the defendants need only have been aware that the misleading statement was made and have knowledge of the facts that made it 'objectively obvious' that the statement was misleading"; instead, it held, "'the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity.'"  *Id.* at *12-13 (quoting *Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010)).

The SEC's theory here is that Mr. Sambol knew of various facts relating to Countrywide's underwriting guidelines and loan production but "did not assure that this material information was disclosed to investors."  Lefler Decl., Ex. 276, at 35.  However, neither the theory nor the evidence the SEC proffers to support it creates a triable issue as to Mr. Sambol's scienter under these standards.

### A.    The Evidentiary Record Negates Any Finding That Mr. Sambol Acted With Scienter

Mr. Sambol's numerous personal disclosures of the very information the SEC alleges Countrywide omitted preclude a finding that he intentionally or with deliberate disregard hid anything about the qualities of Countrywide loans.  It is settled that a person's "'provision of adverse information to the securities analysts

negates an inference that [he] acted with an intent to defraud.'" *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992) (dismissing claim of inadequate MD&A disclosure) (quoting *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1520 (N.D. Cal. 1990)). *See also* Joint Mem. at 35-36. Here, Mr. Sambol made numerous, detailed public disclosures of Countrywide's expanding underwriting guidelines, the business strategy and philosophy surrounding them, and the growing mix of non-conforming loans that the Company was originating, thus negating scienter.

Mr. Sambol frequently disclosed to the public, before and throughout the relevant period, what the SEC describes (Compl. ¶ 8) as the Company's strategy of aggressively expanding its underwriting guidelines by "match[ing] the terms of any loan being offered in the market." *See* Defendants' Joint Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Summary Judgment ("UF") 120-123. On these occasions, he told investors, in words or substance, that if a customer could "legitimately qualify for a loan anywhere else in the U.S., they'll qualify at Countrywide, and if they have a product or loan preference that product will be on our menu." UF 123. One such instance prompted an analyst to publish a report commenting that Countrywide's commitment "not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an underwriting guideline." UF 124. Despite this reaction, Mr. Sambol continued to make this disclosure of Countrywide's expanding underwriting guidelines. UF 122, 125-126. These public disclosures of Countrywide's expanding guidelines, despite such coverage, defeat the contention that Mr. Sambol intended to conceal this very same information from investors.

Further refuting the notion that Mr. Sambol intended to conceal the nature of Countrywide's underwriting guidelines or loan characteristics is his disclosure of the extent to which Countrywide was originating nonprime and other alternative products. For example, he disclosed that 2/3 of the Company's volume in the first

quarter of 2005 "was non-conforming, Jumbo, Alternative-A, non-prime and home equity volume…. [W]e believe that Countrywide today is the largest originator of non-conforming loans in the country." UF 127. Mr. Sambol also indicated that non-conforming loans had roughly doubled as a percentage of Countrywide's overall loan production from 2002 to 2005. *Id.*

Throughout 2007, Mr. Sambol also repeatedly disclosed how the "liberal credit environment," "[a]ggressive" underwriting guidelines, and lowering home prices had all resulted in "pressure on delinquencies and defaults," "significant volatility and instability," and reduced secondary market liquidity. UF 128-129. Analysts took note of this dire commentary. *E.g.*, UF 130 ("Sambol sounded a warning on the continued deterioration of the mortgage market"), UF 131 ("Sambol crystallized our concerns"). From both a legal and factual viewpoint, Mr. Sambol's collective disclosures (*see* UF 120-122, 126-129, 132-133) disprove the notion that Mr. Sambol intended to conceal from investors the expansion of Countrywide's underwriting guidelines or the anticipated risks of such expansion.

**B.    The SEC's Theory And Evidence Are Insufficient**

To summarize the SEC's theory and evidence of scienter: (1) Mr. Sambol knew of various facts relating to Countrywide's underwriting guidelines and loan production and (2) he "did not assure" that these facts were disclosed to investors. Lefler Decl., Ex. Ex. 276, at 35. This theory fails at the threshold because, as shown in the Joint Mem. and herein, Mr. Sambol, other executives, and Countrywide itself repeatedly disclosed all material information that the SEC claims was concealed. The SEC's theory is also legally insufficient. Evidence that Mr. Sambol was apprised of potential business risks is insufficient to support a finding of securities fraud. Rather, the SEC must show that Mr. Sambol knew of undisclosed material information and intentionally or with deliberate recklessness ignored a duty to disclose it. Despite the millions of reports, memoranda and internal communications produced during the course of this litigation, and the extensive investigative

1  testimony and deposition record, the SEC can make no such showing.

2  All of the evidence the SEC cites in its interrogatory responses for its assertion

3  that Mr. Sambol knew that required disclosures were not being made involves

4  alleged efforts by John McMurray, Countrywide's Chief Risk Officer, to include

5  additional information about credit risk in various Company SEC filings.  Lefler

6  Decl., Ex. 277 at 25-26. The SEC says that Mr. McMurray "unsuccessfully lobbied

7  to the financial reporting department" for additional disclosures throughout 2006 and

8  specifically asked "the financial reporting staff" to include certain disclosures in the

9  2006 10-K that were not ultimately included.  *Id*. at 25.  These anecdotes, even if

10  accepted for purposes of this motion, do not show that Mr. Sambol failed to ensure

11  that Countrywide made any required disclosure.  The SEC elicited no testimony

12  from Mr. McMurray or anyone else that his alleged failed lobbying resulted in a

13  material omission.  Nor could it, since Mr. McMurray provided unqualified

14  Sarbanes-Oxley certifications for each of Countrywide's 2006 SEC filings.  UF 134-

15  135.  Thus, whatever additional disclosure Mr. McMurray may have sought to

16  include in those filings was not, even in his own mind, "necessary" in order to make

17  the statements made in those filings, in the light of the circumstances under which

18  they were made, not misleading.  Rule 10b-5.[2]  The SEC's evidence of Mr.

19  McMurray's alleged lobbying thus presents no factual or legal basis on which to

20  conclude that Mr. Sambol intentionally or with deliberate disregard excluded

21  necessary material information from Countrywide's periodic filings.

22  Nor is there record support for the SEC's contentions that Mr. McMurray

23  signed a "qualified" Sarbanes-Oxley certification regarding the 2Q 2007 10-Q and

24  that Messrs. Sieracki and Sambol directed Anne McCallion, the Deputy CFO, not to

25  _____

26  [2] As to the 2006 10-K in particular, the SEC says that Mr. McMurray sought to have included a version of "an outline of where credit terms impacted Countrywide's balance sheet."  Lefler Decl., Ex. 277 at 25.  But, the SEC has not alleged that Countrywide's "balance sheet" was materially false or misleading.  Thus, on the face of the SEC's own contention, the "outline" was not necessary to make any statement in the 2006 10-K, under the circumstances in which it was made, not misleading.

DAVID SAMBOL'S MEMO OF P&A ISO
MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 09-3994-JFW (MANX)

include Mr. McMurray's concerns in the 10-Q.  Lefler Decl., Ex. 277 at 26.  In investigative testimony before the SEC filed this action, the SEC asked Mr. McMurray directly whether he had qualified his certification, and Mr. McMurray responded in the negative:  "You know, I don't know that I would use that word…. [T]hese were issues that I wanted to be sure to have Tom [Saletta] see as I sent this over to him."  UF 136.  He further testified that he was "comfortable" after talking with Ms. McCallion about the decision not to include the discussion contained in his email.  UF 136.  Ms. McCallion corroborated Mr. McMurray at her deposition; she testified that, based on her conversations with Mr. McMurray at the time, she had "no belief that he was qualifying his certification" and that he had agreed that the items in his email were "not a big enough deal" to be included in the 10-Q.  UF 137.  She further testified that it was *her* decision not to make any such disclosures; she nowhere testified that Messrs. Sieracki and Sambol directed her to exclude the information from the 10-Q.  UF 137.[3]  The SEC has adduced no evidence to counter Mr. McMurray's and Ms. McCallion's sworn testimony.  In short, it is the SEC, and only the SEC, that has improperly affixed the label "qualified" to Mr. McMurray's certification; its fictitious assertions regarding the 2Q 2007 10-Q must be rejected.

In the end, the SEC seems to believe that there must be fraud whenever a company executive internally recommends or even simply raises for consideration some disclosure that is not ultimately made.  If this were the law, we submit that most if not all companies or their senior officers could be held liable for fraud.  But this is not the law, as Judge Benitez explained in granting judgment as a matter of law to the defendants in *SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007).  There, the SEC argued that two Gateway Computer executives committed securities fraud by rejecting the recommendations of certain financial staff members and the

---

[3] Similarly, Gregory Hendry testified more generally that he had primary responsibility for drafting, reviewing and finalizing Countrywide's periodic filings, and that he did not recall any instance in which Mr. Sambol overruled any of Mr. McMurray's proposed credit risk disclosures.  UF 138.

1    company's independent auditors for additional financial disclosure, and opting

2    instead for "more abbreviated disclosure." *Id*. at *8.  The auditors ultimately

3    concluded that the more abbreviated disclosure was adequate.  The court held as a

4    matter of law—in words highly appropriate here—that the executives could not be

5    found to have possessed scienter, since the "only requirement is compliance with the

6    law"; the executives "were not obligated to adopt" additional disclosures "so long as

7    the disclosure they adopted was adequate.  Their auditor told them it was.  As a

8    matter of law, there can be no scienter under these facts." *Id*.  Similarly here, while

9    Mr. McMurray may have initially suggested additional possible disclosures, he was

10   ultimately comfortable with the disclosures that were made, and signed Sarbanes-

11   Oxley certifications so indicating.  We urge the Court to follow the lead of *Todd* and

12   to reject the SEC's attempt to resurrect its "embrace disclosure" theory (*id*.) that the

13   *Todd* court correctly found to lack any basis in the law.

14   **II.   THERE IS NO SIGNIFICANT PROBATIVE EVIDENCE CREATING
         A GENUINE ISSUE OF MATERIAL FACT THAT MR. SAMBOL
15       PERSONALLY MADE A FALSE OR MISLEADING STATEMENT**

16         In addition to the general allegations relating to Countrywide's 2005 and 2006

17   10-Ks (addressed in the Joint Mem.), the SEC alleges that Mr. Sambol personally

18   made two statements that materially misled the Company's investors.  Compl. ¶ 99.

19   There is no significant probative evidence creating a genuine issue of material fact

20   that either statement was materially misleading.

21         **A.    The May 24, 2005 Statement**

22         The SEC alleges that on May 24, 2005, Mr. "Sambol reassured analysts that

23   Countrywide addressed the higher credit risk associated with adjustable rate

24   mortgage programs by requiring different underwriting criteria such as 'higher credit

25   scores or lower loan to value ratios.'" *Id*.  While not challenging the truth of Mr.

26   Sambol's statement,[4] the SEC nevertheless contends it was "disingenuous" because

27   ──────────────
     [4] The SEC could not dispute the truth of the statement.  At the end of 2005, seven
28   months after the statement, the average FICO score for pay-options was a very high
     720 and the average combined loan-to-value ratio was a low 78%.  UF 37.

1    Mr. Sambol knew that Countrywide made numerous exceptions to the underwriting

2    guidelines and wrote pay-option loans that exceeded guideline limitations, and

3    because Mr. McMurray had warned him in a May 22, 2005 email about potential

4    negative implications of exceptions.  Lefler Decl., Ex. 276, at 31-32.  These

5    assertions do not create a genuine issue of material fact for trial.

6         When the full context of Mr. Sambol's statement is considered (as it must be),

7    it is clear that Mr. Sambol did not state or imply that Countrywide mitigated credit

8    risk for its ARM loans solely or even primarily by applying more stringent

9    underwriting criteria.  Rather, he stated that, in addition to mitigating or addressing

10   these risks "in part" by different underwriting criteria than those used for traditional

11   fixed-rate loans, it also mitigated these risks through pricing:  "*importantly*, the

12   paradigm in the mortgage market today and with Countrywide in particular, is that

13   *the increased risk is priced for in a very granular way*."  UF 133 (emphasis added).

14        The SEC does not and could not contend that there was anything inappropriate

15   or remarkable about issuing loans by exception.  Exception loans were a well-

16   understood, well-established industry practice.  UF 139.  There is no record evidence

17   to the contrary.  Indeed, the SEC's own mortgage industry expert testified that

18   exceptions do not inherently increase the risk of a particular loan or loan portfolio

19   and that a loan portfolio having a higher average FICO score and a higher exception

20   rate (even as high as 50%) would nevertheless have a lower credit risk profile than a

21   portfolio with a lower average FICO score and a zero exception rate (all else being

22   equal).  UF 140.  Fully consistent with Mr. Sambol's statement, mitigating risk

23   through pricing was recognized as a standard, effective industry practice.  UF 139.

24        In any event, Countrywide regularly disclosed, throughout the relevant period,

25   that it originated loans pursuant to exceptions.  UF 16, 53, 142; Joint Mem. at 20-21.

26   It disclosed in March 2004 that its "[e]xception pricing system" was one of its "Loan

27   Production Growth Strategies."  UF 141.  According to one former Countrywide

28   credit risk executive, its policies and practices for making exception loans were "a

- 9 -

1  regular topic that came up at every conference or almost every discussion." UF 142.

2  In fact, at the May 24, 2005 conference itself, Mr. Sambol disclosed that

3  Countrywide enjoyed "a significant advantage with respect to handling exceptions,"

4  and commented on the Company's ability to identify and appropriately price for

5  exceptions. UF 143. Countrywide also publicly disclosed in prospectus

6  supplements filed prior to Mr. Sambol's statement that it made exceptions to its

7  guidelines and expected that "a significant number" of the underlying mortgage

8  loans were "originated based on such underwriting exceptions." UF 53. The SEC

9  has admitted that this information was reflected in Countrywide's stock price; its

10  own economic expert admits that this information, like all public information about

11  the Company's securitizations, was "quickly and fully" incorporated into

12  Countrywide's stock price. UF 49. Since the SEC thus admits that this information

13  regarding exceptions was "then available to the market," Mr. Sambol cannot have

14  violated the law by not including that very same information in his May 24, 2005

15  statement. *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991)

16  (affirming summary judgment due to lack of falsity, because "an omission is

17  materially misleading only if the information has not already entered the market").

18       Mr. McMurray's email does not support the SEC's contention that Mr.

19  Sambol knew of specific undisclosed risks associated with pay-option loans

20  originated on an exception basis, the omission of which rendered his statement

21  materially false and misleading. According to the SEC's interrogatory responses,

22  Mr. McMurray's email was the sole instance prior to Mr. Sambol's statement in

23  which the SEC claims Mr. Sambol was warned of the risks of exception loans.

24  Lefler Decl., Ex. 277 at 4. But that email does not refer even once to pay-option

25  loans. UF 144. The SEC cited no evidence that Mr. Sambol then knew whether or

26  to what extent pay-option loans retained in Countrywide Bank, on which the

27  Company retained direct credit risk, were issued on an exception basis. Because the

28  SEC has thus failed to establish any factual basis for its allegation that Mr. Sambol

1    was aware before May 24, 2005 of material undisclosed risks associated with pay-

2    option loans originated on an exception basis, and because the fact that Countrywide

3    issued exception loans was disclosed and known to the market well before that date,

4    Mr. Sambol is entitled to summary adjudication that his May 24, 2005 statement was

5    not materially false or misleading when made.  *See In re Worlds of Wonder Sec.*

6    *Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) (summary judgment affirmed where

7    purportedly concealed risks to the company's future had in fact been disclosed); *In*

8    *re Convergent*, 948 F.2d at 515-16 (summary judgment affirmed because, *inter alia*,

9    allegedly concealed risks to a particular product line had been disclosed).

10            **B.      The September 13, 2006 Statement**

11           The SEC alleges that Mr. Sambol "downplayed Countrywide's participation

12   in originating subprime loans" at a September 13, 2006 investor presentation "by

13   falsely stating that Countrywide had been 'on the sidelines'" of the subprime market.

14   Compl. ¶ 99.  The full context of Mr. Sambol's statement, rather than the SEC's

15   careful excision of three words from it, makes clear that he did not downplay the

16   Company's presence in subprime.  In response to a question from an attendee at the

17   conference regarding Countrywide's future plans for its retail and wholesale

18   subprime channels, Mr. Sambol stated that at that time subprime represented

19                  less than 10% of our total production.  Looking ahead, and that is not to say

20                  that subprime is not an important part of our menu . . . . [W]e remain

21                  committed to having a subprime presence.  But, there are no particular plans

22                  to accelerate growth.  And I think that would characterize our current posture

23                  as remaining on the sidelines, waiting for the market to rationalize somewhat.

24   UF 146.  The SEC has not adduced significant probative evidence creating a triable

25   issue either that Mr. Sambol's statement was false or that Mr. Sambol intended

26   to mislead anyone about Countrywide's participation in the subprime market.

27           This Court denied Mr. Sambol's motion to dismiss as to this statement in large

28   part because of the SEC's contention that "Countrywide did not use the industry's

- 11 -

customary prime/subprime dividing line in categorizing its loans." Dkt. No. 78, Amended Civil Minutes ("Nov. 3, 2009 Order"). at 16 n.9.  That contention is addressed at pp. 27-29 of the Joint Mem.  Critically, the SEC appears to have abandoned any reliance on the prime/subprime distinction in support of its contention that Mr. Sambol's September 13, 2006 statement was false when made— not surprisingly, in light of its mortgage industry expert's unambiguous sworn testimony that he did not find anything misleading about Countrywide's use of the word "nonprime" in its public statements (UF 60).  Instead, the SEC now contends that this statement was false *solely* because Countrywide was, at the time of the statement, "the number three originator of subprime loans by volume in the United States" and maintained a similar position through the first three quarters of 2007.  *See* Lefler Decl., Ex. 277, at 23-24.

Even putting aside that a statement as vague as being "on the sidelines" is non-verifiable, non-quantifiable, and therefore no more than non-actionable puffery (*see* Joint Mem. at 23-25, the SEC's new contention does not create a triable issue that Mr. Sambol's statement was false or misleading when made.  Countrywide had repeatedly disclosed its leading position in the subprime market throughout 2006, including as recently as September 6, 2006, a week before Mr. Sambol's statement, in which the Company stated at an investor presentation that it was "the nation's third largest originator of Subprime residential mortgage loans."  UF 147-149.  Indeed, Mr. Sambol himself had previously disclosed the extent to which Countrywide was originating nonprime and other alternative products.  *See supra* at UF 127, 133.  These prior disclosures of Countrywide's market position in subprime preclude any finding that Mr. Sambol's statement was materially false when made.

It cannot be disputed that analysts and investors knew of Countrywide's position in the subprime market before Mr. Sambol's statement and throughout the SEC's alleged relevant period.  For example, the sole analyst whom the SEC deposed testified under direct examination by the SEC that he understood when he

1   initiated coverage of Countrywide in January 2006 that the Company was a "top

2   player" by market share in the subprime market.  UF 150.  He initiated coverage in

3   part because he understood that "Countrywide was consistently one of the top five

4   originators of subprime loans"; he further understood throughout the relevant period

5   that, while subprime loans were a small portion of what the Company originated,

6   Countrywide was "one of the leading originators of subprime loans."  UF 150.

7   There is abundant other evidence that analysts clearly understood Countrywide's

8   position as a leading originator of subprime loans throughout the relevant period.

9   UF 151.   The SEC, whose burden is to show that Mr. Sambol's "sidelines"

10  comment was materially misleading, has failed to adduce any evidence that that

11  vague comment did or could have misled anybody about Countrywide's well-known

12  position in the subprime market.  *See Convergent*, 948 F.2d at 512 ("an omission is

13  materially misleading only if the information has not already entered the market").

14       In short, Mr. Sambol is entitled to summary adjudication that his September

15  13, 2006 statement was not materially false or misleading when made.[5]

16                              **CONCLUSION**

17       Mr. Sambol's motion for summary judgment should be granted.

18  Dated:  August 2, 2010              ORRICK, HERRINGTON & SUTCLIFFE LLP

19

20                              By:  _____/s/ *Walter F. Brown, Jr.*_____

21                                        Walter F. Brown, Jr.
                                   Attorneys for Defendant David Sambol

22

23  ────────────────
    [5] Mr. Sambol also requests that the Court dismiss the SEC's Third Claim for Relief,

24  which alleges that he aided and abetted Countrywide's alleged-but-uncharged
    primary violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1,

25  and 13a-13 thereunder.  Compl. ¶¶ 131-134.  Generally speaking, these provisions
    require an issuer to file 10-Ks and 10-Qs that are materially accurate and free of

26  material omission.  *See* Nov. 3, 2009 Order at 17-18.  Moreover, to hold Mr. Sambol
    liable for aiding and abetting, the SEC must prove that he had "actual knowledge" of

27  Countrywide's supposed primary violation; mere recklessness is insufficient.  *Ponce
    v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *SEC v. Fehn*, 97 F.3d 1276, 1288-95 (9th

28  Cir. 1996).  As demonstrated throughout this Memorandum and the Joint Mem., the
    SEC has not raised a triable issue as to either of these allegations.