1  IRELL & MANELLA LLP
   David Siegel (101355) (dsiegel@irell.com)
2  Daniel P. Lefler (151253) (dlefler@irell.com)
   Randall L. Jackson (244545) (rjackson@irell.com)
3  1800 Avenue of the Stars, Suite 900
   Los Angeles, CA 90067
4  Telephone:   (310) 277-1010
   Facsimile:   (310) 203-7199
5

6  WILLIAMS & CONNOLLY LLP
   Brendan V. Sullivan, Jr. (*Pro Hac Vice*)
7  David D. Aufhauser (*Pro Hac Vice*)
   Tobin J. Romero (*Pro Hac Vice*)
8  725 Twelfth Street, N.W.
   Washington, D.C. 20005
9  Telephone:  (202) 434-5000
   Facsimile:  (202) 434-5029
10

   Attorneys for Defendant
11 Angelo Mozilo

12 [Additional counsel on signature page]

13

14

15            UNITED STATES DISTRICT COURT

16           CENTRAL DISTRICT OF CALIFORNIA

17                WESTERN DIVISION

18 SECURITIES AND EXCHANGE          )  Case No. CV 09-03994 JFW (MANx)
   COMMISSION                       )
19                                  )  **DEFENDANTS' JOINT
                                    )  STATEMENT OF
20            Plaintiff,            )  UNCONTROVERTED FACTS AND
                                    )  CONCLUSIONS OF LAW IN
21      vs.                         )  SUPPORT OF DEFENDANTS'
                                    )  MOTIONS FOR SUMMARY
22 ANGELO MOZILO, DAVID             )  JUDGMENT**
   SAMBOL, AND ERIC SIERACKI,       )
23                                  )  Date:    August 30, 2010
            Defendants.             )  Time:    1:30 p.m.
24                                  )  Ctrm:    16
                                    )  Judge:   Hon. John F. Walter
25                                  )
                                    )  Pre-Trial Conf:    October 1, 2010
26 _____  )  Trial:             October 19, 2010

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

Defendants respectfully submit the following Joint Statement of Uncontroverted Facts and Conclusions of Law pursuant to Local Rule 56-1 in support of their Motions for Summary Judgment.

## I.   STATEMENT OF UNCONTROVERTED FACTS

The chart below identifies facts as to which Defendants contend there is no genuine issue to be tried.  Supporting evidence is found in, or attached as an exhibit to, the Declaration of Daniel P. Lefler ("Lefler Decl.")[1] submitted concurrently herewith or in the Declaration of Eric Sieracki ("Sieracki Decl.").

## A.   FACTS IN SUPPORT OF JOINT MEMORANDUM

### 1.   Countrywide's "Originate-to-Distribute" Business Model

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 1.   Countrywide routinely disclosed: "Nearly all of the mortgage loans that we originate … are sold into the secondary mortgage market." | • Lefler Decl. ¶ 5, Ex. 4, at 117 (2006 10-K at 37); <br> • *Id.* ¶ 11, Ex. 10, at 278 (2005 10-K at 93); <br> • *Id.* ¶ 12,  Ex. 11, at 309 (Q1 2006 10-Q at 60); <br> • *Id.* ¶ 13, Ex. 12 at 323 (Q2 2006 10-Q at 81); <br> • *Id.* ¶ 14,  Ex. 13, at 338 (Q3 2006 10-Q at 84). |

---

[1] Except where otherwise noted, the parties have stipulated to the authenticity of the exhibits to the Lefler Declaration. See Lefler Decl. Ex. 1 (letter memorializing agreement re: authenticity).

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 2.   Countrywide disclosed in its 2006 10-K:<br><br>Our ability to sell loans at acceptable margins is affected by many factors including the relative demands for such loans and mortgage-backed securities evidencing interests in such loans, the cost of credit enhancements, investor perceptions of such loans and mortgage-backed securities and the risks posed by such products. | • Lefler Decl. ¶ 5, Ex. 4, at 117 (2006 10-K at 37). |
| 3.  In an October 24, 2004 analyst report, Morgan Stanley explained that:<br><br>The risk [of new loan products] to Countrywide and other originators would be that 1) these new loans don't perform as well as traditional collateral and 2) as a result, capital markets investors and rating agencies tighten underwriting and pricing standards.  If this happened, then some portion of current production would turn out to be unsustainable. | • Lefler Decl. ¶ 15, Ex. 14, at 351 (Kenneth Posner, "Company Update," Morgan Stanley, Oct. 24, 2004, at 2). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 2 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 4.  Countrywide disclosed in its 2005 10-K and its 2006 10-K that:<br>Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market.  We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers. | • Lefler Decl. ¶ 11, Ex. 10, at 278 (2005 10-K at 93);<br><br>• *Id.* ¶ 5,  Ex. 4, at 134 (2006 10-K at 101). |
| 5.  As industry credit criteria became more liberal, Countrywide participated in this industrywide evolution of credit standards. | • Lefler Decl. ¶ 16, Ex. 15, at 371 (McMurray SEC Depo. Tr. 71:16-25 (July 7, 2010)):<br><br>"Q:  Is it accurate to say that from September of '03, when you started at Countrywide, until the middle of 2007 the company's underwriting guidelines were expanding? . . .<br>A: … [F]or the entire industry, and that certainly included Countrywide, guidelines were expanding in both time frames that you mentioned";<br><br>• Lefler Decl. ¶ 17, Ex. 16, at 376 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 3 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | (Simantel SEC Depo. Tr. 231:17-21 (May 10, 2010)): |
| | "Q: And through your interactions with investors, did you form any opinions about the direction of industrywide underwriting guidelines during this time period? A: They were expanding"; |
| | • *Id.* ¶ 18, Ex. 17, at 390 (McCallion SEC Depo. Tr. 126:25 – 128:3 (May 6, 2010): |
| | "Q.  All right.  Mr. McMurray's reference is specifically to industry guidelines expanded beyond anything ever seen historically. Do you see that? A.  Yes. Q.  Had Countrywide's guidelines, underwriting guidelines also expanded? A.  Yes. Q.  What was your notation over on the right-hand side? A.  It says "Noted," and then in parentheses it says "Production disclosed." |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                    - 4 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Q.  All right.  Did you make a determination as to whether or not the company should add any disclosures with respect to the company's broadened underwriting guidelines based on Mr. McMurray's  comment? A.  Yes. Q.  What was your decision? A.  My decision was that the -- there were disclosures that were contained in the document that addressed the substance of his comments.  And that a portion of his comments related to information or discussion that was widely available in the media at that time, his reference to the Wall Street Journal.  And, therefore, for that portion of this comment, there was no specific disclosure that was required because it was information that was in the public domain."; • *Id.* ¶ 19,  Ex. 18, at 405 (Kuelbs SEC Depo. Tr. 39:14-20 (April 29, 2010): "Q.  And was there an industry |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 5 -

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | wide loosening of guidelines during that time period?<br><br>A.  Yes.<br><br>Q.  Did you believe that, at that time, the industry wide loosening of guidelines was a widely known phenomenon in the market?<br><br>A.  Yes." |
| 6.  Countrywide repeatedly disclosed to investors its strategy of offering a very broad product menu. | • Lefler Decl. ¶ 88, Ex. 87, at 1451 (September 9, 2003, Lehman Bros. Financial Services Conference Transcript at 6) (transcript quotes Mr. Mozilo as stating: "These plans [to grow market share] are further supported by the expansion of loan products that are structured to make home buying more affordable in a rising rate environment.");<br><br>• *Id.* ¶ 20, Ex. 19, at 410 (CFC 2004 Annual Report at 5) (In the Letter to Shareholders in its Annual Report for 2004, Countrywide stated that it had one of "the widest selections of loan products in the industry.");<br><br>• *Id.* ¶ 21,  Ex. 20, at 413 (January 27, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153                                    - 6 -                    STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 2004, Q4 2003 Earnings Call Transcript at 4) (transcript quotes Mr. Mozilo as saying that a "key component of our strategy is to maintain the industry's broadest product menu"); |
| | • *Id.* ¶ 22, Ex. 21, at 420 (March 30, 2004, CFC Equity Investor Forum Transcript at 31) (transcript quotes Mr. Sambol as stating: "The next aspect of our share growth strategy is to maintain the broadest product line in the mortgage industry, which is a claim that we can safely make, in fact, today. It's our intent to carry every product or program for which there is reasonable demand. Our value proposition to our business partners, whether they be realtors, builders, brokers or correspondents is that if your customer can legitimately qualify for a loan anywhere else in the U.S., they'll qualify at Countrywide. And if they have a product or loan preference, that product will be on our menu"); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 7 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | • *Id.* ¶ 151,  Ex. 148, at __ (April 21, 2004, Q1 2004 Earnings Call Transcript at 18) (transcript quotes Mr. Mozilo as stating: "But again, I think it is important for Countrywide to participate in whatever channel is being developed in the country we have to be a player in that channel."); |
| | • *Id.* ¶ 22,  Ex. 21, at 421 (March 30, 2004, CFC Equity Investor Forum Transcript at 85) (transcript quotes Stanford Kurland as stating: "we have the broadest product line. We look constantly, to see if there are other mortgage lines, or features, that we could add to our product … [W]e have basically every product, from sub-prime to HELOCs, to [alt-A loans], to prime loans"); |
| | • *Id.* ¶ 23,  Ex. 22, at 427-28 (May 24, 2005, CFC Analyst Meeting Transcript at 12, 13) (transcript from a May 24, 2005 investor conference quotes Mr. Sambol as saying that Countrywide maintained "the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 8 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | broadest and most comprehensive product line in the marketplace," meaning that "if a consumer … genuinely qualifies for a home loan anywhere else in the US, they will qualify at Countrywide and if that customer has a product preference, that product will reside on our product menu"); |
| | • *Id.* ¶ 24,  Ex. 23, at 431 (Bruce Harting, "CFC Investor Forum Highlights," Lehman Bros., May 25, 2005, at 3) (analyst report stating: "CFC wants to be the leader in every market, every product and every channel.…It wants to continue to offer all mortgage products to meet the needs of the market"); |
| | • *Id.* ¶ 25,  Ex. 24, at 438 (Charlotte A. Chamberlain, "No Customer Left Behind," Jefferies & Company, Inc., May 25, 2005, at 1) (analyst report stating: "CFC's commitment not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 9 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | underwriting guideline"); |
| | • *Id.* ¶ 26,  Ex. 25, at 450 (CFC 2005 Annual Report at 8) (Countrywide's 2005 Annual Report, filed with the SEC on Form ARS on May 2, 2006, stated that "Countrywide maintains one of the broadest product lines in the industry. . . .[I]f a customer has a loan preference, it likely will be on Countrywide's product menu …. The mortgage lending segment's market share growth initiatives are supported by one underlying theme – ubiquity.  This segment's long-range goal is not only to participate in, but to be a leader in, every channel and segment of the mortgage market – whether these channels or segments are defined by geography, consumer demographic profile or product preference"; and "The *real story* for customers … is that if a customer has a loan preference, it will likely be on Countrywide's product menu" (emphasis in the original)); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 10 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | • *Id.* ¶ 28,  Ex. 27, at 455-56 (March 30, 2006, CFC Equity Investor Forum Transcript at CFC2007826939, 51, 54) (transcript quotes Mr. Sambol as stating: "We've also been able to grow share because we have without question, the broadest product line in the mortgage industry. . . .As it relates to products, while our current product line, as I mentioned, may be the broadest product line of any one competitor, there are still competitors out there that have a product, a certain product, that don't rely on our product line. So we still have holes within the Countrywide product line. . . .It's a big aspect of our game plan to grow wholesale shares to plug the wholes [sic] in our current product line").<br><br>• *Id.* ¶ 29,  Ex. 28, at 463 (Hesser [HSBC Analyst] SEC Depo. Tr. 75:17-25 (June 9, 2010)):<br><br>"Q:  What did you understand from Mr. Mozilo's comment that a key |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | component of Countrywide's strategy was to maintain the industry's broadest product menu? A: Countrywide, I think management intended to offer all of the products that customers were demanding at the time. I think they were committed to competing on a broad base of home finance solutions"; |
| | • *Id.* ¶ 30, Ex. 29 (Richard A. Eckert, "Countrywide Credit Reports Q1 Earnings of $1.32, In Line with Wedbush Estimate," Wedbush Morgan Securities, Apr. 24, 2002) |
| | • *Id.* ¶ 152, Ex. 149, at 2173 (June 16, 2004, Countrywide Investor Forum Transcript at 10) (transcript that quotes Mr. Mozilo as stating: "We also have the depth and the breadth of product line so our salespeople feel like 100 percent of the borrowers who apply to Countrywide who can qualify for a loan can get a loan from Countrywide."); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 12 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | • *Id.* ¶ 28, Ex. 27, at 458 (March 30, 2006, CFC Equity Investor Forum Transcript at CFC2007827004) (transcript quotes Mr. Mozilo as stating: "We believe, and I think David may have shared this with you because this is almost religious with him, is that he firmly believes that we should be able to offer, be ready and able to offer a competitive product in every type of financing, mortgage financing that's available in the world, that's his goal, and that we should never lose -- we can lose a loan over price, but not because we didn't have the product.  And I think that's an important objective for Countrywide.  There should be something on every shelf for every consumer and hopefully priced properly.  So I think that that is correct, that's an initiative that I share with him and I think the new products you'll see will be probably in the subprime area."); |
| | • *Id.* ¶ 75, Ex. 74, at 1394 (September |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 13 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 12, 2006, CFC Equity Investor Forum Transcript at 10) (transcript quotes Mr. Sambol as stating: "Now – our plan for continued expansion of our top-line growth and share growth also calls for expansion of our product line in almost all of our business segments."); |
| | • *Id.* ¶ 31,  Ex. 30, at 481 (Jennifer Scutti, "Initiating Coverage: Countrywide Credit," CIBC World Markets, June 20, 2002) ("Once limited only to originating, selling and servicing prime quality, first-line mortgages secured by single-family residences, Countrywide has expanded its product line to encompass virtually every residential loan product type and has broadened its underwriting parameters."); |
| | • *Id.* ¶ 32,  Ex. 31, at 511 (Jody Shenn, "ARMed — Not Stuck, Bank Making Countrywide Less Rate Sensitive," *American Banker*, June 21, 2004) ("At one point during an |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 14 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | investor presentation last week, Countrywide Financial Corp.'s chairman started to sound like a carnival barker as he listed some of the 180 loan products it now offers. 'We have ARMs, one-year ARMs, three-year, five-year, seven- and 10-year,' Angelo Mozilo said. 'We have interest-only loans, pay-option loans, zero-down programs, low-, no-doc programs, fast-and-easy programs, and subprime loans.'"); |
| | • *Id.* ¶ 34, Ex. 33, at 517 (James R. Hagerty, "Firm Stakes its Claim, Writing Mortgages to the Masses," *Chicago Tribune*, Jan. 9, 2005) ("Countrywide also is an aggressive lender in the riskier parts of the mortgage market, including loans to people with flawed credit histories and loans on which only the interest is due in the early years."); |
| | • *Id.* ¶ 35, Ex. 34, at 521 (Moshe Orenbuch, "Investor Day Highlights," Credit Suisse First Boston, May 25, 2005) ("Over the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 15 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | course of the past several years, the mortgage market has evolved, and Countrywide has been in the forefront of that development. As recently as 2002, only one-third of its production was outside of the 'GSE market', while in the first quarter 2005 it was twice that level."); |
| | • *Id.* ¶ 37, Ex. 36, at 538 (Traci Hallett, "Countrywide: #1 is Not Enough; Aggressive Growth Plans Cap Upside for Borrowers," BNP Paribas, May 27, 2005) ("Our Take: With residential mortgage originations likely to slide at some point over the next five years, we think that Countrywide will only be able to meet its lofty market share targets by continuing to expand the share of subprime activity and nontraditional mortgage products….We think it is difficult to get a read on the performance of non-traditional mortgage products under stress, as there is insufficient |

IRELL & MANELLA LLP
A Registered Liability
Law Partnership Including
Professional Corporations

2280153

- 16 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | historical data through different cycles."); |
| | • *Id.* ¶ 33,  Ex. 32, at 514-15 ("Summary Opinion: Countrywide Home Loans," Moody's Investors Service, Oct. 13, 2004); |
| | • *Id.* ¶ 38, Ex. 37, at 543-47 (Traci Hallett, "Countrywide's 2Q05 Earnings Warning: Are the Credit Risks Growing?" BNP Paribas, July 15, 2005); |
| | • *Id.* ¶ 39, Ex. 38, at 548 (Eric E. Wasserstrom, "Analyst Day Highlights Growth Initiatives, Capital Management Outlook," UBS Investment Research, Sept. 13, 2006) ("The company's growth strategies include building out its sales force and branch networks, and expanding the product offerings. In particular at the bank, which we view to be the main growth area, the company is expanding its capabilities into more niche products. . . ."); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 17 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | • *Id.* ¶ 40, Ex. 39, at 553-54 (Wire report, "Buyers Wary of Lender's Bonds," *Los Angeles Times*, Oct. 17, 2006) ; <br><br> • *Id.* ¶ 153, Ex. 150, at __ (Frederick Cannon, CFA, and Robert Bolden, "CFC: The Challenge of Growing in a Shrinking Market," Keefe Bruyette & Woods, Feb. 1, 2006); ("Countrywide was able to achieve its high level of origination through non-traditional mortgage products, such as 90-100% LTV and piggyback loans."); <br><br> • *Id.* ¶ 115, Ex. 114, at 1965 (Chris Brendler, CFA, and Michael R. Widner, "Countrywide Financial Corp. – Non-Bank Financials: Too Early To Try To Be A Hero" Stifel Nicolaus, July 27, 2007, at 6). |

**2.    Countrywide Disclosed An Enormous Amount Of Information About The Credit Attributes Of Its Loan Originations**

| Uncontroverted Facts | Supporting Evidence: |
|---|---|

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 18 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 7.  Countrywide disclosed in its Forms 10-K for 2005-07 and in its Forms 10-Q for 2006 and 2007: "The continuing evolution of the secondary mortgage market and demand by borrowers has resulted in a proliferation of mortgage products." | • Lefler Decl. ¶ 11, Ex. 10, at 282 (2005 10-K at 104);<br><br>• *Id.* ¶ 5,  Ex. 4, at 147 (2006 10-K at 124);<br><br>• *Id.* ¶ 6,  Ex. 5, at 179 (2007 10-K at 146);<br><br>• *Id.* ¶ 12,  Ex. 11, at 310 (Q1 2006 10-Q at 66);<br><br>• *Id.* ¶ 13,  Ex. 12, at 324 (Q2 2006 10-Q at 87);<br><br>• *Id.* ¶ 14,  Ex. 13, at 342 (Q3 2006 10-Q at 90);<br><br>• *Id.* ¶ 41,  Ex. 40, at 558 (Q1 2007 10-Q at 65);<br><br>• *Id.* ¶ 42,  Ex. 41, at 562 (Q2 2007 10-Q at 96);<br><br>• *Id.* ¶ 43,  Ex. 42, at 565 (Q3 2007 10-Q at 114). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 19 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 8.  The mortgage industry's evolution towards more lenient credit standards was well known and widely discussed in the popular press. | • Lefler Decl. ¶ 44, Ex. 43, at 569-71 (Jonathan Laing, "Barron's: Home Groan: Rising Housing Prices Have Kept the Economy Afloat; What Happens if the Bubble Bursts?" Dow Jones Capital Markets Report, Apr. 15, 2002) ("According to a U.S. Census Report, over 50% of all mortgages in 1999 had down payments of 10% or less, compared with 7% in 1989. . . . 'This liberalization of credit standards may have an admirable social intent and most certainly it will help Fannie and Freddie continue to grow, and wow Wall Street investors,' observes [Josh] Rosner [of Graham Fisher]. 'But the lax standards also have the potential to make the housing market and general economy far more unstable.'"); <br><br> • *Id.* ¶ 45, Ex. 44, at 574 (Edmund Andrews, "The Ever More Graspable, and Risky, American Dream," *New York Times*, June 24, 2004) ("Lenders have aggressively |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 20 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | encouraged home buyers to stretch in ways that would have been unimaginable a decade ago. In the new world of flexible mortgage lending, it is possible to buy a $600,000 house with no down payment, and to pay only interest and nothing on the principal for years. . . . 'Underwriting standards have loosened to almost historic levels,' said Bill Dallas, a pioneer in no-money-down loans and a board member of the California Mortgage Bankers Association. 'Nobody is heeding the yield signs.'");

• *Id.* ¶ 46,  Ex. 45, at 578 (Deborah Lagomarsino, "Bank Regulators Plan Guidance On Riskier Mortgage Loans," Dow Jones Industrial News, June 22, 2005) ("In both the home equity and first mortgage areas regulators are seeing an easing of underwriting standards, with lenders using lower credit scores, higher loan-to-value ratios, higher debt-to-income ratios and lower |

IRELL & MANELLA LLP
A Registered Liability
Law Partnership Including
Professional Corporations

2280153

- 21 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | documentation and no documentation."); |
| | • *Id.* ¶ 47, Ex. 46, at 580 (Dean Foust, "Lenders Are Cranking Out An Ever-Growing Array of Financing Schemes and Lowering Standards to Keep the Boom Going," *Business Week*, June 27, 2005) ("Yet nothing screams 'frenzy' louder than the huge popularity of innovative – and risky – mortgage products that allow buyers to stretch for those million-dollar studios and multimillion-dollar suburban colonials. With interest only mortgages now offered by everyone from ditech.com to Washington Mutual (WM), such loans now account for 20% of all new mortgages, up from under 5% two years ago.. . . According to a survey of homebuyers released last November by the National Association of Realtors, 25% of those polled were able to get a mortgage with no money down, vs. 18% in early 2003 and virtually none |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 22 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | in the late 1990s -- a trend that could leave many of these new homeowners under water if home prices take even a small dip."); |
| | • *Id.* ¶ 48, Ex. 47, at 583 (Ruth Simon, "Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules," *Wall Street Journal*, July 26, 2005) ("Mortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets. But lenders are making it still easier for borrowers to qualify for a loan. They are lowering the credit scores needed to qualify for certain loans, increasing the debt loans borrowers can carry and easing the way for borrowers to get loans while providing little documentation"); |
| | • *Id.* ¶ 154, Ex. 151, at 2190 (Robert Lacoursiere, Martin Ji, CFA, and |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 23 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Dwain Carryl, "Fear and Loathing in the Mortgage Market Intensifying Competition, Declining Origination Volume and Mounting Credit Concerns Cloud Earnings Visibility," Banc of America Securities, Aug. 30, 2005) (noting that industry-wide, "loss rates should begin rising beginning in the second half of 2007, especially given the higher levels of sub-prime, ARM, option ARM, I/O, and low/no doc mortgages currently being originated"); |
| | • *Id.* ¶ 49, Ex. 48 (Mary Ellen Podmolik, "More and More Mortgages Aimed at First-Time Buyers," *Chicago Tribune*, Apr. 9, 2005); |
| | • *Id.* ¶ 34, Ex. 34, (Moshe Orenbuch, "Investor Day Highlights," Credit Suisse First Boston, May 25, 2005) ; |
| | • *Id.* ¶ 49, Ex. 49, (Kate Berry, "A Turn of the Tide Could Strand Lenders Lacking Loss Reserves," |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 24 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | *Los Angeles Business Journal*, July 25, 2005); |
| | • *Id.* ¶ 46, Ex. 45 (Deborah Lagomarsino, "OCC: To Issue Guidance On Alternative Mortgages By Year End," Dow Jones Capital Markets Report, Oct. 27, 2005); |
| | • *Id.* ¶ 52, Ex. 51 (Moshe Orenbuch, et al., "Mortgage Finance: Guidance on Mortgage Lending Will Address 'Affordability Products,'" Credit Suisse First Boston, Dec. 19, 2005); |
| | • *Id.* ¶ 53, Ex. 52 ("The Home Lending Trap; The American Dream Shouldn't be a Nightmare," *Pittsburgh Post-Gazette*, Apr. 10, 2006); |
| | • *Id.* ¶ 54, Ex. 53 (Henry Paulson, "Remarks by Secretary Henry M. Paulson, Jr. on Current Housing and Mortgage Market Developments," Oct. 16, 2007); |
| 9.   Countrywide's 2006 10-K disclosed the following loan production | • Lefler Decl. ¶ 5, Ex. 4, at 108 (2006 10-K at 28). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 25 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| statistics:<br><br>| | 2002 | 2003 | 2004 | 2005 | 2006 |<br>|---|---|---|---|---|---|<br>| Conventional Conforming | 59.2% | 53.9% | 37.1% | 32% | 31.9% |<br>| Conventional Non-Conforming | 24.9% | 31.7% | 39.8% | 47.2% | 45.2% |<br>| Prime Home Equity | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |<br>| Nonprime | 3.7% | 4.6% | 10.9% | 8.9% | 8.7% |<br>| FHA/VA | 7.6% | 5.6% | 3.6% | 2.1% | 2.8% |<br>| Commercial | 0.0% | 0.0% | 0.1% | 0.8% | 1.2% | | |
| 10.   In monthly reports that were filed with the SEC on Form 8-K, Countrywide disclosed loan production information for the prior 13 months by category: Government, Adjustable Rate Mortgage, Home Equity and Nonprime. | • Lefler Decl. ¶ 55, Ex. 54, at 619 (May 10, 2006 8-K, Ex. 99.1 at 3) (table entitled "Countrywide Financial Corporation and Subsidiaries Operating Statistics" listing, under the heading "Mortgage Loan Fundings by Product," the dollar amount of loan fundings on a monthly and year-to-date basis for four product categories: government loans, ARMs, home equity loans, and nonprime loans);<br><br>• *Id.* ¶ 56, Ex. 55, at 629 (May 9, 2007, 8-K, Ex. 99.1 at 3) (similar table);<br><br>• *Id.* ¶ 57, Ex. 56, at 640 (May 9, 2005 8-K, Ex. 99.1 at 3) (similar table);<br><br>• *Id.* ¶ 58, Ex. 57, at 649 (May 10, 2004 8-K, Ex. 99.1 at 3) (similar table); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 26 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | • *Id.* ¶ 18, Ex. 17, at 393 (McCallion SEC Depo. Tr. 312:16 - 313:8 (May 6, 2010)):<br><br>"Q.  The 8-Ks that we marked -- that I marked earlier, the monthly performance reports, do you have any understanding whether those are also considered standard standard -- practice among public companies?<br><br>A.  My understanding is that the disclosure that was provided in those 8-Ks was greater than provided by many other publicly-traded companies.<br><br>Q.  What about other publicly-traded mortgage-originating companies?<br><br>…. [objection omitted]<br><br>THE WITNESS:  I believe that the information that was provided in the 8-K was a greater level of disclosure than other publicly-traded mortgage companies." |
| 11.   Countrywide's monthly Forms | • Lefler Decl. ¶ 59, Ex. 58, at 659 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 27 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 8-K disclosed the evolution of the Company's product mix, including the increasing originations of subprime or pay-option loans. | (November 8, 2005, 8-K, Ex. 99.1 at 1 ) ("[p]ay-option fundings for [October 2005] were $8.5 billion, as compared to $3.4 billion in October 2004; [n]onprime loan fundings totaled $3.9 billion in October, which compares to $3.3 billion for the same period last year; [y]ear-to-date nonprime fundings were $36 billion");<br><br>• *Id.* ¶ 55, Ex. 54, at 617 (May 10, 2006, 8-K, Ex. 99.1 at 1);<br><br>• *Id.* ¶ 60, Ex. 59, at 669 (September 14, 2006, 8-K, Ex. 99.1 at 1). |
| 12.   Countrywide's monthly Forms 8-K contained performance data including delinquency and pending foreclosure statistics. | • Lefler Decl. ¶ 55, Ex. 54, at 617 (May 10, 2006 8-K, Ex. 99.1 at 3) (table entitled "Countrywide Financial Corporation and Subsidiaries Operating Statistics" indicating, under the heading "Mortgage Loan Servicing," monthly and year-to-date delinquency and foreclosure rates in Countrywide's servicing portfolio);<br><br>• *Id.* ¶ 56,  Ex. 55, at 629 (May 9, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 28 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 2007, 8-K, Ex. 99.1 at 3) (similar table); <br><br> • *Id.* ¶ 57, Ex. 56, at 640 (May 9, 2005 8-K, Ex. 99.1 at 3) (similar table); <br><br> • *Id.* ¶ 58, Ex. 57, at 649 (May 10, 2004 8-K, Ex. 99.1 at 3 (3 of 5) (similar table). |
| 13.   Each time Countrywide's subsidiaries sold non-GSE mortgage-backed securities into the secondary market, they filed prospectus supplements with the SEC, which are available online on the SEC's EDGAR system. | • Lefler Decl. ¶ 61, Ex. 60, at 750 (Grundfest Report ¶¶ 134-135) ("Countrywide's loan securitization activity generated detailed disclosure in the form of registration statements, prospectuses, and prospectus supplements that were filed with the SEC and that were publicly available on EDGAR. Countrywide used four subsidiaries—CWALT, CWABS, CWMBS, and CWHEQ, also known as Depositors—and loan trusts for each securitization of Countrywide loans. These entities filed prospectus supplements with the SEC for each completed securitization. Each of |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 29 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | these filings contained extensive information on the registered securitization, including pool-level data outlining the credit risk attributes of loans in each securitization. . . . Between 2005 and 2007, Countrywide's four securitization entities issued 447 prospectus supplements, as reflected on the MIC website, containing an estimated total of approximately 100,000 pages"); <br><br> • Lefler Decl. ¶ 66, Ex. 65 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-12 (Form 424B5, filed June 29, 2006)) (example of prospectus supplement). |
| 14.   The 10-K disclosed that CWABS, Inc., CWALT, Inc., CWMBS, Inc. and CWHEQ, Inc. companies were Countrywide subsidiaries. | • *Id.* ¶ 5, Ex. 4, at 160-61 (2006 10-K, Ex. 21). |
| 15.   Each prospectus supplement disclosed the underwriting guidelines applied to the particular pool of mortgages being sold, including | • Lefler Decl. ¶ 61, Ex. 60, at 750 (Grundfest Report ¶ 135) ("The prospectus supplements included tables showing the breakdown of |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 30 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| information regarding certain characteristics of the mortgages, such as FICO scores, documentation levels, loan-to-value ratios, and geographical distribution. | asset pool characteristics by original loan balance, mortgage interest rate, term to maturity, loan purpose, loan-to-value ratio ('LTV'), occupancy type, FICO score, geographic distribution, and documentation level, among other characteristics");<br><br>• *Id.* ¶ 63, Ex. 62 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-SPS1 (Form 424B5, filed June 26, 2006);<br><br>• *Id.* at 1038 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-SPSI at A-4) (table entitled "Original Combined Loan-to-Value Ratios" providing the range and weighted averages of CLTVs in the mortgage pool);<br><br>• *Id.* at 1039 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series, 2006-SPSI at A-6) (table entitled "Documentation Programs" indicating the percentage of loans underwritten on a "stated income" basis); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 31 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | • Lefler Decl. ¶ 64, Ex. 63, at 1041 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-15) (outlining risk factors and noting that loans were not underwritten to "[m]ore [t]raditional [s]tandards"); <br><br> • *Id.* at 1042 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-34) (describing "Underwriting Standards" for the "credit-blemished mortgage loans"); <br><br> • *Id.* at 1043-44 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-36 – S-37) (outlining the underwriting guidelines for different "credit grade categories"). |
| 16.   A prospectus supplement of credit-blemished second lien loans sold by CWABS in mid-2006 disclosed: <br><br> •    that the pool included borrowers with "impaired credit histories, | • Lefler Decl. ¶ 66, Ex. 65, at 1065 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-12 (Form 424B5, filed June 29, 2006) at S-15); <br><br> • *See also, id.* ¶ 64,  Ex. 63, at 1041 |

IRELL & MANELLA LLP
A Registered Liability
Law Partnership Including
Professional Corporations

2280153

- 32 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| which may include a record of major derogatory credit items such as outstanding judgments or prior bankruptcies"; <br><br> • that the company "expected that a significant number of the mortgage loans [in the securitization] will have been originated based on underwriting exceptions"; and <br><br> • that "the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." | (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5, filed Feb. 23, 2006) at S-15); <br><br> • *See also, id.* ¶ 67,  Ex. 66, at 1326 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-3 (Form 424B5, filed Feb. 23, 2006) at S-17); <br><br> • *See also, id.* ¶ 68,  Ex. 67, at 1328 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-4 (Form 424B5, filed Feb. 23, 2006) at S-15); <br><br> • *See also, id.* ¶ 69,  Ex. 68, at 1330 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-5 (Form 424B5, filed Feb. 23, 2006) at S-15); <br><br> • *See also, id.* ¶ 70,  Ex. 69, at 1332 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-6 (Form 424B5, filed Feb. 23, 2006) at S-15); <br><br> • *See also, id.* ¶ 71,  Ex. 70, at 1334 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 33 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-7 (Form 424B5, filed June 26, 2006) at S-15). |
| 17.   Countrywide maintained two websites that included the information disclosed in the prospectus supplements (e.g., loan and product type, FICO score, loan-to-value ratio, occupancy type, and documentation type) as well as each pool's performance to date by month (including delinquencies and losses suffered). | • Lefler Decl. ¶ 72, Ex. 71, at 1342-43 (Kurzban SEC Depo. Tr. 45:12 – 47:1 (July 22, 2010)):<br><br>"Q:  In terms of the categories of information that were contained on the website, I just want to make sure that I've got these, that I've got a comprehensive list.  You mentioned the prospectus supplements; is that right?<br><br>A:  The prospectus supplements, closing loan schedules, rating agency information in terms of the ratings on individual bonds, both initial and current; access to the trustee's reports, which would both include the pdf remittance report that details cash flow on the bonds, as well as access to what essentially is an Excel file that would detail out the performance of each loan |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 34 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | for that given time period. . . . .

Q:  Were there deal summaries on the website?

A:  In what regard?

Q:  Were there -- was there a section of the website that offered historical information about the performance of any particular securitization?

A:  Yeah, in two forms.  So there was performance information that was actually on the website itself, so you would click to the deal and within the deal there was performance information on that specific deal, so delinquencies, all that type of trending over a period of time.  Additionally, access to the trustee reports, which had that information.  And there was an analytical or a reporting function capability as part of the website as well in the sense that you could build and a investor could combine all the different groups  of -- of bonds that they owned, build the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | portfolio there and store it so they could then add characteristics and graph 30-day delinquencies, 30 plus, 60, 60 plus.  Whatever type of characteristics they wanted to look in trending, they could build and it would show a graph."; |
| | • *Id.* at 1347 (Kurzban SEC Depo. Tr. 78:21-79:21 (July 22, 2010)) (testimony indicating that Countrywide periodically updated the website to include underwriting guidelines); |
| | • *Id.* at 1347 (Kurzban SEC Depo. Tr. 80:5-81:6 (July 22, 2010)) (testimony regarding an instance in which Countrywide published a set of underwriting guidelines for subprime products on the website); |
| | • *Id.* (Kurzban SEC Depo. Tr. 67:24-68:25, 73:13-75:16, 82:11-84:10 (July 22, 2010)); |
| | • *Id.* ¶ 73,  Ex. 72, at 1353-54 (Kurzban Decl. ¶ 22) ("After SEC |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 36 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Regulation AB went into effect, Countrywide also maintained, and continues to maintain, a website at www.countrywidedealsdata.com, which provided performance data about the loans underlying its MBS as required by Regulation AB. Each MBS prospectus supplement contained a link to a specific portion of this website that provided information on comparable MBS previously issued by Countrywide. This website has been in existence since January 2006 and is still active today");<br><br>• *Id.* ¶ 73,  Ex. 72, at 1354 (Kurzban Decl. ¶ 23) ("In 2005, and continuing through the present, the MBS Investor Website contained a large amount of data on all of Countrywide's closed MBS deals … in the percentage of loan delinquencies, borrower bankrupteies, property foreclosures, and real estate owned properties");<br><br>• *Id.* at 1354 (Kurzban Decl. ¶ 24) |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 37 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | ("For each MBS, the MBS Investor Website also provides complete historical information on deal performance on a month-by-month basis, including the percentage of loans within each pool that are 30 days delinquent, 60 days delinquent, 90 days delinquent, in foreclosure, in bankruptcy and real estate owned."); |
| | • *Id.* at 1354 (Kurzban Decl. ¶ 25) (The MBS Investor Website also contained "all reports issued by the trustee for each particular MBS," which "include detailed information on distributions for each class of the MBS, collateral, credit enhancement draw details, payments, realized losses by loan identification number, and information on the number of delinquent loans in the pool underlying the MBS"); |
| | • *Id.* at 1355 (Kurzban Decl. ¶ 27) (The MBS Investor Website allowed users to "compare the delinquency and default history of one Countrywide MBS versus another |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 38 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | MBS, or a collection of MBS"); |
| | • *Id.* at 1357-82 (Kurzban Decl., Attachment A) (Registered users of Countrywide's website included the following investment banks that provided coverage of Countrywide's equity and/or debt securities: Banc of America Securities, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, J.P. Morgan, Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Securities, Raymond James, RBC Capital Markets, Stifel Nicolaus, UBS, and Wachovia, among others.); |
| | • *Id.* ¶ 72,  Ex. 71, at 1340 (Kurzban SEC Depo. Tr. 12:21-14:20 (July 22, 2010)  (authenticating and reaffirming declaration at Lefler Decl. Ex. 72) |
| | • *Id.* ¶ 74, Ex. 73, at 1389-91 (January 3, 2006, Email from Michael Burak to Scott Kurzban (SEC Ex. 1302) at CFCP000637054) (table showing |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 39 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | that under the underwriting guidelines referenced above, Countrywide would offer a 90% LTV loan on a stated income basis to a subprime borrower with a FICO score as low as 580);<br><br>• *Id.* at 1347 (Kurzban SEC Depo. Tr. 80:5-12 (July 22, 2010)) (authenticating SEC Ex. 1302). |
| 18.   Information on the www.mortgageinvestorcountrywide.com website can be accessed for free by registering on the website. | • Lefler Decl. ¶ 73, Ex. 72, at 1353 (Kurzban Decl. ¶ 19) ("The MBS Investor Website has been in existence since 2005 and is still active today.  Throughout this time, the MBS Investor Website was accessible to any member of the public.  Upon completing a short registration form, any interested person could access this website");<br><br>• *Id.* ¶ 72,  Ex. 71, at 1345 (Kurzban SEC Depo. Tr. 12:21-14:20 (July 22, 2010)) (authenticating and reaffirming declaration);<br><br>• *Id.* at 1346 (Kurzban SEC Depo. Tr. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 47:9 - 47:24 (July 22, 2010)): <br><br> "Q:  Who had access to the Countrywide mortgage investor website? <br><br> A:  Anybody who wanted it. <br><br> Q:  Did Countrywide ever deny access to anyone to the investor website? <br><br> A:  The investor website's not even set up to deny access.  It's an open site, similar to setting up a, like, a Yahoo account, a Yahoo mail account.  We require -- what they do is they go and put their e-mail address in and choose a password, but there's no -- there's no acceptance or rejection of any users, so anyone could go on there and do it.  The only reason for that is so that users can store their portfolio and actually, you know, create their own kind of user experience.  But the website's open to anyone.  It's unrestricted." |
| 19.  Countrywide disclosed details | • Lefler Decl. ¶ 75, Ex. 74, at 1397 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 41 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| about the credit characteristics of its originations at investor conferences. | (September 12, 2006, CFC Equity Investor Forum Transcript at 32) (John McMurray discussing the CLTVs, FICOs and delinquency trends, and accumulated negative amortization of the Bank's portfolio); |
| | • *Id.* at 1398 (September 12, 2006, CFC Equity Investor Forum Transcript at 33) (John McMurray discussing FICO and DTI in the context of the servicing portfolio); |
| | • *Id.* ¶ 77, Ex. 76, at 1409 (September 13, 2006, CFC Fixed Income Investor Forum Transcript at 59) (John McMurray discussing the CLTVs, FICOs, and accumulated negative amortization of the Bank portfolio); |
| | • *Id.* (September 13, 2006, CFC Fixed Income Investor Forum Transcript at 60) (John McMurray discussing the characteristics of the servicing portfolio); |
| | • *Id.* ¶ 79, Ex. 78, at 1419-20 (September 2005, Countrywide: |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 42 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Product Overview Presentation (SEC Ex. 209) at CFCP001008741) (presentation slide providing detailed information on Countrywide's pay-option and other non-conforming loan originations, including funding volume, FICO score, LTV, CLTV, occupancy type, property type, documentation type, geographic distribution and other information); |
| | • *Id.* ¶ 80, Ex. 79, at 1423 (Ingerslev SEC Depo. Tr. 207:19-209:1 (May 19, 2010) (testimony confirming that Ingerlev prepared the Lefler Decl. Ex. 78 for the Whole Loan Conference, hosted by Countrywide's Capital Markets division for "whole loan investors or potential investors"); |
| | • *Id.* ¶ 81, Ex. 80, at 1428 (September 2006, CFC Residential Mortgage Lending Corporate Overview (SEC Ex. 134) at CFCP006259253) (presentation slide providing detailed information on |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 43 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Countrywide's pay-option and other non-conforming loan originations, including funding volume, FICO score, LTV, CLTV, occupancy type, property type, documentation type, and other information); |
| | • *Id.* ¶ 82, Ex. 81, at 1429 (September 8, 2006, Email re: Aguilera / Ingerslev Presentation at Conference (SEC Ex. 133)) (showing that Aguilera and Ingerslev made a conference presentation together). |
| 20.   The *Wall Street Journal* ran a front page story on December 5, 2006, stating that "[b]ased on current performance, 2006 is on track to be one of the worst ever for subprime loans. . . Delinquency rates have been rising steadily since the middle of 2005.  But the trend has accelerated sharply in the past two to three months." | • Lefler Decl. ¶ 86, Ex. 85, at 1444-47 (December 5, 2006, "More Borrowers with Risky Loans Are Falling Behind," *Wall Street Journal*, A1, at 1, 2). |
| 21.   During 2006 and 2007, Countrywide disclosed that relaxed underwriting standards were a factor contributing to higher delinquencies. | • Lefler Decl. ¶ 14, Ex. 13, at 336 (Q3 2006 10-Q at 52) (Countrywide increased the Bank's provision for loan losses because of changing |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 44 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | borrower "credit profile[s.]"); |
| | • *Id.* at 340  (Q3 2006 10-Q at 88) ("changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency"); |
| | • *Id.* ¶ 87, Ex. 86, at 1449 (Q3 2006 Earnings Press Release at 7) ("The year-over-year increase in delinquencies and foreclosures are [sic] primarily the result of portfolio seasoning, product mix and changing economic and housing market conditions."); |
| | • *Id.* ¶ 89, Ex. 88, at 1453 (January 30, 2007, Earnings Conference Call Transcript at 27) (transcript quotes Mr. Sambol as stating that the "for the most part a liberal credit environment over the last several years all of which is now – as rates are going up, as credit is tightening, is going to contribute in our view to continued pressure on delinquencies and defaults and associated credit |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 45 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | cost"); |
| | • *Id.* ¶ 10, Ex. 9, at 233 (Jan. 30, 2007, Q4 2006 Earnings Release, Ex. 99, at 2) (press release quotes Mr. Mozilo as stating: "Looking ahead to 2007, the industry will likely see continued pressure on margins as mortgage origination volumes decline and industry capacity is rationalized. We are also preparing for increased borrower delinquencies and continued credit deterioration. We believe, however, that 2007 will likely be the trough year of the current housing cycle and that 2008 should represent the beginning of upward trends associated with the next cycle."); |
| | • *Id.* ¶ 90, Ex. 89, at 1456 (Testimony of Sandor Samuels Before the Senate Committee on Banking, Housing and Urban Affairs, March 22, 2007, at CFCP006592874) (Sandor Samuels, Executive Managing Director of Countrywide Financial Corporation, stating: "In |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 46 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | the past few years, housing appreciation increased at rates far exceeding income growth . . . . Lenders responded by expanding underwriting guidelines …. All of these factors together contributed to the dramatic liberalization of underwriting guidelines.  So long as home prices continued to rise, there were very few market forces to counter the push toward credit liberalization.  Things started to change in 2006 as appreciation began to flatten and many markets began to see home price declines.  In the absence of appreciation, delinquencies have begun to increase dramatically"). |
| 22.   Countrywide disclosed in its 2006 10-K that Countrywide "ha[d] observed a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006," and that "changing borrower profiles and | • Lefler Decl. ¶ 5, Ex. 4, at 149, 145 (2006 10-K at 126, 114). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 47 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| higher combined loan-to-value ratios contributed to the increased nonprime delinquency." | |

### 3.   Countrywide Did Not Lose "Access" To The Secondary Mortgage Market – Rather, The Secondary Mortgage Market Evaporated

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 23.   In June and July 2007, rating agencies downgraded the investment grade ratings on hundreds of securities issued by the industry (although relatively few issued by Countrywide). | • Lefler Decl.¶ 91, Ex. 90, at 1500 (Culp Report ¶¶ 129-30) ("the rating agencies began a series of aggressive downgrades of RMBS and CDOs….On June 15, 2007, Moody's downgraded about 131 second-lien RMBS and placed 136 additional securities on downgrade review. On June 22, 2007, S&P downgraded 34 second-lien and 42 subprime securities.  Moody's announced ratings cuts for another 399 subprime RMBS on July 10, 2007.  And on July 11, 2007, Moody's announced that it might cut ratings on $5 billion in CDO tranches.  Despite all these negative |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 48 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | developments, Exhibit 24 demonstrates that Countrywide sponsored RMBS were subject to relatively few S&P downgrade actions in May and June 2007. S&P downgraded RMBS backed by Countrywide on July 12th and 19th.");<br><br>• Lefler Decl. ¶ 92, Ex. 91, at 1599 (Culp SEC Depo. Tr. 125:21-24 (July 23, 2010)) ("what triggered the turmoil in the RMBS market was the change in housing prices, not the dramatic weakening of underwriting standards");<br><br>• *Id.* (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report) (#120). |
| 24.  In early August 2007 short-term liquidity disappeared for borrowings based on asset-backed collateral. | • Lefler Decl. ¶ 91, Ex. 90, at 1513 (Culp Report ¶¶ 166-67) ("beginning in August 2007, ABCP [asset-backed commercial paper] risk spreads rose sharply across all conduit types.  Although spreads on single-seller mortgage-backed |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 49 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | ABCP rose more than spreads on other conduit types…the average increase in risk spreads across all conduits between July and August was 41 bps.  The data thus shows an implosion in the entire ABCP market – not just subprime mortgage-backed ABCP….losses in mortgage markets were not by themselves large enough to precipitate the widespread outbreak of panic that occurred in so many unrelated credit markets (including ABCP) in August 2007”); |
| | • Lefler Decl. ¶ 92, Ex. 91, at 1594 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); |
| | • *Id.* ¶ 83, Ex. 82, at 1435 (Foster SEC Depo. Tr. 71:18 – 71:24 (July 12, 2010)): |
| | “Q:  And do you recall whether Countrywide was able to secure those replacement sources of liquidity, these additional repo |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 50 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | lines?<br><br>A:  No, we were not, which was very alarming and drove us to the conclusion that we needed to enact the contingent liquidity plan and to draw on our back-up lines of credit for the revolver." |
| 25.   The disappearance of short-term liquidity for borrowings based on mortgage collateral in early August 2007 was not specific to Countrywide, affected the entire mortgage industry, and extended well beyond the mortgage industry. | •  Lefler Decl. ¶ 91, Ex. 90, at 1513 (Culp Report ¶¶ 166-67) ("beginning in August 2007, ABCP [asset-backed commercial paper] risk spreads rose sharply across all conduit types.  Although spreads on single-seller mortgage-backed ABCP rose more than spreads on other conduit types…the average increase in risk spreads across all conduits between July and August was 41 bps.  The data thus shows an implosion in the entire ABCP market – not just subprime mortgage-backed ABCP. . . .losses in mortgage markets were not by themselves large enough to precipitate the widespread outbreak of panic that occurred in so many |

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | unrelated credit markets (including ABCP) in August 2007"); |
| | • Lefler Decl. ¶ 92, Ex. 91, at 1594 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); |
| | • *Id.* ¶ 83, Ex. 82, at 1435 (Foster SEC Depo. Tr. 71:25 – 72:4 (July 12, 2010)) ("Q:  And do you recall, was it your impression at the time that Countrywide's inability to secure these replacement repo lines was due to Countrywide specific?  A:  No."); |
| | • *Id.* at 1435 (Foster SEC Depo. Tr. 73:6-13, 23-25 (July 12, 2010)): |
| | "Q:  So did you ever get the impression that Countrywide was being singled out? |
| | A:  Absolutely not. |
| | Q:  Okay. |
| | A:  In fact, if I can add, I was told that we were one on a – at the top of a laundry list of companies that were approaching them for credit support….we were one of their best |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 52 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | customers.  They considered us to be the highest quality of their customers." |
| 26.   In August 2007, the market for non-GSE mortgage-backed securities (i.e., mortgage-backed securities other than those sold to Fannie Mae, Freddie Mac and other government-sponsored entities) essentially evaporated. | • Lefler Decl. ¶ 93, Ex. 92, at 1607 (LaCour-Little SEC Depo. Tr. 76:9-77:11 (July 28, 2010)): "Q.  Okay.  I'm sorry to do this, I'm going to ask you to turn back to paragraph 21 for a second. You write, quote: 'The liquidity crisis that began in August 2007 dramatically altered the capital markets environment, making sale of nonagency mortgage virtually impossible and raising the cost of holding unsold mortgage loans on balance sheet.' Do you see that? A.  I do. Q.  …. You believe this was true when you wrote this; correct? A.  I did. Q.  And you still believe it's true? A.  Yes. Q.  When you say 'making sale of |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 53 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | nonagency mortgages virtually impossible,' do you mean with respect to Countrywide or with respect to the entire industry? A.  This is a description of the market events of August 2007. Q.  So it was virtually impossible for anyone in the industry to sell nonagency mortgages at that time; correct? A.  I believe so, yes."<br><br>• *Id.* ¶ 94, Ex. 93, at 1612-18 (Bartlett SEC Depo. Tr. 197:17 - 198:2 (June 3, 2010)):<br><br>"Q:  Did anything significant happen in Countrywide's business in August of 2007? A:  Yes.  The -- at some point -- I am not sure if it was July or August -- I think it became evident that the secondary market for private label securitizations had -- had been disrupted to the point where you couldn't really issue new transactions at some point.  I am not sure exactly when that |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | happened, but it looked at some point that we couldn't issue private label mortgage-backed securities." |
|  | • *Id.* ¶ 91, Ex. 90, at 1523 (Culp Report ¶ 200) ("Also contributing to the uncertainty regarding liquidity was the virtual disappearance of the secondary mortgage markets – which, by mid-August 2007, included both subprime and higher-quality prime mortgages"); |
|  | • *Id.* ¶ 92, Ex. 91, at 1524 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); |
|  | • *Id.* ¶ 95, Ex. 94, at 1621-22 (Lehn Report Exhibit J) (chart showing significant decline in RMBS issuance industry-wide from Q2 2007 to Q1 2008); |
|  | • *Id.* ¶ 83, Ex. 82, at 1433 (Foster SEC Depo. Tr. 63:23 – 64:10 (July 12, 2010)): "Q: It says, quote: 'He reported that the secondary market for virtually all classes of mortgage |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 55 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | securities, both prime and nonprime, had unexpectedly and with almost no warning seized up, and that the company was unable to sell high quality mortgage-backed securities.' Do you recall whether that was occurring on – during this time period? A: Yes. It was early August. We had – we'd started to see the rumblings, as I said earlier in our discussion, in late July, and so it came on very hard and very fast." |
| 27.  The evaporation of the market for non-GSE mortgage-backed securities in August 2007 was not an event that was specific to Countrywide. | • Lefler Decl. ¶ 83, Ex. 82, at 1434 (Foster SEC Depo. Tr. 66:4-7 (July 12, 2010)): "Q: Do you recall anyone during this time period expressing to you that contagion from subprime to the prime space was due to the credit quality of Countrywide's loans? A: No. There was a general contagion in the market -- Q: And -- A: -- not specific to |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 56 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Countrywide.";
• *Id.* ¶ 94, Ex. 93, at 1618 (Bartlett SEC Depo. Tr. 200:3-19 (June 3, 2010)):
"Q:  Okay.  Was that phenomenon of being unable to issue new private label mortgage-backed securities restricted to Countrywide, or was it broader than that?
A:  Not to my knowledge.  It affected the market in general.";
• *Id.* ¶ 82, Ex. 82, at 1434 (Foster SEC Depo. Tr. 66:25-67:15 (July 12, 2010)):
"Q:  I see.  And then in the last sentence of --of that paragraph it says:
'Mr. Mozilo noted that the problems were not isolated to the company but were being experienced by other major market participants, such as Wachovia Corporation.'
A:  Yes.
Q:  Do you recall whether you were |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 57 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | observing those events as well? … [objection omitted] A:  Yes.  As I said, I think several times in my discussion, I was observing -- I was observing across the board that these events were impacting the industry at large. ”;<br><br>• Lefler Decl. ¶ 96, Ex. 95 at 1694 (Vandell Report ¶ 177) (“The housing bubble and the financial crisis impacted the entire mortgage industry, not just Countrywide.”);<br><br>• *Id.* ¶ 93, Ex. 92, at 1607 (LaCour-Little SEC Depo. Tr. 76:9- 77:11 (July 28, 2010)):<br><br>“Q.  Okay.  I'm sorry to do this, I'm going to ask you to turn back to paragraph 21 for a second. You write, quote: 'The liquidity crisis that began in August 2007 dramatically altered the capital markets environment, making sale of nonagency mortgage virtually impossible and raising the cost of holding unsold mortgage loans on balance sheet.' |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 58 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Do you see that? <br> A.  I do. <br> Q.  …. You believe this was true when you wrote this; correct? <br> A.  I did. <br> Q.  And you still believe it's true? <br> A.  Yes. <br> Q.  When you say 'making sale of nonagency mortgages virtually impossible,' do you mean with respect to Countrywide or with respect to the entire industry? <br> A.  This is a description of the market events of August 2007. <br> Q.  So it was virtually impossible for anyone in the industry to sell nonagency mortgages at that time; correct? <br> A.  I believe so, yes."; <br> • *Id.* ¶ 91, Ex. 90, at 1524-26 (Culp Report ¶¶ 202-206). |
| 28.   The changes in investor demand for mortgages were not the result of new information about the risk characteristics of Countrywide | • Lefler Decl. ¶ 92, Ex. 91, at 1597 (Culp SEC Depo. Tr. 88:3-88:6 (July 23, 2010)): ("A:  The quality of the loans that Countrywide was |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 59 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| mortgages, but rather the manifestation of economic forces outside of Countrywide's control. | underwriting -- was writing and the poor performance over time of those loans, in my opinion, have nothing to do with their access to the secondary mortgage market in August of 2007.");<br><br>• *Id.* ¶ 83, Ex. 82, at 1433-34 (Foster SEC Depo. Tr. 65:25 – 66:7 (July 12, 2010)):<br><br>"Q:  Do you recall anyone during this time period expressing to you that contagion from subprime to prime space was due to the credit quality of Countrywide's loans? A:  No.  There was a general contagion in the market -- Q:  And -- A:  -- not specific to Countrywide.";<br><br>• Lefler Decl. ¶ 96, Ex. 95, at 1689-91, 1693-99 (Vandell Report ¶¶ 162-168, 175-177);<br><br>• *Id.* ¶ 91, Ex. 90, at 1525-26 (Culp Report ¶¶ 162, 203-206). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 60 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

### 4. Countrywide Disclosed the Material Facts Concerning its Portfolio of Pay-Option ARM Loans

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 29.  Countrywide disclosed in its 2006 10-K that pay-option ARM loans: are different than "traditional" loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in the early periods of a loan's life. While we believe that we have prudently underwritten these loans, such loans present additional risks. | • Lefler Decl. ¶ 5, Ex. 4, at 139 (2006 10-K at 106). |
| 30.  Countrywide disclosed in its 2006 10-K that pay-option loans "have interest rates that adjust monthly and minimum required payments that adjust annually, resulting in the potential for negative amortization." | • Lefler Decl. ¶ 5, Ex. 4, at 129 (2006 10-K at 63);<br>• *See also, id.* ¶ 11, Ex. 10, at 270, 274, 292 (2005 10-K at 42, 56, F-36). |
| 31.  Countrywide disclosed in its 2006 10-K that, with respect to the "reset" risk associated with pay-option loans, after the initial period when borrowers were permitted to pay less than the full interest cost, "a new monthly payment amount adequate to repay the loan over its remaining | • Lefler Decl. ¶ 5, Ex. 4, at 140 (2006 10-K at 107). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 61 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| contractual life [would be] established." | |
| 32.   Countrywide disclosed in its Q2 2006 10-Q that when a loan reset, "[t]he resulting payment adjustment could be substantial." | •   Lefler Decl. ¶ 13, Ex. 12, at 321 (Q2 2006 10-Q at 49). |
| 33.   Countrywide disclosed in its 2006 10-K and its 2005 10-K that "Negative amortization" associated with pay-option loans originated by Countrywide was capped at 115% of the original loan, meaning that the loan would automatically "reset" if a borrower's balance increased to 115% of the initial balance. | •   Lefler Decl. ¶ 4, Ex. 4, at 129, 140 (2006 10-K at 63, 107); <br> •   *Id.* ¶ 10, Ex. 10, at 274 (2005 10-K at 56). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 62 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 34.   Pay-option loans had been offered by other mortgage industry originators since the 1980s. | • Lefler Decl. ¶ 94, Ex. 93 (Bartlett SEC Depo. Tr. 147:10-17 (June 3, 2010)):<br><br>"Q:  And as of May of 2006 was there a 20-year history of pay option mortgages?<br>A:  I believe so.  I think at least, if you might narrow it down to -- I think the negative-amortization monthly-adjusting interest rate mortgage I think was created in the early '80s and used by some of the savings and loan institutions."<br><br>• Lefler Decl. ¶ 97, Ex. 96 ("CFC: Assuming Coverage with Buy Rating and $41 PO," AG Edwards, September 29, 2005 at CFCP000194956: "we do note that Golden West Financial and Downey Savings, two large California-based lenders, have been issuing this [pay-option] product with great success and limited losses since the 1980s");<br><br>• *Id.* ¶ 98, Ex. 97 (Garcia SEC Depo. Tr. 25:1-12 (June 29, 2010)): |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 63 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | "A: Well, I think the thrift industry, particularly World and WaMu's predecessor or predecessors had been involved in pay option-type products for a number of years. And sometime -- I think it was in the -- in the 2000, probably 2- -- through 2003 time period, I think WaMu actually developed a secondary market for pay options as well.  So the secondary market came after the product had been out there for quite a number of years to portfolio lenders. Q.   How long had the product existed? A.   I think since -- my impression was it existed since the early '80s or mid '80s, you know." |
| 35.   During the history of the pay-option product, pay-option lenders had been exposed to several instances of depressed housing prices, including the declining real estate values in Southern California in the late 1980s and early 1990s. | • Lefler Decl. ¶ 94, Ex. 93, at 1615 (Bartlett SEC Depo. Tr. 147:20-149:1 (June 3, 2010)): "Q:  And over the period from the early '80s up through May of 2006, had there been difficult |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 64 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | environments for payoffs on loans? A: I am sorry. The period again was from? Early '80s? Q: Yes, the starting period you just gave me, early '80s, up to May of 2006, which was the date of this document. A: I think -- there were -- the first one I can recollect -- and the question is whether the product existed at that time. But in the mid-'80s there was a regional crisis in the -- what were kind of largely known as the oil-producing states. They used to call them the COLT states. It was Colorado, Oklahoma, Louisiana, Texas. So that was a pretty severe housing environment, at least in that region. Towards the end of the '80s until the early '90s Southern California and other places in the country I believe experienced significant difficulties in housing prices or sales of homes. I am not sure about the direction of housing prices, but |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 65 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | certainly it was a difficult environment in the late '80s and early '90s. The -- the period in the kind of mid '90s to late '90s I believe interest, I mean, real estate prices weren't moving up dramatically. I am not sure what was happening to default levels in those times, but they certainly were kind of flat. And then post 9/11 -- so, that would have been September of 2001 -- there was a period of where there was maybe a stress environment for real estate…"; <br> • *Id.* ¶ 28, Ex. 27, at 457 (March 30, 2006, Countrywide Financial Equity Investor Forum Transcript at CFC2007826979) (transcript quotes John McMurray as stating: "We could also look at the experience that [Golden West and Downey Savings] had in the early '90s when they both had high concentrations of pay option products here in southern California and observed how those |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 66 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | loans performed.  So, during that time of stress, we could observe, for example, that they both had around 19 or 20 basis points of charge-offs at the peak.  That's per year."). |
| 36.   Countrywide disclosed in its 2005 10-K and 2006 10-K that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of these [pay-option] loans has not been established for the Company." | • Lefler Decl. ¶ 5, Ex. 4, at 140 (2006 10-K at 107);<br>• *Id.* ¶ 11, Ex. 10, at 292 (2005 10-K at F-36). |
| 37.   With respect to pay-option loans held in Countrywide's held-for-investment portfolio, Countrywide disclosed in its 2005 10-K and its 2006 10-K the amount of negative amortization, as well as the outstanding loan balance, average loan-to-value ratio, average FICO score and delinquencies. | • Lefler Decl. ¶ 5, Ex. 4, at 140 (2006 10-K at 107) (table providing information regarding Countrywide's pay-option portfolio in 2005 and 2006, including the total size of the pay-option portfolio; the total principal balance of the pay-option ARM loans with accumulated negative amortization; accumulated negative amortization; the average original LTV for the pay-option portfolio; the average original CLTV for the pay-option portfolio; the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 67 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | average original FICO score for the pay-option portfolio; and the percentage of pay-option loans delinquent 90 days or more); <br> • *Id.* ¶ 11, Ex. 10, at 275 (2005 10-K at 57) (similar table for 2004 and 2005). |
| 38.   Countrywide disclosed in its 2005 10-K and its 2006 10-K that "[m]anagement expects the delinquency rate in the Company's pay-option ARM loan portfolio to increase as this product continues to season." | • Lefler Decl. ¶ 5, Ex. 4, at 141 (2006 10-K at 108); <br> • *See also, id.* ¶ 11, Ex. 10, at 293 (2005 10-K at F-37). |
| 39.   Countrywide's periodic filings and quarterly earnings press releases updated investors concerning the amount of negative amortization in Countrywide's held-for-investment portfolio. | • Lefler Decl. ¶ 99, Ex. 98, at 1711 (Q2 2005 10-Q at 39) (table showing amount of total pay-option portfolio, principal balance of loan with accumulated negative amortization, and the total amount of accumulated negative amortization); <br> • *Id.* ¶ 100, Ex. 99, at 1718 (Q3 2005 at 46); <br> • *Id.* ¶ 11, Ex. 10, at 275 (2005 10-K at 57); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 68 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | • *Id.* ¶ 12, Ex. 11, at 306 (Q1 2006 10-Q at 47); |
| | • *Id.* ¶ 13, Ex. 12, at 322 (Q2 2006 10-Q at 50); |
| | • *Id.* ¶ 14, Ex. 13, at 337 (Q3 2006 10-Q at 53); |
| | • *Id.* ¶ 5, Ex. 4, at 130 (2006 10-K at 64); |
| | • *Id.* ¶ 41, Ex. 40, at 557 (Q1 2007 10-Q at 42); |
| | • *Id.* ¶ 47, Ex. 41, at 561 (Q2 2007 10-Q at 86); |
| | • *Id.* ¶ 44, Ex. 43, at 564 (Q3 2007 10-Q at 100); |
| | • *Id.* ¶ 6, Ex. 5, at 178 (2007 10-K at 126); |
| | • *Id.* ¶ 101, Ex. 100, at 1739 (April 26, 2007, Earnings Release at 19); |
| | • *Id.* ¶ 10, Ex. 9 at 255 (January 30, 2007, Earnings Release, at 25-29); |
| | • *Id.* ¶ 102 Ex. 101, at 1751 (July 25, 2006, Earnings Release at 7); |
| | • *Id.* ¶ 103, Ex. 102, at 1787 (October |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 24, 2006, Earnings Release at 22). |
| 40.   The transcript from an April 27, 2006, earnings call quotes Mr. Mozilo as saying that 70% of pay-option borrowers were electing in 2006 to make the minimum payment, and were therefore accruing negative amortization. | • Lefler Decl. ¶ 104, Ex. 103, at 1791-92 (April 27, 2006, Countrywide Financial Earnings Call at 19-20). |
| 41.   The transcript from a September 13, 2006, investor conference quotes Mr. Mozilo as stating that the percentage of pay-option borrowers making the minimum payment had risen to 78% of the portfolio and that he had been "shocked" by this figure. | • Lefler Decl. ¶ 77, Ex. 76, at 1406 (September 13, 2006, Countrywide Financial Corporation Fixed Income Investor Forum at 12). |
| 42.   Countrywide disclosed to stockholders management's uncertainty regarding the future performance of pay-option loans. | • Lefler Decl. ¶ 224, Ex. 221 (July 26, 2005, Q2 2005 Countrywide Financial Corporation Earnings Conference Call Transcript, CFCNYF00019113, at 136) (transcript quotes Mr. Mozilo as saying that although pay-option |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                              - 70 -                    STATEMENT OF UNCONTROVERTED FACTS AND
                                                                   CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | ARMs were Countrywide's "lowest delinquency product at the moment ... you have to wait some time for loans to mature a year, two years, even three years to determine how they're going to perform."); |
| | • Lefler Decl. ¶ 105, Ex. 104, at 1794 (July 25, 2006, Q2 2006 CFC Earnings Conference Call at 10) (transcript that quotes Mr. Mozilo as stating, in response to a question about the pay-option portfolio, "[w]ell, I don't know where it's going to end up because it will depend upon interest rates. . . . [D]epending upon where rates are the resets could be significant and we just need time to see how this is going to play out.  If rates continue to rise significantly, then these resets and payment shocks will be substantial"); |
| | • *Id.* at 1794 (July 25, 2006, Q2 2006 CFC Earnings Conference Call at 10) ("in terms of the delinquencies that we're experiencing on that loan |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | overall in our portfolio is about 61 basis points versus 81 for all other types of conventional loans.  And obviously they should perform better; I mean it's a low payment and they should – so they're performing well in this environment. The test will be when the resets take place and I'm not certain exactly what's going to happen there."); |
|  | • *Id.* ¶ 106, Ex. 105, at 1799 (Jeff Bailey, "The Mortgage Maker vs. the World," *The New York Times*, Oct. 16, 2005) ("That volume of such loans [adjustable-rate, pay option loans with negative amortization] has never been tested in a sharply rising interest-rate environment, a situation feared by some though not yet on the horizon."); |
|  | • *Id.* ¶ 107, Ex. 106, at 1804 (Kenneth Bruce, "Countrywide Financial Corp.: Untapped Strength," Merrill Lynch, Oct. 28, 2005, at 4) ("[T]he market remains quite concerned with |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 72 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | CFC's ability to manage credit risk and the pay-options [sic] ARM's overall impact to the risks that may be built up in the U.S. mortgage market. Since CFC's portfolio is quite young (unseasoned) and coming in at possibly the top of the real-estate cycle, investors remain concerned that CFC could bear higher losses, if housing values correct as much as some as concerned. CFC has typically not retained loan products, so we have no historical performance to suggest a possible outcome...."); |
| | • *Id.* ¶ 108, Ex. 107, at 1815 (Frederick Cannon, "CFC: Countrywide Bank - Living up to Its Name?" Keefe, Bruyette & Woods, Jan. 13, 2006, at 7) ("While the Pay-Option ARM loan has been around for quite some time, it represents a new product offering for Countrywide. We are taking a cautious outlook on the performance of these loans for a couple of |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 73 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | reasons. Countrywide is allowing the greatest amount of negative amortization on these loans of any of the lenders we follow. The start rate for a Countrywide Pay-Option ARM remains at the industry low 1.00%. Further, to the degree that the piggyback loans mentioned above are written in concert with the Option-ARM loans, it is our opinion that the risk becomes greater that the bank will experience defaults."); |
| | • *Id.* ¶ 109, Ex. 108, at 1821 (Danielle Reed, "Option ARM Exposure Grows At Banks, Posing Credit Risk," Dow Jones Capital Markets Report, May 15, 2006) ("Consumers aren't the only ones who like so-called 'exotic' mortgages. Banks have been retaining more of them in their portfolios, possibly increasing their vulnerability to a housing or economic downturn. . . . But growth in mortgage loan balances (also called 'negative amortization') is nonetheless a developing trend, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 74 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | CreditSights noted. At Countrywide, for example, 'the growth rate for accumulated negative amortization has been on a tear.' Option ARM balances on its books increased by $75 million in 2005, up from a mere $29,000 at year-end 2004, CreditSights said."); |
| | • *Id.* ¶ 153, Ex. 152, at 2192 ("Phantom Profits," *BusinessWeek*, Sept. 11, 2006) (noting that "Countrywide has been among the most aggressive underwriters of option ARMs," and that "[t]hree-quarters of the company's option ARM borrowers chose the cheapest mortgage payment, according to its latest earnings release -- meaning these loans could reset at much higher rates."). |
| 43.   Countrywide disclosed in its 2006 10-K: "The allowance for loan losses is our best estimate of the credit losses incurred in our loan investment portfolio." | • Lefler Decl. ¶ 5, Ex. 4, at 124 (2006 10-K at 51). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 75 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 44.   Countrywide disclosed that its provision for loan loss reserves was approximately $81.6 million in 2005 and approximately $154 million in 2006. | • Lefler Decl. ¶ 5, Ex. 4, at 127 (2006 10-K at 61). |
| 45.   Countrywide disclosed in its 2006 10-K that "[t]his increase [in loan loss reserves] reflects increased delinquencies and loss levels resulting from seasoning of loans acquired during the past years of rapid portfolio growth, as well as prevailing real estate and market conditions." | • Lefler Decl. ¶ 5, Ex. 4, at 129 (2006 10-K at 63). |
| 46.   Countrywide disclosed that it increased its provision for loan losses in the first quarter of 2007 by $95.9 million and in the second quarter of 2007 by $231 million. | • Lefler Decl. ¶ 41, Ex. 40, at 556 (Q1 2007 10-Q at 31);<br>• *Id*. ¶ 42, Ex. 41, at 560 (Q2 2007 10-Q at 40). |
| 47.   Most loans in the Company's held-for-investment portfolio were not scheduled to begin resetting until 2009. | • Lefler Decl. ¶ 98, Ex. 97, at 1705 (Garcia SEC Depo. Tr. 95:18 – 96:22 (June 29, 2010)):<br>"Q:  Okay.  So I want to focus your attention on some of Mr. Mozilo's comments about the PayOptions. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 76 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | And he says -- this is at -- towards the end of the second full paragraph in his e-mail of May 18th. 'As for PayOptions, the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated, and as a result causing, mortgagors -- mortgagors to default due to the substantial increase in their payments.' Do you see that?<br><br>A:  Uh-huh.<br><br>Q:  Was -- was that a concern that you shared in May of 2006?<br><br>A:  No.<br><br>Q:  And why not?<br><br>A:  Well, I think I went through the answer to the earlier question.  It would be the -- the same points that I would have to repeat to you. But the only additional thing that comes to mind now is that -- in addition to what I said earlier is that also the -- you know, the recast of these [pay-option] loans, even under an accelerated basis with what rates |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 77 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | were doing, is -- or was, you know, into the future, several years. I think it started in '09 and kind of peaked in 2010." |
| | • Lefler Decl. ¶ 110, Ex. 109, at 1847 (Cmplt. ¶ 58) ("Because Countrywide began to offer Pay-Option loans in 2004, Countrywide's first wave of automatic resets were scheduled to occur in 2009."). |

### 5.    Countrywide Stockholders Knew And Understood That Its Underwriting Guidelines Expanded Over Time

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 48.   In response to a written interrogatory the Commission admitted that the information about Countrywide's non-GSE loans contained in the prospectus supplements was reflected in Countrywide's stock price. | • Lefler Decl. ¶ 111, Ex. 110, at 1880-81 (Plaintiff Securities and Exchange Commission's Third Supplemental Responses to Defendant Angelo R. Mozilo's First Set of Interrogatories at 3:7-11 and 3:27-4:1): "**Interrogatory No. 11:** For the period 2004 through 2007, do you contend the price of Countrywide common stock did not reflect the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                                     - 78 -                         STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | information about loan attributes that was disclosed in prospectus supplement filed by CWABS, Inc., CWALT, Inc., CWHEQ, Inc. and CWMBS, Inc.<br><br>**Third Supplemental Response to Interrogatory No. 11:**…. No, the Commission does not contend that the Prospectus Loan Information was not reflected in the price of Countrywide common stock once each piece of information was filed on EDGAR and absorbed by the market." |
| 49.   The SEC's designated expert witness, Alan Hess, admitted: "all publicly available information, including material information . . . concerning Countrywide's activities in mortgage and mortgage securitization markets, was quickly and fully incorporated into the market price of Countrywide's stock." | • Lefler Decl. ¶ 3, Ex. 2, at 88 (June 21, 2010, Expert Report of Alan Hess, Ph.D. ¶ 73). |
| 50.   At his deposition, Alan Hess conceded that information contained in | • Lefler Decl. ¶ 4, Ex. 3, at 93 (Hess SEC Depo. Tr. 39:7-40:4 (July 20, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 79 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| Countrywide prospectus supplements filed with the SEC was incorporated in the Company's stock price. | 2010)):<br><br>"Q: And can you briefly explain what it meant to say that Countrywide's stock traded in a market that was semistrong form efficient?<br>A: The classroom definition of that is that in a semistrong form efficient market, price correctly reflects all public information.<br>Q: And with respect to publicly available information that would be incorporated into Countrywide's stock price, that public information would include Countrywide's Form 10-Ks that were filed with the SEC; correct?<br>A: Yes.<br>Q: And it would also include 10-Qs that were filed with the SEC; correct?<br>A: Yes.<br>Q: And it would also include 8-Ks that were filed with the SEC; correct?<br>A: Yes. |

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | Q: And is there any information that would be filed with the SEC that you would consider not to be publicly available? A: If it's filed with the SEC and listed on EDGAR, then it's public – in the public domain." |
| 51.   The SEC further admitted in discovery that one of the purposes for requiring documents to be filed on EDGAR was to make them available to investors. | • Lefler Decl. ¶ 113, Ex. 112, at 1950 (Plaintiff Securities and Exchange Commission's Responses to Defendant Eric Sieracki's First Set of Requests for Admission, Request for Admission No. 68) (admitting that "one reason the SEC requires issuers to file documents (e.g., prospectus supplements) on EDGAR is to make them available to investors"). |
| 52.   Information on Countrywide's websites was incorporated into Countrywide's stock price. | • Lefler Decl. ¶ 4, Ex. 3, at 94 (Hess SEC Depo. Tr. 42:4-13 (July 20, 2010)): "Q: … In general, do you believe that information that's posed on a company's internet Website constitutes publicly available information that would be |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 81 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | impounded into its securities price? A: …. I would suspect that people who are ferreting out information about Countrywide would look at that Website"; <br><br> • *Id.* ¶ 3, Ex. 2, at 88 Hess Report ¶ 73 ("… I conclude that the market for Countrywide's stock was semi-strong form efficient during the Relevant Period. This means that all publicly available information … was quickly and fully incorporated into the market price of Countrywide's stock."). |
| 53.   At least 82 of the prospectus supplements issued by Countrywide subsidiaries disclosed that "a significant number of the mortgage loans will have been originated based on underwriting exceptions." | • Lefler Decl. ¶ 61, Ex. 60, at 798 (Grundfest Report ¶ 243); <br><br> • *Id.* at ¶ 62, Ex. 61 at 900-05 (Grundfest Report, Appendix E-1 ¶¶ 414-492). |
| 54.   The prospectus supplements and the Company-sponsored website disclosed that Countrywide originated loans with combinations of risk factors such as low FICO scores, high loan-to- | • Lefler Decl. ¶ 63, Ex. 62, at 1039 (Prospectus Supplement, CWABS Asset-Backed Certificates, 2006-SPS1 (Form 424B5, filed June 26, 2005) at A-6): |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**Documentation Programs**

| Documentation Program | Number of Statistical Mortgage Loans | Aggregate Principal Balance Outstanding | PROV CON | Weighted Average Credit Bureau Risk Score | Weighted Average Original Combined Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|
| Full | 2,259 | $ 94,185,311 | | 622 | 95.4 |
| Stated Income | 1,230 | 63,083,256 | | 667 | 99.8 |
| Total | 3,489 | $157,268,567 | | | |

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| value ratios, or reduced or stated documentation. | |



Credit Bureau Risk Scores[1]

| Range of Credit Bureau Risk Scores | Number of Statistical Mortgage Loans | Aggregate Principal Balance Outstanding | % of Statistical Mortgage Loans | Weighted Average Remaining Term to Maturity (Months) | Weighted Average Credit Bureau Risk Score | Weighted Average Original Combined Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|
| 781 – 809 | 8 | $ 364,367 | 0.23% | 178.68 | 791 | 98.5 |
| 761 – 780 | 20 | 1,236,916 | 0.81 | 178.79 | 771 | 99.0 |
| 741 – 760 | 32 | 1,897,150 | 1.21 | 179.01 | 750 | 100.0 |
| 721 – 740 | 63 | 3,318,065 | 2.11 | 179.01 | 730 | 99.5 |
| 701 – 720 | 110 | 6,364,934 | 4.05 | 179.29 | 710 | 99.5 |
| 681 – 700 | 239 | 13,361,898 | 8.50 | 181.09 | 710 | 99.4 |
| 661 – 680 | 393 | 19,925,800 | 12.67 | 180.39 | 689 | 99.3 |
| 641 – 660 | 543 | 25,679,479 | 16.46 | 180.95 | 670 | 98.9 |
| 621 – 640 | 672 | 30,533,541 | 19.41 | 181.41 | 649 | 98.0 |
| 601 – 620 | 605 | 24,568,537 | 15.62 | 180.79 | 630 | 97.5 |
| 581 – 600 | 620 | 23,004,157 | 14.63 | 183.18 | 610 | 95.4 |
| 561 – 580 | 162 | 5,966,203 | 3.79 | 182.61 | 590 | 95.8 |
| 541 – 560 | 18 | 647,331 | 0.41 | 185.95 | 572 | 88.5 |
| 521 – 540 | 3 | 139,936 | 0.09 | 190.11 | 554 | 96.0 |
| 500 or Less | 1 | 19,962 | 0.01 | 195.53 | 527 | 87.2 |
| | | | | 179.00 | 480 | 75.3 |
| Total | 3,489 | $157,268,567 | 100.00% | | | |

(1) As of the Statistical Calculation Date, the weighted average Credit Bureau Risk Score of the mortgagors related to the Statistical Mortgage Loans was approximately 640.

- *Id.* ¶ 65, Ex. 64, at 1046 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2005-15 (Form 424B5, filed Feb. 23, 2006) at S-32);

- *Id.* ¶ 64, Ex. 63, at 1043 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5, filed Nov. 16, 2005) at S-36);

- *Id.* ¶ 71, Ex. 70, at 1335-36 (Prospectus Supplement, CWABS Asset-Backed Certificate, Series 2006-7 (Form 424B5, filed June 26, 2006) at S-38 – S-39).

| 55.  Based on the information | • Lefler Decl. ¶ 115, Ex. 114, at 1965 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 83 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| Countrywide disclosed with respect to its securitizations, equity analysts took note of, and presented to investors a graph showing, combinations of risk factors such as low FICO scores, high loan-to-value ratios, or reduced or stated documentation. | (Chris Brendler, CFA, and Michael R. Widner, "Too Early to Try to Be a Hero," Stifel Nicolaus, July 27, 2007, at 6 (SEC Ex. 513), containing table with loan information):<br><br>• *Id.* ¶ 116, Ex. 115, at 1978 (Brendler SEC Depo. Tr. 190:4-24 (June 25, 2010)) (testimony confirming that Brendler reviewed and approved publication of the table in Lefler Decl. Ex. 114 (SEC Ex. 513) and that it represented an analysis of Countrywide's home equity underwriting criteria by time period, based on loan level data from Countrywide's website);<br><br>• *Id.* at 1978 (Brendler Depo. Tr 191:15-193:17 (June 25, 2010)) (testimony confirming that the table in Lefler Decl. Ex. 114 (SEC Ex. 513) included information on FICOs, CLTVs, and reduced |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 84 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | documentation); <br><br> • *Id.* at 1980 (Brendler Depo. Tr 225:10-23 (June 25, 2010)) (testimony indicating that, using data underlying the table in SEC Ex. 513, it would be possible to determine what percentage of loans of CLTV's of 100-plus and a weighted average FICO below 660). |
| 56.   The Company's Chief Risk Officer, John McMurray, made presentations to investors in September 2006 in which he clearly demonstrated that prime and nonprime loans included risk factors such as high loan-to-value ratios and reduced documentation. | • Lefler Decl. ¶ 76, Ex. 75, at 1404 (September 12, 2006 Presentation at CSL-CB001526); <br><br> • *Id.* ¶ 78, Ex. 77, at 1416 (September 13, 2006 Presentation at 200). |
| 57.   Mr. McMurray, publicly disclosed that in Countrywide's experience, a prime loan with a FICO score of 600 was roughly 3 times more likely to become 90 days delinquent than a prime loan with a FICO score of 675, and that a prime loan with a FICO score of 580 was roughly 4 times more likely to become 90 days delinquent | • Lefler Decl. ¶ 129, Ex. 128, at 2075 (January 30, 2006 ASF Conference Presentation Slides at  |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| than a prime loan with a FICO score of 675. | |
| | • *Id.* ¶ 130, Ex. 128A, at 2091 (February 9, 2006 Email re: American Securitization Forum Presentation at CFCP000954303) (email confirming that John McMurray made a presentation at the American Securitization Fourm in early 2006); (#177) |
| | • *Id.* ¶ 27, Ex. 26, at 452 (March 30, 2006 Equity Investor Forum Slides at 109 at CSL-CB001299); |
| | • *Id.* ¶ 132, Ex. 129, at 2096 (May 18, 2006 Federal Reserve Bank Structure and Competition Conference Slides at CFCP008010337): |
| |  |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | • *Id.* ¶ 76, Ex. 75 (September 12, 2006 Equity Investor Forum Slides at 159 at CSL-CB001521); <br><br> • *Id.* ¶ 78, Ex. 77, at 1416 (September 13, 2006 Fixed Income Investor Forum Slides at 200). |

**6.      Countrywide's Use of the Terms "Prime and "Subprime" Was Not Misleading**

| | |
|---|---|
| 58.   There is no commonly accepted, industry-wide definition of the term "prime." | • Lefler Decl. ¶ 19, Ex. 18, at 406 (Kuelbs 7/10/10 SEC Depo. Tr. at 114:7-9): <br><br> "Q:  Okay.  Mr. Kuelbs, was there a standard industrywide definition for prime loans? <br> A:  No."; <br><br> • *Id.* ¶ 29, Ex. 28, at 464 (Hesser SEC Depo. Tr. 82:25-83:4 (June 9, 2010)): <br><br> "Q:  I want to focus your reference to sub-prime loans. Was there an industry-wide definition of prime or sub-prime in the 2005 to 2007 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 87 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

period?

A:  There was not.";

- Lefler Decl. ¶ 96, Ex. 95, at 1650
  (Vandell Report ¶ 58) ("Banking
  regulators agreed that the subprime
  vs. prime classification depends on
  many factors," and FICO is "only
  one" of those factors);

- *Id.* at 1651 (Vandell Report at ¶ 59)
  ("The GSEs also agreed that the term
  is not well defined," and "[s]ecurities
  analysts also agree that there is no
  clear FICO cutoff for subprime
  loans");

- Lefler Decl. ¶ 194, Ex. 191, at 2427
  (Lehn Report ¶ 42) ("... [T]here is no
  industry standard definition for
  'prime' and 'subprime' loans, as noted
  in a Federal Reserve Bank paper and
  a Financial Crisis Inquiry
  Commission staff report. Even
  Fannie Mae, a government-
  sponsored enterprise ('GSE'), had a
  conventional conforming mortgage
  credit book of business that included
  loans with FICO scores below 620."

IRELL & MANELLA LLP
A Registered Liability
Law Partnership Including
Professional Corporations

2280153

- 88 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

(footnotes omitted));

- Lefler Decl. ¶ 61, Ex. 60 at 815 (Grundfest Report ¶ 291) ("... [T]here was no standard definition of prime and subprime in the market during the period relevant to the Complaint, and a loan's riskiness cannot be judged by any one single variable. Mortgage loan credit risk is multidimensional, and that fact is documented by academic literature and was disclosed repeatedly by Countrywide.");

- *Id.* ¶ 93, Ex. 92, at 1604 (Lacour-Little SEC Depo. Tr. 42:4-25 (July 28, 2010)):

  "Q.  Professor, there are a number of different ways of defining subprime; correct?
  A.  I would agree with that.
  Q.  You've cited one in -- on page 6 of your report; is that correct?
  A.  Yes.  I cited the OCC statement.
  Q.  What are some of the other ways of defining subprime?

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 89 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

A.  Well, there are a number of ways that have been done in the research literature.  In general, subprime loans will have higher interest rates and lower credit quality for the borrower, so one way to do it is just to look at the highest priced loans within some distribution of loans.

Another way, which I refer to later on in my report, is based on the HMDA reportable loans which are loans that are priced higher than a particular pricing threshold as established by the bank regulatory agencies.  I think probably researchers have used FICO scores of 620, FICO scores of 660 and various other ways of defining subprime."

59.   Countrywide's Chief Risk Officer, John McMurray, publicly disclosed that Countrywide's prime loans included a small percentage of loans with FICO scores below 620 and that there was a substantial overlap between the FICO scores of prime and

- Lefler Decl. ¶ 76, Ex. 75, at 1403 (September 12, 2006 Equity Investor Forum Slides at 159) [CSL-CB001363 at 1521] (slides demonstrating the overlap between prime and subprime loans, with prime loans extending to FICO

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 90 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| subprime loans. | scores below 580); |
| | • *Id.* ¶ 75,  Ex. 74, at 1398 (September 12, 2006 Equity Investor Forum Transcript at 33) ("All right this is back to our servicing portfolio for a moment. So here we're showing a couple key characteristics that are important from a credit perspective. So the first is combined loan-to-value, so that's a measure again of leverage so we show you the distribution in our serviincg portfolio there…  Over on the far right or tip right I should say, we've got FICOs. One of the things to notice here is the tremendous overlap between prime and sub-prime FICOs. So these markets long ago ceased to be definiend in terms of FICO by where a borrower fell, it's much more drven by the transaction level details now."); |
| | • *Id.* ¶ 77,  Ex. 76, at 1410 (September 13, 2006 Fixed Income Investor Forum Transcript at 61) ("[T]he upper right are FICOs so one of the things to notice there is the |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 91 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

tremendous overlap between prime and subprime so those two markets are moving. There's much more of a blurring between those two markets. They overlap more than they don't overlap so that's the change that we've seen over the past couple years.");

- *Id.* ¶ 78,  Ex. 77, at 1416 (September 13, 2006 Fixed Income Investor Forum Slides at 200):



- *Id.* ¶ 16,  Ex. 15, at 372 (McMurray SEC Depo. Tr. 303:24-304:6 (July 7, 2007) (McMurray recalling that he made successive presentations to equity investors and fixed income investors in New York in September

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 92 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

2006); (#3)

- *Id.* ¶ 84, Ex. 83, at 1440 (May 23, 2007 Fixed Income Investor Forum at CFC2007E837356):



60.   The SEC's own expert identified at least five different ways to define "subprime," admitted that there is no one agreed upon definition of "subprime," and opined that Countrywide's use of the term "nonprime" in its public disclosures was not false or misleading.

- Lefler Decl. ¶ 92, Ex. 92, at 1604 (LaCour-Little SEC Depo. Tr: 42:4-42:25 (July 28, 2010)):

"Q.  Professor, there are a number of different ways of defining subprime; correct?

A.  I would agree with that.

Q.  You've cited one in -- on page 6 of your report; is that correct?

A.  Yes.  I cited the OCC statement.

Q.  What are some of the other ways of defining subprime?

A.  Well, there are a number of ways that have been done in the research literature.  In general,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

subprime loans will have higher interest rates and lower credit quality for the borrower, so one way to do it is just to look at the highest priced loans within some distribution of loans.

Another way, which I refer to later on in my report, is based on the HMDA reportable loans,which are loans that are priced higher than a particular pricing threshold as established by the bank regulatory agencies.  I think probably researchers have used FICO scores of 620, FICO scores of 660 and various other ways of defining subprime.

Q.  Are those all that you can recall at this time?

A.  Yes.

Q.  Has HUD ever suggested a way of defining subprime that you haven't listed?

A.  Yes.  HUD has a list of those institutions that are self-identified, I believe, based as primarily subprime and manufactured

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 94 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1

2    housing lenders.

3    Q.  I have five now currently.  Is

4    there a sixth that you can recall

5    from your time at Wells Fargo?

6    A.  Not that I recall."

7    • *Id.* at 1605 (LaCour-Little SEC

8       Depo. Tr: 50:1-16 (July 28, 2010)):

9    "Q.  Does that refresh your

10    recollection regarding whether you

11    believed that nonprime or subprime

12    had a problem with respect to

13    category definition?

14    A.  Yeah.  I think what I was trying

15    to say here in this sentence is that

16    different researchers have used

17    different definitions, and so it's

18    sometimes difficult to compare the

19    results of various research findings

20    because the definitions may be

21    slightly different.

22    Q.  So there's no one agreed-upon

23    definition of subprime?

24    A.  I would agree with that.

25    Q.  And there's no one agreed-upon

26    definition of nonprime?

27    A.  I think that's right.";

28    • *Id.* at 1606 (LaCour-Little SEC

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153                          - 95 -              STATEMENT OF UNCONTROVERTED FACTS AND
                                                          CONCLUSIONS OF LAW

| | |
|---|---|
| | Depo. Tr: 55:17-20 (July 28, 2010)):<br><br>"Q.  Well, is it your opinion that Countrywide's use of nonprime in its public disclosures was false or misleading?<br>A.  I don't believe so." |
| 61.   Countrywide's prospectus supplements for prime MBS loans disclosed to investors that many prime loans had FICO scores below 620. | • Lefler Decl. ¶ 120, Ex. 119, at 2028 (CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-3 (Form 424B5)  (January 25, 2006) at S-39 (table showing that approximately 1.74% of loans in Loan Group 1 of CWMBS Series 2006-3 had FICO scores below 620);<br><br>• *Id.* ¶ 124, Ex. 123, at 2040 (CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-TMI (Form 424B5, filed March 8, 2006)), S-38 (table entitled "FICO Credit Scores" showing three loans with FICO scores between 561 and 620);<br><br>• *Id.* ¶ 125, Ex. 124, at 2042 (CWMBS, CHL Mortgage Pass-Through Trust 2006-J3 (Form 424B5, filed March 28, 2006), S-28 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 96 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| | (table entitled "Fico Credit Scores" with a loan with FICO score between 581 and 600); |
| | • *Id.* ¶ 158, Ex. 155, at 2249 (Screenshot from www.mortgageinvestorcountrywide.com showing, in the column entitled "Collateral Type," that the loans underlying each of the CWMBS securitizations cited above were considered to be prime: |
| |  |
| 62.   Countrywide's internal credit monitoring packages show that, from | • Lefler Decl. ¶ 134, Ex. 131, at 2103 (June 2007 CFC Product Insight |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 97 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| the first quarter of 2005 through the second quarter of 2007,  loans classified as prime by Countrywide with FICO scores below 620 constituted between 1-2% of the total prime loans originated for each of the quarters during this period. | Book at 5) (table from Countrywide's "Conventional Prime Product Book" containing from 2005, 2006 and 2007 showing that loans classified as prime with FICO scores of less than 620 consistently constituted 1-2% of Countrywide's monthly and quarterly loan production);<br><br>• *Id.* ¶ 133, Ex. 130, at 2100 (July 2006 CFC Product Insight Book at 25). |
| 63.   Countrywide prospectus supplements disclosed that many loans categorized as prime included risk factors such as reduced documentation, high loan-to-value ratios, or both. | • Lefler Decl. ¶ 126, Ex. 125 (Prospectus Supplement, CWMBS Mortgage Pass-Through Trust 2007-HYB2  at A-32) (table entitled "Documentation Programs" showing reduced documentation loans with a weighted average CLTV of 91.32%);<br><br>• *Id.* (Prospectus Supplement, CWMBS Mortgage Pass-Through Trust 2007-HYB2 at A-33) (table entitled "FICO Credit Scores" showing loans with FICO from 601-620 and a weighted average CLTV |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 98 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1

2

of 100%);

3   • *Id.* ¶ 128, Ex. 127, at __ (CWMBS,

4   CHL Mortgage Pass-Through Trust

5   2006-HYB4 (Form 424B5) at S-35)

6   (table entitled "Original Loan-to-

7   Value Ratios" showing that 9.21% of

8   the loans underlying the

9   securitization had LTVs above

10   80%);

11   • *Id.* (CWMBS, CHL Mortgage Pass-

12   Through Trust 2006-HYB4 (Form

13   424B5) at S-39) (table entitled

14   "Documentation Programs" showing

15   that 54.20% of the loan pool was

16   originated on a "reduced"

17   documentation basis) (May 26,

18   2006);

19   • *Id.* ¶ 125, Ex. 124, at __ (Prospectus

20   Supplement, CWMBS, CHL

21   Mortgage Pass-Through Certificates,

22   Series 2006-J3 (May 25, 2006) at S-

23   28 (table showing a loan with a

24   FICO score between 581 and 600

25   and an LTV of 90%);

26   • *Id.* (Prospectus Supplement,

27   CWMBS, CHL Mortgage Pass-

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 99 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

Through Certificates, Series 2006-J3 at S-29) (table entitled "Original Loan-to-Value Ratios" with 30 loans with LTVs greater than 80%);

- *Id.* ¶ 158, Ex. 155, at __ (Screenshot from www.mortgageinvestorcountrywide.com showing, in the column entitled "Collateral Type," that the loans underlying each of the CWMBS securitizations cited above were classified as prime):



64.   Fannie Mae disclosed in its 2006 10-K that: (a) 16-17% of its loans in 2005-2006 reflected sub-660 FICOs; (b) 5-6% of its loans in 2005-2006 were

- Lefler Decl. ¶ 135, Ex. 132, at 2105-06 (2006 10-K for Federal National Mortgage Association, 125-26);

- *Id.* ¶ 116, Ex. 115, at 1975-76

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| issued to sub-620 FICO borrowers, and (c) 9-10% of its loans in 2005-2006 featured LTVs above 90%. | (Brendler SEC Depo. Tr. 167:16-170:1 (June 25, 2010) (testimony of analyst Christopher Brendler confirming that, according to Fannie Mae's 2006 10-K, 16% of its loans in 2005 and 17% of its loans in 2006 were to borrowers with FICO scores below 660). |
| 65.   Countrywide disclosed that pay-option loans were included in its "prime" category. | • Lefler Decl. ¶ 136, Ex. 133, at 2118 (January 31, 2006, CFC Earnings Release, at 6) ("Prime margins declined [in the 4th quarter of 2005]. The decline from the third quarter was largely attributable to weaker secondary market sales, primarily related to pay-option loans.");<br><br>• *Id.* ¶ 5, Ex. 4, at 106, 155 (2006 10-K at 3, F-37) (disclosing that in 2005 and 2006 "nonprime" loans constituted a little less than 9% of overall production, while it separately disclosed that pay-options constituted 19% of production in 2005 and 14% in 2006). |

### 7.   Countrywide Repeatedly Disclosed That Performance Of Its Pay-Option Loans Was Untested And Uncertain

| | |
|---|---|
| 66.   The transcript from a Q2 2005 earnings call quotes Mr. Mozilo as saying that although pay-option ARMs were Countrywide's "lowest delinquency product at the moment ... you have to wait some time for loans to mature a year, two years, even three years to determine how they're going to perform." | • Lefler Decl. ¶ 216, Ex. 213, at 2617 (July 26, 2005, Q2 2005 Countrywide Financial Corporation Earnings Conference Call Transcript) |
| 67.   The transcript from Countrywide's Q2 2006 quarterly earnings call quotes Mr. Mozilo as saying that pay-option loans were "complicated in that there are resets here, and depending upon where rates are, the resets could be significant and we just need time to see how this is going to play out.  If rates continue to rise significantly, then these resets and payment shocks will be substantial. … The test will be when the resets take place and I'm not certain exactly what's going to happen there." | • Lefler Decl. ¶ 105, Ex. 104, at 1794 (July 25, 2006, Q2 2006 Countrywide Financial Corporation Earnings Conference Call at 10). |
| 68.   The Federal Financial | • Lefler Decl. ¶ 138, Ex. 135, at 2135 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| Regulatory Agencies issued a Final Guidance on Nontraditional Mortgage Product Risks on 9/29/06, which states: "To manage the risks associated with nontraditional mortgage loans, management should. . . .Recognize that many nontraditional mortgage loans. . . Are untested in a stress environment." | (Board of Governors of the Federal Reserve System, "Federal Financial Regulatory Agencies Issue Final Guidance on Nontraditional Mortgage Product Risks," at 1 (September 29, 2006)). |
| 69.   On October 10, 2004, the *Wall Street Journal* published an article discussing the payment shock associated with interest only loans, which stated:<br><br>The surging popularity of [interest-only] loans raises questions about how many borrowers will run into financial trouble once the higher payments kick in. The industry has no recent experience with granting them to a broad range of borrowers and so no deep pools of data on default rates.  In that sense, says Doug Duncan, chief economist of the Mortgage Bankers Association, 'We're flying blind.' | • Lefler Decl. ¶ 139, Ex. 136, at 2137 (James Hagerty, "Borrow Now, Pain Later: Interest Only Mortgages," *Wall Street Journal* (October 10, 2004) at 1;<br><br>• *See also id.* ¶ 15, Ex. 14, at 350 (Kenneth Posner and Suzanne Schiavelli, "Countrywide Financial Corp.: Remain Equal-weight," Morgan Stanley,  Oct. 24, 2004) (noting that "[t]he chief economist of the Mortgage Bankers' Association was recently quoted, with respect to IOs, as saying 'we're flying blind.'"). |
| 70.   Countrywide stated in both its | • Lefler Decl. ¶ 13, Ex. 12, at 318 (2Q |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 103 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| Q2 and Q3 2006 10-Qs that "substantially all" of its pay-option loans were issued on the basis of reduced borrower documentation. | 2006 10-Q at 37);<br><br>• *Id.* ¶ 14, Ex. 13, at 334 (3Q 2006 10-Q at 40). |
| 71.   The transcript from a February 28, 2006 analyst forum quotes Mr. Mozilo as stating with respect to reduced documentation loans: "There's no question that the no doc loan or stated income is, you know, there's some exaggeration going on....I believe there's a lot of fraud." | • Lefler Decl. ¶ 140, Ex. 137, at 2140 (February 28, 2006, Transcript, Countrywide Financial Corporation 2006 Fixed Income Analyst Forum, CFC2007827007, at 018). |
| 72.   Countrywide's Chief Risk Officer, John McMurray, publicly disclosed that in Countrywide's experience, reduced documentation loans were 1.5 to 3.5 times more likely to become delinquent than full documentation loans, depending on the level of documentation. | • Lefler Decl. ¶ 129, Ex. 128, at 2080 (January 30, 2006, ASF Conference Presentation at CFCP006856249, at 256):<br><br>• *Id.* ¶ 130, Ex. 128A, at 2096 (February 9, 2006, Email re: American Securitization Forum |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 104 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

Presentation at CFCP000954303) (confirming that John McMurray made a presentation at the American Securitization Fourm in early 2006); (#177)

- *Id.* ¶ 132, Ex. 129, at __ (May 18, 2006, Federal Reserve Bank Structure and Competition Conference Presentation at CFCP008010335, at 347):



- *Id.* ¶ 75, Ex. 74, at 1399 (September 12, 2006, Equity Investor Forum Transcript at CFC2007826886 at 919 ("The type of documentation that the borrower selects we find to be very important in explaining the future delinquency. So on the far left we start with a full documentation loan, that's where the borrower is documenting bother their income

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 105 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

and their assets, and we use that as a base of one. And so you can see compared to a NINA, over at the far right of that chart, NINA stands for no income no asset, so the borrower is neither documenting nor disclosing either what they have in assets or income and you can see that, all else equal, those are going to be three times as seriously delinquent as a fully documented loan. In between we've got [SISA]. That stands for a stated income sated asset, the borrwer is telling us what their income and assets are but they're not providing documentation.");



IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- *Id.* ¶ 77, Ex. 76, at 1412 (September 13, 2006, Fixed Income Investors Forum Transcript at 62) ("[O]n the upper left is documentation type. So here, we've used full doc over on the far left as our base of one. And, you can see that as documentation is reduced going from left to right, the odds ratios go up significantly. So, if you go over to the far right, it's a NINA loan. That stands for no income, no asset, so the borrower's neither disclosing nor documenting income or assets. And so, that's a factor in excess of three. So, just the change by itself would triple the likelihood of that loan getting into -- or defaulting. And then in between, we've got the intermediate doc types. SISA stands for a stated income, stated asset. That's the borrower's telling us what they're income and assets are but not documenting it. And so, you could take away from this chart that some of them may have lied.");

- *Id.* ¶ 16, Ex. 15, at 372 (McMurray

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 107 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

SEC Depo. 303:24-304:9 (July 7, 2010)) (McMurray recalling that he made successive presentations to equity investors and fixed income investors in New York in September 2006);

- *Id.* ¶ 141, Ex. 138, at 2142 (Chicago Fed Letter, Essays on Issues, The Federal Reserve Bank of Chicago, October 2006 Number 231a, "Developments and Innovations in Real Estate Markets: A Conference Summary") (discussing May 2006 presentation by Mr. McMurray to the Chicago Fed's 42nd Annual Conference on Bank Structure & Competition titled "Innovations in Real Estate Markets: Risks, Rewards, and the Role of Regulation." An article summarizing this presentation states that Mr. McMurray's presentation disclosed that when less documentation was tied to loans, delinquencies increased markedly.);

- *Id.* ¶ 85, Ex. 84, at 1443 (May 23, 2007, Fixed Income Investor Forum

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| | Transcript at CFCNYF00035047) (quotes Mr. McMurray as stating: "So a couple things to conclude from this chart.  The first is that documentation obviously matters.  What could we conclude from some of the individual borrowers that did NINA or SISA loans?  Because I'm led to the conclusion that some of them may not have been telling the truth.  So anyway, documentation matters.  It matters more -- it matters over the life of the loan, but it even matters more from a short - term perspective, and you can see that particularly on the NINA and the SISA"). |
| 73.   The risks of reduced documentation loan programs were discussed extensively in the popular press. | • Lefler Decl. ¶ 159, Ex. 156, at 2251 (Randi Marshal, "Zero-Down Buyers May Put Themselves at Risk; Eagerness May Lead to Jeopardy, Some Experts Say," *Chicago Tribune*, Dec. 5, 2004) ("[N]o documentation, no down payment or high interest rates for those with bad credit are easy to get now, and that's |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 109 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

potentially dangerous.");

- *Id.* ¶ 158, Ex. 157, at 2254 (Sue McAllister, "A Mortgage, But No Proof of Income?  No Problem!," *The State*, Dec. 12, 2004 ("With the end of the refinancing boom in late 2003, lenders started looking for new ways to boost business, and stated income mortgages – and related "low documentation" loans – were one solution. . . . [I]t's an open secret in the mortgage business that some applicants for stated income loans will give an inflated estimate of their monthly income so that they can qualify for the loan amount they want.");

- *Id.* ¶ 161, Ex. 158, at 2258 (Sue McAllister, "Sounds Like Spam But It's True; Loans OK Without Proof of Income," *Chicago Tribune*, Dec. 19, 2004) ("But it's an open secret in the mortgage business that some applicants for stated income loans will give an inflated estimate of their monthly income so that they can qualify for the loan amount they

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 110 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| | want. . . .[T]here's a potential risk for both borrower and lender."); |
| | <ul><li>*Id.* ¶ 162, Ex. 159, at 2260 (Kenneth Harney, "Just How Sour Could These Sweet Mortgages Turn?," *Chicago Tribune*, Jan. 16, 2005) ("Why don't people with W-2 documented salaries want to show them? You guessed it: Many of them are buying houses with price tags they can't really afford. And if the economy falters or their incomes drop, they will be the first into foreclosure.");</li><li>*Id.* ¶ 199, Ex. 196, at 2534 (Kenneth R. Harney, "Mortgage Fraud Booming Along With Housing Market," *Chicago Tribune*, July 31, 2005) ("during the housing boom, stated income and NINA mortgages routinely have been extended to applicants with shaky credit profiles and insufficient incomes to qualify for their home purchases");</li><li>*Id.* ¶ 131, Ex. 128B, at 2093 ("No Surprise: Subprime Mortgages Are</li></ul> |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                     - 111 -                    STATEMENT OF UNCONTROVERTED FACTS AND
                                                                        CONCLUSIONS OF LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

More Likely to Default, Countrywide Study Finds," Feb. 3, 2006, *Inside MBS & ABS*, Vol. 2006, No. 5) (article discussing presentation given by Mr. McMurray in January 2006 in which he revealed the results of a Countrywide study showing that "preferred" doc programs were 50% more likely than full-doc loans to go delinquent, while the chances of delinquency were more than double on SIVA loans.  NINA loans were 3 times more likely than full-doc loans to go delinquent.);

- *Id.* ¶ 200, Ex. 197, at 2535 (Jennifer Harmon, "Income Verification Tools are a Must Have," *National Mortgage News*, Mar. 6, 2006) ("With the increasing climate of creative mortgages including stated docs and stated-income loans . . . the mortgage industry is seeing a decreased emphasis on paperwork, which only spells an increase in fraud.");

- *Id.* ¶ 201, Ex. 198, at 2537 (Lingling

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 112 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

Wei, "Stated Income Loans Vulnerable to Fraud," *Associated Press*, Aug. 21, 2006) ("The case points to a growing concern among consumer advocates and regulators over the home-lending industry's increasing reliance on reduced documentation, particularly unverified income, to speed up the loan approval process amid the ever-intensifying competition. 'It's just too easy to cheat,' says Tom Miller, Iowa's attorney general. He says fraud related to stated income loans often is initiated by lenders and brokers in pursuit of profits, leaving unsuspecting consumers in the dark.");

- *Id.* ¶ 202, Ex. 199, at 2544 (Robert Lacoursiere, "Market Disconnects from Fundamentals: Reiterating Sell Rating," *Banc of America Securities*, Oct. 27, 2006) ("The low/no documentation feature of Alt-A products . .. means increased difficulty to accurately gauge individual borrowers' credit profile,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 113 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

increased odds of loans being mis-priced and increased probability that loans go into default.");

- *Id.* ¶ 203, Ex. 200, at 2577 ("2007 Industry Outlook; Expect Some Bumps Along the Way," *Credit Suisse*, Jan. 4, 2007, 8) (Analyst report stating: "Recent studies indicate that borrowers who choose stated income loans inflate their incomes on average 20-50%.");

- *Id.* ¶ 204, Ex. 201, at 2585 (Gretchen Morgenson, "Crisis Looms in Mortgages," *The New York Times*, Mar. 11, 2007) ("Mortgages requiring little or no documentation became known colloquially as 'liar loans.' An April 2006 report by the Mortgage Asset Research Institute, a consulting concern in Reston, Va …. [found that] in 90 percent of loans, borrowers overstated their incomes 5 percent or more. But in almost 60 percent of cases, borrowers inflated their incomes by more than half. A Deutsche Bank report said liar loans accounted for 40 percent of the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 114 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

subprime mortgage issuance last year, up from 25 percent in 2001");

- *Id.* ¶ 206, Ex. 203, at 2588 (Dawn Kopecki, "Why Fannie and Freddy Are Fidgety," *Business Week*, July 30, 2007) ("[Low-documentation loans] require little or no proof of the borrower's income. That segment has proven to be rife with abuse in recent years. A study by the Mortgage Asset Research Institute found that 90% of borrowers with so-called stated income loans upped their annual incomes falsely to qualify for more money. In almost 60% of low-documentation loans, the borrower's income was inflated by more than 50%.");

- *Id.* ¶ 207, Ex. 204, at 2590 (Andrew LePage, "Popular Loan Can Be a Stretch," *Sacramento Bee*, Dec. 5, 2004);

- *Id.* ¶ 208, Ex. 205, at 2593 (Lew Sichelman, "Innovative Home Loans Stir Worries Among Critics," *Chicago Tribune*, May 22, 2005);

- *Id.* ¶ 209, Ex. 206, at 2597 (Edmund

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 115 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

Andrews, "Efforts to Regulate Risky
Mortgage Innovations Are So Far
Ignored," *The New York Times*, July
15, 2005);

- *Id.* ¶ 210, Ex. 207, at 2601 (James R.
  Hagerty, "Is Getting a Home Loan
  Becoming Too Easy?," *Wall Street
  Journal*, Nov. 16, 2005);

- *Id.* ¶ 211, Ex. 208, at 2604 (James
  Hagerty and Ruth Simon, "Loans
  Too Easy to Obtain, Some Experts
  Claim; Low-Docs, No-Docs Being
  Used More," *Chicago Tribune*, Nov.
  20, 2005;

- *Id.* ¶ 212, Ex. 209, at 2607 (David
  Streitfeld, "More Home Buyers
  Stretch Truth, Budgets to Get
  Loans," *Los Angeles Times*, Sept.
  29, 2006);

- *Id.* ¶ 213, Ex. 210, at 2610 (Kenneth
  Harney, "The Lowdown on Low-
  Doc Loans," *The Washington Post*,
  Nov. 25, 2006);

- *Id.* ¶ 214, Ex. 211, at 2612 (Staff,
  "Stated Income Loans Add to Risk,"
  *National Mortgage News*, Dec. 18,
  2006);

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 116 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



- *Id.* ¶ 215, Ex. 212, at 2614 (Damian Paletta, "OCC Chief Warns of Growing Dangers of 'Stated Income' Loans," *Dow Jones International News*, May 23, 2007).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 117 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

74. The risk of borrowers misrepresenting their income in their loan applications – and the risk that any such misrepresentation would result in higher delinquencies – were factors that Countrywide took into account when setting its loan loss reserves.

- Lefler Decl. ¶ 143, Ex. 140, at 2151 (Email Chain re: 4506 Summary at CFCP007182178) (discussing the results of an audit of borrower fraud in the loan application process, noting that default rate projections for reduced documentation loans were increased, through the use of a multiplier, to reflect the risk that reduced documentation borrowers would exagerate their income);

- *Id.* ¶ 98, Ex. 97, at 1708 (Garcia SEC Depo. Tr. 114:7- 115:3 (June 29, 2010)):

"Q: …. We talked this morning about the fact that when the company -- or when the bank and the company, guess together, established the loan-loss reserve for the -- for the held for investment portfolio, that was an important step in communicating what the perception was of the risk of the loans that were held for investment. Was the risk of borrower fraud one of the factors that was considered in establishing the reserve?

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 118 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

|  |  |
|---|---|
|  | A: It was built into the -- effectively into the reserve, because the -- the -- are you asking specifically about reduce documentation or just in general? I'm not sure I understand. Q: Yeah, reduced documentation. A: In the case of reduced-documentation loans, they had done, you know, in the modeling work, work that resulted in a -- in a -- in a factor being applied for, you know, greater risk being assigned to reduced-doc loans.  So that was – those models were used in the reserving process." |

## B.   ADDITIONAL FACTS IN SUPPORT OF SEPARATE SUBMISSION OF MOZILO

### 1.   Mr. Mozilo's Ten Trading Plans and Two Amendments

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 75.  Mr. Mozilo's first trading plan became effective on April 24, 2002, and was designed to sell 1,448,904 shares of Countrywide stock (split adjusted). | Lefler Decl. ¶ 163, Ex. 160 (April 2002 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1); *id.* ¶ 223, Ex. 220 (Lehn SEC Depo. Tr. 7:4-24 (July 22, 2010)). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 119 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 76.   Mr. Mozilo's second trading plan was executed on July 30, 2002, and was designed to sell 1,135,224 shares of Countrywide stock (split adjusted). | Lefler Decl. ¶ 164, Ex. 161 (August 2002 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1). |
| 77.   Mr. Mozilo's third trading plan was executed on May 2, 2003, and was designed to sell 848,904 shares of Countrywide stock (split adjusted). | Lefler Decl. ¶ 165, Ex. 162 (May 2003 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1). |
| 78.   Mr. Mozilo's fourth trading plan became effective on October 28, 2003, and was designed to sell 646,984 shares of Countrywide stock (split adjusted). | Lefler Decl. ¶ 166, Ex. 163 (October 2003 trading plan); *id.* ¶ 194, Ex. 191, at 2498 (Lehn Report, Ex. P, at 2). |
| 79.   Mr. Mozilo's fifth trading plan was executed on April 26, 2004, and was designed to sell 1,948,606 shares of Countrywide stock (split adjusted). | Lefler Decl. ¶ 167, Ex. 164 (April 2004 trading plan); *id.* ¶ 194, Ex. 191, at 2498 (Lehn Report, Ex. P, at 2). |
| 80.   The April 2004 trading plan was amended on August 19, 2004, to provide for the same number of total sales as under the April 2004 plan, but in smaller quantities and with an earlier termination date. | Lefler Decl. ¶ 168, Ex. 165 (August 2004 amendment); *id.* ¶ 194, Ex. 191, at 2498-99 (Lehn Report, Ex. P, at 2-3, n.5). |
| 81.   Mr. Mozilo's sixth trading plan was executed on December 29, 2004, and was | Lefler Decl. ¶ 169, Ex. 166 (December 2004 plan); *id.* ¶ 194, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 120 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| designed to sell 5,428,964 shares of Countrywide stock. | Ex. 191, at 2499-2502 (Lehn Report, Ex. P, at 3-6). |
| 82.   Mr. Mozilo's seventh trading plan was executed on October 27, 2006, and was designed to sell 3,989,588 shares of Countrywide stock over eleven months. | Lefler Decl. ¶ 170, Ex. 167 (October 2006 plan); id. ¶ 194, Ex. 191, at 2502-03 (Lehn Report, Ex. P, at 6-7). |
| 83.   Mr. Mozilo's eighth trading plan, the Foundation Plan, was executed on October 27, 2006, and was designed to sell 91,999 shares of Countrywide stock. | Lefler Decl. ¶ 171, Ex. 168 (Foundation plan); id. ¶ 194, Ex. 191, at 2503 (Lehn Report, Ex. P, at 7). |
| 84.   Mr. Mozilo's ninth trading plan, the Trust Plan, was executed on November 13, 2006, and was designed to sell 100,000 shares of Countrywide stock. | Lefler Decl. ¶ 172, Ex. 169 (Trust plan); id. ¶ 194, Ex. 191, at 2504 (Lehn Report, Ex. P, at 8). |
| 85.   Mr. Mozilo's tenth trading plan was executed on December 12, 2006, and was designed to sell 1,389,580 shares of Countrywide stock over eleven months. | Lefler Decl. ¶ 173, Ex. 170 (December 2006 plan); id. ¶ 194, Ex. 191, at 2504 (Lehn Report, Ex. P, at 8). |
| 86.   On February 2, 2007, the December Plan was amended to sell an additional 1,393,197 shares of Countrywide stock over ten months. | Lefler Decl. ¶ 174, Ex. 171 (February amendment); id. ¶ 194, Ex. 191, at 2504-05 (Lehn Report, Ex. P, at 8-9, n.6). |
| 87.   Countrywide common stock | Lefler Decl. ¶ 175, Ex. 172 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 121 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| experienced splits of 4-for-3, 3-for-2, and 2-for-1, on December 18, 2003, April 13, 2004, and August 31, 2004, respectively. | (December 10, 2003 proxy); *id.* ¶ 176, Ex. 173 (April 21, 2004 8-K); *id.* ¶ 177, Ex. 174 (July 16, 2004 proxy). |

## 2.   Implementation of the Challenged Trading Plans

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 88.   Beginning in 2002, financial advisors at AYCO, including John Conners, urged Mr. Mozilo to diversify his investments through the use of Rule 10b5-1 trading plans. | Lefler Decl. ¶ 217, Ex. 214, at 2621 (Mozilo NYF Depo. Tr. 29:5-9 (January 26, 2010)) ("I was advised by a financial advisor hired by the company, because of my age, that I should begin to diversify, and I started that process in 2002."). |
| 89.   Mr. Conners encouraged Mr. Mozilo to sell more Countrywide shares as Mr. Mozilo accumulated more options each year. | Lefler Decl. ¶ 217, Ex. 214, at 2622 (Mozilo NYF Depo. Tr. 37:7-9 (January 26, 2010)) ("John would continue to encourage me to continue to diversify, particularly as I received more options each year."); *id.* ¶ 218, Ex. 215, at 2630 (Conners SEC Inv. Depo. Tr. 142:19-143:11 (April 18, 2008)) ("[W]e need to keep moving on this diversification plan and looking |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 122 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | ahead, . . . so I have three months in '06, 12 months in '07 and 12 months in '08 to get through, you now, at that point it was seven-plus new grants, maybe 8 million shares of stock. . . . So it really puts your back against the wall."); *id.* ¶ 219, Ex. 216, at 2642 (Bow SEC Depo. Tr. 75:23-76:11 (July 16, 2010)) ("John really felt that Mr. Mozilo need to increase his sales activity. . . . And I know that John had been on Angelo for a long period of time to not only sell some of his company ownership but just, you know, for diversification purposes primarily."). |
| 90.   Long-time board member Robert Donato advised Mr. Mozilo to sell more shares of Countrywide stock. | Lefler Decl. ¶ 220, Ex. 217, at 2656-57 (Donato SEC Depo. Tr. 20:10-16 (April 2, 2010)) ("[A]s we grew and the company prospered, Angelo rarely if ever sold any stock other than expiring options. . . . I suggested to him, particularly when the plan was for him to retire in whatever year that was, 2006 or '7, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 123 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | that he should begin to diversify his holdings."); *id.* ¶ 220, Ex. 217, at 2658-59 (Donato SEC Depo. Tr. 36:15-37:19 (April 2, 2010)) ("Q: Is this statement by Angelo, 'One of the Directors has suggested that I consider accelerating my sales,' is that consistent with the conversations that you had been having with Mr. Mozilo?  A: Yeah."); *id.* ¶ 178, Ex. 175 (Exhibit 118). |
| 91.   Mr. Mozilo owned 6.89 million shares of Countrywide stock and exercisable options as of April 4, 2008. | Lefler Decl. ¶ 179, Ex. 176, at 2372 (2008 Proxy statement, at 58). |

### 3.    Legal Preclearance of the Challenged Plans

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 92.   Each of the challenged trading plans was executed during an open trading window. | Lefler Decl. ¶ 219, Ex. 216, at 2645-46 (Bow SEC Depo. Tr. 97:20-98:1 (July 16, 2010)) ("Obviously he would not be able to enter into a plan during a blackout period. . . . So clearly it |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 124 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | couldn't be done when there was a trading blackout on."). |
| 93.   Each of the challenged trading plans was approved by Countrywide's General Counsel (Corporate and Securities), Susan Bow. | Lefler Decl. ¶ 219, Ex. 216, at 2640 (Bow SEC Depo. Tr. 68:21-69:25 (July 16, 2010)) ("Q: [D]id Mr. Mozilo need your approval to enter into a plan – to execute the plan?  A: . . . When an executive would want to trade, they had to get permission."); *id.* ¶ 170, Ex. 167, at 2331 (October Plan (Bow signed)); *id.* ¶ 171, Ex. 168, at 2338 (Foundation Plan (Bow signed)); *id.* ¶ 172, Ex. 169, at 2346 (Trust Plan (Bow signed)); *id.* ¶ 173, Ex. 170, at 2357 (December Plan (Bow signed)); *id.* ¶ 174, Ex. 171, at 2361 (February Amendment (Bow signed)). |
| 94.   Before approving each of the challenged trading plans, Susan Bow spoke with executives within the company, including the Chief Legal Officer and the CFO, in order to determine whether anyone was aware of material nonpublic | Lefler Decl. ¶ 219, Ex. 216, at 2646 (Bow SEC Depo. Tr. 98:2-8 (July 16, 2010)) ("Then what I would do, because of his high-profile position, I would ask around.  Does anybody know anything?  I would talk to |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 125 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| information that would prevent Mr. Mozilo from implementing his trading plans. | Sandy Samuels, my boss, chief legal officer.  I would always talk to Eric Sieracki to make sure he didn't know anything, and then just general, you know, scuttlebutt."). |
| 95.   Ms. Bow was the chief legal officer in charge of Countrywide's SEC disclosure process. | Lefler Decl. ¶ 219, Ex. 216, at 2635 (Bow SEC Depo. Tr. 15:25-16:4 (July 16, 2010)) ("[I]n your position as general counsel corporate and securities you were the company's chief lawyer with respect to this disclosure process?  A: Absolutely, yes."). |
| 96.   Ms. Bow consulted with outside counsel at least with respect to the December Plan. | Lefler Decl. ¶ 219, Ex. 216, at 2643 (Bow SEC Depo. Tr. 89:16-19 (July 16, 2010)) ("Q: [W]as there ever an occasion that you sought outside counsel's advice with respect to Mr. Mozilo's trading?  A: Yes."); *id.* at 2644 (Bow SEC Depo. Tr. 91:7-93-4 (July 16, 2010)) ("Q: [D]oes looking at this . . . refresh your recollection . . . that you sought advice from Mr. O'Sullivan with respect to Mr. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 126 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | Mozilo's December trading plan? A: Yes. . . . Q: [I]s there any circumstance under which, if an outside lawyer told you . . . Mr. Mozilo cannot enter into a trading plan right now, that you would have approved that plan? . . . A: No."). |

### 4.     Mr. Mozilo's Negative Public Statements

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 97.   Throughout his tenure as CEO of Countrywide, Mr. Mozilo made numerous negative public statements about news affecting Countrywide and the housing market. | *E.g.*, Lefler Decl. ¶ 180, Ex. 177, at 2374 (February 28, 2006 analyst forum) (noting that borrower "[f]raud has always been a part of the business"); *id.* ¶ 181, Ex. 178, at 2375-76 (March 6, 2006 CNBC interview) ("The market has turned. . . . I would expect a general decline of 5% to 10% throughout the country, some areas 20%."); *id.* ¶ 182, Ex. 179, at 2377 (May 17, 2006 CNBC interview) ("What my concern is, … the pay option arms, . . . loans that'll be resetting at the higher interest rates."); *id.* ¶ 183, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 127 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | Ex. 180, at 2383 (July 25, 2006 earnings call) ("If rates continue to rise significantly, then these resets and payment shocks will be substantial."); *id.* ¶ 184, Ex. 181 (September 13, 2006 investor forum) ("[I]n the first year 78% of the borrowers employ the lower payment.  I was shocked at that."); *id.* ¶ 185, Ex. 182, at 2385 (March 18, 2007 CNBC interview) ("I think the industry loosened their guidelines, and we're paying – the industry is paying the consequences for that."); *id.* ¶ 194, Ex. 191, at 2518 (Lehn Report, Ex. V) (chart of public comments). |
| 98.   The transcript from a July 25, 2006 earnings call quotes Mr. Mozilo as stating: "I've never seen a soft landing in 53 years, so I think we have a ways to go here for this thing to level out." | Lefler Decl. ¶ 183, Ex. 180, at 2379-80 |
| 99.   The transcript from an October 25, 2006 conference quotes Mr. Mozilo as stating: "the housing cycle has entered a | Lefler Decl. ¶ 186, Ex. 183, at 2387 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| downward phase." | |
| 100. The transcript from a January 30, 2007 earnings call quotes Mr. Mozilo as stating: "We're also preparing for increased borrower delinquencies and continued credit deterioration." | Lefler Decl. ¶ 187, Ex. 184, at 2389 |
| 101. As of January 30, 2007, Mr. Mozilo had yet to sell 78 percent of the shares planned to be sold under the October and December Plans. | Lefler Decl. ¶ 194, Ex. 191, at 2503 (Lehn Report, Ex. P, at 6-8) ((shares sold as of 1/30/07 under October Plan (1.050 million) + shares sold as of 1/30/07 under December Plan (.115 million)) / (shares to be sold under October Plan (3.989 million) + shares to be sold under December Plan (1.389 million)) = 21.65%; 21.65% − 1 = 78.34%). |
| 102. The transcript from a March 26, 2007 CNBC interview quotes Mr. Mozilo as stating: "I think that there's more to come out in terms of delinquencies and foreclosures. . . . I thought that the housing downturn would have an impact on the economy and could be the start of a recession." | Lefler Decl. ¶ 188, Ex. 185, at 2391 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 129 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 103. An article published in the American Banker on July 20, 2007 quotes Mr. Mozilo as stating: "I think we're going to go through an enormous correction period, and we have a long way to go . . . this is just the beginning of the process." | Lefler Decl. ¶ 189, Ex. 186, at 2392 |
| 104. The transcript from a July 24, 2007 earnings call quotes Mr. Mozilo as stating: "We are experiencing home price depreciation almost like never before, with the exception of the Great Depression." | Lefler Decl. ¶ 190, Ex. 187, at 2394 |
| 105. As of July 24, 2007, 33 percent of the Mr. Mozilo's shares under the October and December Plans (and February Amendment thereto) had yet to be sold. | Lefler Decl. ¶ 194, Ex. 191, at 2502 (Lehn Report, Ex. P, at 6-9) ((shares sold as of 7/24/07 under October Plan (3.150 million) + shares sold as of 7/24/07 under December Plan (.115 million) + shares sold as of 7/24/07 under February Amendment (1.242 million) / shares to be sold under October Plan (3.989 million) + shares to be sold under December Plan (1.389 million) + shares to be sold under February Amendment (1.393 million) = 66.55%) − 1 = |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 33.45%). |

### 5.    Actions Inconsistent With Scienter

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 106. Each of the challenged trading plans included a price "floor," which prevented shares from being sold below $28 per share. | Lefler Decl. ¶ 219, Ex. 216, at 2647 (Bow SEC Depo. Tr. 108:5-8 (July 16, 2010)) ("Q: [Y]ou recalled that his trading plans had a floor, a price below which he didn't want to sell shares?  A: Yes."); *id.* ¶ 194, Ex. 191 (Lehn Report ¶ 84, Ex. S); *id.*, Exs. 160-71 (trading plans). |
| 107. If Mr. Mozilo's trading plans had not included a price floor, he would have sold an additional 1.1 million shares in 2007 at a profit, under the February Amendment. | Lefler Decl. ¶ 194, Ex. 191, at 2512 (Lehn Report ¶ 84, Ex. T). |
| 108. Mr. Mozilo's financial advisor urged him to remove the price floor, but Mr. Mozilo refused because he "didn't want to give the stock away." | Lefler Decl. ¶ 221, Ex. 218, at 2664 (Conners SEC Inv. Depo. Tr. 96:12-15 (September 22, 2008)) ("[T]raditionally there's been a floor in the prior plans. . . . And I think it was Angelo saying he didn't want to give the stock away."); *id.* at |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 131 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 2664-65 (Conners SEC Inv. Depo. Tr. 96:22-97:6 (September 22, 2008)) ("Q: Did you have any discussions with Mr. Mozilo to try to persuade him to not include the floor?  A: I probably recommended to him five or six times that do we really need to have a floor, because we had more time to maneuver on these shares.  Q: And other than saying that he didn't want to give the stock away, did Mr. Mozilo give you any other reasons why he wanted the floor in the plan?  A: No.  It was really just, I don't want to sell below 28 or 29, whatever the floor was at the time."). |
| 109. On February 7, 2007, Mr. Mozilo transferred $1 million to a grantor retained annuity trust ("GRAT") that he established for the benefit of his children. | Lefler Decl. ¶ 191, Ex. 188, at 2396 (February 7, 2007 Conners email); *id.* ¶ 221, Ex. 218, at 2666 (Conners SEC Inv. Depo. Tr. 118:14-16 (September 22, 2008)) ("Q: [E]ach GRAT, to the best of your recollection, was established at about that million-dollar threshold?  A: Yes."). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 132 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 110. GRATs only provide tax benefits for assets that increase in value over time. | Lefler Decl. ¶ 221, Ex. 218, at 2668 (Conners SEC Inv. Depo. Tr. 146:1-15 (September 22, 2008)) ("Q: Would you ever advise a client to put stock into a GRAT that you anticipated might go down in value or would likely go down in value? A: If there was a greater likelihood of it going down, it wouldn't make sense. . . . [W]e wouldn't have done it if we thought there was."); *id.* ¶ 218, Ex. 215, at 2628 (Conners SEC Inv. Depo. Tr. 122:9-16 (April 18, 2008)) ("So you would only fund a GRAT with assets that you believed were going to appreciate. You wouldn't put depreciating assets in there or assets that you felt were going to lose value. And not only would they have to appreciate; they have to appreciate really above the hurdle was what interest rate set. And that interest rate at the time, it's 120 percent of the AFR rate, it was about 5 percent."). |
| 111. On July 1, 2007, Mr. Mozilo | Lefler Decl. ¶ 192, Ex. 189. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| received 18,000 shares of common stock pursuant to a restricted stock agreement. | |
| 112. Mr. Mozilo paid more than $300,000 in taxes on shares he received pursuant to the restricted stock agreement, and held the shares. | Lefler Decl. ¶ 192, Ex. 189. |
| 113. If Mr. Mozilo had sold the shares he received on July 1, 2007 pursuant to the restricted stock agreement, Mr. Mozilo would have realized a profit. | Lefler Decl. ¶ 192, Ex. 189. |
| 114. On July 27, 2007, Mr. Mozilo became aware that a substantial number of shares remained unsold under the October Plan because of the $28 price floor in the plan, and that all remaining shares would be sold pursuant to the plan's "catch-all" provision. | Lefler Decl. ¶ 193, Ex. 190. |
| 115. Mr. Mozilo attempted to prevent any shares from being sold below $28 per share pursuant to the catch-all provision. | Lefler Decl. ¶ 193, Ex. 190. |
| 116. Mr. Mozilo insisted that the company issue a press release calling attention to the sales pursuant to the catch-all provision and to explain why they were | Lefler Decl. ¶ 219, Ex. 216, at 2648-49 (Bow SEC Depo. Tr. 113:25-115:4 (July 16, 2010)) ("When the decision was made not |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 134 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| occurring. | to amend the plan, he wanted to convey to the market what was happening and why it was happening. . . .[H]e wanted the market to understand he had to do that because he was not going to be permitted to amend or terminate his plan. . . . This press release was filed on October 5, and the sales would occur between October 8 and October 12."). |
| 117. When the challenged trading plans were created, Mr. Mozilo believed Countrywide's stock price would increase over time. | Lefler Decl. ¶ 217, Ex. 214, at 2623 (Mozilo NYF Depo. Tr. 49:9-10 (January 26, 2010)) ("I had a firm conviction that the stock would continue to do well."). |
| 118. Countrywide's earnings forecasts (so-called "Matrix Reports") were the company's best estimate of its expected earnings per share ("EPS") and stock price performance. | Lefler Decl. ¶ 222, Ex. 219, at 2671 (Iyer SEC Depo. Tr. 60:10-15 (March 23, 2010)) ("Q: So the matrix [report] ended up becoming essentially the forecast, the company's internal forecast . . . A: Yes.  Q: -- for following upcoming periods?  A: That's correct."); *id.* ¶ 94, Ex. 93 (Bartlett SEC Depo. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 135 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 158:6-10 (June 3, 2010)) ("[I]t's the best estimate of management's expectations at that time."). |
| 119. The January 10, 2007 Matrix Report shows that Countrywide expected its average stock price to improve from $36.98 in 2006, to $40.60 in 2007, and $45.42 in 2008. | Lefler Decl. ¶ 195, Ex. 192, at 2521. |

## C.   ADDITIONAL FACTS IN SUPPORT OF SEPARATE SUBMISSION OF SAMBOL

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 120. The transcript of a May 24, 2005, Investor Day Conference quotes Mr. Sambol as stating, "we maintain without question the broadest product line in the mortgage banking industry.  That is part of our value proposition we convey to our customers whether they be realtors or builders, brokers or correspondents, that if a consumer … genuinely qualifies for a home loan anywhere else in the US, they will qualify at Countrywide and if that customer has a product preference, that product will reside on our product menu." | • Lefler Decl., ¶ 23, Ex. 22 at 428 (Transcript of CFC Analyst Meeting held on May 24, 2005, at 13). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 136 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 121. The transcript of a CFC Earnings Call for Q2 2007 held on July 24, 2007, quotes Mr. Sambol as stating, "[i]n terms of our posture, I think somebody mentioned that the best way to look at Countrywide is somewhat of a supermarket. We offer all products that are otherwise appropriately or legitimately offered in the marketplace; and we don't try to direct or divert people, necessarily, into one product versus the other. We just provide for a complete menu, except in educating our customers as to the pros and cons of the alternatives available to them." | • Lefler Decl. ¶ 142, Ex. 139 at 2150 (Transcript of CFC Earnings Call held on July 24, 2007, at 31). |
| 122. The transcript from a September 12, 2006 Equity Investor Forum quotes Mr. Sambol as stating, "Now our plan for continued expansion of our top-line growth and share growth also calls for expansion of our product line in almost all of our business segments."  Mr. Sambol further stated, "expansion of our product line is another very key component of our growth strategies, particularly in the mortgage segment. It's our goal, not only to have the broadest product menu in our industry, | • Lefler Decl. ¶ 75, Ex. 74 at 1394-95 (Transcript of CFC Equity Investor Forum held on September 12, 2006, at 10, 13). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 137 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| which we arguably have today, but also to have every loan program on our menu that's otherwise legitimately offered by any competitor, in other words, to have a fully complete menu such that we'll never have to tell our customers that Countrywide doesn't have the program that they want." | |
| 123. The transcript from a March 30, 2004 Equity Investor Forum quotes Mr. Sambol as stating that if a customer can "legitimately qualify for a loan anywhere else in the U.S., they'll qualify at Countrywide, and if they have a product or loan preference that product will be on our menu." | • Lefler Decl. ¶ 22, Ex. 21 at 420 (Transcript of Equity Investor Forum held on March 30, 2004, at 31). |
| 124. In response to disclosures made by Countrywide at the May 24, 2005 Equity Investor Forum, securities analyst Ms. Charlotte Chamberlain issued a report for Jefferies & Co., entitled "No Customer Left Behind." In that report, she expressly cautioned Countrywide investors that "CFC's commitment not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an | • Lefler Decl. ¶ 25, Ex. 24 at 438 (Charlotte Chamberlain, "No Customer Left Behind," Jefferies & Company, Inc., May 25, 2005, at 1). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 138 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| underwriting guideline." | |
| 125. The transcript of a CFC Earnings Call for Q2 2007 held on July 24, 2007, quotes Mr. Sambol as stating, "where we and the market liberalized guidelines, we sought to price for more risk and more liberalized guidelines." | • Lefler Decl. ¶ 142, Ex. 139 at 2149 (Transcript of CFC Earnings Call held on July 24, 2007, at 25). |
| 126. The transcript of the Earnings Call for Q1 2007 held on April 26, 2007, quotes Mr. Sambol as stating that "the current turmoil in subprime was precipitated in our view by a convergence of several things; expansion of program and credit guidelines in the industry over the last several years, followed by a flattening of home price appreciation and in fact, declines in home prices in some markets over the last year, which in turn has resulted in increasing delinquencies and defaults in the sector, particularly in the last several quarters." | • Lefler Decl. ¶ 157, Ex. 154 at 2218 (Transcript of CFC Earnings Call held on April 26, 2007, at 4). |
| 127. At the May 24, 2005 Investor Day Conference, Mr. Sambol disclosed that "[i]n the first quarter of 2005, 67% of our volume was non-conforming, Jumbo, Alternative-A, non-prime and home equity | • Lefler Decl., ¶ 23, Ex. 22 at 426 (Transcript of CFC Analyst Meeting held on May 24, 2005, at 13). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 139 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| volume.  In fact, as I mentioned we believe that Countrywide today is the largest originator or non-conforming loans in the country." | |
| 128. The transcript of the Earnings Call for Q4 2006 held on January 30, 2007, quotes Mr. Sambol as stating that the "liberal credit environment over the last several years" was "going to contribute . . . to continued pressure on delinquencies and defaults." | • Lefler Decl. ¶ 89, Ex. 88 at 1453 (Transcript of CFC Earnings Call held on January 30, 2007, at 27). |
| 129. Countrywide's Form 8-K, filed March 12, 2007, quotes Mr. Sambol as stating, "The nonprime lending industry is currently experiencing significant volatility and instability," Sambol continued. "As a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question.  Aggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults. Furthermore, as a result of investor concerns about nonprime loan performance, | • Lefler Decl. ¶ 225, Ex. 222 at 2683 (CFC's Form 8-K filed March 12, 2007, Exhibit 99.1 (February 2007 Operational Report)). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 140 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| yield requirements have increased and secondary market liquidity has been reduced. These factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve." | |
| 130. In response to Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, analysts from Keefe Bruyette & Woods observed that "[i]n the press release, President and COO David Sambol sounded a warning on the continued deterioration of the mortgage market. The softening housing market continues to drive higher delinquencies and defaults, while interest rates, price competition in lending, and secondary market volatility have all increased, according to Sambol." | • Lefler Decl. ¶ 226, Ex. 223 at 2685 (Frederick Cannon, "CFC June Data: Production Sound, but Credit Warning Sounded," Keefe, Bruyette & Woods, July 16, 2007, at 2). |
| 131. In response to Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, Stifel Nicolaus analysts stated, "we believe COO David Sambol crystalized our concerns in yesterday's June operating data press release, stating, | • Lefler Decl. ¶ 227, Ex. 224 at 2686 (Chris Brendler, "Countrywide Financial Corporation – Lowering Estimates on Rekindled Industry Concerns," Stifel Nicolaus, July |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 141 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 'Market conditions became increasingly challenging throughout the second quarter of 2007.  The housing market continues to soften and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending market, and secondary market volatility have all increased.'" | 17, 2007, at 1). |
| 132. Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, quotes Mr. Sambol as stating, "Market conditions became increasingly challenging throughout the second quarter of 2007," and that "[t]he housing market continues to soften, and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending markets and secondary market volatility have all increased." | • Lefler Decl. ¶ 228, Ex. 225 at 2689 (CFC's Form 8-K filed July 16, 2007, Exhibit 99.1 (June 2007 Operational Report)). |
| 133. At the May 24, 2005 Investor Day Conference, Mr. Sambol disclosed that "certain other loans being offered today, such as interest-only product, pay-option ARMS and other short-term ARMS, have received significant press lately and have | • Lefler Decl. ¶ 23, Ex. 22 at 428 (Transcript of CFC Analyst Meeting held on May 24, 2005, at 13). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 142 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| been the subject of questions that we have been receiving from you.  What's important for us to emphasize, that while it is the case, that some of the products offered today carry higher credit risk than traditional GSE, 30 year fixed-rate loan.  These risks are mitigated or addressed in part by the different underwriting criteria which are applied to these loans relative to those used for traditional fixed-rate agency product such as maybe higher credit scores or lower loan to value ratios, and also importantly, the paradigm in the mortgage market today and with Countrywide in particular, is that the increased risk is priced for in a very granular way.  And as I mentioned the secondary markets have become increasingly sophisticated and proficient.  They are pricing different credit risks, which in turn flows down into the pricing that is offered to consumers." | |
| 134. John McMurray executed Sarbanes-Oxley certifications for each of Countrywide's periodic filings for 2006, in which he certified that he was "not aware of any untrue statement of material fact in the | • Lefler Decl. ¶ 229, Ex. 226 at 2690 (John McMurray's Senior Executive Officer's Certification for the Quarterly Report on Form 10-Q for the quarter ended |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 143 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| Report or omission of a material fact that is necessary to make the statements that are contained in the Report in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Report," and that "[t]o the best of [his] knowledge, the financial statements and other information provided to the Accounting Department for the segment(s) of the Company for which [he was] responsible fairly present, in all material respects, the results of operations for the segment(s) as of, and for, the periods presented in the Report." | March 31, 2006); <br>• Lefler Decl. ¶ 230, Ex. 227 (John McMurray's Senior Executive Officer's Certification for the Quarterly Report on Form 10-Q for the quarter ended June 30, 2006); <br>• Lefler Decl. ¶ 231, Ex. 228 (John McMurray's Senior Executive Officer's Certification for the Quarterly Report on Form 10-Q for the quarter ended September 30, 2006); <br>• Lefler Decl. ¶ 232, Ex. 229 (John McMurray's Senior Executive Officer's Certification for the Annual Report on Form 10-K for the year ended December 31, 2006). |
| 135. John McMurray executed Divisional Officer certifications for the MD&A disclosure templates for each of Countrywide's periodic filings for 2006, in which he certified that he was "not aware of any material misstatements or omissions in | • Lefler Decl. ¶ 233, Ex. 230 (John McMurray's Divisional Officer's Certificate for the MD&A Disclosure Template for the quarter ended March 31, 2006); |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 144 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| the internal financial statements of the subsidiary(ies) and/or segment(s) of Countrywide Financial Corporation (the 'Company') for which [he was] responsible" and that "[t]o the best of [his] knowledge and belief, [he] has made no intentionally false or misleading statements, entries or omissions in connection with [his] activities or the activities of the subsidiary(ies) and/or segment(s) of the Company for which [he was] responsible or in information provided to the Accounting Department, including the information set forth in the Disclosure Template." | • Lefler Decl. ¶ 234, Ex. 231 (John McMurray's Divisional Officer's Certificate for the MD&A Disclosure Template for the quarter ended June 30, 2006);<br><br>• Lefler Decl. ¶ 235, Ex. 232 (John McMurray's Divisional Officer's Certificate for the MD&A Disclosure Template for the quarter ended September 30, 2006);<br><br>• Lefler Decl. ¶ 236, Ex. 233 (John McMurray's Divisional Officer's Certificate for the MD&A Disclosure Template for the Annual Report on Form 10-K for the year ended December 31, 2006). |
| 136. During his investigative testimony before the SEC, the SEC asked Mr. McMurray whether he had qualified his certifications, and Mr. McMurray responded in the negative: "You know, I don't know that I would use that word…. [T]hese were issues that I wanted to be sure | • Lefler Decl. ¶ 237, Ex. 234 (McMurray SEC Inv. Tr., 909:7-17; 912:23-913:5 (Feb. 11, 2009)). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 145 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| to have Tom [Saletta] see as I sent this over to him."  Mr. McMurray further testified that, after talking with Ms. McCallion after the decision had been made not to include any of the discussion contained in his email, he was "comfortable." | |
| 137. Anne McCallion testified that she had "no belief that [Mr. McMurray] was qualifying his certification" and that he had agreed that the items in his email were "not a big enough deal" to be included in the 10-Q.  McCallion further testified that it was her decision not to make any such disclosures. | • Lefler Decl. ¶ 18, Ex. 17 (McCallion SEC Depo. Tr., 127:12-128:9; 141:15-16; 271:5-6 (May 6, 2010)). |
| 138. Gregory Hendry testified that he had primary responsibility for drafting, reviewing and finalizing Countrywide's periodic filings, and that he did not recall any instance in which Mr. Sambol overruled any of Mr. McMurray's proposed credit risk disclosures. | • Lefler Decl. ¶ 238, Ex. 235 (Hendry SEC Depo. Tr., 155:20-23; 158:22-159:3 (July 26, 2010)). |
| 139. Exceptions to underwriting guidelines and mitigating risk through pricing were standard in the mortgage industry. | • Lefler Decl. ¶ 239, Ex. 236 (Rossi SEC Depo. Tr., 301:16-25; 333:3-5; 333:21-334:1 (Feb. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 146 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 24, 2010));<br><br>• Lefler Decl. ¶ 16, Ex. 15 (McMurray SEC Depo. Tr., 289:12-290:9 (July 7, 2010)). |
| 140. The SEC's mortgage industry expert, Michael LaCour-Little, testified that exceptions do not inherently increase the risk of a particular loan or loan portfolio and that a loan portfolio having a higher average FICO score and a higher exception rate (even as high as 50%) would nevertheless have a lower credit risk profile than a portfolio with a lower average FICO score and a zero exception rate (all else being equal). | • Lefler Decl. ¶ 93, Ex. 92 (LaCour-Little SEC Depo. Tr., 97:7-100:14 (July 28, 2010)). |
| 141. A PowerPoint slide accompanying the March 30, 2004 investor presentation stated that Countrywide's "[e]xception pricing system" was one of its "Loan Production Growth Strategies." | • Lefler Decl. ¶ 240, Ex. 237 (CFC Investor Presentation held March 30, 2004, at 19). |
| 142. Frank Aguilera, Countrywide's Senior Vice President and Product Manager of Subprime Mortgages during the relevant time period, testified that Countrywide's | • Lefler Decl. ¶ 241, Ex. 238 (Aguilera SEC Inv. Depo. Tr., 15:23-16:1; 78:11-14 (Aug. 21, 2008)). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 147 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| policies and practices for making exception loans were "a regular topic that came up at every conference or almost every discussion." | |
| 143. The transcript from a May 24, 2005 Investor Day Conference quotes Mr. Sambol as stating that Countrywide enjoyed, "a significant advantage with respect to handling exception[s]. We have the ability to identify exceptions and we have the pricing (inaudible) specification." | • Lefler Decl. ¶ 23, Ex. 22 (Transcript of CFC Analyst Meeting held on May 24, 2005, at 23). |
| 144. John McMurray's May 22, 2005 email to Mr. Sambol regarding  "Your speech / Exceptions / SLDs" does not mention pay-option loans or adjustable rate products. | • Lefler Decl. ¶ 242, Ex. 239 (May 22, 2005 email from John McMurray to David Sambol). |
| 145. Intentionally Omitted | |
| 146. The transcript of a September 13, 2006 investor conference quotes Mr. Sambol as stating that at that time subprime represented "less than 10% of our total production.  Looking ahead, and that is not to say that subprime is not an important part of our menu…we remain committed to | • Lefler Decl. ¶ 77, Ex. 76 (Transcript of CFC Fixed Income Investor Forum held on September 13, 2006, at 24). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 148 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| having a subprime presence.  But, there are no particular plans to accelerate growth. And I think that would characterize our current posture as remaining on the sidelines, waiting for the market to rationalize somewhat." | |
| 147. PowerPoint slides from a presentation given on September 6, 2006, show that Countrywide disclosed that it was the nation's third largest originator of subprime residential mortgage products. | • Lefler Decl. ¶ 243, Ex. 240 (PowerPoint Presentation from t CFC Subprime Residential Mortgage Lending Presentation given September 2006, at 9). |
| 148. At the American Financial Services Association Finance Industry Conference for Fixed Income Investors held on May 17, 2006, Countrywide disclosed that "[w]e were number three in sub-prime originations, we were number four last year in home equity originations." | • Lefler Decl. ¶ 244, Ex. 241 (Transcript from American Financial Services Association Finance Industry Conference for Fixed Income Investors held on May 17, 2006, at 8). |
| 149. PowerPoint slides from a presentation given on June 7, 2006, show that Countrywide disclosed that it was the nation's third largest originator of subprime residential mortgage products. | • Lefler Decl. ¶ 245, Ex. 242 (PowerPoint Presentation from CFC Subprime Residential Mortgage Lending Presentation given on June 7, 2006, at 9). |
| 150. Chris Brendler, a research analyst | • Lefler Decl. ¶ 116, Ex. 115 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 149 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| following Countrywide, testified that he initiated coverage in part because he understood that "Countrywide was consistently one of the top five originators of subprime loans"; he further understood that in January 2006, Countrywide was a "top player" by marketshare in the subprime market and that throughout the relevant period, while subprime loans were a "small portion" of Countrywide's overall volume, Countrywide was "one of the leading originators of subprime loans." | (Brendler SEC Depo. Tr., 20:9-21; 84:20-24; 130:1-14 (June 25, 2010)). |
| 151. Numerous research analysts following Countrywide understood Countrywide's position as a leading originator of subprime loans throughout the SEC's alleged relevant period. | • Lefler Decl. ¶ 29, Ex. 28 (Hesser SEC Depo. Tr., 164:19 – 165:14 (June 9, 2010));<br><br>• Lefler Decl. ¶ 246, Ex. 243 (Robert G. Hottensen, "Countrywide Financial: Business Momentum Excellent, Raising '03 Estimates," Goldman Saches, Nov. 10, 2003, at 1);<br><br>• Lefler Decl. ¶ 247, Ex. 244 (Joel Houck, "CFC: Downgrading to Underperform from Market |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 150 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Perform," Wachovia Securities, Feb. 10, 2004, at 3); |
| | • Lefler Decl. ¶ 248, Ex. 245 (Jim Shanahan, "CFC: Transferring Research Coverage with a Market Perform Rating," March 18, 2004, at 1); |
| | • Lefler Decl. ¶ 249, Ex. 246 (Mike McMahon, "Countrywide Financial Corporation, Good Numbers and Trends Reported for July," Sandler O'Neil Equity Research, Aug. 10, 2004, at 1); |
| | • Lefler Decl. ¶ 250, Ex. 247 (Bruce Hartin, "CFC: Operational Data and 10-Q Review," Lehman Brothers, Nov. 9, 2004, at 2); |
| | • Lefler Decl. ¶ 38, Ex. 37 (Traci Hallett, "Countrywide's 2Q05 Earnings Warning: Are the Credit Risks Growing?" BNP Paribas, July 15, 2005, at 2-3); |
| | • Lefler Decl. ¶ 251, Ex. 248 (Robert Lacoursiere, "Potential |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 151 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Growth Trap?; Initiating Coverage with a Neutral Rating," Banc of America Securities, July 18, 2005, at 5); |
| | • Lefler Decl. ¶ 252, Ex. 249 (Guy D. Cocala, "Servicing Market Continues to Consolidate In 2005, But Distinct Trends Are Emerging," Inside Mortgage Finance, Aug. 5, 2005, at 3); |
| | • Lefler Decl. ¶ 253, Ex. 250 (Guy D. Cocala, "Ameriquest and IndyMac Tops in Hottest Mortgage Productions Sectors in Early 2005," Inside Mortgage Finance, Sept. 16, 2005, at 8). |

**D.   ADDITIONAL FACTS IN SUPPORT OF SEPARATE SUBMISSION OF SIERACKI**

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 152. Eric Sieracki served as Chief Financial Officer of Countrywide Financial Corporation from April 1, 2005 until it was acquired by Bank of America in July 2008. | • Declaration Of Eric P. Sieracki In Support Of Motion For Summary Judgment Or Summary Adjudication |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                    - 152 -                    STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | ("Sieracki Decl.") ¶ 4. |
| 153. As CFO, Sieracki headed the Finance Department, which produced Countrywide's financial statements reported in the 10-Ks and on a quarterly basis in the 10-Qs and press releases. | • Sieracki Decl. ¶ 8. |
| 154. The SEC admits Sieracki had no operating responsibilities regarding loan production or loan sales. | • Lefler Decl, ¶ 113, Ex. 112 (Plaintiff Securities and Exchange Commission's Responses to Defendant Eric Sieracki's First Set of Requests for Admissions) ("SEC Response to RFAs") at 33:10-22, Response to Request for Admission No. 50. |
| 155. During Sieracki's tenure as CFO, he did not have any operational responsibilities for, or expertise in, the mortgage loan production units or in Secondary Marketing, which sold the loans originated by Countrywide. | • Sieracki Decl. ¶ 9. |
| 156. Sieracki relied upon the executives in mortgage banking business segment to classify loans as "prime," "subprime" and | • Sieracki Decl. ¶ 9. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 153 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| "nonprime." | |
| 157. Sieracki was aware that Countrywide sold typically well over 90% of the loans it originated to the secondary market, and that the Company's loan origination standards reflected the criteria of secondary market investors. | • Sieracki Decl. ¶10.<br>• Lefler Decl., ¶ 5, Ex. 4 (2006 10-K) at 101 ("Nearly all of the mortgage loans that we originate or purchase in our Mortgage Banking and Capital Markets Segments are sold into the secondary mortgage market primarily in the form of securities, and to a lesser extent as whole loans."). |
| 158. The SEC admits in its contention interrogatory responses that the only statements it challenges and attributes to Sieracki are contained in 10-Ks he signed for Fiscal Years 2005 and 2006. | • Lefler Decl, ¶ 255, Ex. 252, (Plaintiff Securities and Exchange Commission's Responses to Defendant Eric P. Sieracki's First Set of Interrogatories) ("SEC Responses to Interrogatories") Nos. 1, 3 at 6:6-17, 18:4-12.[2] |
| 159. Countrywide was a large and complex company and had a detailed process for preparing the 10-Ks. | • Sieracki Decl. ¶¶ 9, 28-41.<br>• Lefler Decl., ¶ 278, Ex. 275 (Transcript of July 11, 2010 |

---

[2] As explained in the Joint Brief, the SEC abandoned its claim based upon the 2007 10-K.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 154 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Deposition of Julie Scammahorn) at 66:11-20 ("Countrywide's disclosure process was tightly monitored, comprehensive and designed to ensure that the Company's representations to investors were accurate."). |
| 160. The process of preparing the 10-K's involved the Legal Department. | • Sieracki Decl. ¶¶ 14, 25-27, 30, 34, 35, 38.<br>• Lefler Decl., ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 62:14-63:16 (Udovic, an in-house attorney, chaired Disclosure Committee), *id.* at 65:13-25 (in-house attorney Bow also involved in disclosure process), *id.* at 95:7-19 (Legal Department made itself available to consult with Hendry regarding the periodic reports), *id.* at 99:2-14 (SEC Lawyer, Udovic, to review Board and Board Committee minutes in discharge of duties), *id.* at 108:8-11 ("And |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 155 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | as we have discussed, the legal department, they received all of the drafts all the way up to completion, but they were very involved also in the drafting of the report."). |
| | • Lefler Decl., ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006) at 5 ("In addition, the SEC Lawyer shall . . . consult with other members of the Legal Division to determine whether changes or additions to the information in the draft Report are necessary based upon events that occurred during or subsequent to the applicable reporting period."); *id.* ("[The senior officer in the Accounting Division] shall consult freely with the Legal Department and the Company's outside accountants, as necessary, to |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                     - 156 -                    STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | obtain guidance and clarification on the specific legal and accounting requirements."); <br> • Lefler Decl., ¶ 219, Ex. 216 (Transcript of July 16, 2010 Deposition of Susan Bow) at 35:17-22 (Udovic and Samuels reviewed every periodic filing before it was filed); 51:1-2 ("[Legal] would review every redraft until it was filed."), *id.* at 35:3-36:9, 170:12-171:8 (Mr. Hendry was "directed by the controls and procedures to consult freely with . . . the legal department."  Udovic was assigned to respond to questions concerning disclosures); 183:23-184:6 (Mr. Udovic consulted with legal staff sitting in other committees); <br> • Lefler Decl. ¶ 277, Ex. 274 (Transcript of June 25, 2010 Deposition of Lisa Riordan) at 38:17-21 (Disclosure Committee was managed by the legal |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 157 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | department);<br>• Lefler Decl. ¶ 257, Ex. 254 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of December 2005, at 5). |
| 161. The process of preparing the 10-K's involved the Finance Department. | • Sieracki Decl. ¶¶ 31-33;<br>• Lefler Decl., ¶ 276, Ex. 273 (Transcript of June 30, 2010 Deposition of Laura Milleman) at 81:10-82:7, 186:2-6 (filings were subject to several layers of – levels of review within finance). |
| 162. The process of preparing the 10-K's involved outside auditors and the Audit Committee. | • Sieracki Decl. ¶¶ 37-38;<br>• Lefler Decl., ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006, at 6) (requiring Accounting Division to distribute draft of 10-Q and 10-K to "the outside auditors" and to distribute draft |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 158 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | of 10-K to "the Audit and Ethics Committee"); |
| | • Lefler Decl. ¶ 18, Ex. 17, (McCallion SEC Depo. Tr. 126:25 – 128:3 (May 6, 2010) at 107:18-21 (Hendry, Milleman and McCallion discussed potential disclosure items with KPMG), *id.* at 108:7-11 (draft of SEC filing "was circulated to the external auditors"). |
| | • Lefler Decl., ¶ , Ex.  (Transcript of June 23, 2010 Deposition of John R. Taylor) ("Taylor Tr.") at 46:18-47:8 (for a filing, KPMG received drafts and "tried to consolidate [their] comments" as drafts were exchanged and that "it was an iterative process"); 52:23-54:5 (KPMG would meet with the Audit and Ethics Committee regarding filings and "we would go through the process of reading drafts, exchanging comments with the company"). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 159 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 163. The process of preparing the 10-K's involved the Board of Directors. | • Sieracki Decl. ¶ 37;<br>• Lefler Decl. ¶ 256, Ex. 253 (SEC Deposition Exhibit 608 ) (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006) at 6. |
| 164. The business units and credit risk function were solicited for information to be considered for inclusion in the 10-Ks, and their senior managers were required to review and edit the 10-Ks. | • Sieracki Decl. ¶ 31;<br>• Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006)) at 4 ("[T]he [Chief Accounting Officer] and members of her staff shall seek input from, and discuss with, the Divisional Officers information pertaining to the past and current performance and prospects for their business unit, known trends and uncertainties related to the business unit, significant risks and contingencies that may affect the business unit, any |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 160 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | changes that might have taken place in their methods of collecting, reporting or analyzing financial data and any other information needed to complete the Release and/or Report."); <br> • Lefler Decl. ¶ 219, Ex. 216 (Transcript of July 16, 2010 Deposition of Susan Bow) at 19:24-20:3 ("The head of the division, as well as the head of the accounting for that division, would be given a questionnaire that [] ask[ed] them questions about the disclosure."). |
| 165. The process culminated in senior business unit managers and executive management, and Legal, certifying that they were not aware of any false or misleading statements in the filing. | • Sieracki Decl. ¶¶ 35-36; <br> • *See, e.g.*, Lefler Decl. ¶ 282, Ex. 279 (SEC Deposition Exhibit 234) (The certifications attested to the facts that the certifier reviewed the document, that the certifier was not aware of any material misstatement or omissions in the internal financial statements of the portion of the company for |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 161 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | which he or she was responsible, and that the certifier, to the best of his or her knowledge and belief did not make any intentionally false or misleading statements, entries or omissions in the activities for the portion of the company for which he or she was responsible or in the information provided to the Accounting Department).<br>• Lefler Decl., ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 108:24-109:13;<br>• Lefler Decl., ¶ 219, Ex. 216 (Transcript of July 16, 2010 Deposition of Susan Bow) at 21:10-12 ("So at the end of all of that, once everyone had signed off and given their clearance, we would be prepared to file"); 62:25-63:7 (a form 10-Q or form 10-K would not be filed if anyone failed to submit a certification for that filing. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                                                    - 162 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | "[Certification] was required as part of [their] process."). |
| 166. If a certifier had any issues with a draft, he or she was required to withhold certifying the filing until they were resolved such that he or she could certify the filing. | • Sieracki Decl. ¶ 36;<br>• Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006, at 7) ("The certification shall be signed by the President, each Executive Managing Director (other than the CFO) and each SMD Certifier following his or her review of the Report and satisfaction of any significant concerns raised by him or her during the review process and prior to the filing with the SEC of the related periodic report.");<br>• Lefler Decl. ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 113:23-114:16;<br>• Lefler Decl. ¶ 94, Ex. 93 at __ (Transcript of June 3, 2010 Deposition of Kevin Bartlett) at |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 163 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | 103:10-14 ("Q: And you understood that if there was an inaccuracy in the portion of the report that you read that you were supposed to point it out; is that fair? A: That's correct."); *id.* at 103:15-20 ("Q: And is it also fair to say that if you read something, even in a part of the report that wasn't your part, that you thought was wrong, you understood that you had an obligation to speak up and say – say something? A: I believe so."); *id.* at 103:21-104:1 ("And is it fair to say as well that if anybody in your organization, somebody who worked for you, had an issue with the disclosures and they raised that issue with you, you would have taken steps to make sure that the issue was addressed?  A: That's correct."); *id.* at 104:4-9 ("Q: [I]f there was some important fact that you thought needed to be disclosed |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 164 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | that wasn't in the quarterly filing, you understood that you were supposed to raise your hand in that circumstance, too; correct? A: That's correct."); <br><br> • Lefler Decl. ¶ 98, Ex. 97 (Transcript of June 29, 2010 Deposition of Carlos Garcia) at 82:7-18 ("Q: In the periods where you provided certifications, did you have an understanding that if you reached the conclusion that there was something inaccurate in the portions of the – of the periodic filing that you had read, that you were supposed to say something? A: Yes.  Q: Okay.  And you - would you have done that if that had happened? A: Yes. Q: Do you recall that happening? A: No."); *id. at*  82:19-83:10 ("Q: if one of your subordinates had come to you and said he or she thought there was something inaccurate in one of the periodic |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 165 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | filings or in one of the drafts of the periodic filings, would you have done anything about it? A: Yes.  Q: What would you have done? A: I would have made sure I understood what they were saying.  I would have made sure they conveyed it directly to the holding company, to the – you know, the CFO and the legal department.  My subordinates, if I recall correctly, were also, you know, signing subcertifications.  If they weren't signing technically subcertifications, they were signing something, because they were part of the process.  Their review was required, and they had direct communication with the CFO and the CFO's organization.");
• Lefler Decl. ¶ 275, Ex. 252 (Transcript of July 14, 2010 Deposition of Jim Furash) at 68:21-25 ("Q.  And if you had any concerns about the accuracy |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 166 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | of the statements of concerns that there were any misleading statements in the financials, would you have marked 'true without exception'?  A.  No."); <br><br> • Lefler Decl. ¶ 276, Ex. 273 (Transcript of June 30, 2010 Deposition of Laura Milleman) at 100:2-6 ("Everybody has a choice of whether they agree or not.  And I would expect the reason we gave them the opportunity to disagree is to get it on the table that they disagreed so we could talk to them and see what we needed to do." ). |
|    167. Sieracki observed that Legal was integrally involved in the disclosure process and knew it was responsible for obtaining certifications. | • Sieracki Decl. ¶¶ 14, 16-17, 25-27, 35, 38, 40. |
|    168. Sieracki would not and did not sign the 10-Ks until Legal presented him with the final SEC report for filing, and represented that all certifications had been received. | • Sieracki Decl. ¶40. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 167 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 169. Sieracki no Countrywide stock during his tenure as CFO. | • Sieracki Decl. ¶ 6. |
| 170. On May 26, 2005, Sieracki acquired common stock by exercising stock options. | • Sieracki Decl. ¶ 6;<br>• Lefler Decl. ¶ 258, Ex. 255 (Form 4 filed May 27, 2005). |
| 171. On May 26, 2005, Sieracki acquired common stock by exercising stock options. | • Sieracki Decl. ¶ 6;<br>• Lefler Decl. ¶ 259, Ex. 256 (Form 4 filed July 11, 2006). |
| 172. On May 31, 2007, Sieracki acquired common stock by exercising stock options. | • Sieracki Decl. ¶ 6;<br>• Lefler Decl. ¶ 260, Ex. 257 (Form 4 filed May 31, 2007). |
| 173. Sieracki paid tax upon these option exercises, based on the imputed "profit" he would have earned had he immediately sold the acquired shares on the open market (the difference between the market price and the exercise price). | • Sieracki Decl. ¶ 6. |
| 174. On May 26, 2005, Countrywide common stock closed at $36.65 per share. | • Lefler Decl. ¶ 261, Ex. 258 (Historical Stock Price Table). |
| 175. On July 11, 2006, Countrywide common stock closed at $38.08 per share. | • Lefler Decl. ¶ 261, Ex. 258 (Historical Stock Price Table). |
| 176. On May 31, 2007, Countrywide common stock closed at $38.94 per share. | • Lefler Decl. ¶ 261, Ex. 258 (Historical Stock Price Table). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 168 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 177. On May 31, 2007, Countrywide common stock closed at $38.94 per share. | <u>May 26, 2005</u><br>10,006 shares * ($36.65-$6.29) = $303,782.16<br><br>6,352 shares * (36.65-5.84) = $195,705.12<br><br>20,002 shares * ($36.65-$4.64) = $640,264.02<br><br><u>July 11, 2006</u><br>60,000 shares * ($38.08-$5.80) = $1,936,800.00<br><br><u>May 31, 2007</u><br>16,708 shares * ($38.94-$6.77) = $537,496.36<br><br><u>TOTAL</u>: $3,614,047.66 |
| 178. As of May 31, 2007, Sieracki owned almost 600,000 shares of common stock and vested options. | • Sieracki Decl. ¶ 7. |
| 179. The last publicly reported price for Countrywide stock was $4.25. | • Lefler Decl. ¶ 261, Ex. 258 (Historical Stock Price Table). |
| 180. By holding onto his shares as Countrywide and the industry's fortunes declined , Sieracki experienced a loss in value of approximately $20 million. | 600,000 shares * ($38.940-$4.25) = 600,000 * $34.69 = $20,814,000. |
| 181. The SEC Response points to a single document in support of Sieracki's supposed scienter; the minutes of a June 28, | • Lefler Decl. ¶ 255, Ex. 252 (SEC Responses to Defendant Eric P. Sieracki's First Set of |

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 2005 Corporate Credit Risk Committee meeting. | Interrogatories), Response to Interrogatory No. 2, at 7:18-8:6. |
| 182. The June 28, 2005 minutes state that the percentage of subprime loans had increased, but the 10-Ks disclosed the percentage of subprime loans. | • Lefler Decl. ¶ 11, Ex. 10 (2005 10-K) at 2. |
| 183. Mr. Kurland certified the 2005 Form 10-K as not false or misleading. | • Lefler Decl. ¶ 262, Ex. 259 (February 13, 2006 Executive Officer's Certification, CFCP002211946). |
| 184. According to the minutes of the June 22, 2006 CRC meeting cited by Plaintiff, Mr. Rossi stated that "[t]he Bank's overall credit quality had been very high and in line with model expectations" and the Chief Risk Officer, John McMurray, "reviewed the Credit Policy–Credit Exposure Limits for Q1 2006, reporting that all exposures were well within tolerance." | • Lefler Decl. ¶ 263, Ex. 260 (SEC Deposition Exhibit 26) at 1, CFC2007C006790; at 5, CFC2007C006794. |
| 185. In the April 13, 2006 email from Mr. Mozilo cited by the SEC, Mr. Mozilo directed the heads of loan production and credit risk management (David Sambol and | • Lefler Decl. ¶ 264, Ex. 261 (SEC Investigation Exhibit 92); Sieracki Decl. ¶ 54. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 170 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| Mr. McMurray) to address arising from HSBC, and it was reasonable for Sieracki to believe they would. | |
| 186. The December 7, 2006 memorandum from Mr. Mozilo which discussed comments made in a Wall Street Journal article about subprime loans stated that loans originated in 2006 had performed better than the industry average, but worse than loans originated in prior years. | • Lefler Decl. ¶ 265, Ex. 262 (SEC Deposition Exhibit 148) at 2, CFC2007829059. |
| 187. At Countrywide, subprime loans represented only 9% to 10% of originations. | • *See, e.g.*, Lefler Decl. ¶ 11, Ex. 10 (2005 10-K) at 2. |
| 188. The 2006 10-K disclosed: "a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006." | • Lefler Decl. ¶ 5, Ex. 4 (2006 10-K) at 126. |
| 189. The December 7, 2006 memorandum also reported that "product introductions and guidelines have not been implemented indiscriminately." | • Lefler Decl. ¶ 265, Ex. 262 (SEC Deposition Exhibit 148) at 4, CFC2007829061. |
| 190. The December 7, 2006 memorandum set forth numerous steps undertaken by Countrywide to manage | • Lefler Decl., ¶ 5, Ex. 4 (SEC Deposition Exhibit 148) at 4-6, CFC2007829061-63. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 171 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| guidelines and risk. | |
| 191. Emails from Mr. Mozilo on which Mr. Sieracki was copied regarding pay-option loans, or HSBC, did not inform Sieracki that Countrywide's loan origination standards or practices were different than as described in the 10-Ks. Rather, they informed him that the CEO was asking appropriate executives to devote attention to business matters of concern. | • Sieracki Decl. ¶¶ 52-54. |
| 192. In response to a question regarding credit expenses for the upcoming year 2007, Mr. McMurray opined that loan delinquencies would increase. | • Sieracki Decl. ¶ 43;<br>• Lefler Decl. ¶ 266, Ex. 263 (SEC Investigation Exhibit. 245 (January 2, 2007 E-mail from McMurray, JPM001054 - JPM001058)). |
| 193. Countrywide's January 30, 2007 press release announcing Fourth Quarter 2006 results stated that the Company was "preparing for increased borrower delinquencies and continued credit deterioration" and that the industry "will experience…increased defaults and foreclosures…" | • Sieracki Decl. ¶ 44.<br>• Lefler Decl., ¶ , Ex. __ (January 30, 2007 Press Release, downloaded from SEC website, at 2, 12). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 172 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 194. In the quarterly conference call on January 30, 2007, in response to a question whether Countrywide's guidance for 2007 "reflect your expectations for increase delinquencies and continued credit deterioration," Sieracki said that it did: "…we also expect this loan season—which we expect the portfolio to season during '07—that delinquencies will go up.  And so that's typically baked into our probability models as well." | • Lefler Decl., ¶ 89, Ex. 88 (Transcript of Countrywide Financial  Corp., Q4 2006 Earnings Call) at 27-28, CFCNYF00019449-50. |
| 195. In the quarterly conference call on January 30, 2007, Sambol disclosed:  "for the most part a liberal credit environment over the last several years all of which is now–as rates are going up, as credit is tightening, is going to contribute in our view to continued pressure on delinquencies and defaults and associated credit risk." | • Lefler Decl., ¶ 89, Ex. 88 (Transcript of Countrywide Financial Corp., Q4 2006 Earnings Call) at 27, CFCNYF00019449. |
| 196. The 2006 10-K, as filed on March 1, said that Countrywide expected delinquencies to increase for many reasons, including under the headings, ***"We may experience credit losses due to downward*** | • Lefler Decl. ¶ 5, Ex. 4 (2006 10-K) at 36-37, 108. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 173 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| *trends in the economy and in the real estate market,*" and "*Impact of Decline in Credit Performance.*" | |
| 197. The 2006 10-K stated that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency." | • Lefler Decl., ¶ 5, Ex. 4 (2006 10-K) at 114. |
| 198. Sieracki knew that the general expansion of guidelines already was well-known via the massive public disclosures about Countrywide and the industry (including disclosures from McMurray). | • Sieracki Decl. ¶¶ 11-13. |
| 199. Sieracki signed registration statements for Countrywide subsidiaries that issued mortgage-backed securities.   He believed that the prospectus supplements for these securitizations, which were filed with the SEC, were accessible to Countrywide investors. | • Sieracki Decl. ¶ 12. |
| 200. The written Disclosure Controls and Procedures designated Michael Udovic as the SEC Lawyer responsible for many elements of the disclosure process. | • Lefler Decl. ¶ 113, Ex. 112 (Plaintiff Securities and Exchange Commission's Supplemental Responses to Defendant Eric Sieracki's First |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 174 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
|  | Set of Requests for Admissions) at 3:6-10, Response to Request for Admission No. 17 (Udovic was SEC Lawyer);<br><br>• Lefler Decl. ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 69:12-21 (Udovic was SEC Lawyer), *id.* at 63:22-64:16 (Udovic had responsibilities of disclosure and compliance with regulation), *id.* at 17 (Udovic assisted officers and employees in understanding that the disclosures must contain all material information necessary to make the statements, in light of the circumstances under which they were made, not misleading and that disclosures including financial information must provide a fair presentation of the Company's financial position and results);<br><br>• *See, e.g.,* Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 175 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| | Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006, at 5). |
| 201. At the same time Udovic was reviewing the draft 2005 10-K, he expressly informed Sieracki that detailed information about Countrywide's loans and loan standards had been and was being made publicly available through presentations to investors, never advised Sieracki that this type of information was required to be in the 10-K. | • Siearcki Decl. ¶¶ 18-20;<br>• Lefler Decl. ¶ 268, Ex. 265 (including February 8, 2006 email from Udovic to Sieracki *et al.* attaching, *inter alia,* presentation on "Countrywide's Pay-Option ARM," CFCP000036912-48). |
| 202. No lawyer within Countrywide, including the Company's chief lawyer, Sandor Samuels (whose name appeared on the cover of many of the registration statements) and the General Counsel, Susan Bow (who served on the Disclosure Committee with Udovic and Sieracki) ever advised Sieracki that this type of information was required to be in the 10-K. | • Sieracki Decl. ¶ 21. |
| 203. Sandor Samuels is listed as the Chief Legal Officer for Countrywide on the cover of S-3 Registration Statements signed | • *See, e.g.*, Lefler Decl., ¶ 270, Ex. 267 (Form S-3 filed July 21, 2005), Ex. ____ (Form S-3/A, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 176 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| by Sieracki. | filed March 2, 2007). |
| 204. In February 2007, the Chief Accounting Officer, Laura Milleman, informed Sieracki that the reporting group was working on incorporating McMurray's suggestions into the 10-K. | • Lefler Decl. ¶ _, Ex. __ (February 2007 Memorandum from Laurie Milleman to David Sambol, Eric Sieracki and Kevin Bartlett, CFCP006729924 - CFCP006729925). |
| 205. Milleman and her supervisor, Anne McCallion, told Sieracki that edits had been proposed to a section for which McMurray had previously provided language. Sieracki reported this to McMurray, and noted that there was time to discuss it if he thought the text needed to be included. | • Sieracki Decl. ¶ 45. |
| 206. McMurray did <u>not</u> object to the editing of the text, even as he continued to make suggestions regarding other portions of the draft 10-K. | • Sieracki Decl. ¶ 45;<br>• Lefler Decl. ¶ _, Ex. __ (February 26, 2007 E-mail from John McMurray to Eric Sieracki, Anne McCallion and Laurie Milleman, CFC2007A476997);<br>• Lefler Decl. ¶ _, Ex. __ (referencing February 27, 2007 E-mail from Anne McCallion to Stephen Thompson, at CFCP004106815). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 177 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence: |
|---|---|
| 207. McMurray certified the 2006 10-K as being accurate and not misleading. | • Lefler Decl. ¶ 236, Ex. 233 at __ (John McMurray's Senior Executive Officer's Certification for the Annual Report on Form 10-K for the year ended December 31, 2006). |
| 208. Milleman signed the 2006 10-K. | • Lefler Decl. ¶ 5, Ex. 4  (2006 10-K) at p. 150. |
| 209. Sieracki signed the 2006 10-K once it was presented to him by Legal with a representation that all certifiers had certified it. | • Sieracki Decl. ¶ 46. |

## II.   CONCLUSIONS OF LAW

| | |
|---|---|
| 1.     There is no evidence of any material false statement or omission with respect to the SEC's allegations pertaining to Countrywide's originate-to-distribute model because the very information the Commission claims was concealed was in fact disclosed. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515-16 (9th Cir. 1991).  Thus, Defendants are entitled to | See evidence cited in support of: UFs 1, 2, 4, 6, 7, 9-17, 19, 21, 22, 53-57, 59, 62, 63, 65, 120-123, 125-129, 132, 133, 147-149. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 178 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | |
|---|---|
| summary adjudication as to this falsity theory. | |
| 2.     Vague statements, including representations that Countrywide "manage[d] credit risk" or generated "quality" loans, are inactionable puffery as a matter of law. | See *In re Cutera Sec. Litig.*, __ F.3d ____, 2010 WL 2595281, at *5 (9th Cir. June 30, 2010) |
| 3.     A purported violation of Item 303 of Regulation S-K is not sufficient to establish a legally viable fraud claim. | *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000);  *S.E.C. v. Todd*, 2007 WL 1574756, at *6 (S.D. Cal. May 30, 2007) |
| 4.     There is no evidence of any material false statement or omission with respect to the SEC's allegations pertaining to Countrywide's pay-option portfolio because the very information the Commission claims was concealed was in fact disclosed.   Thus, Defendants are entitled to summary adjudication as to this falsity theory. | See evidence cited in support of: UFs 29-33, 36-46, 66, 67, 70-72; *See, e.g., SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, __ F. Supp. 2d ____, 2010 WL 2473595 (S.D.N.Y. June 17, 2010). |
| 5.     Countrywide's extensive disclosures about its sold loans and its pay-option portfolio are inconsistent with an actual intent to deceive and negates any inference of scienter as a matter of law. | See evidence cited in support of: UFs 1, 2, 4, 6, 7, 9-17, 19, 21, 22, 29-33, 36-46, 53-57, 59, 62, 63, 65- 67, 70-72, 120-123, 125-129, 132, 133, 147-149; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (1994); *In re First Marblehead Corp. Sec. Litig.*, |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 179 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

| | 639 F. Supp. 2d 145, 163 (D. Mass. 2009) |
|---|---|
| 6.    Mozilo and Sieracki are entitled to summary judgment of the Complaint's fourth cause of action for allegedly false financial certifications pursuant to SEC Rule 13a-14 because this rule simply creates a filing obligation that does not give rise to an independent cause of action. | *See S.E.C. v. Black*, 2008 WL 4394891, at *16-17 (N.D. Ill. Sept. 24, 2008). |
| 7.    The SEC has not sustained its burden to establish that Mr. Mozilo possessed material nonpublic information at the time each challenged trading plan was executed. *See United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (material and non-public information are required elements of claim). | See evidence in support of: UFs 1, 2, 4, 6, 7, 9-17, 19, 21, 22, 29-33, 36-46, 53-57, 59, 62, 63, 65,  66, 67, 70-72, 120-123, 125-129, 132, 133, 147-149. |
| 8.    The SEC has not sustained its burden to establish that Mr. Mozilo acted with scienter when he executed each of the challenged trading plans.  *See SEC v. MacDonald*, 699 F.2d 47, 50 (1st Cir. 1983) (SEC must prove that insider "had actual knowledge of undisclosed material information; knew it was undisclosed, and knew it was material").  Mr. Mozilo's undisputed overall conduct conclusively | See evidence in support of: UFs 75-119. |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2280153

- 180 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| negates any inference of scienter. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989) (scienter "completely dispelled by the defendants' overall pattern of conduct"). | |
| 9. The SEC has not sustained its burden to establish that Mr. Mozilo traded "on the basis of" material nonpublic information – that he actually used such information when executing each of the challenged plans. *See United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998) ("Rule 10b-5 requires . . . the SEC . . . [to] demonstrate that the suspected inside trader actually used material nonpublic information in consummating his transaction." (footnote omitted). | See evidence in support of UFs 88-90. |
| 10. Mr. Sambol's extensive disclosures are inconsistent with an actual intent to deceive and negates any inference of scienter as a matter of law. | *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (1994); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009). |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153

- 181 -

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

1   Dated:  August 2, 2010                    IRELL & MANELLA LLP

2                                             WILLIAMS & CONNOLLY LLP

3

4                                             By:  /s/
                                                   _____
5                                                  David Siegel
                                                   Attorneys for Defendant
6                                                  Angelo Mozilo

7   Dated:  August 2, 2010                    ORRICK, HERRINGTON & SUTCLIFFE
                                              LLP
8

9                                             By:  /s/
                                                   _____
10                                                 Walter F. Brown, Jr.
                                                   Attorneys for Defendant
11                                                 David Sambol

12  Dated:  August 2, 2010                    DLA PIPER LLP (US)

13

14                                            By:  /s/
                                                   _____
15                                                 Shirli Fabbri Weiss
                                                   Attorneys for Defendant
16                                                 Eric Sieracki

17

18

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2280153                              - 182 -        STATEMENT OF UNCONTROVERTED FACTS AND
                                                           CONCLUSIONS OF LAW