1   JOHN M. McCOY, III, Cal. Bar No. 166244
    Email: mccoyj@sec.gov
2   SPENCER E. BENDELL, Cal. Bar No. 181220
    Email: bendells@sec.gov
3   LYNN M. DEAN, Cal. Bar. No. 205562
    Email: deanl@sec.gov
4   SAM S. PUATHASNANON, Cal. Bar No. 198430
    Email: puathasnanons@sec.gov
5   PARIS A. WYNN, Cal. Bar No. 224418
    Email: wynnp@sec.gov
6
    Attorneys for Plaintiff
7   Securities and Exchange Commission
    Rosalind R. Tyson, Regional Director
8   Michele Wein Layne, Associate Regional Director
    5670 Wilshire Boulevard, 11th Floor
9   Los Angeles, California 90036
    Telephone: (323) 965-3998
10  Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>        Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**INVESTIGATIVE TESTIMONY RELIED UPON IN PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT: WITNESS ANGELO MOZILO**<br><br>Date:      August 30, 2010<br>Time:      1:30 p.m.<br>Place:     Courtroom 16<br>           (Hon. John F. Walter) |

Per the Court's Amended Scheduling Order, Plaintiff Securities and Exchange Commission ("the Commission"), in opposition to the Defendants' motions for summary judgment or summary adjudication, offers the following investigative testimony of Angelo Mozilo taken by the Commission on November 9, 2007, October 2, 2008 and August 20 - 21, 2008.

Page:  25:10-23 (11/9/07)

10    **Q   Okay.  Let me just unpack that a little bit.  That was helpful.  Can you identify who the executive managing directors are that attend every one of these strategic meetings?**

14    A   David Sambol, Carlos Garcia, Eric Sieracki, Kevin Bartlett. I believe one is Jack Schakett.  I believe that's it.

17    **Q   And then yourself?**

18    A   And then myself.

19    **Q   Do you attend every one of these strategic meetings?**

21    A   If I'm traveling -- I may be interrupted by a travel schedule but generally yes. They may have one when I'm gone but I'm given in advance the agenda.

Page:  49:4-50:4

49

4    **Q   Okay.  Just to call your attention to one other section on the first page.  Under number two, the heading is policy regarding material non-public information. It reads: "It is the policy of Countrywide that no covered person as**

1

8    defined below who is aware of material non-public information

9    relating to Countrywide may buy or sell securities of

10   Countrywide or engage in any other action to take advantage

11   or pass on to others that information." Were you familiar

12   with that provision?

13      A   Yes, I was.

14      Q   I think you just explained to us that you were

15   familiar generally with the notion of material non-public

16   information, correct?

17      A   Correct.

18      Q   If you look on the second page, Bates stamped

19   ending in 67, there's a definition of covered persons under

20   the number three. It's at the top of the second page.

21   Covered persons is defined here as directors, officers,

22   employees, contractors, representatives and similarly

23   situated persons of Countrywide, its subsidiaries and

24   affiliates. Do you see that?

25      A   Yes.

                                                                    50

1    Q   Did you understand that you were a covered person

2    under the terms of the Countrywide insider trading policy in

3    September of 2006?

4    A   Yes.


**Page:** 51:10-16

10      Q   Had you in fact had 10(b)(5)(1) trading

11   arrangements at Countrywide prior to September 2006?

12      A   Started in March of 2002.

2

13     Q   Did you understand that it was not permissible to

14   enter into a 10(b)(5)(1) trading plan when you were in

15   possession of material non-public information?

16     A   Yes, I did.

Page:  61:1-22

1     Q   And you had a conversation with John Connors.  Was

2   that by phone or e-mail?

3     A   My recollection is he came to the office with this

4   sheet of paper because I said I never paid attention to that

5   aspect of it because I was focusing on making sure the

6   company was okay. He came to me with a sheet of paper giving

7   me all of these options I had over the years.  This is 10

8   years later so I had not thought about it.

9        He said these are expiring now. These are expiring

10   then and you have to do something.  He came with a report

11   that listed out all my grants, the amount of those grants,

12   the strike price of those grants and the expiration date,

13   when they became vested and the expiration date of the

14   option.

15     Q   So you met with him face to face and he showed you

16   that report.  This would have been some time in 2002, right?

17     A   I believe so.

18     Q   Okay.  At that time did you have a discussion with

19   Mr. Connors about instituting a single 10(b)(5)(1) plan that

20   was just intended to take care of the options that were about

21   to expire?

22     A   That's correct.

3

Page:  62:23-63:7

62

23    **Q    So the idea was to set up a 10(b)(5)(1) that would**
24    **liquidate all of your options except for 7,000,000 shares?**
25        A    No, I apologize for that.  To answer your question,

63

1    at the time we did that my only focus was on the expiring
2    options. It wasn't until subsequent meetings that this began
3    to evolve into a much more global planning process.
4        **Q    Do you recall when you arrived at the decision that**
5    **what you wanted to do was get to that 7,000,000 shares left**
6    **over?**
7        A    It was in February of  '07.

Page:  67:9-69:6

67

9        **Q    Is this, in fact, your December 29, 2004**
10    **10(b)(5)(1) sales plan?**
11        A    I believe it is.  It looks like it.
12        **Q    Now this is a plan that was set up for you in your**
13    **capacity as an individual, correct?**
14        A    Correct.
15        **Q    You do have some other sales plans that are**
16    **actually in the names of a trust or foundation, correct?**
17        A    What's this in the name of?
18        **Q    If you look at the top --**
19        A    Yeah, because the -- it's based on the account.  I
20    have a Mozilo family trust is where all the assets are now in

4

21   Countrywide.  I believe that trust was in effect since 1988.

22   So I think what happened is when I opened the account at Bear

23   Stearns, I opened it up in my name. That's probably what it

24   was.  Then we put everything into the Mozilo family trust

25   account.  Let me give you some background here.

68

1   **Q   Sure**

2   A   My account was at JP Morgan Chase. That's where I

3   did the first 10(b)(5)(1).  The individual who was handling

4   my account moved over to Bear Stearns and asked if he could

5   continue with this plan.  So we ultimately got everybody to

6   agree to move it over to Bear Stearns. I think when they

7   opened the account they just did it in a simple way and put

8   Angelo Mozilo. It had no legal meaning or anything else.

9   Eventually, everything -- this account was then merged into a

10   new account called Mozilo family trust May 12, 1988.

11   **Q   Do you know when that happened, when the accounts**

12   **were merged?**

13   A   I don't know.

14   **Q   Would it have been some time after 2004?**

15   A   Some time after December 2004.

16   **Q   Okay.  Now this plan calls for selling a total of**

17   **5,428,964 shares of Countrywide stock, correct?**

18   A   Of exercising, right, those options at that

19   exercised price and selling the shares.

20   **Q   Did you have any role in drafting this plan?**

21   A   No.

22   **Q   Can you tell me why you entered into this**

5

23   **particular sales plan?**

24        A   I think the document itself is explanatory.  If you

25    look at the expiration date of these options, they had to be

69

1    sold before June 30, 2006 and 7/11/06 they expired and that

2    was the end of it.  Again, to try to create a sales plan

3    where a lot of stock is being dumped on the market at one

4    time that could create perceptions just weren't true, that it

5    was best that they do it over a period of time. That's why it

6    was done this way.


Page:  86:18-87:1

86

18        **Q   So at some point in December of '06 you know that**

19    **you're going to get some additional shares that you're going**

20    **to invest over time through the end of 2009. Is that what**

21    **prompted you to enter into the December 12, 2006 plan or was**

22    **that a function --**

23        A   No.

24        **Q   Of just options --**

25        A   I didn't know December 12th.  It was just options

87

1    expiring.


Page:  874:10-878:21 (10/3/08)

874

10        **Q   Mr. Mozilo, I'm handing you what has now been**

11    **marked as Exhibit 587.  For the record, this is another**

6

12   multiple-page e-mail strings.  This one is Bates-stamped

13   CFC2007A366046 through -049.  The e-mail at the top of the

14   first page is from Angelo Mozilo to Dan Tarman, Dave Sambol,

15   Carlos Garcia and Kevin Bartlett and it's dated

16   March 29, 2007.  Mr. Mozilo, have you ever seen what's now

17   been marked as Exhibit 587?

18          (SEC Exhibit No. 587 was marked for

19              identification.)

20    A   I think I wrote it.

21    Q   Okay.  So you -- it's your recollection that you

22   did in fact write this e-mail?

23    A   That's correct.

24    Q   There's actually an article attached here which

25   appears to be a print out of a New York Times article

875

1   entitled "Irresponsible Mortgages have opened doors to many

2   of the excluded."  Mr. Tarman forwarded that article to you

3   and then your e-mail at the top of the page appears to be a

4   response to the article.  I'm going to give you a chance to

5   read it.  I just wanted to ask you a couple of questions

6   about your response.

7    A   Okay.

8    Q   In your response to Mr. Tarman, you make a couple

9   of statements I want to ask you about.  The first of which in

10   the third paragraph that starts "there is no question",  you

11   say:

12       "There is no question that there was a degree of

13   irresponsible lending primarily by Pacific Mortgage Brokers

7

14   that exploited the uninitiated and that certain underwriting

15   guidelines were extended beyond reason."

16      Do you see that?

17   A   I do.

18   Q   Was it your belief in March of 2007 that

19   underwriting guidelines at Countrywide had been expanded

20   beyond reason or was this common on the mortgage market in

21   general?

22   A   It was common in the mortgage market in general

23   because I think this article was on the mortgage market.

24   Q   Did you have concerns in March of 2007 that

25   underwriting guidelines at Countrywide had been expanded

876

1   beyond reason?

2   A   I don't recall.

3   Q   You don't recall having that concern?

4   A   I don't recall having that concern other than what

5   you've already pulled out in the thousands of e-mails that

6   you've presented to me that, you know, what my concerns were

7   at the time.  I think I articulated them to my people.  I

8   expressed my concern to pay options.  I expressed my concern

9   over the sub prime seconds.  I think all of those concerns

10   were clearly expressed in previous testimony.  Here, this was

11   really devoted to the greater issue I saw that time.  Now

12   that was -- again, this thing cascaded very quickly in '07

13   and the beginning of '08.

14      So, frankly I didn't see all that was coming but I

15   think it was common knowledge there were speculators in

8

16   there.  There was fraud.  Cheetah loans and all that stuff

17   was public knowledge.  You can see that I felt that there

18   were two issues, and I don't know even now in retrospect

19   whether it was right.  Clearly, the 17 consecutive increases

20   in mortgage rates really was devastating particularly so many

21   people were on loans and it impacted them immediately.

22        So that's where I talked about the government

23   having a responsibility.  I also thought that -- and I do

24   think I feel that way today is that everything came down too

25   quickly and tightened too quickly, and therefore just shut

877

1   off all the oxygen to the market where if the guidelines

2   could have been pulled back in a more reasonable way, slowly

3   giving people an opportunity to either refinance what they

4   had and/or create a market for -- create a product for first

5   time home buyers, we wouldn't have had to go through this

6   wenching that we went through.

7        Everything was done in knee jerk reaction.  I think

8   it was historic.  There has never been 17 consecutive

9   increases in rates, again which had a massive impact at the

10   same time pulling back all the guidelines that were

11   previously accepted.  The regulator accepted those guidelines

12   and over night pulled everything down and the whole market

13   just ceased up as a result of it.  I think that was the tone.

14   What I was just promoting is have more of a softer landing

15   type of thing then what we experienced.

16   **Q   So in the second paragraph here where you refer to**

17   **imprudent actions of the regulators, it's the second**

9

18   sentence --

19      A   Yeah, it's that.

20      **Q   It was that.  It was a --**

21      A   It's not a prudent use of words but I was trying to

22   educate -- Dan was brand new to the business.  He worked for

23   Visa before.  He was brand new with us and he was trying to

24   get a perspective.  He'd ask me for can you help me

25   understand the history here and what's happened.  That was

878

1   the general tone of our relationship.  So when he sent me

2   this article I tried to give him some background and educate

3   more.

4      **Q   But I just want to make sure that we're clear that**

5   **the imprudent action that you were referring to in this**

6   **e-mail is what you just described which is the tightening of**

7   **the -- the sudden tightening of the guidelines?**

8      A   Sudden.

9      **Q   Okay.  And also the increase in the fed funds rate?**

10      A   Right.

11      **Q   Okay.  One of the things you say in the second**

12   **paragraph, or I guess it's actually the fourth paragraph of**

13   **this e-mail, the one that starts --**

14      A   Can I -- I'm sorry I didn't mean to do this to you

15   Lynn but I just saw this one sentence that I think sort of

16   brings up the point that I was trying to raise.  What they

17   should focus on is to stop the use of SISA's and NINA's, the

18   stated income and no income or non-traditional underwriting

19   on subprime bars, but permit the use of start rate

10

20   underwriting so that these bars can save their homes through

21   the refinancing process.


Page:  878:25-880:11

878

25       Q    That's okay.  When you said stop the use of SISA's

879

1   and NINA's there, actually let me just read it.  The phrase

2   is:

3          "What they should focus on is to stop the use of

4   SISA's and NINA's or non-traditional underwriting on subprime

5   borrowers but permit the use of start rate underwriting."

6          So did you have concerns about the viability of

7   SISA and NINA loans in general?

8      A   I did but part of it was it was non-traditional.

9   I'm a traditional lender.  I've always done full doc and

10   30-year fixed, and all this stuff was new to me.  The thing I

11   was always plagued with is maybe I'm just too old for this

12   business, that things are changing rapidly and maybe it's

13   okay, because it seems to be working but I'm not comfortable.

14   You see that throughout the fabric of my e-mails on a lot of

15   subject matters that I was concerned about.

16       Q   Can you just tell me what you mean by the phrase

17   start rate underwriting?

18      A   Start rate would be the initial rates.  If you

19   were -- let's assume it's a three-year high-bred and it

20   starts at 3 percent or 3-and-a-half percent, and then it

21   bumps up each year with a maximum of 7 percent.  Instead of

22   the fully indexed rate would be 7 percent assuming rates

23   continue to climb, you go up to 7, but I'm going to qualify

24   you at 3 percent.  Two things might happen positive, one, the

25   values go up over that period of time and then you can

880

1   refinance and get out or interest rates go down dramatically

2   and you reset at a very low rate, and bad things can happen.

3   Rates can go up and values can go down.  So I was just trying

4   to keep the engine running.  Not just stop the engine and not

5   worry about the consequences of it and that was what I meant

6   by it.

7       **Q   So it would be qualifying the borrower at the**

8   **initial start rate as opposed to the index rate?**

9       A   For the index rate.  First time home buyers only

10  but none of this was -- this was an internal memo and none of

11  it was adopted.

Page:  717:1-13 (10/2/08)

1       **Q   Mr. Mozilo, I'm going to hand you what has**

2   **previously been marked as Exhibit 92.  For the record,**

3   **Exhibit 92 is a two-page e-mail string Bates-stamped**

4   **CFC2007B008980 through 981.  And I really just want to focus**

5   **on the e-mail on the first page, which is from Angelo Mozilo**

6   **to Eric Sieracki with some carbon copies to others, and it's**

7   **dated April 13th, 2006.**

8       **Mr. Mozilo, have you ever seen the e-mail that's**

9   **been marked as Exhibit 92?**

10          **(SEC Exhibit No. 92 was referred to.)**

11    A   Yes, I have.

12    **Q   Okay.  And do you recall sending it?**

13    A   I do.


**Page:** 304:21-305:14 (8/20/08)

304

21    **Q   Did you take any comfort from the experience that**

22    **World Savings had had with pay options when deciding**

23    **whether or not Countrywide should offer the product?**

24    A   I did.  I felt  like it was a 30-year tested product

25    and that this was not something that nobody ever

305

1    before and we were inventing a product.

2     Is that your question?

3    **Q   Yes.**

4    A   Yeah,  it was a great  company, because we never

5    invented a product.   Every product we ever -- the only

6    product we ever had on our menu of all the hundreds of

7    products we had over  the 40 years were a response to the

8    consumer.   We never invented  a product, we  only took

9    existing products that were out there and  tried to tailer

10    it to our  underwriting system and  to our --  you know, our

11    culture, the way we operate.  But yeah, I did.  But the

12    fact is I think at the  end of the day that this is such a

13    debacle that Wachovia's  experience with all loans, forget

14    about pay options, has been not good.


**Page:  313:3-314:18**

13

313

3     **Q   And as of April  4th, 2006, did you conclude that a**
4     **sizable  number of borrowers would  not be able  to handle**
5     **payment shock?**
6         A     I  think what I  was -- what I  was really asking
7     here -- first of all, it was my responsibility -- I felt
8     it was my responsibility to the management team was to
9     alert them as to dangers, potential dangers  in any product
10     we have.  Payment shock was inherent in most of the
11      products we had.   The one-year, three  -- most of the
12      products we had were arm loans.   All arm loans had the
13      payment shock component to them, a reset component to
14      them.  And I think the only difference in this type of
15      loan was  that the start rate was lower  than would be in a
16      normal three-year arm or five-year arm so that the
17      potential for  -- you have  to get 15  percent, so again,
18      depending upon interest rates, that could be three years
19      out, four years out.
20          And  just to make sure that our  people are aware
21      that there is an issue here -- because I would have not
22      known,  no way  in the  beginning of  putting this product in,
23      as to how many  people would opt  for the minimum payment.
24      No idea.   As  it became apparent  in 2006,  April 2006, that
25      more and more were opting for the minimum payment,

314

1     bells  went off.   And  so I  wanted to  alert my management
2      team to start making sure several things were done.
3          Now, I think the warning issues was  done -- I think

14

4    it was done before April of '06, I'm not sure.  But we

5    did -- I sent out -- that's why I went to Steve Bailey in

6    servicing, to begin the process of alerting the borrowers

7    as to the consequences of their actions, and encourage

8    them to refinance.  And we sent out special letters to

9    these people, or notices of some kind either in their

10   payment coupon or whatever, to encourage them to refinance

11   out of the product if they didn't plan to get rid of it,

12   rid of the house in a few years.

13        Now, it so happened that a lot of people bought

14   these houses, it appears to me, at least, now, that used

15   this product to get into a house and within a couple years

16   get out of it and make a lot of money, because values were

17   continuing to go up.  And they saw it as an opportunity to

18    get in -- so get in and get out.


Page:  320:10-321:6

320

10   **Q    I'm handing you what's been marked as Government**

11   **Exhibit 533.  It's a two-page document, Bates numbered CFC**

12   **2007, B as in boy, 084228, a series of E-mails, the most**

13   **recent of which is dated May 19th, 2006 from Mr. Mozilo to**

14   **David Sambol with copies to Kevin Bartlett and Eric**

15   **Sieracki.**

16    A   Uh-huh.

17   **Q    Have you had a chance to review the entire**

18   **document?**

19    A   Not the entire document.  Okay.

15

20   Q   Focusing first on the earlier E-mail  which starts

21   at the middle  of the first page  and continues to the

22   second page, the last sentence, essentially, of the second

23   full paragraph begins, "As for pay options the bank

24   faces."  Do you see that?

25   A   Yeah.

321

1   Q   Okay.

2   A   Right.

3   Q   Are you expressing anything different here than you

4   were in the earlier E-mail that we looked at?

5   A   No.  I'm expressing the same thing over and over

6   again.

Page:  326:10-21

10   Q   Okay.  And so at this point in  time in May of 2006,

11   does the fact that World  Savings had success with the pay

12   option arms give  you any comfort with  respect to the fact

13   that it's untested at Countrywide?

14   A   No.  It was unrelated because  I think the decision

15   was  made probably in  2004, 2005 to  get into the product,

16   and  that's when  World  Savings'  protocol  was introduced to

17   me  as to  how they  did it.   I was  not really familiar with

18   it, and as I said, there was sort of an outlier in terms

19   of the product  but they did a  lot of it.   So by that time,

20   the World Savings issue was over with.  I mean, the first

21   time they were sold, they were gone by that time.

16

Page:  328:19-332:15

328

19    Q    Mr. Mozilo, I have one more question on

20    Exhibit 533.  At  the bottom of the first page you listed

21    three items or suggestions in order to address the

22     potential payment shock issue  of pay options.  Do you see

23    those?

24    A   Yes, I do.

25    Q    Did you ever  consider or propose to anyone

329

1    start rate on pay option loans be increased?

2    A   Yes.

3    Q    And what happened with that suggestion?

4    A   It was attempted and our volume stopped.

5    Q    So  you rose  the start  rates, you  loss business to

6    competitors, and you lowered them?

7    A   Went back to where they were, I believe.

8    Q    Could you explain for the  record what the start

9    rate is on a pay option loan?

10    A   What the amount is?  What the percentage --

11    Q   What it is, what the start rate is.

12    A    That's the percentage, the  interest rate that's

13    charged on the loan.

14    Q    And the testimony I've heard is that credit

15    proposed a rate raise of a hundred basis points, it was

16    eventually  raised  by  25 due  to  concerns  of production.

17    A   I'm sorry.   I'm having a problem following what

18    you're saying.  Say this again, now.

19     Q    According to the testimony  I've heard from people

20     at the company --

21     A    Okay.  Not here?

22     Q    Right.  Part of management proposed that the start

23     rate of  pay options  be increased  by 100  basis points

24     sometime in early '06.  Due to the concern of slow

25      production,  losing market share,  eventually a 25

330

1     point  increase in the start rate  was agreed upon. Is that

2     your recollection?

3     A    I remember that  conversation taking place, yes.

4     Q    Then according to previous  testimony that the 25

5     basis  point increase  in  the start  rate was  in effect for a

6     very brief time before  production complained that they

7     were losing market share; therefore, it was lowered back

8     to where it was.  Is that your recollection?

9     A    I don't have complete recollection  of it, but I do

10     remember  a problem in raising -- I  don't remember the

11     exact percentage, in raising the start rate and it

12     affecting production.  That's what I recall.

13     Q    And  were you involved in  the decision to lower the

14      start rate  to where  it had  been before  it was increased?

15     A    No.

16     Q    Did anyone inform you of this decision?

17     A     I was informed  of the decision.  I don't remember

18     how, but yes, I was informed of the decision.

19     Q    Did you agree with the decision?

20     A     I agreed  with the decision because I  told you that

21   I operated  in a collaborative  way, and everybody agreed

22   that that was the right decision for the company.

23       Q    So it seems that production  concerns were allowed

24   to trump  credit risk management  concerns in this instance;

25   is that correct?

331

1    A   No.

2       Q   Why is that not correct?

3    A    Well, because there  was no evidence that that

4   decision would lead to risk for the company or that it

5    would  mitigate  any  potential losses  that  the company would

6   experience.

7       Q   Well, why was the decision made in the first

8   instance to  increase the start rate?   Wasn't that --

9    A   It was --

10      Q   I'm sorry to cut you off, but wasn't that to

11   address the problem of payment shock and  make it a smaller

12   payment shock by raising the rate?

13    A    This is the first time I'm  hearing of 100 basis

14   point increase.  What I heard was a 25 basis point

15   increase.

16      Q   Okay.  And what was the rationale behind the 25

17   basis point increase?

18    A   It was  to test the market -- I  believe to test the

19    market to see if we can get an additional increase in the

20   rate without  a major impact on volumes.   And that would be

21    orchestrated by, if I  recall, by Stan Kurland and Dave

22   Sambol, head of operations and head of production.

19

23    Q    Again, according  to testimony  that I've heard from
24    people says that credit risk management, the reason for
25     the 25 basis point increase in  the start rate was

332

1    attempt to alleviate  the potential payment  shock problem
2    by reducing the  amount of negative  amortization. Were you
3    not aware of that rationale before the increase in the
4    start rate?
5        A    I'm aware of that rationale.
6        Q    Okay.  So that's  back to  my original question as to
7    whether  or not, in  your opinion, by allowing  the start
8    rate  to  be  lowered,  concerns  expressed  by production were
9    allowed to trump concerns expressed by credit risk
10    management.
11        A    There's  always a natural tension  between credit and
12    production, and  it has  to be  managed.   And -- however, if
13    I believed  that that 25 basis points would  make a material
14    or  even  an  immaterial  differences  in  the performance of
15    the  loans, I would  certainly intervene.   But I didn't.


**Page:** 340:14-342:13

340

14    Q    In  the first paragraph, you  state, "In a discussion
15    with both Stan  and Dave, it came  to my attention that the
16    majority of  pay options being  originated by  us, both
17    wholesale and retail, are based upon stated income.
18    There's also some  evidence that  the information that the
19    borrower  is providing us relative to  their income does not

20

**20   match up with IRS records."  To your knowledge, was the**

**21   discussion  you had with Mr. Kurland and Mr. Sambol the**

**22   first  time  that you  were  made aware  that the majority of**

**23   the pay options  being originated  by Countrywide were based**

**24   upon stated income?**

25     A   Yes, I was -- yes, that's what prompted this

341

1   E-mail.

**2     Q     Did you read that as -- were you concerned about**

**3   that?**

4     A   Yes.

**5     Q     Why were you concerned about it?**

6     A   Well, stated income  was a product used for many

7   years for self-employed people who couldn't verify, or day

8   laborers where it was impossible to get W-2s or the

9   ordinary type  of information  you get  to verify income.

10   And when I said  that  -- and I used  the  word "majority."  I

11   assume that's what they told me,  that many or the majority

12   of loans  coming in  as  pay options  were stated income.  It

13   was a concern to me.

**14     Q     Why was it a concern?**

15     A   Because it didn't sound right to me as to -- why

16   would they do  it on stated income?   Why wouldn't they go

17   through the normal documentation process?

**18     Q     Did any credit  concerns come to mind based upon the**

**19     fact that majority of these loans  were based upon stated**

**20   income?**

21     A   That's the concern.

21

22    **Q     The use of stated  income is  a credit concern?**

23     A    Well, because you  don't know for sure what the

24    income is.   It  could be  the right  income, the stated

25    income could be correct or it could not be correct.

342

1    not verified.  And so the extent that you have less

2    documentation to  verify income, there's a  greater risk.

3    **Q    Risk of what?**

4    A    Risk of default.

5    **Q    And do you know why that is?**

6    A    There's a risk of default, but not certainty of

7    default, so it's -- because if you're -- if someone tells

8    me they're making  X and I rely upon  it versus me going out

9    to  the employer and verifying that  they're making X,

10    there's a  difference, qualitative  difference in that

11    information.   Therefore, the risk is  there.  I'm not

12    saying that the end result would be worse, but the initial

13    risk is higher, it seems to me.

**Page:** 361:19-362:16

361

19    **Q    Let me show you Exhibit 221.  Exhibit 221 is a**

20    **series of E-mails,  one from yourself to Mr. Sambol on**

21    **September 26th,  '06, and then  there's an  E-mail from**

22    **Mr. McMurray to you on September 26th, '06.**

23        **Can you  make sure that doesn't  have any writing on**

24    **it?**

25        **(SEC Exhibit 221 was referred**

22

362

BY MR. WYNN:

**Q     Okay.  Mr. Mozilo, if you could start  with the second  E-mail on the  second page, I think  that's what starts the discussion.**

A    This is September of '07?

**Q     Yeah.  At  the bottom of  the first page, there's a September --**

MR. BRENNER:  September of '06.

BY MR. WYNN:

**Q     September 26th, '06 E-mail from yourself to Mr. Sambol at 7:15 a.m.**

A    Right.

**Q     So do you recall sending this E-mail to Mr. Sambol on September 26th, '06?**

A   I don't recall  sending it, but obviously I did because it's here.


Page: 395:3-24 (8/21/08)

**Q   I hand you what's been marked as Government Exhibit 45.  It's a series of e-mails Bates-numbered CFC 2007B, as in boy, 277227 through 277232.**

**(SEC Exhibit 45 was referred**

**to.)**

BY MR. PUATHASNANON:

**Q    Take your time reviewing the document, and when you're ready, please let me know, Mr. Mozilo.**

A    Okay.

23

Q    First of all, Mr. Mozilo, what is a flash report?

A    It's a -- I believe a monthly record of delinquencies -- delinquency trends.

Q    Did you regularly receive flash reports?

A    I did.

Q    And that would be for the different products offered by Countrywide?

A    As I recall, the flash report included all products.

Q    Turning your attention to the third page of the document, which includes an e-mail from you to Mr. Bailey on July 10th, 2006.

A    Yes.


Page:  416:14-417:7

416

Q    So if you were assured at the beginning of the process that holding on to pay-option ARM loans in the bank's portfolio was a sound investment for the bank, what prompted your desire to sell a portion of the portfolio in September -- I'm sorry, yes, in September of 2006?

A    A lot of things have transpired since the founding of the bank.  And since our -- I think we began putting -- I'm not sure of the dates -- but around 2004, 2005, a year or so before that, began putting loans in the bank and everything was performing well.

When I began looking at trends -- and this is not a loan that sold in the secondary market; this is a loan that

417

1    we own.  And I was trying to achieve a balance and not have

2    such a concentration of that product.  That was my feeling at

3    the time and that's why I kept on -- because things -- things

4    as, you know, in business are not static; they change every

5    single day.  So what appeared to be a -- the proper decision

6    a year or two before, I began to question, because of change

7    in circumstances.

Page:  448:7-20

7        **Q   I'm handing you what was marked as Government**

8    **Exhibit 539.  It's a single page, Bates-numbered**

9    **CFC2007A362338.**

10       A    All right.

11       **Q    Who's e-mail address is capbob12 --**

12       A    Bob Donatto.

13       **Q    Bob Donatto who was a member of the board?**

14       A    That's correct.

15           MS. DEAN:  You know, I think you might have cut Mr.

16   Puathasnanon off.  So just for the record, the e-mail address

17   we're referring to is capbob1235@aol.com.

18           THE WITNESS:  1225.

19           MS. DEAN:  Okay.  But that is Mr. Donatto's e-mail.

20           THE WITNESS:  That's correct.

Page:  471:25-472:5

471

25       **Q    Do you recall a meeting sometime in August or**

25

472

1    **September of 2006 with Kevin Bartlett, Carlos Garcia, David**

2    **Sambol -- there may have been others -- to discuss selling**

3    **off the pay-option ARM portfolio?**

4        A   I don't remember that specific meeting, but I know

5    that we had discussions about it.


Page:  531:10-22

10       **Q   Mr. Mozilo, I'm handing you now what's been marked**

11   **as Exhibit 548, which is a single page e-mail string.  The**

12   **Bates number is CFC2007B061477.  The e-mail at the top of the**

13   **page is from Dave Sambol to Angelo Mozilo, dated April 17th**

14   **of 2006.**

15                   **(SEC Exhibit 548 was marked for**

16                        **identification.)**

17       BY MS. DEAN:

18       **Q   And my first question will be, do you recall**

19   **writing the e-mail that is contained in the second half of**

20   **the page?**

21       A   I don't recall writing it, but I do see that it

22   came from me, so I assume I wrote it.


Page:  545:15-546:17

545

15       **Q   Okay.  Well, let me actually ask you some questions**

16   **about it.  First, do you recall writing the first e-mail on**

17   **Exhibit 549 to Mr. Sambol?**

18       A   I don't recall writing it, but I would say, again,

26

19   I -- my name is on here and I wrote it.

20        **Q   So you don't have any reason to believe that wasn't**

21   **you?**

22        A   No, I don't have any reason to believe that.

23        **Q   And it's short so I'll just read it into the**

24   **record.  The text of the e-mail which responds to his prior**

25   **response on the subprime seconds is, quote, there was a time**

546

1   **when savings and loans were doing things because their**

2   **competitors were doing it, period.  They all went broke,**

3   **period, close quote.**

4        **Did you believe at the time that you wrote that**

5   **that subprime seconds were actually a dangerous business for**

6   **Countrywide to continue to be in?**

7        A   I thought it was a high-risk business, and if not

8   managed properly and priced properly, it could be problematic

9   for the company.

10        **Q   Did you think, generally, that the practice of**

11   **matching products that were being offered by competitors**

12   **could lead to a condition in which Countrywide suffered**

13   **losses?**

14        A   If the only reason why you offered a product,

15   without any other thought, any other study, any other

16   actuarial work being done is because somebody else was doing

17   it, that's a dangerous game to play.

Page:  593:18-594:19

18        **Q   Mr. Mozilo, I've handed you what has been marked as**

27

19    **Exhibit 555, which is a four-page document.  It's Bates**

20    **stamped CFC2007B668917 through 920.**

21         **The first e-mail at the top of the first page is**

22    **dated February 11th, 2007, and it's from Angelo Mozilo to**

23    **Dave Sambol and several other recipients.**

24         **And, Mr. Mozilo, I would like to know first, do you**

25    **recall -- well, strike that.**


Dated:  August 16, 2010              Respectfully submitted,


                                     /s/ Lynn M. Dean
                                     John M. McCoy III
                                     Lynn M. Dean
                                     Attorneys for Plaintiff
                                     Securities and Exchange Commission