JOHN M. McCOY III, Cal. Bar No. 166244
Email: mccoyj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
Email: bendells@sec.gov
LYNN M. DEAN, Cal. Bar No. 205562
Email: deanl@sec.gov
SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
PARIS A. WYNN, Cal. Bar No. 224418
Email: wynnp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>    Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ERIC SIERACKI'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:   August 30, 2010<br>Time:   1:30 p.m.<br>Place:  Courtroom 16<br>        (Hon. John F. Walter) |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................1

II. GENUINE ISSUES OF MATERIAL FACT PRECLUDE
SUMMARY JUDGMENT ....................................................................................1

    A. The SEC Has Adduced More Than Enough Evidence To
Raise A Genuine Issue Regarding Sieracki's Scienter .........................2

        1. Sieracki Received Alarming Information About
Countrywide's Underwriting And Credit Risk ..........................2

    B. Sieracki Buried His Head In The Sand Regarding
Suggested Disclosures For Countrywide's MD&A .............................6

    C. Sieracki Abdicated His Role in the SEC Disclosure Process
Upon Which He Claims To Have Relied ..............................................7

    D. Sieracki's Stock Transactions Do Not Negate Scienter ........................8

    E. Sieracki Has Not Made The Showing Necessary To
Establish A Reliance On Counsel Defense ...........................................9

III. CONCLUSION....................................................................................................12

# TABLE OF AUTHORITIES

Page

## CASES

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 202 (1986) ............................1

*Bittaker v. Woodford*
    331 F.3d 715, 719 (9th Cir. 2003) ................................................................11

*Chevron Corp. v. Pennzoil Co.*
    974 F.2d 1156, 1162 (9th Cir. 1992) ............................................................11

*Dellastatious v. Williams*
    242 F.3d 191 (4th Cir. 2001) .......................................................................12

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) .........................................................................9

*Howard v. Everex Systems, Inc.*
    228 F.3d 1057 (9th Cir. 2000) .......................................................................6

*Howard v. SEC*
    376 F.2d 1136 (D.C. Cir. 2004)...................................................................10

*In re Fischbach Corp. Sec. Litig*
    1992 WL 8715 (S.D.N.Y. Jan 15, 1992) .......................................................7

*In re Homestore.com, Inc. Sec. Litig.*
    347 F. Supp. 2d 790 (C.D. Cal. 2004) ...........................................................6

*In re Remec Inc. Sec. Litig*
    2010 WL 1676741, (S.D. Cal. April 21, 2010) .............................................8

*In re Software Toolworks, Inc.*
    50 F.3d 615 (9th Cir. 1994) ...........................................................................6

*In re Worlds of Wonder Sec. Litig.*
    35 F.3d 1407 (9th Cir. 1994) .........................................................................8

*Kaplan v. Rose*
    49 F.3d 1363 (9th Cir. 1994) .......................................................................... 9

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
    320 F.3d 920 (9th Cir. 2003) .......................................................................... 9

*Pirraglia v. Novell, Inc.*
    339 F.3d 1182 (10th Cir. 2003) ...................................................................... 9

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) ........................................................................ 9

*SEC v. Goldfield Deep Mines Co. of Nevada*
    758 F.2d 459 (9th Cir. 1985) ........................................................................ 10

*SEC v. Roor*
    2004 WL 1933578 (S.D.N.Y. August 30, 2004) ............................................ 7

*SEC v. Savoy Indus. Inc.*
    665 F. 2d 1310 (DC Cir. 1981) ..................................................................... 10

*SEC v. Schroeder*
    2009 WL 1635202 (N.D. Cal. June 10, 2009) .............................................. 12

*SEC v. Seaboard Corp.*
    677 F.2d 1297, 1298 (9th Cir. 1982) .............................................................. 1

*Shuster v. Symmetricon, Inc.*
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)
    *aff'd* 35 Fed. Appx. 705 (9th Cir. 2002) ......................................................... 9

*United Steel Workers of Am. v. Phelps Dodge Corp.*
    865 F.2d 1539, 1542 (9th Cir. 1989) .............................................................. 2

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*
    739 F.2d 1434, 1436 (9th Cir. 1984) .............................................................. 2

## **FEDERAL REGULATIONS**

Rule 10b-9
    [17 C.F.R. § 240.10b-5] ............................................................................... 10

## **FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 502(d).................................................................................................11

## I. INTRODUCTION

Defendant Eric Sieracki was in a unique position at Countrywide. He served on various risk management committees; the group that prepared the periodic SEC filings reported to him; and, he was a required signatory on those filings. From 2005 through 2007, Sieracki learned a variety of troubling facts about Countrywide's underwriting deficiencies and its increasing credit risks. He also learned, on at least two occasions, of the unsuccessful efforts of Chief Risk Officer John McMurray to get Countrywide to include greater credit risk disclosures in its SEC filings. Nevertheless, when it came time to sign and certify the SEC filings, Sieracki turned a blind eye to the facts he had learned, instead purporting to rely completely on being informed that the sub-certifiers below him had submitted the appropriate form. In a shocking attempt to abdicate any responsibility, Sieracki now claims not to have known anything and to have relied on lawyers, accountants, board members, and the disclosure "process." However, these blatantly self-serving assertions cannot erase the extensive evidence of his knowledge.

## II. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT

Summary judgment is appropriate only where there are no genuine issues of material fact and where the moving party is entitled to prevail as a matter of law when the evidence is viewed in the light most favorable to the party opposing the motion. *SEC v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir. 1982). The Court should draw all justifiable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 202 (1986), and those inferences need not be the "most likely" or the "most persuasive," but only "rational" or "reasonable*." United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989). "Summary judgment is generally inappropriate when mental state is an issue, unless *no reasonable inference*

1

supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (emphasis added).

### A. The SEC Has Adduced More Than Enough Evidence To Raise A Genuine Issue Regarding Sieracki's Scienter

#### 1. Sieracki Received Alarming Information About Countrywide's Underwriting And Credit Risk

Sieracki was a member of various operational committees at Countrywide, including Countrywide's Corporate Credit Risk Committee ("CCRC"). Plaintiff SEC's Statement of Genuine Issues of Material Fact ("SF") 449. Through his attendance at meetings of these committees and his interactions with other Countrywide officers, Sieracki learned a variety of disturbing facts about Countrywide's underwriting guidelines, deteriorating loan quality, and increasing credit risk.

Sieracki was generally aware of the widening of guidelines within Countrywide, SF 553, but more importantly, he knew that Countrywide was not adhering to even those expansive guidelines:

On June 28, 2005, Sieracki attended a CCRC meeting in which Countrywide's failure to adhere to its own underwriting guidelines was made clear. At this meeting, he was informed that 1/3 of the loans which were referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines and 1/3 violated "minor" guidelines. SF519, 524. Moreover, Sieracki was informed that the mere fact that a loan was underwritten as an exception to guidelines increased the risks associated with the loan: he was informed that certain exception loans were performing 2.8 times worse than similar loans written within guidelines. SF 524. At that same meeting, Sieracki was also informed that the pace of negative amortization on PayOption loans was increasing, along with the size of the "payment shock" borrowers would experience when their loans reached their negative amortization limits and were re-amortized. SF 525.

Sieracki learned these concrete facts, not mere statements of opinion, as Sieracki incorrectly characterizes them in his brief. *See* Erik P. Sieracki's Separate Memorandum of Points and Authorities in Support of his Motion for Summary Judgment ("MSJ") at 8:4-7.

The effects of Countrywide's aggressive lending were succinctly put by Countrywide's Chief Operating Officer, who stated in the meeting that Countrywide was taking on "too much balance sheet risk." SF 521.

In March of 2006, Sieracki was made aware of Mozilo's concerns regarding the subprime 100% loan-to-value product (also known as an "80/20 loan") which was discussed in relation to HSBC's decision to compel Countrywide to buy back certain 80/20 loans it had purchased from Countrywide. SF 532. On March 27, 2006, Sieracki received an email from Mozilo repeatedly emphasizing the need to adhere to guidelines with regard to these loans, and describing them as "the most dangerous product in existence" and "toxic." SF 321.

On April 13, 2006, Sieracki received an email from Mozilo in which Mozilo wrote he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of such [80/20 loans] loans." SF 324. The email also described the loans as "poison." SF 324. Mozilo's email stressed the need to adhere to guidelines, recognizing that Countrywide's guidelines were not being followed. SF 324.

On May 18, 2006, Sieracki received an email from Mozilo regarding PayOption ARM loans, in which Mozilo, echoing statements which Sieracki had heard approximately a year earlier in a credit risk committee meeting, explained that Countrywide would face unexpected losses as a result of the increased payments that borrowers would be required to make upon reset of their loans. SF 504. Mozilo went on to explicitly inform Sieracki that the behavior of PayOption ARM loans was "untested." Sieracki would have understood what

1  Mozilo meant by "untested," since he has admitted that he was aware of Mozilo's
2  point that the oft-cited history of World Savings (a Countrywide competitor who
3  had originated PayOption type loans for many years) was not instructive because
4  World Savings' underwriting focused on high equity (low loan-to-value) while
5  Countrywide focused on FICO score.  SF 539.
6       At least by June of 2006, Sieracki was also aware that Countrywide had
7  specific evidence that the stated income of borrowers were contradicted by IRS
8  records.  SF 533.
9       At a June 22, 2006 meeting of the CCRC, it was revealed that exceptions
10 were being granted to accommodate ineligible borrowers. SF 313 .  At that same
11 meeting Sieracki was informed that a focus group study revealed that borrowers
12 didn't understand the PayOption loan program and that many could only afford the
13 minimum payment.  SF 344.  Sieracki was also informed that potential payment
14 shock on PayOption loans was increasing and time to recast was decreasing due to
15 interest rates having risen.  Additionally, Sieracki was informed that Countrywide
16 Bank's loan loss models were underpredicting losses.  *Id.*, Declaration of Daniel P.
17 Lefler, Ex. 260.
18      In September, 2006, Sieracki received yet another email from Mozilo
19 expressing alarm regarding the risks associated with PayOption ARM loans.
20 Specifically, Mozilo decried the known uncertainty associated with holding
21 PayOption loans on Countrywide's balance sheet – "[w]e have no way, with any
22 reasonable certainty to assess the real risk of holding [PayOption] loans."  SF 513
23 Mozilo made clear that he did not believe Countrywide could rely on the
24 experiences of World Savings because "their portfolio was fundamentally different
25 than ours."  SF  513.  Mozilo's email made it clear enough for any layman to
26 understand when he stated that "we are flying blind" with regard to the expected
27 performance of PayOption loans. SF 513.  Sieracki has admitted to agreeing with
28

Mozilo's concern that the company faced difficulty in assessing the real risk of holding PayOption Loans. SF 534.

Mozilo's email also alerted Sieracki to the acute danger to Countrywide's continued viability associated with PayOption loans. SF 513. Mozilo's email explained that "PayOptions are currently *mispriced in the secondary market* and that spread could disappear quickly." *Id.* (emphasis added). Mozilo directed his subordinates to explore selling Countrywide's portfolio of PayOption loans, a process in which Sieracki participated. SF 536. In January 2007, Sieracki received another email from Mozilo again directing executives to consider selling the PayOptions loans. SF537.

On November 8, 2006 Sieracki attended a committee meeting where he was informed about increases in the volume of Suspicious Activity Reports being filed related to mortgage fraud. SF 540.

In December 2007, Sieracki received a memo from Mozilo explaining the widening of subprime guidelines that had taken place and the poor expected performance of 2006 vintage subprime loans. SF 541.

Despite these numerous red flags, Sieracki signed and certified three consecutive Form 10-Ks which represented that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted the Company's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." SF 210. He likewise signed off on two Form 10-Ks that represented that Countrywide "ensure[d] [its] ongoing access to the secondary mortgage market by consistently producing quality mortgages." SF 211. He represented in the 2006 Form 10-K that "[w]e believe we have prudently underwritten" PayOption ARM loans. SF 213.

A defendant's decision to ignore red flags supports an inference of scienter. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) ("[W]here

reports raised legitimate red flag, defendants were required to take further steps to ensure the accuracy [of their statements] to negate intent.") (citing *In re Software Toolworks, Inc.*, 50 F.3d 615, 624-25 (9th Cir. 1994). Even where one event is not sufficient to raise a red flag, a string of similar events may raise a material fact as to scienter. *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 790, 809 (C.D. Cal. 2004). "This sort of quantum of evidence question, especially one that involves temporal accumulation of knowledge, is particularly unsuited to resolution by summary judgment." *Id.*

### B. Sieracki Buried His Head In The Sand Regarding Suggested Disclosures For Countrywide's MD&A

Contrary to Sieracki's claim that he was never advised of misstatements or omissions in Countrywide's SEC filings, on at least two occasions, Sieracki was advised of McMurray's thwarted attempts to have additional credit risk-related disclosures included in Countrywide's periodic filings.

First, in January 2007, in response to a request from Sieracki, McMurray sent an email to Sieracki explaining that delinquencies would increase and explaining that guidelines were "wider than they had ever been." SF 453. Sieracki took no steps to include McMurray's information in the upcoming 10-K. SF 545. McMurray subsequently incorporated his email by reference in his MD&A questionnaire response for the 2006 10-K. SF 453. On February 26, 2007, Sieracki advised McMurray that Sambol had "slashed" his proposed revisions to the credit disclosures. SF457.

Second, in connection with the filing of the Form 10-Q for the second quarter of 2007, McMurray provided a qualified certification to the company's Sarbanes-Oxley officer. SF 459. McMurray's submission was brought to Sieracki's and David Sambol's attention. SF 460. They instructed McCallion not to change the Form 10-Q. *Id.* Sieracki claims he later asked McMurray whether his certification was "qualified," but did not substantively discuss McMurray's

concerns. SF 463. McMurray, on the other hand, does not recall the alleged conversation. *Id.* Even crediting Sieracki's version of events, it is damning. Apparently upon learning that the head of credit risk management at the company had significant concerns that he had documented as part of the Sarbanes-Oxley certification process, Sieracki turned a blind eye. He limited his questioning of McMurray to whether the certification was qualified or unqualified, but did not take any steps to learn the substance of the concern. "Willful blindness, i.e., a deliberate refusal to acquire information" can establish scienter. *SEC v. Roor*, No. 99Civ. 3372 (HB), 2004 WL 1933578 (S.D.N.Y. Aug. 30, 2004) (citing *In re Fischbach Corp. Sec. Litig,*. No. 89 Civ. 5826, 1992 WL 8715 at *6 (S.D.N.Y. Jan 15, 1992).

### C. <u>Sieracki Abdicated His Role in the SEC Disclosure Process Upon Which He Claims To Have Relied</u>

Sieracki had access to all of the above-described information. Moreover, Sieracki was the sole individual who served on both the Credit Risk Management Committee and the Disclosure Committee of Countrywide. SF 449. Nevertheless, Sieracki apparently ignored everything he learned in his day-to-day interactions at Countrywide so long as he was told that all the subcertfications had been received. SF531. This dramatically demonstrates that the disclosure process upon which Sieracki claims to have relied consisted entirely of form over substance.

Countrywide's disclosure process called for relevant officers to receive training regarding Regulation S-K, which they did not. SF 440-41. The process relied on MD&A questionnaires that were sent to various sub-certifiers. SF 443. However, the head of Financial Reporting believed them to be ineffective. SF 446.

The disclosure committee, on which Sieracki sat, did not have regular meetings. SF 447. The disclosure committee did not review the MD&A questionnaires. SF445. McMurray made repeated attempts to include additional disclosures in Countrywide's filings. SF 451. In at least two of these instances, as

described above, Sieracki was made aware, and in neither instance did he address McMurray's concerns or increase the disclosures.

Here, the SEC has come forward with evidence of a variety of instances where Sieracki had information that was inconsistent with the statements in the periodic filings that he was reviewing, editing, signing, and certifying. Sieracki deliberately ignored these red flags and signed off on the periodic filings so long as he had the fig leaf that he had been told that all the sub-certifications from other Countrywide officials had been submitted.

### D. **Sieracki's Stock Transactions Do Not Negate Scienter**

Unlike the other defendants, Sieracki did not sell stock during the time period alleged in the Complaint. He is certainly free to argue to the jury that his stock trading activity supports his assertion that he lacked scienter. However, Sieracki's stock trading history is far from the only evidence relevant to his scienter, and none of the cases cited by Sieracki support the proposition that stock trading alone conclusively rebuts any inference of scienter arising from any other evidence. In *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424-25 (9th Cir. 1994), cited by Sieracki, the Court noted that plaintiffs had failed to cite any direct evidence of scienter on the part of the defendants, and instead relied upon speculative inference based solely upon the defendants' "suspicious conduct." *Id.* at 1425. The remaining cases cited by Sieracki for this proposition are likewise distinguishable.[1]

---

[1] In *In re Remec Inc. Sec. Litig.* No. 04-CV-1948-MMA (AJB), 2010 WL 1676741, (S.D. Cal. April 21, 2010) the CEO, as to whom the court found an absence of scienter, was not involved in the analysis of the accounting line item (goodwill) which was the "cornerstone" of the plaintiffs' allegations. *Id.* at *28. Here, Sieracki was deeply involved in managing credit risk and disclosure. *See also Shuster v. Symmetricon, Inc.*, C9420024RMW, 2000 WL 33115909, (N.D. Cal. Aug. 1, 2000) *aff'd,* 35 Fed. Appx. 705 (9th Cir. 2002), the court did not view the other evidence as supporting scienter either; *Kaplan v. Rose* 49 F.3d 1363, 1380 (9th Cir. 1994) (defendant's statements of good faith were "uncontradicted by any . . . other evidence of scienter.")

1  As set forth above, Sieracki received repeated and specific warnings. Even
2  where a corporate officer's trading does not support an inference of scienter, other
3  direct, or indirect, evidence can create a genuine issue of material fact regarding
4  scienter. *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("[E]ven though
5  we find that [the CFO's] stock sales were too minimal to suggest insider trading,
6  we still believe a genuine issue of material fact exists as to whether [he] acted with
7  scienter.") The mere fact that Sieracki did not sell his stock is insufficient to
8  negate the substantial evidence of his scienter. *No. 84 Employer-Teamster Joint
9  Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d at 920, 944
10 (9th Cir. 2003) ("Scienter can be established even if the officers who made the
11 misleading statements did not sell stock during the class period. In other words,
12 the lack of stock sales by a defendant is not dispositive of scienter"); *Hanon v.
13 Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992) (defendant corporation's
14 continued investment of millions of dollars in its product and corporate officers'
15 failure to sell their stock during the class period does not negate evidence of
16 scienter plaintiff produced and, therefore, there was a genuine issue of material fact
17 regarding scienter precluding summary judgment);[2] *Pirraglia v. Novell, Inc.*, 339
18 F.3d 1182, 1191 n. 12 (10th Cir. 2003) (declining to negate scienter or infer lack of
19 motive to defraud from fact defendants did not sell their stock).

### E. Sieracki Has Not Made The Showing Necessary To Establish A Reliance On Counsel Defense

Sieracki attempts to make two related arguments. One appears to be a traditional reliance on counsel defense. *See* MSJ at 12. The other appears to be some type of quasi-reliance on counsel defense based on the legal department's "involvement" with Countrywide's periodic filings.

---

[2] Sieracki attempts to distinguish *Hanon* because it involved a corporate defendant rather than an individual. However, in *Hanon,* the court considered the officers' failure to sell stock in evaluating the corporation's scienter which was based in part on knowledge of "high level executives." 976 F.2d. at 502.

9

In order to establish a good faith reliance on counsel, a party must show that he "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985) (citing *SEC v. Savoy Indus. Inc.*, 665 F. 2d 1310, 1314 n.28 (DC Cir. 1981)). Here, there is no evidence regarding what information was provided to counsel or any advice received.[3] Instead Sieracki attempts to argue that because a particular lawyer worked on both a Form 10-K and review of other disclosures for compliance with Regulation F-D at the same time, that this represented some type of advice regarding the adequacy of particular disclosures in the Form 10-K. Sieracki MSJ at 12:22. This is a far cry from complete disclosure and receipt of actual advice, as required by *Goldfield Deep Mines*.

Sieracki cites *Howard v. SEC*, 376 F.3d 1136, 1148 (D.C. Cir. 2004) for the proposition that his interaction with Countrywide's lawyers demonstrates a lack of scienter. Sieracki MSJ at 12:12-26. However, *Howard* is distinguishable. In *Howard*, the court considered – on a full evidentiary record after a hearing on the merits – whether the defendant had aided and abetted violations of Rule 10b-9 with respect to how the structuring of certain transactions was disclosed. *Id.* at 1138-41. The finder of fact determined that the defendant had relied on his understanding that higher management and both inside and outside counsel had specifically approved the disclosures after fully reviewing the underlying transactions *and analyzing their treatment under applicable law*. *Id.* at 1146-47. Even then, the court noted that the defendant's reliance upon counsel's advice was not a complete defense, but merely one "relevant consideration in evaluating a defendant's

---

[3] Although Sieracki's brief does not specifically argue reliance on Countrywide's outside auditor, he does mention KPMG's involvement in his portion of the SUF (SUF 162). To the extent that he is asserting reliance on KPMG this argument fails as well. KPMG was never asked to opine on the accuracy of Countrywide's MD&A disclosures. SF 550.

scienter." *Id.* at 1147.  Here, Sieracki adduces no evidence that he sought or received advice, and, in fact, cites to the absence of advice from the attorneys. Sieracki MSJ at 12:12-26 ("Udovic never advised Sieracki that . . ."); SF 202. However, when asked in deposition whether he consulted Countrywide lawyer Mike Udovic regarding credit risk disclosures, Sieracki asserted the attorney-client privilege.  SF 549.  It is well settled that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) (quoting *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)).  Thus, Sieracki should not be allowed to assert reliance on attorneys while neither the SEC nor the Court are allowed to probe the actual content of his communications with counsel.

     Sieracki will likely argue that he is powerless to address this conundrum because he will argue the privilege belongs to Countrywide.  This argument will be disingenuous.  It is not clear whether (or when) he has even asked Countrywide to waive the privilege, but he certainly has not moved to compel Countrywide to produce documents reflecting the attorney-client communications upon which he now claims to rely.  *See* Declaration of John Damiani (Doc. No. 171), filed in support of Sieracki's Motion for Summary Judgment.  Nor has he sought an order from the Court allowing him and the attorneys to testify and fully set forth the communications which he now asserts would exculpate him.  Particularly in light of the Court's power under Federal Rule of Evidence 502(d) to order that disclosure not be deemed a waiver, it would seem to have been the logical solution to Sieracki's purported dilemma.  In *SEC v. Schroeder*, the defendant, a former corporate officer, who was represented by the same attorneys who represent Sieracki here, sought and obtained privileged documents relevant to his defense from the former employer.  *SEC v. Schroeder,* No. C 07-03798 JW, 2009 WL 1635202 (N.D. Cal. June 10, 2009).  Thus, Sieracki is no doubt aware of this option.  Sieracki's decision to instead assert reliance on counsel while maintaining the privilege

certainly raises the suspicion that, upon a full airing, the attorney-client communications would not have been as exculpatory as Sieracki now asserts.

In a variation on the theme, Sieracki argues "good faith reliance on procedures designed to ensure compliance with the securities laws, including the involvement of lawyers and other professionals, negates scienter." In support of this contention, Sieracki cites to *Dellastatious v. Williams*, 242 F.3d 191 (4th Cir. 2001), where the Fourth Circuit found a director not liable as a "control person" under Section 20(a) of the Exchange Act because he acted in "good faith." However, Sieracki's reliance upon *Dellastatious* is wholly misplaced, as the Commission is not alleging that Sieracki is a "control person" under Section 20(a). Plainly, Sieracki is not entitled an affirmative defense set forth in a statute he is not alleged to have violated. In any event, to the extent that Sieracki claims to have generally relied on Countrywide's legal department's "involvement" in SEC filings such an argument fails for all the same reasons that his traditional reliance on counsel defense must fail. Indeed, this purported defense is even more deficient. Taken to its logical extreme, it would allow a company to hire attorneys to carry out ministerial tasks throughout the enterprise in order to immunize its officers from scienter-based charges.

### III. CONCLUSION

For all the foregoing reasons, Sieracki's motion should be denied.

Dated: August 16, 2010            Respectfully submitted,

/s/ Spencer E. Bendell
John M. McCoy III
Spencer E. Bendell
Lynn M. Dean
Attorneys for Plaintiff
Securities and Exchange Commission