JOHN M. McCOY, III, Cal. Bar No. 166244
Email:  mccoyj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
Email:  bendells@sec.gov
LYNN M. DEAN, Cal. Bar No. 205562
Email:  deanl@sec.gov
SAM S. PUATHASNANON, Cal. Bar No. 198430
Email:  puathasnanons@sec.gov
PARIS A. WYNN, Cal. Bar No. 224418
Email:  wynnp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:   (323) 965-3908

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DAVID SAMBOL'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>Date:    August 30, 2010<br>Time:   1:30 p.m.<br>Judge:  Hon. John F. Walter<br>Ctrm;   16 (Spring Street) |

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION AND FACTUAL BACKGROUND ...............................1

II. THE SEC HAS CREATED GENUINE ISSUES OF MATERIAL FACT AS TO SAMBOL'S VIOLATIONS OF THE FEDERAL SECURITIES LAWS ........................................................................................................1

    A. Sambol Acted With Scienter................................................................2

        1. Sambol's Knowledge of Countrywide's Expansion of Underwriting Guidelines and Its Consequences ...................................3

        2. Sambol's Knowledge of The Extensive Use of Exceptions to the Expanded Guidelines........................................................................9

        3. Sambol's Knowledge of Borrower Fraud.................................10

    B. Sambol Made Material Misstatements And Omissions ......................11

III. CONCLUSION..................................................................................13

i

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)....................1

*Howard v. Everex Systems, Inc.*,
    228 F.3d 1057, 1064-65 (9th Cir. 2000) ......................................................3

*In re Homestore.com, Inc. Sec. Litig.*,
    347 F. Supp. 2d 790, 808 (C.D. Cal. 2004) ..............................................3

*In re Software Toolworks*,
    50 F.3d 615, 624-25 (9th Cir. 1994) ..........................................................3

*MacLean v. Huddleston*,
    459 U.S. 375, 390-91 n. 30 (1983)............................................................2

*SEC v. Ingram*,
    649 F. Supp. 1437, 1441 (C.D. Cal. 1998) ...............................................8

*SEC v. MacDonald*,
    699 F.2d 47, 51 (1st Cir. 1983) .................................................................8

*SEC v. Rubera*,
    350 F.3d 1084, 1093-94 (9th Cir. 2003) ...................................................2

*SEC v. Seaboard Corp.*,
    677 F.2d 1297, 1298 (9th Cir.1982)..........................................................1

*United Steel Workers of Am. v. Phelps Dodge Corp.*,
    865 F.2d 1539, 1542 (9th Cir. 1989).........................................................1

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083, 1097, 111 S. Ct. 2749, 2760 (1991)................................3

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
    739 F.2d 1434, 1436 (9th Cir. 1984).........................................................2

I.      **INTRODUCTION AND FACTUAL BACKGROUND**

Despite receiving a flood of undisclosed, material information regarding the significant credit risks inherent in expanding guidelines to chase market share, the escalating rate of underwriting exceptions and the attendant risks of those loans, and the startling percentage of borrowers misrepresenting their income, Defendant David Sambol hides behind a series of general representations about Countrywide's business model to seek summary judgment of the SEC's claims. Sambol argues that Countrywide's public representations are qualitatively the same as the undisclosed material information that he knew internally. That argument fails however because Sambol cannot point to any evidence that he or Countrywide ever disclosed that Countrywide's guidelines were (1) the "a composite of the outer boundaries across multiple lenders," (2) rapidly being undermined through the escalating rate of exceptions, and (3) compromised by large numbers of borrowers routinely misrepresenting their income. As discussed below, there are genuine issues of material fact that Sambol acted with scienter when he made material misstatements and omissions. Accordingly, for the reasons discussed herein, and in the SEC's Joint Opposition to the defendants' Motions for Summary Judgment, the Court should deny Sambol's motion in its entirety.

II.     **THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO SAMBOL'S VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Summary judgment is appropriate only where there are no genuine issues of material fact and where the moving party is entitled to prevail as a matter of law when the evidence is viewed in the light most favorable to the party opposing the motion. *SEC v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir.1982). The Court should draw all justifiable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Those inferences need not be the "most likely or the most persuasive," but only "rational" or "reasonable." *United Steel Workers of Am. v. Phelps Dodge Corp.*,

865 F.2d 1539, 1542 (9th Cir. 1989). "Summary judgment is generally inappropriate when mental state is an issue, unless *no reasonable inference* supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (emphasis added).

### A. Sambol Acted With Scienter

Sambol had knowledge of (1) the expansion of Countrywide's underwriting guidelines and the poor expected performance of those loans; (2) the high percentage of loans Countrywide was underwriting as exceptions to the widened guidelines; and (3) evidence of a significant amount of borrower fraud in connection with stated income loans. Despite his knowledge of these facts, and his responsibility for the accuracy of Countrywide's periodic filings, Sambol knew that this material information was not disclosed to investors.

Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In Rule 10b-5 cases generally, scienter can be shown either through evidence of a direct intent to deceive or through a showing of extreme recklessness. *SEC v. Rubera*, 350 F.3d 1084, 1093-94 (9th Cir. 2003). "Scienter can be inferred from circumstantial evidence." *MacLean v. Huddleston*, 459 U.S. 375, 390-91 n. 30 (1983).

Sambol has inaccurately argued that the record negates any finding that he acted with scienter because he made numerous detailed disclosures. However, the "adverse information" that Sambol identifies are nothing more than general statements about Countrywide's product menu, widening underwriting guidelines, the broader economy, and the housing and mortgage market. None of the statements that Sambol identifies disclose the specific material, nonpublic information about Countrywide-specific risks and loan underwriting that caused concern internally among Countrywide management, including Sambol. See

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S. Ct. 2749, 2760 (1991) ("[N]ot every mixture with the true will neutralize the deceptive.")

As discussed below, Sambol received numerous warnings regarding the aggressive expansion of guidelines, the substantial use of exceptions, and the numerous instances of borrower fraud. A defendant's decision to ignore red flags supports an inference of scienter. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) ("where reports raised legitimate red flag, defendants were required to take further steps to ensure the accuracy [of their statements] to negate intent.") (citing *In re Software Toolworks*, 50 F.3d 615, 624-25 (9th Cir. 1994). Even where one event is not sufficient to raise a red flag, a string of similar events may raise a material fact as to scienter. *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 790, 808 (C.D. Cal. 2004). The quantum of evidence question, especially one that involves temporal accumulation of knowledge, is particularly unsuited to resolution by summary judgment. *Id.*

### 1. Sambol's Knowledge of Countrywide's Expansion of Underwriting Guidelines and Its Consequences

Sambol knew about, and participated in, the expansion of Countrywide's loan underwriting guidelines. This expansion was the result of Countrywide's desire, expressed by Sambol and other senior management, to offer a broad product mix and match the offerings of competitors. However, the expansion of Countrywide's underwriting guidelines was nothing more than a race to the bottom that pushed the quality of Countrywide's loans to the extremes of the industry.

As early as 2004, Sambol, when he was the head of loan production, knew that the quality of Countrywide originated loans was deteriorating. SEC's Statement of Genuine Issues of Material Fact ("SF"), Nos. 224-229. Starting in 2005, he received explicit and ominous warnings about Countrywide's matching strategy. In a June 25, 2005 email to Sambol concerning guideline expansion and the company's growing credit risks, the chief credit officer warned that "our

[guidelines] will be a composite of the outer boundaries across multiple lenders[,]" and that because comparisons are only made to competitor guidelines where they are more aggressive and not used where they are less aggressive, Countrywide's "composite guides [sic] are likely among the most aggressive in the industry." SF Nos. 253-256. The aggressiveness of these composite guidelines was never disclosed by Countrywide. SF No. 475. On June 14, 2005, Sambol engaged in a lengthy email exchange regarding the impact of guideline expansion requests for subprime products that had been considered in the first and second quarters of 2005. SF No. 252. In that exchange, Sambol was warned that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas." The chief credit officer went on to note that the frontier had "high expected default rates and losses." SF No. 252. On November 2, 2006, Sambol was advised that the matching strategy had caused Countrywide to cede its underwriting standards to the most aggressive lenders in the market. SF No.262-265.

In 2006, Countrywide began to originate loans under a new set of guidelines called Extreme Alt-A ("EAA") that were intended to copy certain program guidelines offered by certain Wall Street firms. SF No. 372. Because the EAA program had very high expected rates of default, the credit risk management group referred the proposed guidelines to the Responsible Conduct Committee. SF No. 373-375. After being presented with the data showing that the EAA guidelines had high rates of expected default, Sambol, using his delegated authority to act on behalf of the RCC, signed-off on the guidelines. SF No. 376  In accordance with credit policy, obtaining the chief risk officer's sign-off was one of the additional requirements that had to be fulfilled before Countrywide could began originating loans under the proposed EAA guidelines, although the chief risk officer never signed-off on, or otherwise approved, the implementation of the EAA guidelines. SF No. 378-379. In a November 16, 2006 email to Sambol, the chief risk officer,

complained about guidelines and products being introduced in contravention of credit policy, citing the offering of Extreme Alt-A loans by the loan production divisions, even though that program had not been officially approved in the guideline review process. SF No. 380-382. The proposed guidelines would have permitted 100% financing, layered with additional credit risk factors such as stated income, lower than average FICO scores, or non-owner occupied investment properties.

On December 7, 2006, Mozilo circulated a memorandum drafted for him by McMurray to the board of directors and all Countrywide managing directors, including Sambol and Sieracki. SF No. 514. In the memorandum, Mozilo made the following observations, among others: (1) Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV, and making interest only, stated income, and piggyback second loans available to subprime borrowers; (2) Countrywide expected that subprime loans originated in 2006 (the "2006 Vintage") would be the worst performing on record, driven by wider guidelines and the worsening economic environment; (3) the percentage of 60- and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03% respectively), exceeded the percentages from each of the previous six years; and (4) 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%. SF No. 514.

In a February 11, 2007 email, Sambol was again advised about the riskiness of Countrywide's approach. The chief credit officer noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone, and repeated his concern that the strategy would cause Countrywide's guidelines to be a composite of the riskiest offerings the market. SF No. 274. Additionally, he warned "I doubt this approach would play well with regulators, investors, rating agencies etc. To some, this approach might

5

seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines."  SF No. 275.

The company's experience with "80/20" subprime loans reveals the seriousness and depth of Risk Management's warnings on guideline expansion and the consequences of Countrywide's failure to heed such warnings.  Pursuant to Risk Management's "Policy on High Risk Products," subprime 80/20 loans could not be originated via the exceptions process, and could only be originated if Countrywide could totally extinguish the credit risks (*e.g.,* residual interests or corporate guarantees) resulting from such loans.  SF No. 322.  But the production divisions ignored the policy at Sambol's behest.  SF No. 323.

In the first quarter of 2006, HSBC, a purchaser of Countrywide's 80/20 loans, began to contractually force Countrywide to "buy back" certain of these loans that HSBC contended were defective, which caught Mozilo's attention. Mozilo directed Sambol and others to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks."  Mozilo further stated that the 100% loan-to-value (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

Later, Mozilo informed Sambol, Sieracki, and others that there were numerous issues that they must address relating to the losses associated with the HSBC buyback.  One issue in particular that Mozilo identified was the fact that the loans had been originated "through our channels with disregard for process [and] compliance with guidelines."  SF No. 325.  Mozilo went on to write that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [sic]."  SF No. 324.  Mozilo noted that, "[i]n my conversations with Sambol he calls the 100% sub prime seconds as the

'milk' of the business. Frankly, I consider that product line to be the poison of ours." SF No. 324.

Later, in an April 17, 2006 email to Sambol concerning Countrywide's subprime 80/20 loans, Mozilo continued to fume:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the FICOs are below 600, below 500 and some below 400[.] With real estate values coming down…the product will become increasingly worse. . . . Whether you consider the business milk or not, I am prepared to go without milk irrespective of the consequences to our production.

SF Nos. 327-329. Echoing these criticisms, in April 2006, credit risk management recommended increasing the minimum FICO score on the product by 20 points to mitigate some credit risk. SF Nos. 330-333. Sambol, then still the head of the production divisions, opposed this recommendation, and noted that such an increase would make Countrywide uncompetitive with other subprime lenders. SF No. 334.

Sambol's knowledge of the consequences of aggressive guideline expansion extended to Countrywide's PayOption ARM loans as well. Sambol acknowledged the credit risks and poor loan quality internally. On May 25, 2006, the chairman of the board of Countrywide Bank reported that he had spoken to Sambol regarding PayOption ARM loans:

> Spoke with sambol. He believes historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort. Sambol is concerned about payment shock at recast and inability to absorb increased payments thru income or refi (due to

7

    low equity). So Sambol believes high cltv loans with no
    mi, particularly those with high dti are risky. Maybe also
    those with low ficos. If the loans are in markets that have
    slowed the risk is exacerbated. SF No. 367

 Sambol's concerns demonstrate the importance of the information, which is sufficient to establish scienter in this context. See *SEC v. MacDonald*, 699 F.2d 47, 51 (1st Cir. 1983) (if defendant himself considers information important, he necessarily understands it would be material to a reasonable investor); *SEC v. Ingram*, 649 F. Supp. 1437, 1441 (C.D. Cal. 1998) (perceived materiality of information probative of scienter).

 In September 2006 Mozilo warned Sambol that he believed that the Pay-Option loan was "mispriced" in the secondary market and that the pricing spread could disappear quickly if there were a negative event in the market. SF No. 513. As a result, he encouraged Sambol and others to sell Countrywide Bank's PayOption loan portfolio into the secondary market before this mispricing was discovered. SF No. 513. However, that did not occur because PayOption loans were one of the few Countrywide products that still had margins.

 From 2005 through 2007, during which time Sambol served first as head of loan production and then as president and chief operating officer, he heard a constant drumbeat of warnings and criticism regarding the company's aggressive guideline expansion and the consequences of that expansion. Sambol's knowledge extended across Countrywide's product line from the undisclosed composite match program that placed Countrywide's guidelines among the most aggressive in the industry, to the "toxic" subprime second, or 80/20, loans, to the PayOption ARM loans, about which Sambol expressed his own concerns and which were mispriced by the secondary market. As discussed below, and in the Joint Opposition, Countrywide, and Sambol, failed to disclose any specific details about the extent to

8

which Countrywide aggressively expanded its guidelines and the company's expectations regarding the poor performance of those loans.

### 2. **Sambol's Knowledge of the Extensive Use of Exceptions to the Expanded Guidelines**

Sambol was aware of significant lapses in Countrywide's underwriting processes and the resulting risk to Countrywide. Not only was Countrywide widening its stated guidelines to the extremes of the industry, but Countrywide rendered those guidelines practically meaningless by underwriting loans as exceptions to the already expanded guidelines. Sambol insisted that Countrywide should write loans whether or not competitors were offering the product. SF No. 283.

In May 2005, Sambol, in response to an internal Countrywide speech, was warned that loans made on an exception basis would result in higher default rates. Countrywide's chief risk officer explained to Sambol that "exceptions are generally done at terms more aggressive than our guidelines," and asserted that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions." SF No. 287-288. Additionally, the chief risk officer warned that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate. SF No. 288.

Despite these warnings and despite the adoption of the no exceptions policy with respect to 80/20 loan products discussed above, Sambol persistently sought to circumvent the guidelines, both directly and indirectly, all in the interest of underwriting more loans for Countrywide. Reacting to concerns from a loan production division that the no 80/20 exceptions policy has placed Countrywide in "a very disadvantageous position relative to the non-prime market," Sambol tells the head of the division in February 2006 that he will talk to the chief risk officer to "narrow the scope of the non exception policy." SF No. 565. Sambol later

intervened on numerous other occasions at the expense of the credit risk management group to implement policies that enhanced the ability of the production divisions to underwrite riskier loans. SF Nos. 290, 358-368, 388-396.

Sambol also received reports regarding the exception loans through his attendance of Credit Risk Management Committee meetings, in which presentations were regularly provided on, among other things, exceptions and credit risk. The poor quality of the loans originated through the exception process became even more apparent in the first quarter of 2007. In fact, in materials distributed at a March 12, 2007 meeting of the Credit Risk Committee attended by Sambol, it was reported that nearly 12% of the loans reviewed by Countrywide in an internal quality control process were rated "severely unsatisfactory" or "high risk." SF No. 424. The causes for such a rating included findings that such loans had debt-to-income, loan to value, or FICO scores outside of Countrywide's already wide underwriting guidelines. SF No. 424.

In February 2007, credit risk management has already warned Sambol that guideline expansions could disrupt the secondary market for subprime mortgage backed securities ("MBS"). SF No. 407. Later in that quarter, the MBS market for subprime loans experienced a disruption that forced Countrywide to write down loans that it had previously intended to sell into that market.

### 3. Sambol's Knowledge of Borrower Fraud

Sambol was aware as early as June 2006 that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud. On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process. SF No. 508.

On June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated

income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. SF No. , 435.Of those, 69% had an income variance of greater than 50%. In 2006, Countrywide Bank's QC function reported the results of an audit of the Bank's reduced documentation loans for the 10 month period ending on April 30, 2006 in which the Bank QC department had executed Forms 4506 submitted by the borrowers with their loan applications and compared the stated income on the loan application with income reported to the Internal Revenue Service (the "4506 Audit"). SF No. 427. The audit results showed that 50.3% of the IRS forms executed in the QC process showed an income variance between the loan application and IRS records of 10% or more. SF No. 428-433. The Bank's credit risk officer believed that the vast majority of the income discrepancies revealed in the audit were the result of fraud and misrepresentation. SF No. 434. The results of this audit or the implications of this data were not disclosed publicly by Countrywide.

### B. Sambol Made Material Misstatements and Omissions

As discussed in the Joint Opposition, Section III.B.1, Defendants misconstrue the law, the SEC's claims, and the evidentiary record to assert that information absorbed into an efficient market is somehow sufficient to negate any claim of falsity. Sambol explicitly makes this argument in connection with his May 24, 2005 misstatement. As discussed in greater detail in the Joint Opposition, the Defendants, and Sambol in particular, are wrong and there are genuine issues of material fact regarding Sambol's misstatements and omissions.

Efficient market theory cannot provide Sambol with a defense, absolving him of making a false statement. During the May 24, 2005 investor day presentation, Sambol reassured analysts that Countrywide addressed the higher credit risk associated with adjustable rate mortgage programs by requiring different underwriting criteria such as "higher credit scores or lower loan to value ratios. SF No. 563. Sambol attempted to reassure investors about Countrywide's credit risk

mitigation efforts, despite his knowledge that (1) Countrywide generally made numerous exceptions to its own underwriting guidelines; (2) Countrywide specifically wrote Pay-Option loans that exceeded the guideline limitations; and (3) McMurray had warned Sambol in May 2005 of the negative impact that exceptions to underwriting guidelines would have on Countrywide's default rate and the performance of Countrywide-issued MBS. There is no evidence that Sambol or Countrywide disclosed any specific information related to the increasing number of exception loans Countrywide was underwriting.

Similarly, there are issues of material fact with respect to the second material misstatement attributed to Sambol. At the September 13, 2006 Fixed Income Investor Forum, Sambol downplayed Countrywide's participation originating subprime loans by falsely stating that Countrywide had been "on the sidelines" in the subprime market. SF No. 564. However, when Sambol made that statement in September 2006, Countrywide was the number three originator of subprime loans by volume in the United States. In fact, Countrywide became the number one subprime originator in the first two quarters of 2007 before dropping to second place in the third quarter. These facts are simply not consistent with Sambol's assertion that Countrywide was "on the sidelines" with respect to subprime. The enlarged quote cited by Sambol does not cure the falsity of the statement. That excerpt amounts to nothing more than generalities about Countrywide's intentions, and that the company had no plans to accelerate growth, which contradicts Sambol's own internal efforts to expand subprime guidelines and exceptions. To the extent that Sambol's argument relies on the distinction between prime and subprime, an issue that the SEC has not abandoned, that argument is addressed in the Joint Opposition, Section III.E.

Finally, as a senior officer, and ultimately COO of Countrywide, Sambol was responsible for sub-certifying and, for the third quarter of 2006 and all of 2007, signing Countrywide's periodic filings. SF No. 561-562. Accordingly, he

1  substantially participated in the preparation of the periodic filings and is liable for
2  their content.  Moreover, Sambol directly participated in Countrywide's 2006 and
3  2007 securities offerings, but failed to take any action to correct false and
4  misleading statements in the offering documents, which he signed.  Countrywide's
5  materially false and misleading periodic reports were also incorporated by
6  reference in the February 9, 2006 Form S-3 and the November 15, 2007 Form S-3
7  that Sambol signed.  He also actively participated in decisions to exclude
8  disclosures regarding Countrywide's widened underwriting guidelines in the
9  periodic filings.

Sambol knew and failed to disclose substantial negative information relating to the deteriorating quality and performance of Countrywide's loan production.  He also failed to disclose the predictable losses stemming from that deterioration, which would have a material unfavorable impact on Countrywide's revenues or income from continuing operations.  Without this information, disclosure of positive information regarding Countrywide's loan production and the risks associated with those loans was misleading, and investors were left with an incomplete picture of Countrywide's financial prospects.  Sambol failed to disclose these negative trends and how loans underwritten under relaxed standards would negatively impact Countrywide's future financial results.

### III. CONCLUSION

For the reasons cited herein, and in the SEC's Joint Opposition, the SEC respectfully requests that the Court deny Sambol's Motion for Summary Judgment or Summary Adjudication.

Dated:  August 16, 2010                Respectfully submitted,

/s/ Sam S. Puathasnanon
John M. McCoy III
Sam S. Puathasnanon
Attorneys for Plaintiff
Securities and Exchange Commission