JOHN M. McCOY, III, Cal. Bar No. 166244
Email: mccoyj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
Email: bendells@sec.gov
LYNN M. DEAN, Cal. Bar. No. 205562
Email: deanl@sec.gov
SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
PARIS A. WYNN, Cal. Bar No. 224418
Email: wynnp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>Date: August 30, 2010<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>(Hon. John F. Walter) |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ......................................................................1

II.    SUMMARY OF FACTS ...........................................................3

    A.     Countrywide's Pursuit of Market Share and Its Declining
Underwriting Standards ...........................................................3

    B.     Countrywide's Pay-Option Loans Were Inherently Risky, and Its
Failure to Require Equity or Income Verification Made Them Even
More So ...................................................................................7

    C.     Countrywide's Underwriting Practices Exposed It To Credit  Risk in
Both its Held For Investment Loans and Its MBS Securitizations ......8

    D.     Defendants Substantially Participated in the Preparation of
Countrywide's Periodic Filings ...........................................10

    E.     Defendants' Affirmative Misstatements to Investors .........11

    F.     Mozilo's Affirmative Misstatements ...................................12

    G.     Defendants Are Responsible for Material Omissions From
Countrywide's Filings ..........................................................15

III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT  SHOULD BE
DENIED...................................................................................15

    A.     Summary Judgment Standard ..............................................15

    B.     The True Facts Regarding the Deteriorating State of Countrywide's
Underwriting Were Not Disclosed ......................................16

        1.     An admission of Market Efficiency Does Not Foreclose the
Possibility That Investors Were Misled .............................17

        2.     Defendants' Omissions And Misrepresentations Were Material
19

        3.     The Alleged Omissions Were Not Disclosed Elsewhere ..........22

4.    Statistical Data From Countrywide's MBS Filings And Earnings Releases Was Not Reasonably Available ...........................................23

C.    The Disruption of the Secondary Market in Q3 2007 Was Not Caused by Countrywide But Countrywide's Conduct Placed It More Risk Than Its Many of Its Peers ..................................................25

D.    Defendants' Misrepresentations Are Not Mere Puffery......................27

1.    Regulation S-K Sets the Standard for Disclosure in Periodic Filings and Gives Rise to a Duty to Disclose.....................................30

E.    Countrywide's Use of the Terms Prime and Subprime Was Misleading ..........................................................................33

F.    Defendants' Misled Investors About the Quality of Countrywide's HFI Portfolio ..........................................................................33

G.    Countrywide's Selective Disclosure Do Not Negate Defendants' Scienter ..........................................................................36

H.    Violation of Rule 13a-14(b) Is A Stand Alone Cause Of Action In This Circuit ..........................................................................38

IV.    CONCLUSION..........................................................................39

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## CASES

*American Italian Pasta Co. v. New World Pasta Co.*
   371 F.3d 387 (8th Cir. 2004).................................................................28

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ..........................................................................16

*Atlas v. Accredited Home Lenders Holding Co.*
   556 F. Supp. 2d 1142 (S.D. Cal. 2008)..................................................20

*Basic Inc. v. Levinson*
   485 U.S. 224 (1988) ..................................................................... 18, 19

*Bd. of Trustees of Knox County Hosp. v. Shalala*
   959 F. Supp. 1026 (S.D. Ind. 1997) .....................................................32

*Chevron USA, Inc. v. N.R.D.C.*
   467 U.S. 837 (1984) ..................................................................... 32, 33

*Fecht v. Price Co.*
   70 F.3d 1078 (9th Cir. 1995).................................................................22

*Ganino v. Citizens Utils. Co.*
   228 F.3d 154 (2d Cir. 2000)..................................................................18

*In re Apple Computer*
   886 F.2d 1109 (9th Cir. 1989)...............................................................19

*In re Countrywide Fin. Corp. Derivative Litig.*
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................... 20, 36

*In re Countrywide Sec. Litig.*
   588 F. Supp.2d 1132 (C.D. Cal. 2008) ..................................................29

*In re Cutera Sec. Litig.*
   2010 WL 2595281 (9th Cir. June 30, 2010) ..........................................28

iii

*In re Dura Pharms., Inc. Sec. Litig.*

   452 F. Supp. 2d 1005 (S.D. Cal. 2006)....................................................................29

*In re Dynex Capital, Inc., Sec. Litig.*

   2009 WL 3380621 (S.D.N.Y., Oct. 19, 2009)............................................. 29, 30

*In re First Marblehead Corp. Sec. Litig.*

   639 F. Supp. 2d 145 (D. Mass.2009)....................................................................38

*In re Neopharm, Inc. Sec. Litig.*

   2003 WL 262369 (N.D.Ill. Feb. 7, 2003)............................................................39

*In re New Century*

   588 F.Supp.2d 1206 (C.D. Cal. 2009)..................................................................29

*In re Stac Electronic Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)....................21

*In re Washington Mutual, Inc. Sec. Litig.*

   694 F.Supp.2d. 1192 (W.D. Wash. 2009)............................................................29

*In re Wells Fargo Sec. Litig.*

   12 F.3d 922 (9th Cir. 1993)..................................................................................20

*In re Worlds of Wonder Sec. Litig.*

   35 F.3d 1407 (9th Cir. 1994)................................................................................38

*In the Matter of Bank of Boston Corp.* 1995 WL 757874 (Dec. 22, 1995)............31

*Jones v. Corus Bancshares*

   2010 WL 1338070 (N.D. Ill. April 6, 2010).................................................. 19, 39

*Kapps v. Torch Offshore, Inc.*

   379 F.3d 207 (5th Cir. 2004)......................................................................... 19, 24

*Koppel v. 4987 Corp.*

   167 F.3d 125 (5th Cir. 2004)......................................................................... 19, 24

*Lane v. Page*

   649 F. Supp. 2d 1256 (D.N.M. 2009)..................................................................18

*Marks v. CDW Computer Centers, Inc.*

   122 F.3d 363 (7th Cir. 1997)................................................................................22

*Miller v. Thane*

2010 WL 308148 (9th Cir. August __, 2010)......................................................18

*Navellier v. Sletten*

262 F.3d 923 (9th Cir. 2001)...........................................................................32

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*

320 F.3d 920 (9th Cir. 2003)...........................................................................18

*Oran v. Stafford*

226 F.3d 275 (3d Cir. 2000).............................................................................31

*Pacific Coast Medical Enters. v. Harris*

633 F.2d 123 (9th Cir. 1980)...........................................................................32

*SEC v. Black*

2008 WL 4394891 (N.D. Ill. Sept. 24, 2008) .................................................39

*SEC v. Brady*

2006 U.S. Dist. LEXIS 29086 (N.D. Tex. May 12, 2006) ..............................39

*SEC v. Kalvex, Inc.*

425 F. Supp 310 (S.D.N.Y. 1975)....................................................................39

*SEC v. Kearns*

691 F. Supp. 2d 601 (D.N.J. 2010) ..................................................................28

*SEC v. Phan*

500 F.3d 895 (9th Cir. 2007)..................................................................... 18, 21

*SEC v. Rana Research, Inc.*

8 F.3d 1358 (9th Cir. 1993)....................................................................... 18, 19

*SEC v. Reyes*

__ F. Supp. 2d __, 2010 WL 1734843 (N.D.Cal. April 28, 2010) ......................19

*SEC v. Reys*, No. C09-1262RSM, 2010 WL 1734843 at *4(W.D. Wash. April 28, 2010)....................................................................................................36

v

*SEC v. Sandifur*

   2006 U.S. Dist. LEXIS 12243 (W.D. Wash. Mar. 2, 2006) .................................39

*SEC v. Seaboard Corp.*

   677 F.2d 1297 (9th Cir.1982)...............................................................................16

*Shapiro v. UJB Fin. Corp.*

   964 F.2d 272 (1st Cir. 1992) ...................................................................... 20, 30

*TSC Indus., Inc. v. Northway, Inc.*

   426 U.S. 438 (1976) ...................................................................... 18, 20, 22

*United States v. Mylett*

   97 F.3d 663 (2d Cir. 1996)...................................................................................19

*United Steel Workers of Am. v. Phelps Dodge Corp.*

   865 F.2d 1539 (9th Cir. 1989)..............................................................................16

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*

   739 F.2d 1434 (9th Cir. 1984)..............................................................................16

## FEDERAL STATUTES

**Securities Act of 1933**

Section 17(a)

   [15 U.S.C. § 77q(a) ..............................................................................11

**Securities Exchange Act of 1934**

Section 10(b)

   [15 U.S.C. § 78j(b)]..............................................................................11

## FEDERAL RULES OF EVIDENCE

Rule 10b-5

   [17 C.F.R. § 240.10b-5] ......................................................................11

Rule 13a-14(b)

   [17 C.F.R. § 240.13a-14(b)]................................................................39

1

2
## **COMMISSION RELEASES**

3
*In re Caterpillar*

4
  Exchange Act Rel. No. 30532 (Mar. 31, 1992) .....................................................33

5
*Interpretation:  Commission Guidance Regarding Management's Discussion and*

6
  *Analysis of Financial Condition and Results of Operations*

7
  Exchange Act Rel. No. 48960 (Dec. 29, 2003) .....................................................32

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    **INTRODUCTION**

On January 27, 2004, Defendant Angelo Mozilo stood up at Countrywide's earnings call and announced to Countrywide's shareholders that Countrywide intended to have a 30% share of the United States mortgage market by 2008. Mozilo then reassured the assembled analysts and investors, saying, "[g]oing for 30% market share is ***totally unrelated to the quality of loans*** we go after[,]" and asserted that, "[t]here will be ***no compromise by this company in the overall quality of the product line*** . . ." (emphasis added.)  A mere nine months later, on September 1, 2004, Mozilo wrote to Countrywide's then Chief Credit Risk Officer:

> As I look at production trends, not only at Countrywide, but also with other lenders, there is a clear deterioration in the credit quality of loans being originated over the past several years.  In addition, from my point of view, the trend is getting worse as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate.

Thereafter, and for the next three years, Defendants Mozilo, David Sambol, and Eric Sieracki ("Defendants") engaged in disclosure sleight of hand – appearing to provide sufficient information to satisfy analysts and the purchasers of its mortgage backed securities ("MBS") that Countrywide was being forthcoming, all while concealing the true nature of the company's rapidly deteriorating underwriting quality from its equity investors.

Defendants' Joint Motion attempts a similar sleight of hand.  Defendants set up a series of straw men and then proceed to knock them down.  Unfortunately, the contentions that Defendants ascribe to the SEC, and their arguments about what the SEC has abandoned or conceded in discovery, have little to do with the actual facts and contentions at issue here.  Defendants' characterizations aside, the record at the close of discovery is even more troubling than it was at the outset.  The SEC has adduced evidence that demonstrates even more clearly the serious deficiencies in Countrywide's underwriting and the systematic circumvention of the internal controls over underwriting that were known to Defendants at the time and yet went

undisclosed to investors.   To borrow a turn of phrase from Defendants, disproving imaginary allegations is easy; disproving actual facts is hard.

Defendants' Joint Motion for Summary Judgment or Adjudication should be denied because there remain genuine issues of disputed fact which no amount of characterization or argument can explain away.  Specifically, the SEC has adduced convincing evidence that:

   1)   Defendants each substantially participated in the preparation of Countrywide's periodic filings;

   2)   Countrywide's periodic filings were misleading due to their misrepresentations and omissions, which are set forth in detail in the Statement of Facts herein; and

   3)   Mozilo and Sambol made affirmative misrepresentations to investors in earnings and analyst calls.[1]

Contrary to Defendants' assertions in the Joint Brief, the SEC's allegations are not merely about "widened underwriting guidelines."  The SEC has alleged, and adduced evidence sufficient to establish, that the Defendants' ***affirmative statements*** about Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, . . . and help to prevent fraud," were false.  In addition, Defendants' assurances to investors that "Countrywide ensured its ongoing access to the secondary mortgage market by consistently producing quality mortgages," that the majority of the loans originated by Countrywide were in fact "prime credit quality," or even that Countrywide had "prudently underwritten" its Pay-Option ARM loans, were also knowingly false. Contrary to the representations made to investors, Defendants knew that (1) Countrywide was making an excessive number of loans as exceptions to its own

---

[1]      In addition, and as addressed in the separate Opposition Briefs as to each Defendant's Motion, the SEC has adduced evidence that Defendants acted with scienter, and, in the case of Defendant Mozilo, engaged in insider trading.

underwriting guidelines; (2) had evidence of rampant misrepresentation in the stated income PayOption loans Held for Investment at Countrywide Bank; (3) knew that many of the loans Countrywide originated and described as "prime credit quality" in its periodic filings had the features of subprime loans;  and (4) as the SEC confirmed during discovery, Countrywide's own internal quality assessments revealed the deteriorating quality of its underwriting in the number of loans that were deemed either "Severely Unsatisfactory" or "High Risk."   Indeed, the evidence is clear that by as early as July, 2005, Countrywide's primary "underwriting standard" was not the borrower's ability to repay the loan, but rather whether it could sell the loan into the secondary market, where Defendants apparently hoped the performance of the loan would then become the purchaser's problem.  SF 279-82.

## II.   SUMMARY OF FACTS

### A.   Countrywide's Pursuit of Market Share and Its Declining Underwriting Standards

As noted above, in January 2004, Mozilo announced to investors that Countrywide intended to obtain a 30% share of the mortgage market by 2008.  SF 219.  In pursuit of that strategy, Mozilo assured investors on at least two occasions that Countrywide would not sacrifice quality for market share.  SF 219-220.  These assurances were belied by Mozilo's internal observation in September 2004 that loan quality was deteriorating at Countrywide due to increased competition.  SF 221.

In pursuit of a dominant share of the market, Countrywide engaged in numerous practices that were inconsistent with its claims to prudent underwriting practices.

First, Countrywide had a matching strategy which allowed its loan production divisions to meet the guidelines of any competitor in the market, without applying that competitor's credit risk mitigants.  SF 245, 246, 252-255.  As

3

a result, Countrywide's underwriting guidelines were a composite of the most aggressive guidelines in the market.   SF 254-55.  Indeed, although Defendants disclosed that Countrywide had a policy of "matching" competitors' loan offerings, they never disclosed that the match was in fact a more aggressive iteration of competitors' guidelines.   SF 255.  Both Mozilo and Sambol were aware of the matching strategy, and heralded it to investors.  SF 253-54.  Without understanding the true reach of the matching strategy, it was impossible to understand Countrywide's underwriting, but the true facts were never disclosed to investors.  SF 245.

       Second, Countrywide underwriting policy was based on the principle that no borrower should be turned away without at least four attempts to underwrite the loan.  Loan applications were originally processed by an automated underwriting system.  SF 279.  The only possible results from automatic underwriting were an "accept" or a "refer."  SF 279.  If the loan was referred, it went to manual underwriting, where an underwriter would determine if the loan could be made based on that underwriter's authority to make an exception to underwriting guidelines.  SF 280.  If that underwriter lacked the requisite authority, the loan was referred to the Structured Lending Desk, where yet another underwriter, with even more authority to waive guideline requirements, attempted to make the loan.  SF 281.  If that attempt to make the loan failed, the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, where no attempt was made to underwrite the loan at all, and the sole criterion for approving the loan was whether Secondary Marketing could sell the loan.  SF 282.   Although the Defendants were eager to tout Countrywide's "proprietary underwriting systems" that insured "quality mortgages" none of them ever saw fit to inform investors, either in Countrywide's SEC filings or the MBS prospectuses of its indirect subsidiaries, that their sole underwriting criterion was whether a loan could be sold.

As a result of its "Make Every Loan" strategy, Countrywide had a very high rate of exception loans.  SF 284-85.  Prior to late 2005, Countrywide was unable to effectively track its exception loans.  SF 286.  However, after the implementation of the Exception Processing System in late 2005/early 2006, it became evident that the rate of exception loans was very high indeed, averaging well over 25% , and in some loan products as high as 55%.  SF 293-94.   An exception rate over 20% was considered high by analysts.  SF 295.   The percentage of exception loans was reported to Sambol, as the head of the production divisions and later as COO, and exception loans were a topic of discussion at more than one Credit Risk Management Meeting at Countrywide.  SF 292.   The Credit Risk function at Countrywide created monthly reporting packages that included statistics on the number of exception loans being made by product category.  SF 291.   Both Sambol and Sieracki were members of and attended Credit Risk Committee meetings, Sambol from 2006 through 2007, and Sieracki from 2005 through 2007.  SF 519-27.

On June 28, 2005, Sieracki attended a Credit Risk Committee meeting in which Countrywide's failure to adhere to its own underwriting guidelines was made clear.  At this meeting, he was informed that 1/3 of the loans which were referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines and 1/3 violated "minor" guidelines.  SF289.  Moreover, Sieracki was informed that the mere fact that a loan was underwritten as an exception to guidelines increased the risks associated with the loan:  exception loans were performing 2.8 times worse than similar loans written within guidelines.  SF 289.

But the "exceptions" culture at Countrywide started at the top.  Mozilo himself was responsible for some of the exception loans made at Countrywide.  Mozilo underwrote and approved loans pursuant to a program coined as Friends of Angelo ("FOA").  SF 400. In many instances, Mozilo approved loans that were in

direct contravention of Countrywide's own credit policies and underwriting guidelines. SF 401, 403. When the Chief Risk officer attempted to intervene in one instance, Mozilo berated him for becoming involved in loans that Mozilo had "already approved" and asserted that Countrywide's balance sheet was "big enough" for his FOA loans. SF 404. The Defendants never disclosed the high percentage of exception loans Countrywide was making, in either its SEC filings or its MBS Prospectus Supplements. SF 296.

Finally, in 2007, Countrywide's loan production divisions began writing loans under a program deceptively named "Competitor Match." In the First Quarter of 2007, there was a disruption in the securitization market for subprime and Alt-A loans. SF 543. Countrywide had to take a write down of certain of its loans Held for Sale because it was unable to sell them into the disrupted market. In its first Quarter earnings call, Countrywide management told investors that it was addressing the issue by tightening its underwriting guidelines. However, internally, and without the approval of Credit Risk Management, Countrywide's production divisions rolled out the Competitor Match Program, which allowed them to circumvent the new underwriting guidelines for 100% LTV subprime loans by making them on an exception basis, even though the "competitors" being cited as a justification for making the exceptions had themselves ceased making the loans months earlier. SF 298-302. Sambol and Mozilo were both aware of the program and approved the circulation of an internal email to all the production divisions touting it. SF 303.

As a result of widening its guidelines to be a composite of the most aggressive guidelines in the industry, and then setting up a system which encouraged the making of exceptions to those already wide guidelines, Countrywide effectively abandoned prudent underwriting. Not surprisingly, that failure to appropriately underwrite its loans led to a serious deterioration in the quality of Countrywide' loan production. SF 235-40. This deterioration became

evident in the post-closing audits of loan production performed by the Quality Control functions at both the Bank and Countrywide Home Loans, where high rates of Severely Unsatisfactory and High Risk Loans were detected throughout 2006 and 2007.  SF 421-26.  A Severely Unsatisfactory Loan was defined by at least one Countrywide managing Director as a loan that should never have been made.  McCoy Decl., ¶ 44, Ex. 234.

In fact, a QC audit specifically aimed at testing borrowers' representations regarding their income on stated income loans revealed that a staggering 50% of the loans surveyed in Countrywide Bank's QC process showed a material variance between the borrower's stated income and that reported to IRS, and of those variances, 69% were greater than 50%.  SF 427-28.  As a result, management at the Bank estimated that between 30% and 40% of the PayOption ARM loans in the Bank's HFI portfolio had material misrepresentations related to borrower income. SF 429-434.  Mozilo, Sambol, and Sieracki were aware of these facts but were never disclosed to investors.  SF 435-36; 533.

**B.** **Countrywide's Pay-Option Loans Were Inherently Risky, and Its Failure to Require Equity or Income Verification Made Them Even More So**

The majority of the PayOption ARM loans originated by Countrywide were reduced documentation loans.  While Defendants are correct that Countrywide disclosed many of the risk features inherent in this *type* of loan – the possibility that the loan could negatively amortize due to the borrower making less than the interest only payment, and cause future "payment shock" to a borrower  – nowhere did Countrywide or Defendants disclose to investors the features specific to Countrywide's underwriting that increased that risk.

Specifically, Defendants did not tell investors that Countrywide permitted second liens to be originated concurrently with the PayOption, thus reducing the borrowers' equity.  SF 469.  Nor did Defendants disclose that Countrywide was

holding loans in its portfolio, a portfolio described by Defendants as "high FICO," with subprime FICO scores.  SF 469.  Defendants did not disclose that Countrywide's internal audits revealed a significant amount of misstatement in borrowers incomes, leading management to conclude that somewhere between 30 and 40% of the loans held for investment at Countrywide Bank had materially misstated income, and therefore misstated debt to income ratios.  SF 433.  Mozilo, Sambol, and Siearacki were all aware of these facts, and between 2005 and 2007, Mozilo unwaveringly criticized Countrywide's PayOption loans to Sambol and Sieracki, even advocating selling them out of the Bank on several occasions.  SF 502-515, 533.  But Investors were never informed of these important facts.

**C.    Countrywide's Underwriting Practices Exposed It To Credit Risk in Both its Held For Investment Loans and Its MBS Securitizations**

As Defendants acknowledge in their Joint Brief, Countrywide generally originated loans with the intent to sell them into the secondary mortgage market.  UF 1; Joint Brief at 5.  This model did not completely eliminate the credit risk to Countrywide associated with the loans, however.   SF 228, 230-33.  First, Countrywide owned all of the credit risk associated with the loans in the Bank's Held for Investment portfolio.  Second, Countrywide typically retained risk in the form of a residual interest in the securitizations it sold, typically the lowest rated, or first loss, tranche of the securitization.  Third, Countrywide had loss exposure due to the representations and warranties it made to MBS purchasers.  That representation and warranty liability caused Countrywide to suffer significant losses in the First Quarter of 2006 related to repurchase requests from HSBC.

In September 2005, Countrywide made several sales to HSBC of subprime second liens.  HSBC found serious deficiencies with the loans, both related to documentation and non-compliance with guidelines, and asked Countrywide to repurchase thousands them.  SF 309, 320-21, 324-27, 532.  The repurchases

eventually caused losses to Countrywide in the tens of millions of dollars.  As a result of this event, Mozilo wrote several emails to both Sambol and Sieracki decrying what he called the "serious lack of compliance" in Countrywide's underwriting of these loans and the disregard for guidelines that he had witnessed. SF 309, 320-21, 324-27, 532.  For example, in April 2006, Mozilo wrote of Countrywide's subprime 80/20 loans that he had "personally observed a serious lack of compliance within [Countrywide's] origination system as it relates to documentation and generally a deterioration in the quality of the loans originated. . ." SF 324.

In addition to the credit risk associated with its underwriting, Countrywide ran the risk that if the loans Countrywide originated, packaged into MBS and then sold to investors performed badly, Countrywide's ability to continue accessing the capital markets could be frustrated.  SF 407, 418.   The Chief Risk Officer warned Sambol of just this eventuality, but he needn't have bothered – Sambol was aware of the issue.  SF 407.   In 2005, while he was still the head of loan production, Sambol urged the Bank to take on more risk, because he was concerned that one effect of the Bank's practice of cherry-picking higher quality loans to portfolio would be to cause the secondary markets to lose confidence in the quality of Countrywide's MBS securitizations:

> While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversly [sic] selected pool.

SF 418.

Mozilo himself was concerned in 2006 about the possibility that a "reputational event" could adversely affect Countrywide's ability to sell PayOption

loans.  SF 513.  In September 2006, he wrote that he believed that Countrywide's ability to sell Pay-Option loans into the secondary market, a practice that was critical to Countrywide's liquidity, was at risk because the credit spread was likely to disappear.  SF 513.

Ultimately, Countrywide was forced to begin disclosing the serious problems created by its lax underwriting.   After Countrywide's July 24, 2007 earnings call, where it made disclosures regarding the HFI portfolio at the Bank, Countrywide experienced a series of significant declines in stock price.  SF 469-71.  There was an 11% share price decline following Countrywide's July 24, 2007 earnings call, when it provided investors with statistical information regarding its portfolio of loans held for investment that revealed that its definition of prime loans included loans to borrowers with FICO scores as low as 500, and that 80% of its Pay-Option loans were based upon reduced documentation.   SF 469; Lefler Decl. Ex. 2 at 80-81.  There was an additional approximately 11% decline in Countrywide's share price on August 16, 2007 after Countrywide was forced to drawdown its $11.5 billion credit facility, an event it acknowledged was necessitated by the over 97% decline in Countrywide's revenue from mortgage securitizations from 2006 to 2007, and by Countrywide's inability to bridge the gap by issuing commercial paper.  Lefler Decl. Ex. 2 at 80-81.

Following those announcements, Countrywide's share price began a precipitous decline that decoupled it from other the Dow Jones Financial Services Index, with which it had previously been closely aligned.  Lefler Decl. Ex.at 85.

## D.   Defendants Substantially Participated in the Preparation of Countrywide's Periodic Filings

Defendants substantially participated in the preparation of Countrywide's filings with the SEC.   Mozilo and Sieracki both reviewed drafts of the documents, signed Sarbanes-Oxley certifications for each Form 10-Q from Q1 2005 through Q3 2007, and each Form 10-K for the years ended 2005, 2006, and 2007, and

10

signed the Forms 10-K for the years ended 2005, 2006, and 2007.  SF 217, Dean Decl. Exhs. 43, 45, 47, 63, 64, 65, 67, 68, 69.  Sambol received and reviewed drafts of the documents, sub-certified the filings prior to his becoming COO in September 2006, signed the Forms 10-Q for the third quarter of 2006 and each quarter in 2007, and signed the Form 10-K for the year ended 2007.  SF 561, 217, Dean Decl. Exhs. 43, 63, 64, 65, 67, 68, 69.  In addition, Sambol was an active participant in decisions about disclosures regarding Countrywide's underwriting standards and was the person whose decisions trumped the disclosures requested by Countrywide's Chief Credit Risk Officer with respect to the 2006 Form 10-K and in the second quarter of 2007.  SF 453-57, 458-61.

### E.   Defendants' Affirmative Misstatements to Investors

In Countrywide's Form's 10-K for the years ended 2005, 2006, and 2007, Defendants made false and misleading affirmative statements, including:

(1) statements in Countrywide's Forms 10-K for 2005, 2006, and 2007 that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touting the Company's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud."  Dean Decl Exhs. 43, 45, 47.  These statements were false.  Defendants knew that a significant portion of Countrywide's loans were being made as exceptions to Countrywide's already extremely lax underwriting guidelines.  SF 293-94, 289.

(2) statements in Countrywide's 2005 and 2006 Form 10-K that Countrywide ensured its ongoing access to the secondary mortgage market by consistently producing quality mortgages.  Dean Decl Exhs. 43, 45, 47.  These statements were false.  Defendants knew that Countrywide was originating increasing percentages of poor quality loans that did not comply with Countrywide's own wide underwriting guidelines, and Mozilo feared that one adverse event would be

enough to foreclose Countrywide's access to the secondary market for Pay-Option ARM loans.  SF 309, 320-21, 324-27, 532; 502-515, 533;

(3) a statement in Countrywide's 2006 Form 10-K that "[w]e believe we have prudently underwritten" Pay-Option ARM loans.  Dean Decl Exh. 47.  These statements were false because Mozilo had begun sounding internal alarms about the underwriting of the Pay-Option portfolio at least as early as April 4, 2006, citing his knowledge that a significant percentage of borrowers were misstating their incomes on stated income loans such as the Pay-Option ARM.  SF 532; 502-515, 533;

(4) deceptive descriptions of "prime loans" in Countrywide's 2005, 2006, and 2007 Forms 10-K that did not inform investors that Countrywide's definition of such loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality and with additional credit risk factors such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and higher Dean Decl Exhs. 43, 45, 47;

(5) the misleading use of the term "nonprime" in Countrywide's periodic filings because Countrywide failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this category included loans with significant additional layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or combined loan to value ratios of 95% and higher; and (5) loans made to borrowers with recent bankruptcies and late mortgage payments.  Dean Decl Exhs. 43, 45, 47.

### F.   **Mozilo's Affirmative Misstatements**

In addition, to the misrepresentations made by Defendants in Countrywide's

Form 10-Ks, Mozilo made affirmative misstatements[2] to investors in Countrywide's earnings calls and at investor forums.  Specifically:

1)      In an April 26, 2005 earnings call Mozilo said that "We don't see any change in our protocol relative to the quality of loans that we're originating."   SF 554.;

2)      In a July 26, 2005 earnings call Mozilo stated that he was "not aware of any change of substance in [Countrywide's] underwriting policies" and that Countrywide had not "taken any steps to reduce the quality of its underwriting regimen."  SF 555;

3)      In that same July 26, 2005 earnings call, Mozilo touted the high quality of Countrywide's Pay-Option ARM loans by stating that "[t]his product has a FICO score exceeding 700. . . . the people that Countrywide is accepting under this program . . . are of much higher quality. . . that [sic] you may be seeing . . . for some other lender."  SF 556;

4)      In a January 31, 2006 earnings call Mozilo stated that "It is important to note that [Countrywide's] loan quality remains extremely high."  SF 557 ;

5)      In an April 27, 2006 earnings call Mozilo stated that  Countrywide's "pay option loan quality remains extremely high"  and that Countrywide's "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period."  SF 558;

6)      At the May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference, Mozilo told the audience that despite recent scrutiny of Pay-Option loans, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers."  Mozilo added that the

---

[2]      The commission also alleges affirmative misstatements as to David Sambol. Those are addressed separately in the Opposition to Mr. Sambol's Motion.

"performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments."   SF 506, 559;

7)      At a Fixed Income Investor Forum on September 13, 2006, Mozilo told investors that "[t]o help protect our bond holder customers, we engage in prudent underwriting guidelines" with respect to Pay-Option loans.  SF 560.

All of Mozilo's statements regarding underwriting quality were false when made because Mozilo had already observed a "clear deterioration in the credit quality of loans being originated at Countrywide," a trend he expected to worsen given the competition for subprime, Alt-A, and non-conforming loans.  SF 221. Moreover, as set forth in detail in the accompanying Opposition to Mozilo's Motion, Mozilo was not only on notice of the deterioration in Countrywide's underwriting controls and loan quality, he was sounding repeated internal alarms about the PayOption ARMs and subprime 100% financing from 2005 until right before Countrywide was forced to sell itself to Bank of America in January 2008. SF 309, 320-21, 324-27, 427-36, 469, 502-515, 532, 533,

In addition, Mozilo's statements at the Sanford Bernstein Conference were false when made, because Mozilo had just written to Sambol and Sieracki in a May 19, 2006 email that Pay-Option loans would continue to present a long-term problem "unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."  SF 505. Moreover, one day after the conference, on June 1, 2006, Mozilo wrote an email to Sambol in which he stated that in a conversation with Sambol, he had been informed that the Pay-Option portfolio was largely underwritten on a reduced documentation basis, and that there was evidence that borrowers were lying about their income in the application process.  SF 508.

Mozilo concluded that email by stating: (1) in an environment of rising interest rates, borrowers would reach the 115% negative amortization cap sooner than they expected; (2) borrowers would suffer payment shock because of the

1  substantially higher payments upon reset, particularly those with FICO scores

2  below 700 who "are going to experience a payment shock which is going to be

3  difficult if not impossible for them to manage"; and (3) "we know or can reliably

4  predict what's going to happen in the next couple of years" so the company must

5  act quickly to address these issues.  SF 508.  In addition, Mozilo failed to disclose

6  that by the time he made the statement about the 20-year history of pay-options,

7  the history that he was referring to, that of World Savings, no longer provided him

8  any comfort about the future performance of the portfolio.  SF 507.

9       **G.      Defendants Are Responsible for Material Omissions From**

10              **Countrywide's Filings**

11         Despite the assurances in Countrywide's periodic filings, and the additional

12  comfort statements made by Mozilo and Sambol to investors, the evidence is clear

13  that in its pursuit of market share, Countrywide had abandoned prudent

14  underwriting, and that its loan quality had deteriorated as a result.  SF 235, 240,

15  289, 291-95, 427-434.   Defendants failed to disclose to investors that Countrywide

16  had a adopted a matching strategy that rather than assuring that Countrywide

17  offered every loan program offered by its competitors, as defendants assured

18  investors, gave Countrywide the most aggressive underwriting guidelines in the

19  industry.  Nor did Defendants disclose that Countrywide was failing to comply

20  even with its own severely widened guidelines, and generating high rates of

21  exceptions loans, SUS loans, and clear evidence of fraud in the Bank's held for

22  investment portfolio as a consequence.

23  **III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT  SHOULD**

24          **BE DENIED**

25         **A.      Summary Judgment Standard**

26  Summary judgment is appropriate only where there are no genuine issues of

27  material fact and where the moving party is entitled to prevail as a matter of law

28  when the evidence is viewed in the light most favorable to the party opposing the

motion.  *SEC v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir.1982).  The Court should draw all justifiable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), and those inferences need not be the "most likely or the most persuasive," but only "rational" or "reasonable*." United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).  "Summary judgment is generally inappropriate when mental state is an issue, unless ***no reasonable inference*** supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (emphasis added).

**B.**     **The True Facts Regarding the Deteriorating State of Countrywide's Underwriting Were Not Disclosed**

Notably, Defendants do not argue that the critical information regarding known deterioration in Countrywide's underwriting standards was in fact included in Countrywide's SEC filings.[3]  Instead, Defendants posit two equally unavailing arguments to excuse Defendants' failure to disclose the material non-public information regarding Countrywide's lax underwriting practices and deteriorating loan quality.

First, Defendants argue that everything that the SEC alleges they failed to disclose was available to investors elsewhere in the marketplace via (1) Prospectus Supplements for MBS Securities offerings filed by four indirect subsidiaries of Countrywide; (2) websites that Countrywide Securities provided to inform investors in those securitizations of the performance of the collateral underlying their investments; (3) Countrywide's monthly press releases showing origination

---

[3]     Tellingly, nowhere in the Joint Brief do Defendants dispute the SEC's fundamental allegation that Countrywide's loan quality was deteriorating at a rapid pace from 2005 to 2007.  Instead, Defendants simply argue that a Countrywide equity investor should have known that Countrywide's loans quality was deteriorating, despite the pains taken by Defendants to keep that information from them.

and delinquency statistics; and (4) statements by Countrywide management.  Joint Brief at pp. 6-11, 19-20.  What Defendants ignore is that (1) the material information that the SEC alleges it failed to disclose (and which might have cured their affirmative misrepresentations) was in fact never disclosed from any of these sources; and (2) what information was available via the MBS securitizations was not reasonably available to Countrywide's equity investors such that it altered the total mix of information available to them.  Accordingly, the material cited by Defendants is both factually and legally insufficient to cure the serious defects in Countrywide's disclosures.

Second, Defendants argue that the SEC has admitted that that the omitted materials were disclosed elsewhere.  The SEC has done nothing of the kind.

## 1.   An admission of Market Efficiency Does Not Foreclose the Possibility That Investors Were Misled

Defendants incorrectly argue that the SEC's acknowledgment that information contained in secondary market prospectuses would be incorporated into Countrywide's stock price precludes the Court from finding their misrepresentations and omissions material.  Joint Brief at 18-21.  But Defendants have misconstrued the law, the SEC's claims, and the evidentiary record to arrive at this strained conclusion.

First, Defendants conflate the distinct concepts of materiality and loss causation.  The former is an element in a SEC enforcement action; the latter is not.  Whether an efficiently trading stock exhibits a price change in response to a corrective disclosure (assuming a true corrective disclosure ever occurs) may be part of a loss causation analysis.  But as the Ninth Circuit recently explained, it is neither necessary to nor relevant to a determination of materiality:

"[T]he materiality inquiry concerns whether a 'reasonable investor' **would** consider a particular misstatement important."  *Miller v. Thane* 2010 WL 308148 at *8-9 (9th Cir. August 9, 2010), citing *Miller I*, 519 F.3d 879, 889 (9th Cir. 2009)

(discussing reasonable investor test for materiality in a section 12(a)(2) claim); *see TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976).  The inquiry is hypothetical and objective.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  By contrast, the loss causation inquiry assesses whether a particular misstatement ***actually*** resulted in loss.  *Miller I*, 519 F.3d at 892.  It is historical and context-dependent.  *See Lane v. Page*, 649 F. Supp. 2d 1256, 1297 (D.N.M. 2009) (contrasting ex post causation and ex ante materiality assessments)."  *Miller v. Thane* ___ WL ____ at *8-9 (9th Cir. August 9, 2010).  *See also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) (fact can be material without causing stock price movement); *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir. 1993).  *See also SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement.")

Second, Defendants' argument that enough information made its way into the market to put investors on constructive notice of their misrepresentations and omissions is nothing more than a thinly veiled attempt to assert a "truth-on-the-market" defense. The "truth-on-the-market" defense posits that a misrepresentation "is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  But this defense is not appropriate in a SEC action because the fraud-on-the-market theory, to which the "truth-on-the-market" defense may be asserted, is a means for a private securities law plaintiff to prove reliance on a material misstatement.  *See In re Apple Computer*, 886 F.2d at 1113-14.  But unlike a private plaintiff, the SEC is not required to prove reliance in a securities fraud case, and the truth-on-the-market defense is therefore inapposite. *SEC v. Reyes*, __ F. Supp. 2d __, 2010 WL 1734843 (N.D.Cal. April 28, 2010); s*ee Rana Research, Inc.*, 8 F.3d at 1363-64.

1    Third, Defendants cannot establish undisputed facts that would form the

2    predicate for such an argument.  The release of some information regarding a

3    particular subject into the marketplace (even assuming the applicability of a truth-

4    on-the-market theory) obviously does not mean that no other, undisclosed

5    information about that subject can be deemed material.  Here, the information

6    Defendants cite fails to cure the critical omissions and representations

7    demonstrated by the SEC.  *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir.

8    1996); *Jones v. Corus Bancshares*, 2010 WL 1338070 (N.D. Ill. April 6, 2010)

9    [explain] Moreover, in evaluating materiality the relevant "total mix" of

10   information includes only information that is "readily" or "reasonably" available to

11   individual shareholders.  *Koppel v. 4987 Corp*., 167 F.3d 125, 132 (5th Cir. 2004);

12   *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004).

13   Accordingly, the mere fact that the SEC has admitted that the market for

14   Countrywide's stock was efficient, does not preclude the  possibility that investors

15   were simultaneously misled by Defendants misrepresentations and omissions.

16   Accordingly, summary judgment cannot be granted on this ground.

17        **2.    Defendants' Omissions And Misrepresentations Were**

18              **Material**

19   The antifraud provisions require that a misrepresentation or omission be

20   material.  *See Basic Inc. v. Levinson*, 485 U.S. at 231-32.  A fact is material if there

21   is a substantial likelihood that a reasonable investor would consider the

22   information important in making an investment decision.  *See TSC Indus., Inc.*, 426

23   U.S. at 449.  A reasonable investor would want adequate and accurate disclosures

24   regarding Countrywide's loan underwriting, loan quality, and credit risk.  *Shapiro*

25   *v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[I]f a defendant represents

26   that its lending practices are 'conservative' . . ., the securities laws are clearly

27   implicated if it nevertheless intentionally or recklessly omits certain facts

28   contradicting these representations."); *Atlas v. Accredited Home Lenders Holding*

19

*Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("as a mortgage lender,
Accredited's underwriting practices would be among the most important
information looked to by investors."); *In re Countrywide Fin. Corp. Derivative
Litig.*, 554 F. Supp. 2d 1044, 1072 (C.D. Cal. 2008) (allegedly false "statements
included representations, for example, that Countrywide actively managed credit
risk, applied more stringent underwriting standards for riskier loans such as
ARMS, and only retained high credit quality mortgages in its loan portfolio.  The
importance of the quality of Countrywide's loans held for both sale and investment
underscores the materiality of these statements."); *see also In re Wells Fargo Sec.
Litig.*, 12 F.3d 922, 930 (9th Cir. 1993) ("Where a defendant affirmatively
characterizes management practices as 'adequate' or loans as 'substantially
secured,' 'a defendant declares the subject of its representation to be material to the
reasonable shareholder, and thus is bound to speak truthfully.'")

      The information that Defendants omitted or misrepresented would have been
important to a reasonable investor.  Countrywide's periodic filings trumpeted that
Countrywide was a primarily prime lender with "prudent" underwriting guidelines
and an underwriting process designed to ensure quality loans.  This was plainly not
the case.  Defendants knew substantial negative information relating to
Countrywide's loan production that was likely to, and ultimately did, have a
material unfavorable impact on Countrywide's revenues.  But Defendants did not
disclose the critical facts about Countrywide's deteriorating underwriting
standards, which were accompanied by rising exception loans, SUS loans, and
evidence or material borrower and/or broker fraud.  Without this critical
information, Defendants' disclosures regarding Countrywide's loan production and
the risks associated with those loans was misleading.

      News about the decline in the credit quality of Countrywide's loan
originations was in fact material to investors.  After Countrywide's July 24, 2007
earnings call, and its disclosures regarding the HFI portfolio at the Bank,

Countrywide experienced a series of significant declines in stock price.  There was an 11% share price decline following Countrywide's July 24, 2007 earnings call, when it provided investors with statistical information regarding its portfolio of loans held for investment that revealed rising defaults and delinquencies in the Countrywide Bank's portfolio, along with the news that the portfolio included loans to borrowers with FICO scores as low as 500, and that 80% of the Pay-Option loans were reduced documentation.   SF 469-71; Lefler Exh. 2 at 80-81. There was an additional approximately 11% decline in Countrywide's share price on August 16, 2007 after Countrywide was forced to drawdown its $11.5 billion credit facility, an event Countrywide acknowledged was necessitated by the over 97% decline in Countrywide's revenue from mortgage securitizations from 2006 to 2007 and Countrywide's inability to bridge the gap by issuing commercial paper. Lefler Exh. 2 at 80-81.

The materiality and misleading nature of a misstatement or omission is usually a question for the trier of fact, and such an argument is rarely successful on a motion for summary judgment.  *See SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."); *In re Stac Electronic Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (materiality is a fact-specific determination that should ordinarily be assessed by a jury), quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995) ("[o]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law.").  "The determination of materiality requires delicate assessments of the inferences a 'reasonable [investor]' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage. . . ."  *Marks v. CDW Computer*

*Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).  Because the SEC is entitled to all justifiable inferences in its favor, the Court should deny Defendants' Motion.

### 3.   The Alleged Omissions Were Not Disclosed Elsewhere

Although Defendants spend pages of their Joint Brief arguing about what they allege was disclosed about Countrywide's loans, they largely miss the point of the SEC's allegations against them.  To begin, Defendants' argue that disclosures about delinquencies, either in Countrywide's press releases, or in on its MBS investor website, were somehow sufficient to apprise investors of the true state of affairs at Countrywide.  Joint Brief  11, 19-20.  This is not so for several reasons. First, providing statistical information about portfolio delinquencies is simply not the same thing as informing investors that Countrywide had actual knowledge of excessive exceptions to guidelines, SUS loans, and fraud.  Second, delinquencies are a lagging indicator of underwriting quality, a fact acknowledged by Defendants themselves in a statement they attribute to Mozilo: "you have to wait some time for loans to mature a year, two years, or even three years to determine how they are going to perform."  Joint Brief 32.  Thus, delinquencies attributable to lax underwriting might not manifest for some time, so an investor reviewing delinquency statistics  in 2006 would likely been unable to assess the quality of loans originated in 2006, or even 2005 for that matter, and certainly would be unable to intuit what Defendants actually knew from those statistics, good or bad. Finally, as discussed in detail below, information directed at MBS investors was not reasonably available to Countrywide's equity investors.

Similarly, Sambol may have told investors that Countrywide had a "the broadest and most comprehensive ***product line*** in the marketplace," or that a borrower who ***genuinely*** qualified for a loan elsewhere would qualify at Countrywide (Joint Brief p. 7), but that is a long way from informing investors that Countrywide's matching strategy had given it underwriting guidelines that were

the most aggressive in the industry, that Countrywide made high levels of exceptions even to those guidelines, that Countrywide's ultimate underwriting criterion was whether a loan could be sold to a downstream purchaser, and that Countrywide's internal QC process revealed high levels of SUS loans and evidence of significant borrower fraud.   None of this information could be gleaned from the materials cited to by Defendants.

Likewise, statements and statistical data in Countrywide's earnings releases regarding its origination volumes and delinquency trends were insufficient to adequately inform investors of what Defendants knew – Countrywide's pursuit of a dominant share of the mortgage market had come at the expense of quality, despite Defendants' assurances to the contrary.  None of the alternative sources of information cited by Defendants could have disclosed Countrywide's effective abandonment of prudent underwriting from 2005 through 2006 through unfettered guideline expansion and underwriting exceptions.

The material omissions and misstatements alleged by the SEC go directly to Defendants' knowledge about the quality of Countrywide's loan production.  The statistical data about Countrywide's loan originations referenced at pages 8-10 of the Joint Brief do not include any discussion about Countrywide's unprecedented widening of underwriting guidelines, the percentage of exception loans Countrywide was making, the instances of known or suspected fraud in the PayOption portfolio or the generally deteriorating quality of Countrywide's loans. They therefore cannot be a substitute for disclosure by Defendants.

**4.** **Statistical Data From Countrywide's MBS Filings And Earnings Releases Was Not Reasonably Available**

Defendants argue that the material misstatements and omissions alleged by the SEC were in fact disclosed in the MBS prospectus supplements of Countrywide's subsidiaries such that disclosure in Countrywide's periodic filings would not have "significantly altered the 'total mix' of information available."

23

However, the "total mix" of information only includes information that is "readily" or "reasonably" available to an investor.  *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999) ("The 'total mix' includes only information 'reasonably available to shareholders.'")*; Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) ("The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders.").

As Defendants admit in footnote 5 of the Joint Brief, and as the Court has previously noted in connection with the Motions to Dismiss in this matter, Countrywide sold its mortgage pools through four *indirect* subsidiaries, CWALT, LLC, CWABS, LLC, CWMBS, LLC, or CWHEQ, LLC.  The prospectus supplements and disclosures cited by Defendants were therefore not filed on Edgar under the Countrywide name, but rather under the name of these various special purpose entities.  Thus, investors in Countrywide could not reasonably be expected to know that the MBS prospectuses of issuers named CWALT, LLC, CWABS, LLC, CWMBS, LLC, or CWHEQ, LLC contained information that was relevant to a decision to invest in Countrywide Financial Corporation.

Moreover, even if an investor were to stumble upon the raw data about loans contained in the MBS prospectuses, that investor could not reasonably be expected to determine the relevant information from the tables included in the MBS prospectuses that showed aggregate FICO scores, loan to value ratios, or geographical information, as Defendants suggest at pages 9-10 of the Joint Brief. The SEC alleges that Countrywide abandoned prudent underwriting  – while at the same time distinguishing itself from the "irrational" competition and assuring investors that it was using its proprietary systems to assure loan quality – by engaging in a competitor match program that gave it composite under writing guidelines more  aggressive than the industry and by writing excessive numbers of loans as exception to those widened guidelines.  Nothing in the information cited

by Defendants is sufficient on its own to tell that story, and a reasonable investor in Countrywide cannot be expected to wade through the dry statistics in an MBS securitization prospectus for an entity other than Countrywide, each one of which might represent information related to hundreds or thousands of loans, and then conduct a meaningful analysis of how that securitization compared with the hundreds that may have gone before it, in the hopes of learning information that Defendants had a legal obligation to disclose in Countrywide's periodic filings.

Finally, the MBS disclosures provide no information about the loans that Countrywide held for investment on its balance sheet, loans as to which it bore the entire credit risk.

For all the above reasons, Defendants' attempt to argue that MBS prospectuses and Countrywide's press releases cure the omissions and misrepresentations alleged in the Complaint fails.  Indeed, deluging investors with the avalanche of statistical information contained in Countrywide's  MBS filings and other data sources and expecting them to analyze and synthesize the information ignores the very point of Regulation S-K's requirement that MD&A in periodic filings provide investors with a view of the company through the eyes of management.  *MD&A Release*, Exchange Act Release No. 48960 (Dec. 29, 2003).

## C.     The Disruption of the Secondary Market in Q3 2007 Was Not Caused by Countrywide But Countrywide's Conduct Placed It More Risk Than Its Many of Its Peers

Defendants also argue that Countrywide's conduct did not cause the disruption of the secondary mortgage market in Q3 2007.  The SEC has never alleged that Countrywide was single-handedly responsible for that disruption.  Rather, the SEC has alleged, and the evidence demonstrates, that Countrywide's risk-taking with its mortgages originations created the very real possibility that if the loans it originated, packaged into MBS or sold as whole loans performed badly, Countrywide's ability to continue accessing the capital markets would be

frustrated.  SF407-10, 417-18.  Defendants call this a fictitious "theory," and falsely assert that the SEC has abandoned it.  Joint Brief at 2.  The SEC has not, and the evidence says it was no mere theory.

Countrywide's Chief Risk Officer warned Sambol of the possibility that lax underwriting could cause Countrywide problems in the secondary market,[4] but Sambol was well aware of the issue in any case.  In 2005, while he was still the head of loan production, Sambol urged the Bank to begin taking on riskier loans, because he was concerned that the Bank's practice of cherry-picking higher quality loans to portfolio would cause the secondary markets to lose confidence in the quality of Countrywide's MBS securitizations:

> While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversly [sic] selected pool.

Mozilo himself was concerned in 2006 about the possibility that a "reputational event" could adversely affect Countrywide's ability to sell PayOption loans.  SF 502-510, 513.  In September 2006, he wrote that he believed that Countrywide's ability to sell Pay-Option loans into the secondary market, a practice that was critical to Countrywide's liquidity, was at risk because the credit spread was likely to disappear.

Defendants in fact had an early warning of the potential severity of this problem in September 2005, Countrywide made several sales to HSBC of subprime second liens.  HSBC found serious deficiencies with the loans, both related to documentation and non-compliance with guidelines, and asked Countrywide to repurchase thousands them.  The repurchases eventually caused

---

[4]     Indeed, one of the Chief Risk Officer's subordinates independently concluded that it was deteriorating credit quality ultimately caused the market disruption, in his words: "investors lost confidence in their ability to assess and risk and predict performance, and so they stopped buying mortgages."

losses to Countrywide in the tens of millions of dollars.  As a result of this event, Mozilo wrote several emails to both Sambol and Sieracki decrying what he called the "serious lack of compliance" in Countrywide's underwriting of these loans and the disregard for guidelines that he had witnessed.  SF 309, 320-21, 324-27, 532. For example, in April 2006, Mozilo wrote of Countrywide's subprime 80/20 loans that he had "personally observed a serious lack of compliance within [Countrywide's] origination system as it relates to documentation and generally a deterioration in the quality of the loans originated. . ."  SF 324.

Ultimately, Countrywide was forced to begin disclosing the serious problems created by its lax underwriting.   After Countrywide's July 24, 2007 earnings call, where it made disclosures regarding the HFI portfolio at the Bank, Countrywide experienced a series of significant declines in stock price.

Defendants argue that because companies other than Countrywide were affected by the Q3 2007 liquidity event, that somehow means that Countrywide's conduct did not contribute to its problems selling its own mortgages.  But what Defendants cannot explain is why Countrywide's share price dropped 11% ***before*** it had to draw down its line of credit on August 16, 2007.   Lefler Ex. 2, at 80-81. Nor can Defendants explain why Countrywide's stock price decoupled precipitously from those of other financial service companies after having closely tracked them in the three year period immediately prior to the July 24th disclosures. SF Lefler Exh. 2 at 85.

### D.   <u>Defendants' Misrepresentations Are Not Mere Puffery</u>

Despite Defendants' protestations to the contrary, Countrywide's statements that it "manage[d] credit risk through credit policy, underwriting[,]" and "quality control" activities, and that it was "consistently producing quality mortgages," are false, misleading and actionable under the securities laws.  Defendants attempt to

characterize them as "inactionable puffery"[5] is simply inconsistent with the many recent decisions in this Circuit and others which hold that such statements are in fact actionable.

As numerous courts have recognized, statements regarding "underwriting standards," "credit policy" and "high quality credit" – *are*, in fact, actionable where they are plainly at odds with reality. *See, e.g.*, *In re Dynex Capital, Inc., Sec. Litig.*, 2009 WL 3380621, *7 (S.D.N.Y., Oct. 19, 2009) (denying motion to dismiss, noting that "[a]t some point, statements made by a defendant that it "generally" adheres to a particular policy become misleading when in fact there is no policy or the policy is something else altogether."); *In re New Century*, 588 F.Supp.2d 1206, 1127 (C.D. Cal. 2009) (denying motion to dismiss, and finding that statements regarding "credit quality" and "strict underwriting practices" when contrasted with actual state of affairs, were material, and thus did not constitute "mere puffery."); *In re Countrywide Sec. Litig.*, 588 F. Supp.2d 1132, 1144-1153 (C.D. Cal. 2008) (to the extent Countrywide's underwriting related statements "systematically departed" from its actual underwriting practices, the puffery defense is inapplicable.)[6] Specifically, the court wrote in the *Countrywide* matter,

---

[5] Defendants' reliance upon *American Italian Pasta Co. v. New World Pasta Co.,* 371 F.3d 387, 391 (8th Cir. 2004)*,* is misplaced, as the allegations there concerned false advertising under the Lanham Act, which has different standards, and was meant to serve different purposes, than the federal securities laws. Defendants fare no better in invoking, *In re Cutera Sec. Litig.*, 2010 WL 2595281, at *5 (9th Cir. June 30, 2010) (allegations that statements such "our employee relations are good," while aware that "many employees were on their way out the door" were puffery) or *SEC v. Kearns*, 691 F. Supp. 2d 601, 617 (D.N.J. 2010) (statements about "management discipline," were puffery)  But the facts and allegations at issue here are qualitatively different than those in the cases cited by Defendants, and are more analogous to the systematic violations of policy that were found actionable in *In re Dynex,* 2009 WL 3380621*,* and *In re Countrywide Sec. Litig.*, 588 F. Supp.2d 1132.

[6] *See also In re Washington Mutual, Inc. Sec. Litig*., 694 F.Supp.2d. 1192, 1211 (W.D. Wash. 2009) (In denying motion to dismiss, court found that statements regarding "excellent processes, policies," and "standards," were actionable, where complaint alleged facts undermining the veracity of such statements.)

plaintiffs had alleged facts sufficient to show that "Countrywide's practices so departed from its public statements that even 'high quality' became materially false or misleading; and . . .  to apply the puffery rule to such allegations would deny that 'high quality' has any meaning." *Id.*, 588 F. Supp.2d at 1144, citing *In re Dura Pharms., Inc. Sec. Litig.,* 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (because "the facts alleged . . . lead to a strong inference there was no reasonable basis for believing such statements to be true . . . the puffery rule does not insulate Defendants from liability" under the securities laws); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 282 (3d Cir. 1992), *cert. denied,* 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'  For example, if a defendant represents that its lending practices are 'conservative' . . . the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations."

Similarly, in *Dynex*, plaintiffs argued that defendants' statements that they "relied upon their guidelines" to underwrite the securities at issue were false and misleading as such guidelines were "systematically disregarded." *Id.* at *7. Specifically, defendants in *Dynex* alleged that defendants "'routinely' disregarded their own underwriting standards, not in the principled manner described in the Offering Documents—*i.e.,* in 'appropriate cases' where 'favorable compensating factors exists'—but recklessly to achieve loan volume." *Id.* at *7.  Finding that such statements were, in fact, actionable under the securities laws, the court observed that, "[a]t some point, statements by a defendant that it 'generally' adheres to a particular policy become misleading when in fact there is no policy or the policy is something else all together." *Id.* at *7.

The record here is replete with factual evidence that Defendants' public statements touting Countrywide's "proprietary underwriting systems . . . that

29

improve the consistency of underwriting standards, . . . and help to prevent fraud," or assuring investors that "Countrywide ensured its ongoing access to the secondary mortgage market by consistently producing quality mortgages," or had "prudently underwritten" its Pay-Option ARM loans were violently at odds with Countrywide's actual practices of essentially writing any loan that it could sell into the secondary market, whether or not that loan met Countrywide's underwriting guidelines.  The evidence demonstrates that Defendants were well aware that Countrywide's underwriting guidelines were honored more in the breach than in the observance, thus, Defendants' statements are actionable.

### 1.   Regulation S-K Sets the Standard for Disclosure in Periodic Filings and Gives Rise to a Duty to Disclose

Defendants also argue that the SEC has previously argued that failure to comply with Regulation S-K somehow separately and independently establishes a fraud claim.  Joint Motion at 25. [7]  Once again, Defendants appear to have willfully misunderstood both the SEC's position and the law.  The word "fraud" appears nowhere on page 15 of the SEC's Opposition to Defendants' Motion to Dismiss.  Dkt. No. 57 at 15.  Rather, the SEC's brief simply sets forth the sets the standard for disclosures in periodic filings with the SEC and notes that to the extent management identifies a known trend whose outcome is either certain or impossible to determine, it must evaluate objectively the consequences of the known trend, demand, commitment, event, or uncertainty, on the assumption that it will come to fruition.  **Disclosure is then required**, even if the information is disclosed elsewhere, unless management determines that a material effect on the

---

[7]      Defendants argue that the position they falsely ascribe to the SEC is "wrong as a matter of law."  Since the SEC has taken the position ascribed to it, Defendants' argument is moot.  Nevertheless, the SEC notes that the sole case that Defendants cite in this section of the brief merely stands for the proposition that Item 303 of Regulation S-K does not *automatically* give rise to a fraud charge, not that it can never give rise to one.  *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

registrant's financial condition or results of operations is not reasonably likely to occur. *In the Matter of Bank of Boston Corp.*, SEC Admin. Proc. File No. 3-8270, 1995 WL 757874 at *13 (Dec. 22, 1995) (the "existence of information in other filings, unless it was incorporated by reference, is irrelevant to whether disclosure in a particular [periodic filing] was sufficient"); *see also MD&A Release*, Exchange Act Release No. 48960 at Section II.B.3 (Dec. 29, 2003); *In the Matter of Caterpillar, Inc.*, Exch. Act Rel. 30532 at *16-17 (Mar. 31, 1992).

Countrywide adopted the Item 303 standard as its own disclosure policy. Among other things, Item 303 and Countrywide's own disclosure policy require MD&A disclosures of:

> any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  [17 C.F.R. § 229.303(a)(3)(ii)]

The purpose of MD&A disclosures is (1) "to give the investor the opportunity to see the company **through the eyes of management**;" (2) enhance the overall financial disclosure and **provide the context within which financial information should be analyzed**; and (3) provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance. *Interpretation:  SEC Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Exchange Act Rel. No. 48960, Section I.B (Dec. 29, 2003) ("MD&A Release") (emphasis added)[8]; *In the Matter of Caterpillar, Inc.*, Exchange Act Rel. No.

---

[8]     Courts have recognized that "the SEC's reasonable interpretation of a statute that it administers, including its promulgation of rules and regulations interpreting or implementing the statute, is entitled to deference." *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir. 2001) (*citing Chevron USA, Inc. v. N.R.D.C.*, 467 U.S. 837 (1984)).  Further, the Ninth Circuit has stated that, in general:

> when the meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction.  In such cases, the agency's expertise make it

30532, *12-177 (Mar. 31, 1992).  To further these objectives, Item 303 of Regulation S-K sets forth the information required in the MD&A disclosure that must be included in Forms 10-K and 10-Q.  *See* 17 C.F.R. § 229.303.

The evidence establishes that Defendants knew of Countrywide's serious departures from prudent underwriting, and the likely negative consequences thereof.  Yet these facts and trends were not included in Countrywide's MD&A in any quarter from 2005 through the end of 2007.  Moreover, Mozilo and Sambol continued to make statements in earnings and investor calls that touted the quality of Countrywide's underwriting and the high quality of its Pay-Option ARM portfolio.  Investors would have considered it important in making an investment decision that Countrywide was writing increasingly risky loans, because the increasing losses on such loans would directly result in higher repurchase expenses and lower net income.  Moreover, the poor performance of its shoddily underwritten loans was likely to imperil Countrywide's continued ability to rely on the secondary mortgage market as a source income and liquidity.  Without the disclosure of such material known negative trends, Countrywide's disclosures were misleading and did not comply with the MD&A disclosure requirements of Item 303 of Regulation S-K.

---

particularly suited to interpret the language. This is especially true when an agency's own regulation is involved, and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation.

*See Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980).

Moreover, so long as the agency's interpretation of its own regulation is reasonable, "[a] court may not substitute its own judgment or 'its own construction of a statutory provision.'"  *See Bd. of Trustees of Knox County Hosp. v. Shalala*, 959 F. Supp. 1026, 1030 (S.D. Ind. 1997) (*citing Monsanto v. E.P.A.*, 19 F.3d 1201, 1206-07 (7th Cir. 1994) (*quoting Chevron*, 467 U.S. at 844).  When Congress empowers an agency, such as the SEC, "to elucidate a specific provision of the statute by regulation," "such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *See Chevron*, 467 U.S. at 843-44.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.    Countrywide's Use of the Terms Prime and Subprime Was Misleading**

Defendants filed periodic filings in which they asserted that prime and subprime loans were in fact distinct categories.  The Commission alleges that Defendants' definitions were fundamentally misleading, because they included loans with subprime risk characteristics in their prime loans category.   Rather than simply admit to the truth of this easily provable allegation, Defendants engage in gamesmanship – mischaracterizing the SEC's expert's testimony by stating that he cited "five different ways to define subprime" as if each one of them were so distinctly different as to form an admission on the SEC's part that the terms prime and subprime are meaningless, when in fact all of the definitions provided by the expert were mere variations on the theme stated throughout his report – a subprime loan is a loan made to a borrower with blemished credit and/or on terms which include higher credit risk characteristics.  Bendell Decl. ¶ 9, Ex. 301, at fn. 6. Likewise, they argue that SEC counsel's objection to an ambiguous deposition question constitutes an admission.   Joint Brief at 27.   The truth is that Defendants simply have no defense to this well-founded allegation.  Countrywide's definition was in fact misleading, as evidenced by the fact their "Prime Credit Quality" category included not only alt-A, but Extreme Alt-A loans, which were described at the April 6, 2006 meeting of the Corporate Credit Risk Committee as having extreme credit risk layering, and were likely to perform as bad, or worse, than Sub-Prime, potentially impacting the external view of our "prime" performance.  SF 165.  In addition, analysts were misled.  SF 473.

**F.    Defendants' Misled Investors About the Quality of Countrywide's HFI Portfolio**

Defendants' tortured reading of the SEC's allegations with regard to the PayOption portfolio held for investment at Countrywide Bank is also based on a misapprehension of the SEC's allegations and the evidence.  Defendants argue that

the SEC has not alleged that any material fact about those loans that was
misrepresented or omitted, apparently because the SEC has not alleged that
Countrywide's financial statements were misstated.  Joint Brief at 29.  But the SEC
has indeed alleged, and the evidence establishes, that Defendants concealed from
investors the true credit risk associated with the PayOption ARM portfolio at the
Bank.  The SEC has adduced evidence that Defendants failed to disclose that
Countrywide had placed loans with subprime FICOs scores in the portfolio, a fact
that was first disclosed by the Chief Credit Risk Officer on July 24, 2007, and
which caused at least one analyst to write that he believed management had
previously either underestimated or misrepresented the nature of the portfolio.  SF
470-71.  In addition, the evidence establishes that Defendants failed to disclose the
material percentage of these reduced documentation loans that had been originated
based upon overstated income.  SF 427-34.  These facts, which were known to all
three Defendants, and yet not disclosed, would have been material to investors.

The Pay-Option loans were a material percentage of Countrywide's total
loan originations, comprising 21% of Countrywide's total loan production by Q2
2005.  Defendants' knowledge of the borrower fraud associated with stated income
loans such as the Pay-Option, and combined with Countrywide's guidelines an
exceptions program, were precisely the sort of material facts necessary to render
Defendants' public statements not misleading.

Instead, Countrywide's Pay-Option disclosures were no more than a
description of the possible features of the loans, e.g., that borrowers could chose a
payment which did not fully cover the accrued interest, the loans had the potential
to negatively amortize, and borrowers might suffer payment shock on reset
(Motion at 24-25), did not disclose the facts about the Pay-Option loans that
Mozilo actually knew.  The descriptions of the loan features could not and did not
convey to investors what Defendants knew – borrowers were ***in fact***
misrepresenting their income in stated documentation loans like the Pay-Option ,

the loans were *in fact* negatively amortizing at a higher than expected rate; borrowers would *in fact* suffer payment shock that would be "difficult if not impossible for them to manage," and as early as 2006 Mozilo wanted Countrywide to stop holding Pay-Option loans for investment at Countrywide Bank.

Defendants try to explain away Mozilo's now infamous "flying blind" email by arguing that the decision in *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.,* 2010 WL 2473595, at *9 (S.D.N.Y. June 16, 2010) is somehow dispositive of whether that email evidences the information known to Mozilo was material. Joint Brief at 30-31. But Defendants overstate what *SRM Global* says in that respect – that court noted that a single fact (Countrywide's lack of historical experience with pay-option loans) had been disclosed in a public filing and in statements by Mozilo. Here, the SEC has more than a single email evidencing Mozilo's serious concerns about the PayOption portfolio over a sustained period of time. SF 502-515, 533. In addition, the SEC has evidence of serious deficiencies in Countrywide's underwriting of these loans, including the material findings of income misrepresentation associated with the portfolio. SF 427-34. These deficiencies were known to Defendants, and prompted Mozilo to repeatedly advocate ceasing to write the loans and sell the portfolio. SF 502-515, 533. In any event, the *SRM Global* decision considered whether *private* class-action Plaintiffs had adequately pleaded materiality under a "fraud on the market" theory under the PSLRA's heightened pleading standards. As such, the analysis employed by the court in that action is inapposite here. *See SEC v. Reys*, No. C09-1262RSM, 2010 WL 1734843 at *4 (W.D. Wash. April 28, 2010) (fraud on the market and truth on the market doctrines are inapposite in an SEC enforcement action). A more illuminating recent decision is Judge Pfaelzer's decision in *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d at 1072 (allegedly false "statements included representations, for example, that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as

35

ARMS, and only retained high credit quality mortgages in its loan portfolio.  The importance of the quality of Countrywide's loans held for both sale and investment underscores the materiality of these statements.").

Defendants also argue that the fact that there was fraud associated with the PayOption Arm loans was disclosed.  Joint Brief at 34.  But the selective quotation engaged in by Defendants does not establish this point.   It is true that the transcript of a February 28, 2006 Fixed Income Analyst Forum quotes Mozilo as responding to a question about low documentation loans in general - not PayOptions, and not the PayOptions Countrywide was holding at the Bank – with the comments quoted by Defendants.  But Mozilo did not "starkly state his view" as Defendants suggest.  Joint Brief at 33.   Defendants have merely cut the quote off in the middle (without elipses).  Mozilo does on to say, "but I don't think it's [fraud] been meaningful in terms of the quality of the performance of the loans."  Lefler Decl. ¶ 140, Exh. 137 at 2140.  That is hardly a fulsome disclosure about the material, known fraud in Countrywide Bank's PayOption portfolio, fraud so pervasive that management had determined that it was likely that at least 30% of the portfolio had been underwritten based on income overstated by 50% or more.   SF 427-34.

Finally, Defendants' argument that Mozilo's statement at the May 31, 2006 Sanford Bernstein Conference that the PayOption loan was well understood because it had a "twenty year history" was in fact true at the time that he said it is utterly belied by the statements Mozilo made internally in which he distinguished Countrywide's portfolio from World Savings  (SF 304), and by the fact that Mozilo has admitted under oath that the 20 year history he referenced at the May 31, 2006 Stanford Bernstein no longer gave him comfort ***at the time he made the statement.***  SF 298.

## G.   <u>Countrywide's Selective Disclosures Do Not Negate Scienter</u>

Defendants also argue that the "mountain of information" disclosed by Countrywide, coupled with its "accurate" financial statements, is inconsistent with

1    scienter.  To begin, the facts that Countrywide did not restate its financials

2    (instead, it sold itself to Bank of America), or that the SEC elected not to sue a

3    defunct entity for financial fraud do not demonstrate that Countrywide's financials

4    were in fact "accurate."

5        Moreover, as amply demonstrated in the SEC's Oppositions to Defendants'

6    Motions to Dismiss and herein, the disclosures that Defendants urge this Court

7    were curative, were not.   Defendants' reliance of *In re Worlds of Wonder Sec.*

8    *Litig.*, 35 F.3d 1407 (9th Cir. 1994) and *In re First Marblehead Corp. Sec. Litig.*,

9    639 F. Supp. 2d 145 (D. Mass.2009) is misplaced.   In both of those cases, the

10   court found detailed disclosures that it deemed sufficient to disclose the facts that

11   plaintiffs alleged had been concealed.  The *Worlds of Wonder* court addressed

12   whether a debenture prospectus adequately disclosed the risks of investing in the

13   company.  In finding that it did, the court that it was the "overall course of conduct

14   of defendants that negated scienter."  *Worlds of Wonder Sec. Litig.*35 F.3d at 1424

15   In *Marblehead* the court found detailed disclosures in the company's periodic

16   filings, that were "consistent with the approximate numbers in the Complaint."

17   *First Marblehead Corp*, 639 F. Supp. 2d 158.  Here, SEC alleges misstatements

18   and omissions that do not appear in any of the disclosures Defendants seek to rely

19   on.  Moreover, as set forth above, those disclosures themselves more closely

20   resemble a "morass" than the "mountain" Defendants describe them as - reams of

21   impenetrable data which no reasonable investor could be expected to amass and

22   analyze so that Defendants can now point to them as "evidence" that they always

23   intended to disclose the information that rightfully belonged in their periodic

24   filings all along.

25       This is simply not what the securities laws require.  Defendants were senior

26   officers of a publicly traded company that was in the business of making

27   mortgages.  Mortgages were this company's product, and the serious deterioration

28   in the process by which that product was generated, along with the concomitant

decline in the quality of the product itself was a material fact that should have been disclosed to investors.  Reg S-K and Countrywide's own Disclosure Policy required as much.  Simply disclosing that Countrywide wanted to have a broad menu of loan products was insufficient to disclose that Countrywide had abandoned underwriting standards in favor of generating loans that carried with them serious credit and reputational risk, and is therefore insufficient to negate scienter.  *Jones v. Corus Bankshares*, 2010 WL 1338070 (N.D. Ill, April 6, 2010) at at *9 ("the fact that [defendant] disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for [defendant's] statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.  *In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369 (N.D.Ill. Feb. 7, 2003) (even though corporation acknowledged potentially bad economic consequences due to delays in testing of its new drug, statements were still actionable because the defendant may have "downplayed the significance of the ... delay by not disclosing the serious extent and nature of the problems plaguing [the drug]").

## H. Violation of Rule 13a-14(b) Is A Stand Alone Cause Of Action In This Circuit

Mozilo and Sieracki argue that they are entitled to summary judgment on the SEC's Rule 13a-14(b) cause of action because it is not an independent cause of action.  Their sole support for this contention is an unreported case from of the Northern District of Illinois, *SEC v. Black*, 2008 WL 4394891 (N.D. Ill. Sept. 24, 2008).  Other courts, including one in this Circuit, have allowed stand alone causes of action for violation of Rule 13a-14(b).  *SEC v. Sandifur*, Fed. Sec. L. Rep. (CCH) P93,728; 2006 U.S. Dist. LEXIS 12243 at *23-25 (W.D. Wash. Mar. 2, 2006) (cause of action for violation of Rule 13a-14(b) pled with sufficient particularity to withstand a motion to dismiss); *SEC v. Brady*, Fed Sec. L. Rep. (CCH) P93,885; 2006 U.S. Dist. LEXIS 29086 at *17-18 (N.D. Tex. May 12,

2006) ("SEC has adequately pleaded that. . . [defendant] committed a primary violation of Rule 13a-14(b)").  The violation of Rule 13a-14 results from the certification of a periodic report that is false or misleading.  *SEC v. Kalvex, Inc.*, 425 F. Supp 310, 316 (S.D.N.Y. 1975) (Section 13(a) embodies the requirement that periodic reports be true and correct, and a failure to comply with such section would result in violations of the securities laws).   Mozilo and Sieracki signed Sarbanes-Oxley certifications for each Form 10-Q from Q1 2005 through Q3 2007 and each Form 10-K for the years ended 2005, 2006, and 2007, and signed the Forms 10-K for the years ended 2005, 2006, and 2007.  For all of the reasons set forth above, those reports were misleading.  Accordingly, Defendants' motion for summary judgment on this cause of action must be denied.

## IV.   **CONCLUSION**

For all the foregoing reasons, Defendants' Joint Motion for Summary Judgment must be denied.

Dated:  August 16, 2010                    Respectfully submitted,

                                           /s/ Lynn M. Dean
                                           John M. McCoy III
                                           Lynn M. Dean
                                           Attorneys for Plaintiff
                                           Securities and Exchange Commission