JOHN M. McCOY III, Cal. Bar No. 166244
Email: mccoyj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
Email: bendells@sec.gov
LYNN M. DEAN, Cal. Bar. No. 205562
Email: deanl@sec.gov
SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
PARIS A. WYNN, Cal. Bar No. 224418
Email: wynnp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI,<br><br>                Defendants. | Case No. CV 09-3994 JFW (MANx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:    August 30, 2010<br>Time:    1:30 p.m.<br>Place:   Courtroom 16<br>            (Hon. John F. Walter) |

Plaintiff Securities and Exchange Commission ("Commission") submits this Statement of Genuine Issues in opposition to Defendants' Motions for Summary Judgment.

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| 1.       Countrywide routinely disclosed: "Nearly all of the mortgage loans that we originate … are sold into the secondary mortgage market." | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 5, Ex. 4, at 117 (2006 10-K at 37);<br><br>• *Id.* ¶ 11, Ex. 10, at 278 (2005 10-K at 93);<br><br>• *Id.* ¶ 12,  Ex. 11, at 309 (Q1 2006 10-Q at 60);<br><br>• *Id.* ¶ 13, Ex. 12 at 323 (Q2 2006 10-Q at 81);<br><br>*Id.* ¶ 14,  Ex. 13, at 338 (Q3 2006 10-Q at 84).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that the the quoted statement appears in the cited Forms 10-Q and 10-K.  Disputed to that it appeared "routinely", as the evidence does not support such an assertion, for example with respect too the first three quarters of FY 2005 and all of FY 2007, as the evidence indicates merely that the quoted |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | statement was made at year-end 2005 and in 2006. |
| 2.    Countrywide disclosed in its 2006 10-K:<br><br>Our ability to sell loans at acceptable margins is affected by many factors including the relative demands for such loans and mortgage-backed securities evidencing interests in such loans, the cost of credit enhancements, investor perceptions of such loans and mortgage-backed securities and the risks posed by such products. | Undisputed. |
| 3.    In an October 24, 2004 analyst report, Morgan Stanley explained that:<br><br>The risk [of new loan products] to Countrywide and other originators would be that 1) these new loans don't perform as well as traditional collateral and 2) as a result, capital markets investors and rating agencies tighten underwriting and pricing standards.  If this happened, then some portion of current production would turn out to be unsustainable. | **_Defendants' Evidence_**<br><br>• Lefler Decl. ¶ 15, Ex. 14, at 351 (Kenneth Posner, "Company Update," Morgan Stanley, Oct. 24, 2004, at 2).<br><br>**_SEC Response_**<br><br>Disputed in part.  Undisputed that the non-paraphrased portions of the text appear  in the referenced report.  Disputed that the incomplete snippet accurately reflects the substance of the comment, because it fails to state that the analyst referred specifically to |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | Interest Only loans, and further fails to note that the analyst quotes Mozilo as defending the performance of Interest Only loans in the Third Quarter earnings call under discussion. |
| | **SEC Evidence:** |
| | "On the conference call, Countrywide's CEO Angelo Mozilo defended IO loans as being as good quality as traditional loans:  'as to performance I don't believe there's any difference in performance.  I don't understand why there would be.'" |
| | Lefler Decl. ¶ 15, Ex. 14, at 351. |
| | ***SEC's Evidentiary Objections To Defendants' Evidence:*** |
| | Incomplete; Lack of Foundation. |
| 4.      Countrywide disclosed in its 2005 10-K and its 2006 10-K that:

Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| private investors, rating agencies and third-party credit enhancement providers. | |
| 5.     As industry credit criteria became more liberal, Countrywide participated in this industrywide evolution of credit standards. | Undisputed. |
| 6.     Countrywide repeatedly disclosed to investors its strategy of offering a very broad product menu. | Undisputed. |
| 7.     Countrywide disclosed in its Forms 10-K for 2005-07 and in its Forms 10-Q for 2006 and 2007: "The continuing evolution of the secondary mortgage market and demand by borrowers has resulted in a proliferation of mortgage products." | Undisputed. |
| 8.     The mortgage industry's evolution towards more lenient credit standards was well known and widely discussed in the popular press. | Undisputed. |
| 9.     Countrywide's 2006 10-K disclosed the following loan production statistics: | Undisputed. |

| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Conventional Conforming Conventional | 59.2% | 53.9% | 37.1% | 32% | 31.9% |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| Non-Conforming 24.9% 31.7% 39.8% 47.2% 45.2%<br>Prime Home Equity 4.6% 4.2% 8.5% 9.0% 10.2%<br>Nonprime 3.7% 4.6% 10.9% 8.9% 8.7%<br>FHA/VA 7.6% 5.6% 3.6% 2.1% 2.8%<br>Commercial 0.0% 0.0% 0.1% 0.8% 1.2% | |
| 10.    In monthly reports that were filed with the SEC on Form 8-K, Countrywide disclosed loan production information for the prior 13 months by category: Government, Adjustable Rate Mortgage, Home Equity and Nonprime. | Undisputed. |
| 11.    Countrywide's monthly Forms 8-K disclosed the evolution of the Company's product mix, including the increasing originations of subprime or pay-option loans. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 59, Ex. 58, at 659 (November 8, 2005, 8-K, Ex. 99.1 at 1 ) ("[p]ay-option fundings for [October 2005] were $8.5 billion, as compared to $3.4 billion in October 2004; [n]onprime loan fundings totaled $3.9 billion in October, which compares to $3.3 billion for the same period last year; [y]ear-to-date nonprime fundings were $36 billion");<br><br>• *Id.* ¶ 55, Ex. 54, at 617 (May 10, 2006, 8-K, Ex. 99.1 at 1);<br><br>• *Id.* ¶ 60, Ex. 59, at 669 (September 14, 2006, 8-K, Ex. 99.1 at 1). |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | ***SEC Response***<br><br>Disputed in part.  Undisputed that Countrywide disclosed certain origination statistics for PayOption and subprime loans in its monthly Form 8-Ks.  Disputed that those statistics fairly revealed the evolution of Countrywide's product mix toward underwriting guidelines that were a composite of the widest guidelines in the industry without compensating risk mitigants, the number of high risk loans with layered credit risk features, nor the percentage of loans that were being made as exceptions to underwriting guidelines.<br><br>***SEC Evidence***<br><br>• McCoy Decl., ¶ 79, Ex. 269 (McMurray SEC Dep. Ex. 768, 273:2-14 - As explained by CFC's Chief Risk Officer, it is ***not possible to comprehend CFC's underwriting policies without an understanding of the matching*** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | *strategy*.)<br><br>• Dean Decl., ¶ 108, Ex. 106 (McMurray SEC Dep. Ex. 780, p. (1-2) 6/14/2005 email from McMurray copied to Sambol)<br><br>The matching strategy committed CFC to offering any product and/or underwriting guideline available from at least one "competitor," including subprime lenders such as Aames and First Franklin.<br><br>On June 14, 2005, McMurray warned Sambol that "As a consequence of CW's strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas.  While I'm sure you already know this, ***I think we should be very deliberate since the outer boundaries are potentially controversial and have high expected default rates and losses*.**"  (emphasis added.)<br><br><br>• McCoy Decl., ¶ 76, Ex.266 |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | (McMurray Dep. Tran. 132:25-134:23)<br><br>Q.   BY MR. WYNN:  Okay. What were your credit concerns regarding the matching strategy? Well, --<br><br>THE WITNESS:  All right.  So -- so if -- in -- in the course -- And actually, we can -- we can look at it.  It's here, right here in the e-mail. So if we go into the second page, about midway down the page you can see a paragraph that's titled "Composite Match" and "Companion Mitigants," and so those are two -- those are two credit-related concerns I would have had with regard to the -- to the matching strategy.<br><br>Q.   BY MR. WYNN:  Could you explain the composite match concern?<br><br>A.   Sure.  And so, again, it is -- it is talked about here, but if you have -- if you match one lender on -- on one -- on certain guidelines or for |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that -- of that two-step match would be more -- would be more aggressive than either one of those competitor reference points viewed in isolation. |
| | Q.    Okay.  And what is the companion mitigant concern? |
| | A.    This is -- this is the idea that -- so -- and we'll use the example that I talk about here.  So they -- they may have offered certain features with their product set, but then also what I would -- would have what I call companion mitigants, so let's suppose as an example they offered a low -- a very low FICO floor as part of their product offering but they also required that the borrower have a specific credit history, like no -- where I say – do you see where it says 0x30 or 1x30?  That refers to |

9

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | the number of 30-day lates that the borrower may have had.  They -- they may have layered on that additional type of -- of a requirement.  So one of the -- one of the complications with the matching strategy goes to what I call plumbing considerations or system considerations, so there may be things -- aspects in your system that wouldn't allow you to match some of those companion mitigants based on the infrastructure that you have that -- that might be easier for the competitor you're trying to match to deploy.  So that's -- that was the idea that I was getting at there.) |
| | ***Competitor Match*** |
| | • McCoy Decl., ¶ 29, Ex. 219 (Sambol Dep. Ex. 2010) |
| | • McCoy Decl., ¶ 28, Ex.218 (Mozilo Dep. Ex. 1806) |
| | • Dean Decl., ¶ 95, Ex. 93 (Simantel Dep. Ex. 987 - At least 600 loans |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | were originated under Competitor Match in a single month – April 2007.  In many cases these were loans that no Countrywide competitor was offering.)

***Exceptions***

- Dean Decl., ¶ 27, Ex. 217 (Kuelbs Dep.  Ex. 971 - 6/12/06 email from Aguilera to Kuelbs:  In June 2006, Credit Risk Management conducted an audit of 1Q 2006 loan production that demonstrated that the level of exceptions with respect the subprime 80/20 product exceeded 26 percent.)

- Dean Decl., ¶ 6, Ex. 4 (Krsnich Dep. Ex. 359 at p. 42 -In June 2006, the Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, 55.3% of its standalone home equity loans.) |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | • Dean Decl., ¶ 7, Ex.5 (Schakett Dep. Ex. 389 at p. 54 - In December 2006, the Credit Risk Leadership package reported similar percentages of loans underwritten on an exceptions basis: 45.4% of Pay-Option ARMs, 35.3% of subprime first liens, 24.1% of subprime second liens, and 52.6% of standalone home equity loans.<br><br>• McCoy Decl., ¶ 52, Ex. 242 (Brendler Dep., 58:24-59:13.)<br><br>Typical exceptions rates would have been 5% to 10% and rates in excess of 20% would have been inconsistent with a low exceptions rate. |
| 12.    Countrywide's monthly Forms 8-K contained performance data including delinquency and pending foreclosure statistics. | Undisputed. |
| 13.    Each time Countrywide's subsidiaries sold non-GSE mortgage- | ***Defendants' Evidence*** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| backed securities into the secondary market, they filed prospectus supplements with the SEC, which are available online on the SEC's EDGAR system. | • Lefler Decl. ¶ 61, Ex. 60, at 750 (Grundfest Report ¶¶ 134-135) ("Countrywide's loan securitization activity generated detailed disclosure in the form of registration statements, prospectuses, and prospectus supplements that were filed with the SEC and that were publicly available on EDGAR. Countrywide used four subsidiaries—CWALT, CWABS, CWMBS, and CWHEQ, also known as Depositors—and loan trusts for each securitization of Countrywide loans. These entities filed prospectus supplements with the SEC for each completed securitization. Each of these filings contained extensive information on the registered securitization, including pool-level data outlining the credit risk attributes of loans in each securitization. . . . Between 2005 and 2007, Countrywide's four securitization entities issued 447 prospectus supplements, as reflected |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | on the MIC website, containing an estimated total of approximately 100,000 pages"); |
| | • Lefler Decl. ¶ 66, Ex. 65 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-12 (Form 424B5, filed June 29, 2006)) (example of prospectus supplement). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that Exhibit 65 to the Lefler Declaration was filed on Edgar. The statements by Defendants' expert do not support the assertion that every prospectus supplement was filed on Edgar. |
| | ***SEC's Evidentiary Objection To Grundfest Report Citation:*** |
| | Lack of Foundation |
| 14.    The 10-K disclosed that CWABS, Inc., CWALT, Inc., CWMBS, Inc. and CWHEQ, Inc. companies were Countrywide subsidiaries. | ***Defendants' Evidence*** |
| | • *Id.* ¶ 5, Ex. 4, at 160-61 (2006 10-K, Ex. 21). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed to the extent this fact is intended to refer |

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
|  | only to the 2006 Form 10-K attached to the Lefler Declaration.  Otherwise disputed, as Defendants have not sufficiently identified the Form 10-K to which they intend to refer. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| 15.   Each prospectus supplement disclosed the underwriting guidelines applied to the particular pool of mortgages being sold, including information regarding certain characteristics of the mortgages, such as FICO scores, documentation levels, loan-to-value ratios, and geographical distribution. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 61, Ex. 60, at 750 (Grundfest Report ¶ 135) ("The prospectus supplements included tables showing the breakdown of asset pool characteristics by original loan balance, mortgage interest rate, term to maturity, loan purpose, loan-to-value ratio ('LTV'), occupancy type, FICO score, geographic distribution, and documentation level, among other characteristics");<br><br>• *Id.* ¶ 63, Ex. 62 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-SPS1 (Form 424B5, filed June 26, 2006);<br><br>• *Id.* at 1038 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-SPSI at A-4) (table entitled "Original Combined Loan-to-Value Ratios" providing the range and weighted averages of CLTVs in the mortgage pool); |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | • *Id.* at 1039 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series, 2006-SPSI at A-6) (table entitled "Documentation Programs" indicating the percentage of loans underwritten on a "stated income" basis); |
| | • Lefler Decl. ¶ 64, Ex. 63, at 1041 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-15) (outlining risk factors and noting that loans were not underwritten to "[m]ore [t]raditional [s]tandards"); |
| | • *Id.* at 1042 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-34) (describing "Underwriting Standards" for the "credit-blemished mortgage loans"); |
| | *Id.* at 1043-44 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5) at S-36 – S-37) (outlining the underwriting guidelines for different |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
|  | "credit grade categories"). |
|  | ***SEC Response*** |
|  | Disputed.  The underwriting guidelines applicable to any loan program at Countrywide were contained the Countrywide Technical Manual applicable to that product.  Those guidelines were not provided in the Prospectus Supplements.  Instead, different Prospectus Supplements identified different characteristics of the subject loan pool.  Those disclosures changed over time, and not all prospectuses contained the same degree of specificity. |
|  | **SEC Evidentiary Objection To Grundfest Report Excerpt:** |
|  | Lack of Foundation. |
|  | ***SEC Evidence*** |
|  | • McCoy Decl, ¶ 44, page 234. (Adler Dep. Tran. 147:22-148:18) |
|  | Q.  Were Countrywide's underwriting guidelines provided to purchasers of |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | securitizations? |
| | A.  I don't recall -- |
| | MS. RUTHERFORD:  Objection. Lacks foundation. |
| | THE WITNESS:  -- if they actually received the guidelines outside of the description of guidelines that were in the prospectuses.  I don't believe they got our full technical manual. |
| | Q.  And the technical manual at Countrywide was where the loan -- was where the underwriting guidelines could be found? |
| | A.  Right. |
| | Q.  And that was an internal document to Countrywide? |
| | A.  That's right. |
| | Q.  It wasn't published anywhere on Countrywide's website? |
| | MR. GIGOUNAS:  Objection. Lacks foundation. |
| | THE WITNESS:  I don't believe so. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| 16.    A prospectus supplement of credit-blemished second lien loans sold by CWABS in mid-2006 disclosed:<br><br>•    that the pool included borrowers with "impaired credit histories, which may include a record of major derogatory credit items such as outstanding judgments or prior bankruptcies";<br>•    that the company "expected that a significant number of the mortgage loans [in the securitization] will have been originated based on underwriting exceptions"; and<br>•    that "the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those underwritten in a more traditional manner." | Undisputed. |
| 17.    Countrywide maintained two | *Defendants' Evidence* |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| websites that included the information disclosed in the prospectus supplements (e.g., loan and product type, FICO score, loan-to-value ratio, occupancy type, and documentation type) as well as each pool's performance to date by month (including delinquencies and losses suffered). | • Lefler Decl. ¶ 72, Ex. 71, at 1342-43 (Kurzban SEC Depo. Tr. 45:12 – 47:1 (July 22, 2010)):<br><br>"Q:  In terms of the categories of information that were contained on the website, I just want to make sure that I've got these, that I've got a comprehensive list.  You mentioned the prospectus supplements; is that right?<br><br>A:  The prospectus supplements, closing loan schedules, rating |
| | agency information in terms of the ratings on individual bonds, both initial and current; access to the trustee's reports, which would both include the pdf remittance report that details cash flow on the bonds, as well as access to what essentially is an Excel file that would detail out the performance of each loan for that given time period.  . . . .<br><br>Q:  Were there deal summaries on the website?<br><br> A:  In what regard?<br><br>Q:  Were there -- was there a |

21

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | section of the website that offered historical information about the performance of any particular securitization?<br><br>A:  Yeah, in two forms.  So there was performance information that was actually on the website itself, so you would click to the deal and within the deal there was performance information on that specific deal, so delinquencies, all that type of trending over a period |
| | of time.  Additionally, access to the trustee reports, which had that information.  And there was an analytical or a reporting function capability as part of the website as well in the sense that you could build and a investor could combine all the different groups of -- of bonds that they owned, build the portfolio there and store it so they could then add characteristics and graph 30-day delinquencies, 30 plus, 60, 60 plus.  Whatever type of characteristics they wanted to look in trending, they |

22

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | could build and it would show a graph."; |
| | • *Id.* at 1347 (Kurzban SEC Depo. Tr. 78:21-79:21 (July 22, 2010)) (testimony indicating that Countrywide periodically updated the website to include underwriting guidelines); |
| | • *Id.* at 1347 (Kurzban SEC Depo. Tr. 80:5-81:6 (July 22, 2010)) (testimony regarding an instance in which Countrywide published a set of underwriting guidelines for subprime products on the website); |
| | • *Id.* (Kurzban SEC Depo. Tr. 67:24-68:25, 73:13-75:16, 82:11-84:10 (July 22, 2010)); |
| | • *Id.* ¶ 73, Ex. 72, at 1353-54 (Kurzban Decl. ¶ 22) ("After SEC Regulation AB went into effect, Countrywide also maintained, and continues to maintain, a website at www.countrywidedealsdata.com, which provided performance data about the loans underlying its MBS |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | as required by Regulation AB. Each MBS prospectus supplement contained a link to a specific portion of this website that provided information on comparable MBS previously issued by Countrywide. This website has been in existence since January 2006 and is still active today"); <br><br> • *Id.* ¶ 73,  Ex. 72, at 1354 (Kurzban Decl. ¶ 23) ("In 2005, and |
| | continuing through the present, the MBS Investor Website contained a large amount of data on all of Countrywide's closed MBS deals … in the percentage of loan delinquencies, borrower bankruptcies, property foreclosures, and real estate owned properties"); <br><br> • *Id.* at 1354 (Kurzban Decl. ¶ 24) ("For each MBS, the MBS Investor Website also provides complete historical information on deal performance on a month-by-month basis, including the percentage of loans within each pool that are 30 |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | days delinquent, 60 days delinquent, 90 days delinquent, in foreclosure, in bankruptcy and real estate owned."); |
| | • *Id.* at 1354 (Kurzban Decl. ¶ 25) (The MBS Investor Website also contained "all reports issued by the trustee for each particular MBS," which "include detailed information on distributions for each class of the MBS, collateral, credit enhancement |
| | draw details, payments, realized losses by loan identification number, and information on the number of delinquent loans in the pool underlying the MBS"); |
| | • *Id.* at 1355 (Kurzban Decl. ¶ 27) (The MBS Investor Website allowed users to "compare the delinquency and default history of one Countrywide MBS versus another MBS, or a collection of MBS"); |
| | • *Id.* at 1357-82 (Kurzban Decl., Attachment A) (Registered users of Countrywide's website included the following investment banks that |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | provided coverage of Countrywide's equity and/or debt securities: Banc of America Securities, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, J.P. Morgan, Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Securities, Raymond James, RBC Capital Markets, Stifel Nicolaus, UBS, and Wachovia, among others.); |
| | • *Id.* ¶ 72, Ex. 71, at 1340 (Kurzban SEC Depo. Tr. 12:21-14:20 (July 22, 2010) (authenticating and reaffirming declaration at Lefler Decl. Ex. 72) <br><br> • *Id.* ¶ 74, Ex. 73, at 1389-91 (January 3, 2006, Email from Michael Burak to Scott Kurzban (SEC Ex. 1302) at CFCP000637054) (table showing that under the underwriting guidelines referenced above, Countrywide would offer a 90% LTV loan on a stated income basis to a subprime borrower with a FICO score as low as 580); <br><br> • *Id.* at 1347 (Kurzban SEC Depo. Tr. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | 80:5-12 (July 22, 2010)) (authenticating SEC Ex. 1302). **SEC Response** Disputed in part. Undisputed that Countrywide maintained two websites at various times that contained information regarding Countrywide's MBS securitizations, both of which were directed to MBS investors rather than Countrywide's equity investors. Disputed as to Defendants' characterization of the content of the website, as Defendants have conflated the content and access requirements of the two websites. The Lewtan website, maintained by Countrywide Securities, was password protected and contained information specific to particular securitizations. Lefler Exh. 73 was posted on the restricted access Lewtan website, as indicated in the Re: line of the email itself. In addition, Defendants' description |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | of the testimony at Exh 71, p 1347 mischaracterizes the testimony and lacks foundation.  Kurzban testified that:<br><br>THE WITNESS:  There were a set of guidelines that were visible -- that were visible on the website.<br>Q.  Could you describe for me that set of guidelines?<br>A.  There were guidelines we received from our Product Administration Group.  I don't know to what level -- I don't recall to what level those guidelines went, but they were -- they were passed to me from our Product Administration Group to put on the website.<br><br>The Managing Director of the Secondary Markets Division testified that:<br><br>Q.  Were Countrywide's underwriting guidelines provided to purchasers of securitizations?<br>A.  I don't recall --<br><br>MS. RUTHERFORD:  Objection. Lacks foundation.<br><br>THE WITNESS:  -- if they actually received the guidelines outside of the description of guidelines that were in the prospectuses.  I don't believe they got our full technical manual.<br><br>Q.  And the technical manual at |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | Countrywide was where the loan -- was where the underwriting guidelines could be found? A. Right. Q. And that was an internal document to Countrywide? A. That's right. Q. It wasn't published anywhere on Countrywide's website?<br><br>MR. GIGOUNAS: Objection. Lacks foundation.<br><br>THE WITNESS: I don't believe so.<br><br>• McCoy Decl ¶ 44, Exh. 234 (Adler Depo. 147:22-148:18)<br><br>*SEC Evidentiary Objection to Kurzban testimony cited as Exhibit 71, p. 1347:*<br><br>Lack of Foundation.<br><br>*SEC Evidence*<br><br>• McCoy Decl ¶ 84, Exh. 274 (Riordan Dep. Tran. 72:19-73:13; 75:2-76:7)<br><br>Q. Are you familiar with something called the "Lewtan website"? A. Yes. Q. Can you tell us what that is? A. It was a website that the mortgage investor relations group used as a result of -- I think it was |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
|  | Reg AB to post deal-specific information. |
|  | Q.  What do you mean by "Reg AB"? |
|  | A.  I don't remember the exact information behind Reg AB, but it was an SEC regulation.  I really couldn't recall what. |
|  | Q.  Do you have a general understanding of what that was? |
|  | A.  I really can't recall.  I wasn't as familiar with that one. |
|  | Q.  And what did you mean in your answer when you referred to something called "deal-specific information"? |
|  | A.  So this would have been mortgage-backed securities. |
|  | * * * |
|  | Q.  Now, if you go to the next page from the one we were reading from of the e-mail, which is -56211, did you -- do you see at the bottom of the text, it reads: |
|  | "We would want to make sure that if an equity investor requested a password, that they weren't being denied by CSC if they weren't a trading customer"? |
|  | Do you see that? |
|  | A.  Right. |
|  | Q.  Do you understand or can you tell us what that means? |
|  | THE WITNESS:  Countrywide Securities Corporation was a broker/dealer.  And they had analysts |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | that wrote research reports, much like the sell-side analysts that I mentioned before that the equity investor relations department catered to.  And so because they sold their research to their institutional investors, they felt their data and their research was proprietary.  And so the Lewtan website was theoretically for their clients, and so we didn't control the access to the Lewtan website.  And so the process was the investor had to log in and request access, and then that e-mail went directly to them.  So this was meaning that if our equity investors were wanting access, but CSC was saying they weren't one of their institutional investor clients.

• McCoy Decl ¶ 44, Ex. 234 (Adler Dep. Tran.  200: 3-5)

Q.  Okay.  Did the investor website at Countrywide require a password to access?
A.  Yes, I believe so.

• Dean Decl ¶ 51, Ex. 241(Bigelow Dep. Tran.  145:12 – 146:7)

Q.  Earlier today you were asked about something called the Lewtan Web site. Do you recall that?
A.  Yes.
Q.  Did you, yourself, ever personally access the Web site?
A.  I don't know.  I don't think I did.
Q.  Do you know whether or not it |

31

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | was password protected? A.  It was password protected initially.  I think it -- yeah, I -- I don't recall.  I think there was some changes to the rules over that over time, but I don't -- I'm not -- I never accessed it personally, so I'm not sure. Q.  Okay.  Fair enough. And I just want to make sure the record's clear, so you -- you believe it was password protected for at least some portion of the time but that may have changed.  Is that right? A.  Yes, I think so. |
| 18.    Information on the www.mortgageinvestorcountrywide.com website can be accessed for free by registering on the website. | ***Defendants' Evidence*** • Lefler Decl. ¶ 73, Ex. 72, at 1353 (Kurzban Decl. ¶ 19) ("The MBS Investor Website has been in existence since 2005 and is still active today.  Throughout this time, the MBS Investor Website was accessible to any member of the |
| | public.  Upon completing a short registration form, any interested person could access this website"); • *Id.* ¶ 72, Ex. 71, at 1345 (Kurzban SEC Depo. Tr. 12:21-14:20 (July 22, 2010)) (authenticating and |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | reaffirming declaration); |
| | • *Id.* at 1346 (Kurzban SEC Depo. Tr. 47:9 - 47:24 (July 22, 2010)): "Q:  Who had access to the Countrywide mortgage investor website? A:  Anybody who wanted it. Q:  Did Countrywide ever deny access to anyone to the investor website? A:  The investor website's not even set up to deny access.  It's an open site, similar to setting up a, like, a Yahoo account, a Yahoo mail account.  We require -- what they do is they go and put their e-mail address in and choose a password, but there's no -- there's no acceptance or rejection of any users, so anyone |
| | could go on there and do it.  The only reason for that is so that users can store their portfolio and actually, you know, create their own kind of user experience.  But the website's |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | open to anyone.  It's unrestricted." |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that there was no monetary cost to access the website.  However, access was available only to those who provided their name, business affiliation, and email address, so the site was not "unrestricted." |
| | ***SEC Evidence*** |
| | • Lefler Decl. Ex. 71 at 1343 (Kurzban Dep. Tran. 47:25-48:15) |
| 19.    Countrywide disclosed details about the credit characteristics of its originations at investor conferences. | ***Defendants' Evidence*** |
| | • Lefler Decl. ¶ 75, Ex. 74, at 1397 (September 12, 2006, CFC Equity Investor Forum Transcript at 32) (John McMurray discussing the CLTVs, FICOs and delinquency trends, and accumulated negative amortization of the Bank's portfolio); |
| | • *Id.* at 1398 (September 12, 2006, CFC Equity Investor Forum Transcript at 33) (John McMurray discussing FICO and DTI in the |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | context of the servicing portfolio); |
| | • *Id.* ¶ 77, Ex. 76, at 1409 (September 13, 2006, CFC Fixed Income Investor Forum Transcript at 59) (John McMurray discussing the CLTVs, FICOs, and accumulated negative amortization of the Bank portfolio); |
| | • *Id.* (September 13, 2006, CFC Fixed Income Investor Forum Transcript at 60) (John McMurray discussing the characteristics of the servicing portfolio); |
| | • *Id.* ¶ 79, Ex. 78, at 1419-20 (September 2005, Countrywide: Product Overview Presentation (SEC Ex. 209) at CFCP001008741) (presentation slide providing detailed information on Countrywide's pay-option and other non-conforming loan originations, including funding volume, FICO score, LTV, CLTV, occupancy type, property type, documentation type, geographic distribution and other information); |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | • *Id.* ¶ 80, Ex. 79, at 1423 (Ingerslev SEC Depo. Tr. 207:19-209:1 (May 19, 2010) (testimony confirming that Ingerslev prepared the Lefler Decl. Ex. 78 for the Whole Loan Conference, hosted by Countrywide's Capital Markets division for "whole loan investors or potential investors");<br><br>• *Id.* ¶ 81, Ex. 80, at 1428 (September 2006, CFC Residential Mortgage Lending Corporate Overview (SEC Ex. 134) at CFCP006259253) (presentation slide providing detailed information on Countrywide's pay-option and other non-conforming loan originations, including funding volume, FICO score, LTV, CLTV, occupancy type, property type, documentation type, and other information);<br><br>• *Id.* ¶ 82, Ex. 81, at 1429 (September 8, 2006, Email re: Aguilera / Ingerslev Presentation at Conference (SEC Ex. 133)) (showing that Aguilera and Ingerslev made a |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | conference presentation together). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that Countrywide did provide some information about credit characteristics of its loan originations.  Disputed to the extent Defendants suggest Countrywide fully disclosed the "details about the credit characteristics", as the information provided was incomplete. |
| 20.    The *Wall Street Journal* ran a front page story on December 5, 2006, stating that "[b]ased on current performance, 2006 is on track to be one of the worst ever for subprime loans. . . Delinquency rates have been rising steadily since the middle of 2005.  But the trend has accelerated sharply in the past two to three months." | Undisputed. |
| 21.    During 2006 and 2007, Countrywide disclosed that relaxed | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 14, Ex. 13, at 336 (Q3 |

37

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| underwriting standards were a factor contributing to higher delinquencies. | 2006 10-Q at 52) (Countrywide increased the Bank's provision for loan losses because of changing borrower "credit profile[s.]");<br><br>• *Id.* at 340  (Q3 2006 10-Q at 88) ("changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency");<br><br>• *Id.* ¶ 87, Ex. 86, at 1449 (Q3 2006 Earnings Press Release at 7) ("The year-over-year increase in delinquencies and foreclosures are [sic] primarily the result of portfolio |
|  | seasoning, product mix and changing economic and housing market conditions.");<br><br>• *Id.* ¶ 89, Ex. 88, at 1453 (January 30, 2007, Earnings Conference Call Transcript at 27) (transcript quotes Mr. Sambol as stating that the "for the most part a liberal credit environment over the last several years all of which is now – as rates are going up, as credit is tightening, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | is going to contribute in our view to continued pressure on delinquencies and defaults and associated credit cost"); |
| | • *Id.* ¶ 10, Ex. 9, at 233 (Jan. 30, 2007, Q4 2006 Earnings Release, Ex. 99, at 2) (press release quotes Mr. Mozilo as stating: "Looking ahead to 2007, the industry will likely see continued pressure on margins as mortgage origination volumes decline and industry capacity is rationalized. We are also preparing for increased borrower delinquencies and |
| | continued credit deterioration. We believe, however, that 2007 will likely be the trough year of the current housing cycle and that 2008 should represent the beginning of upward trends associated with the next cycle."); |
| | • *Id.* ¶ 90, Ex. 89, at 1456 (Testimony of Sandor Samuels Before the Senate Committee on Banking, Housing and Urban Affairs, March 22, 2007, at CFCP006592874) (Sandor Samuels, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | Executive Managing Director of Countrywide Financial Corporation, stating: "In the past few years, housing appreciation increased at rates far exceeding income growth . . . . Lenders responded by expanding underwriting guidelines …. All of these factors together contributed to the dramatic liberalization of underwriting guidelines.  So long as home prices continued to rise, there were very few market forces to counter the push toward credit liberalization.  Things started to |
| | change in 2006 as appreciation began to flatten and many markets began to see home price declines.  In the absence of appreciation, delinquencies have begun to increase dramatically"). |
| | ***SEC Response*** |
| | Disputed.   The evidence cited does not support this purported fact. |
| | Ex. 13 refers to loan seasoning, credit profiles, and the housing |

40

| Defendants' Statement | Evidence Cited by Defendants and SEC Responses |
|---|---|
| | market, not underwriting. |
| | Ex. 86 refers to loan seasoning, product mix, and the housing market, not underwriting. |
| | Ex. 88 refers to tightening credit standards, not loan underwriting. |
| | Exs. 9 and 89 refer to the industry in general rather than Countrywide. |
| | Finally, Exhs 9, 14, 88, and 89 all refer to statements made in 2007, and thus cannot support the statement that this purported disclosure was made in 2006. |
| 22.   Countrywide disclosed in its 2006 10-K that Countrywide "ha[d] observed a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006," and that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency." | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| 23.    In June and July 2007, rating agencies downgraded the investment grade ratings on hundreds of securities issued by the industry (although relatively few issued by Countrywide). | ***Defendants' Evidence***<br><br>• Lefler Decl.¶ 91, Ex. 90, at 1500 (Culp Report ¶¶ 129-30) ("the rating agencies began a series of aggressive downgrades of RMBS and CDOs....On June 15, 2007, Moody's downgraded about 131 second-lien RMBS and placed 136 additional securities on downgrade review. On June 22, 2007, S&P downgraded 34 second-lien and 42 subprime securities.  Moody's announced ratings cuts for another 399 subprime RMBS on July 10, 2007.  And on July 11, 2007, Moody's announced that it might cut ratings on $5 billion in CDO tranches.  Despite all these negative developments, Exhibit 24 demonstrates that Countrywide sponsored RMBS were subject to relatively few S&P downgrade actions in May and June 2007. S&P downgraded RMBS backed by Countrywide on July 12th and 19th."); <br><br>• Lefler Decl. ¶ 92, Ex. 91, at 1599 |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | |
| | (Culp SEC Depo. Tr. 125:21-24 (July 23, 2010)) ("what triggered the turmoil in the RMBS market was the change in housing prices, not the dramatic weakening of underwriting standards"); <br><br> • *Id.* (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report) (#120). <br><br> ***SEC Response*** <br><br> Disputed in part. Undisputed that in June and July 2007 rating agencies downgraded the investment grade ratings on hundreds of securities issued by the industry. <br><br> Disputed that this included "relatively few issued by Countrywide", which assertion is not supported by competent evidence. <br><br> ***Evidentiary Objections to Culp Report Citation*** <br><br> Hearsay; Relevance. |
| 24.    In early August 2007 short- | ***Defendants' Evidence*** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| term liquidity disappeared for borrowings based on asset-backed collateral. | • Lefler Decl. ¶ 91, Ex. 90, at 1513 (Culp Report ¶¶ 166-67) ("beginning in August 2007, ABCP [asset-backed commercial paper] risk spreads rose sharply across all conduit types. Although spreads on single-seller mortgage-backed ABCP rose more than spreads on other conduit types…the average increase in risk spreads across all conduits between July and August was 41 bps.  The data thus shows an implosion in the entire ABCP market – not just subprime mortgage-backed ABCP….losses in mortgage markets were not by themselves large enough |
| | to precipitate the widespread outbreak of panic that occurred in so many unrelated credit markets (including ABCP) in August 2007"); <br><br> • Lefler Decl. ¶ 92, Ex. 91, at 1594 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); <br><br> • *Id.* ¶ 83, Ex. 82, at 1435 (Foster SEC Depo. Tr. 71:18 – 71:24 (July 12, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | 2010)): |
| | "Q:  And do you recall whether Countrywide was able to secure those replacement sources of liquidity, these additional repo lines? |
| | A:  No, we were not, which was very alarming and drove us to the conclusion that we needed to enact the contingent liquidity plan and to draw on our back-up lines of credit for the revolver." |
| | *SEC Response* |
| | Disputed in part.  Undisputed that there was a contraction in the market for MBS securitizations in August 2007.  Disputed as to the balance of the statement, which is not supported by the evidence cited or the evidentiary record, as Countrywide closed 29 securitization deals in the third Quarter of 2007. |
| | *SEC Evidence* |
| | McCoy Decl ¶ 40, Ex. 230 (October 18, 2007 Memorandum to File from David Simmons re 3rd Quarter Non- |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Agency Securitizations) |
| | ***Evidentiary Objections as to Culp Report Excerpt*** |
| | Lack of Foundation; Hearsay |
| 25.    The disappearance of short-term liquidity for borrowings based on mortgage collateral in early August 2007 was not specific to Countrywide, affected the entire mortgage industry, and extended well beyond the mortgage industry. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 91, Ex. 90, at 1513 (Culp Report ¶¶ 166-67) ("beginning in August 2007, ABCP [asset-backed commercial paper] risk spreads rose sharply across all conduit types. Although spreads on single-seller mortgage-backed ABCP rose more than spreads on other conduit types…the average increase in risk spreads across all conduits between July and August was 41 bps.  The data thus shows an implosion in the entire ABCP market – not just subprime mortgage-backed ABCP. . . .losses in mortgage markets were not by themselves large enough to precipitate the widespread outbreak of panic that occurred in so many unrelated credit markets (including ABCP) in August |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | 2007"); |
| | • Lefler Decl. ¶ 92, Ex. 91, at 1594 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); |
| | • *Id.* ¶ 83, Ex. 82, at 1435 (Foster SEC |
| | Depo. Tr. 71:25 – 72:4 (July 12, 2010)) ("Q:  And do you recall, was it your impression at the time that Countrywide's inability to secure these replacement repo lines was due to Countrywide specific?  A:  No."); |
| | • *Id.* at 1435 (Foster SEC Depo. Tr. 73:6-13, 23-25 (July 12, 2010)): "Q:  So did you ever get the impression that Countrywide was being singled out? A:  Absolutely not. Q:  Okay. A:  In fact, if I can add, I was told that we were one on a – at the top of a laundry list of companies that were approaching them for credit support….we were one of their best customers.  They considered us to be the highest quality of their customers." |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | ***SEC Response***<br><br>Disputed in part. Undisputed that there was a contraction in the market for MBS securitizations in August 2007. Disputed as to the balance of the statement, which is not supported by the evidence cited.<br><br>***Evidentiary Objections as to Foster Testimony***<br><br>Lack of Foundation; Improper Opinion Testimony<br><br>***Evidentiary Objections as to Culp Report***<br><br>Hearsay; Lack of Foundation |
| 26.    In August 2007, the market for non-GSE mortgage-backed securities (i.e., mortgage-backed securities other than those sold to Fannie Mae, Freddie Mac and other government-sponsored entities) essentially evaporated. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 93, Ex. 92, at 1607 (LaCour-Little SEC Depo. Tr. 76:9-77:11 (July 28, 2010)): "Q.  Okay.  I'm sorry to do this, I'm going to ask you to turn back to paragraph 21 for a second. You write, quote: 'The liquidity crisis that began in August 2007 dramatically altered the capital |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | markets environment, making sale of nonagency mortgage virtually impossible and raising the cost of holding unsold mortgage loans on balance sheet.' |
|  | Do you see that? |
|  | A.  I do. |
|  | Q.  …. You believe this was true when you wrote this; correct? |
|  | A.  I did. |
|  | Q.  And you still believe it's true? |
|  | A.  Yes. |
|  | Q.  When you say 'making sale of nonagency mortgages virtually impossible,' do you mean with respect to Countrywide or with |
|  | respect to the entire industry? |
|  | A.  This is a description of the market events of August 2007. |
|  | Q.  So it was virtually impossible for anyone in the industry to sell nonagency mortgages at that time; correct? |
|  | A.  I believe so, yes." |
|  | • *Id.* ¶ 94, Ex. 93, at 1612-18 (Bartlett SEC Depo. Tr. 197:17 - 198:2 (June 3, |

49

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | 2010)): |
|  | "Q:  Did anything significant happen in Countrywide's business in August of 2007? |
|  | A:  Yes.  The -- at some point -- I am not sure if it was July or August -- I think it became evident that the secondary market for private label securitizations had -- had been disrupted to the point where you couldn't really issue new transactions at some point.  I am not sure exactly when that happened, but it looked at some point that we couldn't issue private label mortgage-backed securities." |
|  | • *Id.* ¶ 91, Ex. 90, at 1523 (Culp Report ¶ 200) ("Also contributing to the uncertainty regarding liquidity was the virtual disappearance of the secondary mortgage markets – which, by mid-August 2007, included both subprime and higher-quality prime mortgages"); |
|  | • *Id.* ¶ 92, Ex. 91, at 1524 (Culp SEC Depo. Tr. 9:18-10:12 (July 23, 2010)) (authenticating his report); |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | • *Id.* ¶ 95, Ex. 94, at 1621-22 (Lehn Report Exhibit J) (chart showing significant decline in RMBS issuance industry-wide from Q2 2007 to Q1 2008); |
| | • *Id.* ¶ 83, Ex. 82, at 1433 (Foster SEC Depo. Tr. 63:23 – 64:10 (July 12, 2010)): |
| | "Q:  It says, quote: 'He reported that the secondary market for virtually all classes of mortgage securities, both prime and nonprime, had unexpectedly and with almost no warning seized up, and that the |
| | company was unable to sell high quality mortgage-backed securities.' Do you recall whether that was occurring on – during this time period? A:  Yes.  It was early August.  We had – we'd started to see the rumblings, as I said earlier in our discussion, in late July, and so it came on very hard and very fast." Disputed in part.  Undisputed that |

51

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | there was a contraction in the market for MBS securitizations in August 2007.  Disputed as to the balance of the statement, which is not supported by the evidence cited or the evidentiary record, as Countrywide closed 29 securitization deals in the third Quarter of 2007.<br><br>***SEC Evidence***<br><br>• McCoy Decl ¶ 40, Ex. 230 (October 18, 2007 Memorandum to File from David Simmons re 3rd Quarter Non-Agency Securitizations)<br><br>***Evidentiary Objections to Foster Testimony***<br><br>Lack of Foundation; Improper Opinion Testimony<br><br>***Evidentiary Objections as to Culp Report***<br><br>Hearsay; Lack of Foundation |
| 27.    The evaporation of the market for non-GSE mortgage-backed securities in August 2007 was not an event that was specific to | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 83, Ex. 82, at 1434 (Foster SEC Depo. Tr. 66:4-7 (July 12, 2010)): |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| Countrywide. | "Q:  Do you recall anyone during this time period expressing to you that contagion from subprime to the prime space was due to the credit quality of Countrywide's loans? A:  No.  There was a general contagion in the market – Q:  And -- A:  -- not specific to Countrywide."; • *Id.* ¶ 94, Ex. 93, at 1618 (Bartlett SEC Depo. Tr. 200:3-19 (June 3, 2010)): |
|  | "Q:  Okay.  Was that phenomenon of being unable to issue new private label mortgage-backed securities restricted to Countrywide, or was it broader than that? A:  Not to my knowledge.  It affected the market in general."; • *Id.* ¶ 82, Ex. 82, at 1434 (Foster SEC Depo. Tr. 66:25-67:15 (July 12, 2010)): "Q:  I see.  And then in the last sentence of --of that paragraph it says: 'Mr. Mozilo noted that the problems |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | were not isolated to the company but were being experienced by other major market participants, such as Wachovia Corporation.' <br> A:  Yes. <br> Q:  Do you recall whether you were observing those events as well? <br> … [objection omitted] <br> A:  Yes.  As I said, I think several times in my discussion, I was observing -- I was observing across the board that these events were |
| | impacting the industry at large. "; <br> • Lefler Decl. ¶ 96, Ex. 95 at 1694 (Vandell Report ¶ 177) ("The housing bubble and the financial crisis impacted the entire mortgage industry, not just Countrywide."); <br> • *Id.* ¶ 93, Ex. 92, at 1607 (LaCour-Little SEC Depo. Tr. 76:9- 77:11 (July 28, 2010)): <br> "Q.  Okay.  I'm sorry to do this, I'm going to ask you to turn back to paragraph 21 for a second. <br> You write, quote: 'The liquidity crisis that began in August 2007 |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | dramatically altered the capital markets environment, making sale of nonagency mortgage virtually impossible and raising the cost of holding unsold mortgage loans on balance sheet.' Do you see that? A.  I do. Q.  …. You believe this was true when you wrote this; correct? A.  I did. Q.  And you still believe it's true? |
| | A.  Yes. Q.  When you say 'making sale of nonagency mortgages virtually impossible,' do you mean with respect to Countrywide or with respect to the entire industry? A.  This is a description of the market events of August 2007. Q.  So it was virtually impossible for anyone in the industry to sell nonagency mortgages at that time; correct? A.  I believe so, yes." • *Id.* ¶ 91, Ex. 90, at 1524-26 (Culp |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Report ¶¶ 202-206). |
| | **SEC Response** |
| | Disputed in part.  Undisputed that there was a contraction in the mortgage market for MBS securitizations in August 2007.  Disputed as to the balance of the statement, which is not supported by the evidence cited. |
| | **Evidentiary Objections as to Foster Testimony** |
| | Lack of Foundation; Improper Opinion Testimony |
| | **Evidentiary Objections as to Culp Report** |
| | Hearsay; Lack of Foundation |
| 28.    The changes in investor demand for mortgages were not the result of new information about the risk characteristics of Countrywide mortgages, but rather the manifestation of economic forces outside of Countrywide's control. | **Defendants' Evidence** |
| | • Lefler Decl. ¶ 92, Ex. 91, at 1597 (Culp SEC Depo. Tr. 88:3-88:6 (July 23, 2010)): ("A:  The quality of the loans that Countrywide was underwriting -- was writing and the poor performance over time of those loans, in my opinion, have nothing to |

56

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | do with their access to the secondary mortgage market in August of 2007."); |
| | • *Id.* ¶ 83, Ex. 82, at 1433-34 (Foster SEC Depo. Tr. 65:25 – 66:7 (July 12, 2010)): "Q:  Do you recall anyone during this time period expressing to you that contagion from subprime to prime space was due to the credit quality of Countrywide's loans? A:  No.  There was a general contagion in the market -- Q:  And -- A:  -- not specific to Countrywide."; • Lefler Decl. ¶ 96, Ex. 95, at 1689-91, 1693-99 (Vandell Report ¶¶ 162-168, 175-177); • *Id.* ¶ 91, Ex. 90, at 1525-26 (Culp Report ¶¶ 162, 203-206). **SEC Response** Disputed.  Countrywide Management had been on notice that if the loans CFC originated, packaged into MBS, and sold to investors performed badly, CFC's ability to continue accessing the |

57

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | capital markets could be frustrated. |
|  | ***SEC Evidence*** |
|  | • McCoy Decl. ¶ 77, Ex.267 (McMurray Dep. Tran. 89:15-92:6) |
|  | • McCoy Decl. ¶ 65, Ex. 255 (Ingerslev Inv. Test. 167:3-170:16) |
|  | • Bendell Decl. ¶ 5, Ex. 297 (Kurland Inv. Test. Ex. 840 (8/2/2005 email from Dave Sambol to Carlos Garcia, Angelo Mozilo, and Stan Kurland) |
|  | "While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversly [sic] selected pool." |
|  | • Dean Decl. ¶ 181, Ex.179 (Culp Dep. Ex. 1453) |
|  | "In March 2008, the President's |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Working Group on Financial Markets ("PWG"), which the President of the United States created to review the underlying causes of the financial market turmoil that began in 2007, issued its preliminary report.  In the report, the PWG listed as a principal cause of the turmoil in the financial markets the "breakdown in underwriting standards for subprime mortgages." |
| 29.     Countrywide disclosed in its 2006 10-K that pay-option ARM loans:<br><br>are different than "traditional" loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in the early periods of a loan's life. While we believe that we have prudently underwritten these loans, such loans present additional risks. | Undisputed. |
| 30.     Countrywide disclosed in its 2006 10-K that pay-option loans "have interest rates that adjust monthly and minimum required payments that adjust annually, | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| resulting in the potential for negative amortization." | |
| 31.    Countrywide disclosed in its 2006 10-K that, with respect to the "reset" risk associated with pay-option loans, after the initial period when borrowers were permitted to pay less than the full interest cost, "a new monthly payment amount adequate to repay the loan over its remaining contractual life [would be] established." | Undisputed. |
| 32.    Countrywide disclosed in its Q2 2006 10-Q that when a loan reset, "[t]he resulting payment adjustment could be substantial." | Undisputed. |
| 33.    Countrywide disclosed in its 2006 10-K and its 2005 10-K that "Negative amortization" associated with pay-option loans originated by Countrywide was capped at 115% of the original loan, meaning that the loan would automatically "reset" if a borrower's balance increased to 115% of the initial balance. | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| 34.    Pay-option loans had been offered by other mortgage industry originators since the 1980s. | Undisputed. |
| 35.    During the history of the pay-option product, pay-option lenders had been exposed to several instances of depressed housing prices, including the declining real estate values in Southern California in the late 1980s and early 1990s. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 94, Ex. 93, at 1615 (Bartlett SEC Depo. Tr. 147:20-149:1 (June 3, 2010)):<br><br>"Q:  And over the period from the early '80s up through May of 2006, had there been difficult environments for payoffs on loans? |
|  | A:  I am sorry.  The period again was from?  Early '80s?<br>Q:  Yes, the starting period you just gave me, early '80s, up to May of 2006, which was the date of this document.<br>A:  I think -- there were -- the first one I can recollect -- and the question is whether the product existed at that time.  But in the mid-'80s there was a regional crisis in the -- what were kind of largely known as the oil-producing states.  They used to call them the COLT states.  It was |

61

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | Colorado, Oklahoma, Louisiana, Texas.  So that was a pretty severe housing environment, at least in that region.<br><br>Towards the end of the '80s until the early '90s Southern California and other places in the country I believe experienced significant difficulties in housing prices or sales of homes.  I am not sure about the direction of housing prices, but certainly it was a difficult |
|  | environment in the late '80s and early '90s.  The -- the period in the kind of mid '90s to late '90s I believe interest, I mean, real estate prices weren't moving up dramatically.  I am not sure what was happening to default levels in those times, but they certainly were kind of flat.  And then post 9/11 -- so, that would have been September of 2001 -- there was a period of where there was maybe a stress environment for real estate…";<br><br>• *Id.* ¶ 28, Ex. 27, at 457 (March 30, 2006, Countrywide Financial Equity |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Investor Forum Transcript at CFC2007826979) (transcript quotes John McMurray as stating: "We could also look at the experience that [Golden West and Downey Savings] had in the early '90s when they both had high concentrations of pay option products here in southern California and observed how those loans performed.  So, during that time of stress, we could observe, for |
| | example, that they both had around 19 or 20 basis points of charge-offs at the peak.  That's per year."). **SEC Response** Disputed in part.  Undisputed that between them Bartlett and McMurray recalled two instances where Pay-Option loans existed and were subjected to regionalized housing price downturns.   Disputed to the extent that Defendants intend to imply that Countrywide's Pay-Option loans were underwritten to the same |

63

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | standards as the Pay-Option loans written during those periods.<br><br>***SEC Evidence***<br><br>• Dean Decl ¶ 20, Ex. 18 (Inv. Test. Ex. 221 - September 26, 2006 email from Mozilo to Sambol, Sieracki, and Carlos Garcia):<br><br>[w]e have no way, with any reasonable certainty, to assess the real risk of holding [Pay-Option] loans on our balance sheet. ***The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.*** In my judgement, as a long time lender, I would always trade off fico for equity.  The bottom line is that ***we are flying blind on how these loans will perform in a stressed environment*** of higher unemployment, reduced values and slowing home sales. (emphasis added) |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| 36.    Countrywide disclosed in its 2005 10-K and 2006 10-K that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of these [pay-option] loans has not been established for the Company." | Undisputed.<br><br>(Sanford Bernstein Conference where Mozilo told investors:<br><br>"Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers."  Mozilo added that the "performance profile of *this product is well-understood because of its 20-year history, which includes "stress tests" in difficult environments.*"<br><br>Mozilo also told the audience that despite recent scrutiny of Pay-Option loans, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers.") |
| 37.    With respect to pay-option loans held in Countrywide's held-for-investment portfolio, Countrywide disclosed in its 2005 10-K and its 2006 10-K the amount of negative amortization, as well as the outstanding loan balance, average loan-to-value ratio, average FICO score and delinquencies. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 5, Ex. 4, at 140 (2006 10-K at 107) (table providing information regarding Countrywide's pay-option portfolio in 2005 and 2006, including the total size of the pay-option portfolio; the total principal balance of the pay-option ARM loans with accumulated negative amortization; accumulated negative |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | amortization; the average original LTV for the pay-option portfolio; the average original CLTV for the pay-option portfolio; the average original FICO score for the pay-option portfolio; and the percentage of pay-option loans delinquent 90 days or more); *Id.* ¶ 11, Ex. 10, at 275 (2005 10-K at 57) (similar table for 2004 and 2005). ***SEC Response*** Disputed in part.  Undisputed that the two Forms 10-K in question contain statistics regarding the Pay-Option portfolio at Countrywide Bank. Disputed to the extent that the fact indicates that the subject charts show current loan to value ratios as of the date of the filing, which fact is not supported by the evidence cited. |
| 38.    Countrywide disclosed in its 2005 10-K and its 2006 10-K that "[m]anagement expects the delinquency rate in the Company's pay-option ARM loan portfolio to | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| increase as this product continues to season." | |
| 39.     Countrywide's periodic filings and quarterly earnings press releases updated investors concerning the amount of negative amortization in Countrywide's held-for-investment portfolio. | Undisputed. |
| 40.     The transcript from an April 27, 2006, earnings call quotes Mr. Mozilo as saying that 70% of pay-option borrowers were electing in 2006 to make the minimum payment, and were therefore accruing negative amortization. | Undisputed. |
| 41.     The transcript from a September 13, 2006, investor conference quotes Mr. Mozilo as stating that the percentage of pay-option borrowers making the minimum payment had risen to 78% of the portfolio and that he had been "shocked" by this figure. | Undisputed. |
| 42.     Countrywide disclosed to | *Defendants' Evidence* |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| stockholders management's uncertainty regarding the future performance of pay-option loans. | • Lefler Decl. ¶ 224, Ex. 221 (July 26, 2005, Q2 2005 Countrywide Financial Corporation Earnings Conference Call Transcript, CFCNYF00019113, at 136) (transcript quotes Mr. Mozilo as saying that although pay-option ARMs were Countrywide's "lowest |
| | delinquency product at the moment ... you have to wait some time for loans to mature a year, two years, even three years to determine how they're going to perform.");<br><br>• Lefler Decl. ¶ 105, Ex. 104, at 1794 (July 25, 2006, Q2 2006 CFC Earnings Conference Call at 10) (transcript that quotes Mr. Mozilo as stating, in response to a question about the pay-option portfolio, "[w]ell, I don't know where it's going to end up because it will depend upon interest rates. . . . [D]epending upon where rates are the resets could be significant and we just need time to see how this is going to play out.  If rates continue to rise significantly, then these resets and payment shocks will be substantial"); |

68

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | • *Id.* at 1794 (July 25, 2006, Q2 2006 CFC Earnings Conference Call at 10) ("in terms of the delinquencies that we're experiencing on that loan |
|  | overall in our portfolio is about 61 basis points versus 81 for all other types of conventional loans.  And obviously they should perform better; I mean it's a low payment and they should – so they're performing well in this environment.  The test will be when the resets take place and I'm not certain exactly what's going to happen there."); <br><br> • *Id.* ¶ 106, Ex. 105, at 1799 (Jeff Bailey, "The Mortgage Maker vs. the World," *The New York Times*, Oct. 16, 2005) ("That volume of such loans [adjustable-rate, pay option loans with negative amortization] has never been tested in a sharply rising interest-rate environment, a situation feared by some though not yet on the horizon."); <br><br> • *Id.* ¶ 107, Ex. 106, at 1804 (Kenneth Bruce, "Countrywide Financial Corp.: Untapped Strength," Merrill Lynch, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Oct. 28, 2005, at 4) ("[T]he market remains quite concerned with |
| | CFC's ability to manage credit risk and the pay-options [sic] ARM's overall impact to the risks that may be built up in the U.S. mortgage market. Since CFC's portfolio is quite young (unseasoned) and coming in at possibly the top of the real-estate cycle, investors remain concerned that CFC could bear higher losses, if housing values correct as much as some as concerned. CFC has typically not retained loan products, so we have no historical performance to suggest a possible outcome. . . ."). <br><br> • *Id.* ¶ 108, Ex. 107, at 1815 (Frederick Cannon, "CFC: Countrywide Bank - Living up to Its Name?" Keefe, Bruyette & Woods, Jan. 13, 2006, at 7) ("While the Pay-Option ARM loan has been around for quite some time, it represents a new product offering for Countrywide. We are taking a cautious outlook on the performance of these |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | loans |
|  | for a couple of reasons. Countrywide is allowing the greatest amount of negative amortization on these loans of any of the lenders we follow. The start rate for a Countrywide Pay-Option ARM remains at the industry low 1.00%. Further, to the degree that the piggyback loans mentioned above are written in concert with the Option-ARM loans, it is our opinion that the risk becomes greater that the bank will experience defaults."); |
|  | • *Id.* ¶ 109, Ex. 108, at 1821 (Danielle Reed, "Option ARM Exposure Grows At Banks, Posing Credit Risk," Dow Jones Capital Markets Report, May 15, 2006) ("Consumers aren't the only ones who like so-called 'exotic' mortgages. Banks have been retaining more of them in their portfolios, possibly increasing their vulnerability to a housing or economic downturn. . . . But growth in mortgage loan balances (also called 'negative amortization') is nonetheless a |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | developing trend, |
| | CreditSights noted.  At Countrywide, for example, 'the growth rate for accumulated negative amortization has been on a tear.' Option ARM balances on its books increased by $75 million in 2005, up from a mere $29,000 at year-end 2004, CreditSights said."); |
| | • *Id.* ¶ 153, Ex. 152, at 2192 ("Phantom Profits," *BusinessWeek*, Sept. 11, 2006) (noting that "Countrywide has been among the most aggressive underwriters of option ARMs," and that "[t]hree-quarters of the company's option ARM borrowers chose the cheapest mortgage payment, according to its latest earnings release -- meaning these loans could reset at much higher rates."). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that various contingencies inherent to the Pay-Option product and thus that might impact future performance of the product were disclosed.  Disputed |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | to the extent that Countrywide failed to disclose senior management's conclusion that they could not reliably assess the risk to Countrywide posed by those contingencies.<br><br>***SEC Evidence***<br><br>• Dean Decl. ¶ 20, Ex. 18 (Inv. Test. Ex. 221 (September 26, 2006 email from Mozilo to Sambol, Sieracki, and Carlos Garcia):<br><br>    [w]e have no way, with any reasonable certainty, to assess the real risk of holding [Pay-Option] loans on our balance sheet. ***The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.*** In my judgement, as a long time lender, I would always trade off fico for equity. The bottom line is that ***we are flying blind on how these loans will perform in a stressed environment*** of higher unemployment, reduced values and slowing home sales. (emphasis added)<br><br>• Dean Decl. ¶ 20, Ex. 18 (Inv. Test. Ex. 221, John McMurray's 9/26/2006 response to Mozilo): |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | "I was very happy to see your email because I personally share the same sentiment (that we should be shedding rather than adding Pay Option credit risk to the portolio)"<br><br>• McCoy Decl. ¶ 104, Ex. 294 (Dep. Ex. 15 - Carlos Garcia email to Cliff Rossi dated May 25, 2006)-:<br><br>"Spoke with sambol. He believes historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort.  Sambol is concerned about payment shock at recast and inability to absorb increased payments thru income or refi (due to low equity).  So sambol believes high cltv loans with no mi, particularly those with high dti are risky.  Maybe also those with low ficos. If the loans are in markets that have slowed the risk is exacerbated."<br><br>***Evidentiary Objection to Lefler Exh 221***<br><br>Mischaracterization of the Document; Cited Material Not Included. |
| 43.    Countrywide disclosed in its 2006 10-K: "The allowance for loan losses is our best estimate of the | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 5, Ex. 4, at 124 (2006 10-K at 51). |

74

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| credit losses incurred in our loan investment portfolio." | **SEC Response**<br><br>Disputed in part. Undisputed that the quoted language appears in the Form 10-K. Disputed to the extent that fact implies that the allowance was in fact management's best estimate, which fact is not supported by the evidentiary record.<br><br>**SEC Evidence**<br><br>• McCoy Decl. ¶ 74, Ex. 264 (McCallion Dep. Tran. 181:16-19; 189:18-190:5)<br><br>Q. Now, Countrywide's auditors had identified a significant deficiency with respect to Countrywide's models; is that correct?<br>A. Yes.<br><br>\* \* \*<br><br>Q. Okay. I had asked you before you reviewed the pages whether you remembered what the deficiencies related to. Does reviewing the pages that end in 4171 and 4172 refresh your recollection with respect to the deficiencies that together aggregated into a significant deficiency in 2005?<br>A. Yes.<br>Q. And what is your recollection?<br>A. The -- the significant deficiency |

75

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | had to do with the document -- excuse me, documentation and testing of some of the models that were used in the valuation of the MSRs and the residuals, loan related loss -- and loan related loss reserves.

• Bendell Decl. ¶ 6, Ex. 298 (Rossi Dep. Ex. 28 – May 1, 2006 email from Don White to Clifford Rossi regarding model development)

"I believe we should also consider having an "automatic adjustment factor" in the ALLL model [analogous to the HELOC model] to deal with model over/under predicting delinquency."

• McCoy Decl. ¶ 90, Ex. 280 (Sieracki Dep. Trans. 76:16-77:4)

Testimony that Sieracki was aware that in March 2007, the Office of the Comptroller of the Currency had informed management that Countrywide Bank's models were underpredicting losses underlying the Allowance for Loan and Lease Losses.

***SEC Evidentiary Objection To 10-K Excerpt:*** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Hearsay |
| 44.    Countrywide disclosed that its provision for loan loss reserves was approximately $81.6 million in 2005 and approximately $154 million in 2006. | Undisputed. |
| 45.    Countrywide disclosed in its 2006 10-K that "[t]his increase [in loan loss reserves] reflects increased delinquencies and loss levels resulting from seasoning of loans acquired during the past years of rapid portfolio growth, as well as prevailing real estate and market conditions." | Undisputed. |
| 46.    Countrywide disclosed that it increased its provision for loan losses in the first quarter of 2007 by $95.9 million and in the second quarter of 2007 by $231 million. | Undisputed. |
| 47.    Most loans in the Company's held-for-investment portfolio were not scheduled to begin resetting | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 98, Ex. 97, at 1705 (Garcia SEC Depo. Tr. 95:18 – 96:22 |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| until 2009. | (June 29, 2010)): |
| | "Q:  Okay.  So I want to focus your attention on some of Mr. Mozilo's comments about the PayOptions. And he says -- this is at -- towards the end of the second full paragraph in his e-mail of May 18th. 'As for PayOptions, the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated, and as a result causing, mortgagors -- mortgagors to default due to the substantial increase in their payments.' Do you see that? |
| | A:  Uh-huh. |
| | Q:  Was -- was that a concern that you shared in May of 2006? |
| | A:  No. |
| | Q:  And why not? |
| | A:  Well, I think I went through the answer to the earlier question.  It would be the -- the same points that I would have to repeat to you. But the only additional thing that comes to mind now is that -- in addition to |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | what I said earlier is that also the -- you know, the recast of these [pay-option] loans, even under an accelerated basis with what rates were doing, is -- or was, you know, into the future, several years.  I think it started in '09 and kind of peaked in 2010." Lefler Decl. ¶ 110, Ex. 109, at 1847 (Cmplt. ¶ 58) ("Because Countrywide began to offer Pay-Option loans in 2004, Countrywide's first wave of automatic resets were scheduled to occur in 2009."). ***SEC Response*** Disputed in part.  Undisputed that the initial scheduled wave of automatic resets was to occur in 2009.  Disputed to the extent that Defendants' assertion does not take into account the possible earlier rests that would occur based upon borrowers making the minimum payment who would hit the 115% negative amortization cap before the scheduled reset date. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | ***SEC Evidence***<br><br>• Bendell Decl. ¶12, Ex. 304 (Depo. Ex. 704 (June 2007 Flash Report identifying 2 loans that already reset and an additional 38 loans which had reached negative amortization of between 109% and 114.99%). |
| 48.    In response to a written interrogatory the Commission admitted that the information about Countrywide's non-GSE loans contained in the prospectus supplements was reflected in Countrywide's stock price. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 111, Ex. 110, at 1880-81 (Plaintiff Securities and Exchange Commission's Third Supplemental Responses to Defendant Angelo R. Mozilo's First Set of Interrogatories at 3:7-11 and 3:27-4:1):<br><br>"**Interrogatory No. 11:** For the period 2004 through 2007, do you contend the price of Countrywide common stock did not reflect the information about loan attributes that was disclosed in prospectus |
| | supplement filed by CWABS, Inc., CWALT, Inc., CWHEQ, Inc. and CWMBS, Inc.<br><br>**Third Supplemental Response to Interrogatory No. 11:**…. No, the |

80

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | Commission does not contend that the Prospectus Loan Information was not reflected in the price of Countrywide common stock once each piece of information was filed on EDGAR and absorbed by the market." |

*SEC Response*

Disputed.  The Commission's actual Interrogatory Response was:

**<u>Third Supplemental Response to Interrogatory No. 11:</u>**…. No, the Commission does not contend that the Prospectus Loan Information was not reflected in the price of Countrywide common stock once each piece of information was filed on EDGAR and was absorbed by the market. However, the Commission does contend that such information could not be completely and accurately reflected in Countrywide's common stock price because of the material misstatements and omissions regarding material negative information regarding Countrywide's loan underwriting set forth in the

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Commission's Complaint and its Responses to Interrogatories 2, 3, and 5, which responses are incorporated by reference, and which the prospectus supplements for CWABS, Inc., CWALT, Inc., CWHEQ, Inc., and CWMBS, Inc. were insufficient to cure.<br>See, Lefler Decl. ¶ 111, Ex. 110, at 1880-81 |
| 49.     The SEC's designated expert witness, Alan Hess, admitted: "all publicly available information, including material information . . . concerning Countrywide's activities in mortgage and mortgage securitization markets, was quickly and fully incorporated into the market price of Countrywide's stock." | Undisputed. |
| 50.     At his deposition, Alan Hess conceded that information contained in Countrywide prospectus supplements filed with the SEC was incorporated in the Company's | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 4, Ex. 3, at 93 (Hess SEC Depo. Tr. 39:7-40:4 (July 20, 2010)):<br>"Q: And can you briefly explain what |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| stock price. | it meant to say that Countrywide's stock traded in a market that was semistrong form efficient?

A: The classroom definition of that is that in a semistrong form efficient market, price correctly reflects all public information.

Q: And with respect to publicly available information that would be incorporated into Countrywide's stock price, that public information would include Countrywide's Form 10-Ks that were filed with the SEC; correct?

A: Yes.

Q: And it would also include 10-Qs that were filed with the SEC; correct?

A: Yes.

Q: And it would also include 8-Ks that were filed with the SEC; correct?

A: Yes.

Q: And is there any information that would be filed with the SEC that you would consider not to be publicly available?

A: If it's filed with the SEC and listed |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | on EDGAR, then it's public – in the public domain." **SEC Response** Undisputed that the cited excerpt reflects a portion of Dr. Hess' testimony, but disputed to the extent that the fact mischaracterizes his opinion. |
| 51.   The SEC further admitted in discovery that one of the purposes for requiring documents to be filed on EDGAR was to make them available to investors. | Undisputed. |
| 52.   Information on Countrywide's websites was incorporated into Countrywide's stock price. | Undisputed. |
| 53.   At least 82 of the prospectus supplements issued by Countrywide subsidiaries disclosed that "a significant number of the mortgage loans will have been originated based on underwriting exceptions." | Undisputed. |
| 54.   The prospectus supplements and the Company-sponsored | **Defendants' Evidence** • Lefler Decl. ¶ 63, Ex. 62, at 1039 |

84

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| website disclosed that Countrywide originated loans with combinations of risk factors such as low FICO scores, high loan-to-value ratios, or reduced or stated documentation. | (Prospectus Supplement, CWABS Asset-Backed Certificates, 2006-SPS1 (Form 424B5, filed June 26, 2005) at A-6): <br><br> **Documentation Programs** <br><br> | Documentation Program | Number of Statistical Mortgage Loans | Aggregate Principal Balance Outstanding | Weighted Average Credit Bureau Risk Score | Weighted Average Original Combined Loan-to-Value Ratio (%) | <br> |---|---|---|---|---| <br> | Full | 2,259 | $ 94,185,311 | 652 | 95.4 | <br> | Stated Income | 1,230 | 63,083,256 | 667 | 99.8 | <br> | Total | 3,489 | $157,268,567 | | | <br><br> **Credit Bureau Risk Scores[(1)]** <br><br> | Range of Credit Bureau Risk Scores | Number of Statistical Mortgage Loans | Aggregate Principal Balance Outstanding | % of Statistical Mortgage Loans | Weighted Average Remaining Term to Maturity (Months) | Weighted Average Credit Bureau Risk Score | Weighted Average Original Combined Loan-to-Value Ratio | <br> |---|---|---|---|---|---|---| <br> | 781 – 800 | 8 | $   364,767 | 0.23% | 178.68 | 791 | 98.5 | <br> | 761 – 780 | 20 | 1,276,916 | 0.81 | 178.79 | 771 | 99.0 | <br> | 741 – 760 | 32 | 1,897,150 | 1.21 | 179.01 | 750 | 100.0 | <br> | 721 – 740 | 63 | 3,318,665 | 2.11 | 179.28 | 730 | 99.5 | <br> | 701 – 720 | 139 | 6,364,934 | 4.05 | 181.09 | 719 | 99.4 | <br> | 681 – 700 | 239 | 13,361,808 | 8.50 | 180.39 | 689 | 99.3 | <br> | 661 – 680 | 393 | 19,925,800 | 12.67 | 180.95 | 670 | 98.9 | <br> | 641 – 660 | 543 | 25,879,479 | 16.46 | 181.41 | 649 | 98.0 | <br> | 621 – 640 | 672 | 30,533,541 | 19.41 | 180.79 | 630 | 97.5 | <br> | 601 – 620 | 605 | 24,568,537 | 15.62 | 183.18 | 610 | 95.4 | <br> | 581 – 600 | 620 | 23,004,137 | 14.63 | 182.63 | 590 | 95.8 | <br> | 561 – 580 | 162 | 5,966,203 | 3.79 | 185.95 | 572 | 88.5 | <br> | 541 – 560 | 18 | 647,331 | 0.41 | 190.11 | 554 | 96.0 | <br> | 521 – 540 | 3 | 139,936 | 0.09 | 195.53 | 527 | 87.2 | <br> | 500 or Less | 1 | 19,962 | 0.01 | 179.00 | 489 | 75.3 | <br> | Total | 3,489 | $157,268,567 | 100.00% | | | | <br><br> (1)  As of the Statistical Calculation Date, the weighted average Credit Bureau Risk Score of the mortgagors related to the Statistical Mortgage Loans was approximately 640. <br><br> • *Id.* ¶ 65, Ex. 64, at 1046 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2005-15 (Form 424B5, filed Feb. 23, 2006) at S-32); <br><br> • *Id.* ¶ 64, Ex. 63, at 1043 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5, filed Nov. 16, 2005) at S-36); <br><br> • *Id.* ¶ 71, Ex. 70, at 1335-36 (Prospectus Supplement, CWABS Asset-Backed Certificate, Series 2006-7 (Form 424B5, filed June 26, |
| | 2006) at S-38 – S-39). |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that the supplements contained charts setting forth loan characteristics.  Disputed to the extent that a reader could readily determine the combinations of risk factors represented in each pool, which fact is not supported by the evidence cited not the evidentiary record. |
| | ***SEC Evidence*** |
| | • Dean Decl. ¶ 12, Ex. 10 (Adler Depo. Ex. 1061) |
| | • McCoy Decl. ¶ 44, Ex. 234 (Adler Dep. Trans. 198:10-199:17) |
| | Q.  There are several tables in an Annex A to Exhibit 1061.  They start at page A-1 and continue through A-56.  Do any of those tables contain loan level details or are they just aggregate tables?<br>A.  These are aggregate tables.<br><br>* * *<br>Q.  Is there any way, using the appendix or the Annex A to Exhibit 1061, to determine how many loans in this pool had more than one credit risk factor associated with them?<br><br>[Objection Omitted] |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | THE WITNESS:  No. |
| 55.    Based on the information Countrywide disclosed with respect to its securitizations, equity analysts took note of, and presented to investors a graph showing, combinations of risk factors such as low FICO scores, high loan-to-value ratios, or reduced or stated documentation. | **Defendants' Evidence**<br><br>• Lefler Decl. ¶ 115, Ex. 114, at 1965 (Chris Brendler, CFA, and Michael R. Widner, "Too Early to Try to Be a Hero," Stifel Nicolaus, July 27, 2007, at 6 (SEC Ex. 513), containing table with loan information):<br><br>• *Id.* ¶ 116, Ex. 115, at 1978 (Brendler SEC Depo. Tr. 190:4-24 (June 25, 2010)) (testimony confirming that Brendler reviewed and approved publication of the table in Lefler Decl. Ex. 114 (SEC Ex. 513) and that it represented an analysis of Countrywide's home equity underwriting criteria by time period, based on loan level data from |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Countrywide's website); |
| | • *Id.* at 1978 (Brendler Depo. Tr 191:15-193:17 (June 25, 2010)) (testimony confirming that the table in Lefler Decl. Ex. 114 (SEC Ex. 513) included information on FICOs, CLTVs, and reduced documentation); |
| | • *Id.* at 1980 (Brendler Depo. Tr 225:10-23 (June 25, 2010)) (testimony indicating that, using data underlying the table in SEC Ex. 513, it would be possible to determine what percentage of loans of CLTV's of 100-plus and a weighted average FICO below 660). |
| | ***SEC Response*** |
| | Disputed in part. Undisputed that the Stifel Nicolas analyst Christopher Brendler heard the disclosures at Countrywide's July 24, 2007 earnings call, believed management had disclosed new information about its Held for Investment loan portfolio that led him to believe that management had made "serious miscalculations (or possibly misrepresentations)" |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | regarding the  risk in the portfolio. Undisputed that he and his colleague prepared the cited table based upon loan pool securitization information. Disputed that the table was sufficient to determine what percentage of loans of CLTV's of 100-plus and a weighted average FICO below 660 were in the securitization pools.  Also disputed that the underlying data on the loan pools contained information on Countrywide's Held For Investment portfolio.<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 72, Ex. 262 (Liu Dep. Trans. 134:4-18 ):<br><br> Q.  Okay.  What else did it do with loans besides securitize them?  If you know.<br>A.  I can't give you percentages, but it – it held loans on portfolio.  It sold loans to GSEs government-sponsored enterprises.  It sold loans  into government, like Ginnie Mae -- Ginnie Mae, VA, HUD, FHA securities.  It sold loans to whole loan investors as |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | opposed to a securitization where there's multiple investors. |
| | Q.  And did the prospectus supplements that you've -- sorry, that your group reviewed in the nonagency RMBS business, did they provide any information about the loans that were held at Countrywide on portfolio? |
| | A.  I don't believe they did. |
| | • Dean Decl. ¶ 52, Ex. 242 (Brendler Dep. Trans. 226:6-17) |
| | Q. And would the data in the securitization pools provide you any information about loans that were held for investment rather than being securitized? |
| | [Objection omitted] |
| | A. Not directly.  We put this in because it was all that we had.  And we are making, just trying to make the point of here's some data for Countrywide Home Loans home equity securitizations.  It's a proxy for what could be in the bank, but it could also be irrelevant, really. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | • Lefler Decl. ¶ 115, Ex. 114, at 1965.<br><br>• *Id.* at 1980.<br><br>***Evidentiary Objection***<br><br>    Lefler Decl. ¶ 115, Ex. 114, at 1978 and 1980 – Mischaracterizes testimony. |
| 56.    The Company's Chief Risk Officer, John McMurray, made presentations to investors in September 2006 in which he clearly demonstrated that prime and nonprime loans included risk factors such as high loan-to-value ratios and reduced documentation. | • Lefler Decl. ¶ 76, Ex. 75, at 1404 (September 12, 2006 Presentation at CSL-CB001526);<br><br>• *Id.* ¶ 78, Ex. 77, at 1416 (September 13, 2006 Presentation at 200).<br><br>***SEC Response***<br><br>Disputed.  The alleged fact (that this information was actually presented to investors) is not supported by the evidence presented.<br><br>***SEC's Evidentiary Objections To Exhibits 76 and 77 and Lefler Declaration:***<br><br>Lack of Foundation. |
| 57.    Mr. McMurray, publicly disclosed that in Countrywide's experience, a prime loan with a FICO score of 600 was roughly 3 | ***Defendant's Evidence***<br><br>• Lefler Decl. ¶ 129, Ex. 128, at 2075 (January 30, 2006 ASF Conference |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| times more likely to become 90 days delinquent than a prime loan with a FICO score of 675, and that a prime loan with a FICO score of 580 was roughly 4 times more likely to become 90 days delinquent than a prime loan with a FICO score of 675. | Presentation Slides at CFCP006856251): <br><br>• *Id.* ¶ 130, Ex. 128A, at 2091 (February 9, 2006 Email re: American Securitization Forum Presentation at  CFCP000954303) (email confirming that John McMurray made a presentation at the American Securitization Forum in early 2006); (#177)<br><br>*Id.* ¶ 27, Ex. 26, at 452 (March 30, 2006 Equity Investor Forum Slides at 109 at CSL-CB001299);<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that McMurray disclosed that as a general matter, loans with lower FICO scores were more likely to default than those |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | with higher FICO score.  The balance of the alleged fact is not supported by the evidence presented. ***Evidentiary Objection to Exhibit 128A:*** Hearsay |
| 58.    There is no commonly accepted, industry-wide definition of the term "prime." | • Lefler Decl. ¶ 19, Ex. 18, at 406 (Kuelbs 7/10/10 SEC Depo. Tr. at 114:7-9):<br><br>"Q:  Okay.  Mr. Kuelbs, was there |
| | a standard industrywide definition for prime loans? A:  No."; <br>• *Id.* ¶ 29, Ex. 28, at 464 (Hesser SEC Depo. Tr. 82:25-83:4 (June 9, 2010)):<br><br>"Q:  I want to focus your reference to sub-prime loans. Was there an industry-wide definition of prime or sub-prime in the 2005 to 2007 period? A:  There was not.";<br>• Lefler Decl. ¶ 96, Ex. 95, at 1650 (Vandell Report ¶ 58) ("Banking regulators agreed that the subprime vs. prime classification depends on many |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | factors," and FICO is "only one" of those factors); |
| | • *Id.* at 1651 (Vandell Report at ¶ 59) ("The GSEs also agreed that the term is not well defined," and "[s]ecurities analysts also agree that there is no clear FICO cutoff for subprime loans"); |
| | • Lefler Decl. ¶ 194, Ex. 191, at 2427 |
| | (Lehn Report ¶ 42) ("... [T]here is no industry standard definition for 'prime' and 'subprime' loans, as noted in a Federal Reserve Bank paper and a Financial Crisis Inquiry Commission staff report. Even Fannie Mae, a government-sponsored enterprise ('GSE'), had a conventional conforming mortgage credit book of business that included loans with FICO scores below 620." (footnotes ommitted)); |
| | • Lefler Decl. ¶ 61, Ex. 60 at 815 (Grundfest Report ¶ 291) ("... [T]here was no standard definition of prime and subprime in the market during the |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | period relevant to the Complaint, and a loan's riskiness cannot be judged by any one single variable. Mortgage loan credit risk is multidimensional, and that fact is documented by academic literature and was disclosed repeatedly by Countrywide."); |
|  | • *Id.* ¶ 93, Ex. 92, at 1604 (Lacour- |
|  | • Little SEC Depo. Tr. 42:4-25 (July 28, 2010)): |
|  | "Q.  Professor, there are a number of different ways of defining subprime; correct? |
|  | A.  I would agree with that. |
|  | Q.  You've cited one in -- on page 6 of your report; is that correct? |
|  | A.  Yes.  I cited the OCC statement. |
|  | Q.  What are some of the other ways of defining subprime? |
|  | A.  Well, there are a number of ways that have been done in the research literature.  In general, subprime loans will have higher interest rates and lower credit quality for the borrower, so one way to do it is just to look at the highest priced loans within some |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | distribution of loans. |
| | Another way, which I refer to later on in my report, is based on the HMDA reportable loans which are loans that are priced higher than a particular pricing threshold as established by the bank regulatory |
| | agencies.  I think probably researchers have used FICO scores of 620, FICO scores of 660 and various other ways of defining subprime." |
| | *SEC Response* |
| | Disputed in part.  Undisputed that there is no single, definitive definition of subprime in the literature.  Disputed to the extent that the alleged fact implies that there is no consensus regarding what generally constitutes a subprime loan; *i.e.,* a loan made to a borrower with blemished credit and/or on terms which include higher credit risk characteristics. |
| | *SEC Evidence* |
| | • Bendell Decl. ¶ 9, Ex. 301  (Depo Exh 1750 (Expert Report of LaCour-Little |

96

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | at p. 6, fn. 6) |
| 59.    Countrywide's Chief Risk Officer, John McMurray, publicly disclosed that Countrywide's prime loans included a small percentage of loans with FICO scores below 620 and that there was a substantial overlap between the FICO scores of prime and subprime loans. | • Lefler Decl. ¶ 76, Ex. 75, at 1403 (September 12, 2006 Equity Investor Forum Slides at 159) [CSL-CB001363 at 1521] (slides demonstrating the overlap between prime and subprime loans, with prime loans extending to FICO scores below 580); <br><br> • *Id.* ¶ 75,  Ex. 74, at 1398 (September 12, 2006 Equity Investor Forum Transcript at 33) ("All right this is back to our servicing portfolio for a moment. So here we're showing a couple key characteristics that are important from a credit perspective. So the first is combined loan-to-value, so that's a measure again of leverage so we show you the distribution in our servicing portfolio there…  Over on the far right or tip right I should say, we've got FICOs. |
| | One of the things to notice here is the tremendous overlap between prime and sub-prime FICOs. So these markets long ago ceased to be |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | definiend in terms of FICO by where a borrower fell, it's much more drven by the transaction level details now."); <br><br> • *Id.* ¶ 77,  Ex. 76, at 1410 (September 13, 2006 Fixed Income Investor Forum Transcript at 61) ("[T]he upper right are FICOs so one of the things to notice there is the tremendous overlap between prime and subprime so those two markets are moving. There's much more of a blurring between those two markets. They overlap more than they don't overlap so that's the change that we've seen over the past couple years."); <br><br> • *Id.* ¶ 78,  Ex. 77, at 1416 (September 13, 2006 Fixed Income Investor Forum Slides at 200): |
| |  <br><br> • *Id.* ¶ 16,  Ex. 15, at 372 (McMurray SEC Depo. Tr. 303:24-304:6 (July 7, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | 2007) (McMurray recalling that he made successive presentations to equity investors and fixed income investors in New York in September 2006); (#3) |
| | • *Id.* ¶ 84, Ex. 83, at 1440 (May 23, 2007 Fixed Income Investor Forum at CFC2007E837356):  |
| | ***SEC Response*** Disputed in part. Undisputed that the transcripts contain the quoted information made the quoted statements. Disputed to the extent that the alleged fact implies that the information presented related to the Held for Investment portfolio at the Bank, which implication is not supported by the evidence presented. ***SEC's Evidentiary Objections To*** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | ***Exhibits 15, 74, 76, 77, 15 and 84:***<br><br>Hearsay; Lack of Foundation |
| 60.     The SEC's own expert identified at least five different ways to define "subprime," admitted that there is no one agreed upon definition of "subprime," and opined that Countrywide's use of the term "nonprime" in its public disclosures was not false or misleading. | • Lefler Decl. ¶ 92, Ex. 92, at 1604 (LaCour-Little SEC Depo. Tr: 42:4-42:25 (July 28, 2010)):<br><br>"Q.  Professor, there are a number of different ways of defining subprime; correct?<br>A.  I would agree with that.<br>Q.  You've cited one in -- on page 6 of your report; is that correct?<br>A.  Yes.  I cited the OCC statement.<br>Q.  What are some of the other ways of defining subprime?<br>A.  Well, there are a number of ways that have been done in the research literature.  In general, subprime loans will have higher interest rates and lower credit quality for the borrower, so one way to do it is just to look at the highest priced loans within some distribution of loans.<br>Another way, which I refer to later on in my report, is based on the HMDA reportable loans,which are loans that are priced higher than a particular |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | pricing threshold as established by the bank regulatory agencies.  I think probably researchers have used FICO scores of 620, FICO scores of 660 and various other ways of defining subprime. Q.  Are those all that you can recall at this time? A.  Yes. Q.  Has HUD ever suggested a way of defining subprime that you haven't listed? A.  Yes.  HUD has a list of those institutions that are self-identified, I believe, based as primarily subprime and manufactured housing lenders. Q.  I have five now currently.  Is there a sixth that you can recall from your time at Wells Fargo? A.  Not that I recall." <br><br> • *Id.* at 1605 (LaCour-Little SEC Depo. Tr: 50:1-16 (July 28, 2010)): <br><br> "Q.  Does that refresh your recollection regarding whether you |
|  | believed that nonprime or subprime had a problem with respect to |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | category definition?<br><br>A.  Yeah.  I think what I was trying to say here in this sentence is that different researchers have used different definitions, and so it's sometimes difficult to compare the results of various research findings because the definitions may be slightly different.<br><br>Q.  So there's no one agreed-upon definition of subprime?<br><br>A.  I would agree with that.<br><br>Q.  And there's no one agreed-upon definition of nonprime?<br><br>A.  I think that's right.";<br><br>• *Id.* at 1606 (LaCour-Little SEC Depo. Tr: 55:17-20 (July 28, 2010)):<br><br>"Q.  Well, is it your opinion that Countrywide's use of nonprime in its public disclosures was false or misleading?<br><br>A.  I don't believe so."<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that LaCour-Little made the quoted |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | statements.  Disputed as to the purported opinion quoted at Lefler Decl. ¶ 92, Ex. 92, at 1606, which exceeds the scope of Prof. LaCour-Little's written opinion.  (*See* Deposition Exh 1750 at Bendell Decl., ¶ 9, Ex. 301) *Evidentiary Objection*: Relevance. |
| 61.    Countrywide's prospectus supplements for prime MBS loans disclosed to investors that many prime loans had FICO scores below 620. | *Defendants' Evidence* <br>• Lefler Decl. ¶ 120, Ex. 119, at 2028 (CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-3 (Form 424B5)  (January 25, 2006) at S-39 (table showing that approximately 1.74% of loans in Loan Group 1 of CWMBS Series 2006-3 had FICO scores below 620); <br>• *Id.* ¶ 124, Ex. 123, at 2040 (CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-TMI (Form 424B5, filed March 8, 2006)), S-38 (table entitled "FICO Credit Scores" showing three loans with FICO scores between 561 and 620); |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | • *Id.* ¶ 125, Ex. 124, at 2042 (CWMBS, CHL Mortgage Pass-Through Trust 2006-J3 (Form 424B5, filed March 28, 2006), S-28 (table entitled "Fico Credit Scores" with a loan with FICO score between 581 and 600);<br><br>• *Id.* ¶ 158, Ex. 155, at 2249 (Screenshot from |
| | www.mortgageinvestorcountrywide.com showing, in the column entitled "Collateral Type," that the loans underlying each of the CWMBS securitizations cited above were considered to be prime:<br><br> |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | **SEC Response**<br><br>Disputed in part.  Undisputed that the quoted material appears in the specific exhibits cited.  Disputed as to the characterization of this as representing "many" prime loans, which is not supported by the evidence cited. |
| 62.     Countrywide's internal credit monitoring packages show that, from the first quarter of 2005 through the second quarter of 2007,  loans classified as prime by Countrywide with FICO scores below 620 constituted between 1-2% of the total prime loans originated for each of the quarters during this period. | **Defendants' Evidence**<br><br>•   Lefler Decl. ¶ 134, Ex. 131, at 2103 (June 2007 CFC Product Insight Book at 5) (table from Countrywide's "Conventional Prime Product Book" containing from 2005, 2006 and 2007 showing that loans classified as prime with FICO scores of less than 620 consistently constituted 1-2% of Countrywide's monthly and quarterly loan production);<br><br>•   *Id.* ¶ 133, Ex. 130, at 2100 (July 2006 CFC Product Insight Book at 25).<br><br>**SEC Response**<br><br>Disputed.  The alleged fact is not supported by the evidence cited. |
| 63.     Countrywide prospectus | **Defendants' Evidence** |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| supplements disclosed that many loans categorized as prime included risk factors such as reduced documentation, high loan-to-value ratios, or both. | • Lefler Decl. ¶ 126, Ex. 125 (Prospectus Supplement, CWMBS Mortgage Pass-Through Trust 2007-HYB2 at A-32) (table entitled "Documentation Programs" showing reduced documentation loans with a weighted average CLTV of 91.32%); <br><br> • *Id.* (Prospectus Supplement, CWMBS Mortgage Pass-Through Trust 2007-HYB2 at A-33) (table entitled "FICO Credit Scores" showing loans with FICO from 601- |
| | 620 and a weighted average CLTV of 100%); <br><br> • *Id.* ¶ 128, Ex. 127 (CWMBS, CHL Mortgage Pass-Through Trust 2006-HYB4 (Form 424B5) at S-35) (table entitled "Original Loan-to-Value Ratios" showing that 9.21% of the loans underlying the securitization had LTVs above 80%); <br><br> • *Id.* (CWMBS, CHL Mortgage Pass-Through Trust 2006-HYB4 (Form 424B5) at S-39) (table entitled "Documentation Programs" showing |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | that 54.20% of the loan pool was originated on a "reduced" documentation basis) (May 26, 2006);<br><br>• *Id.* ¶ 125, Ex. 124, (Prospectus Supplement, CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-J3 (May 25, 2006) at S-28 (table showing a loan with a FICO score between 581 and 600 and an LTV of 90%);<br><br>• *Id.* (Prospectus Supplement, |
| | • CWMBS, CHL Mortgage Pass-Through Certificates, Series 2006-J3 at S-29 (table entitled "Original Loan-to-Value Ratios" with 30 loans with LTVs greater than 80%);<br><br>• *Id.* ¶ 158, Ex. 155 (Screenshot from www.mortgageinvestorcountrywide.com showing, in the column entitled "Collateral Type," that the loans underlying each of the CWMBS securitizations cited above were classified as prime): |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| |  |
| | **SEC Response**<br><br>Disputed in part.  Undisputed that Countrywide characterized these loans as "prime."  Disputed as to whether the loans in the securitization were in fact prime credit quality, which fact is not supported by the evidence cited. |
| 64.    Fannie Mae disclosed in its 2006 10-K that: (a) 16-17% of its loans in 2005-2006 reflected sub-660 FICOs; (b) 5-6% of its loans in 2005-2006 were issued to sub-620 FICO borrowers, and (c) 9-10% of its loans in 2005-2006 featured LTVs above 90%. | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| 65.    Countrywide disclosed that pay-option loans were included in its "prime" category. | ***Defendants' Evidence:***<br><br>• Lefler Decl. ¶ 136, Ex. 133, at 2118 (January 31, 2006, CFC Earnings Release, at 6) ("Prime margins declined [in the 4th quarter of 2005]. The decline from the third quarter was largely attributable to weaker secondary market sales, primarily related to pay-option loans.");<br><br>• *Id.* ¶ 5, Ex. 4, at 106, 155 (2006 10-K at 3, F-37) (disclosing that in 2005 and 2006 "nonprime" loans constituted a little less than 9% of overall production, while it |
| | separately disclosed that pay-options constituted 19% of production in 2005 and 14% in 2006).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that Countrywide disclosed such information on or after January 31, 2006.<br><br>Disputed with respect to any period before that, as the evidence cited by Defendants does not support such an |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | assertion. |
| 66.    The transcript from a Q2 2005 earnings call quotes Mr. Mozilo as saying that although pay-option ARMs were Countrywide's "lowest delinquency product at the moment ... you have to wait some time for loans to mature a year, two years, even three years to determine how they're going to perform." | Undisputed. |
| 67.    The transcript from Countrywide's Q2 2006 quarterly earnings call quotes Mr. Mozilo as saying that pay-option loans were "complicated in that there are resets here, and depending upon where rates are, the resets could be significant and we just need time to see how this is going to play out.  If rates continue to rise significantly, then these resets and payment shocks will be substantial. … The test will be when the resets take place and I'm not certain exactly | Undisputed. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| what's going to happen there." | |
| 68.    The Federal Financial Regulatory Agencies issued a Final Guidance on Nontraditional Mortgage Product Risks on 9/29/06, which states:  "To manage the risks associated with nontraditional mortgage loans, management should. . . .Recognize that many nontraditional mortgage loans. . . Are untested in a stress environment." | **Defendants' Evidence**<br><br>• Lefler Decl. ¶ 138, Ex. 135, at 2135 (Board of Governors of the Federal Reserve System, "Federal Financial Regulatory Agencies Issue Final Guidance on Nontraditional Mortgage Product Risks," at 1 (September 29, 2006)).<br><br>**SEC Response**<br><br>Disputed to the extent that the quote is incomplete:<br><br>". . . management should. . . Recognize that nontraditional mortgage loans, *particularly when they have risk layering features*, are untested in a stressed environment.  *These products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectability of the portfolio*. . ."<br><br>Emphasis added. |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | • Lefler Decl. ¶ 138, Ex. 135, at 2135 |
| 69.    On October 10, 2004, the *Wall Street Journal* published an article discussing the payment shock associated with interest only loans, which stated:<br><br>The surging popularity of [interest-only] loans raises questions about how many borrowers will run into financial trouble once the higher payments kick in.  The industry has no recent experience with granting them to a broad range of borrowers and so no deep pools of data on default rates. In that sense, says Doug Duncan, chief economist of the Mortgage Bankers Association, 'We're flying blind.' | Undisputed. |
| 70.    Countrywide stated in both its Q2 and Q3 2006 10-Qs that "substantially all" of its pay-option loans were issued on the basis of reduced borrower documentation. | Undisputed. |
| 71.    The transcript from a February 28, 2006 analyst forum quotes Mr. Mozilo as stating with respect to reduced documentation loans: "There's no question that the no doc loan or stated income is, you | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 140, Ex. 137, at 2140 (February 28, 2006, Transcript, Countrywide Financial Corporation 2006 Fixed Income Analyst Forum, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| know, there's some exaggeration going on….I believe there's a lot of fraud." | CFC2007827007, at 018).<br><br>**SEC Response**<br><br>Disputed in part.  Undisputed that the quoted (but truncated) language appears in the transcript – aside from the period Defendants have inserted to suggest that the final sentence ends with their truncated quotation.  Disputed that the statement as truncated and modified by Defendants is accurate and complete.  The transcript actually reads:<br><br>"There's no question that the no doc loan or stated income is, you know, there's some exaggeration going on….I believe there's a lot of fraud, ***but I don't think it's been meaningful in terms of the quality of performance of the loans*.**"<br><br>**SEC Evidence**<br><br>• Lefler Decl. ¶ 140, Ex. 137, at 2140 (February 28, 2006, Transcript, Countrywide Financial Corporation 2006 Fixed Income Analyst Forum, CFC2007827007, at 018). |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | |
| 72.    Countrywide's Chief Risk Officer, John McMurray, publicly disclosed that in Countrywide's experience, reduced documentation loans were 1.5 to 3.5 times more likely to become delinquent than full documentation loans, depending on the level of documentation. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 129, Ex. 128, at 2080 (January 30, 2006, ASF Conference Presentation at CFCP006856249, at 256):<br><br><br><br>• *Id.* ¶ 130, Ex. 128A, at 2096 (February 9, 2006, Email re: American Securitization Forum Presentation at CFCP000954303) (confirming that John McMurray made a presentation at the American |
| | • Securitization Forum in early 2006); (#177)<br><br>• *Id.* ¶ 132, Ex. 129, (May 18, 2006, Federal Reserve Bank Structure and Competition Conference Presentation at CFCP008010335, at 347): |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| |  |

- *Id.* ¶ 75, Ex. 74, at 1399 (September 12, 2006, Equity Investor Forum Transcript at CFC2007826886 at 919 ("The type of documentation that the borrower selects we find to be very important in explaining the future delinquency. So on the far left we start with a full documentation loan, that's where the borrower is documenting bother their income and their assets, and we use that as a base of one. And so you can see

- compared to a NINA, over at the far right of that chart, NINA stands for no income no asset, so the borrower is neither documenting nor disclosing either what they have in assets or income and you can see that, all else equal, those are going to be three times

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | as seriously delinquent as a fully documented loan. In between we've got [SISA]. That stands for a stated income sated asset, the borrwer is telling us what their income and assets are but they're not providing documentation.");<br><br>• *Id.* ¶ 78, Ex. 77, at 1417 (September 13, 2006, Fixed Income Investor Forum Presentation at CSL-CB001560 at 764:<br><br> |
| | • *Id.* ¶ 77, Ex. 76, at 1412 (September 13, 2006, Fixed Income Investors Forum Transcript at 62) ("[O]n the upper left is documentation type. So here, we've used full doc over on the far left as our base of one. And, you can see that as documentation is reduced going from left to right, the odds ratios go up significantly. So, if |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | you go over to the far right, it's a NINA loan. That stands for no income, no asset, so the borrower's neither disclosing nor documenting income or assets. And so, that's a factor in excess of three. So, just the change by itself would triple the likelihood of that loan getting into -- or defaulting. And then in between, we've got the intermediate doc types. SISA stands for a stated income, stated asset. That's the borrower's telling us what they're income and assets are but not documenting it. And so, you could take away from this chart that some of them may have lied."); |
| | • *Id.* ¶ 16, Ex. 15, at 372 (McMurray SEC Depo. 303:24-304:9 (July 7, 2010)) (McMurray recalling that he made successive presentations to equity investors and fixed income investors in New York in September 2006); |
| | • *Id.* ¶ 141, Ex. 138, at 2142 (Chicago Fed Letter, Essays on Issues, The Federal Reserve Bank of Chicago, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | October 2006 Number 231a, "Developments and Innovations in Real Estate Markets: A Conference Summary") (discussing May 2006 presentation by Mr. McMurray to the Chicago Fed's 42nd Annual Conference on Bank Structure & Competition titled "Innovations in Real Estate Markets: Risks, Rewards, and the Role of Regulation." An article summarizing this presentation states that Mr. McMurray's presentation disclosed that when less documentation was tied to loans, delinquencies increased markedly.); |
| | • *Id.* ¶ 85, Ex. 84, at 1443 (May 23, 2007, Fixed Income Investor Forum Transcript at CFCNYF00035047) (quotes Mr. McMurray as stating: "So a couple things to conclude from this chart.  The first is that documentation obviously matters.  What could we conclude from some of the individual borrowers that did NINA or SISA loans?  Because I'm led to the conclusion that some of them may not |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | have been telling the truth.  So anyway, documentation matters.  It matters more -- it matters over the life of the loan, but it even matters more from a short - term perspective, and you can see that particularly on the NINA and the SISA"). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that the transcripts for the events reflect that McMurray made the quoted statements.  Disputed to the extent that the Defendants' characterization implies that the information presented related to Countrywide itself or the Held for Investment portfolio at the Bank, which implications are not supported by the evidence presented. |
| 73.    The risks of reduced documentation loan programs were discussed extensively in the popular press. | • Lefler Decl. ¶ 159, Ex. 156, at 2251 (Randi Marshal, "Zero-Down Buyers May Put Themselves at Risk; Eagerness May Lead to Jeopardy, Some Experts Say," *Chicago Tribune*, Dec. 5, 2004) ("[N]o documentation, no down payment or |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | high interest rates for those with bad credit are easy to get now, and that's potentially dangerous."); |
| | • *Id.* ¶ 158, Ex. 157, at 2254 (Sue McAllister, "A Mortgage, But No Proof of Income?  No Problem!," *The State*, Dec. 12, 2004 ("With the end of the refinancing boom in late 2003, lenders started looking for new ways to boost business, and stated income mortgages – and related "low documentation" loans – were one solution. . . . [I]t's an open secret in the mortgage business that some applicants for stated income loans will give an inflated estimate of their monthly income so that they can qualify for the loan amount they want."); |
| | • *Id.* ¶ 161, Ex. 158, at 2258 (Sue McAllister, "Sounds Like Spam But It's True; Loans OK Without Proof of Income," *Chicago Tribune*, Dec. 19, 2004) ("But it's an open secret in the mortgage business that some |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | applicants for stated income loans will give an inflated estimate of their monthly income so that they can qualify for the loan amount they want. . . .[T]here's a potential risk for both borrower and lender."); |
|  | • *Id.* ¶ 162, Ex. 159, at 2260 (Kenneth Harney, "Just How Sour Could These Sweet Mortgages Turn?," *Chicago Tribune*, Jan. 16, 2005) ("Why don't people with W-2 documented salaries want to show them? You guessed it: Many of them are buying houses with price tags they can't really afford. And if the economy falters or their incomes drop, they will be the first into foreclosure."); |
|  | • *Id.* ¶ 199, Ex. 196, at 2534 (Kenneth R. Harney, "Mortgage Fraud Booming Along With Housing Market," *Chicago Tribune*, July 31, 2005) ("during the housing boom, stated income and NINA mortgages routinely have been extended to applicants with shaky credit profiles and insufficient incomes to qualify |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | for their home purchases"); |
| | • *Id.* ¶ 131, Ex. 128B, at 2093 ("No Surprise: Subprime Mortgages Are More Likely to Default, Countrywide Study Finds," Feb. 3, 2006, *Inside MBS & ABS*, Vol. 2006, No. 5) (article discussing presentation given by Mr. McMurray in January 2006 in which he revealed the results of a Countrywide study showing that "preferred" doc programs were 50% more likely than full-doc loans to go delinquent, while the chances of delinquency were more than double on SIVA loans.  NINA loans were 3 times more likely than full-doc loans to go delinquent.); |
| | • *Id.* ¶ 200, Ex. 197, at 2535 (Jennifer Harmon, "Income Verification Tools are a Must Have," *National Mortgage News*, Mar. 6, 2006) ("With the increasing climate of creative mortgages including stated docs and stated-income loans . . . the mortgage industry is seeing a decreased emphasis on paperwork, which only |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | spells an increase in fraud."); <br><br> • *Id.* ¶ 201, Ex. 198, at 2537 (Lingling Wei, "Stated Income Loans Vulnerable to Fraud," *Associated Press*, Aug. 21, 2006) ("The case points to a growing concern among consumer advocates and regulators over the home-lending industry's increasing reliance on reduced documentation, particularly unverified income, to speed up the loan approval process amid the ever-intensifying competition. 'It's just too easy to cheat,' says Tom Miller, Iowa's attorney general. He says fraud related to stated income loans often is initiated by lenders and brokers in pursuit of profits, leaving unsuspecting consumers in the dark."); <br><br> • *Id.* ¶ 202, Ex. 199, at 2544 (Robert Lacoursiere, "Market Disconnects from Fundamentals: Reiterating Sell Rating," *Banc of America Securities*, Oct. 27, 2006) ("The low/no documentation feature of Alt-A |
| | products . .. means increased difficulty |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | to accurately gauge individual borrowers' credit profile, increased odds of loans being mis-priced and increased probability that loans go into default."); |
| | • *Id.* ¶ 203, Ex. 200, at 2577 ("2007 Industry Outlook; Expect Some Bumps Along the Way," *Credit Suisse*, Jan. 4, 2007, 8) (Analyst report stating: "Recent studies indicate that borrowers who choose stated income loans inflate their incomes on average 20-50%."); |
| | • *Id.* ¶ 204, Ex. 201, at 2585 (Gretchen Morgenson, "Crisis Looms in Mortgages," *The New York Times*, Mar. 11, 2007) ("Mortgages requiring little or no documentation became known colloquially as 'liar loans.' An April 2006 report by the Mortgage Asset Research Institute, a consulting concern in Reston, Va …. [found that] in 90 percent of loans, borrowers overstated their incomes 5 percent or more. But in almost 60 |
| | percent of cases, borrowers inflated their incomes by more than half. A |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | Deutsche Bank report said liar loans accounted for 40 percent of the subprime mortgage issuance last year, up from 25 percent in 2001"); |
|  | • *Id.* ¶ 206, Ex. 203, at 2588 (Dawn Kopecki, "Why Fannie and Freddy Are Fidgety," *Business Week*, July 30, 2007) ("[Low-documentation loans] require little or no proof of the borrower's income. That segment has proven to be rife with abuse in recent years. A study by the Mortgage Asset Research Institute found that 90% of borrowers with so-called stated income loans upped their annual incomes falsely to qualify for more money. In almost 60% of low-documentation loans, the borrower's income was inflated by more than 50%."); |
|  | • *Id.* ¶ 207, Ex. 204, at 2590 (Andrew LePage, "Popular Loan Can Be a Stretch," *Sacramento Bee*, Dec. 5, 2004); |
|  | • *Id.* ¶ 208, Ex. 205, at 2593 (Lew Sichelman, "Innovative Home Loans Stir Worries Among Critics," *Chicago* |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | *Tribune*, May 22, 2005); |
| | • *Id.* ¶ 209, Ex. 206, at 2597 (Edmund Andrews, "Efforts to Regulate Risky Mortgage Innovations Are So Far Ignored," *The New York Times*, July 15, 2005); |
| | • *Id.* ¶ 210, Ex. 207, at 2601 (James R. Hagerty, "Is Getting a Home Loan Becoming Too Easy?," *Wall Street Journal*, Nov. 16, 2005); |
| | • *Id.* ¶ 211, Ex. 208, at 2604 (James Hagerty and Ruth Simon, "Loans Too Easy to Obtain, Some Experts Claim; Low-Docs, No-Docs Being Used More," *Chicago Tribune*, Nov. 20, 2005; |
| | • *Id.* ¶ 212, Ex. 209, at 2607 (David Streitfeld, "More Home Buyers Stretch Truth, Budgets to Get Loans," *Los Angeles Times*, Sept. 29, 2006); |
| | • *Id.* ¶ 213, Ex. 210, at 2610 (Kenneth Harney, "The Lowdown on Low- Doc Loans," *The Washington Post*, |
| | Nov. 25, 2006); |
| | • *Id.* ¶ 214, Ex. 211, at 2612 (Staff, "Stated Income Loans Add to Risk," |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | *National Mortgage News*, Dec. 18, 2006);<br><br>• *Id.* ¶ 215, Ex. 212, at 2614 (Damian Paletta, "OCC Chief Warns of Growing Dangers of 'Stated Income' Loans," *Dow Jones International News*, May 23, 2007).<br><br>**SEC Response**<br><br>Disputed in part.  Undisputed that the general risks associated with reduced documentation loans were discussed in various periodicals.  Disputed to the extent that Defendants characterize the periodicals cited herein as all in general circulation, which fact is not supported by the evidence cited. |
| 74.    The risk of borrowers misrepresenting their income in their loan applications – and the risk that any such misrepresentation would result in higher delinquencies – were factors that Countrywide took into account when setting its loan loss reserves. | • Lefler Decl. ¶ 143, Ex. 140, at 2151 (Email Chain re: 4506 Summary at CFCP007182178) (discussing the results of an audit of borrower fraud in the loan application process, noting that default rate projections for reduced documentation loans were increased, through the use of a multiplier, to reflect the risk that reduced documentation borrowers |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | would exaggerate their income); |
| | • *Id.* ¶ 98, Ex. 97, at 1708 (Garcia SEC Depo. Tr. 114:7- 115:3 (June 29, 2010)): "Q: …. We talked this morning about the fact that when the company -- or when the bank and the company, guess together, established the loan-loss reserve for the -- for the held for investment portfolio, that was an important step in communicating what the perception was of the risk of the loans that were held for investment.  Was the risk of borrower fraud one of the factors that was considered in establishing the reserve? A: It was built into the -- effectively into the reserve, because the -- the -- are you asking specifically about reduce documentation or just in general? I'm not sure I understand. Q: Yeah, reduced documentation. A: In the case of reduced-documentation loans, they had done, you know, in the modeling work, |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
|  | work that resulted in a -- in a -- in a factor being applied for, you know, greater risk being assigned to reduced-doc loans.  So that was – those models were used in the reserving process." <br><br> ***SEC Response*** <br><br> Disputed.  The evidentiary record does not support the conclusion that the risk of borrower fraud was adequately accounted for in Countrywide's ALLL. <br><br> ***SEC Evidence*** <br><br> • McCoy Decl. ¶74, Ex.264 (McCallion Dep. Trans. 181:16-19; 189:18-190:5) <br><br> Q.  Now, Countrywide's auditors had identified a significant deficiency with respect to Countrywide's models; is that correct? <br> A.  Yes. <br><br> * * * <br><br> Q.  Okay.  I had asked you before you reviewed the pages whether you remembered what the deficiencies related to.  Does reviewing the pages that end in 4171 and 4172 refresh your recollection with respect to the deficiencies that together aggregated into a significant deficiency in 2005? |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | A.  Yes.<br>Q.  And what is your recollection?<br>A.  The -- the significant deficiency had to do with the document -- excuse me, documentation and testing of some of the models that were used in the valuation of the MSRs and the residuals, loan related loss -- and loan related loss reserves.<br><br>• Bendell Decl. ¶ 6, Ex. 298 (Rossi Dep. Ex. 28 – May 1, 2006 email from Don White to Clifford Rossi regarding model development)<br><br>"I believe we should also consider having an "automatic adjustment factor" in the ALLL model [analogous to the HELOC model] to deal with model over/under predicting delinquency."<br><br>• McCoy Decl. ¶ 90, Ex. 280 (Sieracki Dep. Trans. 76:16-77:4)<br><br>(Testimony that Sieracki was aware that in March 2007, the Office of the Comptroller of the Currency had informed management that Countrywide Bank's models were underpredicting losses underlying the Allowance for Loan and Lease |

| Defendants' Statement | Evidence Cited by Defendants and SEC Response |
|---|---|
| | Losses.)<br><br>• Bendell Decl. ¶13, Ex.305 (Depo Exh 1551 (1/29/07 email from Dave Walker to  Mike Muir, Jim Furash, Carlos Garcia, and Don White)<br><br>(Walker reporting that Countrywide's Banking Regulator informed him that the multiplier used for the ALLL model was "too backward looking" and did not capture the risks Countrywide was facing.) |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 75.    Mr. Mozilo's first trading plan became effective on April 24, 2002, and was designed to sell 1,448,904 shares of Countrywide stock (split adjusted). | ***Defendants' Evidence***<br><br>Lefler Decl. ¶ 163, Ex. 160 (April 2002 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1); *id.* ¶ 223, Ex. 220 (Lehn SEC Depo. Tr. 7:4-24 (July 22, 2010)).<br><br>***SEC Response***<br><br>Undisputed as to the date of the plan.<br><br>Disputed as to the number of shares it was designed to sell, as there is no evidence that Mr. Mozilo was aware of |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | a future stock split. |
|  | ***SEC Evidence*** |
|  | • Lefler Decl., supra, ¶ 163, Ex. 160 (April 2002 trading plan) at 2261 ("Seller desires to sell a total of 362,226 shares . . .") |
|  | ***Evidentiary Objections To Lehn Report*** |
|  | Hearsay; Foundation |
| 76.    Mr. Mozilo's second trading plan was executed on July 30, 2002, and was designed to sell 1,135,224 shares of Countrywide stock (split adjusted). | *Defendants' Evidence:* |
|  | • Lefler Decl. ¶ 164, Ex. 161 (August 2002 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1). |
|  | ***SEC Response*** |
|  | Undisputed as to the date of the plan. |
|  | Disputed as to the number of shares it was designed to sell, as there is no evidence that Mr. Mozilo was aware of a future stock split. |
|  | ***SEC Evidence*** |
|  | • Lefler Decl., *supra*, ¶ 164, Ex. 161 (August 2002 trading plan) at 2270 ("Seller desires to sell a total of |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | 283,806 shares . . .") **Evidentiary Objections To Lehn Report** Hearsay; Foundation; Best Evidence Rule. |
| 77.    Mr. Mozilo's third trading plan was executed on May 2, 2003, and was designed to sell 848,904 shares of Countrywide stock (split adjusted). | **Defendants' Evidence** • Lefler Decl. ¶ 165, Ex. 162 (May 2003 trading plan); *id.* ¶ 194, Ex. 191, at 2497 (Lehn Report, Ex. P, at 1). **SEC Response** Undisputed as to the date of the plan. Disputed as to the number of shares it was designed to sell, as there is no evidence that Mr. Mozilo was aware of a future stock split. **SEC Evidence** • Lefler Decl., *supra*, ¶ 165, Ex. 162 (May 2003 trading plan) at 2280 ("Seller desires to sell a total of 212,226 shares . . .") **Evidentiary Objections To Lehn Report** Hearsay; Foundation; Best Evidence Rule. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 78.     Mr. Mozilo's fourth trading plan became effective on October 28, 2003, and was designed to sell 646,984 shares of Countrywide stock (split adjusted). | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 166, Ex. 163 (October 2003 trading plan); *id.* ¶ 194, Ex. 191, at 2498 (Lehn Report, Ex. P, at 2).<br><br>***SEC Response***<br><br>Undisputed as to the date of the plan.<br><br>Disputed as to the number of shares it was designed to sell, as there is no evidence that Mr. Mozilo was aware of a future stock split.<br><br>***SEC Evidence***<br><br>• Lefler Decl., *supra*, ¶ 166, Ex. 163 (October 2003 trading plan) at 2290 ("Seller desires to sell a total of 161,746 shares . . .")<br><br>***Evidentiary Objections To Lehn Report***<br>Hearsay; Foundation; Best Evidence Rule. |
| 79.     Mr. Mozilo's fifth trading plan was executed on April 26, 2004, and was designed to sell 1,948,606 shares | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 167, Ex. 164 (April 2004 trading plan); *id.* ¶ 194, Ex. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| of Countrywide stock (split adjusted). | 191, at 2498 (Lehn Report, Ex. P, at 2).<br><br>***SEC Response***<br><br>Undisputed as to the date of the plan.<br><br>Disputed as to the number of shares it was designed to sell, as there is no evidence that Mr. Mozilo was aware of a future stock split.<br><br>***SEC Evidence***<br><br>• Lefler Decl., *supra*, ¶ 167, Ex. 164 (April 2004 trading plan) at 2399 ("Seller desires to sell a total of 974,303 shares . . .")<br><br>***Evidentiary Objections To Lehn Report***<br>Hearsay; Foundation; Best Evidence Rule. |
| 80.    The April 2004 trading plan was amended on August 19, 2004, to provide for the same number of total sales as under the April 2004 plan, but in smaller quantities and with an earlier termination date. | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 81.    Mr. Mozilo's sixth trading plan was executed on December 29, 2004, and was designed to sell 5,428,964 shares of Countrywide stock. | Undisputed. |
| 82.    Mr. Mozilo's seventh trading plan was executed on October 27, 2006, and was designed to sell 3,989,588 shares of Countrywide stock over eleven months. | Undisputed. |
| 83.    Mr. Mozilo's eighth trading plan, the Foundation Plan, was executed on October 27, 2006, and was designed to sell 91,999 shares of Countrywide stock. | Undisputed. |
| 84.    Mr. Mozilo's ninth trading plan, the Trust Plan, was executed on November 13, 2006, and was designed to sell 100,000 shares of Countrywide stock. | Undisputed. |
| 85.    Mr. Mozilo's tenth trading plan was executed on December 12, 2006, and was designed to sell 1,389,580 shares of Countrywide stock over eleven months. | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 86. On February 2, 2007, the December Plan was amended to sell an additional 1,393,197 shares of Countrywide stock over ten months. | Undisputed. |
| 87. Countrywide common stock experienced splits of 4-for-3, 3-for-2, and 2-for-1, on December 18, 2003, April 13, 2004, and August 31, 2004, respectively. | Undisputed. |
| 88. Beginning in 2002, financial advisors at AYCO, including John Conners, urged Mr. Mozilo to diversify his investments through the use of Rule 10b5-1 trading plans. | **_Defendants' Evidence_**<br><br>Lefler Decl. ¶ 217, Ex. 214, at 2621 (Mozilo NYF Depo. Tr. 29:5-9 (January 26, 2010)) ("I was advised by a financial advisor hired by the company, because of my age, that I should begin to diversify, and I started that process in 2002.").<br><br>**_SEC Response_**<br><br>Undisputed that Mr. Mozilo received this advice from his financial advisors. Disputed that it occurred no earlier than 2002, which is not supported by Defendants' Evidence and is contradicted by other evidence. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | **SEC Evidence**<br><br>• McCoy Decl. ¶ 54, Ex. 244 (Conners Inv. Test. at 36:3-17)<br><br>**SEC's Evidentiary Objection To Cited Mozilo Testimony**<br><br>Hearsay |
| 89.   Mr. Conners encouraged Mr. Mozilo to sell more Countrywide shares as Mr. Mozilo accumulated more options each year. | Undisputed.<br><br>*But see* Additional Facts 490, indicating that Mozilo rejected the advice. |
| 90.   Long-time board member Robert Donato advised Mr. Mozilo to sell more shares of Countrywide stock. | Undisputed. |
| 91.   Mr. Mozilo owned 6.89 million shares of Countrywide stock and exercisable options as of April 4, 2008. | Undisputed. |
| 92.   Each of the challenged trading plans was executed during an open trading window. | Undisputed. |
| 93.   Each of the challenged trading | **Defendants' Evidence** |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| plans was approved by Countrywide's General Counsel (Corporate and Securities), Susan Bow. | • Lefler Decl. ¶ 219, Ex. 216, at 2640 (Bow SEC Depo. Tr. 68:21-69:25 (July 16, 2010)) ("Q: [D]id Mr. Mozilo need your approval to enter into a plan – to execute the plan?  A: . . . When an executive would want to trade, they had to get permission."); *id.* ¶ 170, Ex. 167, at 2331 (October Plan (Bow signed)); *id.* ¶ 171, Ex. 168, at 2338 (Foundation Plan (Bow signed)); *id.* ¶ 172, Ex. 169, at 2346 (Trust Plan (Bow signed)); *id.* ¶ 173, Ex. 170, at 2357 (December Plan (Bow signed)); *id.* ¶ 174, Ex. 171, at 2361 (February Amendment (Bow signed)).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed tht Bow signed off on the actual plan documents. Disputed as to any implication that Bow reviewed and approved the underlying trading decisions, which is not supported by the evidence cited. |
| 94.    Before approving each of the challenged trading plans, Susan Bow | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 219, Ex. 216, at 2646 |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| spoke with executives within the company, including the Chief Legal Officer and the CFO, in order to determine whether anyone was aware of material nonpublic information that would prevent Mr. Mozilo from implementing his trading plans. | (Bow SEC Depo. Tr. 98:2-8 (July 16, 2010)) ("Then what I would do, because of his high-profile position, I would ask around.  Does anybody know anything?  I would talk to Sandy Samuels, my boss, chief legal officer.  I would always talk to Eric Sieracki to make sure he didn't know anything, and then just general, you know, scuttlebutt."). |
| | ***SEC Response*** |
| | Disputed in part.  Undisputed that Ms. Bow spoke to the Countrywide personnel identified in Defendants evidence with respect to at least some of the plans.  Disputed as to "each" of the plans, and disputed as to "approving," which facts are not supported by the evidence cited. |
| 95.    Ms. Bow was the chief legal officer in charge of Countrywide's SEC disclosure process. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 219, Ex. 216, at 2635 (Bow SEC Depo. Tr. 15:25-16:4 (July 16, 2010)) ("[I]n your position as general counsel corporate and securities you were the company's |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | chief lawyer with respect to this disclosure process?  A: Absolutely, yes."). |
| | **SEC Response** |
| | Disputed in part.  Undisputed that Ms. Bow was the company's chief lawyer with respect to the disclosure process. Disputed to the extent Defendants intend to assert that Ms. Bow was "in charge" of the disclosure process generally, which assertion is not supported by the evidence. |
| | **SEC Evidence** |
| | • Dean Decl. ¶ 131, Ex.129 (McCallion Dep. Ex. 160 - Countrywide Disclosure Policy at page 1) Countrywide's Disclosure Policy identifies Mike Udovic as the Chair of the Disclosure Committee and the senior legal official with responsibility for disclosure matters. |
| 96.    Ms. Bow consulted with outside counsel at least with respect to the December Plan. | Undisputed that Bow consulted with outside counsel with respect to some unspecified aspect of the December |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Plan. |
| 97.   Throughout his tenure as CEO of Countrywide, Mr. Mozilo made numerous negative public statements about news affecting Countrywide and the housing market. | **_Defendants' Evidence_**<br><br>• _E.g._, Lefler Decl. ¶ 180, Ex. 177, at 2374 (February 28, 2006 analyst forum) (noting that borrower "[f]raud has always been a part of the business"); _id._ ¶ 181, Ex. 178, at 2375-76 (March 6, 2006 CNBC interview) ("The market has turned. . . . I would expect a general decline of 5% to 10% throughout the country, some areas 20%.") |
| | • Lefler Decl. ¶ 182, Ex. 179, at 2377 (May 17, 2006 CNBC interview) ("What my concern is, … the pay option arms, . . . loans that'll be resetting at the higher interest rates."); _id._ ¶ 183, Ex. 180, at 2383 (July 25, 2006 earnings call) ("If rates continue to rise significantly, then these resets and payment shocks will be substantial."); _id._ ¶ 184, Ex. 181 (September 13, 2006 investor forum) ("[I]n the first year 78% of |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | the borrowers employ the lower payment.  I was shocked at that."); *id.* ¶ 185, Ex. 182, at 2385 (March 18, 2007 CNBC interview) ("I think the industry loosened their guidelines, and we're paying – the industry is paying the consequences for that."); *id.* ¶ 194, Ex. 191, at 2518 (Lehn Report, Ex. V) (chart of public comments). |
| | **SEC Response**¶ |
| | Disputed in part.  Undisputed that Mr. Mozilo made a number of negative public statements about the housing market generally. |
| | Disputed that his statements indicated that the cited general market trends would be detrimental to Countrywide, which assertion is not supported by the evidence. |
| | **SEC Evidence** |
| | • McCoy Decl. ¶ 39, Ex. 229 (Transcript of March 18, 2007 CNBC interview of Angelo Mozilo by Maria Bartiromo) |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Mozilo is quoted as saying: The fallout from subprime lending will be borne by "monoline" subprime lenders like New Century, Novastar, and Accredited Home Loans.  "It's a mistake to apply what's happening to them to the more diversified companies like Countrywide. . . ."   In the end, "this will be great for Countrywide because at the end of the day, all of the irrational competitors will be gone." <br><br> ***Evidentiary Object to Lehn Report*** <br><br> Lack of Foundation; Hearsay |
| 98.      The transcript from a July 25, 2006 earnings call quotes Mr. Mozilo as stating: "I've never seen a soft landing in 53 years, so I think we have a ways to go here for this thing to level out." | Undisputed. |
| 99.      The transcript from an October 25, 2006 conference quotes Mr. Mozilo as stating: "the housing cycle has entered a downward phase." | Undisputed. |

144

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 100.   The transcript from a January 30, 2007 earnings call quotes Mr. Mozilo as stating: "We're also preparing for increased borrower delinquencies and continued credit deterioration." | Undisputed. |
| 101.   As of January 30, 2007, Mr. Mozilo had yet to sell 78 percent of the shares planned to be sold under the October and December Plans. | Undisputed. |
| 102.   The transcript from a March 26, 2007 CNBC interview quotes Mr. Mozilo as stating: "I think that there's more to come out in terms of delinquencies and foreclosures. . . . I thought that the housing downturn would have an impact on the economy and could be the start of a recession." | Undisputed. |
| 103.   An article published in the American Banker on July 20, 2007 quotes Mr. Mozilo as stating: "I think we're going to go through an enormous correction period, and we have a long way to go . . . this is just | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| the beginning of the process." | |
| 104.   The transcript from a July 24, 2007 earnings call quotes Mr. Mozilo as stating: "We are experiencing home price depreciation almost like never before, with the exception of the Great Depression." | Undisputed. |
| 105.   As of July 24, 2007, 33 percent of the Mr. Mozilo's shares under the October and December Plans (and February Amendment thereto) had yet to be sold. | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 106.   Each of the challenged trading plans included a price "floor," which prevented shares from being sold below $28 per share. | **Defendants' Evidence**<br><br>• Lefler Decl. ¶ 219, Ex. 216, at 2647 (Bow SEC Depo. Tr. 108:5-8 (July 16, 2010)) ("Q: [Y]ou recalled that his trading plans had a floor, a price below which he didn't want to sell shares?  A: Yes."); *id.* ¶ 194, Ex. 191 (Lehn Report ¶ 84, Ex. S); *id.*, Exs. 160-71 (trading plans).<br><br>**SEC Response** |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Disputed.  The evidence does not support the proposition for which it is cited.  For example, the October 27, 2007 Mozilo Family Foundation Plan had no floor.  (Lefler Ex. 168.)  Similarly, the November 13, 2006 Mozilo Living Trust Plan had no floor.  (Lefler Ex. 169.)   In addition, the Plans all had a "catch-up" provision, under which shares would be sold at the end of the plan period, regardless of share price.  **_SEC Evidence_**<br><br>• Lefler Decl. Exs. 160-71 (trading plans). |
| 107.   If Mr. Mozilo's trading plans had not included a price floor, he would have sold an additional 1.1 million shares in 2007 at a profit, under the February Amendment. | **_Defendants' Evidence_**<br><br>• Lefler Decl. ¶ 194, Ex. 191, at 2512 (Lehn Report ¶ 84, Ex. T).  **_SEC Response_**<br><br>Disputed.  The Defendants' statement is not supported by competent evidence.  See also evidence cited in opposition to Fact 106, which is a predicate of this |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | conclusion. *SEC's Evidentiary Objection To Lehn Declaration and Report*: Lack of Foundation; Conclusory. |
| 108.   Mr. Mozilo's financial advisor urged him to remove the price floor, but Mr. Mozilo refused because he "didn't want to give the stock away." | *Defendants' Evidence* <br><br> • Lefler Decl. ¶ 221, Ex. 218, at 2664 (Conners SEC Inv. Depo. Tr. 96:12-15 (September 22, 2008)) ("[T]raditionally there's been a floor in the prior plans. . . . And I think it was Angelo saying he didn't want to give the stock away."); *id.* at 2664-65 (Conners SEC Inv. Depo. Tr. 96:22-97:6 (September 22, 2008)) ("Q: Did you have any discussions with Mr. Mozilo to try to persuade him to not include the floor?  A: I probably recommended to him five |
|  | or six times that do we really need to have a floor, because we had more time to maneuver on these shares.  Q: And other than saying that he didn't want to give the stock away, did Mr. Mozilo give you any other reasons |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | why he wanted the floor in the plan? A: No.  It was really just, I don't want to sell below 28 or 29, whatever the floor was at the time."). **SEC Response** Disputed in part. Undisputed that the advice was given. Disputed as to Mr. Mozilo's reasons for objecting, which are not supported by competent evidence. **SEC's Evidentiary Objection To Connors Testimony** Hearsay; Lack of Foundation. |
| 109.   On February 7, 2007, Mr. Mozilo transferred $1 million to a grantor retained annuity trust ("GRAT") that he established for the benefit of his children. | Undisputed. |
| 110.   GRATs only provide tax benefits for assets that increase in value over time. | Undisputed. |
| 111.   On July 1, 2007, Mr. Mozilo | Undisputed. |

149

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| received 18,000 shares of common stock pursuant to a restricted stock agreement. | |
| 112.   Mr. Mozilo paid more than $300,000 in taxes on shares he received pursuant to the restricted stock agreement, and held the shares. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 192, Ex. 189.<br><br>***SEC Response***<br><br>Disputed.  The purported fact is not supported by the evidence submitted, which refers to a future "approximate" obligation.<br><br>***SEC Evidence***<br><br>• Lefler Decl. ¶ 192, Ex. 189.<br><br>***SEC's Evidentiary Objection to Exhibit 189:***  Hearsay; Lack of Foundation |
| 113.   If Mr. Mozilo had sold the shares he received on July 1, 2007 pursuant to the restricted stock agreement, Mr. Mozilo would have realized a profit. | ***Defendants' Evidence***<br><br>Lefler Decl. ¶ 192, Ex. 189.<br><br>***SEC Response***<br><br>Disputed.  The purported fact is not supported by the evidence submitted. |
| 114.   On July 27, 2007, Mr. Mozilo became aware that a substantial number of shares remained unsold under the October Plan because of the | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| $28 price floor in the plan, and that all remaining shares would be sold pursuant to the plan's "catch-all" provision. | |
| 115.   Mr. Mozilo attempted to prevent any shares from being sold below $28 per share pursuant to the catch-all provision. | Undisputed. |
| 116.   Mr. Mozilo insisted that the company issue a press release calling attention to the sales pursuant to the catch-all provision and to explain why they were occurring. | Undisputed. |
| 117.   When the challenged trading plans were created, Mr. Mozilo believed Countrywide's stock price would increase over time. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 217, Ex. 214, at 2623 (Mozilo NYF Depo. Tr. 49:9-10 (January 26, 2010)) ("I had a firm conviction that the stock would continue to do well.").<br><br>***SEC Response***<br><br>Disputed.<br><br>***SEC Evidence***<br><br>See Additional Facts 499-505, demonstrating Mozilo's serious |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | concerns regarding the deteriorating underwriting quality and loan performance at Countrywide. |
| 118.   Countrywide's earnings forecasts (so-called "Matrix Reports") were the company's best estimate of its expected earnings per share ("EPS") and stock price performance. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 222, Ex. 219, at 2671 (Iyer SEC Depo. Tr. 60:10-15 (March 23, 2010)) ("Q: So the matrix [report] ended up becoming essentially the forecast, the company's internal forecast . . . A: Yes.  Q: -- for following |
| | upcoming periods?  A: That's correct."); *id.* ¶ 94, Ex. 93 (Bartlett SEC Depo. 158:6-10 (June 3, 2010)) ("[I]t's the best estimate of management's expectations at that time.").<br><br>***SEC Response***<br><br>Disputed.<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 65, Exh.255 (Iyer Dep. Trans. 59:12-60:8)<br><br>Q.  Okay.  Why did they call it the |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
| --- | --- |
| | matrix meeting or matrix committee? |
| | A.  I think it was called the matrix committee or the matrix meeting because of where – because of the genesis of this series of meetings. Under Stan Kurland's leadership there was a need to look at the earnings projections of the company across a range of interest rate environments and across a range of hedging strategies.  So the presentations of -- to Stan Kurland and senior management was basically in the form of a matrix of earnings scenarios.  And hence the name matrix meeting. ***But as leadership was assumed by Dave Sambol at some point in time, his focus was really no longer on these range of outcomes or range of earnings outcomes across interest rates scenarios or across hedging strategies, but focusing on only the base case*** or the most likely case.   And so while the intent, the focus and the nature of the reports presented changed, the name stuck. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | • McCoy Decl. ¶ 65, Exh. 255 (Iyer Inv. Test. 50:12-16; 52:16-53:24)<br><br>Q   Did you ever -- well, you said that there were discussions that took place in late 2006 in which you participated where the general credit exposure of the bank was discussed, is that right?<br>A   I said late 2006/early 2007, yes.<br><br>Q   Well, you presented a budget forecast and people commented on that, correct?  Were the comments that you received more along the lines of your assumptions are too conservative or we're expecting larger credit risks than you anticipated?<br>A   There was a baseline credit cost embedded in the forecast.  There were discussions surrounding the reasonableness of that credit risk assumption or credit cost assumption and opinions ranged from that credit risk assumption being too unreasonable or too low -- too high to that credit cost being too low.  So I had opinions in the |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | room on either side of that spectrum. |
| | * * * |
| | Q    Who thought it was too high? |
| | A    *Dave Sambol offered the opinion that we may be too aggressive in our estimation of credit cost because those credit costs embedded in the forecast were higher than what the erstwhile credit models predicted*. |
| | Q    And why was -- why was the assumption embedded in your budget higher than what the credit models were predicting? |
| | A    Because discussions had taken place leading up to that Matrix meeting where concerns were expressed about the credit costs predicted by the model and that we may have more recent data that were not included in the current credit models that may indicate higher credit costs than what the model predicted. |
| | Q    Who expressed to you the opinion that the credit risk models might be under-predicting credit risk? |
| | A    John McMurray. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | **SEC's Evidentiary Objection To Bartlett Testimony** <br><br> Lack of Foundation |
| 119.   The January 10, 2007 Matrix Report shows that Countrywide expected its average stock price to improve from $36.98 in 2006, to $40.60 in 2007, and $45.42 in 2008. | **Defendants' Evidence** <br><br> • Lefler Decl. ¶ 195, Ex. 192, at 2521. <br><br> **SEC Response** <br><br> Disputed in part.  Undisputed that the cited document contains those predictions. <br><br> Disputed to the extent Defendants are asserting the truth of the matter asserted, as the document is not admissible for that purpose. <br><br> **Evidentiary Objection To Exhibit 192** <br><br> Hearsay |
| 120.   The transcript of a May 24, 2005, Investor Day Conference quotes Mr. Sambol as stating, "we maintain without question the broadest product line in the mortgage banking industry.  That is part of our value proposition we convey to our | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| customers whether they be realtors or builders, brokers or correspondents, that if a consumer … genuinely qualifies for a home loan anywhere else in the US, they will qualify at Countrywide and if that customer has a product preference, that product will reside on our product menu." | |
| 121.   The transcript of a CFC Earnings Call for Q2 2007 held on July 24, 2007, quotes Mr. Sambol as stating, "[i]n terms of our posture, I think somebody mentioned that the best way to look at Countrywide is somewhat of a supermarket. We offer all products that are otherwise appropriately or legitimately offered in the marketplace; and we don't try to direct or divert people, necessarily, into one product versus the other. We just provide for a complete menu, except in educating our customers as to the pros and cons of the alternatives available to them." | Undisputed. |
| 122.   The transcript from a | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| September 12, 2006 Equity Investor Forum quotes Mr. Sambol as stating, "Now our plan for continued expansion of our top-line growth and share growth also calls for expansion of our product line in almost all of our business segments." Mr. Sambol further stated, "expansion of our product line is another very key component of our growth strategies, particularly in the mortgage segment. It's our goal, not only to have the broadest product menu in our industry, which we arguably have today, but also to have every loan program on our menu that's otherwise legitimately offered by any competitor, in other words, to have a fully complete menu such that we'll never have to tell our customers that Countrywide doesn't have the program that they want." | |
| 123.   The transcript from a March 30, 2004 Equity Investor Forum quotes Mr. Sambol as stating that if a customer can "legitimately qualify for | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| a loan anywhere else in the U.S., they'll qualify at Countrywide, and if they have a product or loan preference that product will be on our menu." | |
| 124.   In response to disclosures made by Countrywide at the May 24, 2005 Equity Investor Forum, securities analyst Ms. Charlotte Chamberlain issued a report for Jefferies & Co., entitled "No Customer Left Behind." In that report, she expressly cautioned Countrywide investors that "CFC's commitment not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an underwriting guideline." | Undisputed. |
| 125.   The transcript of a CFC Earnings Call for Q2 2007 held on July 24, 2007, quotes Mr. Sambol as stating, "where we and the market liberalized guidelines, we sought to price for more risk and more liberalized guidelines." | Undisputed. |
| 126.   The transcript of the Earnings | Undisputed. |

159

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| Call for Q1 2007 held on April 26, 2007, quotes Mr. Sambol as stating that "the current turmoil in subprime was precipitated in our view by a convergence of several things; expansion of program and credit guidelines in the industry over the last several years, followed by a flattening of home price appreciation and in fact, declines in home prices in some markets over the last year, which in turn has resulted in increasing delinquencies and defaults in the sector, particularly in the last several quarters." | |
| 127.   At the May 24, 2005 Investor Day Conference, Mr. Sambol disclosed that "[i]n the first quarter of 2005, 67% of our volume was non-conforming, Jumbo, Alternative-A, non-prime and home equity volume. In fact, as I mentioned we believe that Countrywide today is the largest originator or non-conforming loans in the country." | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 128.   The transcript of the Earnings Call for Q4 2006 held on January 30, 2007, quotes Mr. Sambol as stating that the "liberal credit environment over the last several years" was "going to contribute . . . to continued pressure on delinquencies and defaults." | Undisputed. |
| 129.   Countrywide's Form 8-K, filed March 12, 2007, quotes Mr. Sambol as stating, "The nonprime lending industry is currently experiencing significant volatility and instability," Sambol continued. "As a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question.  Aggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults. Furthermore, as a result of investor concerns about nonprime loan performance, yield requirements have increased and secondary market liquidity has been reduced. These | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve." | |
| 130.   In response to Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, analysts from Keefe Bruyette & Woods observed that "[i]n the press release, President and COO David Sambol sounded a warning on the continued deterioration of the mortgage market. The softening housing market continues to drive higher delinquencies and defaults, while interest rates, price competition in lending, and secondary market volatility have all increased, according to Sambol." | Undisputed. |
| 131.   In response to Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, Stifel Nicolaus analysts stated, "we believe COO David Sambol crystalized our concerns in yesterday's June | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| operating data press release, stating, 'Market conditions became increasingly challenging throughout the second quarter of 2007. The housing market continues to soften and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending market, and secondary market volatility have all increased.'" | |
| 132.   Countrywide's June 2007 Operating Report, filed on Form 8-K on July 16, 2007, quotes Mr. Sambol as stating, "Market conditions became increasingly challenging throughout the second quarter of 2007," and that "[t]he housing market continues to soften, and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending markets and secondary market volatility have all increased." | Undisputed. |
| 133.   At the May 24, 2005 Investor | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| Day Conference, Mr. Sambol disclosed that "certain other loans being offered today, such as interest-only product, pay-option ARMS and other short-term ARMS, have received significant press lately and have been the subject of questions that we have been receiving from you. What's important for us to emphasize, that while it is the case, that some of the products offered today carry higher credit risk than traditional GSE, 30 year fixed-rate loan.  These risks are mitigated or addressed in part by the different underwriting criteria which are applied to these loans relative to those used for traditional fixed-rate agency product such as maybe higher credit scores or lower loan to value ratios, and also importantly, the paradigm in the mortgage market today and with Countrywide in particular, is that the increased risk is priced for in a very | |
| granular way.  And as I mentioned the secondary markets have become | |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| increasingly sophisticated and proficient.  They are pricing different credit risks, which in turn flows down into the pricing that is offered to consumers." | |
| 134.   John McMurray executed Sarbanes-Oxley certifications for each of Countrywide's periodic filings for 2006, in which he certified that he was "not aware of any untrue statement of material fact in the Report or omission of a material fact that is necessary to make the statements that are contained in the Report in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Report," and that "[t]o the best of [his] knowledge, the financial statements and other information provided to the Accounting Department for the segment(s) of the Company for which [he was] responsible fairly present, in all material respects, the results of operations for the segment(s) as of, | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| and for, the periods presented in the Report." | |
| 135.   John McMurray executed Divisional Officer certifications for the MD&A disclosure templates for each of Countrywide's periodic filings for 2006, in which he certified that he was "not aware of any material misstatements or omissions in the internal financial statements of the subsidiary(ies) and/or segment(s) of Countrywide Financial Corporation (the 'Company') for which [he was] responsible" and that "[t]o the best of [his] knowledge and belief, [he] has made no intentionally false or misleading statements, entries or omissions in connection with [his] activities or the activities of the subsidiary(ies) and/or segment(s) of the Company for which [he was] responsible or in information provided to the Accounting Department, including the information set forth in the Disclosure Template." | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| 136.   During his investigative testimony before the SEC, the SEC asked Mr. McMurray whether he had qualified his certifications, and Mr. McMurray responded in the negative: "You know, I don't know that I would use that word…. [T]hese were issues that I wanted to be sure to have Tom [Saletta] see as I sent this over to him."  Mr. McMurray further testified that, after talking with Ms. McCallion after the decision had been made not to include any of the discussion contained in his email, he was "comfortable." | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 237, Ex. 234 (McMurray SEC Inv. Tr., 909:7-17; 912:23-913:5 (Feb. 11, 2009)).<br><br>***SEC Response***<br><br>Disputed.  The selective quotation obscures the fact that Mr. McMurray testified that he did not know what the word "qualified" meant in this context, but that he wanted the Sarbanes-Oxley compliance officer to see his comments.<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 78, Exh. 268 (McMurray Inv. Test. 902:8-18)<br><br>Q   Do you recall why you wrote this e-mail to Mr. Saletta?<br>A   The reason that I wanted him to have this is because this is something I had shared with the financial reporting folks.  He was in a different -- he ultimately reported up through Anne, but he was more in the SOX area, so I don't know whether they had shared my views with him. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | Q   And why did you want him to have your views? |
|  | A   *I thought it would be helpful for the particular job that he was doing. So I thought it was helpful context relative to the quarterly SOX certification.* |
|  | • McCoy Decl. ¶ 78, Exh. 268 (McMurray SEC Inv. Test. 909:7-910:1) |
|  | Q   Okay.  Well, let me back up and ask you:  By attaching that note to your certification and making the notations to see other documents, in your mind, were you qualifying your certifications? |
|  | A   You know, I don't know that I would use that word.  What -- and again, let's think back to -- the market troubles that started in subprime in the first quarter of '07 had worsened by this time.  They were quite a bit worse.  And so I don't know if "qualifying" is the right verb, but these were issues that I |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | wanted to be sure to have Tom see as I sent this over to him.<br><br>Q    Do you recall anyone asking you, "John, is your certification for this quarter qualified?"<br><br>A    *I don't remember anyone asking that.  I don't know -- when you say "qualified," I guess that's not – whether this was qualified or not, I don't know what that means exactly*.<br><br>Q    Okay.<br><br>A    I do know that I wanted them to see this, which is why I went to the trouble to put it together. |
| 137.   Anne McCallion testified that she had "no belief that [Mr. McMurray] was qualifying his certification" and that he had agreed that the items in his email were "not a big enough deal" to be included in the 10-Q.  McCallion further testified that it was her decision not to make any such disclosures. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 18, Ex. 17 (McCallion SEC Depo. Tr., 127:12-128:9; 141:15-16; 271:5-6 (May 6, 2010)).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that McCallion gave the quoted testimony.<br><br>Disputed to the extent that |

169

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Defendants are asserting the truth of *content* of the testimony rather than its existence (as they appear to intend). |
| | McMurray does not recall being asked if he was qualifying his certification.  Moreover, his recollection is that he was telephoned by Ms. McCallion on his cell phone while he was awaiting surgery, and asked about a valuation issue rather than the credit risk items he included with his Certification.  Finally, Ms. McCallion has offered inconsistent testimony as to who made the decision not to include Mr. McMurray's comments in the Second Quarter 2007 Form 10-Q. |
| | ***SEC Evidence*** |
| | • McCoy Decl. ¶ 78, Exh. 268 (McMurray Inv. Test. 909:18-910:1)<br><br>Q   ***Do you recall anyone asking you, "John, is your certification for this quarter qualified?"***<br>A   ***I don't remember anyone*** |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | ***asking that.***  I don't know -- when you say "qualified," I guess that's not – whether this was qualified or not, I don't know what that means exactly. |
| | Q   Okay. |
| | A   I do know that I wanted them to see this, which is why I went to the trouble to put it together. |
| | • McCoy Decl. ¶ 78, Exh. 268 (McMurray Inv. Test. 902:23-904:8) |
| | Q   Do you recall if anyone in financial reporting contacted you regarding your e-mail to Mr. Saletta? |
| | A   I recall a contact from Anne.  May I just look at this for a moment to see if this might have been -- |
| | Q   Sure. |
| | A   -- the one?  I'm not sure this was the one that Anne contacted me on, so I don't remember a specific contact from someone on this. |
| | Q   Well, if you turn to the page ending in 445. |
| | A   All right. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Q   -- there's another copy of your e-mail to Mr. Saletta that has been, I guess, forwarded or shared with Ms. McCallion.<br><br>A   With all the handwritten notes on it?<br><br>Q   Yeah.<br><br>A   This looks like a little better copy of the e-mail, too.<br><br>Q   So looking at Page 445, do you think that this is the e-mail that you think you may have had a meeting with Ms. McCallion about?<br><br>A   Well, down at the bottom here, she's talking about these residual evaluations. So I do remember talking to financial -- either Laurie or Anne about this.  I don't know that they said it was -- it may have been relative to this e-mail, but I don't remember that specifically.  But I remember them talking to me about that. And then the specific issue I mentioned earlier that I remember Anne calling me about had to do more with a market-to-market procedure, but I don't see that. Let's see here.  Oh, here it is.  So do you |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | see this -- do you see "HFS" about midway up the page?<br><br>Q    Mm-hm.<br><br>A    And then "MTM" right below that, which stands for market-to-market. And so I remember Anne having a call with me about that.<br><br>• McCoy Decl. ¶ 78, Exh. 268 (McMurray Inv. Test. 905:15-907:13)<br><br>Q    And the page ending in 446, which is the next page over --<br><br>A    All right.<br><br>Q    -- at the bottom, there's the handwritten notation from Ms. McCallion.<br><br>A    I'm not sure whose writing it is.<br><br>Q    Just to be clear, in testimony with the staff, she identified that the handwriting is hers.<br><br>A    All right.<br><br>Q    And she has a quote, you know, midway down.  She says, "He said it's not a big enough deal to affect the financial statements or the 10-Q filing." |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | THE WITNESS:  So what -- what I think she's getting at here -- see the little 1?<br><br>Q   Yep.<br><br>A   I think that goes to the 1 on the market-to-market issue.<br><br>Q   Okay.<br><br>A   And I believe that we talked about this on one of the prior meetings that we had.  So she called me.  I was about to have hemorrhoid surgery, and so we talked through this issue right before I went into the surgery.  And I got comfortable, you know, that it wasn't a big enough issue to hold everything up over.<br><br>Q   Was that in connection with the second quarter of '07 that you were having that surgery?<br><br>A   That sounds like about the right time frame.<br><br>Q   So, to your knowledge, the conversation that Ms. McCallion had with you that she's documenting this exhibit occurred sometime in August of '07? |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | A    That sounds about right because that's about the time that I had the surgery.  And she called me on my cell phone right before I was going into the doctor's office, and so we had a discussion on this market-to-market issue.  And I think you may have asked me about -- I think we may have talked about it on one of the prior occasions.<br><br>Q   Okay.  In that phone call with you, did she go over all of the concerns that are listed in your e-mail to Mr. Saletta, or was it just the market-to-market issue?<br><br>A   The issue I remember on the phone call was the market-to-market issue.<br><br>Q   Okay.<br><br>A    There could have been other conversations that she had with me outside of -- but I remember the market-to-market issue on the phone call vividly.<br><br>• McCoy Decl. ¶ 74, Exh. 264 (McCallion Dep. Tran. 284:25-286:15) |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Q.  And were you testifying truthfully when you gave your testimony on January 30, 2009? A.  Yes. Q.  Now, the reference that I asked you to look at which is between line 8 and 22 refers to a discussion that you had with Mr. Sambol and Mr. Sieracki about Mr. McMurray's August 8th certification. And it's not very specific as to time.  I am wondering if you know whether the comments that you attributed to Mr. -- whether the discussion that you reference there between yourself, Mr. Sieracki, Mr. Sambol took place before or after you had spoken to Mr. McMurray? A.  I believe it was before. Q. To your knowledge, when you spoke to Mr. Sambol and Mr. Sieracki before going to talk to Mr. McMurray, it's your recollection that their general response was, quote, "that we had gone through with a large group and reviewed the appropriateness of the disclosures, and |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | they didn't believe that it was necessary or appropriate to make changes to what we had agreed upon probably the previous day."  Close quote.  Is that right?<br>A.  Yes. |
| 138.   Gregory Hendry testified that he had primary responsibility for drafting, reviewing and finalizing Countrywide's periodic filings, and that he did not recall any instance in which Mr. Sambol overruled any of Mr. McMurray's proposed credit risk disclosures. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 238, Ex. 235 (Hendry SEC Depo. Tr., 155:20-23; 158:22-159:3 (July 26, 2010)).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that Hendry gave the quoted testimony.<br><br>Disputed to the extent that Defendants are asserting the truth of *content* of the testimony rather than its existence (as they appear to intend).<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 22, Ex. 212 (McMurray Dep. Ex. 790)<br><br>• McCoy Decl. ¶ 76, Exh. 266 (McMurray Dep. Tran. 227:19- |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | 228:1) |
|  | Q.    Do you recognize Exhibit 790? |
|  | A.    These -- these appear to be pages out of -- handwritten pages out of a spiral notebook that belonged to me. |
|  | Q.    Okay. And is this your handwriting that appears in Exhibit 790? |
|  | A.    It is. |
|  | • McCoy Decl. ¶ 76, Exh. 266 (McMurray Dep. Tran.  229:16-232:16) |
|  | Q.    And if you turn to the page ending in 1151. Bottom left-hand corner there's some abbreviations at the top underlined. |
|  | A.    Okay. |
|  | Q.    There's some abbreviations of "ES," "KB" -- |
|  | A.    Eric Sieracki, Kevin Bartlett, John McMurray, Rod Williams. |
|  | Q.    Okay. And the -- the date is February 26th? |
|  | A.    That -- that is the date. |
|  | Q.    Is this your handwriting in the bottom left-hand corner? |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | A.    It's my handwriting. |
|  | Q.    And do you know what year this 2-26 notation was made? |
|  | A.    I believe that it was 2007. |
|  | Q.    And can you read the comment that's in this box? |
|  | A.    "ES said DS had 'slashed' some of the credit text, especially widened guidelines for affordability."  And then it says "KB's" -- "KB's office." |
|  | Q.    Who is KB? |
|  | A.    Kevin Bartlett. |
|  | Q.    Do you recall a meeting in Mr. Bartlett's office on February 26, of '07? |
|  | A.    Actually, as I thought back on it, I thought it was in Eric's office, but -- but I suspect it was here because that's what the notes say.  Those -- their offices were next to one another at -- at one point in time. |
|  | Q.    Do you recall when you made this notation in the bottom left-hand corner? |
|  | A.    You mean the time of day? |
|  | Q.    No, just the date.  Did you think you made it -- |
|  | A.    Oh. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Q.    Do you think you made -- |
| | A.    Everything in the box would have been made at the same time. |
| | Q.    Okay. And to the best of your recollection would that have been made on February 26, '07? |
| | A.    I tried to label these dates in a -- in a way where the -- where whatever was -- whatever I was taking notes on reflected that date. |
| | Q.    So the notes reflected in this exhibit, were they made by you contemporaneously with observations you were making? |
| | A.    Yes, as the conversation was unfolding. |
| | Q.    Okay. So do you recall what was going on that prompted you to make this comment? |
| | A.    My recollection -- and this -- and this ties to some of the other things that we talked to a little earlier.  Greg Hendry had -- had worked up more voluminous text for -- I think this actually was for the 10-K, is -- is my |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | recollection, but he had -- he had worked up more voluminous text -- text working with me and others, and then that was incorporated into the various drafts.  And as I explained before, the drafts went through a series of review before they were finalized.  And my recollection about this conversation is the portion of the review that included Dave looking through the entire text proposed for the 10-K and then -- and then Eric just relating back his, you know, comments and what the plans were. |
| | Q.     So you recall Eric telling you that Mr. Sambol had slashed some of the credit text having to do with widened guidelines for affordability? |
| | A.     I do, and -- and the reason the "slashed" is in quotes is I think that's -- that's the way Eric had described it.  I mean, that's the -- that's the term he had used, not -- not -- that's not one that I made up.  Again, that's why I put it in quotes. |
| | • McCoy Decl. ¶ 90, Ex. 280 (Sieracki |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Dep. Tran.  220:24-223:8) |
| | Q. Now, you also described earlier a conversation, sort of an informal meeting that you had with Mr. -- I'm sorry, with Ms. McCallion and Ms. Milleman regarding some potential edits to disclosure language.  And that was in February of 2007; is that right? |
| | A.  I believe so. |
| | Q.  And what -- how did the topic of disclosure language come up in that meeting with Ms. McCallion and Ms. Milleman? |
| | A.  I'll try to give some context instead of just jumping into what happened and point out that it was near the finalization of the 2006 10-K.  And you have got dozens and dozens, scores of reviewers.  And trying to get this document finalized is a difficult task.  And they called me in and they pointed out -- I believe Mr. Sambol had made the suggestion for certain language changes.  And while they were okay with it, they felt that it was appropriate to communicate this forward to Mr. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | McMurray.  And I am repeating myself now that I had some other reason to chat with him.  And it was mutually agreed that I would pass this information along.<br><br>Q.  And in that conv- -- and then you went and spoke to Mr. McMurray in Mr. Bartlett's office; is that right?<br><br>A.  That's my recall, is that I believe it was -- because they were next door to one another.  I am pretty sure it was Mr. Bartlett's office.<br><br>Q.  And was there anyone else in the room when you had this conversation besides Mr. Bartlett, yourself and Mr. McMurray?<br><br>A.  There might have been.  I wasn't there<br>very long.<br><br>Q.  And what -- and do you recall what language, disclosure language was at issue?<br><br> A.  I think it was around --<br><br>MS. PHILLIPS:  Excuse me.  Objection. Foundation, speculation.<br><br>THE WITNESS:  I think it was around underwriting guidelines. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | Q.  Do you recall what the language change that was being discussed was? |
|  | MS. PHILLIPS:  Objection. Foundation, speculation. |
|  | THE WITNESS:  Not specifically. |
|  | Q.  Okay.  And you informed Mr. McMurray that his suggested language had been edited by someone else; is that correct? |
|  | MS. PHILLIPS:  Objection. Mischaracterizes testimony. |
|  | THE WITNESS:  I believe I communicated that edits had been suggested. |
|  | Q.  And you communicated that those edits had been suggested by Mr. Sambol; is that correct? |
|  | A.  That's right. |
|  | • McCoy Decl. ¶¶32-34, Exs. 222-224 (Hendry Inv. Test.  Exs. 1269, 1270, 1271) |
|  | • McCoy Decl. ¶ 61, Ex. 251 (Hendry Inv. Test. 256:25-258:12) |
|  | Q   Do you recall the e-mail exchange in SEC Exhibit No. 1271? |

184

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | A    I don't recall it, but I see it and I accept it, that he sent it to me. |
|  | Q    And in your e-mail to him on August 7, 2007, you state, "FYI, I did not make changes to the overview prospective trends section because I was getting too many changes from too many directions, and expect those changes to be trumped by certain reviewers today or tomorrow." |
|  | A    Okay. |
|  | Q    In addition to Mr. McMurray, do you recall who else was giving you suggested changes to the prospective trends section? |
|  | A    Those changes tended to come from Anne McCallion for -- yes, usually from her.  And it would have been based on input, either her input -- or at this time I believe it was David Bartlett and Dave Sambol who were looking at it.  And we were asking him |
|  | MR. WEINGART:  Kevin Bartlett, you mean? |
|  | THE WITNESS:  Kevin Bartlett.  I apologize, yes. Kevin Bartlett or David |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | Sambol.  And we asked them to look at this section, specifically for the June quarter.  I believe we wanted to draw their attention to it.  That's what I was talking about. |
| | Q   Why did you want to draw the attention of Mr. Bartlett and Mr. Sambol to the prospective trends section? |
| | A   Because we were trying to get them through the review.  And I don't remember exactly why now, but I remember that they were trying to identify areas where they wanted to focus on in their review.  And this was one of them, if I'm not mistaken. |
| | Q   When you say "too many directions," what were the directions? |
| | A   I don't remember now. |
| | Q   And who were the reviewers that you thought would trump certain suggestions? |
| | A   It would be Dave Sambol and Kevin Bartlett. |
| | • McCoy Decl. ¶ 74, Ex. 264 (McCallion Dep. Tran.  284:25- |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | 286:15) |
| | Q.  And were you testifying truthfully when you gave your testimony on January 30, 2009? |
| | A.  Yes. |
| | Q.  Now, the reference that I asked you to look at which is between line 8 and 22 refers to a discussion that you had with Mr. Sambol and Mr. Sieracki about Mr. McMurray's August 8th certification.  And it's not very specific as to time.  I am wondering if you know whether the comments that you attributed to Mr. -- whether the discussion that you reference there between yourself, Mr. Sieracki, Mr. Sambol took place before or after you had spoken to Mr. McMurray? |
| | A.  I believe it was before. |
| | Q. To your knowledge, when you spoke to |
| | Mr. Sambol and Mr. Sieracki before going to talk to Mr. McMurray, it's your recollection that their general response was, quote, "that we had gone through with a large group and reviewed the |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | appropriateness of the disclosures, and they didn't believe that it was necessary or appropriate to make changes to what we had agreed upon probably the previous day." Close quote. Is that right?<br>A. Yes. |
| 139. Exceptions to underwriting guidelines and mitigating risk through pricing were standard in the mortgage industry. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 239, Ex. 236 (Rossi SEC Depo. Tr., 301:16-25; 333:3-5; 333:21-334:1 (Feb. 24, 2010));<br><br>• Lefler Decl. ¶ 16, Ex. 15 (McMurray SEC Depo. Tr., 289:12-290:9 (July 7, 2010)).<br><br>***SEC Response***<br><br>Disputed in part. Undisputed that it is exception loans and risk-based pricing are not exclusive to Countrywide. Disputed to the extent that the fact implies (1) that Countrywide's volume of exceptions was normal; and (2) that Countrywide was in fact effectively pricing for the risk it was assuming, |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | which facts are not supported by the evidentiary record. |
| | • McCoy Decl. ¶ 77, Exh. 267 (McMurray Inv. Tr., 374:25-375:6) |
| | • McCoy Decl. ¶ 46, Exh. 236 (Aguilera Inv. Tr., 53:19-55:9) |
| | • Dean Decl. ¶ 6, Ex.4 (Krsnich Dep. Ex. 359 at p. 44 - June 2006, Credit Risk Leadership reporting package showing that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, 55.3% of its standalone home equity loans.) |
| | • McCoy Decl. ¶ 52, Ex. 242 (Brendler Dep. Trans., 58:24-59:13) (Testimony indicating typical exceptions rates would have been 5% to 10% and rates in excess of 20% would have been inconsistent with a |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | low exceptions rate.) |
| | • McCoy Decl. ¶ 102, Ex. 292 (Krsnich Dep. Trans. 154:24-156:5) |
| | Q.  And what period of time are you referring to in that answer? |
| | A.  Our loss exposure was growing over the 2004, 2005, 2006 period. |
| | Q.  The other part of that statement was that "subprime margins had been decreasing."  What did you mean by that? |
| | A.  That we weren't getting paid as much for the risks we were taking, which was my main – I knew that we were taking on more credit risk, and I was okay with that as long as we got paid for it. My opinion was, is that was no longer the case. |
| | Q.  When did you come to the conclusion that the company was not getting paid enough for the credit risk that it was taking on? |
| | A.  I couldn't tell you specifically over the 2003 to 2005 time period, but that during that time period, that was a consistent slow process that was |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | happening. |
| | Q.  And just so the record is clear, when you say get paid for the risk, what did you mean by that? |
| | A.  Well, if we make -- if we originate a loan that has more potential loss exposure, it would be nice if we got a higher profit margin so we made more money on that front end so we would have the capital necessary to -- for a rainy day.  To the extent we no longer had as large a profit margin, that wouldn't be the case and that we should be more adverse to originating riskier products. |
| | • McCoy Decl. ¶ 76, Ex. 266 (McMurray Dep. Trans. 115:23-117:23) |
| | Q.   And is it correct that as of April 6, 2005, there was no pricing difference between a full-doc and reduced-doc PayOption ARM? |
| | A.   That -- that was -- my recollection is that was broadly the case.  There might have been small – at some point there were some price differences introduced, but as to the exact time they were introduced, I don't remember that, but I -- I believe this to be accurate. |
| | Q.   Am I correct that one of the |

191

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | mechanisms that Countrywide used to mitigate credit risk was the concept of risk-based pricing? A.   I -- I would explain it a little differently.  The -- and we -- and we've singled out just risk but the whole -- the whole idea of risk and return and balancing those two is the -- is the -- is the central issue in any business, but particularly so for a financial institution. Financial institutions get paid for -- for keeping certain types of risks, and so the idea of -- of pricing and – and risk and the effect that that has on -- on your projected and actual returns are -- are very important concepts, in my view.  * * *  Q.   Okay.  And do you know why as of April 2005 there is no difference -- no pricing difference between a full-doc PayOption ARM and a reduced-doc PayOption ARM? A.   My -- my recollection on that is it was a market-driven phenomenon, so if we looked at the key originators, the key option ARM lenders that Countrywide was competing against and had been in the market for much longer than Countrywide, that -- that was the -- that was the approach that they had employed, and -- and so that's my recollection of the -- the key driver, just the broadly competitive reasons. |
| 140.   The SEC's mortgage industry expert, Michael LaCour-Little, testified that exceptions do not | ***Defendants' Evidence*** • Lefler Decl. ¶ 93, Ex. 92 (LaCour-Little SEC Depo. Tr., 97:7-100:14 |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| inherently increase the risk of a particular loan or loan portfolio and that a loan portfolio having a higher average FICO score and a higher exception rate (even as high as 50%) would nevertheless have a lower credit risk profile than a portfolio with a lower average FICO score and a zero exception rate (all else being equal). | (July 28, 2010)).<br><br>• ***SEC Response***<br><br>Disputed.  The testimony cited by defendants is based on an incomplete hypothetical posed at the deposition. Prof. LaCour-Little actually testified that the high number of exception loans at Countrywide supported his opinion that Countrywide's underwriting quality was weak.<br><br>***SEC Evidence***<br><br>• Lefler decl. ¶ 93, Ex. 92 (LaCour-Little Depo. 94:3-14)<br><br>A.  Well, I guess the answer would be yes, I reviewed Mr. Grice's report, and he criticized my reliance on the exception reports that we have just been discussing that are contained in the original report, in Table 3 of the original report.  And he mentioned the quality control audits, so I reviewed the quality control audits, and I generally found the same pattern in the SUS rates that I found in the exceptions.  ***So I really found material that continued to support my opinion that the underwriting quality was weak and that they were originating a high number of loans with exceptions***.<br><br>***Evidentiary Objection to the*** |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | ***Defendants' Citation to the LaCour-Little Deposition:***<br><br>Lacks Foundation, Calls for Speculation |
| 141.   A PowerPoint slide accompanying the March 30, 2004 investor presentation stated that Countrywide's "[e]xception pricing system" was one of its "Loan Production Growth Strategies." | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 240, Ex. 237  (CFC Investor Presentation held March 30, 2004, at 19).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that the cited document contains that language.<br><br>Disputed to the extent Defendants are asserting the truth of the matter asserted, as the document is not admissible for that purpose.<br><br>***Evidentiary Objection***<br><br>Lack of foundation. |
| 142.   Frank Aguilera, Countrywide's Senior Vice President and Product Manager of Subprime Mortgages during the relevant time period, testified that Countrywide's policies and practices for making exception | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| loans were "a regular topic that came up at every conference or almost every discussion." | |
| 143. The transcript from a May 24, 2005 Investor Day Conference quotes Mr. Sambol as stating that Countrywide enjoyed, "a significant advantage with respect to handling exception[s]. We have the ability to identify exceptions and we have the pricing (inaudible) specification." | ***Defendants' Evidence*** <br> • Lefler Decl. ¶ 23, Ex. 22 (Transcript of CFC Analyst Meeting held on May 24, 2005, at 23). <br> ***SEC Response*** <br> Disputed in part. Undisputed that the referenced quote appears in the transcript. <br> Disputed to the extent Defendants are asserting the truth of the matter asserted therein, as the only evidence Defendants cite is not admissible for that purpose. <br> ***Evidentiary Objection To Exhibit 22 and Lefler Declaration*** <br> Hearsay; Lack of Foundation |
| 144. John McMurray's May 22, 2005 email to Mr. Sambol regarding "Your speech / Exceptions / SLDs" does not mention pay-option loans or adjustable rate products. | ***Defendants' Evidence*** <br> • Lefler Decl. ¶ 242, Ex. 239 (May 22, 2005 email from John McMurray to David Sambol). <br> ***SEC Response*** <br> Disputed in part. Undisputed that the |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | document does not explicitly mention the specific loan programs cited.  Disputed to the extend Defendants imply that this means the statements do not encompass such products, which is not supported by the evidence.  The email does not refer to <u>any</u> specific loan product.  It refers to loans generally.<br><br>***SEC Evidence***<br><br>Lefler Decl. ¶ 242, Ex. 239. |
| 145.   Intentionally Omitted | |
| 146.   The transcript of a September 13, 2006 investor conference quotes Mr. Sambol as stating that at that time subprime represented "less than 10% of our total production.  Looking ahead, and that is not to say that subprime is not an important part of our menu…we remain committed to having a subprime presence.  But, there are no particular plans to accelerate growth.  And I think that would characterize our current posture as remaining on the sidelines, | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 77, Ex. 76 (Transcript of CFC Fixed Income Investor Forum held on September 13, 2006, at 24).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that the referenced quote appears in the transcript.<br>Disputed to the extent Defendants are asserting the truth of the matter asserted therein, as the only evidence Defendants cite is not admissible for |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| waiting for the market to rationalize somewhat." | that purpose.<br><br>***Evidentiary Objection To Exhibit 76***<br><br>Hearsay |
| 147.   PowerPoint slides from a presentation given on September 6, 2006, show that Countrywide disclosed that it was the nation's third largest originator of subprime residential mortgage products. | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 243, Ex. 240 (PowerPoint Presentation from t CFC Subprime Residential Mortgage Lending Presentation given September 2006, at 9).<br><br>***SEC Response***<br>Disputed in part.  Undisputed that the slides say that.<br>Disputed to the extent Defendants are asserting the truth of the matter asserted therein, as the only evidence Defendants cite is not admissible for that purpose.  Further disputed to the extent that Defendants' contend that the information was presented outside of Countrywide, as the evidence does not support that conclusion.<br>***Evidentiary Objection To Exhibit 243*** |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | Foundation, Hearsay |
| 148.   At the American Financial Services Association Finance Industry Conference for Fixed Income Investors held on May 17, 2006, Countrywide disclosed that "[w]e were number three in sub-prime originations, we were number four last year in home equity originations." | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 244, Ex. 241 (Transcript from American Financial Services Association Finance Industry Conference for Fixed Income Investors held on May 17, 2006, at 8).<br><br>***SEC Response***<br><br>Disputed in part. Undisputed that the referenced quote appears in the transcript.<br><br>Disputed to the extent Defendants are asserting the truth of the matter asserted therein, as the only evidence Defendants cite is not admissible for that purpose.<br><br>***Evidentiary Objection To Exhibit 241***<br><br>Hearsay |
| 149.   PowerPoint slides from a presentation given on June 7, 2006, | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 245, Ex. 242 |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| show that Countrywide disclosed that it was the nation's third largest originator of subprime residential mortgage products. | (PowerPoint Presentation from CFC Subprime Residential Mortgage Lending Presentation given on June 7, 2006, at 9).<br><br>***SEC Response***<br>Disputed in part.  Undisputed that the slides say that.<br>Disputed to the extent Defendants are asserting the truth of the matter asserted therein, as the only evidence Defendants cite is not admissible for that purpose.  Further disputed to the extent that Defendants' contend that the information was presented outside of Countrywide, as the evidence does not support that conclusion.<br>***Evidentiary Objection To Exhibit 242***<br><br>Foundation, Hearsay |
| 150.   Chris Brendler, a research analyst following Countrywide, testified that he initiated coverage in part because he understood that | Undisputed. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| "Countrywide was consistently one of the top five originators of subprime loans"; he further understood that in January 2006, Countrywide was a "top player" by marketshare in the subprime market and that throughout the relevant period, while subprime loans were a "small portion" of Countrywide's overall volume, Countrywide was "one of the leading originators of subprime loans." | |
| 151.   Numerous research analysts following Countrywide understood Countrywide's position as a leading originator of subprime loans throughout the SEC's alleged relevant period. | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 29, Ex. 28 (Hesser SEC Depo. Tr., 164:19 – 165:14 (June 9, 2010));<br>• Lefler Decl. ¶ 246, Ex. 243 (Robert G. Hottensen, "Countrywide Financial: Business Momentum Excellent, Raising '03 Estimates," Goldman Saches, Nov. 10, 2003, at 1); |
| | • Lefler Decl. ¶ 247, Ex. 244 (Joel Houck, "CFC: Downgrading to Underperform from Market Perform," Wachovia Securities, Feb. |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
| | 10, 2004, at 3); |
| | • Lefler Decl. ¶ 248, Ex. 245 (Jim Shanahan, "CFC: Transferring Research Coverage with a Market Perform Rating," March 18, 2004, at 1); |
| | • Lefler Decl. ¶ 249, Ex. 246 (Mike McMahon, "Countrywide Financial Corporation, Good Numbers and Trends Reported for July," Sandler O'Neil Equity Research, Aug. 10, 2004, at 1); |
| | • Lefler Decl. ¶ 250, Ex. 247 (Bruce Hartin, "CFC: Operational Data and 10-Q Review," Lehman Brothers, Nov. 9, 2004, at 2); |
| | • Lefler Decl. ¶ 38, Ex. 37 (Traci Hallett, "Countrywide's 2Q05 Earnings Warning: Are the Credit Risks Growing?" BNP Paribas, July 15, 2005, at 2-3); |
| | • Lefler Decl. ¶ 251, Ex. 248 (Robert Lacoursiere, "Potential Growth Trap?; Initiating Coverage with a Neutral Rating," Banc of America |

| Mozilo's Statement | Evidence Cited by Mozilo and SEC Response |
|---|---|
|  | Securities, July 18, 2005, at 5); |
|  | • Lefler Decl. ¶ 252, Ex. 249 (Guy D. Cocala, "Servicing Market Continues to Consolidate In 2005, But Distinct Trends Are Emerging," Inside Mortgage Finance, Aug. 5, 2005, at 3); |
|  | • Lefler Decl. ¶ 253, Ex. 250 (Guy D. Cocala, "Ameriquest and IndyMac Tops in Hottest Mortgage Productions Sectors in Early 2005," Inside Mortgage Finance, Sept. 16, 2005, at 8). |
|  | ***SEC Response*** |
|  | Disputed.  The evidence cited does not support Defendants' characterization. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 152.   Eric Sieracki served as Chief Financial Officer of Countrywide Financial Corporation from April 1, 2005 until it was acquired by Bank of America in July 2008. | Undisputed. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 153.   As CFO, Sieracki headed the Finance Department, which produced Countrywide's financial statements reported in the 10-Ks and on a quarterly basis in the 10-Qs and press releases. | Undisputed. |
| 154.   The SEC admits Sieracki had no operating responsibilities regarding loan production or loan sales. | Undisputed. |
| 155.   During Sieracki's tenure as CFO, he did not have any operational responsibilities for, or expertise in, the mortgage loan production units or in Secondary Marketing, which sold the loans originated by Countrywide. | Undisputed. |
| 156.   Sieracki relied upon the executives in mortgage banking business segment to classify loans as "prime," "subprime" and "nonprime." | ***Defendants' Evidence***<br>• Sieracki Decl. ¶ 9.<br>***SEC Response***<br>Disputed in part.  Undisputed that Sieracki's Declaration states this. Disputed to the extent that Sieracki testified that he was generally conversant with the difference |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | between a conforming and non-conforming loan and a prime and subprime loan.  Also disputed to the extent that the fact implies that Sieracki's reliance was reasonable, which implication is not supported by the evidence cited. |

**SEC Evidence**

- McCoy Decl. 91, Exh. 281 (Sieracki Inv. Test. 36:3-15; 163:9-25)

MS. DEAN:  Did you get both of those? They were all head nods.

THE WITNESS:  I caught myself.

MS. DEAN:  Let's go off the record.

(Discussion held off the record.)

MS. DEAN:  Back on the record.

Q    Are the loans originated in the secondary non-agency market sometimes known as conforming loans?

A    Yes.

Q    And they're non-conforming in the sense that they don't conform to GSC guidelines; correct?

A    Yes.

***

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Q   Would a loan that was made at a loan to value of higher than 90 percent conform to Fannie Mae or Freddie Mac guidelines? <br><br> A   If you got PMI and brought it back down to 80 -- actually, I need to defer, because I'm not enough of an expert on exactly what the criteria are for Fannie and Freddie.  So, you know, I'm generally conversant in what, you know, conforming conventional loans are and what non-conforming is and things of that nature.  I understand how those loans perform, in terms of, you know, what the subtle differences are in prepayments, means, and things like that, but I'm not an expert on classification of loans. And I rely on the certification of a string of executives who would have produced the loans, who would have classified them, would have underwritten them, and packaged them, and gotten them guaranteed in secondary marketing.  I, you know, defer to those executives and their management teams. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | ***Evidentiary Objection To Sieracki Decl.:*** <br><br> Conclusory |
| 157.   Sieracki was aware that Countrywide sold typically well over 90% of the loans it originated to the secondary market, and that the Company's loan origination standards reflected the criteria of secondary market investors. | • Sieracki Decl. ¶10. <br><br> • Lefler Decl., ¶ 5, Ex. 4 (2006 10-K) at 101 ("Nearly all of the mortgage loans that we originate or purchase in our Mortgage Banking and Capital Markets Segments are sold into the secondary mortgage market primarily in the form of securities, and to a lesser extent as whole loans."). <br><br> ***SEC Response*** <br><br> Disputed in part.  Undisputed that the company sold most of the loans it originated into the secondary market. Disputed as to whether Countrywide's underwriting standards reflected the "criteria of the secondary markets," which fact is not supported by the evidence cited. Sieracki's declaration refers to the "purchasing criteria" of the secondary market rather than any form of origination standard. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 158.   The SEC admits in its contention interrogatory responses that the only statements it challenges and attributes to Sieracki are contained in 10-Ks he signed for Fiscal Years 2005 and 2006. | ***Defendants' Evidence***<br><br>• Lefler Decl, ¶ 255, Ex. 252 (Plaintiff Securities and Exchange Commission's Responses to Defendant Eric P. Sieracki's First Set of Interrogatories) ("SEC Responses to Interrogatories") Nos. 1, 3 at 6:6-17, 18:4-12.<br><br>***SEC Response***<br><br>Disputed.  The Evidence does not support Defendants' characterization of the Commission's responses, which were directed at requests for the identification of affirmative misstatements.  The Commission's Complaint is also predicated on material omissions.  Further, as set forth in the Commission's Opposition Brief to the Sieracki Motion, the Commission has not abandoned its claims with respect to Form 10-K for 2007. |
| 159.   Countrywide was a large and complex company and had a detailed process for preparing the 10-Ks. | Undisputed. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 160.   The process of preparing the 10-K's involved the Legal Department. | Undisputed. |
| 161.   The process of preparing the 10-K's involved the Finance Department. | Undisputed. |
| 162.   The process of preparing the 10-K's involved outside auditors and the Audit Committee. | Undisputed. |
| 163.   The process of preparing the 10-K's involved the Board of Directors. | ***Defendants' Evidence***<br>• Sieracki Decl. ¶ 37;<br>• Lefler Decl. ¶ 256, Ex. 253 (SEC Deposition Exhibit 608 ) (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006) at 6.<br>***SEC Response***<br>Disputed in part.  Undisputed that a final draft was presented to the Board for review before the filing. Disputed that the Board actually assisted in "preparing" the drafts, which fact is not supported by the |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | evidence cited. |
| 164.   The business units and credit risk function were solicited for information to be considered for inclusion in the 10-Ks, and their senior managers were required to review and edit the 10-Ks. | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶ 31;<br><br>• Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006)) at 4 ("[T]he [Chief Accounting Officer] and members of her staff shall seek input from, and discuss with, the Divisional Officers information pertaining to the past |
| | and current performance and prospects for their business unit, known trends and uncertainties related to the business unit, significant risks and contingencies that may affect the business unit, any changes that might have taken place in their methods of collecting, reporting or analyzing financial data and any other information needed to complete the Release and/or Report.");<br><br>• Lefler Decl. ¶ 219, Ex. 216 |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | (Transcript of July 16, 2010 Deposition of Susan Bow) at 19:24-20:3 ("The head of the division, as well as the head of the accounting for that division, would be given a questionnaire that [] ask[ed] them questions about the disclosure.").<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that MD&A Questionnaires were sent to the business units and credit risk function.  Disputed that the input from those Questionnaires was considered for inclusion in the Forms 10-K, which fact is not supported by the evidentiary record.<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 60, Exh. 250 (Hendry Depo. 224:6-225:14)<br><br>Q.  Okay.  So Exhibit 789 I think you've already got in front of you.  It's the January 25th, '07 e-mail from Katica Rich to Jie Ling.  It's the completed MD&A questionnaire for the 2006 10-K.  Do you have the document? |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | A.  January 25th, 2007? |
| | Q.  Yes. |
| | A.  Yes. |
| | Q.  Sorry if I said it wrong. |
| | Did Mrs. Ling bring this to your |
| | attention? |
| | A.  I don't remember. |
| | Q.  Would you have expected Jie |
| | Ling to bring this to your attention? |
| | A.  They didn't -- they didn't always |
| | come -- they didn't come to me other |
| | than -- *they didn't very often come* |
| | *to me.  I looked at them usually* |
| | *late, very late in the process*. |
| | Q.  Why is that? |
| | A.  Because -- because we got two |
| | types of MD&A templates back. |
| | MD&A templates that contained |
| | content that was -- basically was a |
| | way of passing content along to us |
| | that was basically agreed to in form, |
| | such as the Capital Markets |
| | disclosures and the bank's |
| | disclosures.  And then we got other |
| | MD&A templates that very seldom |
| | had a much -- much -- *they weren't* |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | ***very -- particularly useful in terms of content.***  So a lot of times I just -- you know, I didn't see these until very late when I was going through a final review.<br><br>Q.  ***But there's a procedure in place to elicit information having to do with the business units; right?***<br><br>A.  ***Right.  It wasn't particularly effective***.<br><br>***Evidentiary Objection to Sieracki Declaration***<br><br>Lacks Foundation |
| 165.   The process culminated in senior business unit managers and executive management, and Legal, certifying that they were not aware of any false or misleading statements in the filing. | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶¶ 35-36;<br><br>• *See, e.g.*, Lefler Decl. ¶ 282, Ex. 279 (SEC Deposition Exhibit 234) (The certifications attested to the facts that the certifier reviewed the document, that the certifier was not aware of any material misstatement or omissions in the internal financial statements of the portion of the company for which he or she was responsible, and that the certifier, to |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | the best of his or her knowledge and belief did not make any intentionally false or misleading statements, entries or omissions in the activities for the portion of the company for which he or she was responsible or in the information provided to the Accounting Department).<br><br>• Lefler Decl., ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 108:24-109:13;<br><br>• Lefler Decl., ¶ 219, Ex. 216 (Transcript of July 16, 2010 |
| | Deposition of Susan Bow) at 21:10-12 ("So at the end of all of that, once everyone had signed off and given their clearance, we would be prepared to file"); 62:25-63:7 (a form 10-Q or form 10-K would not be filed if anyone failed to submit a certification for that filing. "[Certification] was required as part of [their] process.").<br><br>***SEC Response***<br><br>Disputed.  The process "culminated" |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | in Sieracki and Mozilo independently and personally certifying the document, as evidenced by Defendants' Fact 168 herein. |
| 166.   If a certifier had any issues with a draft, he or she was required to withhold certifying the filing until they were resolved such that he or she could certify the filing. | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶ 36;<br><br>• Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006, at 7) ("The certification shall be signed by the President, each Executive Managing Director (other than the CFO) and each SMD Certifier following his or her review of the Report and satisfaction of any significant concerns raised by him or her during the review process and prior to the filing with the SEC |
| | of the related periodic report.");<br><br>• Lefler Decl. ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne McCallion) at 113:23-114:16; |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | • Lefler Decl. ¶ 94, Ex. 93 (Transcript of June 3, 2010 Deposition of Kevin Bartlett) at 103:10-14 ("Q: And you understood that if there was an inaccuracy in the portion of the report that you read that you were supposed to point it out; is that fair? A: That's correct."); *id.* at 103:15-20 ("Q: And is it also fair to say that if you read something, even in a part of the report that wasn't your part, that you thought was wrong, you understood that you had an obligation to speak up and say – say something? A: I believe so."); *id.* at 103:21-104:1 ("And is it fair to say as well that if anybody in your organization, somebody who worked for you, had an issue with the disclosures and they raised that issue |
| | with you, you would have taken steps to make sure that the issue was addressed?  A: That's correct."); *id.* at 104:4-9 ("Q: [I]f there was some important fact that you thought needed to be disclosed that wasn't in |

215

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | the quarterly filing, you understood that you were supposed to raise your hand in that circumstance, too; correct? A: That's correct."); |
| | • Lefler Decl. ¶ 98, Ex. 97 (Transcript of June 29, 2010 Deposition of Carlos Garcia) at 82:7-18 ("Q: In the periods where you provided certifications, did you have an understanding that if you reached the conclusion that there was something inaccurate in the portions of the – of the periodic filing that you had read, that you were supposed to say something? A: Yes. Q: Okay. And you - would you have done that if that had happened? A: Yes. Q: Do you recall that happening? A: No."); |
| | *id. at* 82:19-83:10 ("Q: if one of your subordinates had come to you and said he or she thought there was something inaccurate in one of the periodic filings or in one of the drafts of the periodic filings, would you have done anything about it? A: Yes. Q: What would you have done? A: I |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | would have made sure I understood what they were saying.  I would have made sure they conveyed it directly to the holding company, to the – you know, the CFO and the legal department.  My subordinates, if I recall correctly, were also, you know, signing subcertifications.  If they weren't signing technically subcertifications, they were signing something, because they were part of the process.  Their review was required, and they had direct communication with the CFO and the CFO's organization."); <br><br> • Lefler Decl. ¶ 275, Ex. 252 |
| | (Transcript of July 14, 2010 Deposition of Jim Furash) at 68:21-25 ("Q.  And if you had any concerns about the accuracy of the statements of concerns that there were any misleading statements in the financials, would you have marked 'true without exception'?  A.  No."); <br><br> • Lefler Decl. ¶ 276, Ex. 273 (Transcript of June 30, 2010 |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Deposition of Laura Milleman) at 100:2-6 ("Everybody has a choice of whether they agree or not.  And I would expect the reason we gave them the opportunity to disagree is to get it on the table that they disagreed so we could talk to them and see what we needed to do." ). <br><br> ***SEC Response*** <br><br> Disputed.  The evidence cited does not support the contention that a certifier was required to raise any issues before signing.  Moreover, Defendants have mischaracterized the content of the certifications. |
| 167.   Sieracki observed that Legal was integrally involved in the disclosure process and knew it was responsible for obtaining certifications. | ***Defendants' Evidence*** <br><br> Sieracki Decl. ¶¶ 14, 16-17, 25-27, 35, 38, 40. <br><br> ***SEC Response*** <br><br> Disputed.  The evidence cited is insufficient to support the contention, and contradicts the evidentiary record, which establishes that the MD&A Questionnaires were circulated and collected by Financial |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Reporting, the filings were drafted by Financial Reporting, and decisions about what to include or exclude were made by Financial Reporting, Eric Sieracki and David Sambol.<br><br>***Evidentiary Objection to Sieracki Declaration***<br><br>Lacks Foundation |
| 168.   Sieracki would not and did not sign the 10-Ks until Legal presented him with the final SEC report for filing, and represented that all certifications had been received. | ***Defendants' Evidence***<br><br>Sieracki Decl. ¶40.<br><br>***SEC Response***<br><br>Disputed.  The fact is not supported by competent evidence.<br><br>***Evidentiary Objection to Sieracki Declaration***<br><br>Lacks Foundation |
| 169.   Sieracki no Countrywide stock during his tenure as CFO. | Undisputed. |
| 170.   On May 26, 2005, Sieracki acquired common stock by exercising stock options. | Undisputed. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 171.   On May 26, 2005, Sieracki acquired common stock by exercising stock options. | Undisputed. |
| 172.   On May 31, 2007, Sieracki acquired common stock by exercising stock options. | Undisputed. |
| 173.   Sieracki paid tax upon these option exercises, based on the imputed "profit" he would have earned had he immediately sold the acquired shares on the open market (the difference between the market price and the exercise price). | Undisputed. |
| 174.   On May 26, 2005, Countrywide common stock closed at $36.65 per share. | Undisputed. |
| 175.   On July 11, 2006, Countrywide common stock closed at $38.08 per share. | Undisputed. |
| 176.   On May 31, 2007, Countrywide common stock closed at $38.94 per share. | Undisputed. |
| 177.   On May 31, 2007, Countrywide | Undisputed. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| common stock closed at $38.94 per share. | |
| 178.   As of May 31, 2007, Sieracki owned almost 600,000 shares of common stock and vested options. | Undisputed. |
| 179.   The last publicly reported price for Countrywide stock was $4.25. | Undisputed. |
| 180.   By holding onto his shares as Countrywide and the industry's fortunes declined , Sieracki experienced a loss in value of approximately $20 million. | **_Defendants' Evidence_**<br><br>600,000 shares * ($38.940-$4.25) = 600,000 * $34.69 = $20,814,000.<br><br>**_SEC Response_**<br><br>Disputed.  The fact is not supported by the evidence cited.<br><br>**_Evidentiary Objection_**<br><br>Unintelligible; Compound |
| 181.   The SEC Response points to a single document in support of Sieracki's supposed scienter; the minutes of a June 28, 2005 Corporate Credit Risk Committee meeting. | **_Defendants' Evidence_**<br><br>Lefler Decl. ¶ 255, Ex. 252  (SEC Responses to Defendant Eric P. Sieracki's First Set of Interrogatories), Response to Interrogatory No. 2, at 7:18-8:6.<br><br>**_SEC Response_** |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
|  | Disputed. Defendants mischaracterize the evidence they cite, which does not support the proposition asserted. *Evidentiary Objection* Unintelligible |
| 182.   The June 28, 2005 minutes state that the percentage of subprime loans had increased, but the 10-Ks disclosed the percentage of subprime loans. | *Defendants' Evidence* • Lefler Decl. ¶ 11, Ex. 10 (2005 10-K) at 2. *SEC Response* Disputed.   The evidence cited does not support the proposition asserted. *Evidentiary Objection* Unintelligible; Lack of Foundation |
| 183.   Mr. Kurland certified the 2005 Form 10-K as not false or misleading. | *Defendants' Evidence* • Lefler Decl. ¶ 262, Ex. 259 (February 13, 2006 Executive Officer's Certification, CFCP002211946). *SEC Response* Disputed in part.  Undisputed that Kurland signed a certification related to the 2005 Form 10-K.  Disputed as |

222

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | to Defendants' characterization of the certification. **SEC Evidence** <br> • Lefler Decl. ¶ 262, Ex. 259 (February 13, 2006 Executive Officer's Certification, CFCP002211946). |
| 184.   According to the minutes of the June 22, 2006 CRC meeting cited by Plaintiff, Mr. Rossi stated that "[t]he Bank's overall credit quality had been very high and in line with model expectations" and the Chief Risk Officer, John McMurray, "reviewed the Credit Policy–Credit Exposure Limits for Q1 2006, reporting that all exposures were well within tolerance." | **Defendants' Evidence** <br> • Lefler Decl. ¶ 263, Ex. 260 (SEC Deposition Exhibit 26) at 1, CFC2007C006790; at 5, CFC2007C006794. <br> **SEC Response** <br> Disputed in part.   Undisputed that the cited phrases appear in the document.  Disputed to the extent that the selective quotation mischaracterizes the substance of overall document, which included, *inter alia*, the facts that: <br> (1) the Bank's loss  models, including its ALLL model, had been under-predicting delinquencies.  (Lefler Decl. |

223

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Ex. 260 at 2892); |
| | (2) the underperformance of the first liens at the Bank had been unexpected. (Lefler Decl. Ex. 260 at 2893); |
| | (3) Countrywide had $146 million in potential losses outstanding on $464 million in outstanding principal due to repurchase requests on Countrywide securitizations and loan sales. (Lefler Decl. Ex. 260 at 2894); |
| | (4) Recast speeds on PayOption loans had been increasing. (Lefler Decl. Ex. 260 at 2897). |
| | **_Evidentiary Objections To Exhibit 260_** |
| | Unintelligible; Compound; Best Evidence Rule. |
| 185.   In the April 13, 2006 email from Mr. Mozilo cited by the SEC, Mr. Mozilo directed the heads of loan production and credit risk management (David Sambol and Mr. McMurray) to address arising from | **_Defendants' Evidence_** • Lefler Decl. ¶ 264, Ex. 261 (SEC Investigation Exhibit 92); Sieracki Decl. ¶ 54. **_SEC Response_** |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| HSBC, and it was reasonable for Sieracki to believe they would. | Disputed. This fact is not supported by the evidence cited.<br><br>**Evidentiary Objections**<br><br>Unintelligible; Lack of Foundation; Compound |
| 186.   The December 7, 2006 memorandum from Mr. Mozilo which discussed comments made in a Wall Street Journal article about subprime loans stated that loans originated in 2006 had performed better than the industry average, but worse than loans originated in prior years. | **Defendants' Evidence**<br><br>• Lefler Decl. ¶ 265, Ex. 262 (SEC Deposition Exhibit 148) at 2, CFC2007829059.<br><br>**SEC Response**<br><br>Disputed. Defendants have not accurately characterized the contents of the memorandum.<br><br>**Evidentiary Objections To Exhibit 262**<br><br>Unintelligible; Compound |
| 187.   At Countrywide, subprime loans represented only 9% to 10% of originations. | **Defendants' Evidence**<br><br>• *See*, *e.g*., Lefler Decl. ¶ 11, Ex. 10 (2005 10-K) at 2.<br><br>**SEC Response**<br><br>Disputed in part. Undisputed to the extent that this fact is limited to the period represented in the evidence |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | cited, 2001 to 2006.  Disputed as to all other periods, for which no evidence has been cited. |
| 188.   The 2006 10-K disclosed:  "a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006." | Undisputed that the Countrywide Form 10-K filed in March 2007 contained this statement. |
| 189.   The December 7, 2006 memorandum also reported that "product introductions and guidelines have not been implemented indiscriminately." | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 265, Ex. 262 (SEC Deposition Exhibit 148) at 4, CFC2007829061.<br><br>***SEC Response***<br>Undisputed that the quoted phrase appears in the memorandum. Disputed as to the truth of the quoted statement, which is not supported by the evidence cited.<br><br>***Evidentiary Objections to Exhibit 148***<br>Hearsay; Incomplete |
| 190.   The December 7, 2006 memorandum set forth numerous steps undertaken by Countrywide to | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 265, Ex. 262 (SEC Deposition Exhibit 148) at 4, |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| manage guidelines and risk. | CFC2007829061.<br><br>***SEC Response***<br><br>Undisputed that the memorandum refers to steps related to guideline expansion.  Disputed that as to the truth of the statements, which is not supported by the evidence cited.<br><br>***Evidentiary Objection To Exhibit 148***<br><br>Hearsay; Incomplete |
| 191.   Emails from Mr. Mozilo on which Mr. Sieracki was copied regarding pay-option loans, or HSBC, did not inform Sieracki that Countrywide's loan origination standards or practices were different than as described in the 10-Ks. Rather, they informed him that the CEO was asking appropriate executives to devote attention to business matters of concern. | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶¶ 52-54.<br><br>***SEC Response***<br><br>Disputed.  The evidence cited does not support Defendants' characterization.<br><br>***Evidentiary Objections To Sieracki Decl.:***<br><br>Vague; Hearsay; Lack of Foundation; Best Evidence |
| 192.   In response to a question regarding credit expenses for the upcoming year 2007, Mr. McMurray | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶ 43;<br><br>• Lefler Decl. ¶ 266, Ex. 263 (SEC |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| opined that loan delinquencies would increase. | Investigation Exhibit. 245 (January 2, 2007 E-mail from McMurray, JPM001054 - JPM001058)).<br><br>***SEC Response***<br><br>Undisputed that Mr. McMurray made the statement indicated in an email to Sieracki.  Disputed to the extent that the fact implies that Mr. McMurray stated this information publicly, which implication is not supported by the evidence cited.<br><br>***Evidentiary Objections***<br><br>Vague; Incomplete |
| 193.   Countrywide's January 30, 2007 press release announcing Fourth Quarter 2006 results stated that the Company was "preparing for increased borrower delinquencies and continued credit deterioration" and that the industry "will experience…increased defaults and foreclosures…" | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶ 44.<br><br>• Lefler Decl., ¶ 267, Ex. 264 (January 30, 2007 Press Release, downloaded from SEC website, at 2, 12).<br><br>***SEC Response***<br><br>Undisputed that the quoted statements appear in the press release.  Disputed as to the truth of the matter asserted, which is not supported by the evidence cited. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
|  | ***Evidentiary Objections***<br><br>Incomplete |
| 194.   In the quarterly conference call on January 30, 2007, in response to a question whether Countrywide's guidance for 2007 "reflect your expectations for increase delinquencies and continued credit deterioration," Sieracki said that it did: "…we also expect this loan season—which we expect the portfolio to season during '07—that delinquencies will go up.  And so that's typically baked into our probability models as well." | ***Defendants' Evidence***<br><br>• Lefler Decl., ¶ 89, Ex. 88 (Transcript of Countrywide Financial Corp., Q4 2006 Earnings Call) at 27-28, CFCNYF00019449-50.<br><br>***SEC Response***<br><br>Undisputed that the quoted statements appear in the press release.  Disputed as to the truth of the matter asserted, which is not supported by the evidence cited.<br><br>***Evidentiary Objections To The Transcript Text***<br><br>Incomplete; Hearsay |
| 195.   In the quarterly conference call on January 30, 2007, Sambol disclosed: "for the most part a liberal credit environment over the last several years all of which is now–as rates are going up, as credit is tightening, is going to contribute in our view to continued pressure on | ***Defendants' Evidence***<br><br>• Lefler Decl., ¶ 89, Ex. 88 (Transcript of Countrywide Financial Corp., Q4 2006 Earnings Call) at 27, CFCNYF00019449-50.<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that the |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| delinquencies and defaults and associated credit risk." | quoted statements appear in the transcript of the earnings call. Disputed to the extent that the statement is unintelligible and presented without context. The question to which Sambol was responding related to Countrywide's 2008 earnings guidance, as partially indicated in the sentence immediately following the quoted text. In addition, Sambol went on to say that Countrywide's earnings assumptions were based on a belief that the housing market would improve and "temper some of the pressure on delinquencies and defaults." Lefler Decl., ¶ 89, Ex. 88 at 1453. **_Evidentiary Objections_** Unintelligible; Incomplete; Hearsay |
| 196.   The 2006 10-K, as filed on March 1, said that Countrywide expected delinquencies to increase for many reasons, including under the headings**, "_We may experience credit_** | **_Defendants' Evidence_** • Lefler Decl. ¶ 5, Ex. 4 (2006 10-K) at 36-37, 108. **_SEC Response_** Disputed in part. Undisputed that the |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| *losses due to downward trends in the economy and in the real estate market,"* and *"Impact of Decline in Credit Performance."* | heading "We may experience credit losses due to downward trends in the economy and real estate market" appear s in the Form 10-K.  Disputed as to the balance of the fact which is not supported by the evidence cited.  **Evidentiary Objections**  Unintelligible; Incomplete |
| 197.   The 2006 10-K stated that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency." | Undisputed that these words appear in the 2006 Form 10-K. |
| 198.   Sieracki knew that the general expansion of guidelines already was well-known via the massive public disclosures about Countrywide and the industry (including disclosures from McMurray). | **Defendants' Evidence**  • Sieracki Decl. ¶¶ 11-13.  **SEC Response**  Disputed in part.  Undisputed that the heading "We may experience credit losses due to downward trends in the economy and real estate market" appear s in the Form 10-K.  Disputed as to the balance of the fact which is not supported by the evidence cited.  **Evidentiary Objections** |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Foundation; Legal Conclusion; Vague as to time; Conclusory |
| 199.   Sieracki signed registration statements for Countrywide subsidiaries that issued mortgage-backed securities.   He believed that the prospectus supplements for these securitizations, which were filed with the SEC, were accessible to Countrywide investors. | **Defendants' Evidence**<br><br>Sieracki Decl. ¶ 12.<br><br>**SEC Response**<br><br>Disputed in part.  Undisputed that Sieracki signed registration statements.  Disputed as to the balance of the fact, which is not supported by competent evidence.<br><br>**Evidentiary Objections**<br><br>Foundation; Legal Conclusion; Vague as to time; Argumentative |
| 200.   The written Disclosure Controls and Procedures designated Michael Udovic as the SEC Lawyer responsible for many elements of the disclosure process. | **Defendants' Evidence**<br><br>• Lefler Decl. ¶ 113, Ex. 112 (Plaintiff Securities and Exchange Commission's Supplemental Responses to Defendant Eric Sieracki's First Set of Requests for Admissions) at 3:6-10, Response to Request for Admission No. 17 (Udovic was SEC Lawyer);<br><br>• Lefler Decl. ¶ 18, Ex. 17 (Transcript of May 6, 2010 Deposition of Anne |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | McCallion) at 69:12-21 (Udovic was SEC Lawyer), *id.* at 63:22-64:16 (Udovic had responsibilities of disclosure and compliance with regulation), *id.* at 17 (Udovic assisted officers and employees in understanding that the disclosures must contain all material information necessary to make the statements, in light of the circumstances under which they were made, not misleading and that disclosures including financial information must provide a fair presentation of the Company's financial position and results);<br><br>• *See*, *e.g.*, Lefler Decl. ¶ 256, Ex. 253 (Countrywide Financial Corporation, Disclosure Controls and Procedures, revised and effective as of September 2006, at 5).<br><br>***SEC Response***<br><br>Disputed in part.  Undisputed that Mr. Udovic was the lawyer identified as the "SEC Lawyer" in |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Countrywide's disclosure controls for the relevant period. Disputed as to the balance of the fact, which is not supported by the evidence cited. |
| 201.   At the same time Udovic was reviewing the draft 2005 10-K, he expressly informed Sieracki that detailed information about Countrywide's loans and loan standards had been and was being made publicly available through presentations to investors, never advised Sieracki that this type of information was required to be in the 10-K. | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶¶ 18-20;<br><br>• Lefler Decl. ¶ 268, Ex. 265 (including February 8, 2006 email from Udovic to Sieracki *et al.* attaching, *inter alia,* presentation on "Countrywide's Pay-Option ARM," CFCP000036912-48).<br><br>**SEC Response**<br><br>Disputed. This fact is not supported by the evidence cited.<br><br>***Evidentiary Objection***<br><br>Hearsay; Unintelligible; Compound |
| 202.   No lawyer within Countrywide, including the Company's chief lawyer, Sandor Samuels (whose name appeared on the cover of many of the registration statements) and the General Counsel, Susan Bow (who served on the Disclosure Committee | ***Defendants' Evidence***<br><br>• Sieracki Decl. ¶ 21.<br><br>**SEC Response**<br><br>Disputed. This fact is not supported by the evidence cited.<br><br>***Evidentiary Objection*** |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| with Udovic and Sieracki) ever advised Sieracki that this type of information was required to be in the 10-K. | Lack of Foundation; Hearsay; Unintelligible; Compound |
| 203.   Sandor Samuels is listed as the Chief Legal Officer for Countrywide on the cover of S-3 Registration Statements signed by Sieracki. | Undisputed. |
| 204.   In February 2007, the Chief Accounting Officer, Laura Milleman, informed Sieracki that the reporting group was working on incorporating McMurray's suggestions into the 10-K. | ***Defendants' Evidence***<br><br>• Lefler Decl. ¶ 272, Ex. 269 (February 2007 Memorandum from Laurie Milleman to David Sambol, Eric Sieracki and Kevin Bartlett, CFCP006729924 - CFCP006729925).<br><br>***SEC Response***<br><br>Disputed.  This fact is not supported by the evidence cited.  The reference to Mr. McMurray appears in a discussion of work being done with respect to a "non-performing asset schedule that was pulled from the press release."  Lefler Decl. ¶ 272, Ex. 269 at 2992 (6th bullet point) |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
|  | ***Evidentiary Objection***<br><br>Lack of Foundation; Hearsay;<br>Unintelligible; Compound |
| 205.   Milleman and her supervisor, Anne McCallion, told Sieracki that edits had been proposed to a section for which McMurray had previously provided language.  Sieracki reported this to McMurray, and noted that there was time to discuss it if he thought the text needed to be included. | ***Defendants' Evidence***<br><br>Sieracki Decl. ¶ 45.<br><br>***SEC Response***<br><br>Disputed in part.  The evidentiary record reflects that Milleman and McCallion informed Sieracki that Sambol had edited the text, and that Sieracki conveyed to McMurray that Sambol had "slashed" language regarding underwriting for affordability.  Sieracki had no specific recollection of what he said to McMurray on the subject.<br><br>***SEC Evidence***<br><br>• McCoy Decl. ¶ 22, Ex. 212 (McMurray Dep. Ex. 790)<br><br>• McCoy Decl. ¶ 76, Exh. 266 (McMurray Dep. Trans.  227:19-228:1)<br><br>Q.    Do you recognize Exhibit 790?<br><br>A.    These -- these appear to be pages out of -- handwritten pages out of a |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | spiral notebook that belonged to me.

Q.     Okay. And is this your handwriting that appears in Exhibit 790?

A.     It is.

- McCoy Decl.¶ 76, Ex. 266 (McMurray Dep. Trans. 229:16-232:16)

Q.     And if you turn to the page ending in 1151. Bottom left-hand corner there's some abbreviations at the top underlined.

A.     Okay.

Q.     There's some abbreviations of "ES," "KB" --

A.     Eric Sieracki, Kevin Bartlett, John McMurray, Rod Williams.

Q.     Okay. And the -- the date is February 26th?

A.     That -- that is the date.

Q.     Is this your handwriting in the bottom left-hand corner?

A.     It's my handwriting.

Q.     And do you know what year this 2-26 notation was made?

A.     I believe that it was 2007. |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | Q.     And can you read the comment that's in this box? |
| | A.     "ES said DS had 'slashed' some of the credit text, especially widened guidelines for affordability."  And then it says "KB's" -- "KB's office." |
| | Q.     Who is KB? |
| | A.     Kevin Bartlett. |
| | Q.     Do you recall a meeting in Mr. Bartlett's office on February 26, of '07? |
| | A.     Actually, as I thought back on it, I thought it was in Eric's office, but -- but I suspect it was here because that's what the notes say.  Those -- their offices were next to one another at -- at one point in time. |
| | Q.     Do you recall when you made this notation in the bottom left-hand corner? |
| | A.     You mean the time of day? |
| | Q.     No, just the date.  Did you think you made it -- |
| | A.     Oh. |
| | Q.     Do you think you made -- |
| | A.     Everything in the box would have been made at the same time. |
| | Q.     Okay. And to the best of your |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
|  | recollection would that have been made on February 26, '07? |
|  | A.    I tried to label these dates in a -- in a way where the -- where whatever was -- whatever I was taking notes on reflected that date. |
|  | Q.    So the notes reflected in this exhibit, were they made by you contemporaneously with observations you were making? |
|  | A.    Yes, as the conversation was unfolding. |
|  | Q.    Okay. So do you recall what was going on that prompted you to make this comment? |
|  | A.    My recollection -- and this -- and this ties to some of the other things that we talked to a little earlier.  Greg Hendry had -- had worked up more voluminous text for -- I think this actually was for the 10-K, is – is my recollection, but he had -- he had worked up more voluminous text -- text working with me and others, and then that was incorporated into the various drafts.  And as I explained before, the |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | drafts went through a series of review before they were finalized.  And my recollection about this conversation is the portion of the review that included Dave looking through the entire text proposed for the 10-K and then -- and then Eric just relating back his, you know, comments and what the plans were.<br><br>Q.    So you recall Eric telling you that Mr. Sambol had slashed some of the credit text having to do with widened guidelines for affordability?<br><br>A.    I do, and -- and the reason the "slashed" is in quotes is I think that's -- that's the way Eric had described it.  I mean, that's the -- that's the term he had used, not -- not -- that's not one that I made up.  Again, that's why I put it in quotes.<br><br>• McCoy Decl. ¶ 90, Exh. 280 (Sieracki Dep. Trans. 220:24-223:8)<br><br>Q. Now, you also described earlier a conversation, sort of an informal meeting that you had with Mr. -- I'm |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | sorry, with Ms. McCallion and Ms. Milleman regarding some potential edits to disclosure language.  And that was in February of 2007; is that right? |
| | A.  I believe so. |
| | Q.  And what -- how did the topic of disclosure language come up in that meeting with Ms. McCallion and Ms. Milleman? |
| | A.  I'll try to give some context instead of just jumping into what happened and point out that it was near the finalization of the 2006 10-K.  And you have got dozens and dozens, scores of reviewers.  And trying to get this document finalized is a difficult task.  And they called me in and they pointed out -- I believe Mr. Sambol had made the suggestion for certain language changes.  And while they were okay with it, they felt that it was appropriate to communicate this forward to Mr. McMurray.  And I am repeating myself now that I had some other reason to chat with him.  And it was mutually agreed |

241

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
|  | that I would pass this information along. |
|  | Q.  And in that conv- -- and then you went and spoke to Mr. McMurray in Mr. Bartlett's office; is that right? |
|  | A.  That's my recall, is that I believe it was -- because they were next door to one another.  I am pretty sure it was Mr. Bartlett's office. |
|  | Q.  And was there anyone else in the room when you had this conversation besides Mr. Bartlett, yourself and Mr. McMurray? |
|  | A.  There might have been.  I wasn't there very long. |
|  | Q.  And what -- and do you recall what language, disclosure language was at issue? |
|  | A.  I think it was around -- |
|  | MS. PHILLIPS:  Excuse me.  Objection.  Foundation, speculation. |
|  | THE WITNESS:  I think it was around underwriting guidelines. |
|  | Q.  Do you recall what the language change that was being discussed was? |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| | MS. PHILLIPS:  Objection. Foundation, speculation.<br><br>THE WITNESS:  Not specifically.<br>Q.  Okay.  And you informed Mr. McMurray that his suggested language had been edited by someone else; is that correct?<br><br>MS. PHILLIPS:  Objection. Mischaracterizes testimony.<br><br>THE WITNESS:  I believe I communicated that edits had been suggested.<br>Q.  And you communicated that those edits had been suggested by Mr. Sambol; is that correct?<br>A.  That's right.<br><br>*Evidentiary Objection to Sieracki's Declaration:*<br>Hearsay |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| 206.   McMurray did <u>not</u> object to the editing of the text, even as he continued to make suggestions regarding other portions of the draft 10-K. | Undisputed that McMurray did not express any further objections and that he continued to advocate for more fulsome disclosures. |
| 207.   McMurray certified the 2006 10-K as being accurate and not misleading. | ***Defendants' Evidence***<br>• Lefler Decl. ¶ 236, Ex. 233 (John McMurray's Senior Executive Officer's Certification for the Annual Report on Form 10-K for the year ended December 31, 2006).<br>***SEC Response***<br>Disputed in part.  Undisputed that McMurray signed a sub-certification. Disputed as to Defendants' characterization of the sub-certification, which is not supported by the evidence cited. |
| 208.   Milleman signed the 2006 10-K. | Undisputed. |
| 209.   Sieracki signed the 2006 10-K once it was presented to him by Legal with a representation that all certifiers | ***Defendants' Evidence***<br>Sieracki Decl. ¶ 46.<br>***SEC Response*** |

| Sieracki's Statement | Evidence Cited by Sieracki and SEC Response |
|---|---|
| had certified it. | Disputed in part.  Undisputed that Sieracki signed the 2006 form 10-K.  Disputed as to the balance of the fact, which is not supported by the evidence cited.  ***Evidentiary Objection To Paragraph 46 of Sieracki Decl.:***  Compound; Lacks Foundation |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 210.   Countrywide's Forms 10-K for 2005, 2006, and 2007 disclosed that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted the Company's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." These statements were false, because defendants knew that a significant portion of Countrywide's loans were being made as exceptions to Countrywide's already extremely broad underwriting guidelines. | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. Ex. 156 (2005 10-K)) at pp. 92-93 Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) at pp. 100-101 Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) at pp. 116-17 |
| 211.   Countrywide's Forms 10-K for 2005 and 2006 disclosed that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages."  This statement was false, because, as set forth in detail above, Mozilo, Sambol, and Sieracki were aware that Countrywide was | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. Ex. 156 (2005 10-K)) at pp. 15, 101 Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) at pp. 16, 117 |
| originating increasing percentages of poor quality loans that did not comply | |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| with Countrywide's underwriting guidelines. | |
| 212.   The definition of "prime" loans in Countrywide's 2005, 2006, and 2007 Forms 10-K was:<br><br>*Prime Mortgage Loans*— These are prime credit quality first-lien mortgage loans secured by single-family residences.<br>* * *<br>Prime Mortgage Loans include conventional mortgage loans, loans insured by the Federal Housing Administration ("FHA") and loans guaranteed by the Veterans Administration ("VA"). A significant portion of the conventional loans we produce qualify for inclusion in guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming loans").  Some of the conventional loans we produce either | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. Ex. 156 (2005 10-K)) at p. 2<br>Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) at p. 2<br>Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) at p. 2 |
| have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans ($417,000 for 2006) or otherwise do | |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| not meet Fannie Mae or Freddie Mac guidelines.  Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred to as "nonconforming loans. | |
| 213.   Countrywide's 2006 Form 10-K contained the misrepresentation that "[w]e believe we have prudently underwritten" Pay-Option ARM loans despite Mozilo's resounding internal alarms regarding the reliance on stated income and his and Sambol's knowledge that borrowers were misstating their incomes. | Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) at p. 106 |
| 214.   Mozilo signed the Forms 10-K for the years ended 2005, 2006, and 2007. | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. Ex. 156 (2005 10-K)) <br> Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) <br> Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) |
| 215.   Sieracki and Mozilo signed Sarbanes-Oxley certifications for each Form 10-Q and 10-K from January 1, 2005 though the Form 10-K for the year ended December 31, 2007. | Dean Decl., ¶ 62, Ex. 60 (SEC Inv. Test. Ex. 194 (1Q 2005 certs)) <br> Dean Decl., ¶ 63, Ex. 61 (SEC Inv. Test. Ex. 195) (2Q 2005 certs.)) <br> Dean Decl., ¶ 64, Ex. 62 (SEC Inv. Test. Ex. 196 (3Q 2005 certs.)) <br> Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Ex. 156 (2005 10-K certs.)) |
| | Dean Decl., ¶ 69, Ex. 67 (SEC Inv. Test. Ex. 700 (Sieracki 1Q 2006 cert.)) |
| | Bendell Decl., ¶ 27, Ex. 319 (Mozilo 1Q 2006 cert.) |
| | Dean Decl., ¶ 65, Ex. 63 (Depo. Ex. 576 (2Q 2006 certs.)) |
| | Dean Decl., ¶ 70, Ex. 68 (SEC Inv. Test. Ex. 701 (Sieracki 3Q 2006 cert.)) |
| | Bendell Decl., ¶ 28, Ex. 320 (Mozilo 3Q 2006 cert.) |
| | Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245 (2006 10-K certs.)) |
| | Bendell Decl., ¶ 29, Ex. 321 (1Q 2007 certs.) |
| | Dean Decl., ¶ 66, Ex. 64 (SEC Inv. Test. Ex. 584 (2Q 2007 certs.)) |
| | Bendell Decl., ¶ 30, Ex. 322 (3Q 2007 certs.) |
| | Bendell Decl., ¶ 31, Ex. 323 (Mozilo 2007 10-K cert.) |
| | Dean Decl., ¶ 71, Ex. 69 (SEC Inv. Test. Ex. 704 (Sieracki 2007 10-K cert.)) |
| 216.   Sieracki signed all of the Forms 10-Q and 10-K starting in the first quarter of 2005 and throughout 2007. | Dean Decl., ¶ 62, Ex. 60 (SEC Inv. Test. Ex. 194 (1Q 2005 10-Q)) |
| | Dean Decl., ¶ 63, Ex. 61 (SEC Inv. Test. Ex. 195 (2Q 2005 10-Q)) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Dean Decl., ¶ 64, Ex. 62 (SEC Inv. Test. Ex. 196 (3Q 2005 10-Q)) |
| | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. Ex. 156 (2005 10-K)) |
| | Dean Decl., ¶ 50, Ex. 48 (Depo. Ex. 324) (1Q 2006 10-Q)) |
| | Dean Decl., ¶ 51, Ex. 49 (Depo. Ex. 328) (2Q 2006 10-Q)) |
| | Dean Decl., ¶ 52, Ex. 50 (Depo. Ex. 332) (3Q 2006 10-Q)) |
| | Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) |
| | Dean Decl., ¶ 48, Ex. 46 (Depo. Ex. 229) (1Q 2007 10-Q)) |
| | Dean Decl., ¶ 53, Ex. 51 (Depo. Ex. 349) (2Q 2007 10-Q)) |
| | Dean Decl., ¶ 61, Ex. 59 (SEC Inv. Test. Ex. 147) (3Q 2007 10-Q)) |
| | Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) |
| 217.  Eric Sieracki reviewed in detail and participated in the drafting of Countrywide's Forms 10-Q and 10-K for the period ended March 31, 2005 through the fiscal year ended December 31, 2007. | Dean Decl., ¶ 62, Ex. 60 (SEC Inv. Test. Ex. 194 (1Q 2005 10-Q)) |
| | Dean Decl., ¶ 63, Ex. 61 (SEC Inv. Test. Ex. 195 (2Q 2005 10-Q)) |
| | Dean Decl., ¶ 64, Ex. 62 (SEC Inv. Test. Ex. 196 (3Q 2005 10-Q)) |
| | Dean Decl., ¶ 47, Ex. 45 (SEC Inv. Test. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Ex. 156 (2005 10-K)) |
| | Dean Decl., ¶ 50, Ex. 48 (Depo. Ex. 324) (1Q 2006 10-Q)) |
| | Dean Decl., ¶ 51, Ex. 49 (Depo. Ex. 328) (2Q 2006 10-Q)) |
| | Dean Decl., ¶ 52, Ex. 50 (Depo. Ex. 332) (3Q 2006 10-Q)) |
| | Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K)) |
| | Dean Decl., ¶ 48, Ex. 46 (Depo. Ex. 229) (1Q 2007 10-Q)) |
| | Dean Decl., ¶ 53, Ex. 51 (Depo. Ex. 349) (2Q 2007 10-Q)) |
| | Dean Decl., ¶ 61, Ex. 59 (SEC Inv. Test. Ex. 147) (3Q 2007 10-Q)) |
| | Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) |
| | McCoy Decl., ¶ 91, Ex.281 (Sieracki Inv. Test. 258:21-260:6 Q   I am going to hand you what has previously been marked as Exhibit 194 It's a copy of the Form 10-Q for Countrywide Financial Corporation for the period ended March 31, 2005.  And my first question is, have you ever seen Exhibit 194 before? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A    Yes. |
| | Q    And did you have any role in the preparation or review of Exhibit 194 before it was filed? |
| | A    I was appointed CFO April 1 of '05. I would not have been involved in the -- scratch that.  I am uncertain as to how in depth my role was in the closing of the books early in April of '05.  I believe I was involved in reviewing this document since it would have been filed in May of '05.  I believe I would have reviewed this. |
| | Q    Well, if you turn to page 65 of 65, that's the numbering scheme at the top of the page – |
| | MR. MORGAN:  So 65, the last page? |
| | THE WITNESS:  The last page. |
| | MS. DEAN:  It's actually -- there are some exhibits attached, so it's sort of five pages from the end. |
| | BY MS. DEAN: |
| | Q    It appears -- this is the electronic version of this.  But it appears that you and Stanford Kurland signed this particular 10-Q.  So would it have been your practice to review the document |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | before signing it? |
| | A   Yes. |
| | Q   And then also if you look at -- if you look -- let's see, three more pages, Exhibit 31.2, which is the -- it looks like it's the fourth page from the end, there is a certification there on behalf of Eric Sieracki, again with an electronic signature on the third page from the end. Did you certify this particular 10-Q? |
| | A   Yes.  As I mentioned earlier, I was fairly certain about my involvement in the review of this document.  My role in the closing of the books, I'm less certain about.<br><br>McCoy Decl., ¶ 91, Ex.281 (Sieracki Inv. Test. 299:11-299:21)<br><br>Q   I am handing you what has previously been marked as Exhibit 195. Exhibit 195 is a copy of the Form 10-Q for Countrywide Financial Corporation for the period ended June 30, 2005. Have you ever seen Exhibit 195 before?<br><br>A   I have.<br><br>Q   And did you have any role in its preparation?<br><br>A   I would have been a reviewer. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q    And did you also sign the 10-Q? |
| | A    Yes. |
| | Q    And did you also certify the 10-Q? |
| | A    Yes. |
| | Sieracki Inv. Test. 308:5-13 |
| | Q    I am handing you what has been previously marked as Exhibit 196.  It's a copy of the third quarter 2005 10-Q for Countrywide Financial Corporation.  Have you ever seen Exhibit 196 before? |
| | A    Yes, I have. |
| | Q    Did you have any role in its preparation or finalization? |
| | A    I would have reviewed a draft.  I would have signed it and I would have signed the certification. |
| | McCoy Decl., ¶ 91, Ex.281 (Sieracki Inv. Test. 315:21-316:4) |
| | Q    I am handing you what has previously been marked as Exhibit 197.  For the record, this is a copy of the 10-K for the period ended December 31, 2005.  And I'll ask if you've ever seen Exhibit 197 before? |
| | A    I have. |
| | Q    And did you have any role in its preparation? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A   I would have reviewed the document, I would have reviewed a draft of the document, I would have signed it and interview d have signed the certification.<br>McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 345:20-346:2 )<br>Q   Exhibit 233 is a copy of the form 10-Q for Countrywide Financial |
| | Corporation for the period ended March 31, 2006.  Mr. Sieracki, have you ever seen Exhibit 233 before?<br>A   I would have reviewed a draft of the document.  I would have signed the document and I would have signed the certification related to the document<br>McCoy Decl., ¶ 91, Ex.281 (Sieracki Inv. Test. 378:25-379:8)<br>Q   Let me hand you what has previously been marked as Exhibit 1033.  For the record, 1033 is a copy of the Form 10-Q for Countrywide Financial Corporation for the period ended June 30, 2006.  Mr. Sieracki, have you ever seen Exhibit 1033 before?<br>A   I would have reviewed a draft of of this document.  I would have signed it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | and I would have signed the certification related to it. |
|  | McCoy Decl., ¶ 91, Ex.281 (Sieracki Inv. Test. 455:2-16) |
|  | Q    I am handing you now what has been marked as Exhibit 1034.  Exhibit 1034 is a copy of the form 10-Q for Countrywide Financial for the period ended September 30, 2006.  Have you ever seen Exhibit 1034 before? |
|  | MR. MORGAN:  I just want to make the point before he answers, we yesterday discussed at the beginning of the testimony that excluded from his answers to the question "have you seen this document" would be instances in which he saw the document in connection with our meeting with him. So if we could continue that, that would be – |
|  | MS. DEAN:  Correct.  That's my understanding. |
|  | MR. MORGAN:  Thank you.  Great. Thanks. |
|  | THE WITNESS:  I reviewed a draft of Exhibit 1034. I signed the document and I signed the certification related to the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | document. |
| | McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 139:1-140:25) |
| | Q   Let's take a look at the 2006 10-K. I am handing you what has previously been marked as Exhibit 41, which is a copy of the Countrywide Financial Corporation Form 10-K for the period ended December 31st, 2006. (SEC Exhibit 41 was referred to.) |
| | BY MS. DEAN: |
| | Q   Now, I know you've referenced this document a couple of times so far today. Can you just describe for me briefly what your role was in the preparation of the 10-K. |
| | A   When the -- well, in the process of closing the books at a quarter end, the real driver was the issuance of the Q or the K.  And in the middle, it just so happened to be the release of earnings and the distribution of appropriate of supplemental -- a supplemental presentation like that.  But we very carefully calibrated, because we closed later than the typical financial institution.  They're generally cutting |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | off a month earlier in the quarter and they're closing, many of them, on the second day, and they're announcing it on the 15th calendar day.  We're generally closing, pre-crisis, 10th to 13th.  Post-crisis, we're generally closed around the 15th, but there might have been -- one each quarter there seemed to be one thing at the last minute where we |
| | reopened on the 20 something.  So we were generally a later reporter than the others. So it was finally calibrated and laid out when Laurie was going to get it for review, when Anne was going to get it for review, for when I was going to get it for review.  And pre-crisis, I got it before the board, and they turned my changes.  Crisis, we we're closing later and they didn't have a chance to prepare this so that I was concurrent with the board.  Okay?  I might get it a couple of days before, but they wouldn't get my changes processed into it and it would be distributed to the board, and then I would submit my changes.  So I had a specified -- you know, usually like two-day period where I would read this |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | entire thing.  And I would review it, either with Anne or Laurie, give them my comments going page by page.<br><br>Q   Okay.  So you did review the 2006 10-K and you did make comments on certain sections of it; correct? |
| | A   Very, you know, detailed markups that should be in my files.<br><br>McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 548:3-548:9)<br><br>Q   Okay.  I've handed you what has been marked previously as Exhibit 1035.  This is a copy of the 10-Q for the period ended March 31, 2007.  Did you have any role in the preparation of this document?<br><br>A   I would have reviewed a draft.  I would have signed the document, I believe.  And I would have signed the certification related to it.<br><br>McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 567:14-18<br><br>Q   I think I asked you if you had any role in the preparation of Exhibit 146 [Form 10-Q for period ended June 30, 2007]?<br><br>A   I would have reviewed a draft of |

259

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | this document and I would have signed |
| | this document and I would have signed |
| | a certification related to this document. McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 587:13-21) |
| | Q   Let me hand you what has previously been marked as Exhibit 147. Exhibit 147 is a copy of the 10-Q for the third quarter of 2007.  And I will ask you if you have ever seen Exhibit 147 before? |
| | A   Yes, I have. |
| | Q   And did you have any role in its preparation? |
| | A   I reviewed a draft of this document. I signed this document, and I signed a certification related to this document. McCoy Decl., ¶ 91, Ex. 281 (Sieracki Inv. Test. 599:15-21) |
| | Q   I am handing you now the 10-K for the period ended September 31, 2007.  It has been marked previously as Exhibit 198.  Did you have any role in the preparation of this document? |
| | A   Yes, I would have read a draft of this, I would have signed it and I would have signed a certification related to it. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 218.   Sambol signed the Forms 10-Q for the third quarter of 2006 and all of the quarters in 2007, as well as the Form 10-K for the year ended 2007 | Dean Decl., ¶ 52, Ex. 50 (Depo. Ex. 332) (3Q 2006 10-Q))<br><br>Dean Decl., ¶ 49, Ex. 47 (Depo. Ex. 245) (2006 10-K))<br><br>Dean Decl., ¶ 48, Ex. 46 (Depo. Ex. 229) (1Q 2007 10-Q))<br><br>Dean Decl., ¶ 53, Ex. 51 (Depo. Ex. 349) (2Q 2007 10-Q))<br><br>Dean Decl., ¶ 61, Ex. 59 (SEC Inv. Test. Ex. 147) (3Q 2007 10-Q))<br><br>Dean Decl., ¶ 45, Ex. 43 (Depo. Ex. 156) (2007 10-K)) |
| 219.   The transcript of Countrywide Financial Corporation's ("Countrywide" or "CFC") Fourth Quarter 2003 Earnings call held on January 27, 2004 quotes Mozilo as stating "Our goal is market dominance and we are talking 30 percent origination market share by 2008 to support our macro hedge strategy" | McCoy Decl., ¶ 4, Ex. 194, at (Hesser Depo. Ex. 5 at p. 4). |
| 220.   The transcript of Countrywide's Fourth Quarter 2003 Earnings call held on January 27, 2004 quotes Mozilo as stating:<br><br>   Going for 30% mortgage share | McCoy Decl., ¶4, Ex. 194 (Hesser Depo. Ex. 5 at p. 11) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| here is totally unrelated to quality of loans we go after. . . .  There will be no compromise by this company in the overall quality of the product line, you know, which manifests itself in delinquencies | |
| and foreclosures. There will be no compromise in that as we grow market share.  Nor is there a necessity to do that. | |
| 221.   On September 1, 2004,  Mozilo wrote an e-mail to Stan Kurland and Keith McLaughlin in which he stated: <br> As I look at production trends, not only at Countrywide, but also with other lenders, there is a clear deterioration in the credit quality of loans being originated over the past several years.  In addition, from my point of view, the trend is getting worse as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate. | McCoy Decl., ¶6, Ex. 196, at (Hesser Depo. Ex. 30). |
| 222.   The transcript of the March 15, 2005 Piper Jaffray Investor Conference quotes Mozilo as saying: "I will say | McCoy Decl., ¶36, Ex. 226, at (Class Action Ex. 271 at p. 6). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| this to you that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share." | |
| 223.   The transcript of Countrywide's Second Quarter 2005 Earnings call held on July 26, 2005 quotes Mozilo as stating:<br><br>I am not aware of any change of substance in underwriting policies. If they are referring to the fact that we are participating in pay-option and I/O product and they are defining that as a loosening of standards, if that is the definition, then that would be correct.  We are a big player in the pay-option and I/O product.  I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past. | Bendell Decl., ¶ 33, Ex. 325 |
| 224.   At a Q2 2004 meeting of CFC's Corporate Credit Risk Committee ("CCRC"), CFC's Chief Credit Officer, John McMurray, delivered a presentation entitled "Credit Risk is | Dean Decl., ¶126, Ex. 124 (Aguilera Depo. Ex. 143)<br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran., 178:25-180:17)<br>Q.    I'm going to show you an exhibit |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Increasing." | I've already marked as No. 143.  These are some presentation materials associated with a meeting of the Countrywide credit risk management committee for the second quarter of 2004.  We're going to spend all our time on the first four pages.  Do you recognize Exhibit 143?<br>A.    I do recognize it.<br>Q.    Is this a presentation that you put together?<br>A.    I would have put together many elements of this personally, but also would have relied on -- on lots of other folks to -- to help me assemble different pieces of it.<br>Q.    Okay.<br>A.    Most -- many of whom worked in -- in my group. |
|  | Q.    Okay.  If you turn to the third page.  Are these your observations that appear on<br>the third page?<br>A.    These -- these are my observations that appear on the third page.<br>Q.    So as of the second quarter of 2004 had you concluded that credit risk |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | was increasing at Countrywide? A.    That was -- that was my conclusion that I -- that I shared both here, and then I -- I also recollect putting together an e-mail for Keith McLaughlin. Q.    Okay.  When you say that you shared both here and an e- mail, do you mean within the context of this exhibit? A.    Well, I mean within the context of this meeting that we had, so this -- this deck, this presentation was put together, and then -- and then we had the credit risk meeting and went through the deck. That was the typical pattern at Countrywide. |
| | Q.    Okay.  And holding aside the bullet point that states "Context," the remaining bullet points, are they outlining the reasons why you think that credit risk was increasing at Countrywide? A.    They are, but I'm uncom -- the reason context is there is to provide context, so I hate to hold that aside. |
| 225.   In the presentation, McMurray identified the reasons that CFC's credit | Id. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| risks were increasing. | |
| 226.   According to McMurray, the quality of CFC originated loans was deteriorating as (1) underwriting standards had become more aggressive; and (2) more loans were being originated under riskier loan programs, with riskier features and at higher CLTVs. | Dean Decl., ¶126, Ex. 124 (Aguilera Depo. Ex. 143). |
| 227.   McMurray explained to CFC's senior executives, including Sieracki and Sambol, that as underwriting guidelines expand, the probability of a loan going into default or serious delinquency increase. | McCoy Decl., ¶76, Ex. 266 (McMurray SEC Dep., 73:11-77:2, 114:15-23)<br>Q.    BY MR. WYNN:  So am I correct that there's a -- do you feel there's relationship between expanding underwriting guidelines and a probability of a loan going to default or serious delinquency?<br>A.    I do.  I prefer to get into some of the specifics, if we could, rather than the generalities, but, yes, as a general matter I -- I believe that to be the case, and it's what I've found on the –<br>Q.    And as a general --<br>THE REPORTER:  I'm sorry.  On a –<br>THE WITNESS:  Over the – over the course of my career.<br>Q.    BY MR. WYNN:  I'm sorry I cut |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you off.  And as a general matter, what is the relationship between expanding underwriting guidelines and the probability of a loan going into default and -- or serious delinquency? |
| | MS. WEISS:  Objection.  Overly broad. THE WITNESS:  We have to be -- so generally there's going to be a positive correlation there, but we need to be very, very careful just because -- so let's -- let's suppose as an example that the underwriting guidelines got expanded. That doesn't necessarily mean that every loan or even most of the loans are going to be originated at the boundary of those guidelines.  So -- so what you'd find is that many of the loans would have been originated with much the same terms that they would have had previously. So while I -- you know, I do agree that there's a correlation there and would be happy to spend as much time as you want on this, I just want -- I want to be careful that, you know, we're mindful of the specifics, that's all. Q.    BY MR. WYNN:  Okay. And you agree there is a positive |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | correlation between expanding underwriting guidelines and expected defaults and delinquencies? |
| | MS. WEISS:  Objection.  Overly broad. THE WITNESS:  Yes, generally, but I -- Q.    BY MR. WYNN:  I understand. A.    -- would love to get into the specifics so I could answer more precisely. Q.    We're under kind of a short leash today, so -- A.    I've been told. Q.    All right.  And how do you know that there's a positive relationship between expanding underwriting guidelines and expected defaults and delinquencies? A.    For me the -- the most compelling source of that opinion are various research projects, studies and analyses that I've been part of over the years. And let me just add, and this is an important add, my preference would be if you use "attribute" rather than "guideline."  A guideline is just a standard that a loan gets measured against.   And so, you know, what's high |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | blood pressure?  I'd rather -- the doctor would rather know what your blood pressure specifically is rather than just saying that you have high blood pressure.  So -- so the expand -- if the attributes are -- are expanding, that I think is a -- is an easier way to think about it and talk about it, at least for me.  But that -- there is a connection, obviously, between guidelines and attributes.  So that's how I see the connection. |
| | Q.    So do widened underwriting guidelines lead to a deterioration in loan attributes? |
| | A.    That's -- that is my -- that's been my observation. |
| | Q.    And did you ever share your opinion that there's relation -- a positive relationship between widened underwriting guidelines and expected defaults and delinquencies internally in Countrywide? |
| | A.    What -- what we looked at and was far more useful to the conversation is actually getting at the attributes and showing -- and showing how those -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | how those affected behavior of the borrowers.   And again, we're talking about seriously --  serious delinquencies and defaults but there's other important behavior, such as prepayments, that you'd want to consider, as well, but those studies on how attributes affected those borrower behaviors were shared inside the company. <br> Q.    Okay. <br> A.    And outside the company. <br> Q.    Were they shared with Mr. Sambol? <br> A.    They -- they were shared with Mr. Sambol. <br> Q.    How about Mr. Sieracki? <br> MS. WEISS:  Objection.  Overly broad. <br> THE WITNESS:  Yes, as I mentioned earlier, he -- he was -- I mean, in any number of ways, I mean, he was present at meetings, internal or external, where those would have been shared. <br> *** <br> Q.    BY MR. WYNN:  Based upon your presence at meetings of the Countrywide corporate credit risk |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | committee, do you think that it was adequately explained to the committee that as Countrywide was expanding its underwriting guidelines the probability of default and delinquency associated with Countrywide-originated loans was increasing?<br><br>MS. WEISS:  Objection.  Lack of foundation.<br><br>THE WITNESS:  I think so.<br><br>MS. WEISS:  And overly broad. |
| 228.   In the Q2 2004 CCRC materials, McMurray noted that CFC's loan and execution mix was deteriorating as (1) HELOC and subprime production was increasing; and (2) CFC was doing more executions where it retained most or a substantive amount of the underlying credit risk. | Dean Decl., ¶126, Ex. 124 (Aguilera Depo. Ex. 143). |
| 229.   Finally, McMurray explained that the environment for credit risk was deteriorating as house price appreciation was unlikely to continue. | Dean Decl., ¶126, Ex. 124 (Aguilera Depo. Ex. 143). |
| 230.   On September 9, 2004, McMurray authored a lengthy e-mail explaining why CFC's credit risks were increasing. | McCoy Decl., ¶10, Ex. 200 (Aguilera Depo. Ex. 149)<br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran., 182:9-183:6, 184:25- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | 185:21) |
| | Q.    Okay.  So why don't we look at that e-mail to Mr. McLaughlin.  I've already marked it as Exhibit 149, and it is, in fact, a September 9th, 2004, e-mail from yourself to Keith McLaughlin.  In color.  Do you recognize Exhibit 149? |
| | A.    I do. |
| | Q.    Looking at the September 9th, '04, e-mail to Mr. McLaughlin, do you recall sending this e-mail to him? |
| | A.    I recall sending it to Keith, yes. |
| | Q.    Can you explain the circumstances surrounding you drafting and then sending this e-mail to Mr. McLaughlin? |
| | A.    I sat -- I sat next door to Keith, and this e-mail came out of a discussion that -- that he had where he was -- and I think that -- my recollection is that the discussion -- that his inquiry was prompted by a discussion that he had had with Angelo, and the discussion |
| | entailed whether credit risk was increasing or decreasing at Countrywide.  And keep in mind, it's the -- it's the net credit risk, so, in other words, what -- what was left at the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | company after the various securitization and insuring activities. |
| | *** |
| | Q.    BY MR. WYNN:  Okay. In this memorandum do you identify the reasons that you had concluded, at least as early as September of 2004, that credit risk was increasing at Countrywide? |
| | A.    What this e-mail is meant to do is cap --capture the -- capture what I thought at this particular point in time, particularly with respect to the -- the question that Keith had posed to me. |
| | Q.    Okay.  So does the memorandum include some of the reasons why you think that credit risk was increasing as of the -- at least as early as September of '04? |
| | A.    It -- it lays out -- it lays out my views, which are a little more detailed |
| | than that, but, you know, I think the -- one -- one conclu -- it says, "Our credit risk is increasing for the reasons outlined below," so that's -- that was what I was attempting to do. |
| | Q.    Okay. Sometimes these questions |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | are just as simple<br>as they sound.  I don't want anything --<br>A.    Okay. |
| 231.   In September 2004, Angelo Mozilo approached Keith McLaughlin and inquired as to whether CFC's credit risks were increasing. | McCoy Decl., ¶10, Ex. 200 (Aguilera Depo. Ex. 149). |
| 232.   McMurray wrote the memorandum in response to Mozilo asking whether CFC's credit risks were increasing or decreasing. | McCoy Decl., ¶10, Ex. 200 (Aguilera Depo. Ex. 149). |
| 233.   In the September 9, 2004 e-mail, McMurray explained that "[l]oan quality is a significant credit risk factor[,]" and noted that CFC's "…move to more aggressive underwriting guidelines have increased risk." | McCoy Decl., ¶10, Ex. 200 (Aguilera Depo. Ex. 149);<br>McCoy Decl., ¶78, Ex. 268 (McMurray Inv. Test. 488:8-24)<br>Q   If we can look at Exhibit No. 200 again, and I am looking at Roman |
| | Numeral III, which has loan quality, and it's on Page 972.  Could you explain how loan quality could constitute a significant credit risk?<br>A   Sure.  The important thing here would be to look at all of the A, B, C, D, et cetera, underneath loan quality, so what I'm doing here is calling out some |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | of the important dimensions of loan quality.  As an example, under Item A under Roman Numeral III, I have CLTV/LTV, and that stands for combined loan to value ratio or loan to value ratio, so this is the idea of leverage, and so the more leverage there is in a transaction, generally the riskier it is, and that's a universal principle that would apply to both consumer debt as well as commercial debt. |
| 234.   Loan quality relates to the likelihood of a loan going into default or serious delinquency. | McCoy Decl., ¶63, Ex.253 (Ingerslev Inv. Test. 64:6-9)<br>Q    Well, holding aside the document, to your knowledge does loan quality relate or bear upon the issue of likelihood of default or serious delinquency?<br>A    That would be one measure of loan quality, yeah. |
| 235.   Between September 2004 and August 2007, the loan quality associated with CFC originated loans decreased. | McCoy Decl., ¶76, Ex.266 (McMurray Dep. Tran., 186:1-17)<br>Q.    Was the deterioration in loan quality one reason why you thought that credit risk was increasing at Countrywide?<br>A.    It is, but, here again, one of the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | things we'd want to keep -- keep in mind, we're talking about the raw loans here, and so just that -- that by itself doesn't necessarily mean the -- the credit risk at Countrywide's increasing, it's that factor crossed with other factors that in my opinion gave rise to the increase in credit risk. Q.   Okay.  With respect to Countrywide-originated loans, did loan quality decrease between September '04 and August '07? A.   Well, if we looked at -- if we looked at all of -- all of the attributes, so not just the loan attributes but the environmental attributes, I -- I would say certainly. |
| 236.   In his September 9, 2004 memorandum, McMurray explained that the quality of CFC originated loans was deteriorating as (1) underwriting standards had become more aggressive; and (2) more loans were being originated under riskier loan programs, with riskier features and at higher CLTVs. | McCoy Decl., ¶10, Ex. 200 (Aguilera Depo. Ex. 149) |
| 237.   Additionally, McMurray noted | McCoy Decl., ¶10, Ex.200 (Aguilera |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| that the economic environment for credit risks was deteriorating as house price appreciation was unlikely to continue and the market's compensation (i.e., credit spreads) for credit risks had declined. | Depo. Ex. 149). |
| 238.   Furthermore, McMurray noted that CFC was doing more executions where it retained credit risk, such as HELOC and subprime production. | McCoy Decl., ¶ 10, Ex. 200 (Aguilera Depo. Ex. 149). |
| 239.   McMurray's September 9, 2004 memorandum was widely shared within CFC. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 796:19-797:10) Q.   Now, John, with respect to Exhibit 200, I just want to make sure I have a clear picture of who received this document from you.  Now, I see the people that are listed. So I understand that Mr. McLaughlin got it, Keith McLaughlin,Carlos Garcia, Jim Furash, Dave Walker, Mr. Rossi, possibly Mr. Muir, Keith Russell, someone named Mike Burak.  And in testimony with Walter Smeihavich, he said he'd received and actually filed an e-mail – A.   Stan Kurland received it. Q.   Stan Kurland, right.  And actually received an e-mail from you and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Smeihavich, or you sent it to him.  But in addition to those individuals, can you |
| | think of anyone else who might have received this e-mail?<br><br>A.    There may have been others, but the ones that you've listed off, I recall --<br><br>Q.    Okay.<br><br>A.    -- sharing it with. |
| 240.   The increasing credit risks described in the September 9, 2004 memorandum worsened between September 2004 and 2007. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 68:3-69:2)<br><br>Q.    Well, if you look again at item three, loan quality.<br><br>A.    Uh-huh.<br><br>Q.    Can you recall if any of the items he lists, such as loan to value ARMs, interest only, if any of these situations -- credit situations improved between 2004 and 2007?<br><br>A.    Meaning, did we do --<br><br>Q.    Meaning did any of these --<br><br>A.    -- did the trends that he's describing change? |
| | Q.    Right.  Did they become less of a credit risk or more of a credit risk?<br><br>A.    The -- for the most part, they became more, not less.  Perhaps the only exclusion to that would be the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | manufactured housing.  We had a specific issue on manufactured housing that we were not -- in the origination process, we were not obtaining the appropriate title to the loans.  So, in most states, when you originate or buy a manufactured home, it's actually titled as an automobile or personal property, and you have to go through a conversion process when we take a loan out.  And we weren't doing that correctly, resulting in our inability to foreclose, and we fixed that problem.  But other than that, everything in here continued on the trajectory that it was on them.  In fact, the trajectory probably increased.<br><br>                                   *** |
| | McCoy Decl, ¶78, Ex. 268 (McMurray Inv. Test. 770:1-772:4)<br>Q.    With respect to any of the items that you've listed in the area of credit risk in Exhibit No. 200, had any of them become less of a risk by 2006?<br>A.    I would say by and large most of them had not, but I don't know that I would go as far as saying "any." |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.   Staying on Page 972 where the heading is "Loan quality" under No. 3, you state that "Loan quality is a significant credit risk factor."  By 2006, was loan quality still a significant credit risk factor?

A.   Loan quality is always a significant credit risk factor.

Q.   Under Item A, the loan to value ratios, did that remain a credit risk factor in 2006?

A.   It did, and if you look here where it talks about underwriting guidelines and then also mortgage scorecard and the underwriting, one of the key things that |
| | would be contemplated in the scorecard or the underwriting process would be the combined or just the ordinary loan to value ratio.

Q.   Item B, under "ARMs," did ARMs remain a credit concern in 2006?

A.   Again, ARMs would always be a-- the adjustment rate feature that we've talked about is always going to pose an incremental credit risk for the reasons that we've talked about.  The product type would be considered by |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | underwriting as well.  In one of the exhibits, and this may have been a couple of days back, that you showed me, maybe on the first day that we talked, there was a grid, and I don't know if you remember that, but I believe that the product type may have been in that grid, so for both the automated scorecard or the manual scorecard that's referenced on the bottom of Page 100 of Exhibit No. 41, the underwriting would have considered product type too, of which ARM is a key dimension of product type. |
| | Q.   In answer to my question, which was did the ARM product remain a credit risk concern in 2006, your answer would be-- A.   An ARM versus a fixed rate is a credit risk issue always, so it would have been in 2006 and every year prior and subsequent. Q.   Okay.  Going down to Item C, "Interest only," did that remain a credit concern in 2006? A.   Interest only is also a product featured, and I even talked about that on |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Page 972, so that would be one of the other things that an underwriter would consider if the loan was being underwritten manually or would typically be included in the scorecard. Q.   Did that remain a credit concern in 2006? A.   It is a product feature which is-- any product feature is going to be a credit risk driver, and so it would have been in 2006 as well as before and after. |
| 241.   In sworn testimony, in discussing McMurray's September 9, 2004 memo, Christian Ingerslev of Credit Risk Management ("CRM") stated that "everything in here continued on the trajectory that it was on then.  In fact, the trajectory probably increased." (emphasis added.) | McCoy Decl, ¶63, Ex. 253 (Ingerslev Inv. Test. 68:3-69:2) Q.   Well, if you look again at item three, loan quality. A.   Uh-huh. Q.   Can you recall if any of the items he lists, such as loan to value ARMs, interest only, if any of these situations -- credit situations improved between 2004 and 2007? A.   Meaning, did we do -- Q.   Meaning did any of these -- A.   -- did the trends that he's describing change? Q.   Right.  Did they become less of a credit risk or more of a credit risk? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.   The -- for the most part, they became more, not less.  Perhaps the only exclusion to that would be the manufactured housing.  We had a specific issue on manufactured housing that we were not -- in the origination process, we were not obtaining the appropriate title to the loans.  So, in |
| | most states, when you originate or buy a manufactured home, it's actually titled as an automobile or personal property, and you have to go through a conversion process when we take a loan out.  And we weren't doing that correctly, resulting in our inability to foreclose, and we fixed that problem.  But other than that, everything in here continued on the trajectory that it was on them.  In fact, the trajectory probably increased. |
| 242.   At least as early as 1Q 2006, through the 2Q 2007 (a period in which CFC filed 5 SEC Form 10-Qs and 1 SEC Form 10-K), McMurray urged CFC's senior management to disclose more information in the company's SEC Form 10-Ks and 10-Qs regarding the fact of, the context surrounding, | Dean Decl., ¶¶ 56, 133, 137, & 139-143, Exhs. 54, 131, 135, 137-141 (Depo. Exhs. 753, 757, 786-789, 791, McCallion Depo. Ex. 180); McCoy Decl., ¶¶32-34, Exhs. 222-224 (SEC Test. Exhs. 1269-1271, 1311) McCoy Decl, ¶76, Ex. 266 (McMurray Dep. Tran. 200:17-201:13) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| and likely consequences of, CFC's expansion of its underwriting guidelines. | MR. WYNN:  I'm going to mark as the next exhibit a April 20th, '06, fax from Ms. Rich, who I believe is your secretary, to someone named Jie Ling. The document will be Bates numbered JPM 1076 through JPM 1088. (Deposition Exhibit 786 was marked for identification.) |
|  | Q.    BY MR. WYNN:  Do you recognize the document, Mr. McMurray? A.    I do. Q.    Holding aside the fax cover page, what is the -- what is this document? A.    So the way I thought -- or what I always referred this to as a -- as a questionnaire that -- that the corporate accounting folks would send over on a -- Q.    Okay. A.    -- routine basis. Q.    If we call this document an MD&A questionnaire for the remainder of the day, will you know what I'm talking about? A.    Yeah, with that stipulation, I will know what you're talking about. Q.    Okay. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 215:21-216:5)<br><br>Q.    BY MR. WYNN:  Do you recognize Exhibit 787?<br><br>A.    Not yet, but give me a moment.<br><br>Q.    All right. |
| | A.    Yeah, I don't -- I recognize it.  I don't see the e-mails here that -- that were meant to go with it.<br><br>Q.    Is this your handwriting on Exhibit 787?<br><br>A.    It is.<br><br>Q.    Is -- is Exhibit 753 one of the e-mails that you reference in Exhibit 787?<br><br>A.    I believe that it was.<br><br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 216:6-25):<br><br>Q.    The next exhibit I'll show you I previously marked as Exhibit 756.  It's a October 17th, '06, e-mail from you to Jie Ling.  I've been instructed that it's Jie Ling, not Jie Ling.  Excuse me.<br><br>A.    I think it is Jie.  All right, I'm looking at 756.<br><br>Q.    Do you recognize Exhibit 756?<br><br>MR. LEFLER:  Counsel, we don't have them yet. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | THE WITNESS:  All right. |
|  | Q.    BY MR. WYNN:  Do you recognize the exhibit? |
|  | A.    I do. |
|  | Q.    Did you send this e-mail to Ms. Ling on October 17th, '06? |
|  | A.    It appears so, yes. |
|  | Q.    In Item 1 is the 7-17-06 e-mail you |
|  | A.    It appears so, yes. |
|  | Q.    In Item 1 is the 7-17-06 e-mail you reference the e-mail that appears in Exhibit 753? |
|  | A.    That would -- that would -- Let's take a look here.  I -- yes. |
|  | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 217:24-218:9) |
|  | So the next exhibit was an October 23rd, '06, e-mail from you to Greg Hendry, it was Bates numbered 1063 through 1064. |
|  | (Deposition Exhibit 788 was marked for identification.) |
|  | Q.    BY MR. WYNN:  Do you recognize Exhibit 788? |
|  | A.    Let me just read through quickly. Okay.  I recognize it. |
|  | Q.    Do you recall seeing this e-mail to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Mr. Hendry on October 23rd, '06? |
| | A.    I recall sending him this e-mail. |
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran.  220:2-222:15) |
| | To clarify, the next exhibit is a January 25th, '07, e-mail, from Katica Rich to Jie Ling.  It's Bates numbered JPM 115 through 1125.  Fax.  I'm sorry.  This document is a fax.  (Deposition Exhibit 789 was marked for identification.) |
| | Q.    BY MR. WYNN:  Do you recognize Exhibit 789? |
| | A.    I do. |
| | Q.    Did you cause this exhibit to be faxed -- excuse me.  Did you cause this fax to be sent to Jie Ling on January 25th, '07? |
| | A.    I believe I asked Katica to -- to fax it over to -- to Jie. |
| | Q.    Turn to the second page. Is that your handwriting? |
| | A.    It is. |
| | Q.    Could you read the handwriting under Item 3? |
| | A.    "As noted in other communications, guidelines have |

| SEC Statement | Evidence Cited by SEC |
| --- | --- |
| | widened, making the loans riskier." |
| | Q.    Could you read the handwriting under Item 3? |
| | A.    "As noted in other communications, guidelines have widened, making the loans riskier." |
| | Q.    And could you read the handwriting in -- under Item 2? |
| | A.    "Virtually all environmental factors have increased risk." |
| | Q.    And could you read the handwriting under Item 1? |
| | A.    "I'm incorporating discussions, presentations and e-mails.  In particular please see my e-mail to Eric Sieracki dated January 2nd, 2007." |
| | Q.    I'm going to show you an exhibit I've already marked.  It's 757.  Exhibit 757 is a January 2nd, 2007, e-mail from you to Mr. Sieracki and others.  Do you recognize Exhibit 757? |
| | A.    I do recognize it. |
| | Q.    Is Exhibit 757 the e-mail that you reference on the second page of Exhibit 244? |
| | MR. TAYLOR:  Are you referring to the e-mail that's dated January 2, 2007? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | There's at least a couple that are part of the exhibit. |
| | MR. WYNN:  Yeah, I'm referring to the January 2nd, '07, e-mail that's reflected in Exhibit 757. |
| | THE WITNESS:  Okay, so in Exhibit -- it's labeled 244 and also 789.  So in Exhibit 789-244, the e-mail to Eric dated January 2nd, 2007, that I'm referring to there is the one that you've just shared with us here – |
| | Q.    BY MR. WYNN:  Okay. |
| | A.    -- as Exhibit 757 and 1224. |
| | Q.    It's my bad.  So if you look at your e-mail to Mr. Sieracki that's reflected in Exhibit 757, you state, "As a follow up to our mid day conversation, the purpose of this DRAFT is to outline why delinquencies will increase and impact" -- "and the impact that this increase will have on our financial results."  Do you see that? |
| | A.    I see that. |
| | Q.    Do you recall the midday conversation that you reference? |
| | A.    My recollection is that Eric challenged me to cogently and clearly |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | explain why I thought delinquencies would increase, and then -- and then my views on how that would affect our financial results.<br><br>Q.    And is Exhibit 757 the January 2nd, 2007, e-mail your response to his challenge?<br><br>A.    That's -- that's my attempt, yes.<br><br>McCoy Decl., ¶ 76, Ex. 266, (McMurray Dep. Tran. 233:6-18)<br><br>Q.    Mr. McMurray, do you recognize the last exhibit, which is 791?<br><br>A.    791.  I do.  This appears to be what we've decided to call the MD&N -- MD&A template.<br><br>Q.    Do you recall sending this document to Ms. Ling on April 25th, '07?<br><br>A.    Specifically, no.<br><br>Q.    Any reason to believe that you did not have your secretary send this to Ms. Ling on April 25th, '07? |
|  | A.    I have -- I have no reason to believe that it was not sent.  I just don't specifically remember sending it.<br><br>McCoy Decl., ¶ 76, Ex. 266, (McMurray Dep. Tran. 233:20-234:16) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.     I'm going to show you a document that's apparently already been marked as Exhibit 180.  Exhibit 180 is a document entitled "Senior Executive Officer's Certification."  It's Bates numbered -- Well, it's Exhibit 180.  Mr. McMurray, I'd like to direct you to a particular page.  It's the page ending in 443. THE WITNESS:  All right, 443. Q.     BY MR. WYNN:  Do you recall sending this e-mail to Mr. Saletta on August 8th, 2007? A.     Let me take a look, please. Q.     Sure. A.     All right, this -- this appears to be a note that I put together as part of the SOX certification. Q.     Okay.  Do you recall sending it to Mr. Saletta on August 8th, '07? |
| | A.     Well, again, I -- I recall sending it to him.  As to like the exact date and time, no, but I do recall sending him this note. McCoy Decl., ¶77, Ex. 267, (McMurray Inv. Test. 902:8-18) Q.     Do you recall why you wrote this |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | e-mail to Mr. Saletta? <br><br> A.   The reason that I wanted him to have this is because this is something I had shared with the financial reporting folks.  He was in a different -- he ultimately reported up through Anne, but he was more in the SOX area, so I don't know whether they had shared my views with him. <br><br> Q.   And why did you want him to have your views? <br><br> A.   I thought it would be helpful for the particular job that he was doing.  So I thought it was helpful context relative to the quarterly SOX certification. <br><br> McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 909:7-910:1) |
| | Q.   Okay.  Well, let me back up and ask you:  By attaching that note to your certification and making the notations to see other documents, in your mind, were you qualifying your certifications? <br><br> A.   You know, I don't know that I would use that word.  What -- and again, let's think back to -- the market troubles that started in subprime in the first quarter of '07 had worsened by this |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | time.  They were quite a bit worse.  And so I don't know if "qualifying" is the right verb, but these were issues that I wanted to be sure to have Tom see as I sent this over to him.<br><br>Q.   Do you recall anyone asking you, "John, is your certification for this quarter qualified?"<br><br>A.   I don't remember anyone asking that.  I don't know -- when you say "qualified," I guess that's not – whether this was qualified or not, I don't know what that means exactly.<br><br>Q.   Okay.<br><br>A .   I do know that I wanted them to see this, which is why I went to the trouble to put it together. |
| | McCoy Decl., ¶61, Ex. 251 (Hendry Inv. Test. 256:25-258:12)<br><br>Q .   Do you recall the e-mail exchange in SEC Exhibit No. 1271?<br><br>A.   I don't recall it, but I see it and I accept it, that he sent it to me.<br><br>Q.   And in your e-mail to him on August 7, 2007, you state, "FYI, I did not make changes to the overview prospective trends section because I was |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | getting too many changes from too many directions, and expect those changes to be trumped by certain reviewers today or tomorrow." <br><br> A.   Okay. <br><br> Q.   In addition to Mr. McMurray, do you recall who else was giving you suggested changes to the prospective trends section? <br><br> A.   Those changes tended to come from Anne McCallion for -- yes, usually from her.  And it would have been based on input, either her input -- or at this time I believe it was David Bartlett and Dave Sambol who were looking at it. And we were asking him |
| | MR. WEINGART:  Kevin Bartlett, you mean? <br><br> THE WITNESS:  Kevin Bartlett.  I apologize, yes. Kevin Bartlett or David Sambol.  And we asked them to look at this section, specifically for the June quarter.  I believe we wanted to draw their attention to it.  That's what I was talking about. <br><br> Q.   Why did you want to draw the attention of Mr. Bartlett and Mr. Sambol |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | to the prospective trends section? |
| | A.   Because we were trying to get them through the review.  And I don't remember exactly why now, but I remember that they were trying to identify areas where they wanted to focus on in their review.  And this was one of them, if I'm not mistaken. |
| | Q.   When you say "too many directions," what were the directions? |
| | A.   I don't remember now. |
| | Q.   And who were the reviewers that you thought would trump certain suggestions? |
| | A.   It would be Dave Sambol and Kevin Bartlett. |
| 243.   For instance, on July 17, 2006, McMurray informed CFC's financial reporting department that he was a "huge advocate" of expanding CFC's disclosures regarding credit risks.  In the e-mail, McMurray requested disclosures in the following areas: **Environmental Factors.**  Our credit disclosures need more information on the environmental factors that **will affect** | Dean Decl. ¶137, Ex. 135 (Depo. Ex. 753) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| **performance.**  I've listed the major factors below and briefly explained why **all are likely to increase our delinquencies, defaults and credit losses going forward**. <br> House Prices.  House price performance over the past few years has been a tremendous positive for credit risk.  *As we return to a more normal environment, or worse, we can expect to see delinquencies and defaults increase.  Because conditions have been so favorable, the "reversion to the mean" may be especially abrupt causing delinquencies and defaults to increase dramatically.* <br> Credit Guidelines.  The industry has expanded credit guidelines very aggressively over the past several years.  Some transactions combine risk factors or risk levels that were not seen in previous cycles.  The delinquencies and defaults from these transactions | |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| will be higher.<br><br>(emphasis added.) | |
| 244.   According to CFC's Chief Risk Officer, John McMurray, the matching strategy was a "corporate principal and practice that had a ***profound effect on credit policy[.]***"   (emphasis added.) | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test.  272:11-273:1)<br><br>Q.   Mr. McMurray, we talked yesterday about the matching strategy. Do you consider that as part of Countrywide's credit policy?<br><br>A.   I consider it part of the corporate policy rather.  It's a corporate -- it was a corporate principal and practice that had a profound effect on credit policy, but I wouldn't -- I wouldn't explicitly consider it a credit policy.  Now, there were -- there were discussions that went on, and I'm fairly certain there are e-mails that talk about this, where I was proposing that we try to address this more specifically in our risk vision or risk policies.<br><br>Q.   So would you --<br><br>A.   But to answer your question -- again, I'm rambling<br><br>-- but I personally wouldn't consider it part of the credit policy, but it is a corporate strategy that affects credit policy. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 245.   Moreover, McMurray explained that it is **not possible to comprehend CFC's underwriting policies without an understanding of the matching strategy.** | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 273:2-14)<br><br>Q.   Do you think it's possible to understand the application of Countrywide's underwriting policies such as the technical manual, the loan program guide, without knowing about the matching strategy?<br><br>A.   It's not.  So if you go back to what we talked about yesterday, so we talked about the product leadership group, that is Vijay Lala's group, surveying the competitors, finding out what they did and then bringing those requests in and it going through the process that I |
|  | described yesterday.  And so a lot of what made it into the loan program guidelines, when you showed me an example yesterday it was conforming fixed, would have been driven by this matching strategy. |
| 246.   The matching strategy committed CFC to offering any product and/or underwriting guideline available from at least one "competitor," including monocline subprime lenders such as New Century and First | Dean Decl., ¶108, Ex. 106 (McMurray SEC Dep. Ex. 780, p.(1-2) 6/14/2005 e-mail from McMurray copied to Sambol). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Franklin. | |
| 247.   INTENTIONALLY OMITTED | |
| 248.   Indeed, on March 7, 2005, Ingerslev complained to McMurray that "it's frustrating to try and hold the line and then just be overridden with whining and escalations, just reinforces that sales can have anything they want if they yell loud enough to Drew." | Bendell Decl., ¶11, Ex. 303 (Ingerslev SEC. Dep. Ex. 203) |
| 249.   According to McMurray, Sambol viewed his risk vision as a way for McMurray to "drag his feet on approving" proposed expansions to CFC's underwriting guidelines. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 32:6-33:12)<br><br>Q.   I just wanted to go back to the policy, the three "R" policy.  You mentioned that it wasn't universally accepted within Countrywide; is that right?<br>A.   That's right.<br>Q.   Can you recall who did not accept that policy?<br>A.   So in the conversations with Dave Sambol, for example, you know, he acknowledged that Stan and I put that policy -- you know, put that -- I call it more of a principal than a policy, so I |
| | wanted to think of it in terms of guiding principals, so something that we could use day in and day out.  A lot of the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | policies that we had were very voluminous, and so I purposely made it very simple, three R's.  And so it was more guiding principals than the policy.  So there were several occasions where Dave and I discussed it.  And like I said, he acknowledged that Stan and I had put it together, but said that, you know, it was fine if we wanted to frame discussions that way, but, you know, it wasn't something that he endorsed 100 percent.  Q.   Did Mr. Sambol ever identify any particular concerns he had with that policy?  A.   I think he was concerned that it might be a method for me to drag my feet on approving things.  And so we had the matching principal, and so -- |
| | and this is just my impression, but my impression is that he believed that was a superior strategy -- or superior, in other words, kind of a higher up in the hierarchy of strategies and principals that we had than the three R's.  And certainly, you know, it long predated the three R's. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.   So it's your opinion Mr. Sambol viewed the matching strategy as being more important to Countrywide than the three "R" strategy?<br><br>A.   That's my opinion. |
| 250.   In May 2005, McMurray resisted an effort by the production divisions to increase the maximum amount of a home equity line of credit ("HELOC"), where an Automated Valuation Model ("AVM") (as opposed to an actual appraisal) could be utilized to determine the value of the underlying collateral. | McCoy Decl., ¶ 20, Ex. 210 (McMurray SEC Dep. Ex. 779 (5/18/05 e-mail from McMurray to Gissinger)) |
| 251.   In a May 21, 2005 e-mail from Andrew Gissinger (the head of CFC's production divisions) to McMurray, Gissinger utilized the matching strategy to argue for a change to CFC's credit policy regarding the use of AVMs—*i.e.,* increasing the AVM limit: "limiting avm's to 100k is a take away and further it is not in line with the market.  Our competitors almost all go (sic) to 250k with an avm." | McCoy Decl., ¶ 20, Ex. 210 (McMurray SEC Dep. Ex. 779 (5/21/05 e-mail from McMurray to Gissinger))<br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 126:22-127:19)<br>Q.   On that point, let me show you another exhibit, that I'll mark as the next exhibit, which is a May 21st, 2005, e-mail from Andrew Gissinger to you, Mr. McMurray.  It's going to be Bates numbered JPM 391through JPM 392. (Deposition Exhibit 779 was marked for identification.) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.    BY MR. WYNN:  Mr. McMurray, if you can focus on your May 21st, '05, e-mail.  I'm sorry.  On Mr. Gissinger's May 21st, '05, e-mail to you.  Do you recall receiving that e-mail from Mr. Gissinger?<br>A.    Let me take a -- let me take a look, please. |
|  | Q.    Sure.<br>A.    All right, I -- I recall the topic.<br>Q.    What is an AVM?<br>A.    Automated valuation model.<br>Q.    To me it looks like Mr. Gissinger is using the matching strategy in order to align Countrywide's practices with respect to AVM to other institutions. Would you agree with that?<br>A.    I would agree with that.<br>            * * *<br>McCoy Decl., ¶58, Ex. 248 (Gissinger Dep. Tran., 154:8-155:16)<br>Q.    Okay.  And if you turn to the first page, Mr. McMurray sent you a May 18th, '05 e-mail where he seems to be advocating for keeping a limit on the use of AVMs with respect to HELOCs to a hundred thousand dollars. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A. Correct. |
| | Q. Okay. And then you respond to him on May 21st, '05, and stated: "I have a problem with your below AVM points on several fronts. First, limiting AVMs to one hundred thousand is a take away and, further, is not in line with our market. Our competitors almost all to 250,000 with an AVM." You see that language? |
| | A. Yes. |
| | Q. Okay. Is your -- are you making an argument to Mr. McMurray that's in reliance upon the company's matching strategy? |
| | A. Well, I was making -- my understanding now would be my reflection five years later. |
| | Q. Right. Understood. |
| | A. So that what I'm doing is -- I thought I turned this off. Excuse me. Excuse me. That it appears from this, so somewhat speculation, that somewhere along the line we had this $250,000 increase in limit approved and, in fact, we were going to a beta test to roll out systems. It now appears they had been |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | taken away by John, who was kind of refuting that approval, of which we had. And further, I was making the statement consistent with the matching policy: here's something that almost everybody else is doing. |
| 252.   On June 14, 2005, McMurray warned that Sambol that "As a consequence of CW's strategy to have the widest product line in the industry, we are clearly out on the "frontier" in many areas.  While I'm sure you already know this, ***I think we should be very deliberate since the outer boundaries are potentially controversial and have high expected default rates and losses***."  (emphasis added.) | Dean Decl., ¶108, Ex. 106 (McMurray SEC Dep. Ex. 780, p.(1-2) 6/14/2005 e-mail from McMurray copied to Sambol). <br><br> McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Trans. 129:14-22) <br><br> Q.    BY MR. WYNN:  Do you recognize Exhibit 780, Mr. McMurray? <br><br> A.    I do. <br><br> Q.    Do you recall sending this e-mail to Mr. Sambol on June 24th, '05? <br><br> A.    I recall sending it to him.  It's -- you know, that's the date that appears here.  It's hard for this long to remember a specific day, but I do remember writing this and sending it to -- to Dave. |
| 253.   In a June 24, 2005, e-mail to Sambol concerning how CFC's guideline expansion had increased the company's credit risks, McMurray clarified his concerns regarding the | Dean Decl., ¶108, Ex. 106 (McMurray SEC Dep. Ex. 780, p.(1-2) 6/14/2005 e-mail from McMurray copied to Sambol). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| matching strategy. | |
| 254.   In the June 24, 2005 e-mail, under the heading "**Composite Guidelines**," McMurray explained to Sambol that "because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the ***outer boundaries*** across multiple lenders[,]"and that because comparisons are only made to lender guidelines where they are ***more*** aggressive and not used where they are ***less*** aggressive, ***CFC's "composite guides are likely among the most aggressive in the industry***." (Emphasis added.) | Dean Decl., ¶108, Ex. 106 (McMurray SEC Dep. Ex. 780, p.(1-2) 6/14/2005 e-mail from McMurray copied to Sambol). McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Trans. 133:17-134:1) Q.    BY MR. WYNN:  Could you explain the composite match concern? A.    Sure.  And so, again, it is -- it is talked about here, but if you have -- if you match one lender on -- on one -- on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that -- of that two-step match would be more -- would be more aggressive than either one of those competitor reference points viewed in isolation. |
| 255.   In the June 24, 2005 e-mail, under the heading "**Companion Mitigants**," McMurray explained to Sambol that CFC's "matches" of other lenders guidelines do not incorporate the credit risks mitigants used by such | Dean Decl., ¶108, Ex. 106 (McMurray SEC Dep. Ex. 780, p.(1-2) 6/14/2005 e-mail from McMurray copied to Sambol). McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 134:2-23) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| lenders, and that, therefore, "***our match*** ***ends up being more aggressive that*** ***the guideline we were originally trying*** ***to match***." (emphasis added.) | Q.    Okay.  And what is the companion mitigant concern?<br><br>A.    This is -- this is the idea that -- so -- and we'll use the example that I talk about here.  So they -- they may have offered certain features with their product set, but then also what I would -- would have what I call companion mitigants, so let's suppose as an example they offered a low -- a very low FICO floor as part of their product offering but they also required that the borrower have a specific credit history, like no -- where I say -- do you see where it says 0x30 or 1x30?  That refers to the number of 30-day lates that the borrower may have had.  They -- they may have layered on that additional type of -- of a requirement.  So one of the -- one of the complications with the matching strategy goes to what I call plumbing considerations or system considerations, so there may be things -- aspects in your system that wouldn't allow you to match some of those companion mitigants based on the infrastructure that you have that -- that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | might be easier for the competitor you're trying to match to deploy.  So that's -- that was the idea that I was getting at there. |
| 256.   McMurray's concerns regarding the matching strategy and the composite match problem were generally shared by the employees CFC's Credit Risk Management department, and were frequently discussed, including with Sambol and Bartlett. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 141:17-143:11) <br><br> Q.   So exhibit -- I'm going to show you Exhibit 226. There are two e-mails I want you to look at.  They're both on 6/24/05 and they're from Mr. McMurray to Mr. Sambol.  Actually, you better start on the third page of the exhibit ending in 315 the e-mail from McMurray to Gissinger. <br><br> A.   Okay. <br><br> (SEC Exhibit 226 was referred to.) <br><br> THE WITNESS:  Okay. <br><br> BY MR. WYNN: <br><br> Q.   Have you ever seen any of the e-mails that are reflected in Exhibit 226 before? <br><br> A.   No. <br><br> Q.   If you turn to the first page of the exhibit and look at Mr. McMurray's e-mail to Mr. Sambol. <br><br> A.   Uh-huh. |
| | Q.   Under the heading "Composite |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Guidelines."  Let me repeat this last group of questions.  "Because the matching process includes comparisons to a variety of lenders, our match will be a composite of outer boundaries offered across multiple lenders.  For example, first Franklin is used as a comparison for some guidelines where there are more aggressive -- EG, high LTV, CLTV -- and not used where they are less aggressive -- EG stated doc loans.  As a result, our composite guides are likely among the most aggressive in the industry."  Have you heard Mr. McMurray expressed that concern to you before? <br> A.    Yes. <br> Q.    It is a concern that you agreed with? <br> A.    Yes. <br> Q.    Were you ever present when Mr. McMurray or others expressed this concern to Mr. Sambol and Mr. |
| | Bartlett? <br> A.   I don't recall an exact instance, but it's hard to imagine it not happening. <br> Q.    To your knowledge, was a concern |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | -- and a specific concern being that the matching strategy is resulting in the composite set of guidelines that are among the most aggressive in the industry ever aggressed -- excuse me, ever addressed in corporate credit committee meetings?<br><br>A.   Again, I can't remember a specific instance, but it was one of those things -- this wasn't a one-time revelation commentary from John.  Most of us working for John and his direct reports believe the same, and it was a common commentary that we would provide when talking about or assessing an individual item. |
| 257.   Frank Aguilera (a CRM employee who assessed proposed expansions to CFC's subprime underwriting guidelines) was "surprised" to learn that the matching strategy was being employed in the subprime space, and felt that ***"[i]t was not…from a credit perspective…a tolerable process***." (emphasis added.) | McCoy Decl., ¶46, Ex. 236 (Aguilera Inv. Test. 49:23-52:8)<br><br>Q.   And you briefly touched upon what I've heard termed as the matching strategy.<br><br>A.   The matching strategy.<br><br>Q.   Have you ever the term?<br><br>A.   Are you referring to the concept of, if it's not in our guidelines and someone else does it, they have the authority to match that policy? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.   Generally, yes. |
| | A.   Okay.  Yes, I am familiar with that. |
| | Q.   Could you describe what your understanding of that policy is, or how it operated. |
| | A.   Well, first, I might say that I was surprised it existed in the subprime market.  I wasn't aware of it at the time I learned what that meant.  But they had a strategy in loan production and it emanated from the prime side.  And that strategy was if somebody else offered a feature or a part of the menu that you didn't offer, that if it was one of the named competitors, that the production people could offer that same feature or enhancement, if you will.  And that would be things, as we talked about earlier, the maximum LTV for a particular FICO range is "X" and someone else is now offering "Y," so if they offer "Y," then we're allowed to match that so we wouldn't lose the deal.  And I learned about that in some rather large meeting, if I recall -- I can't tell you the date -- where there was credit and secondary and production people, I |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | learned of that business strategy which I had not been previously aware of. Q.   Do you recall what year you learned of it? A.   I can't tell you, Paris.  I don't recall. Q.   And I think you said that you were surprised to learn it; is that right? A.   Yeah, I didn't know that they were doing that policy out in the production environment. |
| | Q.   Were you surprised just because you didn't know about it or some other reason? A.   In the subprime environment, we actually -- it's a very regimented process relative to prime since we retain credit risk.  And that kind of behavior was somewhat of a surprise to me in the subprime environment.  It was not necessarily -- from a credit perspective, my view, it's not a tolerable process. Without saying, "Here's the way it would work," without getting a credit view, without credit giving some guardrails on how you would do it or not do it, it seemed to me at that time that those kinds of processes should |

311

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | have happened before they implemented a program like that in the subprime environment where we actually retain risk.  In the prime environment, I think it's much easier to deal with.  You're |
| | really dealing with kind of things that are happening in the marketplace, and obviously if someone else can do it and they're selling the risk -- complete risk, where there's no retained risk -- then there's no reason why we shouldn't do that, because apparently there's an appetite for it out in the marketplace.  In the subprime environment, ultimately those products end up going into a pool for which we retain the residual and have first loss.  That shouldn't have been the practice without getting credit to sign off and creating some guidance around that. |
| 258.   During the entirety of his tenure at CFC, McMurray was concerned about the composite match problem posed by the matching strategy, and never represented to anyone he ceased to have such concerns. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 135:22-136:5) <br> Q.     At any point during your time at Countrywide did you no longer hold these views regarding the composite match problem? <br> A.     I don't remember abandoning |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | those views. |
| | Q.   Okay.  Did you ever tell anyone that, you know, "I've changed my mind, I no longer have these concerns regarding the matching strategy"?  A.   I don't recall ever saying that. |
| 259.   On November 2, 2006, McMurray sent an e-mail to Kevin Bartlett (McMurray's immediate superior and Chief Investment Officer), in which he described what had transpired at the November 1, 2006 meeting with the production divisions. | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol)  McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 145:2-16)  Q.   I'm going to show you another document that we've already marked as Exhibit 139.  Exhibit 139 is a November 2nd, 2006, e-mail, from yourself to Mr. Bartlett.  Do you recall this November 2nd, 2006, e-mail to Mr. Bartlett?  A.   My recollection on this was -- if we go down to the bottom half of the first page, these requests I think originated from Greg Lumsden, which was the -- he ran the re -- the subprime-oriented retail portion of the Consumer |
| | Markets Division.  Q.   Okay.  Just to back up, do you recall sending this e-mail to Mr. |

313

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Bartlett? |
| | A.    I do recall sending this to Kevin. |
| 260.   During the November 1, 2006 meeting, CFC's production divisions proposed numerous expansions to CFC's underwriting guidelines. | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol)) |
| 261.   As McMurray, responded to, and/or resisted, the proposals, CFC production division employees admonished him, and stated that: "we match whatever anyone else has in the market." | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol)) |
| 262.   In his November 2, 2006 e-mail to Bartlett, McMurray went on to state that "I've obviously heard this many times before," and then went on to list his concerns regarding the matching strategy. | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol) |
| 263.   Under the heading "Composite Guidelines," in his November 2, 2006, McMurray informed Bartlett that:        When this approach is done across    multiple lenders, across products    and across guidelines, the    composite set of guidelines will be    the most aggressive credit in the    market. | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| (emphasis added.) | |
| 264.   Under the heading "**Ceding Credit Policy**," on November 2, 2006, McMurray informed Bartlett that: <br><br> With this approach, our credit policy is ceded, on both a product-by-product as well as item-by-item basis, to the most aggressive lenders in the market.  Do we want to effectively cede our policy and is this approach "salable" for a risk perspective to those constituents who may worry about our risk profile? <br><br>(emphasis added.) | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol) |
| 265.   McMurray testified that when he referenced (in his November 2, 2006 e-mail to Bartlett) "constituents who may worry about our risk profile," he was referencing a broad set of constituents, ***including investors, regulators and the GSEs***. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 150:18-23) <br> Q.    And when you reference "constituents who may worry about our risk profile," who are you talking about? <br> A.    Well, given Countrywide's importance in the market, that -- that would have been a broad set of constituents, so the reg -- the regulators, investors, GSEs, HUD, just to -- to name a few. |
| 266.   However, Countrywide never | McCoy Decl., ¶76, Ex. 266 (McMurray |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| disclosed to investors that its matching strategy was employed in a manner caused the company to cede its credit policy to the most aggressive lenders in the market. | Dep. Tran. 151:13-152:9)<br><br>Q.    Okay.  And this is similar to the question I asked before, but can you recall in any external presentation you made for Countrywide sharing your concern that the matching strategy would cause Countrywide to cede its credit policy to the most aggressive lender in the market?<br><br>A.    Again, not -- not -- not described – not described in that way, and, you know, the other element that -- that we're missing out of this whole discussion is while we may have -- you've got the abs -- so this gets back to the idea of absolute risk, so what -- what we're ignoring completely is the amount of risk that was retained by Countrywide versus -- versus transfer to -- to other parties.  So -- again, not -- I don't recall saying it this exact way because we're kind of -- we're kind of zeroing in on one -- on one specific part of the -- of the matching strategy, but -- but there's certainly other ways where |
|  | this type of issue was brought into the discussion.  Again, just not -- I was just |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | not used to debating -- or taking the internal debates, you know, outside and letting those bear. -- you know, "I don't like Dave's strategy," you know, that -- that would have -- I sus -- I don't know but I suspect that it would not have gone over well. |
| 267.   Even before November 2, 2006, McMurray had warned that the manner in which CFC's matching strategy was being applied had caused the company to cede its credit policy to the most aggressive lenders in the business. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 149:17-150:17) Q.    All right.   If you go to the second page of Exhibit 139.  Under "Approach" you state:  "As I responded to the various requests, Drew and others reminded me that the company's policy is: 'we match whatever anyone else has out in the market.'  I've obviously heard this many times before.  Following are some of the concerns I've raised in the past with respect to this approach: |
| | "Composite Guidelines.  When this approach is done across lenders, across products and across guidelines, the composite set of guidelines will be the most aggressive credit in the market. "Ceding Credit Policy.  With this approach, our credit policy is ceded, on both a product-by-product as well as an |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | item-by-item basis, to the most aggressive lenders in the market.  Do we want to effectively cede our policy and is this approach 'saleable' from a risk perspective to those constituents who may worry about our risk profile?" With respect to that ceding credit policy point, do you recall making that point prior to November of '06? A.    I'm pretty sure -- I'm pretty sure that I did.  I don't remember the specific instance where I may have brought that up, but -- but I believe I did. |
| 268.   On November 2, 2006, Bartlett forwarded McMurray's November 2, 2006 e-mail to Sambol, along with the message "We should discuss…and make sure we have a policy we're still comfortable with.  I don't want to lose John because he feels powerless." | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol) |
| 269.   McMurray expressed concern that the manner in which the productions utilized the matching strategy. | Dean Decl., ¶107, Ex. 105 (Aguilera SEC Dep. Ex. 139 (11/2/06 e-mail from McMurray to Bartlett, 11/2/06 e-mail from Bartlett to Sambol) |
| 270.   According to Christian Ingerslev (who worked in Credit Risk Management and assessed requests | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 132:1-133:23) Q.    Okay.  If you turn to the first page |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| from CFC's production divisions to expand underwriting guidelines), any request from the production divisions that was not answered with an unqualified yes from Credit Risk Management was not considered final. | of the exhibit, the first paragraph in Mr. McMurray's e- mail, he states, "As a discussion separate from this specific issue,   we need to revisit what constitutes a decision.  My impression is that any request I don't answer with an unqualified yes is considered not final. This is a more general issue."  EG -- "the SLG request we keep saying no to that we really need to resolve."  Did you observe any friction between product management and product leadership during that time period? |
|  | A.   Yes.<br>Q.   Could you explain.  Just give greater detail on what your observations were.<br>A.   So there's a -- you know, in our role in credit and Vijay's team and his role in representing sales, there's a natural conflict that you would expect.  They're incented to behave in a certain way and get, you know, certain results on behalf of sales, and, you know, we're incented and our job descriptions are about, you know, not necessarily doing that exact same thing, you know, in assessing |

319

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | what's  -- you know, what we shouldn't do versus what we should do.  And so there's -- there's -- in every company with those two rules,  there's going to be conflict. In an organization like Countrywide, sales, the strategy of the company was predominantly, you know, a sales-oriented one because of our history as a mortgage banker, and, you know, being able to sell off a lot of credit risk, that was one instant, one probably factor that contributes to the culture that we have.   So there was a |
|  | strong sales culture. So that -- and ultimately, you know, disagreements or ties were broken, you know, to the -- you know, to the side of erring on, well, we don't want to lose volume, we want to keep up the volume and keep up our market share.  That was a strategy that the company had.  But, you know, John and I and those of us in credit still felt like it was our obligation to make sure that there was perspective, and we were doing it with eyes wide open.   In other words, in that environment, there was conflict.  Some of it you'd expect, and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | some of it went beyond what you would expect and was tough.  And what he's describing right here is quite accurate in that any question asked by the sales area that wasn't answered with a yes was either -- just like he says, it was not considered final. That just means we need to ask you again or ask somebody else, or there must be    something |
| | broken with our process, because if the process  were working, you would clearly say yes.  And, you know, that's just -- you can -- you can say that was a bad business strategy in the end, but that's what it was. McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 135:11-136:5) Q.   You mentioned that you observed friction between product management and product leadership that was the natural sort of friction that you would observe because of the two missions, for lack of a better word, but you also saw some things that you said went beyond what you would expect. Can you give us some examples of what you meant by that. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.   Well, the one John describes here is a good one, because it's indicative of the -- you know, we would get complaints that, you know, we don't have a process for decision making, when, in fact, we did.  It's just the process resulted in a no, and so, therefore, the process must be broken.  And just being fed that kind of feedback didn't feel good and, you know, didn't feel like that was part of the plan, or should be part of the plan.  Look, acknowledge -- recognize the rational that was provided to say no.  If you disagree, you know, let's just escalate it and have someone else decide, but to say, oh, the process is broken, and you don't know what you're doing -- and that happened from time to time and that just like -- you know, what's the point in that?  Why is that necessary? |
| 271.   Ingerslev testified that "…there was pressure to…move things along and say yes to things and you felt that pressure…on a daily basis." | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 136:6-14)<br>Q.   Was your job performance ever criticized on the basis of not agreeing to request or take suggestions from product leadership? |

322

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | A.   Certainly not by my superiors or my managers, but, you know, it was part of the culture.  There was -- you know, there was pressure to, you know, move things along and say yes to things, and you felt that pressure.  Does that pressure come in the form of a job performance review?  No.  But you just felt it on a daily basis. |
| 272.   In instances of disagreement between Credit Risk Management and CFC's production divisions, the production divisions would prevail most of the time. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 136:15-20)<br><br>Q.   Is that to say that during the time from, say, '03 to '06 in instances of disagreements between production and credit, that production would prevail most of the time?<br><br>A.   (Non-verbal response.)<br><br>Q.   Is that a yes?<br><br>A.   Sorry, yes. |
| 273.   On January 23 and 24, 2007, McMurray sent e-mails to the head of CFC's production divisions, in which he provided explanations as to how the production division's utilization of the matching strategy, and its inability or unwillingness to comprehend "key risk issues," caused CFC to have the | Dean Decl., ¶109, Ex. 107 (McMurray Dep. Ex. 781 (January 23 and 24 e-mails 2007 e-mails from McMurray to Gissenger))<br><br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran., 153:16-154:21)<br><br>Q.   Okay.  I'm going to show you a new exhibit, which we'll mark as the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| "riskiest, but not the most profitable guidelines." | next exhibit, and it's going to be two e-mails, one's January 27th, 2007, one's January 24th, 2007, and they're both from you to Mr. Gissinger.  This exhibit will be Bates numbered JPM 183 through 184.  (Deposition Exhibit 781 was marked for identification.) (Discussion off the record.) Q.    BY MR. WYNN:  Mr. McMurray, do you recall these e-mails? A.    Let me take a quick look. Q.    Sure. A.    Okay, I do -- I recall this e-mail. Q.    All right.  So the January 24th, '07, e-mail from yourself to Mr. Gissinger, you state, "PL typically presses for 'whatever we can get.'  They seek the |
| | broadest and most aggressive terms possible for any guideline under consideration.  Guidelines should be no different than other corporate initiatives in that the objective should be to maximize risk-adjusted returns for CW. So instead of seeking the most aggressive guidelines, the objective should be the most profitable guidelines. The current approach gives us the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | riskiest, but not the most profitable, guidelines."  Mr. McMurray, in that e-mail does "PL" mean product leadership? |
| | A.   It does. |
| | Q.   And does "CW" mean Countrywide? |
| | A.   It does. |
| 274.   In a February 11, 2007 e-mail to Sambol, McMurray noted that although he had proposed a new risk vision for CFC, the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone, and repeated his concern that <u>the strategy would cause CFC's guidelines to be a composite of the most aggressive offerings the market</u>. | Dean Decl., ¶111, Ex. 109 (McMurray Dep. Ex. 783) |
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 166:13-21) |
| | Q.   Okay.  The next exhibit I'll mark is a February 11th, 2007, e-mail from yourself to Mr. Sambol.  It's Bates numbered JPM 237 through JPM 241.  (Deposition Exhibit 783 was marked for identification.) |
| | Q.   BY MR. WYNN:  Do you recognize Exhibit 783? |
| | A.   Take a quick look here.  I do recognize it. |
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 167:4-168:25) |
| | Q.   If you turn to the third page of the document, page ending in 239.  Do you see the -- the heading "Epilogue"? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.    I do.<br><br>Q.    To your knowledge is that something that you drafted on February 11th, '07, or is that something you pasted from another document?<br><br>A.    Well, my recollection is it was |
| | meant to be -- it was meant to be part of this -- of this document.  This document reflects a -- a continuing conversation that I'd had partially with Drew, partially with Kevin, partially with Dave, and some of the things in the epilogue were issues that -- that -- that I had brought up previously but that I thought should be part of this e-mail to make it complete.<br><br>Q.    Okay.  And sorry to jump around.  On the first page, under the heading "Risk Vision," there's a subheading for "Matching."<br><br>A.    Yes.<br><br>Q.    Third sentence you state, "Instead of my risk vision, a key operating unit proposes an approach based on matching alone: 'if a product, guideline, or transaction is in the market, then we |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | can (and most likely will) offer the same thing.'"  What key operating unit are you referencing? |
| | A.    I -- I believe this came out of a discussion with Drew Gissinger. |
| | Q.    Okay.  So is the key operating unit the production divisions -- or production |
| | division? |
| | A.    I would describe it as residential lending. |
| | Q.    Okay. |
| | A.    And it would include all of the production units plus servicing, everything that comprises the residential business. |
| | Q.    Okay.  And then turning back to the page ending in 239, under "Epilogue," the last sentence in that paragraph, you state, "My concerns with an untempered matching include," there's a heading for "Capacity Match," then there's a heading for "Optics."  And the "Optics" heading reads, "I doubt this approach would play well with regulators, investors, rating agencies.  To some, this approach might seem like we've simply ceded our risk standards |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | and balance sheet to whoever has the most liberal guidelines." |
| 275.   McMurray also warned Sambol that, "I doubt this approach would play well with regulators, investors, rating agencies etc.  To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines." | Dean Decl., ¶111, Ex. 109 (McMurray Dep. Ex. 783) |
| 276.   On November 3, 2006, McMurray informed Kevin Bartlett that he intended to resign from his position as CFC's Chief Credit Risk officer. | Dean Decl., ¶110, Ex. 108 (McMurray SEC Dep. Ex. 782 ((11/3/06 e-mail from McMurray to Bartlett with handwritten notes.)) |
| 277.   During a November 3, 2006 meeting with Sambol to discuss his resignation, McMurray voiced his concerns about CFC's risk philosophy, guideline expansion, the company's "can't say no" culture, the matching and no brokering policies, inadequate controls and *his fear of "personal risk" stemming from credit policy at CFC.* | Dean Decl., ¶110, Ex. 108 (McMurray SEC Dep. Ex. 782 ((11/3/06 e-mail from McMurray to Bartlett with handwritten notes.)) McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran., 156:2-157:7) Q.   So let me quickly show you another exhibit that's going to be a new exhibit.  It's a November 3rd, '06, e-mail from you to Kevin Bartlett.  It's exhibit Bates No. JPM 1024. (Deposition Exhibit 782 was marked for identification.) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.    BY MR. WYNN:  Mr. McMurray, do you recognize Exhibit 782? |
| | A.    I do. |
| | Q.    Is that your handwriting on this document? |
| | A.    It is. |
| | Q.    Could you read your handwriting, please? |
| | A.    "Discussed with Kevin and Dave (Sambol): "(1) Concern about person risk.  Do not want to be blamed for products, guidelines, etc. that I never advocated and often recommended against.  Concerns about inadequate controls, infrastructure, etc. "(2) Concerns about the company's risk philosophy.  Discussed 'can't say no' culture, pressure from matching and no brokering policies.  "(3) Concerns about compensation" – or "Concern about compensation."   And then finally, "Also discussed Bank related items (not wanting to report to Carlos." |
| | Q.    Okay.  If you look back at Exhibit 139. |
| | A.    All right. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.    Well, backing up, it seems from Exhibit 782 that on November 3rd, '06, you intended to resign from Countrywide? <br><br> A.    I did. <br><br> McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 160:25-166:12) <br><br> Q.    Mr. McMurray, before the break we were looking at Exhibit 782. <br><br> A.    Yes. <br><br> Q.    Would you set that one in front of you. <br><br> A.    I do. <br><br> Q.    All right.  Sir, do you recall sending Mr. Bartlett the e-mail that's reflected on Exhibit 782? <br><br> A.    I re -- I recall sending him the e-mail.  That did not include the -- the written text at the bottom. |
| | Q.    Okay.  Did you have a meeting with Mr. Bartlett after he received this e-mail? <br><br> A.    I did have a meeting with him. <br><br> Q.    Did that meeting occur on November 3rd, '06? <br><br> A.    I believe so. <br><br> Q.    Okay.  Did you also meet with Mr. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Sambol after you sent the November 3rd, '06, e-mail? |
| | A.   I -- on the same day that I met with Kevin, later that evening I met with Dave. |
| | Q.   Okay.  And when did you make the handwritten note to the peer, Exhibit 782? |
| | A.   It would have been subsequent to the discussion with Dave. |
| | Q.   Okay.  So these handwritten notations were made on November 3rd, 2006? |
| | A.   Either that evening -- and this may have been either on a Thursday or Friday or shortly thereafter. |
| | Q.   Okay.   And did you discuss the items that are reflected in the handwritten notes with Mr. Sambol? |
| | A.   Well, what these handwritten notes are meant to capture are just some of the key -- the key points I had discussed with both Kevin and Dave. |
| | Q.   Okay.   And were your discussions with Mr. Sambol -- did they concern the reasons why you had tendered the resignation? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | A.    They -- they did include -- they did include that.<br><br>Q.    Okay.   And are the handwritten notes -- do they reflect the reasons why you had tendered your resignation?<br><br>A.    They -- they reflect some of the -- the key things that -- that we had discussed, but not necessarily all of the things that I had discussed either with Kevin or Dave.<br><br>Q.    Okay.  Item No. 1 states, "Concern about personal risk."  What did you mean by "personal risk"? |
|  | A.    What I meant about it is -- it could have been from two -- two different directions.  One is, as we've looked at, on a number of exhibits I was concerned about where the industry as a whole, including Countrywide, was going with respect to guidelines, and one of my concerns there was that a lot of those -- ultimately that expansion, especially as the cycles that we've talked about eventually turned, and cycles do eventually turn, that -- that that could have been -- you know, that could be ugly, and certainly has turned out to be |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | ugly, and my concern was, from a reputational perspective, particularly given Countrywide's prominence in the industry.  So that – so that was one direction.  And then a -- a second direction, and we've seen this in some of the exhibits and some of the discussions we've had up to this point, was that many of -- many of these issues were hotly debated, and I was reflecting |
| | one point of view, wasn't necessarily the point of view of others, and so I had a concern that if the – if the first direction of the risk didn't materialize, how tolerant certain people would be, particularly Dave, you know, with -- with respect to me raising dis -- disagreements.  And keep in mind, by this time Dave had transitioned over into Stan's role, but prior to being in Stan's role there -- there were a number of occasions where we were on different sides of the debate, and so another direction of personal risk was just was there any – was there any left -- was there any animosity left over from the various debates that had occurred in the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | -- in the years leading up to him taking over Stan's spot.  So really two -- two different directions.<br><br>Q.    And when you state that you did not want to be blamed for products, guidelines, et cetera, that you never advocated and often recommended against, what are you talking about there? |
| | A.    So -- so let me -- let me illustrate that via an example.  You mentioned the 80-20.  From a personal perspective, I'm not a fan of a hundred percent financing.  And I think -- so 80-20 would be an example of a hundred percent financing product, and when you combine that with other features, such as a borrower with a -- with a weak credit background, that -- that would not be something that I would recommend that anyone do, you know, whether it was Countrywide or anyone else.<br><br>Q.    And you discussed your concern with – about personal risk with Mr. Sambol?<br><br>A.    I did, both -- both directions that I just explained to you. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.    Okay.  And Item 2, "Concerns about company's risk philosophy," what do you mean there?<br><br>A.    So I'll -- I'll echo back to some of the comments I made a few minutes ago about the idea of balancing risk and return.  It's -- it's central to any investment, it's central to running any |
| | business, again, in my view, and -- and given how risk and re -- risk and return go together, it's -- it's my belief that -- that companies and anyone that's investing have a articulated risk philosophy, and my concern there was having more clarity around the risk philosophy at -- at Countrywide, and the -- the "can't say no" culture is a -- that is a phrase that Kevin Bartlett phrased, and this ties into -- to the matching strategy, as well, where if someone were offering something, the idea was ultimately couldn't say no as a result of that strategy.  And you can see in the notes here I even talk about both matching and then the -- and we haven't talked about this today but the no brokering policies, as well. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.    And the third concern is concern about compensation? |
|  | A.    Yes. |
|  | Q.    After your meeting with Mr. Sambol you decided to stay at Countrywide; is that correct? |
|  | A.    I did. |
|  | Q.    Okay.  And did you receive an increased compensation package? |
|  | A.    I did. |
|  | Q.    Okay.  And did your increased compensation in any way cause you to temper your views concerning credit risk management at Countrywide? |
|  | A.    No, I don't think so.  I think that the various e-mails and such reflect that. McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 571:13-572:9) |
|  | Q.  All right.  So I'm going to give you a document I've already marked as Exhibit 782.  Do you see in Item No. 1, you referenced some concerns about inadequate controls? |
|  | MR. BROWN:  Objection, lack of foundation.  Go ahead. |
|  | A.  I do see that. |
|  | Q.  Do you recall writing that? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  I do recall writing that.<br><br>Q.  Okay.  Did you write that after you had a conversation about your concern with inadequate controls, with Mr. Sambol?<br><br>A.  I did write this after the conversation with Mr. Sambol. |
| | Q.  During the conversation with Mr. Sambol, did you discuss your concern about inadequate controls?<br><br>A.  I did.<br><br>Q.  All right.  Does the issue raised in Exhibit 984 regarding you being overridden on these product changes constitute one of the inadequate controls you're referencing?<br><br>A.  It would have been an example. |
| 278.   Countrywide's "underwriting guidelines" were an amalgam of four documents: three technical manuals for prime, nonprime and government products, and the Countrywide loan program guide, which covered all Countrywide's loan products.  The Countrywide technical manuals contained general instructions and principles concerning how loans were | McCoy Decl., ¶46, Ex. 236 (Aguilera Inv. Test., 38:16-39:13)<br><br>Q.   Did you have any role in creating the technical manual that had to do with the subprime products?<br><br>A.   I had the responsibility for maintaining the technical manual and what we called the loan program guidelines.  The technical manual existed when I joined the company.  We |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| underwritten, and the loan program guide contained the specific requirements for each loan program. | would recommend changes to the technical manual -- and I'll describe the difference between the two in a second – with respect to providing better clarity or more stringent standards from which you qualify borrowers.  The technical manual was really the governing manual for determining how you do fundamentals like determining income, underwriting the income, verifying income, the necessary documentation that might or might not be required. The loan program guides are the documentation, if you will, that set the menu.  So, in other words, can you do interest only, what's the maximum loan, what's the minimum FICO score required, what LTV can you do with a combination of FICO and loan amount. So those program requirements are part of the loan program guide.  They don't tell you how to underwrite the borrower; they just tell you how much -- what the lending parameters are associated with that borrower. |
| 279.   Countrywide used an automated underwriting system known as | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test., 301:17-304:4) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| "CLUES" to actually underwrite loans. The CLUES system applied the principles and variables set forth in the technical manuals and the loan program guide.  CLUES applied a device known as the "underwriting scorecard," which assessed borrower credit quality by analyzing several variables, such as FICO scores, loan to value ratios, documentation type (*e.g*., full, reduced, stated) and debt-to-income ratios. | Q.    And I think earlier you described the technical manuals as laying down general underwriting principals for all loans originated; is that correct? A.    That is one of the purposes of this, yes. Q.    And then for more detailed underwriting requirements for particular loan products, you would go to the loan program guides? A.    The loan program guides set out some of the specifics with respect to a particular product. Q.    Right. A.    And then the technical manual was something that was a companion that would be used in concert with those specific guidelines. |
|  | Q.    And besides those two documents or sets of guidelines, the technical manual and the loan program guide, were there any other underwriting guidelines that went into the underwriting decision?  And I'm only talking about automated underwriting at this point. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.   You are going to automated? |
| | Q.   I'm only talking about automated underwriting or would the guidelines apply or taken into account by Clues or any other AUS that was used by Countrywide when you worked there only the guidelines set forth in the technical manuals and the loan program guides? |
| | A.   No.  So in the automated underwriting system, it's going to have a series of three or four broad things.  So it's going to have the guidelines themselves.  So what you saw in the |
| | written guidelines would have been replicated in the system.  So that's first of all.  Secondly, it would have the quantitative scorecard that I talked about yesterday.  Thirdly, it would have screens that would generate red -- that would generate red flags that were supposed to be cleared.  So let me give you a quick example of that. Countrywide maintained a database of every property that sold across the US. And so Clues would do a check to see whether that property had sold recently. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | And the concern was if that property had just recently sold right before the transaction that we were contemplating, that we would want the processor or the underwriter to check out -- to check that situation out and make sure it was legitimate because, you know, two purchase and sales stacked closely together, you worry about it being a flip type of transaction.  So that would be an |
|  | example of just not required by the secondary market, not -- you know, just kind of some general detective controls that were part of the automated underwriting system.  There are other rules in there that would be similar to that.  And then the fourth would be compliance-related screens.  And so the loan could be kicked out because it didn't pass the quantitative scorecard because -- when I say kicked out, it would generate what is called a refer, meaning a refer to a manual underwriter because it busted one or more of the program guidelines or because of these red flags.<br>Q.   But just to be clear, Clues would |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | take into account the technical manuals and loan program guides? <br><br> A.   It takes into account the loan program guides. <br><br> Q.   Okay. <br><br> A.   Where this technical manual talks about ability to pay, and so that's a judgment made by a human being.  The |
| | way that was replicated in the automated underwriting score – in the underwriting automated system was through the scorecard that I mentioned. <br><br> McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 306:13-314:18) <br><br> Q.   Okay.  Can you explain what that quantitative scorecard is? <br><br> A.   A quantitative scorecard, it's a statistical model.  And in this particular application it's designed to rank loans.  So I mentioned yesterday how not long after I arrived at Countrywide that we redid the quantitative scorecard that they had in place.  And so it ranked loans -- I want to make sure that I recollect this right.  It was the likelihood -- it was based on the predicted likelihood that the borrower became seriously |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | delinquent over a specified time frame. |
| | Q.   Okay.  So it's accurate to state the purpose of this quantitative scorecard was to predict how likely a potential borrower was to go into serious delinquency over a given point in time? |
| | A.   In general, yes.  The specific is it's a ranking tool.  So if you had 10 loans, the idea would be able to rank each of those loans 1 through 10 on -- as to the relative likelihood of, you know, them going into a serious delinquency status at some point in the future. Q.   And what would be the purpose of ranking the loans? A.   So the idea -- the idea is to get at this ability to pay concept that you would see in a technical manual.  So one way to do it would be if you are doing manual underwriting is to apply judgment to make that determination. In an automated underwriting system, you are using a statistical scorecard to do rankings, and then you draw -- you draw a cutoff, a score cutoff.  So think about FICO scores.  We have talked about those a little bit.  That's a ranking |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | tool as well.  And so people use FICO scores all the time where they'll pick a particular FICO and say, "Above this, it's going to be treated one way.  Below this, it may be outside of guidelines."  And so the way Countrywide's |
|  | automated underwriting system worked is if it failed the cutoff on the quantitative scorecard, it would deliver an ability to pay referral, and then the loan would be manually underwritten. Q.   So the scorecard dealt -- is it accurate the scorecard dealt only with ability to pay? A.   That's accurate, but that's a broad concept.  So with understanding that, yes. Q.   Did the quantitative scorecard assess other variables that affected the likelihood of repayment besides attributes of the borrower such as documentation type? A.   Well, that's an attribute of the transaction is I would consider documentation.  So when I got to Countrywide, documentation was not an attribute in the scorecard.  In the very |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | first scorecard that we did and in the subsequent ones that we did, documentation was a scorecard variable. So you try -- what you try to include in these quantitative scorecards are all of the variables that are going to help be predictive and help in ranking the loans.<br><br>Q.   So why did you redo the scorecard once you joined Countrywide?<br><br>A.   Two reasons:  The scorecard that they had hadn't been looked at in a while first of all.  And then secondly as I looked at the scorecard, and I mentioned yesterday by this time Cliff Rossi had joined the bank, and he was a former colleague -- and I had worked together at Freddie Mac, as we looked at the scorecard, it was our collective opinion – our independent and collective opinion that it needed to be replaced.<br><br>Q.   And what types of considerations had formed that opinion?  Like why did you think it needed to be replaced?<br><br>A.   Based on work that we had done at Freddie Mac, it seemed like too simple of a scorecard. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.   Did you add variables to it? |
|  | A.   We did add variables to it. |
|  | Q.   In addition to the documentation type, what other variables were added? |
|  | A.   Oh, boy.  There was probably at least around the original scorecard had four variables that I remember, and one of those variables my recollection is was a ratio.  So that could even be thought of as a combination of two variables.  So documentation was one of the key additions.  But there were other additions, as well. |
|  | Q.   Do you remember what the four existing variables were when you joined? |
|  | A.   I believe -- so my understanding is that Fair Isaac had put the prior quantitative scorecard together for Countrywide.  So FICO was one of the variables.  I think leverage -- there was a leverage ratio or an LTV.  There was -- the variable that was the ratio, what I remember is income to loan amounts, so the borrower's income divided by the loan amount, and that fraction may have been inverted the other way. |

346

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.   Was debt to income an existing variable? |
| | A.   No.  So that ratio of income to loan amount is a proxy for debt to income. |
| | Q.   Okay. |
| | A.   Now, on the new scorecard we included debt to income as a variable.  It didn't turn out to be very predictive, and most of time over the course of my career that I've had occasion to either participate in or observe studies, that typically doesn't come out as being a very predictive variable.  The other thing -- the other thing we did, so we thought the scorecard could be improved from a credit perspective. The other thing we wanted to do with a scorecard is introduce a fair lending technique.  And so in the literature, there's a technique called the Liqueur Little Technique, and we wanted to use that in the scorecard, and we did, to address fair lending concerns. |
| | Q.   Can you briefly explain what you mean by fair lending concerns? |
| | A.   So a concern is so, you know, suppose that you have two applicants, |

347

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you know, one is a man, one is a woman.  You want them to be treated the same.  Suppose one is one race, one is another race, you want them to be treated the same.  So that's the kind of thing that I'm referring to. |
| | Q.   Did that result in gender and race being variables that were factored into the scorecard?<br><br>A.   The statistical technique worked like this:  So you are not supposed to have those variables in the scorecard.  What we were worried about, though, is that some of the variables that were in the scorecard might be correlated to those other prohibitive variables.  So the technique is you estimate the scorecard without those variables, then you estimate the scorecard with those variables, and then whatever coefficients that are on those prohibitive variables you just simply throw out.  So what that does, it draws any correlation away that exists on the non prohibitive variables to the prohibited ones, and then you can extract it explicitly.<br><br>Q.   Was the type of loan being sought, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the particular loan product, added as a variable?<br><br>A.   I recall that it was added as a variable.<br><br>Q.   And for what purpose would you do that? |
| | A.   So one of the things in the various studies that you would observe is that after you adjust for the other common loan attributes, that simply the borrower's choice of product has an effect on the likelihood of the loan becoming seriously delinquent or defaulting.  So, again, that's after you've adjusted for everything else, you will often see a residual effect.<br><br>Q.   If you turn to the page ending 905 in Exhibit 38?<br><br>A.   All right.<br><br>Q.   You see there's a chart at the bottom of the page?<br><br>A.   I do see the chart.<br><br>Q.   We'll talk more about that in detail, but if you look at the column that says "significantly increases risk"?<br><br>A.   Yes.<br><br>Q.   And you go to the bottom, and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | there's, "pay option"? |
| | A.   Yes. |
| | Q.   Now, is that related to what we were just discussing that the type of loan product affects, you know, the ability to repay -- not the ability to repay, but the |
| | likelihood that the loan will go delinquent or default? |
| | A.   So yes.  So what I was talking about a minute ago was evaluating that particular issue from a statistical perspective and some of the things that I observed.  What you see on Page -- the page ending in 905, this was -- this was an attempt to provide a tool to the underwriters when they were making that same kind of determination just from, you know, using their judgment. So it was to help them inform their judgment.  So it was kind of the same idea -- |
| | Q.   But doing the manual -- |
| | A.   But doing it manually versus through a computer system. |
| | Q.   Do you recall any opposition from anyone at Countrywide when you were adding variables to the scorecard? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.   Well, there were a couple different instances that we redid the scorecard. The first time -- the first time -- the first time that the scorecard was redone, I didn't broadcast that we were doing it, and I changed the scorecard out and then put it in.  It was subsequent -- you know, it subsequently became broad knowledge, and so there were discussions about it. |
| | Q.   What kind of discussions? |
| | A.   You know, "before you do that again, come talk to me."  That was Dave. |
| | Q.   Okay.  What was the impact of the addition of the new variables the first time you changed the underwriting scorecard? |
| | A.   Well, there would have been some loans that would have been kicked out previously that then passed the scorecard, and then there also would have been some loans that wouldn't have -- that wouldn't have been kicked out that now were. |
| | Q.   Which of those two was more a predominant result of your changes? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.    Probably the second.  And the other thing that I recall is that the scorecard that was in place didn't really specifically deal with HELOCs, that it had been developed before that time frame, and that we needed something to |
| | deal with HELOCs. So on the home equity loans, prior to the scorecard change that I'm talking about, the first one, I don't think HELOCs would have been referred for inability to pay because there wasn't a specific quantitative scorecard way of dealing with those.  So they are clearly -- there were more referrals.<br><br>Q.    Once that was added to the scorecard?<br>A.    That's correct.<br>Q.    But after the initial additions, the predominant effect was that more loans were either referred or kicked out during that process?<br>A.    More loans would have been referred for ability to pay.  You know, those -- my guess is those would have out numbered the ones that, you know -- the incremental kick outs would have |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | outweighed, you know, the incremental not kickouts.<br>Q.  Did anyone ever complain to you about that specific phenomenon where a loan is being kicked out?<br>A  Yes. |
| 280.   These variables were weighted differently within the scorecard, depending upon their strength in predicting credit performance.  In underwriting a loan, Countrywide loan officers entered an applicant's information into CLUES, which would approve the loan, approve the loan with caveats, or "refer" the loan to the loan officer for further consideration and/or manual underwriting. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Trans., 328:13-330:15)<br>Q.   And with respect to these features on the left-hand column such as reserves and ratio and FICO score, to your knowledge did they receive different weights within the analysis done within the scorecard?<br>A.   The quantitative scorecard?<br>Q.   Right.<br>A.   Yes, they would.  And one of the advantages, and I'm going to go back into my opinion, one of the advantages in my opinion of a quantitative scorecard is that you can more precisely weight the different factors than is easily done with human judgment.<br>Q.   And can you identify some of the factors that would have had higher weights or to the extent you can describe the hierarchy of weight |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | assigned to these different variables? |
| | A.   I can.  And there were also some presentations that I have done that had pie charts that would show the statistical weights of the different factors just to give you an example of that.  So FICO on the second page, so for residential loans, FICO often comes out as having a very heavy weight.  So that would be something that would be weighted heavily.  At the opposite end of the spectrum would be -- you see where it says back end ratio?  That's a debt to income ratio.  That typically will not have a high weight.  So on the various statistical studies that I have seen, both the ones done at Countrywide and the ones that I was involved with prior to Countrywide, the ratios never came out as having much statistical significance.  Now, part of the reason I wanted to leave it in the scorecard is to be able to say that it was in the scorecard so that the underwriters would look at that |
| | because from a logical -- a logical perspective, it seems like it should be important even though the statistical |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | evidence doesn't bear that out.<br><br>Q.   And can you just rank some of the other features in that hierarchy we -- FICO is at the top, back end is at the bottom, so where would something like –<br><br>A.   So that -- well, let me go to the other direction, if I could.  So FICO and then leverage -- let me find that.  Is that in here?  Sorry.  Thank you.  Yes, so go to the back page.  So you see the leverage there, 100, 95, 90, 80 and 70, and then FICO is within those boxes, so these two together would be important.  You know, those would have a heavy statistical rate.   And then documentation type, that would be important.  The product type would be - |
| | - would be more meaningful statistically than typically the debt to income ratio, but it wouldn't have -- it wouldn't have the same weight as the ones I just mentioned.  So it would tend to be one of the lesser weights.  I just remembered one of the tweaks by the way.  Sorry. |
| 281.   CLUES typically did not issue a "reject" result if a requirement of | Dean Decl., ¶129, Ex. 127 (McCallion Depo. Ex. 158 at 32904) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Countrywide's guidelines had not been met or if CLUES calculated that the loan presented an excessive layering of risk.  Instead, an adverse CLUES output came in the form of a "refer" result, indicating that the loan application would have to be reviewed manually, prior to approval.  In these circumstances, to proceed with the loan, the loan officer would have to request an "exception" from the guidelines from more senior underwriters at Countrywide's structured lending desks ("SLD") in each of its production divisions. | |
| 282.   To the extent that the production division SLD underwriter did not have authority to grant the requested exception, the loan would then be referred again, this time to the Secondary Marketing SLD, where the exception would be granted without further underwriting, so long as the Secondary Markets division could find a willing purchaser for the loan, either as a whole loan or a securitization. | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 116:8-117:2) Q.  And I think you testified earlier that with respect to exceptions, there was a process by which a loan might be referred to the Structured Loan Desk, and then if it was not approved there, it would be referred to Secondary Marketing; is that correct? A.  The concept of Structured Loan Desk was used both in the field, in Production, and we used the same |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | description in Secondary to describe kind of an exception desk.  And depending on the level of the exception, it would either go through the Structured Loan Desk in the field or be referred to Secondary's Structure Loan Desk. Q.  Okay.  Did you -- so essentially, I guess, what you're telling me is there were two Structured Loan Desks? A. That's right. Q.  One that was in Production, and one that was in Secondary Marketing? A.  That's right. |
| | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 117:14-19) Q.  And do you have any understanding of whether the Structured Loan Desk that's referred to in this particular e-mail is the Structured Loan Desk from Secondary or from the Production division? A.  I think this was related to the Secondary Structured Loan Desk. Dean Decl., ¶10, Ex. 8 (Adler Depo. Ex. 1062) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 118:11-122:8)<br>Q.  The e-mail goes on to say:<br>"The thought was that we would offer borrower exceptions in our two major loan programs, 30-year fixed rate and 5/1 ARMs."  Do you see that?<br>A.  I do.<br>Q.  Was that consistent with your understanding of the original purpose of the Structured Loan Desk in Secondary? |
| | MR. GIGOUNAS:  Objection.  Lacks foundation.<br>THE WITNESS:  I do recall that.<br>Q.  Okay.  The e-mail goes on to say, skipping a sentence:  "While this process seems to have worked well in the past, we have recently seen – we have been recently seeing increased demand from Production for exceptions on all products in general and on pay-option loans in particular."  Do you see that?<br>A.  I do.<br>Q.  Is that consistent with your recollection of the evolution of the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Structured Loan Desk in July of 2005? |
| | A.  Yes. |
| | MR. BALDING:  Objection.  Lack |
| | foundation, vague and ambiguous. |
| | Q.  The e-mail goes on to say: |
| | "In addition, Production has been |
| | expressing frustration that we were only |
| | offering major exceptions for 5/1 ARMs |
| | and 30-year fixed rates.  As such, to the |
| | widest extent possible, we are going to |
| | start allowing exceptions on all requests, |
| | regardless of loan program, for loans |
| | less than $3 million, effective |
| | immediately."  Do you see that? |
| | A.  Yes. |
| | Q.  Okay.  And is that also consistent |
| | with your understanding of the |
| | evolution of the Structured Loan Desk |
| | in 2005? |
| | MR. BALDING:  Same objections. |
| | THE WITNESS:  That sounds familiar. |
| | Q.  And then the last sentence in that |
| | particular paragraph reads: |
| | "Finally, we will not be reviewing loans |
| | from an underwriting point of view, but |
| | will, rather, be relying on Production to |
| | make certain that the loan meet all other |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | underwriting guidelines and will have been reviewed for fraud."  Do you see that?<br>A.  I do.<br>Q.  Do you recall that, with respect to the Structured Loan Desk in Secondary Marketing, the Structured Loan Desk was not reviewing loans from an underwriting point of view in terms of granting exceptions? |
| | MR. GIGOUNAS:  Objection.  Vague as to time, lacks foundation.<br>MS. DEAN:  The timing is July of 2005.<br>THE WITNESS:  That's correct.<br>McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 123:12-17)<br>Q. Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?<br>A.  That was the only criteria that we followed. |
| 283.   Sambol insisted that Countrywide should write loans whether or not competitors were | McCoy Decl., ¶30, Ex. 220 (Sambol Depo. Ex. 2014); McCoy Decl., ¶86, Ex. 276 (Sambol Dep. Tran. 196:21 – |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| offering the product. | 200:16) |
| | Q.  Exhibit 2014 is a multiple-page e-mail string Bates stamped CFCP006172202 through 2209.  The e-mail at the top of the first page is from Jim Cormosa to Dave Sambol.  It is dated February 14, 2005.   Mr. Sambol, I am only going to ask you a question about the e-mail immediately below that which is dated February 13, 2005.  And |
| | it is from Dave Sambol to Jim Carmosa with carbon copies to Brian Koss, Brian Hale and Dan Hanson. A.  Okay. Q.  The first sentence of that document – the first sentence of that e-mail reads: *"I generally agree with your description of the purpose of SLD and our pricing philosophy, except that I would even expand it to say that we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."*  Do you see that? A.  Yes. Q.  Did you write that e-mail that's |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | dated February 13, 2005? |
| | A.  I believe I did. |
| | Q.  And does the sentence -- is the sentence I just read consistent with your philosophy with respect to the purpose of the SLD and Countrywide's loan pricing philosophy? |
| | MR. BROWN:  Objection.  Compound. |
| | THE WITNESS:  Only if you add to it the part that you didn't read. |
| | Q.  Let's do it this way.  I didn't read the entire paragraph because I am only asking you about the sentence.  I am asking you about the first sentence of the e-mail dated February 13th, 2005.  It starts:  "I generally agree" and ends with the word -- and ends with the phrase "even if other lenders can't or won't do the deal."  And what I am asking you is, is that sentence consistent with your philosophy with respect to the structured lending desk and Countrywide's pricing philosophy as of February 13th, 2005? |
| | MR. SIEGEL:  And the question was asked  and answered by the witness, telling you that only  in the context of the paragraph -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | MS. DEAN:  Counsel, I am going to ask you to stop making speaking objections. MR. SIEGEL:  The question was asked and answered.  You are arguing with the witness and misrepresenting the document. MS. DEAN:  "Asked and answered" would be sufficient, Counsel. MR. SIEGEL:  And the rest of the objections are also sufficient. |
|  | Misrepresenting the document and arguing with the witness. THE WITNESS:  Yes.  That first sentence was intended to be my view in the context of the rest of the paragraph with the qualifications I kind of enumerated in the rest of the paragraph. Q.  Fair enough.  So what you are saying is the qualification which is the next sentence which says "I am qualifying by saying 'virtually any loan' because there are certain circumstances where we will decline to do the loan;" is that right? A.  Yes. Q.  But other than that qualification, that is a correct reflection of your |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | philosophy, is it not? |
| | A.  At that time. |
| 284.   Countrywide's level of exceptions was higher than other mortgage lenders. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test., 374:25-375:6) |
| | BY MR. BENDELL: |
| | Q    Can you compare the level of attention and concern you had about exceptions in the underwriting process at Countrywide as compared to your other professional experience? |
| | A    Sure.  So in terms of the |
| | infrastructure and databases that Countrywide had? |
| | Q    No – |
| | A    This is an important piece, if it's okay. |
| | Q    I want to make sure you understand the question.  You are free to answer it with whatever you think is relevant, but the question is in terms of your level of concern and attention as you just described it being present during the whole time that you were at Countrywide, I'm trying to get -- understanding that it was of some concern and attention during your whole tenure at Countrywide, and you've |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | described that several times, and now I'm trying to take a step back and say, okay, well, comparing that to your -- I mean, you described yesterday a lot of experience you've had in the mortgage industry. So I'm trying to get a sense for whether you viewed exceptions as a bigger -- a more serious risk at Countrywide than at other places that you have worked in the mortgage industry? |
| | A    And so -- and I want to answer that question by providing two perspectives. So -- and some of this is going to tie back things that we have already talked about. So the level of exceptions was higher there compared to, you know, my observations elsewhere. There are multiple reasons for that. We have talked about the matching policy. We talked about the no brokering policy. We've also talked about the exception process being used to introduce new guidelines and product changes. So that's perspective one. |
| 285.   In Countrywide's case, the elevated number of exceptions resulted | *Id.* |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| from its use of exceptions as part of its matching strategy to introduce new guidelines and product changes. | |
| 286.   Until Countrywide's Exceptions Processing System was introduced on a rolling basis in late 2005, the company had no way to even determine how many exceptions loans were being originated. | McCoy Decl., ¶53, Ex. 243 (Cobb Dep. Tran. 173:12-22) Q.  Well, I think your prior testimony was that Mr. Sambol asked you to develop the EPS system; is that right? A.  That's correct. Q.  Did Mr. -- in conjunction with that request, did Mr. Sambol indicate to you that one of the reasons he wanted to |
| | the system was that management at that time had no way of knowing how many exception loans were being originated? MS. HARRIS:  Objection.  Vague, ambiguous. THE WITNESS:  Yes. |
| 287.   On May 22, 2005, Countrywide's Chief Credit Risk Officer sent an e-mail to Sambol regarding the use of exceptions at Countrywide. | Dean. Decl. ¶86, Ex. 84 (SEC Depo. Ex. 778). |
| 288.   The Chief Credit Risk Officer identified, among other things, the following concerns to Sambol regarding credit risk associated with | *Id.* |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| exception loans:<br><br>• because many exceptions loans are structured as piggy-back transactions, Countrywide takes on much of the credit risk on the loan through the second lien, which is not sold into the secondary market;<br><br>• although Countrywide has managed to sell credit risk associated with higher risk transactions to third-parties, | |
| Countrywide will see higher rates of default on these loans, resulting in third-parties seeking repurchase or indemnification from Countrywide for losses due to the defaults;<br><br>• Countrywide's pricing models are inherently limited because they "are often used to price transactions (e.g., exceptions) beyond the scope of the data used to estimate the models. | |
| 289.   About a month later, on June 28, 2005, Countrywide's Corporate Credit Risk Committee, of which Sieracki was | Dean Decl., ¶¶164-165, Exhs. 162-163 (Ingerslev Depo. Ex. 191 at p. 15; Depo Ex. 190 at 054522) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| a member, received a presentation informing the attendees that 1/3 of the loans referred from CLUES miss major guidelines and another 1/3 miss minor guidelines.  Moreover, the presentation informed the committee that exceptions loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines. | |
| 290.   On March 23, 2006, the Chief Credit Risk officer sent an e-mail, ultimately received by Sambol, reiterating recent revisions to Countrywide's credit policy regarding high-risk products.  In particular, he emphasized that Countrywide would not retain any credit risk associated with high-risk products and that all loans must be documented and underwritten to clearly meet all applicable guidelines, including exception guidance.  Sambol, however, tells the head of production that he will speak to the CEO about this policy as it relates to subprime 80-20 loans. | Dean Decl., ¶87, Ex. 85 (Kuelbs Depo. Ex. 961) |
| 291.   The risk management group for | Dean Decl., ¶¶6-7 & 9, Exhs. 359, 389 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| the production division produced a periodic report (distributed to Sambol among others) entitled the "Credit Risk Leadership Reporting Package" which reported various metrics by which to measure loan production. | and 962; McCoy Decl., ¶89, Ex. 279 (Schakett Dep. Tran. 104:11-105:4) Q. The court reporter has handed you a document marked Exhibit 389. This document has the Bates range CFCNYF00214046 through 4146. Is this document an example of the credit risk leadership reporting package that we were just discussing? A. It is. But now that you have put it in front of me, this actually is a document that I am pretty sure that the production risk management group produced |
| | versus John McMurray's risk management group, so I think this is a document that a group under my direction would have produced. Q. Do you recall to whom these reporting packages were given? A. It would have gone to the senior leadership of both the production division and the credit risk division, including Dave Sambol as far as the president of the company. |
| 292.   Sambol was informed the volumes of underwriting exceptions through his receipt of the credit risk | McCoy Decl., ¶89, Ex. 279 (Schakett Dep. Tran. 104:11-105:4) Q. The court reporter has handed you a |

369

| SEC Statement | Evidence Cited by SEC |
|---|---|
| leadership reporting packages. | document marked Exhibit 389.  This document has the Bates range CFCNYF00214046 through 4146.  Is this document an example of the credit risk leadership reporting package that we were just discussing? <br> A.  It is.  But now that you have put it in front of me, this actually is a document that I am pretty sure that the production risk management group produced versus John McMurray's risk management group, so I think this is a document that a group under my direction would have produced. |
|  | Q.  Do you recall to whom these reporting packages were given? <br> A.  It would have gone to the senior leadership of both the production division and the credit risk division, including Dave Sambol as far as the president of the company. <br> McCoy Decl., ¶ 86, Ex. 276 (Sambol Dep. Tran. 122:16-124:4) <br> BY MS. DEAN: <br> Q.  Good afternoon, Mr. Sambol.  I am handing you now what has previously been marked as Exhibit 359. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | (Deposition Exhibit 359 was previously marked for identification.) BY MS. DEAN: Q.  The front page of the document reads: "Countrywide Home Loans Credit Risk Leadership Reporting Package (CHL) All Divisions June 2006."  And the Bates stamps are CFC2007C009798 through  9925.  I know the document is very small type. I'm not going to ask you to read any parts of it.  I just want to know if you recognize the document. A.  I do. Q.  What do you recognize it to be? |
| | A.  It's a monthly report that was put out by the credit risk management department showing various trends in the profile of our production and our portfolio. Q.  And were you a regular recipient of these credit risk leadership reporting packages? A.  At some point I became.  I'm not sure about the June '06, but at some point I received them monthly. Q.  Would you have started to receive |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | them monthly after you became the president and COO of the company? A. I believe so. Q. So -- A. Excuse me. I would have received them monthly at that point, perhaps before. Q. Okay. Is it possible that you received them as early as June of 2006? A. It's possible. Q. Was it your practice to read them when you received them? A. Sometimes. More so I would use them as a reference. |
| 293.   In June 2006, the Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, 55.3% of its standalone home equity loans. | Dean Decl., ¶6, Ex. 4 (Krsnich Depo. Ex. 359 at p. 42). |
| 294.   In December 2006, the Credit Risk Leadership package reported similar percentages of loans underwritten on an exceptions basis: 45.4% of Pay-Option ARMs, 35.3% of | Dean Decl., ¶7, Ex. 5 (Schakett Depo. Ex. 389 at p. 54). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| subprime first liens, 24.1% of subprime second liens, and 52.6% of standalone home equity loans. | |
| 295.   Typical exceptions rates for the industry would have been 5% to 10% and rates in excess of 20% would have been inconsistent with a low exceptions rate. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 58:24-59:13)<br>Q   Do you have any general understanding of what a typical exception rate is in the mortgage industry?<br>MR. DAVIDOFF:  Objection.  Vague.<br>MR. MEYERS:  And form.<br>A   I -- it's not something that was disclosed very often, but my understanding at that time would have been something five, 10 percent. |
| | Q   So would you consider an exception rate of 20 percent or higher to be low?<br>A   No.<br>Q   So an exception rate of 20 percent or higher would be inconsistent with keeping exceptions low in your understanding?<br>A   Yes. |
| 296.   Countrywide did not publicly disclose the amount of loans it was underwriting on an exception basis for any loan product or division. | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 195:22-196:5)<br>Q.  I think we covered this, but if you turn to page S-35, Mr. Balding asked |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you to read the sentence about exceptions that appears five lines from the bottom of the page.  There was nothing in these prospectus supplements that actually quantified the number of exception loans in a pool; correct?<br>MR. GIGOUNAS:  Objection.  Leading.<br>THE WITNESS:  That's correct.<br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 56:3-19)<br>Q    Was -- were you provided any information on any of those conference calls or investor forums regarding exception loans?<br>A    Not in a lot of detail, but I think it was discussed.  Every once in a while, they would say we keep our |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | exceptions low or something like that. |
| | Q   I'm sorry, keep our exceptions low? |
| | A   Yes. |
| | Q   Well, actually let me ask you this. With your experience covering the consumer finance sector and some -- and mortgage banking, are you familiar with what an exception loan is? |
| | A   Yes. |
| | Q   Okay, what is it? |
| | A   It's a loan that does not fall within your guidelines, but you make an exception for various reasons. |
| | McCoy Decl., ¶72, Ex. 62 (Liu Dep. Tran. 122:11-123:13, 131:16-24): |
| | Q.  Before the break, Mr. Liu, I think we were talking about the particular disclosure that's contained in the quote in paragraph 7 of your declaration that's now Exhibit 1094.  I guess my question is:  Does that disclosure that you've quoted, in your understanding, disclose whether there are actually loans underwritten on an exceptions basis that are included in the pool or whether it only discloses that there may be such loans? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. WINAWER:  Objection. |
| | Document and quote speaks for itself.<br><br>MR. BENDELL:  I'm asking for his<br><br>understanding.<br><br>THE WITNESS:  My understanding is<br><br>that this -- well, I guess it would -- I<br><br>guess for any transaction that includes<br><br>Countrywide originated mortgage loans |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that some of those mortgage loans may have been -- may have been originated with exceptions that have compensating factors.<br>BY MR. BENDELL:<br>Q.  Okay.  But I get -- I understand that they may have, but can you tell from this disclosure whether they actually were underwritten based on exceptions on compensating factors?<br>A.  I -- I -- from this statement?<br>Q.  Right.<br>A.  I don't think you can tell.<br>***<br>Q.  Right.  But did you have a -- did you have information about what the – in any of the pools that you were the reviewing attorney on the prospectus supplements for, did you – were you provided with the data of how many |
| | loans were underwritten on an exceptions basis?<br>MR. DROOYAN:  You can answer that yes or no.<br>THE WITNESS:  No. |
| 297.   On June 29, 2007 Christian Ingerslev e-mailed a powerpoint | Dean Decl., ¶11, Ex. 9 (Adler Depo. Ex. 1067 at p. 5) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| presentation to several Managing Directors at Countrywide that summarized delinquency trends in Countrywide's exception loans.   In it, he noted that 1st liens originated in 2006 outside of Countrywide's posted guidelines exhibited "astoundingly poor performance for purportedly prime credit loans." | |
| 298.   On February 21, 2007, Countrywide's product manager for subprime presented statistics demonstrating "greater than expected exceptions levels" to a group that included the Chief Credit Risk Officer. In particular, loans produced by the Full Spectrum Lending Group "exceed[ed] any imaginable comfort level."  The product manager stated that exceptions controls needed to be reviewed in light of this data. Moreover, he added that "[a]ny Guideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained." | Dean Decl., ¶88, Ex. 86 (Hesser Depo. Ex. 35) |
| 299.   Sometime between April and | McCoy Decl., ¶¶28 & 29, Ex. 218 & |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| May 2007, Mozilo and Sambol authorized CFC's Consumer Markets Division ("CMD") to originate loans under a program called the Competitor Match Exception Program ("CMEP"). | 219 ( Mozilo Depo. Ex. 1806 & Sambol Depo. Ex. 2010)<br><br>". . . during the recent subprime and Alt-A meltdown CHL offered the Competitor Match Program which provided an unparalleled product offering to you and your business partners." |
| 300.   In accordance with the CMEP, loan officers within CMD were allowed to seek exceptions that were outside of <u>any</u> existing CFC underwriting guidelines, including the unapproved EAA guidelines and the secondary marketing saleable guidelines. | Dean Decl., ¶100, Ex. 98 (Backley Depo. Ex. 1951 (May 2, 2007 e-mail from Isa Backley to Vijay Lala))<br><br>McCoy Decl., ¶48, Ex. 238 (Backley Dep. Tran. 61:23-63-12, 64:19-69:3):<br>Q.  Okay. Well, let's mark as the next exhibit, which I think will be 1951, a May 2, 2007 e-mail from you to Mr. LaLa.  A lot of copies on it.  The next exhibit is going to be Bates numbered CFCP4482796 through CFCP4482803. |
| | (Deposition Exhibit 1951 was marked for identification and is attached hereto.)<br>Q.  Ms. Backley, do you recall sending this e-mail to Mr. LaLa on May 2, '07?<br>A.  Yes.<br>Q.  Okay.  And you start the e-mail by |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | stating: "Vijay/Trevor - Thank you for your time this morning and walking us through the outline of this program. The following is my understanding, please provide comments/responses as appropriate."  First of all, could you identify who Trevor is? A.  Trevor was with the secondary marketing department. Q.  Okay.  And do you recall attending a meeting the morning of May 2, '07 regarding the competitor match exception program? A.  I don't remember the meeting.  It probably was a call. Q.  A call? A.  That's my guess.  I -- I'm guessing at this point because I -- I don't remember the meeting, but I remember we talked about it. Q.  All right. |
| | MS. BACON:  Don't guess. BY MR. WYNN: Q.  And is your -- is your e-mail describing the understanding of the competitive match program that you gained as having attended that meeting? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  After the call, yes. |
| | * * * |
| | Q.  All right.  Now, you go on to state the -- that: "The program provides CMD with the flexibility to make exceptions outside of shadow and extreme Alt A guidelines and outside of the saleable guidelines currently requiring corporate SLD approval." |
| | A.  Um-hum. |
| | Q.  All right.  I just -- I just want to focus on these three sets of guidelines you reference. |
| | A.  Um-hum. |
| | Q.  The first being the shadow, the second being the extreme Alt-A guidelines and the third being the saleable guidelines. |
| | A.  Um-hum. |
| | Q.  Okay.  Do you -- explain what the shadow guidelines were. |
| | A.  This shadow guidelines -- so there are guidelines that are published. Q.  Okay. A.  To the loan officers or, you know, to our sales force.  And then shadow guidelines were like the exception |

381

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | guidance, if you will. Q. Okay. And were the shadow guidelines available -- A. And that -- that was -- excuse me? Q. Were the shadow -- who were shadow guidelines made available to? A. To the structured loan desk for the division. Q. Okay. A. So that required more scrutiny. Q. Okay. And then what are sala- -- what are the extreme Alt-A guidelines? A. The extreme Alt-A guidelines were more related to actually creating a program. That we were looking at creating a program that -- that it wasn't just necessarily the exceptions, but a program -- an extreme Alt-A program, meaning an Alt-A program bigger than what the loan officers' guidelines would be. |
| | Q. Okay. And to your knowledge, were the loan officers able to request exceptions with reference to the -- by referencing the proposed extreme Alt-A guidelines? MR. DHARNIDHARKA: Objection. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Vague.  Vague as to time. |
| | THE WITNESS:  I couldn't -- I wasn't that much in touch with the decisions themselves or the production staff or loan officers, so I -- I -- I --I cannot speculate how they related to the structured loan desk and what their communication was. |
| | BY MR. WYNN: |
| | Q.  Okay.  Do you know whether or not these extreme Alt-A guidelines were provided to people in the structured loan desk? |
| | A.  In the -- yes, to the structured loan desk.  At some point they were released to the structured loan desks, yes. |
| | Q.  Okay.  And what are the saleable guidelines that you reference? |
| | A.  The saleable guidelines was basically the -- kind of like the -- the -- the -- the box, if you will, of, you know, |
| | the boundaries.  So we would -- on the shadow guidelines or EAA, there will be a lot of details:  Owner-occupied, nonowner-occupied, second home, LTV, CLTV, FICOs.  Documentation types.  And then the saleable guidelines |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | was, you know, a cleaner set of guidelines, if you will, that it will encompass, like, the box, if you will. Used to refer to it like "the box." Q.  Okay. A.  So that's what the saleable guidelines were. Q.  And did the saleable guidelines reside in secondary marketing? A.  Yes. Q.  Okay.  To your knowledge, were they made available at the structured loan desk level? A.  No. Q.  Okay. A.  No. Q.  Okay.  So this competitor match program was an additional level of exception authority.  That's correct? MR. VALLEJO:  Objection.  Misstates the testimony. |
|  | THE WITNESS:  Well, this program, it wasn't really a program that it -- restate the question, please. BY MR. WYNN: Q.  Yeah.  I will just ask you the question.  So in the -- in -- in your e- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | mail, when you state, "This program provides CMD with the flexibility to make exceptions outside of the shadow and EAA and outside the saleable guidelines," what do you mean by that? A. Basically the guidelines that secondary was using as their box. Q. Okay. A. Credit box, if you will. Q. Okay. So did this competitor match exception program expand that box that secondary marketing had been using? A. Some of the guidelines that were shared with us at that time, that's what I'm telling them, yes. |
| 301.   At least 600 loans originated under the CMEP in a single month.  In many cases these were loans that no Countrywide competitor was offering. | Dean Decl., ¶95, Ex. 93 (Scammahorn Depo. Ex. 987) |
| 302.   As of May 1, 2007, hundreds of loans had been approved and/or originated under the CMEP, but no approval request had been circulated to the requisite governance structures within CFC, including credit risk management. | McCoy Decl., ¶62, Ex. 252 (Ingerslev Dep. Tran. 126:25-130:16): Q. Okay.  Exhibit 200 is going to be a series of e-mails, the last of which is a May 3rd, 2007 e-mail from Mr. McMurray and Mr. LaLa.  Exhibit 200 is Bates numbered CFC2007I203893 through 902. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | (Deposition Exhibit 200 was marked for identification.) THE WITNESS: Should I read it all or should I – BY MR. WYNN: Q. No. If you would just turn to your March 1st, 2007 e-mail from you to Mr. LaLa, to the page ending in 898 CFC. MR. BROWN: I'm sorry, what page? MR. WYNN: Ending 898 with the CFC prefix. Q. Do you recall sending the e-mail to Mr. LaLa on May 1st, 2007? A. I don't. Q. Any reason to believe that you did not? A. No. Q. Below that e-mail there is an e-mail from Mr. LaLa to you dated March 1st, 2007. Do you recall receiving that |
|  | e-mail? MR. DROOYAN: May 1st. THE WITNESS: May 1st. BY MR. WYNN: Q. May 1st. May, March. A. I do not recall this, but I have no reason to believe this is not true. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  Do you recall what the Competitor Match Exception Program is? |
| | A.  Vaguely.  I don't have a very good recollection of this topic. |
| | Q.  Do you recall a competitive match exception program was put into effect in the  production divisions? |
| | A.  I remember there being a meaningful amount of confusion around it which is maybe why I am not remembering very well now.  And I think my e-mail sort of depicts that, that this is baffling to me that this is occurring, if what Vijay is describing to me is, in fact, occurring. |
| | Q.  Why is it baffling?  Why was it baffling? |
| | A.  Because I wasn't aware of it. |
| | Q.  From my reading of these two e-mails, it seemed to be an exception program that did not involve the credit risk management department; is that correct? |
| | MR. DROOYAN:  Leading. |
| | MR. LINDENBAUM:  Objection.  Leading. |
| | THE WITNESS:  Yes. |
| | //// |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | BY MR. WYNN:<br><br>Q.  And you don't know if this was ever put into effect; is that right?<br><br>MR. ELDER:  Sorry, what was your question?<br><br>BY MR. WYNN:<br><br>Q.  Your testimony is you don't know whether or not this competitive match exception program was ever put into effect?<br><br>A.  I don't recall, but I don't believe it was formally ratified and I have no recollection as to how long it existed. Referenced in my e-mail here, again, I don't recall this today sitting here, but obviously my e-mail, I am referencing loans that are being done under the program.<br><br>BY MR. WYNN:<br><br>Q.  Right. |
|  | A.  Or the process.  I don't know how long or how much that occurred.<br><br>Q.  And when you say "formally ratified," who would it have been formally ratified by?<br><br>MR. LINDENBAUM:  Objection. Vague and ambiguous, incomplete |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | hypothetical. |
| | THE WITNESS:  The same as any other underwriting guideline or process change; so secondary marketing, credit, legal, servicing, et cetera, depending upon the topic.  So on this particular one, it did not go through the credit -- it didn't obtain credit area's approval. |
| | BY MR. WYNN: |
| | Q.  Even though it did not obtain approval from credit risk management, loans were being originated under this program? |
| | MR. LUSKEY:  Asked and answered. No foundation. |
| | MR. LINDENBAUM:  Calls for speculation. |
| | MR. DROOYAN:  And leading. |
| | BY MR. WYNN: |
| | Q.  Is that correct? |
| | A.  Again, I don't recall that sitting here, but that's what my note says. |
| | Dean Decl., ¶ 97, Ex. 95 (Ingerslev Depo. Ex. 200 (5/1/07 e-mail from Ingerslev to Lala)); Dean Decl., ¶100, Ex. 98 (Backley SEC Dep., Ex. 1951 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | (May 1, 2007 e-mail from Isa Backley to Vijay Lala)) |
| 303.   Dave Sambol approved the CMEP. | Dean Decl., ¶100, Ex. 98 (Backley SEC Dep., Ex. 1951 (May 1, 2007 e-mail from Isa Backley to Vijay Lala))

McCoy Decl., ¶48, Ex. 238 (Backley Dep. Tran. 77:5-18):
Q.  Okay.  So turn to the next page where you are -- are you still continuing with the same e-mail.
A.  Um-hum.
Q.  And you state that:
"Vijay mentioned that Dave S. approved the program."
A.  Um-hum.
Q.  Who is Vijay?  Was that Vijay LaLa?
A.  Yes.
Q.  Okay.  And who is Dave S.?
A.  Dave Sambol.
Q.  Okay.  Did Mr. LaLa tell you that |
| | Dave Sambol had approved the competitor match program?
A.  If I state it in there, that was the case. |
| 304.   However, in accordance with | McCoy Decl., ¶76, Ex. 266 (McMurray |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| established corporate policy, the approval of the Chief Credit Risk Officer should have been obtained prior to implementing the CMEP. | Dep. Tran. 608:10-609:2):<br><br>Q.  Okay.  In accordance with corporate policy at Countrywide, should this program have been rolled out without your approval?<br><br>MR. BROWN:  Objection, lack of foundation.  Calls for speculation.<br><br>THE WITNESS:  On this particular program, my recollection, it would have required more than just my approval.  Again, as I mentioned a moment ago, this was committing the company's capital as a balance sheet asset.  So it would have been something that should have gone to ALCO, as an example.  It would have been something that Kevin should have agreed to and signed off on, at a minimum, is my recollection.<br><br>BY MR. WYNN:<br><br>Q.  Did it need your approval?<br><br>A.  It would have.  But I was just trying to point out, it would not just be my |
| | approval. |
| 305.   On May 2, 2007 Isa Backley (an employee in CFC's Credit Risk Management Department) sent an e-mail to John McMurray asking whether | Dean Decl., ¶102, Ex. 100 (Backley Depo. Ex. 1955  (May 2, 2007 e-mail from Isa Backley to John McMurray, et al.) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| he was aware of the CMEP. | |
| 306.   After receiving Ms. Backley's e-mail, on May 3, 2007, McMurray was upset and admonished Vijay Lala that the CMEP (1) needed to go through the normal written program approval process, and (2) needed to be presented to, and approved by, the Corporate Credit Risk Committee. | Dean Decl., ¶98, Ex. 96 (Trantacosta Depo. Ex. 1660 (May 3, 2007 e-mail from John McMurray to Vijay Lala))<br><br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 603:22-604:14, 605:4-606:22):<br>Q.  Okay.  Back to the first page on Exhibit 1660.  In your e-mail to Mr. LaLa, you state:  "At a bare minimum, this needs to go through the normal approval process, including the prior written approvals."  What are you talking about there?<br>A.  The company had a process, in policies, with the introduction of new products or the changing of product guidelines.  And so what I'm suggesting here is that something like this should go through that exact same process.  And there's no reason whatsoever that it should be exempted in any way. |
| | Q.  Okay.  And if you look at the heading "Documentation" --do you see that?<br>A.  I do. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  In that heading, you state:  "Where is the document describing the details of how this this program works?  All I've seen is Isa's summary." |
| | **** |
| | Q.  All right.  And if you turn to the second page of the document.  Into your e-mail, you state:  "Please let me know the status of this program, including answers to my questions.  I am certainly hoping that this was not launched without the proper approvals, controls, and considerations being in place.  Trevor, if your group is approving these loans, you had better have written and dated authorization to be taking these assets onto the balance sheet.  Please confirm that you have this written authorization or that you have not approved any loans under this program."  It sounds to me like you were pretty heated.  Is that right?  MR. BROWN:  Objection, vague and |
| | ambiguous.  Lack of foundation.  MR. WEISS:  And argumentative.  BY MR. WYNN:  Q.  I won't argue with you.  But it |

| SEC Statement | Evidence Cited by SEC |
| --- | --- |
| | sounds to me, from reading that, that you were upset; is that correct? A. Well, it didn't sound too bad to me. But keeping something on the balance sheet is a big deal at any financial institution. We've talked a lot about -- today on the residential business with Countrywide --with it being primarily an originate-and-distribute model. This is not an originate-and-distribute. This is an originate-and-hold. Furthermore, take a look at the date. So we're well into 2007. The big collapse hasn't happened yet, but we've already had the difficulties around subprime. And Vijay, Trevor, Brian Kuelbs, Charles, Emily, Mark Elbaum --a lot of the people that appear on this do not have the corporate authority to be putting something – to be making investments that will go on the balance sheet. So yes, in my opinion, it was a big deal; and hopefully, this doesn't appear to be |
| | discourteous, because it wasn't meant to be. But if they're going to commit the firm's capital, they should have the requisite authority and approval to do |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | so, in my opinion.<br><br>Q.  Okay.  Back to my original question:  Were you upset when you sent this e-mail on May 3rd, 2007?<br><br>MR. WEISS:  Objection, vague.<br><br>MR. BROWN:  Asked and answered.<br><br>A.  Probably. |
| 307.   Additionally, on May 3, 2007, McMurray requested that CFC's Internal Audit Department investigate the possibility that, pursuant to the CMEP, loans were being originated and placed on CFC's balance sheet without the required approvals and controls. | Dean Decl., ¶104, Ex. 102 (Backley Depo. Ex. 1957) (May 3, 2007 e-mail from John McMurray to Julie Scammahorn)) |
| 308.   After investigating McMurray's concerns regarding the CMEP, Internal Audit determined that the program had been implemented without first having been submitted for approval through the appropriate CFC governance structures. | Dean Decl., ¶95, Ex. 93 (Scammahorn Depo. Ex. 987 (5/3/2007 e-mail from Scammahorn to Smiechewicz, including multiple forwarded e-mails.))<br><br>McCoy Decl., ¶88, Ex. 278 (Scammahorn Dep. Tran. 215:23-218:12, 219:22-221:12): |
| | MS. MELSON:  Let me mark this as Exhibit 987.<br><br>(Scammahorn Exhibit 987 for identification, e-mail chain, Bates |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | stamped CFC20071204036 through 4047 and NYF-SEC 018660 through 8670.) |
| | Q.     Can you review Exhibit 987.  It's an mail chain dated on or about May 2007 and it bears Bates number CFC20071204036 through 4047, as well as NYF-SEC 018660 through 8670.  It looks like the original e-mail was sent on or about April 24th, 2007 from Mary Bresnahan and then at some point it is forwarded to you.  Do you recall receiving this e-mail chain on or about April 24th, 2007, or rather May 3rd, 2007? |
| | A.     I'm going to read through the chain. |
| | Q.     Sure. |
| | A.     I'm trying to get familiar. |
| | Q.     Sure. |
| | A.     Okay, I'm sorry it took so long, it's lengthy. |
| | Q.     That's okay, I know.  So did you in fact receive the e-mail chain that we've marked as Exhibit 987 on or about May 3 rd, 2007? |
| | A.     Yes. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.    And do you recall this issue coming up regarding the competitor match exception program? |
| | A.    Yes. |
| | Q.    Can you describe the competitor match exception program? |
| | A.    If a competitor was giving a better pricing on the loan to a customer and a customer made us aware of that, there were certain financial institutions that we would match to get the loan from a competitor. |
| | Q.    And Countrywide was willing to make that loan even if the terms of the loan didn't meet its underwriting standards; is that correct? |
| | A.    If there were – |
| | MR. CARSTEN:  Objection; vague and ambiguous, compound and calls for speculation.  It's an incomplete hypothetical. |
| | A.    If it was an exception loan, because at this time our guidelines |
| | guidelines became much stricter, the loan would have to be reviewed, my understanding was, by the senior managing director over that division, so |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | it was predominantly CMD, our consumer markets division, which would have been Brian Hale, H-a-l-e. So it would have to go to his level of approval, and I believe, I'm not sure, if Drew Gissinger was directly involved in the approval process, but I do know that the company at large, especially credit and the governance committee did not approve this product.  It was being handled locally by that division. |
| | Q.     And what was the concern that was raised to you regarding this competitor match exception program? |
| | MR. CARSTEN:  Objection; vague and ambiguous. |
| | A.     At this time, the company was being very conservative because, again, funding was becoming very critical and we really did need to be able to limit what loans would have to be held for investment opposed to being held for sale and securitized to get them off |
| | the books. |
| | *** |
| | Q.     On May 3rd, 2007, you wrote "Walter, I've read through the entire e- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | mail chain and it sounds like about 600 loans have already been approved. The procedures have not been documented and no approval has been obtained through CFC's governance structure." Did you write that?<br><br>A.    I did.<br><br>Q.    And what was the basis for your statement that the procedures have not been documented and no approval has been obtained through CFC's governance structure?<br><br>A.    I had my loan production executive in Texas go over and discuss this issue to find out the facts and circumstances within the consumer markets division which was also headquartered out of Texas. At that point he had called me and gave me the number of loans and basically this was being done locally without the formal process, procedures and the credit approval. |
| | Q.    And the procedures that we were looking at previously in connection with the audit report issued around October 2006 that required Mr. McMurray to be |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | involved in underwriting, were those procedures being followed in connection with this competitor match exception program? |
| | A.    They were not. |
| | MR. CARSTEN:  Objection. |
| | MS. GORDON:  Objection. |
| | MR. CARSTEN:  Vague and ambiguous, misstates the prior testimony. |
| | Q.    Who was the individual who looked into this for you? |
| | A.    John Trampe.  He was a direct report to me that was out of the Plano, Texas office. |
| | Q.    When you say the procedures have not been documented, what do you mean by that? |
| | A.    Generally speaking, any type of business that we had in the company there'd be policies and procedures and internal controls to manage the risk associated with that business.  They |
| | had not been formalized nor approved through the governance structure in the company. |
| 309.   In early 2006, HSBC exercised | Dean Decl., ¶18, Ex. 16 (Trentacosta |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| its contractual rights and forced CFC to "buy-back" many of the subprime 80-20 loans that it had purchased from CFC.  Many of the HSBC "kick-outs" were due to defaults on the underlying loans as well as the fact that many of the underlying loans had been originated outside of CFC's underwriting guidelines. | Inv. Test. Ex. 92) <br> McCoy Decl., ¶24, Ex. 214 (Kuelbs Depo. Ex. 968, p. CFCP001628290 (2/1/2006 e-mail exchange between John McMurray and Brian Kuelbs, et al.)) |
| 310.   On or around January 27, 2006, CFC's Credit Risk Management department issues a "no exceptions policy" with respect to subprime 80/20 loan product.   The policy precluded exceptions with respect to the underwriting guidelines applicable to subprime 80/20 loan products. | Dean Decl., ¶190, Ex. 188 (McMurray Inv. Test. Ex. 88 (2/9/06 e-mail from McMurray to Kurland, 2/9/06 e-mail from McMurray to Lumdsen)) <br><br> McCoy Decl., ¶27, Ex. 217 (Kuelbs Depo. Ex. 971 (6/12/06 e-mail from Aguilera to Kuelbs)) |
| 311.   Even though they were required to do so, CFC's production divisions failed to adhere to the no exceptions policy on 80/20 loans. | Dean Decl., ¶90, Ex. 88 (Gissenger Depo. Ex. 1171) <br><br> McCoy Decl., ¶58, Ex. 248 (Gissenger Dep. Tran. 202:23-205:15): <br> Q.  Starting on the second page of Exhibit 1171, there's a February 9th, '06 e-mail from Cliff Kitashima to Greg Lumsden. <br> A.  Correct. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q. Who's Mr. Kitashima? If you know. |
| | A. He was the head of underwriting and credit, I believe, at the time for Full Spectrum Lending. |
| | Q. Okay. Is he a Production division employee? |
| | A. He would be a Production division employee, I believe, with a dotted line into Jack Schackett. |
| | Q. Okay. And Greg Lumsden was the head of Full Spectrum Lending? |
| | A. Full Spectrum Lending. |
| | Q. Okay. Got it. And in Mr. Kitashima's e-mail he mentions something called "Central Underwriting"; what is that? If you know. |
| | A. In Full Spectrum Lending we had dispersed branches that were call centers, and some larger call centers, and then had centralized underwriting where files came into a central location for processing, underwriting, docs, funding. So it was in a -- you'd have underwriters reviewing files in-site, not out in branches, not out places. |
| | Q. To your knowledge, did Central |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Underwriting have authority to set its own policy with respect to exceptions in Full Spectrum Lending, or did they need to do that or did they need to get permission from Credit Risk |
| | Management? |
| | A.  They needed to get permission. |
| | Q.  Okay. |
| | A.  When I say that, let me -- your question was, one more time? |
| | Q.  Did Central Underwriting have permission to set their own policy with respect to the manner in which exceptions would be granted in Full Spectrum Lending? |
| | A.  They did not. |
| | Q.  Okay.  Where did that authority reside? |
| | A.  In the Credit Risk Management area under John, which, as we've spoken about now many times, through the guiding principles. |
| | Q.  Okay.  So if you look at the bottom of Exhibit 7 -- 1171, there's an e-mail from Mr. Lumsden to you, and Mr. Lumsden says he's planning on moving forward with this on Monday morning; |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | do you see that? |
| | A.  I do. |
| | Q.  All right.  And then there's an e-mail in response to Mr. McMurray to Mr. Lumsden, and Mr. McMurray states: |
| | "We need to stay with the no exceptions policy for these loans now." Do you see that? |
| | A.  I do. |
| | Q.  Was Mr. Lumsden required to act in conformity with the no exception policy referenced by Mr. McMurray? |
| | A.  I'm sorry, one more time. |
| | Q.  Was Mr. Lumsden required to act in conformity with the no exception policy referenced by Mr. McMurray? |
| | MS. PHILLIPS:  Objection.  Vague. |
| | THE WITNESS:  It would be my, again, understanding that Greg would have adhered to the policies of -- of what we were doing, which would be no exception policy. |
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 563:24-565:6): |
| | BY MR. WYNN: |
| | Q.  Okay.  Did you put into place a no- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | exceptions policy with respect to certain 100 percent financing products?<br><br>MR. LEFLER:  Vague as to time.<br><br>THE WITNESS:  Earlier today, we talked about the HSBC situation.  And one of the --one of the initiatives there was to put additional restrictions |
| | around exception processing with respect to subprime 100 percent loan-to-value --or combined loan-to-value loans.  That's what I recall.<br><br>BY MR. WYNN:<br><br>Q.  Okay.  Is that the no-exceptions policy?<br><br>A.  I don't know if you call it exactly that.  But that would be a way of describing it.<br><br>Q.  To your knowledge, did the production divisions comply with that policy?<br><br>MR. LEFLER:  Objection, vague and ambiguous.<br><br>THE WITNESS:  I would describe the compliance as not complete, in my opinion.<br><br>BY MR. WYNN:<br><br>Q.  Okay.  Why would you describe it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that way? A. Because we --meaning my team and I --continued to observe instances where those loans were still being originated. Q. Okay. And what did you do about it, if anything? A. We escalated it up through |
| | various chains. So one source --or one path of escalation would have been to Kevin Bartlett. We brought --I recall talking about this in one of the corporate credit risk meetings, actually with – Dave and Jack Schakett, among others, attended. So that would be yet another avenue of escalation. So those would be a couple of things, off the top of my head, that I recall. |
| 312.   In June 2006, Credit Risk Management conducted an audit of 1Q 2006 loan production that demonstrated that the level of exceptions with respect the subprime 80/20 product exceeded 26%. According to Frank Aguilera, "[t]he data…suggest that there was no real effort to impose the new controls at the production end." | McCoy Decl., ¶27, Ex. 217 (Kuelbs SEC Dep. Tran., Ex. 971 (6/12/06 e-mail from Aguilera to Kuelbs)) |
| 313.   At a June 22, 2006 meeting of | Dean Decl., ¶176, Ex.174 (Presentation |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| the CCRC, it was revealed that:<br><br>Over 12% of SLG 80/20 ***exceptions were granted to ineligible borrowers;***<br>26% of FSL 80/20 ***exceptions were granted to ineligible borrowers;*** | materials from June 22, 2006 CCRC meeting.) |
| 42% of FSL High LTV production was ***originated as an exception to accommodate ineligible borrowers***.<br>(emphasis added.) | |
| 314.   On January 23, 2006, CFC's Credit Risk Management department recommended that the minimum FICO score on the subprime 80/20 product be raised by 20 points. | Dean Decl., ¶186, Ex. 184 (Ingerslev Depo. Ex. 204, p. CFCP0069944666 (1/23/2006 e-mail exchange between Frank Aguilera and Steven Trentacosta, et al.)). |
| 315.   In support of the proposal, McMurray noted that raising the FICO by 20 points would result in fewer early payment defaults, which would enhance liquidity in the secondary market. | McCoy Decl., ¶24, Ex. 214 (Kuelbs SEC Dep. Ex. 968, p. CFCP001628290 (2/1/2006 e-mail exchange between John McMurray and Brian Kuelbs, et al.)). |
| 316.   On February 2, 2006, McMurray sent an e-mail to CFC's production divisions asking whether CFC should really even be offering the 80/20 | McCoy Decl., ¶24, Ex. 214 (Kuelbs SEC Dep. Ex. 968, p. CFCP001628290 (2/1/2006 e-mail exchange between John McMurray and Brian Kuelbs, et |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| product.  In the e-mail, McMurray posited the following question: "***There are some at the company, including me, that question the basic existence of this program—does a loan with no equity, nonprime credit, and in some cases, undocumented income make sense?***"  (emphasis added.) | al.)). |
| 317.   Aguilera agreed with McMurray's concerns, stating under oath that "…there was a material expansion of the program, and we were at levels where the performance was questionable[,]" "…he's correct, interest only, stated doc, at 580 FICO , those things in combination, ***that's not a viable product***."  (emphasis added.) | McCoy Decl., ¶46, Ex. 236 (Aguilera Inv. Test. 84:11-86:1):<br><br>Q   If you turn to the second page, concern number one.  The second sentence says:  "Do you think that a 100 percent subprime loan is a viable program?  Does a loan with no equity and nonprime credit, and in some cases undocumented income, make sense?"  Do you recall being party to any discussions or meetings where that specific issue was addressed?<br><br>A   Yes.<br><br>Q   Can you -- which meetings did you attend?<br><br>A   They would have been, you know, kind of more casual conversations in John's office about this particular program.  The 100 percent piggyback |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | program actually was in existence for quite some time.  I think it was launched within Countrywide prior to me arriving there and maybe as early as 2001.  Up until that point in time, there was no material performance issues with the |
| | product.  As it became more popular and as we allowed it to expand its features, if you will -- so, for example, if I recollect, the original program required a 640 FICO score minimum.  You would argue, well, that's not subprime, but it didn't exist in prime.  So as I mentioned earlier, the market was moving up.  At this particular time, you could full doc at 580.  So there was a material expansion in the program, and we were at levels where the performance was questionable.  I mentioned earlier about the wholesale program exception, if you will.  That was to go to 560.  At 560, the product does not perform, it can't perform.  So we had continually tried to push the minimum back up.  But the marketplace was at 580.  So there were sectors of our menu that underperformed and seemed |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | like they shouldn't be viable.  I wouldn't say that the whole product was probably not viable but at certain FICO scores with full doc, there probably was a place at that point in time that our data suggested it could be supported.  But in |
| | that particular environment, he's correct, interest only, stated doc at 580 FICO, those things in combination, that's not a viable product. |
| 318.   According to Aguilera, CFC's Net Profit Margin ("NPM") on subprime 80/20s at the 580/620 FICO range were below cost to produce. | McCoy Decl., ¶11, Ex. 201 (Aguilera Depo. Ex. 151, p. CFCP00802074 (July 3, 2006 e-mail from Frank Aguilera to Kevin Bartlett, et al)). |
| 319.   Hence, CFC was originating subprime 80/20 loans that "couldn't be sold in the secondary market at profit." | McCoy Decl., ¶45, Ex. 235 (Aguilera Dep. Tran. 318:1-13): Q.  And when you stated that, "If I recall, NPM at the current 580/620 level are below cost to produce," what did you mean by that? A.  Well, if I can recall, the -- if I would have made a reference like that, it would be in association with some of the data we looked at earlier on the product market position, right, where we looked at MPMs.  So that would mean that for a particular product, so for 80/20 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | programs with those FICO scores, it would appear that what we were originating couldn't be sold in the secondary market at a profit. |
| 320.   On March 27, 2006, Mozilo convened a meeting in his office to discuss the subprime 80/20 product in generally, and specifically discussed the product in relation to HSBC's decision to compel CFC to "buy-back" certain 80/20 loans it had purchased from CFC.  This meeting was attended by several executives, including Mozilo, Sieracki, Sambol and McMurray. | McCoy Decl., ¶23, Ex. 213 (Kuelbs Depo. Ex. 969 (3/27/2006 e-mail from Mozilo to Sambol, Sieracki, McMurray, et al)). |
| 321.   On March 27, 2006, Mozilo sent an e-mail to several CFC executives, including Sieracki and Sambol, stating that "Sambol will make certain that the people responsible for the origination process understand the necessity for adhering to the guidelines for the 100% LTV subprime product. *This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation for guidelines be permitted* | McCoy Decl., ¶23, Ex. 213 (Kuelbs Depo. Ex. 969 (3/27/2006 e-mail from Mozilo to Sambol, Sieracki, McMurray, et al)). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| *irrespective of the circumstances*." (emphasis added.) | |
| 322.   On or around March 23, 2006, CFC's Credit Risk Management department issued its "Policy on High Risk Products,"  which mandated that all high risk products be originated in accordance with guidelines and disallowed exceptions unless it was documented that an exception explicitly conformed to the exception guidance. | Dean Decl., ¶189, Ex. 187 (Trentacosta Inv. Test. Ex. 91, (3/23/06 e-mail from John McMurray to David Spector, et al.)). |
| 323.   CFC's production and secondary marketing divisions ignored the policy and continued granting unapproved exceptions with respect to subprime 80/20 loans. | Dean Decl., ¶189, Ex. 187 (Trentacosta Inv. Test. Ex. 91 (9/7/07 e-mail from John McMurray to Jess Lederaman)) |
| 324.   On April 13, 2006, Mozilo sent an e-mail to Sieracki and Sambol, stating that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of such loans."  In his e-mail, Mozilo went on to state that "In my conversations with | Dean Decl., ¶18, Ex. 16 (Trentacosta Inv. Test. Ex. 92). McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 717:1-13) Q   Mr. Mozilo, I'm going to hand you what has previously been marked as Exhibit 92.  For the record, Exhibit 92 is a two-page e-mail string Bates-stamped CFC2007B008980 through 981.  And I really just want to focus on the e-mail |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Sambol he calls the 100% subprime seconds as the "milk" of the business. Frankly, I consider that product line to be the poison of ours." | on the first page, which is from Angelo Mozilo to Eric Sieracki with some carbon copies to others, and it's dated April 13th, 2006.  Mr. Mozilo, have you ever seen the e-mail that's been marked as Exhibit 92?  (SEC Exhibit No. 92 was referred to.)<br><br>A   Yes, I have.<br>Q   Okay.  And do you recall sending it?<br>A   I do. |
| 325.   On the morning of April 13, 2006, an "emotionally charged" meeting was held amongst Mozilo, McMurray, Sambol, Kurland and Spector, where the topic of 80/20 loans having been originated in contravention of CFC's credit policy and underwriting guidelines was discussed. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 557:23-559:19):<br>Q   And on Mr. Mozilo's e-mail to Mr. Sieracki, No. 2, he states, "The loans were originated through our channels, but serious disregard for process, compliance with guidelines, and irresponsible behavior relative to meeting time lines"-- had you had any conversations with Mr. Mozilo prior to April 13th regarding the process by which 80/20 loans were originated?<br>A   There was a meeting, and it would have been around this time, and I think it was actually before Angelo sent this e-mail.  What I recall was there was a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | meeting in the afternoon between Stan, Angelo, Dave Sambol, David Spector, and then I came in for part of the meeting where a lot of these issues were discussed, including this Item No. 2, and |
| | so the sequence I believe that happened was that after that meeting that Angelo sent out this e-mail that night. Q    Do you know where Mr. Mozilo got his information regarding the problems with the origination process and the disregarding of underwriting guidelines? A    I think it was as a result of that-- it could have been as a result of that discussion-- he could have had supplemental information that he received elsewhere, but some of it could have come from that discussion we had in his office that afternoon. Q    During that discussion in his office that afternoon, did you personally express the opinion that guidelines hadn't been followed? A    I may have. It was a very emotionally charged meeting, and then Angelo has a tendency to state things in more severe terms than I might use. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | There was certainly discussion about the origination process, and flaws in it that worsened the situation, so that was discussed, but I don't remember exactly how-- who said what or how it was described. |
| | Q   Why do you say it was an emotionally charged meeting?<br><br>A   Because people were angry, voices were raised.<br><br>Q   Who attended that meeting?<br><br>A   It was in Angelo's office, so Angelo, Stan, Kurland, Dave Sambol, David Spector, and myself were the ones that I remember.  I wasn't there for the entire meeting.  There was a bank board meeting that I had to attend, and so as soon as I finished with that meeting, then I came back to Calabasas and joined the meeting that was underway in Angelo's office. |
| 326.   On April 16, 2006, McMurray sent an e-mail to Sambol which identified some of the causes of the HSBC kick backs and made recommendations.  In the e-mail, McMurray stated that "we should | Dean Decl., ¶191, Ex. 189 (Trentacosta Inv. Test. Ex. 93) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| consider truncating the lower FICO rungs of the subprime 80/20 product. ***These rungs have particularly poor delinquency performance*.**"  (emphasis added.) | |
| 327.   On April 17, 2006, Mozilo sent Sambol an e-mail concerning the 80/20 product in general, and subprime-seconds in particular.  In the e-mail, Mozilo stated that "In all years in the business I have never seen a more toxic prduct [sic]." | Dean Decl., ¶31, Ex. 29 (Mozilo Inv. Test. Ex. 548) |
| 328.   In his April 17, 2006 e-mail, Mozilo also stated that "[w]ith real estate values coming down and interest rates rising this product will become increasingly worse.  There has to be major changes in the program including substantial increases in the minimum FICO." | Dean Decl., ¶31, Ex. 29 (Mozilo Inv. Test. Ex. 548) |
| 329.   Mozilo regarded subprime seconds as a high-risk product for Countrywide to be originating. | McCoy Decl., ¶82, Ex. 272 (Mozilo Class Action Depo. 142:9 – 143:10) Q. Okay. But is there a -- did you think at the time that subprime seconds were a potentially dangerous product for Countrywide?") THE WITNESS: All of the product that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | -- that lenders originate have a gradation of risk, and this product had a higher risk profile to it because, A, it was subprime and, B, it was subordinate to the first. And being a -- a higher risk product, you had to make sure you paid special attention to your assessment of that risk and make certain that -- that proper reserves were set aside for it, and that's why this is directed to McMurray, who's head of risk. BY MR. BERNSTEIN: Q. Was this -- was this the highest risk product that Countrywide had at the time? A. I'm not certain -- MR. PASTUSZENSKI: Objection. THE WITNESS: I'm not certain. We had 189 products, so I don't know. BY MR. BERNSTEIN: Q. Was this among the highest risk products that Countrywide had at the time? MR. PASTUSZENSKI: Objection. Same objection. Also, it's overbroad. THE WITNESS: It was a high risk product. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 330.   On April 27, 2006, McMurray recommended that the minimum FICO on 80/20 loans be increased by 20 points.  In doing so, McMurray noted that "I…worry about these lower FICO rungs from the consumer's perspective; the serious delinquency rates seem extremely high." | Dean Decl., ¶186, Ex. 184 (Ingerslev SEC Dep. Ex. 204, p. CFCP006994665 (4/26/2006 e-mail exchange between McMurray and Christian Ingerslev, et al.)). |
| 331.   In response to McMurray's recommendation, CFC's product development group sent Sambol a document it had prepared that assessed and supported McMurray's request the minimum FICO on subprime 80/20s be increased by 20 points. | McCoy Decl., ¶26, Ex. 216 (Kuelbs Depo. Ex. 970, p. NYF-SEC 010642-648 (April 27, 2006 e-mail from Brian Kuelbs to David Sambol, et al.)). |
| 332.   In the document, it was noted that:<br><br>    Loan performance has    deteriorated significantly for    subprime 80/20 product in lower    FICO score bands;<br><br>    Profitability is adversely impacted    by 80/20 transactions with scores    below 600 and 640 for Full and    Stated doc respectively; | McCoy Decl., ¶26, Ex. 216 (Kuelbs Depo. Ex. 970, p. NYF-SEC 010644-010646 (Product Leadership Proposal Review)). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Delinquencies from 580 to 599 and 620 to 639 for Full and Stated doc respectively are almost twice that of the next highest bucket. | |
| 333.   Brian Kuelbs, the head of CFC's product development division, supported increasing the minimum FICO score by 20 points and made that clear to Sambol. | McCoy Decl., ¶ 26, Ex. 216 (Kuelbs SEC Dep., Ex. 970 (April 28, 2006 e-mail from David Sambol to Brian Kuelbs, et al).<br><br>McCoy Decl., ¶ 66, Ex. 256 ( Kuelbs Inv. Test. 139:25-143:23):<br><br>Q.  But in your e-mail to Mr. Sambol on April 27th, '06, you were supporting credit risk management's proposal to raise the FICO by 20 points on 80/20s; is that correct?<br><br>MR. LUSKEY:  Objection.  The document speaks for itself.<br><br>THE WITNESS:  As I review the e-mail, that is the -- yes, a similar response, that I am supporting the 20 basis-point -- or 20-point adjustment to FICO scores.<br><br>BY MR. WYNN:<br><br>Q.  Okay.  And why did you support that recommendation?<br><br>A.  As I reference in the tax year, it is due to my review of the credit risk |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | management's analytics. |
| | Q. And what about their analytics caused you to support their recommendation? |
| | A. Well, it states it here in the document "improve loan performance, increase profitability, achieve a middle market position for guideline characteristics," all reasonable objectives for the firm. |
| | Q. If you turn the page ending in 028. Again I am looking at the CFC prefix. |
| | A. Okay. |
| | Q. There is a heading for "Delinquency." Do you see that? |
| | A. Uh-huh. |
| | MR. DROOYAN: You have to answer audibly. |
| | BY MR. WYNN: |
| | Q. I'm sorry, again? |
| | A. Yes. |
| | Q. At the bottom there is a paragraph that states: "As the above tables show, delinquencies from 580 to 599 (sic) and 620 to 639 for Full and Stated doc respectively are almost twice that of the next highest bucket. This data is a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | major contributing factor in Credit Risk Management's request to increase minimum credit scores 20 points on subprime 80/20s."  Is this chart |
| | something product leadership came up with or did you take it from the credit risk management proposal? MR. LUSKEY:  Objection.  Lacks foundation, calls for speculation, and the chart is unreadable. THE WITNESS:  This is the kind of information that would be generated by credit risk management in developing a joint document like this, so I don't recall specifically, but in my review of this information, you know, I believe that this would be produced by credit risk management, the data in the table. BY MR. WYNN: Q.  If you go back to your April 26 – excuse me -- April 27th, '06 e-mail to Mr. Sambol. A.  The first page? Q.  No.  The second page of the exhibit. A.  Okay. Q.  So credit risk management proposed raising the basis points by -- excuse me |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | – proposed raising the FICO by 20 points and product leadership agreed; is that right? |
| | A.  Yeah.  At least my analysis of the credit risk group supports, you know, the move based on the scope of their analytics. |
| | Q.  Okay.  So product leadership approved the credit risk management request? |
| | A.  I would -- you know, I think approving, this e-mail is not the extent of an approval, but rather, it's voicing support for the analytics that have been reviewed, so there's a difference.  There isn't the authority to actually approve the change. |
| | Q.  There's not? |
| | A.  Not unilaterally, no, no. |
| | Q.  Well, why are you sending this e-mail to Mr. Sambol?  Do you need his approval? |
| | A.  I believe in this particular instance, he was involved in the decisioning on, you know, the change, so that's why I would be sending him this information and updating him on the analytics that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | were being produced in support of this recommended change.<br><br>Q.  When you said "he was involved in the decisioning," what was his role in what you called "the decisioning"?<br><br>MR. LUSKEY:  Objection.  Objection.  Vague and ambiguous.<br><br>THE WITNESS:  Because of the magnitude of the impact on the lending division based on the recommended changes, Mr. Sambol wanted to be involved in reviewing the analytics and understanding the support for any changes that were made, so he was more involved in this particular topic than another product change request that had a more marginal impact.<br><br>BY MR. WYNN:<br><br>Q.  So this was a big deal?<br><br>A.  Yes. |
| 334.   Irrespective of the fact that his own product development team agreed with the proposal submitted by credit risk management, on or around April 28, 2006, Sambol rejected the recommendation. | McCoy Decl., ¶ 26, Ex. 216 (Kuelbs SEC Dep., Ex. 970 (April 28, 2006 e-mail from David Sambol to Brian Kuelbs, et al). |
| 335.   In July 2006, Kevin Bartlett | McCoy Decl., ¶ 11, Ex. 201 (Aguilera |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| became aware that New Century had increased its FICO by 20 points on subprime 80/20s and asked Frank Aguilera whether the market was starting to rationalize. | SEC Dep. Ex. 151, p CFCP000802075 (July 3, 2006 e-mail from Kevin Bartlett to Frank Aguilera). |
| 336.   In response to Bartlett's e-mail, Aguilera explained that New Century had "[t]ried to go here a few months back.  They reluctantly came back to 580/620 because CHL did not follow.  I guess they decided that these levels do not make sense (performance and price) and will allow us to own the market." | McCoy Decl., ¶ 11, Ex. 201 (Aguilera SEC Depo. Ex. 151, p. CFCP000802075 (July 3, 2006 e-mail from Frank Aguilera to Kevin Bartlett)). |
| 337.   As of February 2007, CFC was aware that delinquencies in the 80/20 subprime product were a driver of the unexpected delinquencies in the 2006 vintage subprime loans. | McCoy Decl., ¶ 50, Ex. 240 (Bartlett Inv. Test. 45:13-20):<br>Q   You mentioned something about 100 percent financing or 80/20 loans being partly responsible for the 2006 delinquencies; is that correct?<br>A   Yes.<br>Q   Is that something that you were aware of as of February '07 or something you've become aware of subsequent to that date?<br>A   I was aware of it in February of '07. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 338.   In the late fall or winter of 2006, CFC had revised its delinquency models by adding a house price appreciation ("HPA") variable.  This model predicted that the performance of CFC's 2006 subprime vintage would be worse than previously expected. | McCoy Decl., ¶ 50, Ex. 240 (Bartlett Inv. Test.,42:14-43:7): <br> Q    At the time you received this e-mail did you have -- we'll take the time you received this e-mail first.  So in February of '07 did you have any -- had you identified any reasons why the 2006 loans had performed poorly than previous years -- more poorly than previous years? <br> A    At the time I received this e-mail? <br> Q    In that time frame.  The day maybe. <br> A    So at the time I received this e-mail, I believe in the fall to early winter, there was some new models developed for subprime loans.  So with respect to subprime loans, the new model suggested that the 2006 vintage performance was worse than what we expected.  And so at the time I received this e-mail I certainly would have been aware of that new model development.  And the early performance of that vintage relative to our past expectations was worse.  And so with respect to subprime, I was a aware of some factors at the time this e-mail was written that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | showed the 2006 vintage performance being worse. |
| 339.   In June 2006, CFC organized several consumer focus groups to determine, *inter alia*, whether its POA borrowers understood how the POA product worked. | McCoy Decl., ¶ 64, Ex. 254 (Ingerslev Inv. Test., 94:24-95:25):<br><br>Q    And do you know what these pay-option focus groups were?<br><br>A    Yes.<br><br>Q    Can you explain?<br><br>A    So we decided -- so, you know, we were very concerned and focused on |
| | educating -- not the general public, but, more importantly, educating borrowers around the product.  And we had a concerted effort to do that through a series of venues or mediums and -- but one, you know, tool in our tool belt to sort of figure out what it was that we needed to educate on, the marketing group at Countrywide organized some focus groups with real borrowers, Countrywide borrowers, that had option ARMs, and we -- I don't remember how I -- I actually witnessed one of them personally.  It was behind a one-way mirror and watched a facilitator ask questions of the borrowers, trying to get at, you know, did they understand the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | loan program that they got, and how did they end up, you know, in the program. And so that's what this is -- these are -- that's the focus groups that were being referred to. |
| 340.   In sworn testimony, Ingerslev revealed that the effort demonstrated that borrowers "comprehensively" did not understand the POA product. | McCoy Decl., ¶ 64, Ex. 254 (Ingerslev SEC Inv. Test., 96:2-97:2): Q   And what did you personally take away from the focus groups? A   That people didn't understand the loan product like we -- like they should |
| | and like we'd want them to. Q   And which features were people not understanding? A   I think it was everything, comprehensively.  So people understood that one day the -- they would hit a cap -- they understood that there was the concept of negative amortization.  So they knew that the loan amount would increase if they didn't make the fully-amortizing payment, so they knew that. They knew that one day the payment would go up.  They had no idea when that might occur.  They didn't know if it was five years or ten years or two years. And they didn't know if they could |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | afford it when it did. And they didn't know what they were going to do when that day came. And I remember two of them -- it was in this one -- I can't remember how many people. There were maybe six consumers or seven or something that I witnessed, and two of them said, yeah, maybe I'll rent out one of the rooms in my house when that day comes. And I thought, oh, that's not good financial planning. They didn't |
| | understand how the accrual rate changed, you know, that there was an index, plus a margin, and what drove -- you know, what factors might drive the changes in the index, and how often the index change. I don't think they understood that part of it either. |
| 341. On June 7, 2006, McMurray sent an e-mail to Drew Gissenger and Todd Dal Porto informing them of the focus group results, as well as the issue of broker compensation on POA loan products. In his e-mail, McMurray stated that:<br><br>One of the borrowers was apparently a first-time home | Dean Decl., ¶ 76, Ex. 74 (Ingerslev Depo. Ex. 194 (6/7/06 e-mail from McMurray to Gissenger and Dal Porto). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| buyer on fixed income (disability). ***She said the PayOption minimum payment was all she could afford to pay.*** One obvious concern is how she was qualified and whether the reduced documentation feature was used (and if it was used, was it used properly). Another question is whether the broker properly explained the PayOption program to the borrower. (emphasis added.) | |
| 342.   The focus groups provided evidence that POA borrowers were overstating their income in order to qualify for the POA product. | Dean Decl., ¶ 76, Ex. 74 (Ingerslev SEC Dep. Ex. 194 (6/7/06 e-mail from McMurray to Gissenger and Dal Porto)). <br> McCoy Decl., ¶ 64, Ex. 254 (Ingerslev Inv. Test., 96:13-97:5): <br> Q.  And isn't it true that you did receive at least some evidence that borrowers were and/or brokers were rounding up or giving false income figures? <br> MR. LUSKEY:  Objection.  Leading, vague and ambiguous, assumes facts. <br> MR. LINDENBAUM:  Lacks foundation. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | THE WITNESS:  As referenced in the e-mail above in this exhibit from John, there were focus groups that were conducted where that seemed like that was the case, but that was a small sample of loans.  But yes, it indicated that that potentially was happening. BY MR. WYNN: Q.  What is "that was potentially happening,"  I'm sorry? A.  That income was being overstated relative to reality in some cases. |
| 343.   However, CFC did not take action address the problem of brokers coaching borrowers to overstate their income until mid-to-late 2007. | McCoy Decl., ¶ 64, Ex. 254 (Ingerslev Inv. Test.,  99:24-100:14): Q   Do you recall the company taking any action in order to address the problem of brokers having coached certain borrowers to round up their income, as you termed it? A   I can't remember when, but it was probably not until late '07, maybe middle of '07, where, not specific to pay option, but stated income in general, that we put out more stringent guidance to underwriters about how to test for the reasonableness of stated income so that we could see better or -- yeah, see better |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | if someone else was doing this, that the underwriters would, you know, take a look at their -- the asset profile, versus the income, different tools available to, you know, think about the employment. We found that there are Web sites available, services that you can log on to and plug in a geographic location and job title and kind of get a range of income, but that was -- you know, there's too much variability. |
| 344.   During a June 22, 2006 meeting of the CCRC, it was noted that focus group study revealed that:<br><br>Borrowers did not like the broker experience and were only marginally aware of the program features until the closing table or after (except for the initial payment amount)<br><br>***Some borrowers can only afford to make the minimum payment (and qualified with stated income)***<br><br>Many borrowers don't have a clear plan on what they will do at recast | Dean Decl., ¶¶ 175, 176, Exs. 173, 174 (Inv. Test. Ex. 1264 and CFC2007C007021-7028) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| *(hoping their financial condition will improve, their home will appreciate, or we will offer them another loan with reduced payments)*.<br><br>(emphasis added.) | |
| 345.   David Sambol was made aware of the findings reached as result of organizing and conducting the focus groups. | McCoy Decl., ¶ 64, Ex. 254 (Ingerslev Inv. Test.,106:23-107:15):<br>Q    Back to the focus groups.  Do you know who in the company was made of aware of the results of these focus groups?<br>A    I couldn't give you a complete list. I'm pretty sure Drew knew and Dave Sambol knew.  Is this the -- I don't recall if this is the time when -- I don't remember the time when Stan left, when the date was, but if Stan were here then, he would have, I know.<br>Q    What leads you to think that Mr. Sambol was aware of the focus groups?<br>A    Because it was something we talked about.  And there was a -- I remember I talked about it at one of the credit risk committee meetings.  Again, I don't remember the date when I did, but -- I don't know.  I couldn't tell you to what |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | detail, you know.  I'm sure somewhere there are transcripts.  I haven't seen them, but I'm sure there must be somewhere.  And there were summaries done.  And I don't know what he would have -- I didn't give him anything. |
| 346.   In a separate attempt to gauge borrower understanding of the POA loan product, CFC mailed surveys to 1,800 borrowers, which elicited information concerning the POA loan product. | Dean Decl., ¶ 162, Ex. 160 (Minutes of September 28, 2006 meeting of CCRC, SEC Depo Ex. 184). |
| 347.   In its SEC filings, as well as in other forums, CFC repeatedly stated that it had qualified its POA borrowers at the fully amortizing payment. | Dean Decl., ¶ 52, Ex. 50 (Countrywide's 3Q 2006 10-Q, SEC Dep. Ex. 332, at 53). Dean Decl., ¶ 49, Ex. 47 (Countrywide's 2006 Form 10-K, SEC Dep. Ex. 245, at 107). |
| 348.   However, at a September 28, 2006 meeting of the CCRC, Ingerslev reported the following findings from a survey of 1800 POA borrowers *(1) 25% of borrowers could not afford the fully amortized payment, and that (2) 25% were not sure if they could make the fully amortized payment.* | Dean Decl., ¶ 162, Ex. 160 (Minutes of September 28, 2006 meeting of CCRC). |
| 349.   At least as early as February | Dean Decl., ¶ 74, Ex. 72(SEC Dep. Ex. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 2004, McMurray warned of the likelihood that POA borrowers would suffer "payment shock," particularly in an environment where interest rates were rising and HPA was slowing. | 192). |
| 350.   CFC's internal guidelines explicitly noted that POAs and stated income loans "significantly increased" the likelihood of a loan defaulting. | Dean Decl., ¶ 85, Ex. 83 (Aguilera SEC Dep. Ex. 158, p. CFC2007832905). |
| 351.   During a June 28, 2005 meeting of the CCRC, which was attended by Eric Sieracki, Christian Ingerslev explained that the start rate on POA loans had remained at 1%, despite the fact that fully indexed rates had risen between 200-250 basis points. | Dean Decl., ¶¶ 163, 164, Exs. 161, 162 (Ingerslev SEC Dep. Exs. 190, 191). |
| 352.   At the meeting, it was explained that the qualification rate on the POA loans was pegged at the greater of 4.25% vs the fully indexed rate, and that as of June 28, 2005, the fully indexed rate was between 5.375% and 6.375%. | Dean Decl., ¶¶ 163, 164, Exs. 161, 162 (Ingerslev SEC Dep. Exs. 190, 191). |
| 353.   At the June 28, 2005 CCRC meeting, it was explained that the disparity between the 1.00% start rate on POAs, in relation to the rising fully | Dean Decl., ¶¶ 163, 164, Exs. 161, 162 (Ingerslev SEC Dep. Exs. 190, 191). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| indexed rates, increased the pace of negative amortization, and also increased the size of the "payment shock" that POA borrowers would experience once their loans reached the 115% threshold and their payments reset to the amount necessary to fully amortize the loan. | |
| 354.   In the materials distributed to attendees at the June 28, 2005, Credit Risk Management forecasted that, upon reset, ***borrowers' payments could increase between 65-108%***. | Dean Decl., ¶ 164, Ex. 162 (Ingerslev SEC Dep. Ex. 191). |
| 355.   The materials also disclosed that ***60% to 70%*** of POA borrowers were choosing to only make the minimum payment. | Dean Decl., ¶ 164, Ex. 162 (Ingerslev SEC Dep. Ex. 191). |
| 356.   During the June 28, 2005 CCRC meeting, and as reflected in the materials distributed at the June 28, 2005 CCRC meeting, Credit Risk Management identified raising the start rate as a mechanism to slow the rate of negative amortization and decrease the amount of potential payment shock, but cautioned that "***small changes in start rate improve risk only marginally***." | Dean Decl., ¶¶ 163, 164, Exs. 161, 162 (Ingerslev Depo. Exs. 190, 191). McCoy Decl., ¶ 62, Ex. 252 (Ingerslev Dep. Tran., 80:21-82:20): Q.     If you could refer back to the June 28, 2005 minutes.  I think it's Exhibit 191. MR. LUSKEY:  190. THE WITNESS:  The minutes or the -- //// |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| (emphasis added.) | BY MR. WYNN:<br><br>Q.   Excuse me, slide data presentation, 191.<br><br>A.   Okay.<br><br>Q.   Turn to page 17.<br><br>MR. ELDER:  I'm sorry, what are we looking at?<br><br>MR. WYNN:  Page 17 of Exhibit 191.<br><br>MR. ELDER:  191.  Thank you.<br><br>BY MR. WYNN:<br><br>Q.   If you could view pages 17 through 21. Let me know when you are finished.<br><br>A.   Okay.<br><br>Q.   Do you know if you were responsible for drafting pages 17 through 21? |
| | A.   I -- I did.<br><br>Q.   If you turn to page 18.  Let's look at the first bullet point.  It states:  "An existing 1 percent start rate.  Borrowers may experience a 65 to 108 percent increase in payment at the end of Year 5."  Do you know how you made that forecast?<br><br>A.   Yes.  We -- this is assuming if short-term interest rates rise 200 basis |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | points -- |
|  | Q.      Uh-huh. |
|  | A.      -- we modeled out an amortization table that would mimic what would happen with the loan and the payments being made, the changes to interest rate, the amount of interest accrual, the amount of negative amortization, and then at the recast -- at the recast date, what the payment would change to, and then comparing that payment to the payment in effect just before that change. |
|  | Q.      The last bullet point on this page states: "Small changes in start rate improve risk only marginally."  What did you mean by that? |
|  | A.      So meaning the start rate at this point is 1 percent, so a small change, meaning, you know, one and an eighth, one and a quarter, one and three eighths, that small amount of change would improve our risk, but not significant -- not significantly. And I am reminding people that in the last 12 months, short-term interest rates have moved 200, to 250 basis points. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 357.   In sworn testimony, Ingerslev clarified that "small changes" entailed "one and an eighth, one and a quarter, one and three eights, that small amount of change would improve our risk, but not significant…not significantly." | McCoy Decl., ¶ 62, Ex. 252(Ingerslev Dep. Tran. 82:9-20).<br><br>Q.      The last bullet point on this page states: "Small changes in start rate improve risk only marginally."  What did you mean by that?<br><br>A.      So meaning the start rate at this point is 1 percent, so a small change, meaning, you know, one and an eighth, one and a quarter, one and three eighths, that small amount of change would improve our risk, but not significant -- not significantly. And I am reminding people that in the last 12 months, short-term interest rates have moved 200, to 250 basis points. |
| 358.   On February 2, 2006, McCurray circulated a document to the production divisions entitled "Recommendation to Increase Minimum Payment Rates for PayOption Loans."  In his February 2, 2006 e-mail (which distributed the recommendation,) McMurray stated that "we really need to revisit the minimum pay rates on PayOption ARMs." | Dean Decl., ¶ 77, Ex.75 (Kuelbs SEC Depo. Ex. 966). |
| 359.   The recommendation, which had | Dean Decl., ¶ 75, Ex. 73(Ingerslev Dep. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| been prepared by Christian Ingerslev, disclosed that:<br><br>    Indices have risen over 300 bps in the last 18 months, while our base start rate remains at 1.00%;<br><br>    52% of the POA portfolio has current balance > original balance;<br><br>    71% of loans negatively amortized in Dec (up from 48% in Dec '04); At recast, borrowers will experience at least **100% payment increase** from previous payment and a vast majority are likely to experience the recast prior to the end of year 5. | Ex. 193)<br>McCoy Decl., ¶ 62, Ex. 252(Ingerslev Dep. Tran. 83:12-84:3, 89:21-90:8):<br>MR. WYNN:  Exhibit 193.  Thanks. Exhibit 193 is going to be a document entitled "Recommendation to Increase Minimum Payment Rates for PayOption Loans" dated February 2nd, 2006.  And it is Bates numbered CFC 2007I309740 through 747.  (Deposition Exhibit 193 was marked for identification.)<br>BY MR. WYNN:<br>Q.    Have you ever seen this document before?<br>A.    I produced it.<br>Q.    You created this document; is that |
| (emphasis added.) | right?<br>A.    Yes.<br>Q.    Okay.  Do you know if anyone instructed you to create it or did you do this on your own?<br>A.    I don't recall, but I believe I did it on my own. |
| 360.   In the February 2, 2006 proposal, Christian Ingerslev proposed increasing the start rate by .25%, from 1.00% to 1.25 %. | Dean Decl., ¶ 75, Ex. 73(Ingerslev Dep. Ex. 193) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 361.   Ingerslev pushed for the biggest possible increase in the start rate on POA loans. | McCoy Decl., ¶ 62, Ex. 252 (Ingerslev Dep. Tran. 86:7-13):<br><br>Q.     Okay.  My recollection is your previous testimony is that you had originally recommended that the start rate on the PayOptions be increased by 100 basis points.  Do you recall that?<br><br>A.     I don't recall the exact recommendation. I was pushing for as much as possible an increase. |
| 362.   Previously, Ingerslev had proposed increasing the start rate by a full percentage point, from 1.00% to 2.00%. | McCoy Decl., ¶ 63, Ex. 253(Ingerslev Inv. Test. 86:9-19):<br><br>Q.     Do you recall if a credit had a position as to whether or not the pay rate should be decreased after it had been increased? |
|  | A.     Yes.  Yeah, no.  We didn't think it should be decreased.  I mean, it had only been raised 25 basis points, and I think we recommend an increase of 100 basis points. So to go back down -- I mean, we understood the competitive response, but -- or result, but we still thought that it was better to maybe weather that storm and maybe people would, you know, follow us.  But we didn't give it enough time to know if that was -- to |

440

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | find out if that would occur. |
| 363.   In April 2006, CFC increased the start rate on its POA loans by .25%, from 1.00% to 1.25%. | Dean Decl., Ex. 174, (Presentation materials from June 22, 2006 meeting of CCRC) |
| 364.   During a June 22, 2006 meeting of CFC's Corporate Credit Risk Committee, which was attended by Sambol and Sieracki, the materials noted that although the start rate had been increased in April 2006 by 25 bps, *over the last year fully indexed rates had risen by 280 basis points, thus "driving up potential pay shock and decreasing time to recast.*"  The materials predicted that upon recast, borrowers with 30 year and 40 year POA loans *could experience pay shocks of 113% and 157%, respectively.* | Dean Decl., ¶ 176, Ex. 174, (Presentation materials from June 22, 2006 meeting of CCRC) |
| 365.   Nevertheless, CFC's production divisions began to complain that they were losing business in response to the .25% increase in the start rate. | McCoy Decl., ¶ 62, Ex. 252 (Ingerslev Dep. Tran. 88:4-7):<br>Q.      Okay.  Do you recall production saying that they were losing volume to other lenders because of the .25 increase in the start rate?<br>A.      Yes. |
| 366.   In a May 12, 2006 e-mail from | Dean Decl., ¶ 82, Ex. 80(Class Action |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Gissenger to Sambol, Gissenger requested that Sambol approve production's request to lower the POA start rate "with purpose and speed." | Dep. Ex. 321). |
| 367.   On May 25, 2006, Carlos Garcia informed Cliff Rossi that he had spoken to Sambol regarding PayOptions.  He reported the conversation as follows:<br><br>Spoke with sambol. He believes historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort.  Sambol is concerned about payment shock at recast and inability to absorb increased payments thru income or refi (due to low equity).  So sambol believes high cltv loans with no mi, particularly those with high dti are risky.  Maybe also those with low ficos. If the loans are in markets that have slowed the risk is exacerbated. | McCoy Decl., ¶ 104, Ex. 294 (Depo. Ex. 15) |
| 368.   Due to complaints from CFC's production divisions, Sambol reduced the start rate on the great majority of the POAs back to 1.00%. | McCoy Decl., ¶ 62, Ex. 252(Ingerslev Dep. Tran. 88:10-13):<br>Q.     In response to those complaints. from production, was the start rate |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | reduced to 1 percent? |
| | A.    Yes. |
| | McCoy Decl., ¶ 66, Ex. 256(Kuelbs |
| | Dep. Tran. 118:23-119:11-120:4): |
| | Q.    Do you generally recall at a certain point in time credit risk management proposed raising the start rate in excess of 25 basis points? |
| | A.    Yes. |
| | Q.    So your testimony is that the start rate  was raised, but then subsequently lowered at some point in time? |
| | A.    That's what I recall. |
| | Q.    Would you agree that for the majority of PayOptions, after the start rate was lowered, most PayOptions had the original 1 percent start rate? |
| | MR. MORGAN:  Objection.  Vague and ambiguous. |
| | THE WITNESS:  Yes. |
| | BY MR. WYNN: |
| | Q.    Do you recall what percentage of the PayOption originations Dave Sambol struck out in this meeting you referred to earlier? |
| | A.    No. |
| | MR. LUSKEY:  Objection.  Lacks |

443

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | foundation, calls for speculation. |
| | BY MR. WYNN: |
| | Q.     Do you have any idea of what portion of the volume would be represented by what Mr. Sambol struck out? |
| | MR. LUSKEY:  Same objection. Vague and ambiguous. |
| | THE WITNESS:  I don't recall at this time. |
| | BY MR. WYNN: |
| | Q.     Was it a small volume? |
| | MR. LUSKEY:  Same objection. |
| | THE WITNESS:  Yes. |
| | McCoy Decl., ¶ 67, Ex. 257(Kuelbs Inv. Test. 93:7-16): |
| | Q.     Do you know who requested the start rate be reduced after it had been raised? |
| | A.     You know, that would be Dave Sambol, Drew Gissinger. |
| | Q.     Are you speculating, or do you know for sure who requested that the rate be reduced back to where it was? |
| | A.     My understanding is that Dave Sambol requested the it would be reduced.  And he would really be the |

| SEC Statement | Evidence Cited by SEC |
| --- | --- |
| | only person with the authority to make that change, you know, at this point in time. |
| 369.   Ingerslev opposed reducing the start rate back to 1.00. | McCoy Decl., ¶ 62, Ex. 252(Ingerslev Dep. Tran. 88:16-23):<br>Q.      Did you support production's request to have the start rate lowered back to 1 percent?<br>MR. LINDENBAUM:  Objection. Vague and ambiguous.<br>THE WITNESS:  No.<br>BY MR. WYNN:<br>Q.      Did you oppose that request?<br>A.      Yes.<br>McCoy Decl., ¶, Ex. (Ingerslev Inv. Test. 86:9-19): |
| | Q.      Do you recall if a credit had a position as to whether or not the pay rate should be decreased after it had been increased?<br>A.      Yes.  Yeah, no.  We didn't think it should be decreased.  I mean, it had only been raised 25 basis points, and I think we recommend an increase of 100 basis points.  So to go back down -- I mean, we understood the competitive response, but -- or result, but we still thought that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | it was better to maybe weather that storm and maybe people would, you know, follow us.  But we didn't give it enough time to know if that was -- to find out if that would occur. |
| 370.   McMurray was not consulted prior to the start rate being lowered, and unsuccessfully urged that the start rate be increased back to 1.25%.  In an August 15, 2006 e-mail, McMurray stated that "I recently learned that the minimum payment rates on Pay Option ARMs were moved back down to 1% for certain borrowers.  As before, I continue to believe that this is a really bad idea.  We need to be moving minimum rates up to reduce the **_huge disparity_** between minimum payment rates and accrual rates."  (emphasis added.) | Dean Decl., ¶ 78, Ex. 76(Gissnger SEC Dep. Ex. 1174). |
| 371.   Mozilo (1) was aware of Credit Risk Management's rationale for increasing the start rate on the POA loans – _e.g_, to address the twin problems of negative amortization and payment shock, (2) knew that the rate had been increased by 25 bps, and (3) | McCoy Decl., 83¶ , Ex.273 (Mozilo Inv. Test. 328:25-332:15): Q.     Did you ever consider or propose to anyone start rate on pay option loans be increased? A.     Yes. Q.     And what happened with that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| was aware that complaints from production led to the start rate being lowered. | suggestion?<br><br>A.      It was attempted and our volume stopped.<br><br>Q.      So you rose the start rates, you loss business to competitors, and you lowered them?<br><br>A.      Went back to where they were, I believe.<br><br>Q.      Could you explain for the record what the start rate is on a pay option loan?<br><br>A.      What the amount is?  What the percentage --<br><br>Q.      What it is, what the start rate is.<br><br>A.      That's the percentage, the interest rate that's charged on the loan. |
|  | Q.      And the testimony I've heard is that credit proposed a rate raise of a hundred basis points, it was eventually raised by 25 due to concerns of production.<br><br>A.      I'm sorry.   I'm having a problem following what you're saying.  Say this again, now.<br><br>Q.      According to the testimony I've heard from people at the company --<br><br>A.      Okay.  Not here? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.    Right.  Part of management proposed that the start rate of pay options be increased by 100 basis points sometime in early '06.  Due to the concern of slow production, losing market share, eventually a 25 point increase in the start rate was agreed upon.  Is that your recollection?<br><br>A.    I remember that conversation taking place, yes.<br><br>Q.    Then according to previous testimony that the 25 basis point increase in the start rate was in effect for a very brief time before production complained that they were losing market share; therefore, it was lowered back to where it was.  Is that your recollection?<br><br>A.    I don't have complete recollection of it, but I do remember a problem in raising -- I don't remember the exact percentage, in raising the start rate and it affecting production.  That's what I recall.<br><br>Q.    And were you involved in the decision to lower the start rate to where it had been before it was increased?<br><br>A.    No. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.     Did anyone inform you of this decision? |
| | A.     I was informed of the decision.  I don't remember how, but yes, I was informed of the decision. |
| | Q.     Did you agree with the decision? |
| | A.     I agreed with the decision because I told you that I operated in a collaborative way, and everybody agreed that that was the right decision for the company. |
| | Q.     So it seems that production concerns were allowed to trump credit risk management concerns in this instance; is that correct? |
| | A.     No. |
| | Q.     Why is that not correct? |
| | A.     Well, because there was no evidence that that decision would lead to risk for the company or that it would mitigate any potential losses that the company would experience. |
| | Q.     Well, why was the decision made in the first instance to increase the start rate?  Wasn't that – |
| | A.     It was -- |
| | Q.     I'm sorry to cut you off, but |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | wasn't that to address the problem of payment shock and make it a smaller payment shock by raising the rate? A.     This is the first time I'm hearing of 100 basis point increase.  What I heard was a 25 basis point increase. Q.     Okay.  And what was the rationale behind the 25 basis point increase? A.     It was  to test the market -- I believe to test the market to see if we can get an additional increase in the rate without a major impact on volumes. And that would be orchestrated by, if I recall, by Stan Kurland and Dave Sambol, head of operations and head of |
| | production. Q.     Again, according  to testimony that I've heard from people says that credit risk management, the reason for the 25 basis point increase in the start rate was attempt to alleviate the potential payment shock problem by reducing the amount of negative amortization. Were you not aware of that rationale before the increase in the start rate? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.      I'm aware of that rationale. |
| | Q.      Okay.  So that's back to my original question as to whether or not, in your opinion, by allowing  the start  rate to be lowered, concerns expressed by production were allowed to trump concerns expressed by credit risk management. |
| | A.      There's always a natural tension between credit and production, and it has to be managed.  And -- however, if I believed that that 25 basis points would make a material or even an immaterial differences in the performance of the loans, I would certainly intervene.  But I didn't. |
| 372.   In 2006, CFC began to originate loans under a new set of guidelines called Extreme Alt-A ("EAA") that were intended to copy certain program guidelines offered by Wall Street firms such as Bear Stearns and Lehman Brothers. | McCoy Decl., ¶ 63, Ex. 253(Ingerslev Inv. Test. 29:10-30:4): <br> Q.      And what policy was at issue?  Was it a lot of product to be offered in the market -- to offer the extreme Alt-A product? <br> A.      Yes.  It was -- again, I hesitate to use the term "product," but it was a widening of underwriting guidelines, sort of, you know, on many aspects all at once. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.    And do you recall if this was in response to a competitor being involved in this market? |
| | A.    Yes, very clearly so.  The two competitors, primarily Bear Stearns and Lehman Brothers, were at that time making -- had launched a product or launched a set of guidelines that were much more aggressive than anybody else in the industry, and sales identified it as an impact to market share.  It started through the correspondent lending division, but it filtered throughout the others eventually, and we saw these two lenders start to move |
| | up the leader board, you know -- inside mortgage finance puts out the volume leaders -- we started to see their names come up, and we knew they were doing this product, and it was a direct response to that. |
| 373.   The EAA guidelines constituted a further expansion of CFC's underwriting guidelines as they (1) had high rates of modeled defaults, (2) essentially constituted a 100% financing program, and (3) were | McCoy Decl., ¶ 63, Ex. 253(Ingerslev Inv. Test. 26:21-27:9, 39:2-40:3): Q.    Can you recall any product that product management referred to that committee? A.    Yes.  So there was an expansion |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| layered with additional credit risks such as stated income and low FICO scores. | of prime.  I wouldn't call it a product per se, but there was a expansion of prime product guidelines that internally we had called it extreme Alt-A, that set of standards was assessed that it should be brought to the committee.  We had -- there was a practice in place that -- that I can't remember exactly all the members that could, but individuals of that committee could opine on behalf of all of the committee, and in this particular instance, Dave Sambol did.  So I presented this -- sort of this body of -- I don't want to call it the product -- but this body of underwriting guideline |
| | changes to Dave in his role as responsible lending committee member.<br>Q.    In addition to not initially believing the sales people about the competitive challenge posed by those two institutions, were there any other reasons that you opposed including them in the competitor match?<br>A.    No.  I mean, by extension of -- not that I recall anyway, but by extension, if they're not making meaningful inroads to our, you know, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | against our market share and they're not doing a lot of volume in this particular segment, then it didn't seem like a worthwhile endeavor to go after, because it was -- you know, these were pretty risky loans, and, you know, had a potentially high probability of default, so –<br><br>Q.      And how did you know that the extreme Alt-A guidelines were relatively risky and put in a relatively high likelihood of default?<br><br>A.      You know, first off, just intuitively, based on my years of experience in the business, so we were |
| | talking – it was really primarily about no-money-down lending, layered with additional credit risk.  So those layered additions were, you know, stated income, you know, lower than average FICO scores, doing the same thing on a -- allowing somebody with that same profile to buy a second home, to buy an investment property, again, with no money down, low FICOs, and stated income, intuitively, all by itself, and based on my knowledge of the business, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that seems risky, and perhaps not a good idea, particularly when we thought that, you know, the appreciation train wasn't going to go on forever. |
| 374.   During an April 6, 2006 meeting of CFC's Corporate Credit Risk Committee, which was attended by David Sambol, the following information was provided regarding the EAA program:<br><br>     Given the **extreme credit risks layering** of program, little to no empirical data existed to have full confidence in model results. | Dean Decl., ¶ 154, Ex. 152 (Minutes of April 5, 2006 Meeting of CFC Corporate Credit Committee), p. 1; ¶ 177, Ex.175 (Presentation Materials from April 5, 2006 Meeting of Corporate Credit Risk Committee), p. 10-11. |
| Based on both existing Alt-A and subprime models, **poor performance should be expected**.<br><br>Nearly **all guideline extremes fail retained risk credit policy standards**.<br><br>Segments could perform **as bad, or worse, than Sub-Prime, potentially impacting the external view of our "prime" performance.** | |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| (emphasis added.) | |
| 375.   Because the EAA program had very high expected rates of default, CFC's Credit Risk Management group referred the proposed guidelines to CFC's Responsible Conduct Committee. | McCoy Dec. ¶ 63, Ex. 253 (Ingerslev Inv. Test. 26:21-27:10, 27:24-28:15):<br><br>Q     Can you recall any product that product management referred to that committee?<br><br>A     Yes.  So there was an expansion of prime.  I wouldn't call it a product per se, but there was a expansion of prime product guidelines that internally we had called it extreme Alt-A, that set of standards was assessed that it should be brought to the committee.  We had -- there was a practice in place that -- that I can't remember exactly all the members |
| | that could, but individuals of that committee could opine on behalf of all of the committee, and in this particular instance, Dave Sambol did.  So I presented this -- sort of this body of -- I don't want to call it the product -- but this body of underwriting guideline changes to Dave in his role as responsible lending committee member.<br><br>***<br><br>Q     And whose decision was it to refer the extreme Alt-A guidelines to the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | committee? |
|  | A       I guess it was my recommendation, along with concurrence from John McMurray. |
|  | Q       And why did you make that recommendation? |
|  | A       We had attempted -- as I said a minute ago that it was challenging to predict performance on loans that hadn't been made before, but we had attempted to do so.  We employed the services one of our modeling groups and attempted to predict, at the extremes, you know, what percentage of loans could potentially, you know, go delinquent. |
|  | And we had a -- I don't remember what it was, but we had a threshold over -- if the expectation of delinquency rates is above X, then it needs to go to this committee.  And so those efforts that we put forth had, you know, greater than X delinquency rate expectations and therefore, we said well, we should take it to the committee. |
| 376.   After being presented with the data showing that the EAA guidelines had high rates of expected default, | McCoy Dec. ¶ 63, Ex. 253(Ingerslev Inv. Test. 26:21-27:23): Q       Can you recall any product that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| David Sambol, using his delegated authority to act on behalf of the RCC, signed-off on the guidelines. | product management referred to that committee?<br><br>A      Yes.  So there was an expansion of prime.  I wouldn't call it a product per se, but there was a expansion of prime product guidelines that internally we had called it extreme Alt-A, that set of standards was assessed that it should be brought to the committee.  We had -- there was a practice in place that -- that I can't remember exactly all the members that could, but individuals of that committee could opine on behalf of all of the committee, and in this particular instance, Dave Sambol did.  So I |
|  | presented this -- sort of this body of -- I don't want to call it the product -- but this body of underwriting guideline changes to Dave in his role as responsible lending committee member.<br><br>Q      So to your knowledge, one member of the committee could serve, in effect, on behalf of all of the committee members?<br><br>A      I believe that -- yes, yes.  I'm not sure – I can't -- I honestly can't recall if that person then had to go back and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | inform the other committee members about the decision, but I do recall that, you know, one could opine on behalf of the entire committee, yes.<br><br>Q      And with respect to the referral of the extreme Alt-A guidelines to the committee, the only person you interacted with was Mr. Sambol?<br><br>A      Vijay Lala and I together -- Vijay is in product leadership -- he and I did the presentation to Dave alone, yeah.<br><br>***<br><br>McCoy Dec. ¶ 63, Ex. 253(Ingerslev Inv. Test. 28:16-29:9):<br><br>Q   And do you know how the referral to the committee was ultimately |
| | resolved?<br><br>MR. DROOYAN:  What do you mean "resolved"?<br><br>BY MR. WYNN:<br><br>Q      Was the product -- were the guidelines allowed to go forward or --<br><br>A      This was not -- just for clarification.  This was part of the process, not the ultimate decision-making point.  So part of the process was we should have an opinion or a -- I |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | hesitate to use the term "approval," because it doesn't mean, okay, go forth with the product -- it is, from a responsible lending perspective, do we feel like this is an okay change to make. All right?  So it's one aspect of a total picture of what needs to happen to ultimately go forth with something.  So specifically in that capacity of responsibility lending, Dave said I'm good with this.  But, again, that didn't -- at that point in time, it did not mean that the policy is approved. <br><br>*** <br><br>McCoy Decl., ¶62, Ex. 252 (Ingerslev Dep. Tran., 148:18-150:6): |
| | Q.    Okay.  And do you recall presenting the package of work associated with the Extreme Alt A program to the RCC committee? <br>A.    It was actually to Dave personally as representative of the committee. <br>Q.    Okay. <br>A.    We didn't -- I don't remember exactly why, but there was a timing of when the next committee meeting was going to be and we wanted to do it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | sooner, so we presented it to Dave as representative of proxy for the committee.<br><br>Q.    Do you recall Dave signing off on those guidelines on behalf of the committee?<br><br>A.    Yes.<br><br>Q.    Okay.  And when you presented those guidelines to Mr. Sambol, did you also present to him the work you had done modeling the expected defaults and delinquencies associated with the Extreme Alt A product?<br><br>A.  Yes.<br><br>Q.  Okay.<br><br>A.  Excuse me.  I didn't personally do |
| | the modeling work, I contracted with another group to do the modeling.  But the results of that, I put in a format that was readable and digestible.<br><br>Q.    Okay.  And presented it to Mr. Sambol?<br><br>A.    Yes.<br><br>Q.    Did you also present him with your own recommendation as to whether or not the guidelines should be put into effect at Countrywide? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.      This was in the context of responsible lending, so we had identified that -- and, again, I don't remember over what, but over X, X percent expected default that the responsibility would have to opine.  I remember saying that these are very high rates and -- but I don't recall if I explicitly said, you know, "And I don't think you should approve this."  I don't recall if I said that or didn't. |
| 377.   In accordance with credit policy at CFC, obtaining the Chief Risk Officer's sign-off was one of the additional requirements that had to be fulfilled before CFC could began originating loans under the proposed EAA guidelines. | McCoy Decl., ¶ 76, Ex. 266(McMurray Dep. Tran.,149:4-16): Q.      Was the extreme Alt-A -- were the extreme Alt-A guidelines something that was rolled out without your approval? A.      So that would have been one of the other things I recollect, and that's kind of in a completely different vein, that's more of a -- that would be considered more of an Alt-A or prime -- which is in kind of the never never land between prime and -- and subprime, but at least from my point of view that was rolled out without having all of the -- or partially rolled out without having all of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the steps completed. Q     And was one of the steps your signoff? A.     That would have been one of the steps. |
| 378.   However, John McMurray, CFC's Chief Risk Officer, never signed-off on, or otherwise approved, the implementation of the EAA guidelines at CFC. | McCoy Decl., ¶ 76, Ex. 266(McMurray Dep. Tran., 149:4-16): Q.     Was the extreme Alt-A -- were the extreme Alt-A guidelines something that was rolled out without your approval? A.     So that would have been one of the other things I recollect, and that's kind of in a completely different vein, that's more of a -- that would be considered more of an Alt-A or prime |
| | -- which is in kind of the never never land between prime and -- and subprime, but at least from my point of view that was rolled out without having all of the -- or partially rolled out without having all of the steps completed. Q.     And was one of the steps your signoff? A.     That would have been one of the steps. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | *** |
| | McCoy Decl., ¶ 76, Ex. 266(McMurray Dep. Tran., 562:5-16): |
| | Q.    Did there ever come a time when you approved the Extreme Alt-A guidelines? |
| | A.    I do not recollect approving Extreme Alt-A. |
| | Q.    So there's your statement:  "There are several recent examples where products or transactions proceeded without the required risk approvals or contradiction of established policy." Can you identify some of the examples you had in mind as of November of '06? |
| | A.  Well, it says "Extreme Alt-A is one of those examples."  So that would have been one --that would have been one of the examples I had in mind. |
| 379.   Nevertheless, CFC's production divisions began to originate loans under the Extreme Alt-A guidelines even though McMurray had not signed-off on the proposed guideline expansion. | McCoy Decl., ¶ 63, Ex. 253(Ingerslev Inv. Test. 30:17-32:19): Q    Yeah, I understand.  Were the Alt-A guidelines ever utilized by Countrywide at the retail level? A    What do you mean? MR. LINDENBAUM:  You mean the extreme Alt-A? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. WYNN:  Yeah. |
| | THE WITNESS:  Oh, yes, they were, but not through -- not -- so there's a couple of aspects around it. So we -- we set up -- or it was set up to run these guidelines through as, what we would call exceptions, and exceptions is – be careful with the word because people have different connotations about that, so let me describe that a little bit.  We set up to originate loans outside of underwriting guidelines knowingly, and so you could call that an exception because it's outside of standard underwriting guidelines, but they really were a set of shadow underwriting |
| | guidelines that we -- you could call an exception because it's outside our policies -- or our -- I'm sorry, our posted standard guidelines.  So that was a longstanding practice of Countrywide's. And this particular set of underwriting guidelines, though I'm trying to weave the story here, but it wasn't initially sort of formally approved to be a policy, you know, by John McMurray, but nonetheless, it was still being originated, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you know, through sales in a retail -- through the retail channel through this, you know, shadow guideline concept where loans, you know, were knowingly done, set up to be -- to go through a certain process and there are lots of reasons for doing it that way, generally speaking, that are good ones.  So, again, this was a strategy for a couple of reasons, so examples of that would be, you know, it created tension in the process, meaning, it would naturally inhibit the number of loans we would do if -- versus if they were in standard posted guidelines, because they had to refer the loan to someone else to get |
| | an approval.  So just that referral alone created some tension in the process or an extra step, and that would inhibit loans or volume of loans, and when you're talking about riskiest loans, that's, from a risk perspective, that's a good idea.  Secondly, you had a second set of eyes that were required to look at the loan to approve it.  And the second set of eyes was a more senior set of eyes, so from a skill-based routing perspective, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you know, that was a good idea.  Third, the industry is very good at finding out what each other is doing when you posted an underwriting guidelines.  And, you know, it was good to have some things that we didn't post so that Wells wouldn't see us and try to one-up us, and we'd have this domino effect of continuing sort of trying to one-up each other with move aggressive credit.  So those are the reasons for that sort of the strategy employed of having, you know, certain things knowingly originated, but, you know, not posted in our underwriting guidelines.  And these loans that we're talking about sort of went through that path. |
| | *** |
| | McCoy Decl., ¶ 63, Ex. 253(Ingerslev Inv. Test. 151:5-153:20): |
| | Q     If you focus on the third paragraph, it starts with "the second."  That paragraph ends with the sentence, "There are several recent examples where product or transactions proceed without the required risk approvals or in contradiction of established policy." |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A      Uh-huh. |
| | Q      The next one says, "Extreme Alt-A is one of these examples." |
| | A      Uh-huh. |
| | Q      How could a product or a transaction proceed without risk approval's warned contradiction of an established policy?  Like, how is that possible? |
| | MR. DROOYAN:  You want him to explain what happened?  Just sort of -- I'm not sure how he can answer that question. |
| | BY MR. WYNN: |
| | Q      Well, do you have any difficulty answering that question? |
| | A      Well, I'm churning it a little bit, so, yeah, why don't you rephrase the question. |
| | BY MR. WYNN: |
| | Q      Okay.  So if there are policies and -- that prevent a certain type of transaction, how is it that those transactions go on anyway?  Is it via exceptions or just via acting in contravention to the policy? |
| | A      So there's -- on this particular -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | let me use this particular example. |
| | Q        Yeah, extreme Alt-A. |
| | A        So there's a lot of work around defining what it was required.  So the "it" was very clearly identified and defined, and we had this, you know, myriad of, you know, little nuanced changes, you know, some large, some small, to the underwriting guidelines.  So there's a body of work to document all that.  And included in that body of work would be a, you know, what those guidelines are and what they might look like if -- when they were given to production to act on.  And the Vijay and his team are part of that process so they |
| | have access to that, and, in fact, they helped build it.  So we have this, you know, this information and this description, and we take it to John McMurray to sign it, and he says, "I don't sign it."  Well, the body of work still exists.  And, you know, Vijay and his team can pass it on to-- or Drew -- can pass it on to the production division and say, "Here you go.  Start originating loans."  So that's how-- that's how it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | happened.  I mean, there's no systemic way to stop it from happening, right, because you don't need a -- I mean there's systemic, meaning automated. There's no automated way to prevent what I just described from happening, because you're talking about human beings, you know, not systems. Q      Well, Vijay and people in production could have escalated the matter, right, if McMurray refused to sign and had Bartlett or Sambol officially endorse the extreme Alt-A guideline? A      Right. Q      Was that done, to your |
| | knowledge? A      Eventually it was. Q      Okay. A      It was a long protracted discussion.  I don't remember the exact date when it ultimately was, but it was, and Dave ultimately signed off on it, but I don't remember when that was. Q      Now, is there any consequence or penalty that was bestowed upon the production people for originating these |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | types of loans when McMurray had not signed off? <br><br> A     No.  There wasn't really a mechanism to do so. |
| 380.   On November 16, 2006, McMurray sent Sambol an e-mail stating that he was "nervous" and "frustrated" regarding credit policy at CFC. | Dean Decl., ¶ 96, Ex. 94 (McMurray Dep. Ex., 2634 (November 16, 2006 e-mail from McMurray to Sambol)). <br><br> McCoy Decl., ¶ 76 , Ex. 266(McMurray Dep. Tran., 558:15-559:4): <br><br> Q.     All right.  The next document I'm going to show you is a November 16th, 2006, e-mail from you to Mr. Sambol, and Mr. Bartlett is a cc. <br> MR. WYNN:  Can we go off the record? <br> (A discussion was held off the record.) |
| | (Exhibit 2634 was marked for identification.) <br> THE VIDEOGRAPHER:  Back on the record.  The time is 3:29 p.m. <br> BY MR. WYNN: <br> Q.     Mr. McMurray, do you recognize the November 16, '06, e-mail from you to Mr. Sambol? <br> A.     Let me take a quick peek, please. <br> MR. TAYLOR:  Do you have copies for |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | us?<br>THE WITNESS:  Okay.  I do recognize this e-mail now. |
| 381.   In his November 16, 2006 e-mail to Sambol, McMurray informed Sambol that loan guidelines and loan products had proceeded without the required approvals and in contradiction of CFC credit policies. | Dean Decl., ¶ 96, Ex. 94 (McMurray Dep. Ex., 2634 (November 16, 2006 e-mail from McMurray to Sambol)). |
| 382.   As an example, on November 16, 2006, McMurray informed Sambol that the EAA guidelines had never been approved and that he (McMurray) had refused to sign-off on the EAA guidelines. | Dean Decl., ¶ 96, Ex. 94 (McMurray Dep. Ex., 2634 (November 16, 2006 e-mail from McMurray to Sambol)). |
| 383.   Countrywide's outside auditors identified Countrywide's models as a significant deficiency. | McCoy Decl., ¶ 74, Ex. 264(McCallion Dep. Tran. 181:16-19):<br>Q.     Now, Countrywide's auditors had identified a significant deficiency with respect to Countrywide's models; is that correct?<br>A.     Yes.<br>* * *<br>McCoy Decl., ¶ 74, Ex. 264(McCallion Dep. Tran. 189:18-190:5):<br>Q.     Okay.  I had asked you before you reviewed the pages whether you |

472

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | remembered what the deficiencies related to.  Does reviewing the pages that end in 4171 and 4172 refresh your recollection with respect to the deficiencies that together aggregated into a significant deficiency in 2005? A.     Yes. Q.     And what is your recollection? A.     The -- the significant deficiency had to do with the document -- excuse me, documentation and testing of some of the models that were used in the valuation of the MSRs and the residuals, loan related loss -- and loan related loss reserves. |
| 384.   As late as January 2007, the scorecard models that Countrywide used in its automated underwriting system had not been developed to handle subprime loans, and were therefore unable to distinguish among credit scores below 605. | Bendell Decl., ¶14, Ex. 306 (Depo. Ex. 27) (1/23/2007 e-mail from Stephen Lange to Cliff Rossi) I think the real key here is that these loans were never meant to use Prime scorecard. As you know, Don only considered FICOs >=600 f or CMS4 so every FICO <605 receives the same point.  My assumption has been that all FICO below some threshold would automatically be |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | classified as subprime, hence out of scope for his model – I think this makes sense.  At the same time, the risk of a 500 or 520 FICO is obviously exponentially higher than that 600 minimum.<br><br>Depo Exh 1033 (8/9/2006 e-mail from Cliff Rossi to Mark Suter)<br><br>(CFC has no validated subprime model) |
| 385.   Countrywide used "multipliers" to try to address model underprediction. | Bendell Decl., ¶6, Ex. 298 (Depo. Ex. 28)<br>    "I believe we should also consider having an "automatic adjustment factor" in the ALLL model [analogous to the HELOC model] to deal with model over/under predicting delinquency."<br><br>Bendell Decl., ¶17, Ex. 309 (Elbaum Depo. Ex. 19). |
| 386.   In January 2007, Countrywide's Banking Regulator informed it that the multiplier used for the ALLL model was "too backward looking" and did not capture the risks Countrywide was | Bendell Decl., ¶13, Ex. 305 (Depo. Ex. 1551) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| facing. | |
| 387.   Sieracki was aware that the OCC had informed Countrywide Bank that the models used setting the Allowance for Lease Losses for were underpredicting losses. | McCoy Decl., ¶ 90, Ex. 280(Sieracki Dep. Tran. 76:16-77:4):<br><br>Q.     In March of 2007, were you aware of the OCC commenting on the underprediction of models related to ALLL?<br><br>MR. SIEGEL:  Misstates the document by not including the OCC's conclusion.<br><br>THE WITNESS:  I generally recall the issue of reserve is okay; models might not be spot-on. |
| | BY MR. BENDELL:<br><br>Q.     Right.  But my question is, do you recall the OCC expressing that issue, or discussing that issue?<br><br>A.     I generally recall that.<br><br>MS. PHILLIPS:  Objection.  Vague as to "that." |
| 388.   In June 2006, a product change was proposed within CFC to increase subprime loan and loan to value amounts across all credit grades and most FICO and LTV combinations within each credit grade. | Dean Decl., ¶ 92, Ex. 90 at 3012 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶ 88, Ex.278 (Scammahorn Dep. Tran. 201:15-202:13):<br><br>Q.     And then it says under there, the second sentence under that point says, "On the PCPF reviewed, it was noted |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that the chief credit officer clearly disapproved of the change and this disapproval was formally documented on the form with the following statement: 'I'm still not comfortable with these changes.'" I'm sorry, let me just go back. I guess that refers to, "In June 2006, a product change was considered to increase sub-prime loan and loan-to-value amounts across all credit grades and most Fair Isaac Corporation (FICO) scores and loan to value combinations within each credit |
| | grade." Do you recall a change being made or considered along those lines in or about June of 2006? |
| | A.      Yes. |
| | MS. GORDON:  Object to form. |
| | Q.      And do you recall that Mr. McMurray clearly disapproved of that change? |
| | A.      Yes, it was documented. |
| | Q.      Was the change implemented? |
| | A.      Yes. |
| | Q.      Over the objection of Mr. McMurray? |
| | A.      Correct. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | *** |
| | McCoy Decl., ¶ 76, Ex.266 (McMurray Dep. Tran. 567:19-568:6): |
| | Q.  Okay.  We'll get into that one in a second.  Let me show you a document I've already marked as Exhibit 984. This is a document entitled "Countrywide Internal Audit Department Review of Enterprise-Wide Business Development Product Management."  John, if you can pass it on to your attorneys. |
| | A.  Oh, sure. |
| | Q.  Mr. McMurray, did you ever see this document before? |
| | A.  I don't recall it specifically. However, I am one of the addressees on the front of it.  Well, on the second page, certainly.  And on the front page, I'm listed as part of the distribution.  So --so I do believe that I received it.  I don't explicitly recall so. |
| | * * * |
| | McCoy Decl., ¶77, Ex. 267 (McMurray Dep. Tran. 569:7-570:6): |
| | Q.  All right.  Do you recall being interviewed by anyone in internal audit |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | concerning the matter reflected in Item 1? |
| | A.  Again, as I mentioned a moment ago, I interacted with them frequently, both on audits that they had underway and outside of the audit process.  So on this particular audit, I cannot imagine not being interviewed at least once, if not more than once, as they put this audit together. |
| | Q.  Okay.  I'm sorry if I've already asked you this, but did you contact them and raise this concern? |
| | A.  I don't remember if I did.  I'm not saying I didn't.  I just don't specifically remember it being in that sequence. |
| | Q.  Okay.  And there's the observation -- I'll read it.  "In June of 2006, a product change was considered to increase subprime loan and loan-to-value amounts across all credit grades and most Fair Isaac Corporation scores and LTV combinations within each credit grade.  On the PCPF reviewed, it was noted that the chief credit officer clearly disapproved of the change, and his disapproval was formally documented |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | on the form with the following statement: 'I'm not comfortable with these changes.'"  To your knowledge, is that a true statement?<br><br>A.  I believe that it is, yes. |
| 389.   John McMurray, CFC's Chief Risk Officer, disapproved of the proposed changes, and made his disapproval explicit in pertinent Product Change Proposal Form ("PCPF" or "PC"). | Dean Decl., ¶ 92, Ex. 90 at 3012 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶88, Ex. 278 (Scammahorn Dep. Tran. 201:15-202:13):<br><br>Q.     And then it says under there, the second sentence under that point says, "On the PCPF reviewed, it was noted that the chief credit officer clearly |
|  | disapproved of the change and this disapproval was formally documented on the form with the following statement: 'I'm still not comfortable with these changes.'"  I'm sorry, let me just go back.  I guess that refers to, "In June 2006, a product change was considered to increase sub-prime loan and loan-to-value amounts across all credit grades and most Fair Isaac Corporation (FICO) scores and loan to value combinations within each credit grade."  Do you recall a change being |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | made or considered along those lines in or about June of 2006? |
| | A.    Yes. |
| | MS. GORDON:  Object to form. |
| | Q.    And do you recall that Mr. McMurray clearly disapproved of that change? |
| | A.    Yes, it was documented. |
| | Q.    Was the change implemented? |
| | A.    Yes. |
| | Q.    Over the objection of Mr. McMurray? |
| | A.    Correct. |
| | * * * |
| | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 569:7-570:6): |
| | Q.  All right.  Do you recall being interviewed by anyone in internal audit concerning the matter reflected in Item 1? |
| | A.  Again, as I mentioned a moment ago, I interacted with them frequently, both on audits that they had underway and outside of the audit process.  So on this particular audit, I cannot imagine not being interviewed at least once, if not more than once, as they put this |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | audit together. |
| | Q.  Okay.  I'm sorry if I've already asked you this, but did you contact them and raise this concern? |
| | A.  I don't remember if I did.  I'm not saying I didn't.  I just don't specifically remember it being in that sequence. |
| | Q.  Okay.  And there's the observation -- I'll read it.  "In June of 2006, a product change was considered to increase subprime loan and loan-to-value amounts across all credit grades and most Fair Isaac Corporation scores and LTV combinations within each credit grade.  On the PCPF reviewed, it was noted that the chief credit officer clearly disapproved of the change, and his disapproval was formally documented on the form with the following statement:  'I'm not comfortable with these changes.'"  To your knowledge, is that a true statement? |
| | A.  I believe that it is, yes. |
| 390.   Nevertheless, CFC's Chief Risk Officer's disapproval was overridden by CFC's Chief Production Officer (then David Sambol), and the proposed | McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 201:15-202:13; Dean Decl., ¶ 92, Ex. 90 (Scammahorn Dep. Ex. 984, p.5) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| product changes were implemented at CFC. | * * *<br><br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 567:19-568-6):<br>Q.  Okay.  We'll get into that one in a second.  Let me show you a document I've already marked as Exhibit 984.  This is a document entitled "Countrywide Internal Audit Department Review of Enterprise-Wide Business Development Product Management."  John, if you can pass it on to your attorneys.<br>A.  Oh, sure.<br>Q.  Mr. McMurray, did you ever see this |
| | document before?<br>A.  I don't recall it specifically.  However, I am one of the addressees on the front of it.  Well, on the second page, certainly.  And on the front page, I'm listed as part of the distribution.  So --so I do believe that I received it.  I don't explicitly recall so.<br>* * *<br>McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 569:10-570:6):<br>Q.  All right.  Do you recall being interviewed by anyone in internal audit |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | concerning the matter reflected in Item 1? |
| | A.  Again, as I mentioned a moment ago, I interacted with them frequently, both on audits that they had underway and outside of the audit process.  So on this particular audit, I cannot imagine not being interviewed at least once, if not more than once, as they put this audit together. |
| | Q.  Okay.  I'm sorry if I've already asked you this, but did you contact them and raise this concern? |
| | A.  I don't remember if I did.  I'm not saying I didn't.  I just don't specifically remember it being in that sequence. |
| | Q.  Okay.  And there's the observation -- I'll read it.  "In June of 2006, a product change was considered to increase subprime loan and loan-to-value amounts across all credit grades and most Fair Isaac Corporation scores and LTV combinations within each credit grade.  On the PCPF reviewed, it was noted that the chief credit officer clearly disapproved of the change, and his disapproval was formally documented |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | on the form with the following statement: 'I'm not comfortable with these changes.'"  To your knowledge, is that a true statement?<br><br>A.  I believe that it is, yes. |
| 391.   Subsequently, McMurray reported to Julie Scammahorn of CFC's Internal Audit Department, that, in the case of a disagreement between himself and CFC's Chief Production Officer over proposed expansions to CFC's loan underwriting guidelines, his concerns were rejected and/or trumped by CFC's Chief Production Officer. | Dean Decl., ¶ 92, Ex. 90 at 3012 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 200:10-24):<br>Q.    Did internal audit find any reason or explanation for why the chief production officer at Countrywide Financial Corporation could override the concerns elevated by the chief credit risk officer -- chief credit officer?<br>A.    John McMurray had talked to me specifically, you know, about his concern of if there's a conflict, if there's a disagreement between his role and the role of the production officer, that that was not consistent with what he had seen at other firms that he had been a part of and wanted my insight, and I agreed with him as well, and what we agreed to is that there would have to be an escalation when there was a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | difference between the chief credit officer or the chief production officer. |
| 392.   McMurray told CFC's Internal Audit Department that CFC's practice of allowing the Chief Production Officer to overrule his credit risk management concerns was not consistent with the practice that he had observed at other institutions. | McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 200:10-24):<br><br>Q.    Did internal audit find any reason or explanation for why the chief production officer at Countrywide Financial Corporation could override the concerns elevated by the chief credit risk officer -- chief credit officer?<br>A.    John McMurray had talked to me specifically, you know, about his concern of if there's a conflict, if there's a disagreement between his role and the |
| | role of the production officer, that that was not consistent with what he had seen at other firms that he had been a part of and wanted my insight, and I agreed with him as well, and what we agreed to is that there would have to be an escalation when there was a difference between the chief credit officer or the chief production officer. |
| 393.   After conducting an internal audit, on September 29, 2006, CFC's Internal Audit Department issued it | Dean Decl., ¶ 92, Ex. 90 (Scammahorn Dep. Ex. 984) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| findings in a document called "Enterprise Wide Business Development and Product Management." | McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 196:25-197:25):<br><br>MS. MELSON:  I'll mark as Exhibit 984 this document entitled "Enterprise-Wide business development and product management," dated September 29, 2006," bearing Bates number CFCP 006261213 through 1225.<br><br>(Scammahorn Exhibit 984 for identification, document entitled "Enterprise-Wide business development and product management," dated September 29, 2006, Bates stamped CFCP 006261213 through 1225.)<br><br>Q.    Have you seen Exhibit 984 before |
|  | today?<br>A.    Yes.<br>Q.    Can you describe it?<br>A.    It's the internal audit report around the company's business development and product   management.<br>Q.    It was prepared by internal audit; is that correct?<br>A.    That is correct.<br>Q.    Was it prepared by Tom Shimada who's listed as the audit contact? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.    Yes, it was, yes.<br>Q.    Was this a document prepared and maintained by Countrywide in the ordinary course of its business?<br>A.    Yes. |
| 394.   Defendants Mozilo, Sieracki & Sambol each received a copy of the September 29, 2006 internal audit report. | Dean Decl., ¶ 92, Ex. 90 at 3007 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 198:1-11:<br><br>Q.    And you're listed on the distribution list.  Do you see that?<br>A.    Correct.<br>Q.    Did you receive a copy of it?<br>A.    Yes.<br>Q.    Did Mr. Mozilo as well?<br>A.    Yes. |
| | Q.    Mr. Sambol?<br>A.    Yes.<br>Q.    Mr. Sieracki?<br>A.    Yes. |
| 395.   The September 29, 2006 CFC Internal Audit Report contained the following finding:<br>    CFC policy in the "Product Develop<br>    Process as of June, 21 2005" allows | Dean Decl., ¶ 92, Ex. 90 at 3012 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 198:1-12- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| for the CHL Chief Production Officer to override the concerns elevated by the CFC Chief Credit Officer *thereby posing a conflict of interest that could prevent credit quality issues from being appropriately considered before a product change.*<br><br>(emphasis added.) | 199:2):<br><br>Q.    I want to turn your attention to page 5 which ends in Bates number 1218 of Exhibit 984.  At the top it says "Findings, recommendations, management action plans." Do you see that?<br><br>A.    Yes.<br><br>Q.    And it says, "Internal audit has classified the following as moderate risk findings:  1. CFC policy in the product develop process as of June 21st, 2005 allows for the CHL chief production officer to override the concerns elevated by the CFC chief credit officer thereby posing a conflict of interest   that could prevent credit quality issues from being appropriately considered before a product change." Do you see that?<br><br>A.    Yes. |
| 396.   Julie Scammahorn, CFC's General Auditor, confirmed that the internal audit found that allowing the Chief Production Officer to overrule the Chief Risk Officer posed a conflict of interests that could prevent credit quality issues from being appropriately | Dean Decl., ¶ 92, Ex. 90 (Scammahorn Dep. Ex. 984)<br><br>McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 198:12-200:9):<br><br>Q.    I want to turn your attention to page 5 which ends in Bates number |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| considered before a product change. | 1218 of Exhibit 984.  At the top it says "Findings, recommendations, management action plans."  Do you see that?<br>A.     Yes.<br>Q.     And it says, "Internal audit has classified the following as moderate risk findings:  1. CFC policy in the product develop process as of June 21st, 2005 allows for the CHL chief production officer to override the concerns elevated by the CFC chief credit officer thereby posing a conflict of interest   that could prevent credit quality issues from being appropriately considered before a product change."  Do you see that?<br>A.     Yes.<br>Q.     Do you recall that finding being made by internal audit?<br>A.     I do.<br>Q.     Can you describe it? |
|  | A.     Yes, it's the actual CFC policy regarding product development and we viewed it as a conflict that the chief production officer could override your chief credit officer.<br>Q.     Why was that? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.     You got your salesperson telling the credit person what he or she is going to do.<br><br>Q.     And what were the primary responsibilities for that chief production officer at   Countrywide?<br><br>A.     He had responsibility for all of the production divisions, all for -- be it the retail with   the consumer markets and full spectrum as well as wholesale and correspondent lending.<br><br>Q.     When you say he, who are you referring to?<br><br>A.     Drew Gissinger.<br><br>Q.     He was the chief production officer at this time in 2006?<br><br>A.     That's correct.<br><br>Q.     And was he compensated, was his compensation tied to loan production, if you know?<br><br>A.     Yes, it was. |
| | Q.     What was the primary responsibility of the CFC chief credit officer, if you know?<br><br>A.     The chief credit officer at this time was John McMurray and he had responsibility for credit across the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | company, credit risk management. |
| 397.   When asked to explain why the policy resulted in a conflict of interest, Ms. Scammahorn noted that "***You've (sic) got your salesperson telling the credit person what he or she is going to do***." (emphasis added.) | McCoy Decl., ¶ 88, Ex. 278 (Scammahorn Dep. Tran. 199:3-13)<br><br>Q.    Do you recall that finding being made by internal audit?<br><br>A.    I do.<br><br>Q.    Can you describe it?<br><br>A.    Yes, it's the actual CFC policy regarding product development and we viewed it as a conflict that the chief production officer could override your chief credit officer.<br><br>Q.    Why was that?<br><br>A.    You got your salesperson telling the credit person what he or she is going to do. |
| 398.   Countrywide claimed that it mitigated the additional risks posed by its expansion of underwriting guidelines by pricing for such additional risk -- i.e., charging higher prices to on relatively riskier products. | McCoy Decl., ¶96, Ex. 286 (May 24, 2005 Final Transcript of Countrywide Financial Corporation's Analyst Meeting at p. 13) |
| 399.   However, the September 29, 2006 CFC Internal Audit Report found that the requisite pricing adjustments were inadequate:<br><br>    Pricing justifications submitted as | Dean Decl., ¶ 92, Ex. 90 at 3013 (Scammahorn Dep. Ex. 984) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| part of the approval form for product changes were insufficient or non-existent. (emphasis added.) | |
| 400.   Angelo Mozilo underwrote and approved his own loans, pursuant to a program coined by the media as the Friends of Angelo ("FOA") loans. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran., 580:24-581:8) Q.  All right.  Mr. McMurray, do you know what a "friend of Angelo loan" is? A.  I do know what a friend of Angelo loan is. Q.  What is that? A.  A --or it was --FOAs is what they were called in the company so that -- those were loans that --that -- where the borrower came through Angelo, is how I would describe it. |
| | Q.  Did Mr. Mozilo underwrite the loans? A.  There were occasions that I observed where he –he approved the loans. |
| 401.   In many instances, Mozilo approved and underwrote loans that were outside of CFC's own credit policy and underwriting guidelines. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran, 582:22-583:15): Q.  Were the Friends of Angelo loans that Mr. Sota referred to you outside of Countrywide's underwriting guidelines? A.  The reason he would have brought them up – |

492

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. WEISS:  Let me just interpose an objection.  That's vague and ambiguous.  THE WITNESS:  My recollection is the ones that --that he raised to my attention were outside of guidelines.  And so in particular, one of the --one of the guidelines that Stan Kerlen and I cherished was on large loans having a hard stop for loan-to-value on large-dollar loans.  And so that --that would typically be the one that would cause Gene to bring it to my attention.  So while guidelines are guidelines, they mean just that.  I mean, a hard stop is something else.  And so that's why those were --that's what gave occasion |
| | for Gene to bring it to my attention, because he wanted to let me know that that was going through. |
| 402.   For instance, CFC's underwriting guidelines had certain "hard stops," which meant that a particular loan <u>could not</u> be originated (even via the exception process). | Bendell Decl., ¶15, Ex. 307 (Depo. Ex. 392 at CFC200772206) Dean Decl., ¶ 85, Ex. 83 at CFC2007832907 (Aguilera Depo. Ex. 158) |
| 403.   Mozilo disregarded CFC credit policy and underwriting guidelines and approved loans even though loans | Bendell Decl., ¶15, Ex. 307 (Depo. Ex. 392 at CFC200772206) Dean Decl., ¶ 85, Ex. 83 at |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| contained data making them "hard stops". | CFC2007832907 (Aguilera Depo. Ex. 158, p. CFC2007832907) |
| 404.   CFC's Chief Risk Officer, John McMurray, attempted to assess the appropriateness of certain FOA loans. However, Mozilo chided McMurray for becoming involved in loans that he had "already approved" and admonished that CFC's balance sheet was "big enough" for the FOA loans. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran, 581:20-582:21) Q.  All right.  Did you have any role in underwriting these friends of Angelo loans? A.  On a couple of occasions, I had -- they got escalated to my attention. There's a gentleman, Gene Sota, that ran underwriting for the CMD area, the consumer markets division.  And while |
| | underwriting didn't report up to me, I mean, there were occasions where I would talk to Gene.  And so he brought to my attention some loans that appeared to be outside of guidelines. When I attempted to get involved, the -- my involvement wasn't warmly met. Q.  Who did not warmly meet your involvement? A.  Typically, Angelo.  So again, I would not have seen these, other than Gene escalating them to my attention. And as I said, there was one --he was like, "What is McMurray doing looking at this loan?  I've already approved it." |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | So I can remember an e-mail to that effect that he sent around.  And another one, "You know, with x-hundred-billion-dollar balance sheet, it seems like we could find room for one loan."  Through time.  And so I did talk to both Drew; Nick, at the time; later, Kevin, Dave about, you know, whether the loan should be handled that way.  So I think efforts were made to try to –to change that process.  But it was in place for most of the time that I was there. |
| 405.   Ed McMahon, the former *Tonight Show* co-host, was a recipient of several loans that were underwritten by Mozilo in contravention of CFC credit policy and underwriting guidelines. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 581:14-19): Q.  Have you ever heard in the news, publicly, Ed McMahon defaulted on a Countrywide loan.  Do you recall that? A.  I do.  And he is an example of someone that went through the --came through the FOA process for a couple of loans, is my recollection. * * * McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 582:22-583:15): Q.  Were the Friends of Angelo loans that Mr. Sota referred to you outside of Countrywide's underwriting guidelines? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | A.  The reason he would have brought them up -- <br><br> MR. WEISS:  Let me just interpose an objection.  That's vague and ambiguous. <br><br> THE WITNESS:  My recollection is the ones that --that he raised to my attention were outside of guidelines.  And so in particular, one of the --one of the guidelines that Stan Kerlen and I cherished was on large loans having a hard stop for loan-to-value on large-dollar loans.  And so that –that would |
|  | typically be the one that would cause Gene to bring it to my attention.  So while guidelines are guidelines, they mean just that.  I mean, a hard stop is something else.  And so that's why those were --that's what gave occasion for Gene to bring it to my attention, because he wanted to let me know that that was going through. |
| 406.   Prior to his June 23, 2009 death, in or around March 2008, Mr. McMahon defaulted on $4.8 million CFC mortgage, some of which Mozilo had underwritten and approved in direct contravention of CFC credit | McCoy Decl., ¶ 38, Ex.228 (June 4, 2008 WSJ Article Ed McMahon May Lose Beverly Hills Home) <br> Bendell Decl., ¶16, Ex. 308 (April 28, 2005 e-mail from John McMurray to Nick Krsnich, April 15, 2005 e-mail |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| policy and underwriting guidelines. | from Angelo Mozilo to Joseph Reed) |
| 407.   CFC's Chief Risk Officer, John McMurray, warned Sambol that if the loans CFC originated, packaged into MBS and then sold to investors, performed badly, CFC's ability to continue accessing the capital markets could be frustrated. | McCoy Decl., ¶76, Ex. 266 (McMurray Dep. Tran. 89:15-92:6)<br>Q.    The next item is Item c, "Security Performance."  You state, "To the extent our securities contain a greater concentration of high" – "higher risk transactions than those issued by our competitors, our security performance may be adversely impacted.  The issue here is a concern" -- excuse me.  "The issue here is the extent our concern over security performance drives what we will or won't do on an exception."  What did you mean by that – those statements, Mr. McMurray?<br>A.    So there -- there are a couple things going on here.  So on -- in Item b above we talked about much of the risk being sold off.  The risk was typically sold off --or one of -- one of the common forms would be via a securitization, and by securities performance I -- I mean a couple things.  One would just be the -- the level of delinquencies and defaults that you were seeing in those securities, that -- that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | would be -- that would be one dimension, and partic -- particularly on a relative basis.  And one of my concerns -- so even if someone were keep -- you know, someone might be more aggressive on the credit guidelines than Countrywide, but there's another |
|  | element that we need to bring in here that's important with respect to securities performance.  Countrywide's bank tended to -- on -- on some of the key products, tended to select the best loans out of the ones that were originated by best -- I'm talking about from a credit risk standpoint, so let me clarify that.  So as -- as those loans are drawn out of the population, what's left to put into the securities were not -- are not as good as what you started out with, and then that can have an adverse effect on securities performance.  And in my opinion -- and I suspect it's on the wall of worries; we could go look for it. This idea on security performance was something I think -- I thought we should be mindful of, and when I was at Freddie Mac it was something that -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | that they weren't mindful enough of, and it harmed them for many years subsequently, in my opinion. Q. Did you ever warn Mr. Sambol that a bad performance with respect to Countrywide-issued MBS could impede Countrywide's ability to continue |
|  | accessing the capital markets? A. We -- we discussed it. I want to be careful on the word "warn," because that's kind of a -- has a tone with it, but -- but I certainly discussed it with him, and depending on your perspective, here may not be characterized as a warning. Q. Okay. Is it accurate to say that you made him aware of the possibility that bad performance with respect to Countrywide-issued MBS could frustrate Countrywide's ability to continue to access the capital markets? MR. BROWN: Objection. Leading. THE WITNESS: I express -- I -- I expressed my concerns, and also don't want -- also don't want to leave you with the impression that it's just Dave and I duking it out, although that, you know, happened on occasion. These |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | discussions would typi -- typically include other people, as well, that had a variety of -- a variety of opinions.  And so I probably would have been on the -- the end of the spectrum that was more concerned about this particular issue than others, but -- but I wasn't the only |
| | one.  My recollection is some of the broker -- some of the officers at the broker dealer thought that this was a -- they tended to be more sympathetic to my point of view or my side on this particular debate. |
| 408.   In sworn testimony, Ingerslev stated that he explicitly warned—as part of an ongoing dialogue within CFC—that the expansion of underwriting guidelines could cause disruptions in the secondary market. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 167:3-170:16):<br>Q    And in the bottom paragraph, you reference -- well, you reference a line in this -- whether or not a line in the sand should still be unsalable.  As of the date of this e-mail, was that the limitation on whether a loan could be originated whether or not it was saleable in the secondary market?<br>A    Yes.<br>Q    And were you advocating for a change from that?<br>A    Yes. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q    What change would you have liked to have seen? |
| | A    I don't know if I had a specific -- a specific alternative line, but can we get together and talk about coming up with one I think is my suggestion. |
| | Q    And why did you think the unsalable standard was no longer sufficient? |
| | A    It just -- the performance was looking like – it was just looking bad and there were all sorts of potential ramifications of that.  One of which is, you know, investors heading for the exits, which is exactly what happened with the liquidity crisis.  If you keep taking advantage of an opportunity that exists and you load up on it and it turns out to be bad and you've completely loaded it up, it could potential go away, you know, overnight, and that's exactly what happened. |
| | Q    Well, what do you mean by that, "that's exactly what happened"? |
| | A    Well, investors lost confidence in their ability to assess and risk and predict performance, and so they |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | stopped buying mortgages. |
| | Q    And are you saying that their loss of the ability to assess risk and price were as a result of the certain --what was that a result of? |
| | A    I think it -- it's a result of the volatility that I described.  You know, |
| | so when you have -- when you layer on these additional risks, you go further out, you know, the risk spectrum, the volatility around the expected result grows, and we were witnessing that. And so the confidence to assess that volatility, you know, dropped precipitously particularly when combined with the economic environment that was occurring, specifically home prices declining. |
| | Q    When did you first observe the increased volatility? |
| | A    I just assumed it, you know, intuitively in every-- it's inherent in everything we've talked about today, back from, you know, this entire history we've been talking about.  It just -- it was a steady growth of concern over the years. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q    Did you ever explicitly warn anyone that you thought the expansion of credit guidelines could cause disruptions in the secondary market? |
| | A    Yeah, that was part of the ongoing discussion that that was a potential, that, you know, one day things might – I |
| | never predicted as drastic as it did occur, but, again, that was just part of -- again, it wasn't a one-time proclamation, but part of the ongoing dialogue that we were having. |
| | Q    To the best of your recollection, when was the first time you warned someone that expanding guidelines could lead to disruptions in the secondary market? |
| | A    I don't -- I don't remember. |
| | Q    Would it have been before 2007? |
| | A    Yes. |
| | Q    Would it have been before 2006? |
| | A    Probably not, probably sometime in 2006. |
| | Q    And do you recall who you first gave this warning or the people who you did give this warning to? |
| | A    I think, again, it was just part of |

| SEC Statement | Evidence Cited by SEC |
| --- | --- |
| | whatever conversations we were having, whether it be with John or Kevin or Vijay or Drew.  It was just part of regular conversations around, you know, this was -- you're reading our lives here, you know, in these e-mails, and these weren't one-time events; they |
| | were everyday events. |
| | Q    Can you recall any particular conversation with a specific person about a relationship between widening or expanding guidelines and the possibility of a disruption in the secondary market? |
| | A    The only specific conversations I can recall – I know there are numerous, but you asked me for specific ones.  I really dealt actually more with our fast and easy program that I described earlier and working with Fannie Mae and Freddie Mac to buy those loans.  And we kept pushing the envelope there, too.  And we were successful in negotiating with them, but I was very concerned that we would lose the program and that -- that was expressed to Vijay and to Drew and a gentleman named Charles Emily |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | who was kind of the pricing equivalent of Vijay.  I kept saying, "One day we're going get slammed by them because we loading this up and expanding and expanding, and one day it might not be there for us."  But the rest of the evidence here that we've been talking |
| | about, I can't remember a specific incident. |
| 409.   According to Ingerslev, as CFC and the industry layered on additional risks and moved further out on the risk spectrum, the volatility around the expected results increased. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 167:16-168:23):<br>Q   And why did you think the unsalable standard was no longer sufficient?<br>A   It just -- the performance was looking like – it was just looking bad and there were all sorts of potential ramifications of that.  One of which is, you know, investors heading for the exits, which is exactly what happened with the liquidity crisis.  If you keep taking advantage of an opportunity that exists and you load up on it and it turns out to be bad and you've completely loaded it up, it could potential go away, you know, overnight, and that's exactly what happened. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q    Well, what do you mean by that, "that's exactly what happened"? A    Well, investors lost confidence in their ability to assess and risk and predict performance, and so they stopped buying mortgages. Q    And are you saying that their loss of the ability to assess risk and price were as a result of the certain --what was that a result of? A    I think it -- it's a result of the volatility that I described.  You know, so when you have -- when you layer on these additional risks, you go further out, you know, the risk spectrum, the volatility around the expected result grows, and we were witnessing that. And so the confidence to assess that volatility, you know, dropped precipitously particularly when combined with the economic environment that was occurring, specifically home prices declining. Q    When did you first observe the increased volatility? A    I just assumed it, you know, intuitively in every-- it's inherent in |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | everything we've talked about today, back from, you know, this entire history we've been talking about.  It just -- it was a steady growth of concern over the years. |
| 410.    Therefore, according to Ingerslev, investors lost confidence in their ability to assess risk and stopped buying mortgages. | McCoy Decl., ¶63, Ex. 253 (Ingerslev Inv. Test. 168:2-168:6):<br><br>Q    Well, what do you mean by that, "that's exactly what happened"?<br><br>A    Well, investors lost confidence in their ability to assess and risk and predict performance, and so they stopped buying mortgages. |
| 411.    In March 2008, the President's Working Group on Financial Markets ("PWG"), which the President of the United States created to review the underlying causes of the financial market turmoil that began in 2007, issued its preliminary report. | Dean Decl., ¶ 181, Ex. 179(Culp Dep., Ex. 1453). |
| 412.    In the report, the PWG reported that<br>        Since, mid-2007, financial markets have been in turmoil.  Soaring delinquencies on U.S. subprime mortgages were the primary trigger of recent events. | *Id.* |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 413.   In the report, the PWG listed as a principal cause of the turmoil in the financial markets the "breakdown in underwriting standards for subprime mortgages." | *Id.* |
| 414.   In October 2008, the PWG issued an updated reported, which confirmed and expanded upon the findings of its March 2008 report. | Bendell Decl., ¶21, Ex. 313 ("Progress Update on March Policy Statement on Financial Market Developments" dated October 2008) |
| 415.   In his expert report, Defendants' purported expert Dr. Culp cites to a paper entitled *Deciphering the Liquidity and Credit Crunch,* by M.K. Brunnermeier. | Dean Decl., ¶ 180, Ex. 178(Culp Dep., Ex. 1450). |
| 416.   However, in his paper, *Deciphering the Liquidity and Credit Crunch* 2007-2008, Brunnermeier recognized that, "***The trigger for the liquidity crisis was an increase in subprime mortgage defaults, which was first noted in February 2007.***" | Dean Decl., ¶ 182, Ex. 180(Culp Dep., Ex. 1456, p. 17 fn 39). |
| 417.   Countrywide Bank generally tried to "cherry-pick" the best of the CHL loan production for the Bank's Held for Investment Portfolio. | McCoy Decl., ¶ 8, Ex. 198 (Rossi Dep. Ex. 23).<br>McCoy Decl., ¶85, Ex. 275 (Rossi Dep. Tran. 30:1-10):<br>Q   Now, the loans that the bank was portfolioing, was there a particular |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | strategy that the bank was using to select those loans? |
| | A    Yeah.  So -- so the general strategy that had been provided to me from people like Carlos Garcia and Jim Furash and that would have been conveyed back again from – from the |
| | parent was that -- and this is when I first started there, was that the bank was to originate and to cherry pick the better quality assets.  Largely among those assets that were not saleable, either out to the secondary market, to the GSEs, that is Fannie or Freddie or FHA for that matter, and that we had a fair amount of latitude initially to be able to select those assets.  And so to your -- to your question, that was the general strategy. The specific strategy was that we would identify, using a scorecard and cutoff strategy, the -- the higher quality loans, and we would look at the performance of those over time.  And at least while I was on deck, the – one of the primary ways of communicating out the relative performance of the bank's portfolio versus the overall CFC portfolio was to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | look at these perfor- -- actual performance measures by product type, by vintage, whatever, and along those dimensions you would see that the bank was outperforming the parent, outperforming meaning that we were taking on higher-quality loans. |
| | Admittedly they were loans such as PayOption ARMs and home -- home equity lines of credit, which are we all know higher-risk products than, say, a conforming mortgage.  But throughout my tenure, anyway, it was --that was the primary way for us to provide an indication of whether or not we were -- we were actually executing against that cherry picking strategy. |
| 418.   Sambol was concerned that one effect of the Bank's cherry-picking higher quality loans to portfolio would be to cause the secondary markets to lose confidence in the quality of Countrywide's MBS securitizations:<br>　　While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on | Bendell Decl., ¶5, Ex. 297 (Inv. Test. Ex. 840) |

510

| SEC Statement | Evidence Cited by SEC |
|---|---|
| what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversly [sic] selected pool. | |
| 419.   Countrywide Bank had a Quality Control ("QC") function that conducted post loan closing reviews of loans to assess the portfolio and manufacturing quality of the loans held for investment at the bank. | McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 44:8-23): Q.  Okay.  Can you just describe the QC process generally to me? A.  Yes.  We had a -- we had four types of audits that we conducted each month. The primary focus was around the statistically valid random sample. Those loans were selected randomly twice a month, and we had a staff of underwriters that would review these loans and data was re-verified, appraisals were reviewed, and then the audit findings, if any, were indicated. They were sent out to the origination channels, given an opportunity to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | respond to the findings.  And once the responses were received, the audit -- individual audits would be finalized and then would go into the monthly reporting. <br> * * * <br> McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 116:14-16): <br> Q.  Was the random audit a statistically valid sample of the loan portfolio? <br> A.  Yes. |
| 420.   The QC function conducted random audits based on a statistically valid percentage of the loans in the held for investment portfolio in each quarter. | McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 44:8-23): <br> Q.  Okay.  Can you just describe the QC process generally to me? <br> A.  Yes.  We had a -- we had four types of audits that we conducted each month. The primary focus was around the statistically valid random sample. Those loans were selected randomly twice a month, and we had a staff of underwriters that would review these loans and data was re-verified, appraisals were reviewed, and then the audit findings, if any, were indicated. They were sent out to the origination channels, given an opportunity to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | respond to the findings.  And once the responses were received, the audit -- individual audits would be finalized and then would go into the monthly reporting. <br><br> * * * <br><br> McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 116:14-16): <br> Q.  Was the random audit a statistically valid sample of the loan portfolio? <br> A.  Yes. |
| 421.   The QC Audits could result in a ranking of Severely Unsatisfactory (SUS), High Risk, Document Deficiency, or Acceptable. | Dean Decl., ¶112, Ex. 110 (Rossi Dep. Ex. 2); McCoy Decl., ¶85, Ex. 275 (Rossi Dep. Tran. 57:4-22): <br> Q   Well, the statement in this particular document, in Exhibit 2, is that for the QC process the 4506 was executed for stated income programs, jumbo loan programs, self-employed borrowers, or if tax returns were used to determine and calculate income.  Do you see that? <br> A   Yeah, I see that. <br> Q   And is that how the form was used -- <br> A   Yes. <br> Q   -- during the time period that you were responsible for the QC audits? <br> A   That is correct. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q   If you could turn to page 9 of Exhibit 2, at the bottom there's a heading there "Audit Ratings," and it looks like there are three -- well, it looks like there are four possible ratings: acceptable risk, documentation deficiency, high risk, or SUS; is that correct?<br><br>A   Yes.<br><br>* * *<br><br>McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 44:8-23): |
| | Q.  Okay.  Can you just describe the QC process generally to me?<br><br>A.  Yes.  We had a -- we had four types of audits that we conducted each month. The primary focus was around the statistically valid random sample. Those loans were selected randomly twice a month, and we had a staff of underwriters that would review these loans and data was re-verified, appraisals were reviewed, and then the audit findings, if any, were indicated. They were sent out to the origination channels, given an opportunity to respond to the findings.  And once the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | responses were received, the audit -- individual audits would be finalized and then would go into the monthly reporting. |
| | * * * |
| | McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 45:17-46:14): |
| | Q.  You said there were four types of audits.  You identified one, the random sample. |
| | A.  Yes. |
| | Q.  What were the other three? |
| | A.  The second one was a target -- targeted audit.  The third one was what we called our focus audits.  And the fourth one was adverse audits. |
| | Q.  What was a targeted audit? |
| | A.  Targeted audit were conducted based on the SUS findings for the previous month.  So any loan that received an SUS, we would automatically audit five more loans from that production channel. |
| | Q.  What is an SUS? |
| | A.  That's a loan that was rated severely unsatisfactory. |
| | Q.  Well, I think you referenced possible |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | audit findings.  What were the possible audit findings in the random audit? A.  A loan could be rated severely unsatisfactory or what we called S-U-S or "SUS."  They could be rated high risk.  They could be rated acceptable. And then there was a fourth category known as document deficiency. * * * McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 47:8-49:22): Q.  Now, can you define for me what |
|  | the difference is between an SUS loan and a high risk loan? A.  An SUS loan was a loan that was essentially outside of the guidelines, for instance, and might not be expected to perform throughout the life of the loan, versus a high risk loan which may have some attributes that were outside of the guideline, but there may have been mitigants to offset those attributes. Q.  If you turn to the page of Exhibit 2 that ends in the Bates No. 149. A.  Yes. Q.  There's a table there and across the top line of the table, the first column, it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | reads "Repurchase/Fallout Risk," then "Acceptable," then "Documentation Deficiency," then "High Risk," then "Severely Unsatisfactory."  Do you see that? |
| | A.  Yes. |
| | Q.  Can you tell me what this table is? |
| | A.  This is a table that was provided as a guide for our underwriters and management to provide definitions of what a severely unsatisfactory loan would be as well as high risk |
| | documentation, defi and an acceptable loan. |
| | Q.  And under -- and the first line of -- underneath the headings, I guess the left-hand column, it says "Description of Underwriting Risk"? |
| | A.  Yes. |
| | Q.  Do you see that? |
| | A.  Yes. |
| | Q.  For a severely unsatisfactory loan, it reads:  "Severe underwriting risk with limited or no compensating factors.  Also loans with fraud."  Do you see that? |
| | A.  Yes. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.  So is that a description of what a severely unsatisfactory loan would be?<br>A.  Yes.<br>Q.  Okay.  And then if you go one column to the left -- one column to the left under "High Risk," it reads, quote: "Increased underwriting risk with exceptions to guidelines.  There may be some compensating factors however not sufficient to rate Acceptable."  Close quote.  Do you see that?<br>A.  Yes. |
|  | Q.  Did I read it correctly?<br>A.  Yes.<br>Q.  Okay.  So is that a description of a high risk loan?<br>A.  Yes.<br>Q.  All right.  Now, what is the difference between a high risk loan and a document deficiency loan?<br>A.  A document deficiency loan was a loan where there may be a missing document, but it wasn't felt to impair the quality or the performance of the loan or, perhaps, you know, would require an investor to require repurchase, something like that.  Versus a high risk |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | loan where there was increased risk based on perhaps debt-to-income ratio, so forth, but there were mitigating factors there. |
| 422.   An SUS loan was defined as a loan that was outside of underwriting guidelines and not expected to perform through the life of the loan.  A high risk loan had attributes that were outside of guidelines, but there may have been some risk mitigants associated with the loan. | McCoy Decl., ¶85, Ex. 275 (Rossi Dep. Tran. 57:4-22):<br>Q   Well, the statement in this particular document, in Exhibit 2, is that for the QC process the 4506 was executed for stated income programs, jumbo loan programs, self-employed borrowers, or if tax returns were used to determine |
| | and calculate income.  Do you see that?<br>A   Yeah, I see that.<br>Q   And is that how the form was used --<br>A   Yes.<br>Q   -- during the time period that you were responsible for the QC audits?<br>A   That is correct.<br>Q   If you could turn to page 9 of Exhibit 2, at the bottom there's a heading there "Audit Ratings," and it looks like there are three -- well, it looks like there are four possible ratings: acceptable risk, documentation deficiency, high risk, or SUS; is that correct? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A    Yes.<br><br>* * *<br><br>McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 47:8-17):<br><br>Q.  Now, can you define for me what the difference is between an SUS loan and a high risk loan?<br><br>A.  An SUS loan was a loan that was essentially outside of the guidelines, for instance, and might not be expected to perform throughout the life of the loan, versus a high risk loan which may have some attributes that were outside of the guideline, but there may have been mitigants to offset those attributes. |
| 423.   There was also a Quality Control function at Countrywide Home Loans. The CHL QC function conducted random audits of all of the loan production channels at CHL. | Dean Decl., ¶ 124, Ex. 122 (Simantel Depo Ex. 75). |
| 424.   In materials distributed at a March 12, 2007 meeting of the credit risk committee attended by Sambol and Sieracki, Risk Management reported that 12% of the loans reviewed by Countrywide in its internal quality control process were rated severely | Dean Decl., ¶ 148, Ex. 146 (Hendry Depo Ex. 1610).<br>Dean Decl., ¶ 135, Ex. 133(Schackett Depo Ex. 398). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside of Countrywide's already wide underwriting guidelines.  An additional 14% of the loans audited had document deficiencies. | |
| 425.   An assessment of the Quality Control function at Countrywide Home Loan that was conducted in November 2007 revealed that: | Dean Decl., ¶ 121, Ex. 119 (Feller Depo. Ex. 50); McCoy Decl., ¶57, Ex. 247 (Feller Dep. Tran. 60:3-61:13): Q.  Exhibit 50 is a multiple-page document Bates stamped |
| Over the past 22 months, net QC audit results provide evidence of poor manufacturing quality at the point of origin.  By definition,<br><br>These audit results can be used to predict or anticipate portfolio quality attributes such as early payment delinquency/default, repurchase exposure, probability of MI claim denial or repurchase demands and are indicators of future portfolio performance. | FGJ_00037326 through 337.  The title on the first page is "Summary Review: Quality Control."   Ms. Feller, have you ever seen A.  Yes. Q.  Can you tell me what it is? A.  It is a summary report of a – an assessment review that I was requested to conduct in -- in or about November of 2007.  And I had been requested to review CHL's corporate QC function to assess their readiness to operate in a regulated environment because they were being -- going to be moving in to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | become Countrywide Bank. Q.  Did you read this report when it was complete? A.  Yes. Q.  Did you have any actual role in preparation of the report that's been marked as Exhibit 50? A.  Only from the standpoint that I reviewed and made edits to the report. Q.  Did you agree with the views expressed in the document? MS. WEISS:  Objection.  Lacks foundation. |
| | Q.  You can answer. A.  Yes, I did. |
| 426.   The November 2007 assessment of the Quality Control function at Countrywide Home Loan also revealed that: Both CHL and CWB set the benchmark for SUS ratings at 4%. Over a period of almost 2 years, a level of final SUS rates exceeding the benchmark by 100% have been consistently identified for portfolio and HFS products. * * * | Dean Decl., ¶ 121, Ex. 119 (Feller Depo. Ex. 50, at pp. 3, 4). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| As acknowledged by the Companywide 4 % threshold, perfection is not attainable, but the ongoing level of non-compliance indicates a significant breakdown in the manufacturing quality and, if extrapolated to the entire population, indicates a heightened level of risk. | |
| 427.   In 2006, Countrywide Bank's QC function reported the results of an audit of the Bank's reduced documentation loans for the 10 month period ending on April 30, 2006 in which the Bank QC department had executed Forms 4506 submitted by the borrowers with their loan applications and compared the stated income on the loan application with income reported to the Internal Revenue Service (the "4506 Audit"). | Dean Decl., ¶¶ 115, 117, 119, 116, Exs. 113, 115, 117, 114(Rossi Depo Exhs 6, 7, and 44; Feller Depo Ex. 53. |
| 428.   The 4506 Audit results showed that 50.3% of the Form 4506s executed in the QC process showed an income variance between the loan application and IRS records of 10% or more.  Of those, 69% had an income variance of | Dean Decl., ¶¶ 115, 117, 119, 116, Exs. 113, 115, 117, 114 (Rossi Depo Exhs 6, 7, and 44; Feller Depo Ex. 53). |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| greater than 50%. | |
| 429.   As a result of 4506 Audit, management at Countrywide Bank recognized that 40% of the reduced documentation loans in the Bank's Held for Investment portfolio may have had income overstated by 10% or more. | Dean Decl., ¶¶115, 119, 116, Exs. 113, 117, 114(Rossi Depo Exhs 6 and 44; Feller Depo Ex. 53). |
| 430.   Management at Countrywide Bank recognized that one-third of the Pay-Option loans held for investment at the Bank had income overstated by 50% or more. | Dean Decl., ¶ 120, Ex. 118 (Rossi Depo. Ex. 17). |
| 431.   The 4506 Audit results were discussed at a meeting of the Credit Risk Management Committee of Countrywide Bank attended by John McMurray on April 24, 2006. | Dean Decl., ¶ 117, Ex. 115 (Rossi Depo. Ex. 7). |
| 432.   At the April 24, 2006 meeting of the Credit Risk Management Committee of Countrywide Bank, John McMurray stated that the income discrepancies revealed in the Bank's 4506 Audit were also being seen at Countrywide Home Loans.  He also indicated that the "big surprise" were the variances for salaried borrowers. | Dean Decl., ¶ 117, Ex. 115 (Rossi Depo. Ex. 7). |
| 433.   As a result of the 4506 Audit, | Dean Decl., ¶¶ 117 and 120, Exs. 115 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Bank management knew that the debt to income ratios on its reduced documentation loans were not correct. | and 118(Rossi Depo. Exs. 7 and 17). |
| 434.   The Credit Risk Officer at the Bank believed that the vast majority of the income discrepancies revealed in the 4506 Audit were the result of fraud and misrepresentation. | Dean Decl., ¶ 119, Ex. 117 (Rossi Dep. Ex. 44).<br><br>McCoy Decl., ¶85, Ex. 275 (Rossi Dep. Tran. 429:20-430:8):<br><br>Q   If you could take a look at Exhibit 44, please.  Now, Mr. Varnen read most of the e-mail that's in the center of the first page of Exhibit 44 into the record, but he didn't actually read in the last sentence.  So I just wanted to direct your attention to the paragraph that starts, |
|  | "We need to be careful."  Do you see that?<br><br>A   I do see that.<br><br>Q   And for the record it reads, "We need to be careful painting all of this as a 'misrep.'   Although that's obviously the case in some (perhaps many) instances, it won't be the case in all cases." Do you see that?<br><br>A   I do see that.<br><br>* * *<br><br>McCoy Decl., ¶85, Ex. 275 (Rossi Dep. Tran. 431:8-21): |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q   - - -  I'm asking if you agree with Mr. McMurray's statement that the evidence presented in the 4506 audit could be an indicator that borrowers were misrepresenting their income in many instances. [Objections Omitted] A   I believe that not every one of these overstatements of income would be reflective of fraud or misrepresentation. I would say, however, that the vast majority would likely be. |
| 435.   The results of the 4506 Audit and the Random Audits were communicated to David Sambol. | Dean Decl., ¶ 119, Ex. 117 (Rossi Dep. Ex. 44). |
| 436.   The results of the 4506 Audit and the Random Audits were communicated to Angelo Mozilo. | Dean Decl., ¶¶ 19 and 118, Exs. 17 and 116 (McMurray Test. Ex. 214 and Rossi Depo. Ex. 18). |
| 437.   In April 2004, Countrywide promulgated a set of written "Disclosure Controls and Procedures ("Disclosure Guidelines")" which set forth the procedures governing the preparation of the company's periodic reports.  Those guidelines were revised in December 2005 and again in September 2006. | Dean Decl., ¶¶ 129, 130, and 131, Exs. 127, 128, and 129 (McCallion Depo. Exs. 158, 159, 160). McCoy Decl., ¶74, Ex. 264 (McCallion Dep. Tran. 56:8-58:14): Q.  Ms. McCallion, during the time period 2004 through 2008, did Countrywide have a written policy that governed its Disclosure Controls and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Procedures? |
| | A.  Yes. |
| | Q.  Did Countrywide also have a written disclosure policy? |
| | A.  Yes. |
| | Q.  I will ask you first to take a look at I believe it's Exhibit 158, if our numbers line up, which is the April 2004 Disclosure Controls and Procedures. Could you review it and identify it. |
| | A.  When you say "review it," would you like me to – |
| | Q.  Just thumb through it.  I am just going to ask you to identify it.  That's not the year that we'll be questioning. |
| | A.  Okay. |
| | Q.  Could you tell me what it is. |
| | A.  Yes.  Countrywide Financial Corporation Disclosure Controls and Procedures Revised and Effective as April 2004. |
| | Q.  All right.  Do you believe that to be the controls and procedures adopted by the company for that time period? |
| | A.  Yes. |
| | Q.  Moving to Exhibit 159, Controls and Procedures Revised and Effective as of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | December 2005, does that appear to you to be the Disclosure Controls and Procedures document adopted as of that time period? |
| | A.  Yes.  I note that the copy that I have has "Draft" indicated in the upper right-hand corner. |
| | Q.  Yes. |
| | A.  But I believe that there was a finalized version of this document. |
| | Q.  All right.  This document was produced by the -- from the books and records of the company.  We -- they did not a produce a final copy, but there was a final copy; is that correct? |
| | A.  I believe there was, yes. |
| | Q.  All right.  Did Countrywide from time to time update and revise its Disclosure Controls and Procedures? |
| | A.  Yes. |
| | Q.  And did it from time to time update its disclosure policy? |
| | A.  Yes. |
| | Q.  Exhibit 160 is the Disclosure Controls and Procedures Revised and Effective as of September 2006.  Do you see that? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Yes. |
| 438.   The Disclosure Guidelines established a disclosure committee at Countrywide, which Sieracki joined at least as early as December 2005.  The Disclosure Guidelines required Countrywide "to disclose on a timely basis any information that would be expected to affect the investment decision of a reasonable investor or to alter the market price of the Company's securities."  Countrywide's financial reporting staff was required to: | Dean Decl., ¶¶ 129, 130, and 131, Exs. 127, 128, and 129 (McCallion Depo Exhs 158, 159, 160) |
| *seek input from and discuss with the Divisional Officers information pertaining to the past and current performance and prospects for their business unit, known trends and uncertainties related to the business unit, [and] significant risks and contingencies that may affect the business unit. . .* | |
| 439.   The Disclosure Guidelines also required that Countrywide's accounting division, among others, assist the officers involved in the preparation of the company's periodic reports in | Dean Decl., ¶¶ 129, 130, and 131, Exs. 127, 128, and 129 (McCallion Depo Exhs 158, 159, 160) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| gaining a reasonable understanding of the applicable rules and regulations, including the disclosure requirements set forth in Regulation S-K and the relevant SEC staff guidance and interpretive materials. | |
| 440.   Laurie Milleman was the member of the accounting division responsible for training officers in their responsibilities under Regulation S-K. | McCoy Decl., ¶74, Ex. 264 (McCallion Dep. Tran. 74:11-75:9):<br>Q. Turn to page 3.  Would you read the first sentence.<br>A.  "The Legal and Accounting Divisions through the Chief Accounting Officer and the SEC Lawyer, or their respective designees, shall assist the Company's officers and employees involved in the preparation of the Company's Releases and Reports in gaining a reasonable understanding of the applicable rules and regulations, including the rules governing the form of each Report, and the substantive disclosure requirements set forth in regulations S-X and S-K and the relevant SEC staff guidance and interpretive materials."<br>Q.  So was it your understanding that the training of the company's officers |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | and employees with respect to their fulfilling their responsibilities with respect to the disclosure process, that training responsibility rested in the legal and accounting divisions through the chief accounting officer and the SEC lawyer?<br><br>A. Yes.<br><br>Q. And the chief accounting officer during that time was Ms. Milleman; is that correct?<br><br>A. Yes. |
| 441.   Milleman did not provide training in Regulation S-K.  She relied on the MD&A Questionnaires to elicit the required information. | McCoy Decl., ¶79, Ex. 269 (Milleman Dep. Tran. 240:16-241:9):<br><br>Q. Okay.  Do you recall giving any executive at Countrywide any training with respect to the disclosure requirements set forth in Reg S-K?<br><br>MR. DEIXLER:  I'm sorry, may I have that question again.  (The record was read as follows:  "Do you recall giving any executive at Countrywide any training with respect to the disclosure requirements set forth in Reg S-K?")<br><br>MR. DEIXLER:  The question is vague.<br><br>THE WITNESS:  Well, part of the MD&A template was designed to solicit |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | in- -- the input that was required in accordance with those standards.<br><br>Q.  By "those standards," do you mean the standards set forth in Reg S-K?<br><br>A.  Yes. |
| 442.   Several members of the Disclosure Committee had never heard of Regulation S-K, let alone received training in its requirements. | McCoy Decl., ¶ 84, Ex. 274 (Riordan Dep. Tran. 250:22-251:6):<br><br>Q.   Did you yourself ever receive any training in the substantive disclosure requirements set forth in Regulation S-X?<br><br>A.   I don't know what Regulation S-X |
|  | is.<br><br>Q.   Okay.  Do you know what Regulation S-K is?<br><br>A.   No.<br><br>Q.   So I assume you never received any training in Regulation S-K, either?<br><br>MR. COOPERSMITH:  Objection; leading.<br><br>THE WITNESS:  No.<br><br>       * * *<br><br>McCoy Decl., ¶51, Ex. 241 (Bigelow Dep. Tran. 233:17-234:10):<br><br>Q.  Did you ever receive any training on the substantive disclosure requirements of regulation S-K while you were on the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | disclosure committee? |
| | MR. HAMILTON:  Objection.  Vague. |
| | THE WITNESS:  I don't recall any, no. |
| | I would say that we -- you know, the |
| | disclosures we were preparing were |
| | reviewed by legal and we sought out |
| | their opinion on a number of things, so I |
| | don't specifically recall S-K.  I do |
| | recall, you know, when -- when Reg FD |
| | first became known that we had quite -- |
| | you know, quite a few discussions a lot |
| | of extensive discussions, on that which |
| | I would characterize as training. |
| | Q.  So you recall training on Reg FD but |
| | you don't specifically recall any training |
| | on Reg S-K. Is that right? |
| | A.  That's correct. |
| 443.   To prepare the periodic filings, the senior vice president for financial reporting circulated to the head of each Countrywide division a template ("MD&A Questionnaire") that contained questions concerning the applicable officer's division and a draft of that portion of the prior period's filing that concerned the officer's division. | Dean Decl., ¶ 137, Ex. 134 (Milleman Depo Exh 727). McCoy Decl., ¶ 79, Ex. 269 (Milleman Depo. 45:2-47:13): Q.  All right, and if you can take a moment, Ms. Milleman, just to flip through this, it's --indicates it's presented by Laurie Milleman, and I would ask you if this looks to be the presentation you spoke to the board |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | about that we have seen referenced in Exhibit 726. A.  This is the type of information I would discuss with them. Q.  And this is the -- similar to -- would youmake a similar presentation annually -- A.  Yes. Q.  -- this type of information?  And if we can start with the first slide after the cover, "Basic Preparation of 10-K." And this describes the document is |
| | prepared in sections, speaks to sections. The business section, management's discussion and analysis and financial statements.  Who would -- who was involved in – in preparing those sections?  If you can. A.  The primary preparers would be the financial reporting department, but then they would solicit information from the lines of business. Q.  From each line of business? A.  Yes. Q.  And with respect to the management discussion and analysis of financial condition, was information solicited for |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the preparation or – or changes to that section from each line of business at the company?<br><br>A.  Yes, there was -- yes, there was -- yes, it was.  There was a process where we sent out disclosure templates to the various business units, and they were required to prepare -- to answer the questions in the template, provide comments on changes that needed to be made and also certify that the information they provided was correct. |
| | Q.  And if there was a change in the draft from prior periods, whether it's a K from prior years or a Q from a prior quarter, if -- if there was going to be a change in the -- in the draft, would that change be shared in any -- in any way with the people out in these -- in these business lines?<br><br>MR. WYNN:  Objection.  Vague, ambiguous.  Incomplete hypothetical.<br><br>THE WITNESS:  I'm not sure I understand the question.<br><br>///<br><br>BY MR. SIEGEL:<br><br>Q.  All right.  As I understand it, after |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | collecting information from the business lines, a draft might be changed to reflect the information gathered.  Correct? |
| | A.  The process was, we would send out the templates to request information. That information would be ac- -- would be gathered back by the financial reporting group.  They would incorporate that information, to the extent it was appropriate for the periodic filings, in a draft of the periodic filings, which was then distributed to the line |
| | of business to review the periodic filings. |
| | * * * |
| | McCoy Decl., ¶61, Ex. 251 (Hendry Inv. Test. 26:10-27:16): |
| | Q    Can you just describe generally for me, the process through which the periodic reports are prepared at Countrywide? |
| | A    Sure.  The report preparation process starts about a week after the prior report is filed.  The SEC reporting staff take the form of, say, a quarterly report, for example, they take the form of that and they go and update the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | information contained in the most recently filed Q and make sure that that is conformed to the next quarter's document.  They also go through and make sure that any reclassifications that are made in the financial statement are reflected in the prior period's numbers that will go into the next quarter's disclosure document.  And that's -- that takes several weeks.  And then the books close.  Before the books close, we have a list of things based on prior |
| | disclosures that we need from the business units in various areas of corporate and corporate accounting.  And we send the request list out to these people asking them to provide the information, as well as what's called an MDNA template, which is kind of the form of a report that the business units can provide as feedback on the quarter, and what may have changed that we should be disclosing.  That goes out to the CFOs and the Managing Directors of those business units.  And then it's returned to us, and it's got a certification by the Managing Director of the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | business unit.  That comes to us about the time the books close.  And then after the books close, that information comes in rather quickly, and the SEC reporting staff compile the information for the first draft of the report.<br><br>* * *<br><br>McCoy Decl., ¶ 60, Ex. 250 (Hendry Depo. 26:14-27:15):<br>First, focusing on the company's process for gathering information for preparing its SEC reports, could you briefly |
| | describe that?<br>A.  We -- we had -- I assume -- are you --well, when you say "gathering information for its SEC reports," to me there are a couple pieces of it.  There's what I'll call the accounting piece, which is the information that comes out of the accounting process that supports the financial statements, and then there's the business section and management's discussion analysis piece or MD&A piece.  We solicited input for -- for MD&A formally through a distribution of a template to senior manager -- senior managers of the organization and their |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | financial officers, and that would take the form of asking them certain questions that were broad and also targeted to their area, providing them with copies of, in the questionnaire, of what we had disclosed in the past, and we would ask them to certify to that, that -- that, you know, to provide us with feedback and to sign that whatever they gave us or what we had used previously was still relatively -- was still accurate.  We also supported the press |
| | release process whereby the narrative of the company's reporting period was developed, and we received input through that process also. |
| 444.   After circulating the draft MD&A Questionnaires to the divisions, the financial reporting group compiled them and generated the first draft of the report, which was reviewed and edited by the chief accounting officer and the deputy CFO.  The revised draft then went to the legal department and the senior managing directors responsible for signing sub-certifications, as well as Sieracki, Sambol, and Mozilo. | McCoy Decl., ¶61, Ex. 251 (Hendry Inv. Test. 19:17-20:1) <br> Q    Yes.  Would it be fair to say that the reason you report to both of them is that, in fact, the reporting relationship goes you to Laurie Milleman, and then Laurie Milleman to Ann McCallion? <br> A    Yes.  Informally, yes. <br> Q    What I'm trying to get at, I just want to be clear that for purposes of the SEC reporting, your direct report for that was |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Laurie Milleman? |
| | A    Yes.  For most of the time I worked with the company, yes. |
| | * * * |
| | McCoy Decl., ¶61, Ex. 251 (Hendry Inv. Test. 26:10-28:20) |
| | Q    Can you just describe generally for me, the process through which the periodic reports are prepared at Countrywide? |
| | A    Sure.  The report preparation process starts about a week after the prior report is filed.  The SEC reporting staff take the form of, say, a quarterly report, for example, they take the form of that and they go and update the information contained in the most recently filed Q and make sure that that is conformed to the next quarter's document.  They also go through and make sure that any reclassifications that are made in the financial statement are reflected in the prior period's numbers that will go into the next quarter's disclosure document.  And that's -- that takes several weeks.  And then the books close.  Before the books close, we |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | have a list of things based on prior disclosures that we need from the business units in various areas of corporate and corporate accounting. And we send the request list out to these people asking them to provide the information, as well as what's called an MDNA template, which is kind of the form of a report that the business units can provide as feedback on the quarter, and what may have changed that we should be disclosing.  That goes out to |
| | the CFOs and the Managing Directors of those business units.  And then it's returned to us, and it's got a certification by the Managing Director of the business unit.  That comes to us about the time the books close.  And then after the books close, that information comes in rather quickly, and the SEC reporting staff compile the information for the first draft of the report. Q    Once the feedback from the various business units has been compiled into the first draft, who reviews that particular draft? A    I would say it's me.  Now, there is |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | another review process before it gets to me, but it's a detail review to make sure that the mechanics are okay.  And my SEC reporting manager has some ability to see if something is inconsistent between the financial statements and MDNA, or if just something doesn't look right.  There's that first review, but that's really more the detail review process.  It is the more mechanical phase of the compilation of the report.  The report comes to me either before |
| | that or while I'm reviewing the document.  I'm looking at the MDNA templates and the report, and based on information I've learned through the close process and the Press Release process, I am looking at the Q and looking at whether to draft more language into the document or to change the way we explain things.<br>Q    So, in your review, you actually do some drafting?<br>A    Yes.<br>Q    Once you're satisfied with the document, is there a further review?<br>A    Yes.  It then moves on to Laurie |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Milleman and Ann McCallion concurrently, and Larry Gee. And they do a review over the course of a couple of days and comment and provide their input to us, and we spend several days addressing their comments. |
| 445.   The Disclosure Committee did not review the completed MD&A Questionnaires in conjunction with its review of the Forms 10-Q and Forms 10-K. | McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 253:21-254:7)<br>Q. Now, you also testified earlier today that  as part of the information gathering that went in  to putting together the drafts, that the various division heads or |
| | the subordinate with the most knowledge would put together an MD&A questionnaire.  Do you recall that?<br>A.  Yes.<br>Q.  Were the MD&A questionnaires made available to the disclosure committee when they were reviewing the drafts of the 10-Ks and the 10-Qs?<br>A.  I don't believe so.<br>McCoy Decl., ¶84, Ex. 274 (Riordan Depo. Tran. 251:8-21)<br>Q.  In connection with your service on the disclosure committee at Countrywide, did you ever hear the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | phrase "MD&A questionnaire"? |
| | A.  I heard the phrase "MD&A questionnaire," whether it was as participating on the disclosure committee or just in discussions; but I have heard the term of the MD&A questionnaire. |
| | Q.  Do you have any understanding what an MD&A questionnaire is? |
| | A.  Not 100 percent, no. |
| | Q.  During your tenure at Countrywide, did you ever review the contents of a |
| | completed MD&A questionnaire? |
| | A.  I don't recall that I did. |
| 446.   The MD&A Questionnaires were known to be ineffective in gathering information. | McCoy Decl., ¶60, Ex. 250 (Hendry Depo. Tran. 224:6-225:14) |
| | Q.  Okay.  So Exhibit 789 I think you've already got in front of you.  It's the January 25th, '07 e-mail from Katica Rich to Jie Ling.  It's the completed MD&A questionnaire for the 2006 10-K. Do you have the document? |
| | A.  January 25th, 2007? |
| | Q.  Yes. |
| | A.  Yes. |
| | Q.  Sorry if I said it wrong. Did Mrs. Ling bring this to your attention? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | A.  I don't remember.<br><br>Q.  Would you have expected Jie Ling to bring this to your attention?<br><br>A.  They didn't -- they didn't always come -- they didn't come to me other than -- they didn't very often come to me.  I looked at them usually late, very late in the process.<br><br>Q.  Why is that?<br><br>A.  Because -- because we got two types of MD&A templates back.  MD&A templates that contained content that |
|  | was – basically was a way of passing content along to us that was basically agreed to in form, such as the Capital Markets disclosures and the bank's disclosures.  And then we got other MD&A templates that very seldom had a much -- much -- they weren't very -- particularly useful in terms of content.  So a lot of times I just -- you know, I didn't see these until very late when I was going through a final review.<br><br>Q.  But there's a procedure in place to elicit information having to do with the business units; right?<br><br>A.  Right.  It wasn't particularly |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | effective. |
| 447.   The Disclosure Committee did not have regular meetings. | McCoy Decl., ¶60, Ex. 250 (Hendry Depo. Tran. 292:11-293:2)<br><br>Q.  Do you recall if there were any representatives from the production divisions at these Disclosure Committee meetings?<br><br>A.  I don't believe there were.  The committee didn't always meet.  It wasn't like a quarterly meeting.  They had -- you know, it met regularly for a while and it was determined that |
| | they would have less frequent meetings and just distribute materials to them for them to comment on, so it wasn't like there was a regular, regular meeting.<br><br>Q.  Okay.  And when was it determined that the -- they would stop their regular meetings and go to the distribution list?<br><br>A.  I don't remember.<br><br>Q.  Okay.  Do you know who made that decision?<br><br>A.  I think it was among members of the committee. |
| 448.   There were no members of Credit Risk Management on the Disclosure Committee.  Its members | Dean Decl., ¶¶ 129-131, Exs. 127-129 (McCallion Depo. Exhs. 158, 159, 160) McCoy Decl., ¶74, Ex. 264 (McCallion |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| were from Financial Reporting, Legal, and Investor Relations. | Depo. Tran. 255:8-257:11)<br><br>Q.  If you would turn to Exhibit 159, and just to make it easy, it is basically -- I just want to ask you again about the composition of the committee.  In this particular document I will direct you to Appendix 1, which is at the page ending in 864.  And it's headed "Disclosure Committee Members as of December 2005."  Do you see that?<br><br>A.  Yes.<br><br>Q.  The members are identified as Eric |
|  | Sieracki, Anne McCallion, Laurie Milleman, Susan Bow, David Bigelow, Dan Tarman, Vince Breitenbach, Greg Hendry, Lisa Riordan and Mike Udovic.  Do you see that?<br><br>A.  Yes.<br><br>Q.  To your understanding, was this a correct listing of the disclosure committee members at Countrywide as of December 2005?<br><br>A.  Again, I don't have a specific recollection of the committee members at that time.<br><br>Q.  Okay.  Do you have any reason to believe this list is not complete? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A. No.<br><br>Q. Are there any members of the credit risk management function identified as members of the disclosure committee as of December 2005?<br><br>A. No.<br><br>Q. And, in fact, let me just ask you a couple questions about people who are identified. David Bigelow is identified as a managing director of investor relations. Do you see that?<br><br>A. Yes. |
| | Q. What is the function of investor relations?<br><br>A. Investor relations is the group within the company that had the responsibility for communicating with investors and -- equity investors and the company's equity analysts.<br><br>Q. And then Dan Tarman is identified as corporate communications managing --<br><br>A. Yes.<br><br>Q. -- director. Do you see that?<br><br>A. Yes.<br><br>Q. What is the function of corporate communications? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Corporate communications dealt with the media and other general public entities that were -- that the company had contact with. Q.  And then Lisa Riordan is identified as an executive vice-president of investor relations.  Do you see that? A.  Yes. McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 258:24-259:24) Q.  Okay.  Let's turn to Exhibit 160. Again, membership on the committee. |
| | And it is identified in this particular document at Appendix 1, which ends in the Bates stamp No. 7178.  It looks like the committee is a little bigger at this point.  The members identified there are David Bigelow, Mike Bloch, Susan Bow, Vince Breitenbach, Jim Furash, Greg Hendry, Anne McCallion, Laurie Milleman, Lisa Riordan, Mike Schloessman, Mary Jane Seebach, Eric Sieracki, Dan Tarman and Mike Udovic. Did I read that correctly? A.  Yes. Q.  To your knowledge, was that a correct and complete list of the members |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | of the disclosure committee as of September 2006?<br><br>A.  I don't have specific recollection of the committee members.<br><br>Q.  Do you have any reason to believe that's not a complete list of the committee members as of September 2006?<br><br>A.  No.<br><br>Q.  And are any of the people I identified there a part of the credit risk function at Countrywide? |
| | A.  No. |
| 449.   Sieracki was the sole individual who was a member of both the CCRC and the Disclosure Committee. | McCoy Decl., ¶90, Ex. 280 (Sieracki Depo. Tran. 155:20-156:4)<br><br>Q.  During that time period from becoming the CFO until the 2005 10-K was filed, was there anyone else who was a member of both the credit committee and the disclosure committee besides yourself?<br><br>A.  I'm not aware of anyone who was.<br><br>Q.  At any point in time after you got the CFO title, was there someone besides yourself who was at one time a member of both committees?<br><br>A.  I'm unsure.  I'm not aware of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | anybody who was. |
| 450.   Starting in the first quarter of 2006, the MD&A Questionnaire for credit risk management was sent to McMurray and solicited information pertaining to a number of topics related to credit risks, including (1) changes in the management of credit risks, (2) environmental risks and uncertainties, (3) deterioration in loan quality and (4) changes in underwriting guidelines. | Dean Decl., ¶¶ 139-143, Exs. 137-141 (McMurray Depo. Exhs. 786, 787, 788, 789, 791) McCoy Decl., ¶ 18, Ex. 267 (Depo. Ex. 753); ¶76, Ex. 266 (McMurray Depo. Tran. 200:17-201:13) MR. WYNN:  I'm going to mark as the next exhibit a April 20th, '06, fax from Ms. Rich, who I believe is your secretary, to someone named Jie Ling. The document will be Bates numbered JPM 1076 through JPM 1088. |
| | (Deposition Exhibit 786 was marked for identification.) Q.  BY MR. WYNN:  Do you recognize the document, Mr. McMurray? A.  I do. Q.  Holding aside the fax cover page, what is the -- what is this document? A.  So the way I thought -- or what I always referred this to as a -- as a questionnaire that -- that the corporate accounting folks would send over on a -- Q.  Okay. A.  -- routine basis. Q.  If we call this document an MD&A |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | questionnaire for the remainder of the day, will you know what I'm talking about?<br>A. Yeah, with that stipulation, I will know what you're talking about.<br>Q. Okay.<br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 215:21-216:5)<br>Q. BY MR. WYNN: Do you recognize Exhibit 787?<br>A. Not yet, but give me a moment.<br>Q. All right.<br>A. Yeah, I don't -- I recognize it. I |
| | don't see the e-mails here that -- that were meant to go with it.<br>Q. Is this your handwriting on Exhibit 787?<br>A. It is.<br>Q. Is -- is Exhibit 753 one of the e-mails that you reference in Exhibit 787?<br>A. I believe that it was.<br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 216:6-25)<br>Q. The next exhibit I'll show you I previously marked as Exhibit 756. It's a October 17th, '06, e-mail from you to Jie Ling. I've been instructed that it's Jie |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Ling, not Jie Ling.  Excuse me. |
| | A.  I think it is Jie.  All right, I'm looking at 756. |
| | Q.  Do you recognize Exhibit 756? |
| | MR. LEFLER:  Counsel, we don't have them yet. |
| | THE WITNESS:  All right. |
| | Q.  BY MR. WYNN:  Do you recognize the exhibit? |
| | A.  I do. |
| | Q.  Did you send this e-mail to Ms. Ling on October 17th, '06? |
| | A.  It appears so, yes. |
| | Q.   In Item 1 is the 7-17-06 e-mail you reference the e-mail that appears in Exhibit 753? |
| | A.   That would -- that would -- Let's take a look here.  I -- yes. |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 217:24-218:9) |
| | Q.  Okay.  So the next exhibit was an October 23rd, '06, e-mail from you to Greg Hendry, it was Bates numbered 1063 through 1064.  (Deposition Exhibit 788 was marked for identification.) |
| | Q.  BY MR. WYNN:  Do you recognize Exhibit 788? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Let me just read through quickly.  Okay.  I recognize it.<br><br>Q.  Do you recall seeing this e-mail to Mr. Hendry on October 23rd, '06?<br><br>A.  I recall sending him this e-mail.<br><br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 220:2-17)<br><br>To clarify, the next exhibit is a January 25th, '07, e-mail, from Katica Rich to Jie Ling.  It's Bates numbered JPM 115 through 1125.  Fax.  I'm sorry.  This document is a fax.  (Deposition Exhibit 789 was marked for identification.) |
| | Q.  BY MR. WYNN:  Do you recognize Exhibit 789?<br><br>A.  I do.<br><br>Q.  Did you cause this exhibit to be faxed -- excuse me.  Did you cause this fax to be sent to Jie Ling on January 25th, '07?<br><br>A.  I believe I asked Katica to -- to fax it over to -- to Jie.<br><br>Q.  Turn to the second page.  Is that your handwriting?<br><br>A.  It is.<br><br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 233:6-18) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.  Mr. McMurray, do you recognize the last exhibit, which is 791? A.  791.  I do.  This appears to be what we've decided to call the MD&N -- MD&A template. Q.  Do you recall sending this document to Ms. Ling on April 25th, '07? A.  Specifically, no. Q.  Any reason to believe that you did not have your secretary send this to Ms. Ling on April 25th, '07? A.  I have -- I have no reason to believe that it was not sent.  I just don't |
|  | specifically remember sending it. |
| 451.   Throughout 2006, McMurray unsuccessfully lobbied to the financial reporting department that Countrywide disclose more information about its increasing credit risk. | Dean Decl., ¶¶ 139-143, Exs. 137-141 McMurray Depo. Exs. 786, 787, 788, 789 McCoy Decl., ¶ 18, Ex. 208 (Depo. Ex. 753); ¶76, Ex. 266 (McMurray Depo. Tran. 200:17-201:13): MR. WYNN:  I'm going to mark as the next exhibit a April 20th, '06, fax from Ms. Rich, who I believe is your secretary, to someone named Jie Ling. The document will be Bates numbered JPM 1076 through JPM 1088. (Deposition Exhibit 786 was marked for |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | identification.) |
| | Q.  BY MR. WYNN:  Do you recognize the document, Mr. McMurray? |
| | A.  I do. |
| | Q.  Holding aside the fax cover page, what is the -- what is this document? |
| | A.  So the way I thought -- or what I always referred this to as a -- as a questionnaire that -- that the corporate accounting folks would send over on a -- |
| | Q.  Okay. |
| | A.  -- routine basis. |
| | Q.  If we call this document an MD&A questionnaire for the remainder of the day, will you know what I'm talking about? |
| | A.  Yeah, with that stipulation, I will know what you're talking about. |
| | Q.  Okay. |
| | *** |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 215:21-216:5) |
| | Q.  BY MR. WYNN:  Do you recognize Exhibit 787? |
| | A.  Not yet, but give me a moment. |
| | Q.   All right. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Yeah, I don't -- I recognize it.  I don't see the e-mails here that -- that were meant to go with it. |
| | Q.  Is this your handwriting on Exhibit 787? |
| | A.  It is. |
| | Q.  Is -- is Exhibit 753 one of the e-mails that you reference in Exhibit 787? |
| | A.  I believe that it was. |
| | *** |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 216:6-25) |
| | Q.  The next exhibit I'll show you I previously marked as Exhibit 756.  It's a October 17th, '06, e-mail from you to Jie Ling.  I've been instructed that it's Jie Ling, not Jie Ling.  Excuse me. |
| | A.  I think it is Jie.  All right, I'm looking at 756. |
| | Q.  Do you recognize Exhibit 756? |
| | MR. LEFLER:  Counsel, we don't have them yet. |
| | THE WITNESS:  All right. |
| | Q.  BY MR. WYNN:  Do you recognize the exhibit? |
| | A.  I do. |
| | Q.  Did you send this e-mail to Ms. Ling |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | on October 17th, '06? |
| | A.  It appears so, yes. |
| | Q.   In Item 1 is the 7-17-06 e-mail you reference the e-mail that appears in Exhibit 753? |
| | A.   That would -- that would --  Let's take a look here.  I -- yes. |
| | *** |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 217:24-218:9) |
| | Q.  Okay.  So the next exhibit was an October 23rd, '06, e-mail from you to Greg Hendry, it was Bates numbered 1063 through 1064.  (Deposition Exhibit 788 was marked for identification.) |
| | Q.  BY MR. WYNN:  Do you recognize Exhibit 788? |
| | A.  Let me just read through quickly.  Okay.  I recognize it. |
| | Q.  Do you recall seeing this e-mail to Mr. Hendry on October 23rd, '06? |
| | A.  I recall sending him this e-mail. |
| | *** |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 220:2-17) |
| | To clarify, the next exhibit is a January 25th, '07, e-mail, from Katica Rich to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Jie Ling.  It's Bates numbered JPM 115 through 1125.  Fax.  I'm sorry.  This document is a fax.  (Deposition Exhibit 789 was marked for identification.) Q.  BY MR. WYNN:  Do you recognize Exhibit 789? A.  I do. Q.  Did you cause this exhibit to be faxed -- excuse me.  Did you cause this fax to be sent to Jie Ling on January 25th, '07? A.  I believe I asked Katica to -- to fax it over to -- to Jie. Q.  Turn to the second page.  Is that your handwriting? A.  It is. |
| 452.   When asked whether she was advised of John McMurray's concerns regarding MD&A as expressed in response to MD&A questionnaires Susan Bow, a Countrywide attorney who worked on SEC filings, asserted the attorney-client privilege and refused to answer. | Bendell Decl., ¶4, Ex. 296 (Bow Depo. 347:20-348:12): Q.  Okay.  Is it also fair to say that no one made you aware of any concern or matter that Mr. McMurray had raised in his completed MD&A questionnaires? MS. WEISS:  I'll object to that question on the grounds that it calls for attorney-client communication. MR. McDERMOTT:  Could you repeat the question, please. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  (BY MR. WYNN)  Ms. Bow, is it accurate to say that you were never made aware by anyone of any matter or concern that Mr. McMurray raised in his completed MD&A questionnaires?<br><br>MR. McDERMOTT:  In light of the objection, I instruct the witness not to answer the question pending a resolution by the court.<br><br>MR. WYNN:  Resolution of what matter?<br><br>MR. McDERMOTT:  The privilege issue. |
| 453.   On January 2, 2007, McMurray sent an e-mail to Sieracki, which he subsequently incorporated by reference in his MD&A questionnaire explaining that Countrywide's delinquencies would increase in the future due to a weakening real estate market and what McMurray characterized as credit guidelines that were "wider than they have ever been." | Dean Decl., ¶¶ 56, 142, Exs. 54, 140 (Depo. Exhs. 757, 789)<br><br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 220:8-221-22)<br><br>Q.  BY MR. WYNN:  Do you recognize Exhibit 789?<br><br>A.  I do.<br><br>Q.  Did you cause this exhibit to be faxed -- excuse me.  Did you cause this fax to be sent to Jie Ling on January 25th, '07?<br><br>A.  I believe I asked Katica to -- to fax it over to -- to Jie.<br><br>Q.  Turn to the second page.  Is that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | your handwriting? |
| | A.  It is. |
| | Q.  Could you read the handwriting under Item 3? |
| | A.  "As noted in other communications, guidelines have widened, making the loans riskier." |
| | Q.  And could you read the handwriting in -- under Item 2? |
| | A.  "Virtually all environmental factors have increased risk." |
| | Q.  And could you read the handwriting under Item 1? |
| | A.  "I'm incorporating discussions, presentations and e-mails.  In particular please see my e-mail to Eric Sieracki dated January 2nd, 2007." |
| | Q.  I'm going to show you an exhibit I've already marked.  It's 757.  Exhibit 757 is a January 2nd, 2007, e-mail from you to Mr. Sieracki and others.  Do you recognize Exhibit 757? |
| | A.  I do recognize it. |
| | Q.  Is Exhibit 757 the e-mail that you reference on the second page of Exhibit 244? |
| | MR. TAYLOR:  Are you referring to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the e-mail that's dated January 2, 2007? There's at least a couple that are part of the exhibit. MR. WYNN:  Yeah, I'm referring to the January 2nd, '07, e-mail that's reflected in Exhibit 757. THE WITNESS:  Okay, so in Exhibit -- it's labeled 244 and also 789.  So in Exhibit 789-244, the e-mail to Eric dated January 2nd, 2007, that I'm referring to there is the one that you've just shared with us here – Q.  BY MR. WYNN:  Okay. |
| | A.  -- as Exhibit 757 and 1224. *** McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 221:24-222:15) So if you look at your e-mail to Mr. Sieracki that's reflected in Exhibit 757, you state, "As a follow up to our mid day conversation, the purpose of this DRAFT is to outline why delinquencies will increase and impact" -- "and the impact that this increase will have on our financial results."  Do you see that? A.  I see that. Q.  Do you recall the midday |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | conversation that you reference? |
|  | A.  My recollection is that Eric challenged me to cogently and clearly explain why I thought delinquencies would increase, and then -- and then my views on how that would affect our financial results. |
|  | Q.  And is Exhibit 757 the January 2nd, 2007, e-mail your response to his challenge? |
|  | A.  That's -- that's my attempt, yes. |
| 454.   McMurray wrote his January 2, 2007 e-mail to Eric Sieracki in response to a conversation that he had with Sieracki in which Sieracki specifically asked him whether delinquencies were likely to increase. | McCoy Decl., ¶76, Ex. 266 (McMurray Depo. 221:5-9)<br><br>Q.  I'm going to show you an exhibit I've already marked.  It's 757.  Exhibit 757 is a January 2nd, 2007, e-mail from you to Mr. Sieracki and others.  Do you recognize Exhibit 757?<br><br>A.  I do recognize it.<br><br>***<br><br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 221:24-222:15)<br><br>So if you look at your e-mail to Mr. Sieracki that's reflected in Exhibit 757, you state, "As a follow up to our mid day conversation, the purpose of this DRAFT is to outline why delinquencies |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | will increase and impact" -- "and the impact that this increase will have on our financial results."  Do you see that?  A.  I see that. Q.  Do you recall the midday conversation that you reference?  A.  My recollection is that Eric challenged me to cogently and clearly explain why I thought delinquencies would increase, and then -- and then my views on how that would affect our financial results. |
| | Q.  And is Exhibit 757 the January 2nd, 2007, e-mail your response to his challenge?  A.  That's -- that's my attempt, yes. |
| 455.   Sieracki shared the e-mail with Sambol. | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 765:7-17)  Q  How would you have had an occasion to share your e-mail to Mr. Sieracki to Mr. Sambol?  A  So Eric asked the question, and then after I sent this e-mail to Eric, he told me that he had shared it with Dave.  Q  So you didn't share the e-mail with Mr. Sambol?  A  No, because Eric-- it was a conversation with the people that you |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | see in the e-mail there-- on my e-mail, I should say, so Eric and Tom, and I think Kevin and Rod might have been there as well, and so Eric was the one who shared it with Dave. |
| 456.   On January 29, 2007, McMurray provided Sambol and others with an outline of where credit items impacted Countrywide's balance sheet.   On February 5, 2007, McMurray forwarded the e-mail to the financial reporting staff, and specifically requested that a version of the outline be included in the Form 10-K. | McCoy Decl., ¶ 35, Ex. 225 (SEC Test. Ex. 1311). |
| 457.   On February 26, 2007, McMurray was advised by Sieracki that Sambol had "slashed" his proposed revisions to the credit disclosures. | McCoy Decl., ¶ 22, Ex. 212 (Depo. Ex. 790).<br><br>McCoy Decl., ¶ 76, Ex. 266 (McMurray Depo. Tran. 227:19-228:1)<br><br>Q.   Do you recognize Exhibit 790?<br><br>A.   These -- these appear to be pages out of -- handwritten pages out of a spiral notebook that belonged to me.<br><br>Q.   Okay. And is this your handwriting that appears in Exhibit 790?<br><br>A.   It is. |
| | McCoy Decl., ¶ 76, Ex. 266 (McMurray |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Depo. Tran. 229:16-232:16) |
| | Q.  And if you turn to the page ending in 1151. Bottom left-hand corner there's some abbreviations at the top underlined. |
| | A.  Okay. |
| | Q.  There's some abbreviations of "ES," "KB" – |
| | A.  Eric Sieracki, Kevin Bartlett, John McMurray, Rod Williams. |
| | Q.  Okay. And the -- the date is February 26th? |
| | A.  That -- that is the date. |
| | Q.  Is this your handwriting in the bottom left-hand corner? |
| | A.  It's my handwriting. |
| | Q.  And do you know what year this 2-26 notation was made? |
| | A.  I believe that it was 2007. |
| | Q.  And can you read the comment that's in this box? |
| | A.  "ES said DS had 'slashed' some of the credit text, especially widened guidelines for affordability."  And then it says "KB's" -- "KB's office." |
| | Q.  Who is KB? |
| | A.  Kevin Bartlett. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.  Do you recall a meeting in Mr. Bartlett's office on February 26, of '07?  A.  Actually, as I thought back on it, I thought it was in Eric's office, but -- but I suspect it was here because that's what the notes say.  Those -- their offices were next to one another at -- at one point in time.  Q.  Do you recall when you made this notation in the bottom left-hand corner?  A.  You mean the time of day?  Q.  No, just the date.  Did you think you made it --  A.  Oh.  Q.  Do you think you made-- |
|  | A.  Everything in the box would have been made at the same time.  Q.  Okay. And to the best of your recollection would that have been made on February 26, '07?  A.  I tried to label these dates in a -- in a way where the -- where whatever was -- whatever I was taking notes on reflected that date.  Q.  So the notes reflected in this exhibit, were they made by you contemporaneously with observations |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | you were making? |
| | A. Yes, as the conversation was unfolding. |
| | Q. Okay. So do you recall what was going on that prompted you to make this comment? |
| | A. My recollection -- and this -- and this ties to some of the other things that we talked to a little earlier.  Greg Hendry had -- had worked up more voluminous text for -- I think this actually was for the 10-K, is – is my recollection, but he had -- he had worked up more voluminous text -- text working with me and others, and then |
| | that was incorporated into the various drafts.  And as I explained before, the drafts went through a series of review before they were finalized.  And my recollection about this conversation is the portion of the review that included Dave looking through the entire text proposed for the 10-K and then -- and then Eric just relating back his, you know, comments and what the plans were. |
| | Q. So you recall Eric telling you that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Mr. Sambol had slashed some of the credit text having to do with widened guidelines for affordability?<br><br>A.  I do, and -- and the reason the "slashed" is in quotes is I think that's -- that's the way Eric had described it.  I mean, that's the -- that's the term he had used, not -- not -- that's not one that I made up.  Again, that's why I put it in quotes.<br><br>McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 220:24-223:8)<br><br>Now, you also described earlier a conversation, sort of an informal meeting that you had with Mr. -- I'm |
| | sorry, with Ms. McCallion and Ms. Milleman regarding some potential edits to disclosure language.  And that was in February of 2007; is that right?<br><br>A.  I believe so.<br><br>Q.  And what -- how did the topic of disclosure language come up in that meeting with Ms. McCallion and Ms. Milleman?<br><br>A.  I'll try to give some context instead of just jumping into what happened and point out that it was near the finalization |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | of the 2006 10-K.  And you have got dozens and dozens, scores of reviewers.  And trying to get this document finalized is a difficult task.  And they called me in and they pointed out -- I believe Mr. Sambol had made the suggestion for certain language changes.  And while they were okay with it, they felt that it was appropriate to communicate this forward to Mr. McMurray.  And I am repeating myself now that I had some other reason to chat with him.  And it was mutually agreed that I would pass this information along.  Q.  And in that conv- -- and then you |
| | went and spoke to Mr. McMurray in Mr. Bartlett's office; is that right?  A.  That's my recall, is that I believe it was -- because they were next door to one another.  I am pretty sure it was Mr. Bartlett's office.  Q.  And was there anyone else in the room when you had this conversation besides Mr. Bartlett, yourself and Mr. McMurray?  A.  There might have been.  I wasn't there very long. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  And what -- and do you recall what language, disclosure language was at issue? |
| | A.  I think it was around – |
| | MS. PHILLIPS:  Excuse me.  Objection.  Foundation, speculation. |
| | THE WITNESS:  I think it was around underwriting guidelines. |
| | Q.  Do you recall what the language change that was being discussed was? |
| | MS. PHILLIPS:  Objection.  Foundation, speculation. |
| | THE WITNESS:  Not specifically. |
| | Q.  Okay.  And you informed Mr. McMurray that his suggested language had been edited by someone else; is that correct? |
| | MS. PHILLIPS:  Objection.  Mischaracterizes testimony. |
| | THE WITNESS:  I believe I communicated that edits had been suggested. |
| | Q.  And you communicated that those edits had been suggested by Mr. Sambol; is that correct? |
| | A.  That's right. |
| 458.   Between August 4 and August 7, | McCoy Decl., ¶¶ 32-34, Exs. 222-224 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 2007, McMurray exchanged a series of e-mails with the managing director of financial reporting suggesting revisions to the Form 10-Q for the second quarter of 2007.  On August 4, 2007, McMurray specifically asked financial reporting to include information regarding widened underwriting guidelines in the prospective trends section of the Form 10-Q for the second quarter of 2007.  In response, on August 7, 2007, the managing director of financial reporting wrote back to McMurray, stating that he had not made McMurray's changes because | (SEC Test. Exhs. 1269, 1270, 1271); McCoy Decl., ¶61, Ex. 251 (Hendry Inv. Test. 256:25-258:12) <br><br> Q.  Do you recall the e-mail exchange in SEC Exhibit No. 1271? <br> A.  I don't recall it, but I see it and I accept it, that he sent it to me. <br> Q.  And in your e-mail to him on August 7, 2007, you state, "FYI, I did not make changes to the overview prospective trends section because I was getting too many changes from too many directions, and expect those changes to be trumped by certain reviewers today or tomorrow." |
| he "*expect[ed] those changes to be trumped by certain reviewers*."  The managing director of financial reporting was referring to the CIO and Sambol. | A.  Okay. <br> Q.  In addition to Mr. McMurray, do you recall who else was giving you suggested changes to the prospective trends section? <br> A.  Those changes tended to come from Anne McCallion for -- yes, usually from her.  And it would have been based on input, either her input -- or at this time I believe it was David Bartlett and Dave Sambol who were looking at it.  And we were asking him |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. WEINGART:  Kevin Bartlett, you mean? |
| | THE WITNESS:  Kevin Bartlett.  I apologize, yes. Kevin Bartlett or David Sambol.  And we asked them to look at this section, specifically for the June quarter.  I believe we wanted to draw their attention to it.  That's what I was talking about. |
| | Q.  Why did you want to draw the attention of Mr. Bartlett and Mr. Sambol to the prospective trends section? |
| | A.  Because we were trying to get them through the review.  And I don't remember exactly why now, but I |
| | remember that they were trying to identify areas where they wanted to focus on in their review.  And this was one of them, if I'm not mistaken. |
| | Q.  When you say "too many directions," what were the directions? |
| | A  I don't remember now. |
| | Q.  And who were the reviewers that you thought would trump certain suggestions? |
| | A.  It would be Dave Sambol and Kevin Bartlett. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 459.   When McMurray's request that Countrywide disclose the impact of widened underwriting guidelines was not included in the draft filing, on August 8, 2007 he sent a "qualified" certification to the company's SOX officer, rather than to financial reporting, along with an e-mail articulating his concerns. | Dean Decl., ¶ 133, Ex. 131 (McCallion Depo. Ex. 180). McCoy Decl., ¶76, Ex. 266 (McMurray Depo. Tran. 233:20-234:16) I'm going to show you a document that's apparently already been marked as Exhibit 180.  Exhibit 180 is a document entitled "Senior Executive Officer's Certification."  It's Bates numbered -- Well, it's Exhibit 180.  Mr. McMurray, I'd like to direct you to a particular page.  It's the page ending in 443. THE WITNESS:  All right, 443. Q.  BY MR. WYNN:  Do you recall |
|  | sending this e-mail to Mr. Saletta on August 8th, 2007? A.  Let me take a look, please. Q.  Sure. A.  All right, this -- this appears to be a note that I put together as part of the SOX certification. Q.  Okay.  Do you recall sending it to Mr. Saletta on August 8th, '07? A.  Well, again, I -- I recall sending it to him.  As to like the exact date and time, no, but I do recall sending him this note. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | McCoy Decl., ¶78, Ex. 268 (McMurray Inv. Test. 902:8-18)<br><br>Q.  Do you recall why you wrote this e-mail to Mr. Saletta?<br><br>A.  The reason that I wanted him to have this is because this is something I had shared with the financial reporting folks. He was in a different -- he ultimately reported up through Anne, but he was more in the SOX area, so I don't know whether they had shared my views with him.<br><br>Q.  And why did you want him to have your views?<br><br>A.  I thought it would be helpful for the particular job that he was doing.  So I thought it was helpful context relative to the quarterly SOX certification.<br><br>McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 909:7-910:1)<br><br>Q.  Okay.  Well, let me back up and ask you:  By attaching that note to your certification and making the notations to see other documents, in your mind, were you qualifying your certifications?<br><br>A.  You know, I don't know that I would use that word.  What -- and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | again, let's think back to -- the market troubles that started in subprime in the first quarter of '07 had worsened by this time.  They were quite a bit worse.  And so I don't know if "qualifying" is the right verb, but these were issues that I wanted to be sure to have Tom see as I sent this over to him.  Q.  Do you recall anyone asking you, "John, is your certification for this quarter qualified?"  A.  I don't remember anyone asking that.  I don't know -- when you say "qualified," I guess that's not – whether this was qualified or not, I don't know |
| | what that means exactly.  Q.  Okay.  A.  I do know that I wanted them to see this, which is why I went to the trouble to put it together. |
| 460.   McMurray's August 8, 2007 e-mail was forwarded to the Deputy CFO.  She took McMurray's certification to Sieracki and Sambol, who told her not to change the Form 10-Q to reflect McMurray's comments. | Dean Decl., ¶ 133, Ex. 131 (McCallion Depo. Ex. 180)  McCoy Decl, ¶¶ 15, 16, Exs. 205, 206 (McCallion Depo. Exs. 166, 167)  McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 117:2-119:21)  MS. WEISS:  Okay.  Exhibit 166 is an |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | e-mail chain.  At the top of the e-mail chain is an e-mail by Thomas Saletta to Anne McCallion with a copy to Greg Hendry.  It is Bates stamp No. CFCP000648131 through 8133. THE WITNESS:  Thank you. MS. WEISS:  Exhibit 168? THE REPORTER:  167. MS. WEISS:  Exhibit 167 is another version of that e-mail except this exhibit has handwritten notes in script and the Bates stamp number is CFC2007, capital E, 843445 through 3447. (Deposition Exhibit 167 was marked for identification.) BY MS. WEISS: Q.  Ms. McCallion, please review |
| | Exhibits 166 and 167 and tell me when you have completed that review. A.  I have completed. Q.  All right.  Referring you to the top of the e-mail chain, the e-mail from Mr. Saletta to yourself with a copy to Mr. Hendry, would you please read what Mr. Saletta said in that e-mail, A.  "Anne, Per our discussion, here is the e-mail from John.  I will need to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | include responses in our certification file addressing his concerns and the appropriateness of the 10-Q disclosures and reserve levels based on his comments.  Please let me know how I should proceed."<br><br>Q.  All right.  And then below there is an e-mail from John McMurray to Tom Saletta with copy to Karen Kurciska?<br><br>A.  "Kurciska."<br><br>Q.  Kurciska.  Thank you.  And would you read the first paragraph of that.<br><br>A.  "Here are a few notes to accompany this quarter's SOX certification.  I'll attach this note to the certification, but wanted you to have an electronic copy as well." |
| | Q.  All right.  And then the e-mail continues with several paragraphs thereafter.  Ms. McCallion, do you recall the circumstances of this communication from Mr. Saletta?<br><br>A.  Yes.<br><br>Q.  Would you tell me what they were.<br><br>A.  In the e-mail, Mr. Saletta refers to our previous discussion.  And on the day this e-mail was sent by Mr. Saletta, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | on August 8, 2007 at 2:51 P.M., sometime prior to that on August 8th, he called me and indicated to me that in obtaining the certifications for the completion and the filing of the second quarter 10-Q for Countrywide for 2007, that Mr. McMurray had included comments along with his signed certification for that quarter.  And Mr. Saletta called me and asked me for direction in how to handle the situation because it was highly unusual.  It was the first time that anyone had provided comments along with a signed certification.  And Mr. Saletta was concerned that even though Mr. McMurray had signed the certification |
| | indicating his agreement and -- agreement with the information that was relevant to his areas that was included in the 10-Q, Mr. Saletta was concerned and wanted to be sure that the concerns that accompanied the signed certification were addressed so that we could be certain that it was appropriate to file the Form 10-Q.<br>*** |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 284:25-286:15)<br><br>Q.  And were you testifying truthfully when you gave your testimony on January 30, 2009?<br><br>A.  Yes.<br><br>Q.  Now, the reference that I asked you to look at which is between line 8 and 22 refers to a discussion that you had with Mr. Sambol and Mr. Sieracki about Mr. McMurray's August 8th certification.  And it's not very specific as to time.  I am wondering if you know whether the comments that you attributed to Mr. -- whether the discussion that you reference there between yourself, Mr. Sieracki, Mr. Sambol took place before or after |
| | you had spoken to Mr. McMurray?<br><br>A.  I believe it was before.<br><br>Q. To your knowledge, when you spoke to Mr. Sambol and Mr. Sieracki before going to talk to Mr. McMurray, it's your recollection that their general response was, quote, "that we had gone through with a large group and reviewed the appropriateness of the disclosures, and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | they didn't believe that it was necessary or appropriate to make changes to what we had agreed upon probably the previous day." Close quote. Is that right?<br>A. Yes. |
| 461.   McCallion has offered inconsistent testimony regarding the involvement of Sambol and Sieracki with McMurray's Certification for the Third Quarter 2007 Form 10-Q. She initially claimed to have spoken with Sambol and Sieracki after having spoken to McMurray, then she claimed to have spoken to them before speaking to McMurray. | McCoy Decl., ¶75, Ex. 265 (McCallion Inv. Test. 511:23-513:9)<br>Q. Sure. Once you had received this e-mail from Mr. Soletta [sic] asking you to, you know, respond to Mr. McMurray's comments, did you then talk to people like Mr. Sambol, Mr. Bartlett, Mr. Mozilo, or any other senior officers about these concerns that Mr. McMurray had raised to see if you could get them in the document?<br>A. I talked to Mr. Sieracki and Mr. |
| | Sambol about John's comments.<br>Q. Okay. And what was their response?<br>A. I don't remember specific words. I remember a general response; and that was that we had gone through with a large group and reviewed the appropriateness of the disclosures, and they didn't believe that it was necessary |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | or appropriate to make changes to what we had agreed upon probably the previous day. Q. Okay. And just to be clear, you had that conversation with Bartlett and Sieracki? Q. Sambol and Sieracki? A. Sambol and Sieracki. Q. Okay. And those two individuals indicated to you that they felt that the disclosures were appropriate, and there was no need to address these items -- or they were sufficiently addressed? A. That conversation also was in the context of I was sitting down or had sat down with John and reviewed each of those items and gone through the resolution with him. And at the |
|  | conclusion of that meeting, John had indicated that he believed that there were no barriers to filing the document as it had been drafted. Q. And when you had that conversation with Mr. McMurray, did you present the options to him as, "Hey, is this important enough to hold up the filing?" A. Yes. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | *** |
| | McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 119:22-120:17) |
| | Q.  And what action, if any, did you take based on that communication from Mr. Saletta? |
| | A.  When I spoke to Mr. Saletta on the telephone after he described the situation, I asked him to send me Mr. McMurray's communication, and so he did, and that's why he sent me this e-mail. |
| | Q.  All right.  And then what further action did you take, if any? |
| | A.  When I -- I don't remember exactly when I did this, it was sometime after the initial notification, I informed Mr. Sieracki and Mr. Sambol of the situation that Mr. McMurray had signed a |
| | certification, but included comments. And I indicated my plan was to sit down with Mr. McMurray and to discuss his concerns so that we could complete the 10-Q, which was due within a day or two of the time of receiving these comments and the e-mail. |
| | Q.  And did they comment on that plan? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  They agreed with -- that that was the appropriate course of action. |
| | *** |
| | McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 271:17-272:19) |
| | Q.  Now, you indicated before you went to speak to Mr. McMurray that you informed Mr. Sambol and Mr. Sieracki that you were going to do so; is that correct? |
| | A.  Yes. |
| | Q.  And did you inform the two of them together or was it separately? |
| | A.  I believe they were together. |
| | Q.  Okay.  Whose office were you in? |
| | A.  I don't remember. |
| | Q.  What specifically do you recall Mr. Sambol saying in response to you explaining the situation with respect to Mr. McMurray's certification, if anything? |
| | A.  I don't remember. |
| | Q.  Do you recall anything specifically that Mr. Sieracki said to you in response to your explanation about Mr. McMurray's certification? |
| | A.  No. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  Earlier today you testified that you recalled both of them agreeing with you that you should, in fact, discuss the matter with Mr. McMurray. Do you recall that? <br> A.  Yes. <br> Q.  Do you recall specifically what they said in that regard? <br> A.  No. <br> *** <br> McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 284:25-286:15) <br> Q.  And were you testifying truthfully when you gave your testimony on January 30, 2009? <br> A.  Yes. <br> Q.  Now, the reference that I asked you to look at which is between line 8 and 22 refers to a discussion that you had with Mr. Sambol and Mr. Sieracki about Mr. Mr. McMurray's August 8th |
| | certification.  And it's not very specific as to time.  I am wondering if you know whether the comments that you attributed to Mr. -- whether the discussion that you reference there between yourself, Mr. Sieracki, Mr. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Sambol took place before or after you had spoken to Mr. McMurray?<br><br>A.  I believe it was before.<br><br>Q. To your knowledge, when you spoke to Mr. Sambol and Mr. Sieracki before going to talk to Mr. McMurray, it's your recollection that their general response was, quote, "that we had gone through with a large group and reviewed the appropriateness of the disclosures, and they didn't believe that it was necessary or appropriate to make changes to what we had agreed upon probably the previous day."  Close quote.  Is that right?<br><br>A.  Yes. |
| 462.   McCallion claims to have discussed each of McMurray's concerns with him in person, but McMurray recalls only that she telephoned him on his cell phone to discuss a "valuation issue" while he was awaiting surgery. | McCoy Decl., ¶¶ 15, 16, Exs. 205, 206 (McCallion Depo. Exhs. 166, 167)<br><br>McCoy Decl., ¶74, Ex. 264 (McCallion Depo. Tran. 120:18-121:2)<br><br>Q.  All right.  And what did you do next?<br><br>A.  When I received the e-mail from Mr. Saletta that included the specific comments, I printed them off and went to Mr. McMurray's office and sat down and reviewed them with him. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q. All right. And do you recall doing that with Mr. McMurray? |
| | A. Yes, I do. |
| | Q. And was it in his office? |
| | A. Yes. |
| | McCoy Decl., ¶78, Ex. 268 (McMurray Inv. Test. 902:23-904:8) |
| | Q. Do you recall if anyone in financial reporting contacted you regarding your e-mail to Mr. Saletta? |
| | A. I recall a contact from Anne. May I just look at this for a moment to see if this might have been -- |
| | Q. Sure. |
| | A. -- the one? I'm not sure this was the one that Anne contacted me on, so I |
| | I don't remember a specific contact from someone on this. |
| | Q. Well, if you turn to the page ending in 445. |
| | A. All right. |
| | Q. -- there's another copy of your e-mail to Mr. Saletta that has been, I guess, forwarded or shared with Ms. McCallion. |
| | A. With all the handwritten notes on it? |
| | Q. Yeah. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  This looks like a little better copy of the e-mail, too.<br><br>Q.  So looking at Page 445, do you think that this is the e-mail that you think you may have had a meeting with Ms. McCallion about?<br><br>A.  Well, down at the bottom here, she's talking about these residual evaluations. So I do remember talking to financial -- either Laurie or Anne about this.  I don't know that they said it was -- it may have been relative to this e-mail, but I don't remember that specifically.  But I remember them talking to me about that. And then the specific issue I mentioned earlier that I remember Anne calling me |
| | about had to do more with a market-to-market procedure, but I don't see that. Let's see here.  Oh, here it is.  So do you see this -- do you see "HFS" about midway up the page?<br><br>Q.  Mm-hm.<br><br>A.  And then "MTM" right below that, which stands for market-to-market. And so I remember Anne having a call with me about that.<br><br>*** |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 905:15-907:13) |
| | Q.  And the page ending in 446, which is the next page over -- |
| | A.  All right. |
| | Q.  -- at the bottom, there's the handwritten notation from Ms. McCallion. |
| | A.  I'm not sure whose writing it is. |
| | Q.  Just to be clear, in testimony with the staff, she identified that the handwriting is hers. |
| | A.  All right. |
| | Q.  And she has a quote, you know, midway down.  She says, "He said it's not a big enough deal to affect the financial statements or the 10-Q filing." |
| | THE WITNESS:  So what -- what I think she's getting at here -- see the little 1? |
| | Q.  Yep. |
| | A.  I think that goes to the 1 on the market-to-market issue. |
| | Q.  Okay. |
| | A.  And I believe that we talked about this on one of the prior meetings that we had.  So she called me.  I was about to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | have hemorrhoid surgery, and so we talked through this issue right before I went into the surgery.  And I got comfortable, you know, that it wasn't a big enough issue to hold everything up over.<br><br>Q.  Was that in connection with the second quarter of '07 that you were having that surgery?<br>A.  That sounds like about the right time frame.<br>Q.  So, to your knowledge, the conversation that Ms. McCallion had with you that she's documenting this exhibit occurred sometime in August of '07?<br>A.  That sounds about right because |
|  | that's about the time that I had the surgery.  And she called me on my cell phone right before I was going into the doctor's office, and so we had a discussion on this market-to-market issue.  And I think you may have asked me about -- I think we may have talked about it on one of the prior occasions.<br>Q.  Okay.  In that phone call with you, did she go over all of the concerns that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | are listed in your e-mail to Mr. Saletta, or was it just the market-to-market issue? A.  The issue I remember on the phone call was the market-to-market issue. Q.  Okay. A.  There could have been other conversations that she had with me outside of -- but I remember the market-to-market issue on the phone call vividly. |
| 463.   Sieracki was informed that McMurray had sent his certification to the SOX officer with additional comments, and claims that he later asked McMurray whether his certification was "qualified," but did not discuss the substance of McMurray's comments with him. McMurray however, has no recollection of that conversation. | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 205:9-208:19) Q.  Okay.  Let's break that up.  With regard to -- in -- during the time that you were the CFO of Countrywide, did you have any personal conversations with Mr. McMurray specifically about what disclosure should appear in SEC filings related to credit risk? MS. PHILLIPS:  Objection.  Vague as to "personal," vague as to "time."  And vague as to what you mean by "related to credit risk." THE WITNESS:  The closest I can come to such a conversation was the day of the second quarter of '07 earnings |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | call when I was advised after the call that Mr. Murray's -- Mr. McMurray's certification included an addendum. And I asked if it was an unqualified certification.  I was advised yes.  I happened to run into Mr. McMurray immediately after the call ended and had a brief conversation with him and asked him some questions about whether or not his certification was qualified.  And he said nothing to me to lead believe |
| | it was not qualified.  We did not discuss anything related -- <br><br> MS. WEISS:  I'm sorry, do you want to -- Would you read back the Q&A, what he just said. <br><br> MR. BENDELL:  Can you let him finish the answer and then we will give him a chance to – <br><br> MR. MORGAN:  Double negative. <br><br> MS. WEISS:  You had a double negative problem. <br><br> MR. BENDELL:  But I don't want him to lose his train of thought. <br><br> THE WITNESS:  Did I misspeak? <br><br> MS. DEAN:  You can finish the answer and then we'll clear it up. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | THE WITNESS:  Okay.  So I see him in the hallway shortly after the call ends. We have a conversation about his certification being qualified or unqualified.  My conclusion is that the certification is unqualified.  I understood that to be accounting and legal's interpretation as well.  We did not specifically discuss disclosures.  We discussed his certification.  I regret if I misspoke.  But that's the closest I |
|  | can come to Mr. McMurray saying "I want to talk to you about disclosures." Q.  And in this call after the second quarter 2007 earnings call -- sorry -- this conversation with Mr. McMurray after the second quarter 2007 earnings call, what did he say to you that led you to believe that his certification for that -- was it a certification of an earnings release? A.  Earnings. Q.  What is it that he said that caused you to believe that his certification of that earnings release was unqualified? A.  In the course of the conversation, which was very brief, he never said it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | was qualified. And I remember saying "Okay. What I have heard leads me to interpret that that's an unqualified certification. <br><br> Q. To the best of your recollection, what did he say? <br><br> A. I'm sorry, I can't remember the specific words in the conversation. I think he made reference to a binder that he thought was relevant, but that's about the best that I can do about the |
|  | particular conversation. This was a very brief -- I just was interested. It was important that it was unqualified and I came away from the conversation satisfied that it was. <br><br> *** <br><br> McCoy Decl., ¶77, Ex. 267 (McMurray Inv. Test. 910:2-7) <br><br> Q. And testimony with Mr. Sieracki said that after some type of earnings call in '07, he passed by you in the hallway and asked you whether or not you had qualified your certification for the second quarter of '07 and that you said no, it was unqualified. Do you recall that? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  I don't remember that. |
| 464.   McMurray's submission of his second quarter 2007 Sarbanes-Oxley Certification with comments attached was a significant event, which had not happened before at Countrywide. | McCoy Decl., ¶74, Ex. 264 (McCallion Dep. Tran. 261:14-262:17) Q.  We talked a little bit -- or actually a lot this morning about your meeting with Mr. McMurray in August of 2007 with respect to his Sarbanes-Oxley certification. Do you recall that? A.  Yes, I do. Q.  Now, you said that, to your knowledge, Mr. McMurray providing a certification with comments |
| | attached was the first time that that had occurred; is that correct? A.  The first time that -- Q.  That someone had submitted a certification with comments attached? MS. ARGUEDAS:  I am going to object to that.  I don't think that's what she said.  I think she said it was uncommon. I don't know about the first time. Q.  Well, that's my question, actually.  I mean was it the first time that it had happened or was it something that had -- you tell me, was it uncommon or was it a case of first impression? MS. WEISS:  Objection.  Lacks |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | foundation.<br>THE WITNESS:  That was the first time that I remember it happening.<br>Q.  Okay.  And, in your mind, would that make it a significant event?<br>A.  Yes. |
| 465.   The Disclosure Policy at Countrywide required that matters of significance should be addressed to the Executive Committee at the company for resolution. | Dean Decl., ¶¶ 129-131, Exs. 127-129 (McCallion Depo. Exs. 158, 159, 160)<br>     "The Disclosure Committee or a designated member thereof shall consult with the Company's Executive Committee or designated |
| | members thereof with respect to any matters of significance relating to the Company's disclosure and reporting obligations." |
| 466.   Instead of referring the matter to the Executive Committee, the Deputy CFO went to Sambol and Sieracki, because they were the two individuals on Countrywide's Executive Committee "most closely involved with the SEC reporting process." | McCoy Decl., ¶74, Ex. 264 (McCallion Dep. Tran. 263:18-264:15)<br>Q.  Okay.  Well, you are focusing on the second sentence of the paragraph.  And let me just read the first one into the record.  It reads, quote:  "The Disclosure Committee or a designated member thereof shall consult with the Company's Executive Committee or designated members thereof with respect to any matters of significance |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | relating to the Company's disclosure and reporting obligations." Close quote. Do you see that?<br>A. Yes.<br>Q. And there is nothing in that sentence that refers to whether or not the issue had been resolved, is there?<br>A. I'm sorry, I was referring down below to the second reference to the executive committee. But Mr. Sambol and Mr. Sieracki were both members of the executive committee, and that was |
| | one of the primary reasons why they were brought -- that was why they were brought into the loop and they were the members of the executive committee who were most closely involved with the SEC reporting process. |
| 467.   Countrywide's disclosures led the reader to believe that Countrywide's Pay Option Loan portfolio was of "high credit quality." | Dean Decl., ¶ 165, Ex. 163 (Depo. Ex. 501)<br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 29:12-30:23)<br>Q. Okay. During the 2005 and 2006 time frame, how did the representatives of Countrywide on the earnings conference calls describe the pay option portfolio? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. DAVIDOFF:  Objection, compound. MR. MEYERS:  And to form. A.  I don't recall the portfolio being described as anything different than is on this page right here.  This is -- this is consistent with my recollection of how the portfolio was described. Q.  And when you say this is consistent, are you talking about everything on -- is there some specific part of Slide 13 |
| | that you're referring to, or the entire slide? MR. DAVIDOFF:  Objection.  Form. MR. MEYERS:  And compound. A.  It would be the high quality, which always describes high quality, and it was -- I remember it was consistently -- they made -- consistently made a point of the FICO. Q.  That is high FICO? A.  They actually -- they actually either say high or they would give the average of, you know, 720 or so as the average FICO of that portfolio.  727 I think is the number that's in my head. Q.  And what about this reference on |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | this slide here to DTI is within guideline tolerances in most interest rate shock scenarios.  Do you have an understanding as to what that is a reference to?<br>A.  Yes.<br>Q.  Okay, what is your understanding?<br>A.  There is an adjustable rate mortgage.  There's risk that the borrower's payment will be higher in different interest rates scenarios.  So it's a |
| | a reference to the fact that even if interest rates go up, the debt-to-income would be within their tolerances.<br>***<br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 36:4-36:19)<br>Q.  All right.  So, again, now, Mr. Brendler, hopefully we've corrected my mistake and you have now in front of the Stifel Nicolaus document entitled Countrywide Financial Corporation dated January 12, 2006 that has Exhibit 501 on it; is that right?<br>A.  Yes.<br>Q.  Okay, great.  Do you recognize this document? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Yes.<br><br>Q.  Okay, what is it?<br><br>A.  Initiation of coverage on Countrywide.<br><br>Q.  So this is the first report that you generated when you started covering Countrywide?<br><br>A.  Yes.<br><br>Q.  All right.  Did you draft this report?<br><br>A.  Partially.<br><br>***<br><br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 37:5-38:4) |
| | Q.  And did you -- I mean does this report reflect your analysis and opinions of Countrywide at the time, in January 2006?<br><br>A.  Yes.<br><br>Q.  All right.  Obviously take whatever time you need to review as much of the document as you need, but my questions are about a particular portion I'd like to direct your attention to on Page 8 of Exhibit 501.<br><br>A.  (Reviewing.)\<br><br>Q.  The heading Flexible Prime Balance Sheet. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | A.  Yes.<br><br>Q.  All right.  It says there under that heading, CFC's bank balance sheet is made up of high- quality assets that are overwhelmingly ARM's and duration match to its funding.  Did you believe that to be true at the time that you wrote it?<br><br>A.  Yes.<br><br>Q.  All right.  And the reference to high-quality assets, what did you mean by that?<br><br>A.  High credit quality. |
|  | Q.  And in part -- well, let me rephrase that.  What was the basis for your belief that Countrywide's assets were high credit quality?<br><br>A.  Countrywide disclosures. |
| 468.   Information regarding the evidence known within Countrywide about the incidence of borrowers were misrepresenting income would have been important to analysts covering Countrywide. | Dean Decl., ¶ 19, Ex. 17 (SEC Inv. Test. 214)<br><br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 74:7-76:8)<br><br>Q.  Mr. Brendler, you have in front of you a document that's been marked as Exhibit 506.  It is a one-page document that appears to be an e-mail, has the Bates No. CFC 2007A371364.  And it -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the header on the e-mail is from Angelo Mozilo.  The date is June 1, 2006.  It's to Carlos Garcia and Jim Furash with a cc to Stan Kurland and Dave Sambol.  My first question is, again, setting aside any time you might have seen this document in deposition testimony, have you -- other than that have you ever seen the document in Exhibit 506 before?  A.  No.  Q.  As of June 1st, 2006, with the work you'd been doing covering Countrywide, had you ever been made |
| | aware of any -- well, at that point in time, as of June 1st, 2006, had you been made aware of the -- what proportion of the pay option ARM loans originated by Countrywide were based on stated income?  A.  No.  Q.  And then the -- as of June 1st, 2006, were you ever provi -- sorry, that question doesn't even make sense.  As of June 1st, 2006, had you been provided any information about any work that Countrywide had done to compare incomes as stated by borrowers |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | with IRS records? |
| | A.  No. |
| | Q.  Okay.  Were you -- and again, setting aside any documents you've been shown in deposition testimony, were you ever provided any information about any work that Countrywide did to compare stated incomes by borrower applicants with IRS records? |
| | A.  No. |
| | Q.  Okay.  Were you -- and again, setting aside any documents you've been shown in deposition testimony, |
| | were you ever provided any information about any work that Countrywide did to compare stated incomes by borrower applicants with IRS records? |
| | A.  No. |
| | Q.  Now, it says here in this document that -- it says, there is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records.  Would -- would that information have been important to you in evaluating Countrywide's stock back in June of 2006? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. DAVIDOFF:  Objection. Hypothetical.<br>A.  Yes.<br>Q.  Okay.  Why would that information be important to you?<br>A.  Because the industry in general was quite concerned about stated income. Investor media was concerned about stated income.  And there was generally a fear that borrowers were abusing stated income.  And I think we would have been really interested to know that Countrywide had, A, performed that |
| | analysis, and B, what it showed because it would have highlighted the risk in the portfolio. |
| 469.   Countrywide's July 24, 2007 earnings call revealed new negative information about Countrywide's underwriting and credit risk. | Dean Decl., ¶ 169, Ex. 167 (Depo. Ex. 511).<br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 100:14-100:21)<br>Q.  So -- sorry.  You have in front of you, Mr. Brendler, Exhibit 511 which is a multi-page document, appears to be a Power Point slide presentation with the title Second Quarter 2007 Supplemental Presentation Credit Summary July 24, 2007, Countrywide Financial.  Do you |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | recognize this slide presentation in Exhibit 511? |
| | A.  Yes. |
| | *** |
| | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 101:19-103:12) |
| | Q.  So I think you mentioned that you recognize this document, Mr. Brendler. Where have you seen it before? |
| | A.  I saw it at the time it was released in July of 2007. |
| | Q.  Okay.  And did this slide show accompany some presentation by Countrywide management? |
| | A.  Yes. |
| | Q.  Okay.  What presentation was that? |
| | A.  Those earnings presentation -- earnings call. |
| | Q.  For the second quarter of 2007? |
| | A.  Yes. |
| | Q.  I mean now is there anything in this slide deck that struck you as new information about the credit quality of Countrywide's loans in July of 2007? |
| | A.  Yes. |
| | Q.  Okay.  What is -- what is it -- what is it that struck you as new? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  This is new disclosure on the underwriting characteristics of the bank's portfolio. MR. DAVIDOFF:  Can we just get the page?  I think the witness is looking at a page. Q.  Yeah, I was going -- A.  I'm sorry, 5983. Q.  It's the slide that has the number 6 if you look at the bottom left -- in the bar on the left-hand side of the slide you'll see they have page numbers. So Page 6 of the slide deck? A.  Yes, Page 6. |
| | Q.  So you're -- just so I think we get this clear, you're saying that the information on Page 6 -- or Page 6 of Exhibit 511, that's part of the information that struck you as new in July of 2007? A.  Yes. Q.  Okay.  What -- was there something specific on this page that you believed was new information? A.  Yes. Q.  What's that? A.  The FICO distribution, 38 percent of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the bank pay option portfolio was below 700 FICO, 24 percent of the home equity portfolio was below 700 FICO, the percent of piggybacks was new information, and the low doc percentage was new information.<br>***<br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 104:4-104:23)<br>Q. ….What struck you as new about this piggyback information back in July 2007?<br>A. At this point, we've -- the mortgage industry and the asset community has become more aware of the problems |
| | associated with piggyback loans because typically you had higher incidence of default when piggybacks were used.  It usually indicated that borrowers were stretching to buy a house that they couldn't afford.  So finding out that there was a lot of piggyback loans in the bank portfolio was a concern at that point.<br>Q. All right.  And then I think you also mentioned that the percentage of low documentation loans was new |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | information in some way.  What was new about that? |
|  | A.  I just had at the time no idea that, you know, nearly what, four out of five loans in the pay option bank portfolio were, were stated income.  That just -- that seems much, much higher than we would have expected. |
|  | *** |
|  | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 106:18-109:7) |
|  | Q.  Is it fair to -- well, do you have any -- in July 2007 you were covering several mortgage companies; is that right? |
|  | A.  Yes. |
|  | Q.  Based on your observations of the markets at that time, do you have any understanding as to whether there was an increase in the overall interest by investors in credit quality in July 2007 as opposed to earlier times? |
|  | A.  Yes. |
|  | Q.  Okay.  What is that understanding? |
|  | A.  It was a much more sensitive topic because at that point the subprime mortgage players were already failing. |
|  | Q.  And I think the last section of Slide |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | 6 in Exhibit 511 that you described as containing information that struck you as new is the FICO distribution breakdown.  What struck you as new about that FICO distribution information?<br><br>A.  I don't recall seeing that distribution other than this, this presentation because as we discussed earlier, the average doesn't really tell you what you really want to know, which is how many -- what are the percentage of low-quality subprime loans that are in your portfolio. |
|  | Q.  All right.  And is that information relevant only to pay option ARM loans, or to all of the loans in the portfolio?<br>A.  All the loans.<br>Q.  And I think you described earlier your understanding as to whether the -- as to the -- let me rephrase the question. In 2006 while you were covering Countrywide, did you have any general understanding as to what the credit quality of Countrywide's held for investment home equity lines was?<br>A.  Yes. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.  Okay.  What was that understanding?<br>A.  High quality.<br>Q.  High credit quality?<br>A.  Yes.<br>Q.  Including high FICO?<br>A.  It was always described as being a very high quality, not just high quality, it was described as being very high quality, high FICO, low LTV.<br>Q.  Now, the percentage breakdowns of FICO distribution for -- under the category home equity bank HFI, do you see that? |
|  | A.  Yes.<br>Q.  Are those -- were those percentages -- did you read those percentages at the time that this slide presentation was presented?<br>A.  I believe so.<br>Q.  And did those, those percentages, the one in bank, home equity bank HFI, did those surprise you in any way?<br>A.  Just a little.  I mean it was definitely higher than I would have thought percentage of loans that was below 700.  But in hindsight, it doesn't seem |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | completely unreasonable given the fact the average had been disclosed in the low 700s.<br><br>Q.  So is there some portion of this FICO distribution information that you found more surprising than the bank HFI portion?<br><br>A.  Yes.  I'd say the -- I'd say the pay option. |
| 470.   As a result of the release of information on July 24, 2007, the higher levels of credit risk borne by Countrywide affected analyst opinion about Countrywide. | Dean Decl., ¶ 170, Ex. 168 (Depo. Ex. 512)<br><br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 112:20-114:4)<br><br>Q.  You have in front of you now a document that's been marked as Exhibit 512.  It's a document with the heading Stifel Nicolaus, again references Countrywide Financial Corporation, and it's dated July 17, 2007.  It has the Bates Nos. CSL-CB000175 through 178.  Do you recognize Exhibit 512?<br><br>A.  Yes.<br><br>Q.  Okay.  What is it?<br><br>A.  It's a note that was written following the release of Countrywide's June operation data.<br><br>Q.  And so this is July -- sorry, strike |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that.  If you take a look at the bottom paragraph of Exhibit 512, I'm sorry, the first page of Exhibit 512, the bottom bullet point, it says, overall we still believe CFC is the best-in-class competitor with sustainable competitive advantage and view increasing earnings diversification positively.  Do you see that language?<br>A.  Yes.<br>Q.  Did you believe that to be true on July 17th, 2007?<br>A.  Yes. |
| | Q.  Did the information that was contained in the presentation that's in Exhibit 511 affect your opinions with regard to Countrywide's status as a best-in-class competitor in any way?<br>A.  I would say yes.<br>Q.  Okay.  And how is that?<br>A.  I think I felt less comfortable with the bank's strategy following the disclosure of the additional information about what exactly was in that bank's portfolio.<br>Q.  And why was that?<br>A.  Much more -- much higher levels of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | credit risk than previously thought. |
| 471.   Upon the July 24, 2007 disclosures, at least one analyst felt mislead by Countrywide's previous characterizations of Countrywide's held-for-investment loan portfolio as high quality. | Dean Decl., ¶ 171, Ex. 169 (Depo. Ex. 513). McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 114:13-118:17) Q.  You have in front of you Exhibit 513.  It's a multi-page document with the Bates No. CFC 2007768217 through 768224.  It's again a Stifel Nicolaus document, or headed document again with the reference to Countrywide Financial Corporation at the top.  It's dated July 27, 2007.  Do you |
| | recognize Exhibit 513? A.  Yes, I do. Q.  What is it? A.  It's a note that I wrote in -- following Countrywide's second quarter results. Q.  Okay.  So was this the report that you wrote in response to the presentation that -- where that slide deck that's in Exhibit 511 was presented? A.  Yes. Q.  Okay.  The -- I'll direct your attention to -- I guess let me just ask you first of all, the report that's in Exhibit |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | 513 -- no, actually, sorry, let me withdraw that. Directing your attention to the second bullet point on the first page of Exhibit 513 where it says specifically we believed CFC, while certainly exposed to industry issues, would outperform weaker competitors due to its -- I'm sorry, due its limited, parentheses, and well-managed, closed parentheses, credit risk, strong balance sheet, and superior mortgage franchise. You see that language there? |
|  | A.  Yes.<br>Q.  I notice that the word believed is in the past tense.  Is there a reason why you made that language choice?<br>A.  Yes.<br>Q.  What is that reason?<br>A.  I changed my mind.<br>Q.  Based on something?<br>A.  Based on the results of the second quarter and the disclosures about the home equity portfolio, the bank portfolio.<br>Q.  And I just want to know.  I'm not sure if you misspoke.  Did you mean the home equity portion of the bank |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | portfolio, or the bank portfolio overall? A.  I think at the time I was more concerned about home equity because they had a big reserve build in the second quarter in home equity.  There's more detail in the sixth bullet that begins second where I talk about how I'm not as confident about the bank's portfolio anymore. Q.  Well, you have guessed correctly that I'm going to ask you some questions at that bullet point as well. |
| | So if we go to that bullet point, it says, the one that begins second -- actually, could you just read the -- that bullet point into the record, please? A.  Second -- CFC's second quarter '07 results undermined our sanguine views on its credit exposure.  While we still the company as the debt managers of this risk, we believe management made serious miscalculations, parentheses, and possibly misrepresentations, end parentheses, about the credit risk in the bank portfolio.  Once house prices start falling, parentheses, only down three percent through May, end parentheses, |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | we see further downsided risk in both bank reserves and residual valuation. Q.  Now, did you -- was that paragraph an honest expression of your views as of July 27, 2007? A.  Yes. Q.  So is it fair to say that on July 27, 2007 you believed that it was at least possible that management had made misrepresentations to you? MR. DAVIDOFF:  Leading.  Objection. |
| | A.  That's what I wrote. Q.  Right, I see it there, but I just want to make sure, is -- was it your belief at the time that you wrote it? A.  I remember thinking that, and the reason why I wrote possibly is because I wasn't a hundred percent sure, but I remember being very surprised by the disclosures in the bank's portfolio, and -- you know, Countrywide provided a lot of information to investors, lots of presentations, lots of slide decks, complicated disclosures in their 10Qs. There was a lot of information, so I wasn't a hundred percent sure that maybe I hadn't missed some of these |

616

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | disclosures.  But I felt like at the time that they had always characterized the bank as, as being prime, high-quality loans, and the disclosures on that slide deck we looked at previously suggested otherwise.<br><br>Q.  And the slide deck that you're referring to is Exhibit 511?<br><br>A.  Yes.<br><br>Q.  Now, specifically there's a reference in that bullet point to mis – serious |
| | miscalculations. What were the serious miscalculations that you were referring to?<br><br>A.  I think they, simply put, under -- underestimated the loss content of the bank's portfolio.  You know, at this point the bank's portfolio is falling apart.  The credit risk is increasing rapidly.  So the point of that sentence was either they did some -- either they didn't put the loans that they thought they were putting in the bank or they didn't tell us they were putting the loans -- they didn't put the loans that they were going to put in the bank.  One or the other had to be true, or both really. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 472.   Mozilo's undisclosed conclusion that World Savings history with Pay Option Arms was not a relevant comparison for Countrywide would have been important to analysts evaluating his statements regarding the product's twenty-year history. | Dean Decl., ¶ 172, Ex. 170 (Depo. Ex. 525).<br><br>McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 226:18-231:2)<br><br>Q.  Okay.  I have just one more, one more of the documents that you've already seen to ask you about. This is Exhibit 525.<br><br>A.  Okay.<br><br>Q.  So I'm not sure -- and I'm sure some lawyer will remind me if you already testified to this -- but did you actually read -- sorry, did you actually -- did you actually attend or listen to the presentation that's contained in Exhibit 525?<br><br>A.  I don't recall if I did or not.  I truly did not attend, but I would typically make it my practice to, to at least read transcripts or listen to, when I was in the office, any presentations, especially if it was going to be the CEO who was presenting.<br><br>Q.  So you don't have a specific recollection but you believe based on your general practice that you either listened to or read this transcript -- |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | listened to the presentation or read the transcript?<br><br>A.  Yes, I would hope to.<br><br>Q.  If you take a look, please, on Page 6 of Exhibit 525.<br><br>A.  Okay.<br><br>Q.  The -- starting with the third paragraph from the bottom, the one that says let's look at the bank's balance sheet.<br><br>A.  Yes. |
|  | Q.  Okay.  The last sentence, yes, the last sentence of that paragraph says –<br><br>MR. DAVIDOFF:  I'm going to object to this question.  This is beyond the scope of cross-examination.<br><br>MR. BENDELL:  Well, I understand that, but you asked him questions about the document, I'm going to ask him questions about the rest of the document.<br><br>BY MR. BENDELL:<br><br>Q.  The -- sorry.  The last sentence there in that paragraph on Page 6, we continue to focus on high credit quality customers to the bank's loan portfolio as demonstrated by a weighted average |

| SEC Statement | Evidence Cited by SEC |
| --- | --- |
| | FICO of 727 for loans held for investment by the bank.  You see that sentence there?<br>A.  Yes.<br>Q.  Was that information that was communicated to you by Mr. Mozilo either in this call or in other calls?<br>A.  Yes.<br>Q.  If you go on now to the Paragraph that's on the bottom of Page 6 and carries over to Page 7, and specifically - |
| | - you need to read the whole paragraph for context, but my specific question is about information that's on the part of the paragraph that's on Page 7.<br>A.  Okay.<br>Q.  It says, the performance profile of this product is well-understood because of its 20-year history.<br>MR. DAVIDOFF:  Before you read it, I just want to object again, counselor.<br>Q.  Because of its 20 -- let me just start over.<br>MR. BENDELL:  And I understand the objection still applies.<br>Q.  The performance profile of this product is well-understood because of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | its 20-year history which includes stress tests in very difficult environments. You see that language there?<br><br>A.  I do.<br><br>Q.  Do you remember that information being communicated to you either on this call or otherwise while you were covering Countrywide?<br><br>A.  I do. |
| | Q.  Did you have any understanding as to what the 20-year history of the product, the pay option ARM product was being referred to was?<br><br>MR. DAVIDOFF:  Same objection.<br><br>A.  Yes.<br><br>Q.  What was that 20-year history?<br><br>A.  I believe they were referring to World Financial -- not World Financial.<br><br>Q.  Are you looking for World Savings?<br><br>A.  World Savings, that's it.  I cover World Financial now, so -- World Savings, the California thrift who originated these loans for years and years and years, had very good performance.  Golden West. There it is.<br><br>Q.  Golden West ultimately became part of World Savings? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Reverse. |
| | Q.  Okay.  So World Savings and Golden West is basically, you're referring to the same entity? |
| | A.  Yes. |
| | Q.  Would you -- would you consider it important to evaluating this information to know that Mr. Mozilo himself stated that he didn't take comfort in the World Savings history? |
| | MR. DAVIDOFF:  Objection.  Foundation and beyond the scope. |
| | MS. GORDON:  And form. |
| | A.  Yes. |
| | Q.  Why? |
| | MR. DAVIDOFF:  Again, same objection.  This is very far beyond the scope. |
| | A.  Well, he's -- I mean obviously hindsight is 20/20, but the problem with the World Savings history was it just wasn't -- it was a very specific market and it was a very specific product and it had a much different housing competitive mortgage market that it was underwritten in, so it had a history that was, you know, probably not as relevant |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | as everyone would liked to have believed. |
| 473.   Countrywide's description of its prime loans misled analysts. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 46:21-47:12)<br><br>Q.  …  During the time that you were preparing for and initiating coverage on Countrywide, did you have any understanding as to whether the portfolio of loans held at the bank at |
| | Countrywide were mostly prime or something else?<br><br>A.  I don't really recall them being characterized anything but prime.<br><br>Q.  And what was your understanding of what was meant by when they were characterized as prime back in 2005 and early 2006?<br><br>MR. MEYERS:  Object to foundation.<br><br>A.  That they were higher quality loans with FICO scores that would be, you know, high 600s at a minimum, debt-to-income ratios that would be 40 percent or less.  I don't think -- it's a vague term, but those are the kind of characteristics you're expecting in a prime portfolio. |
| 474.   Some of Countrywide's | McCoy Decl., ¶72, Ex. 262 (Liu Dep. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| securitizations were issued pursuant to exempt transactions where sales documents were not filed with the SEC. | Tran. 19:15-20:12)<br>Q.  Mr. Liu, in order to sell MBS to investors, was Countrywide ordinarily required to file registration or sales documents with the SEC?<br>A.  In connection with publicly registered securitizations and those securities that were not issued pursuant to an exception for registration, and with respect to non -- non- GSE or nonagency securities, yes.<br>Q.  And can you give me a sense of the relative volume of the various, I guess, categories you just described, those that are exempted versus those that are non-exempted?  Do you understand the question?<br>A.  Let me ask you a question and you can respond whether this is -- this is clarifying.  The three categories I mentioned were GSE, non-GSE, and then exempt.  Right?  So are you asking for relative --<br>Q.  Non-GSE versus exempt.<br>A.  Only?<br>Q.  Yes.<br>A.  I -- roughly between somewhat less |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | than 5 percent up to maybe 5 percent of issuance was exempt. |
| 475.   Countrywide's composite matching strategy was not disclosed. | McCoy Decl., ¶ 97, Ex. 287 (SEC Inv. Test. Ex. 226) |
|  | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 49:14-49:20) |
|  | Q.  I'd like you to take a look, please, at the second e-mail in the chain, so it's starts about a quarter of the way down the first page and carries over to the second page of Exhibit 502.  This is the e-mail from John McMurray to Dave Sambol dating June 24, 2005.  If you take a moment to read that e-mail, please. |
|  | *** |
|  | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 50:1-52:25) |
|  | A.  (Reviewing.)  Should I continue reading? |
|  | Q.  Yeah, you're welcome to read the whole document.  My questions are all about that e-mail that I've just directed your attention to. |
|  | A.  Okay. |
|  | Q.  So I guess my first question is is there anything in this e-mail that you see |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | that is inconsistent with your understanding of Countrywide's credit risk position when you started covering it in January of 2006? MR. MEYERS:  Object to form and foundation. MS. GORDON:  Object. A.  Yes. Q.  Okay.  What in -- what in this document strikes you as inconsistent? |
|  | A.  There is some discussion of the credit risk position, which at that time was not saying it was really well-disclosed.  There's also this discussion of the matching strategy which, you know, from my earlier comments I said that I thought they were pretty much the industry.  It seems like from this discussion, this e-mail that they were actually more aggressive in the industry. Q.  So are you referring to the section there that's headed Composite Guidelines? A.  Yes. Q.  All right.  Right there where it says, because the matching process includes comparisons to a variety of lenders, our |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | match will be a composite of outer boundaries offered across multiple lenders.  Is that information that you would have considered important in evaluating Countrywide back in 2000 -- early 2006? MS. GORDON:  Object to form and foundation. A.  Yes. Q.  Why is that? |
| | A.  It's a higher risk strategy. Q.  If you go on and read -- or a higher risk strategy than what, I'm sorry? A.  Than having your own guidelines and sticking to what you believe to be the best credit characteristics through your origination activity. Q.  The next sentence still in that Composite Guidelines section, it says, for example, First franklin is used as a comparison for some guidelines where they are more aggressive, parentheses, e.g. high LTV/CLTV, closed parentheses, and not used where they're less aggressive, parentheses, e.g. stated doc loans, closed parentheses.  Do you see that? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Yes. |
| | Q.  All right.  Back in early 2006 when you initiated coverage of Countrywide, were you aware -- let me rephrase that.  Back in early 2006 when you initiated coverage of Countrywide, would you have considered it important information to know that Countrywide would use a competitor's guideline, would match a competitor's guideline where it was more aggressive without matching the portion of the guidelines that were less aggressive? |
| | MR. DAVIDOFF:  Objection.  The document says -- it doesn't say matching.  Object. |
| | MR. MEYERS:  And I'll object more generally to form. |
| | A.  The question was is it -- would it have been important?  Yes. |
| | Q.  And why is that? |
| | A.  That's -- that would have been a very disturbing disclosure, I believe, to know that you're basically seeking out the most aggressive policies and underwriting guidelines of your competitors without consideration for |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | other factors.  You're essentially creating a worst of the worst. *** McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 53:13-53:24) Q.  The sentence that says -- again, this is in the Composite Guidelines paragraph on the first page of Exhibit 502 -- as a result, our composite guides are likely among the most aggressive in the industry.  Is that information |
| | consistent, or inconsistent with the information that you were aware of in preparing to cover Countrywide? MS. GORDON:  Object to form. A.  Inconsistent. Q.  In what way? A.  I had the impression that they were in line with the industry, not among the most aggressive. *** McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 54:22-55:5) Q.  Were you ever made aware during the time that you were preparing your coverage of Countrywide that there were instances where Countrywide |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | could not incorporate the credit risk mitigants used by other lenders? MR. MEYERS:  Object to form and foundation. A.  The question was aware? Q.  (Nods head.) A.  No, I was not aware. |
| 476.   Countrywide did not make information available to determine the extent of layered risk on loans in its held for investment portfolio. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 77:22-80:6) Q.  Did Countrywide provide you with information -- let me rephrase that. With regard to the portfolio of loans |
| | held at the bank, was there, to your knowledge, a loan level data publicly available? A.  No. Q.  So with regard to the loans held for investment at the bank, what sources of information would you have to try to get at how much layered risk there was? A.  It was solely up to management in the investor presentations or SEC filings. Q.  And no -- what about in those securitization, the securitization data that you looked at, would that provide any information about the layered risk |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | on the bank's portfolio? |
| | A.  No. |
| | Q.  Now, if you take a look at, I guess it's after -- I'm not sure how to describe it, after the numbered paragraphs, it's the first paragraph after that that's not numbered.  It's the one that begins we have at least. |
| | A.  Yes. |
| | Q.  And it says, we have at least 20 percent or more of the bank's pay option loans at a FICO of 700 or less. |
| | Were you aware of the percentage of loans in the bank's pay option portfolio that were below 700 FICO score in -- as of June 1st, 2006? |
| | A.  No. |
| | Q.  All right.  The next -- well, would you have considered that information important in your evaluation of Countrywide's stock? |
| | MR. MEYERS:  Object to form. |
| | A.  Yes. |
| | Q.  And why is that? |
| | A.  Credit risk is an important topic at the bank, and it was characterized by qualitative statements as being high |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | quality, prime and the average FICO being in the low, you know, 700, 720, 730 area.  Having a significant portion of the portfolio below 700 would have raised some concerns with the level of credit risk. Q.  Well, if you have an average of something and it's 720, 730 -- sorry, 700, 720, 730 area, wouldn't you expect some loans to be below that average to get to the average? A.  Absolutely, yes. |
| | Q.  Okay.  So how is -- how is the percentage of loans that are at or below 700 relevant? A.  Well, we just didn't -- MS. GORDON:  Object to form. A.  We didn't know the distribution. You could go from 500 to 800, or you can go from 700 to 750.  So we had no information on the distribution. Q.  So the distribution that ultimately leads to an average is additional information that you believed was at least relevant to your analysis? A.  Yes. MR. MEYERS:  Objection.  Leading. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | (Interruption.) |
| 477.   Information about the frequency with which Countrywide made exceptions to its underwriting guidelines would have been important to analyst opinion about Countrywide. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 56:3-56:19) Q    Was -- were you provided any information on any of those conference calls or investor forums regarding exception loans? A    Not in a lot of detail, but I think it was discussed.  Every once in a while, they would say we keep our exceptions low or something like that. |
| | Q    I'm sorry, keep our exceptions low? A    Yes. Q    Well, actually let me ask you this. With your experience covering the consumer finance sector and some -- and mortgage banking, are you familiar with what an exception loan is? A    Yes. Q    Okay, what is it? A    It's a loan that does not fall within your guidelines, but you make an exception for various reasons. *** McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 58:24-59:13) Q    Do you have any general |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | understanding of what a typical exception rate is in the mortgage industry? <br> MR. DAVIDOFF:  Objection.  Vague. <br> MR. MEYERS:  And form. <br> A   I -- it's not something that was disclosed very often, but my understanding at that time would have been something five, 10 percent. <br> Q   So would you consider an exception rate of 20 percent or higher to be low? |
| | A   No. <br> Q   So an exception rate of 20 percent or higher would be inconsistent with keeping exceptions low in your understanding? <br> A   Yes. |
| 478.   Countrywide's representations caused observers to believe its held-for-investment portfolio was of higher credit quality than its overall originations. | Bendell Decl., ¶7, Ex. 299 (5/10/06 Morgan Stanley analyst report at 33)) ("The bank helps the company 'cherry pick' some of the highest-quality loans from among its originations to hold for investment, while selling the rest to the capital markets.") <br> * * * <br> McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 46:2-46:9) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q   And did you have any understanding as to how the loans held for investment at Countrywide compared to the loans that were sold by Countrywide?<br><br>MR. MEYERS:  Object to form.<br><br>A   Yes.  My understanding, or my recollection is that management characterized the loans that were held for investment as higher quality than the overall origination pipeline.<br><br>*** |
| 479.   Loan level data was not always made available for all of the securitizations sponsored by Countrywide. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 39:8-40:23)<br><br>Q   And I think one of the other items that you mentioned looking at was securitization data.  What's that?<br><br>A   Pools of mortgage assets that are sold, or grouped and sold into a trust to issue bonds to investors.  Those bonds generate, for the benefit of the bondholder, monthly reports of the performance of the pool of loans.<br><br>Q   And why did you review that securitization data in connection with your coverage of Countrywide?<br><br>A   To try to get a better understanding |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | of the credit performance and profile. |
| | Q   And in your understanding, does Countrywide, or did Countrywide bear the credit risk on the loans that were in these pools that you were looking at? |
| | A   Not always. |
| | Q   And did -- so then how was the information in those securitizations relevant to your analysis of Countrywide the company? |
| | A   It was just a source of information that, while not perfect, provided a lot of insight. |
| | Q   Do you recall approximately how many of those securitization pools you looked at? |
| | A   My focus was more on the monoline subprime lenders we discussed earlier.  For some of those companies I looked at every single pool. For Countrywide there was a lot more -- it was really impossible to look at all of them, there were so many transactions, but I looked at a lot of data. |
| | Q   And would each one of the pools contain hundreds of loans, thousands of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | loans? |
| | A   Usually hundreds. |
| | Q   And was the data you were looking at loan level data as to each loan in the pool? |
| | A   Sometimes we got loan level data. That would come out only at the time of the prospectus usually though, so the initial offering of the mortgage securities, or mortgage-backed |
| | securities. |
| | Q   So you're talking about something other than the prospectuses? |
| | A   No, I'm talking the prospectuses. |
| 480.   Countrywide engaged in so many securitization transactions involving so many loans, that it was "really impossible to look at them all." | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 39:8-40:23) |
| | Q   And I think one of the other items that you mentioned looking at was securitization data.  What's that? |
| | A   Pools of mortgage assets that are sold, or grouped and sold into a trust to issue bonds to investors.  Those bonds generate, for the benefit of the bondholder, monthly reports of the performance of the pool of loans. |
| | Q   And why did you review that securitization data in connection with |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | your coverage of Countrywide? |
|  | A    To try to get a better understanding of the credit performance and profile. |
|  | Q    And in your understanding, does Countrywide, or did Countrywide bear the credit risk on the loans that were in these pools that you were looking at? |
|  | A    Not always. |
|  | Q    And did -- so then how was the information in those securitizations |
|  | relevant to your analysis of Countrywide the company? |
|  | A    It was just a source of information that, while not perfect, provided a lot of insight. |
|  | Q    Do you recall approximately how many of those securitization pools you looked at? |
|  | A    My focus was more on the monoline subprime lenders we discussed earlier.  For some of those companies I looked at every single pool.  For Countrywide there was a lot more -- it was really impossible to look at all of them, there were so many transactions, but I looked at a lot of data. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q    And would each one of the pools contain hundreds of loans, thousands of loans?<br>A    Usually hundreds.<br>Q    And was the data you were looking at loan level data as to each loan in the pool?<br>A    Sometimes we got loan level data. That would come out only at the time of the prospectus usually though, so the |
| | initial offering of the mortgage securities, or mortgage-backed securities.<br>Q    So you're talking about something other than the prospectuses?<br>A    No, I'm talking the prospectuses. |
| 481.   Even the defendants, who were employed full time by Countrywide, did not read all of the prospectus supplements issued in connection with Countrywide's securitizations. | Bendell Decl., ¶19, Ex. 311 (Sieracki Response to RFA No. 40);<br>Bendell Decl., ¶20, Ex. 312 (Mozilo Response to RFA No. 40);<br>Bendell Decl., ¶18, Ex. 310 (Sambol Response to RFA No. 40) |
| 482.   When asked to determine the number of loans referenced in a particular prospectus supplement had two particular risk characteristics (FICO scores of 600 or lower and | Dean Decl., ¶ 188, Ex. 181 (Depo. Ex. 217)<br>McCoy Decl., ¶49, Ex. 239 (Bartlett Dep. Tran. 366:20-371:19)<br>MR. BENDELL: |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| origination based on stated income), Countrywide's former Chief Investment Officer, was unable to do so. | Q.  So -- well, I don't think I found a way around it, so I'm going to go back to the original question.  So turning back to the example that's in Exhibit 217, can you determine from the information that's contained in Exhibit 217 how many of the approximately 804 loans with FICO scores of 600 or lower were also originated based on stated income? |
|  | A.  Give me a moment to -- give me a long moment to read this. MR. BENDELL:  If we want to, we can go off the record while he -- while he reads it, so we are not using up tape.  I will leave it up to whether there is a consensus or not. MR. DROOYAN:  Let's stay on the tape. MR. LINDENBAUM:  The document speaks for itself.  Objection. MS. WEISS:  I don't mind going off the tape.  Let's make a note of -- I don't mind going off the tape, if you want to save tape. MR. BENDELL:  I think Mr. Drooyan said he wanted to stay on. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. DROOYAN:  No, let's leave it on. |
| | MR. TU:  I think we should stay on the record. |
| | THE WITNESS:  Can I borrow a pen? Or maybe I can dog ear. |
| | MR. BENDELL:  If you are going to write on it, maybe we can get you a copy. |
| | THE WITNESS:  Or maybe I can get a pad of paper. |
| | MR. DROOYAN:  Don't write on it.  If you want to flag a piece of paper, you can use that to flag the page. |
| | THE WITNESS:  Okay. |
| | MR. DROOYAN:  Don't write anything. |
| | THE WITNESS:  Okay. |
| | MR. LEFLER:  Put on the record an objection.  I'm not sure what it is.  But the deposition is supposed to be an exercise in learning facts from a witness.  It's not supposed to be an exercise in asking a witness to perform analysis.  And I object on that basis.  I think it's silly for all of us to be sitting here while the witness tries to go through a several-hundred-page document and analyze it.  I don't think |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | it's a proper question. |
| | MS. WEISS:  While he is doing that, I will be back in a little while. |
| | MR. DROOYAN:  So let me ask a couple of questions and see if we can expedite this.  Mr. Bartlett, without reviewing this entire document line by line, as you sit here today, do you have any  recollection of any way of determining whether the loans with |
| | FICO scores below 600 also have full documentation or stated income? |
| | THE WITNESS:  I don't know without looking at it.  There's a couple things that I have noticed so far, but... |
| | MR. DROOYAN:  As you sit here today, do you recall whether there is any way of making that determination in this document itself? |
| | THE WITNESS:  I don't know. |
| | MR. DROOYAN:  Why don't you identify at least the things that you found that may be relevant to your analysis? |
| | THE WITNESS:  The only thing is, I am going through the prospectus supplement.  There is a description on |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | page S26 of the mortgage pool, and there is the -- it's an incorporation of a form 8K by reference that will be filed after the closing date.  I don't know what is exactly on that 8K, so I would have to look at that 8K to determine it.  One thing I noticed, as you go back -- It doesn't directly answer, I don't think, the question as posed to me at this point, but – I would have to review the document |
| | to find out more.  -- is on page -- on page A6 in the documentation program section there is a – under the documentation program line, stated income, there is a column that describes the weighted average credit bureau score of that particular group of loans.  Those are the two things I have seen so far.  But I would have to keep looking to understand if there is some way to directly answer the question.  MR. DROOYAN:  As far as you can recall right now, you don't remember any way of doing that; is that correct?  THE WITNESS:  That's correct.  MR. DROOYAN:  It's up to you, Mr. Bendell, but we are going to cut this off |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | at noon, so it's up to you.<br><br>MR. BENDELL:  I believe I am entitled to an answer to my question.<br><br>MR. DROOYAN:  Okay.  If he can finish it by noon, we will do it, but if not, we are going to break.  We have gone three hours over the seven-hour limit.  We have accommodated all of the parties.  Mr. Bartlett has been |
| | deposed three other times in this matter. And I don't see the point in having him go through a line-by-line analysis to do something that you all can do yourselves.<br><br>MR. LEFLER:  I will make a comment that he has been deposed three other times by the staff of the Commission, not the parties to the case.<br><br>MR. DROOYAN:  See if you can finish it by noon.  If not, we are going to be finished.<br><br>MS. WEISS:  I would like to have a few follow-up questions to staff's questions, which I can limit to 10 minutes.<br><br>MR. DROOYAN:  I'm just going to instruct Mr. Bartlett not to answer the question.  If you want to make a motion |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | to compel, you can.  But it's just burdensome harassment to have him try to go through a document that is several hundred pages to try to answer a question based upon an analysis that the SEC is capable of doing, as are all of the individual defendants.  And I think this is an improper question for the witness.  So let's move on. |
| | MR. BENDELL:  Q.  Mr. Bartlett, are you going to follow your attorney's instruction and refuse to answer the question?<br>A.  I believe so. |
| 483.   Investors could not determine how many loans in a given securitization pool had more than one credit risk factor associated with them based upon the aggregate information supplied in the Prospectus Supplements. | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 198:10-199:17)<br>Bendell Decl., ¶10, Ex. 302 (Excerpts of CWMBS Prospectus Supplement)<br>Q.  There are several tables in an Annex A to Exhibit 1061.  They start at page A-1 and continue through A-56.  Do any of those tables contain loan level details or are they just aggregate tables?<br>A.  These are aggregate tables.<br>* * *<br>Q.  Is there any way, using the appendix or the Annex A to Exhibit 1061, to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | determine how many loans in this pool had more than one credit risk factor associated with them? [Objection Omitted] THE WITNESS:  No. |
| 484.   Information about the credit characteristics of loans securitized by Countrywide does not provide information about the credit characteristics of loans held for investment. | McCoy Decl., ¶52, Ex. 242 (Brendler Dep. Tran. 43:15-43:19) Q    Now, the information in the securitization prospectuses, did that provide you any information about banks -- sorry, about the loans held on the portfolio at Countrywide's bank? A    No, not directly. McCoy Decl., ¶72, Ex. 262 (Liu Dep. Tran. 134:4-18) Q.  Okay.  What else did it do with loans besides securitize them?  If you know. A.  I can't give you percentages, but it – it held loans on portfolio.  It sold loans to GSEs government-sponsored enterprises.  It sold loans into government, like Ginnie Mae -- Ginnie Mae, VA, HUD, FHA securities.  It sold loans to whole loan investors as opposed to a securitization where there's multiple investors. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  And did the prospectus supplements that you've -- sorry, that your group reviewed in the nonagency RMBS business, did they provide any information about the loans that were |
| | held at Countrywide on portfolio? A.  I don't believe they did. |
| 485.   Even those prospectus supplements cited by Defendants, which indicated that an unspecified "significant number" of loans were underwritten based on exceptions to guidelines, failed to quantify the frequency of those exceptions. | *E.g.*, Lefler Decl., Ex. 65, at 1065 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-12 (Form 424B5, filed June 29, 2006) at S-15); *id.*, Ex. 66, at 1326 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-3 (Form 424B5, filed Feb. 23, 2006) at S-17). |
| 486.   To the extent that the prospectus supplements disclosed that some of the loans in that particular securitization were underwritten based on exceptions to guidelines, they represented that such exceptions were made on a "case by case basis" and based upon "compensating factors." | Lefler Decl. ¶ 66, Ex. 65, at 1065 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-12 (Form 424B5, filed June 29, 2006) at S-15); *See also, id.* ¶ 64,  Ex. 63, at 1041 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-2 (Form 424B5, filed Feb. 23, 2006) at S-15); *See also, id.* ¶ 67,  Ex. 66, at 1326 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-3 (Form 424B5, filed Feb. 23, 2006) at S-17); |
| | *See also, id.* ¶ 68, Ex. 67, at 1328 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-4 (Form 424B5, filed Feb. 23, 2006) at S-15); *See also, id.* ¶ 69, Ex. 68, at 1330 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-5 (Form 424B5, filed Feb. 23, 2006) at S-15); *See also, id.* ¶ 70, Ex. 69, at 1332 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-6 (Form 424B5, filed Feb. 23, 2006) at S-15); *See also, id.* ¶ 71, Ex. 70, at 1334 (Prospectus Supplement, CWABS Asset-Backed Certificates, Series 2006-7 (Form 424B5, filed June 26, 2006) at S-15); |
| | Dean Decl., ¶ 193, Ex. 191 (Prospectus Supplement, CWMBS, Inc., filed Dec. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | 12, 2006); Dean Decl., ¶ 194, Ex. 192 (Prospectus Supplement, CWMBS, Inc., filed Mar. 3, 2006); Dean Decl., ¶ 195, Ex. 193 (Prospectus Supplement, CWALT, Inc., filed Oct. 3, 2005). |
| 487.   Prospectus supplements containing loans underwritten in nontraditional manners, such as based on reduced documentation, did not disclose that Countrywide expected such loans in the pool to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner. | Dean Decl., ¶ 193, Ex. 191 (Prospectus Supplement, CWMBS, Inc., filed Dec. 12, 2006); Dean Decl., ¶ 194, Ex. 192 (Prospectus Supplement, CWMBS, Inc., filed Mar. 3, 2006); Dean Decl., ¶ 195, Ex. 193 (Prospectus Supplement, CWALT, Inc., filed Oct. 3, 2005). |
| 488.   Prospectus supplements containing loans underwritten based on exceptions to underwriting guidelines did not disclose information regarding the expected performance of exception loans relative to non-exception loans. | Dean Decl., ¶ 193, Ex. 191 (Prospectus Supplement, CWMBS, Inc., filed Dec. 12, 2006); Dean Decl., ¶ 194, Ex. 192 (Prospectus Supplement, CWMBS, Inc., filed Mar. 3, 2006); Dean Decl., ¶ 195, Ex. 193 (Prospectus |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Supplement, CWALT, Inc., filed Oct. 3, 2005). |
| 489.   Mozilo's financial advisors had been suggesting that he diversify his wealth away from his Countrywide holdings since 1998. | McCoy Decl., ¶54, Ex. 244 (Conners Inv. Test. 36:3-17))<br><br>Q   And do you have a sense, as you sit here today, of  when would be the earliest time a letter was sent to Mr. Mozilo indicating that he needed to diversify his portfolio?<br><br>A   I would be willing to bet on Mr. O'Neill having a letter there in 1999.<br><br>Q   Okay.<br><br>A   And if it wasn't a letter, it was a communication he had with Mr. Mozilo in 1999.<br><br>Q   Have you ever personally told Mr. Mozilo that he needed to reduce his CFC holdings?<br><br>A   Absolutely, yes.<br><br>Q   Do you recall when the earliest point in time that you did that was?<br><br>A   Probably December 2003. |
| 490.   Mozilo repeatedly rejected this advice, insisting that he would not sell any of his Countrywide holdings other than expiring options. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 61:1-22, 62:23-63-7)<br><br>Q   And you had a conversation with John Connors.  Was that by phone or e-mail? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A   My recollection is he came to the office with this sheet of paper |
| | because I said I never paid attention to that aspect of it because I was focusing on making sure the company was okay. He came to me with a sheet of paper giving me all of these options I had over the years.  This is 10 years later so I had not thought about it.  He said these are expiring now.  These are expiring then and you have to do something.  He came with a report that listed out all my grants, the amount of those grants, the strike price of those grants and the expiration date, when they became vested and the expiration date of the option.<br>Q   So you met with him face to face and he showed you that report.  This would have been some time in 2002, right?<br>A   I believe so.<br>Q   Okay.  At that time did you have a discussion with Mr. Connors about instituting a single 10(b)(5)(1) plan that was just intended to take care of the options that were about to expire? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A     That's correct. |
| | * * * |
| | Q     So the idea was to set up a 10(b)(5)(1) that would liquidate all of your options except for 7,000,000 shares? |
| | A     No, I apologize for that.  To answer your question, at the time we did that my only focus was on the expiring options. It wasn't until subsequent meetings that this began to evolve into a much more global planning process. |
| | Q     Do you recall when you arrived at the decision that what you wanted to do was get to that 7,000,000 shares left over? |
| | A     It was in February of '07. |
| | * * * |
| | McCoy Decl., ¶ 54, Ex. 244 (Conners Inv. Test. 37:11-21) |
| | Q     Do you recall what Mr. Mozilo's reaction was to your earliest advice to him that he should reduce his holdings of CFC? |
| | A     I do. |
| | Q     What was it? |
| | A     I heard the speech.  And the speech |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | was, I started as the son of a butcher and I built this from scratch, starting in Virginia Beach with another partner named Dave Loeb, and this is my baby and I believe this has phenomenal opportunity and I'm managing this part of the assets, why don't you worry about managing the other part. |
| 491.   The trading plan Mozilo entered into in 2002 was designed to implement only sales associated with expiring options. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 61: 1-22)<br>Q    And you had a conversation with John Connors.  Was that by phone or e-mail?<br>A    My recollection is he came to the office with this sheet of paper because I said I never paid attention to that aspect of it because I was focusing on making sure the company was okay. He came to me with a sheet of paper giving me all of these options I had over the years. This is 10 years later so I had not thought about it.  He said these are |
| | expiring now. These are expiring then and you have to do something.  He came with a report that listed out all my grants, the amount of those grants, the strike price of those grants and the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | expiration date, when they became vested and the expiration date of the option.<br><br>Q    So you met with him face to face and he showed you that report.  This would have been some time in 2002, right?<br><br>A    I believe so.<br><br>Q    Okay.  At that time did you have a discussion with Mr. Connors about instituting a single 10(b)(5)(1) plan that was just intended to take care of the options that were about to expire?<br><br>A    That's correct. |
| 492.   The trading plan Mozilo entered into in 2004 was designed to implement only sales associated with expiring options. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 67:9 – 69:6)<br><br>Q    Is this, in fact, your December 29, 2004 10(b)(5)(1) sales plan?<br><br>A    I believe it is.  It looks like it.<br><br>Q    Now this is a plan that was set up for you in your capacity as an individual, correct? |
| | A    Correct.<br><br>Q    You do have some other sales plans that are actually in the names of a trust or foundation, correct?<br><br>A    What's this in the name of? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q   If you look at the top -- |
| | A   Yeah, because the -- it's based on the account.  I have a Mozilo family trust is where all the assets are now in Countrywide.  I believe that trust was in effect since 1988.  So I think what happened is when I opened the account at Bear Stearns, I opened it up in my name. That's probably what it was. Then we put everything into the Mozilo family trust account.  Let me give you some background here. |
| | Q   Sure |
| | A   My account was at JP Morgan Chase. That's where I did the first 10(b)(5)(1).  The individual who was handling my account moved over to Bear Stearns and asked if he could continue with this plan.  So we ultimately got everybody to agree to move it over to Bear Stearns. I think when they opened the account they just |
| | did it in a simple way and put Angelo Mozilo. It had no legal meaning or anything else.  Eventually, everything -- this account was then merged into a new account called Mozilo family trust May |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | 12, 1988.<br>Q   Do you know when that happened, when the accounts were merged?<br>A   I don't know.<br>Q   Would it have been some time after 2004?<br>A   Some time after December 2004.<br>Q   Okay.  Now this plan calls for selling a total of 5,428,964 shares of Countrywide stock, correct?<br>A   Of exercising, right, those options at that exercised price and selling the shares.<br>Q   Did you have any role in drafting this plan?<br>A   No.<br>Q   Can you tell me why you entered into this particular sales plan?<br>A   I think the document itself is explanatory.  If you look at the expiration date of these options, they had to be sold before June 30, 2006 and |
| | 7/11/06 they expired and that was the end of it.  Again, to try to create a sales plan where a lot of stock is being dumped on the market at one time that could create perceptions just weren't |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | true, that it was best that they do it over a period of time. That's why it was done this way. |
| 493.   Mozilo has testified under oath that his December 2006 trading plan was designed to implement only sales associated with expiring options. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 86:18 – 87:1)<br>Q   So at some point in December of '06 you know that you're going to get some additional shares that you're going to invest over time through the end of 2009. Is that what prompted you to enter into the December 12, 2006 plan or was that a function --<br>A   No.<br>Q   Of just options --<br>A   I didn't know December 12th.  It was just options expiring. |
| | Q   Did you understand that you were a covered person under the terms of the Countrywide insider trading policy in September of 2006?<br>A   Yes. |
| 494.   Mozilo understood that it was not permissible for him to enter into a trading plan when he possessed material non-public information. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 51:10-16)<br>Q   Had you in fact had 10(b)(5)(1) trading arrangements at Countrywide prior to September 2006?<br>A   Started in March of 2002. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q   Did you understand that it was not permissible to enter into a 10(b)(5)(1) trading plan when you were in possession of material non-public information?<br>A   Yes, I did. |
| 495.   Mozilo was concerned that public disclosure of too many securities sales at one time would create an adverse perception in the marketplace. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 68:16-69:6)<br>Q   Okay.  Now this plan calls for selling a total of 5,428,964 shares of Countrywide stock, correct?<br>A   Of exercising, right, those options at that exercised price and selling the shares. |
| | Q   Did you have any role in drafting this plan?<br>A   No.<br>Q   Can you tell me why you entered into this particular sales plan?<br>A   I think the document itself is explanatory.  If you look at the expiration date of these options, they had to be sold before June 30, 2006 and 7/11/06 they expired and that was the end of it.  Again, to try to create a sales plan where a lot of stock is being dumped on the market at one time that |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | could create perceptions just weren't true, that it was best that they do it over a period of time. That's why it was done this way. |
| 496.   Mozilo's gross proceeds from his sales under the October 2006 February 2007 plans and amendment were $188,881,861 with proceeds net of strike price over $140 million. | Bendell Decl., ¶8, Ex. 300 (Hess Export Report, Attachment VI-B). |
| 497.   Mozilo's sales yielded him inflated profits of approximately $74 million. | Bendell Decl., ¶8, Ex. 300 (Hess Expert Report ¶ 74). |
| 498.   Mozilo publicly represented that difficult market and macroeconomic conditions would redound to the benefit of Countrywide. | McCoy Decl., ¶¶ 4, 40, Exs. 194, 229 (Hesser Depo. Ex. 5 at pp. 4, 11) |
| 499.   By September 1, 2004 Mozilo was concerned about the clear deterioration in credit quality of loans being originated at Countrywide. | McCoy Decl., ¶ 82, Ex. 272 (Mozilo Class Action Dep. Tran. 98:20-99:18) Q  Okay And looking at the first sentence you wrote:  "As I look at production trends not only at Countrywide, but also with other lenders, there is a clear deterioration in credit quality of loans being originated over the past several years."  Just |
| | looking at that one sentence, sir, did you believe that was a true statement at the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | time you made that, you said that?<br><br>A  I want to make a couple things clear. One is I -- my style is to speak in very strong terms.  You'll see this throughout any e-mails I wrote.  Secondly, to me the word "deterioration" was comparable to expansion of guidelines. Guidelines had been substantially expanded throughout the industry from the time I started 55 years ago, and there was some substantial changes in guidelines.<br><br>Q  Okay.  And with that explanation, sir, did you believe that this sentence was true at the time that you wrote it?<br><br>A  I think there was expansion in guidelines, yes. |
| 500.   By July 26, 2005 Mozilo was concerned about the negative amortization component of pay-option loans. | Dean Decl., ¶ 42, Ex. 40 (Class Action Ex. 1287); McCoy Decl., ¶82, Ex. 272 (Mozilo Class Action Dep. Tran. 112:1-7)<br><br>(The document referred to was marked by the reporter as Exhibit 1287 for identification and is attached hereto.) |
| | BY MR. BERNSTEIN:<br><br>Q. Is this an e-mail from you to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Mr.Sambol with a copy to Mr. Kurland of July 26, 2005? <br> A. Yes. |
| 501.   Mozilo's concerns about the risks of pay-option loans endured over the years. | McCoy Decl., ¶82, Ex. 272 (Mozilo Class Action Dep. Tran. 115:7-13) <br> Q. Over the years, did you continue to have concerns about the negative amortization component of pay-option loans? <br> MR. SIEGEL: Asked and answered. <br> THE WITNESS: Generally speaking, I have -- that was my job, to be concerned and worried about every loan we make. |
| 502.   On April 4, 2006, Mozilo received an e-mail informing him that 72% of Pay-Option customers chose to make the minimum payment in February 2006.  Mozilo responded to that e-mail, stating, "this is important data that could portend serious problems with this product" and "since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies.  We must limit this product to high ficos | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 313:3–314:18) <br> Dean Decl., ¶23, Ex. 21 (SEC Inv. Test. Ex. 532) <br> Q   And as of April  4th, 2006, did you conclude that a sizable  number of borrowers would  not be able  to handle payment shock? <br> A    I  think what I  was -- what I  was really asking here -- first of all, it was my responsibility -- I felt it was my responsibility to the management team was to alert them as to dangers, potential dangers  in any product we |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| otherwise we would face both financial and regulatory consequences." | have.  Payment shock was inherent in most of the products we had.   The one-year, three -- most of the products we had were arm loans.   All arm loans had the payment shock component to them, a reset component to them.  And I think the only difference in this type of loan was  that the start rate was lower  than would be in a normal three-year arm or five-year arm so that the potential for  -- |
| | you have  to get 15  percent, so again, depending upon interest rates, that could be three years out, four years out.  And just to make sure that our  people are aware that there is an issue here -- because I would have not known,  no way  in the  beginning of  putting this product in, as  to how many  people would opt for the minimum payment.  No idea.  As it became apparent in 2006, April 2006, that more and more were opting for the minimum payment, bells went off.   And so I wanted to alert my management team to start making sure several things were done.  Now, I think the warning issues was  done -- I think it was done before April of '06, I'm not |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | sure.  But we did -- I sent out -- |
| | that's  why I went  to Steve Bailey in servicing, to  begin the process  of alerting  the borrowers as  to the consequences  of their  actions,  and encourage them to refinance.  And we sent out special letters to these  people, or notices  of some kind  either in their payment coupon  or whatever, to encourage them to refinance out of the product  if they didn't plan to get rid of it, rid of the house in a few years.  Now, it so happened that  a lot of people bought these houses, it appears to me, at least, now, that used this product  to get into a  house and within a couple years get out  of it  and make a  lot of  money, because values were  continuing to  go up.   And they saw  it as  an opportunity to get in -- so get in and get out. |
| 503.   In mid-May 2006, Mozilo called a meeting of Executive Managing Directors "to talk over his concerns regarding PayOptions." | McCoy Decl., ¶ 7, Ex. 197 (Rossi Depo. Ex. 13) |
| 504.   On May 18, 2006, Mozilo sent an e-mail to Sambol and Sieracki regarding the Pay-Option loans held for | Dean Decl., ¶ 24, Ex. 22 (SEC Inv. Test. Ex. 533) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| investment at Countrywide Bank.  He argued that "the Bank faces potential unexpected losses because higher [interest] rates will cause the loans to reset much earlier than anticipated and as a result causing mortgagors to default due to the substantial increase in their payments."  Mozilo described behavior of payoptions as "untested." | |
| 505.   On May 19, 2006, Mozilo sent another e-mail to Sambol and Sieracki concluding that Pay-Option loans continue to present a long-term problem "unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen." | Dean Decl., ¶ 24, Ex. 22 (SEC Inv. Test. Ex. 533) |
| 506.   On May 31, 2006, Mozilo falsely assured investors at the Sanford Bernstein Conference that despite recent scrutiny of **Pay-Option loans**, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for for consumers."  Mozilo added that the "performance profile of this product is well-understood because of its 20-year | Dean Decl., ¶172, Ex. 170 (Depo. Ex. 525) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| history, which includes "stress tests" in very difficult environments.<br><br>Mozilo also told the audience that despite recent scrutiny of Pay-Option loans, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers." | |
| 507.   Despite his statements at the May 31, 2006 Sanford Bernstein Conference, Mozilo had concluded that the World Savings experience provided him *no comfort* regarding the future performance of the Pay-Option loan portfolio. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 304:21-305:14)<br>Q   Did you take any comfort from the experience that World Savings had had with pay options when deciding whether or not Countrywide should  offer the product?<br>A   I did.  I felt like it was a 30-year tested product and that this was not something that  nobody ever before and we were inventing a product.  Is that your question?<br>Q   Yes.<br>A    Yeah, it was a great company, because we never invented a product. |
| | Every product we ever -- the only product we ever had on our menu of all the hundreds of products we had over |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the 40 years were a response to the consumer.   We never invented a product, we only took existing products that were out there and tried to tailer it to our underwriting system and to our -- you know, our culture, the way we operate.  But yeah, I did.  But the fact is I think at the end of the day that this is such a debacle that Wachovia's experience with all loans, forget about pay options, has been not good.  <div align="center">* * *</div> McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 326:10-21) Q    Okay.  And so at this point in  time in May of 2006, does the fact that World Savings had success with the pay option arms give  you any comfort with respect to the fact that it's untested at Countrywide? A    No.  It was unrelated because  I think the decision was  made probably in 2004, 2005 to get into the product, and that's when World  Savings' |
| | protocol was introduced to me as to how they  did it.  I was not really familiar with it, and as I said, there was |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | sort of an outlier in terms of the product but they did a lot of it.  So by that time, the World Savings issue was over with.  I mean, the first time they were sold, they were gone by that time. |
| 508.   On June 1, 2006, Mozilo wrote an e-mail to Sambol because he had become aware that the Pay-Option portfolio was largely underwritten on a reduced documentation basis, and that there was evidence that borrowers were lying about their income in the application process.  Mozilo concluded: (1) in an environment of rising interest rates, borrowers would reach the 115% negative amortization cap sooner than they expected; (2) borrowers would suffer payment shock because of the substantially higher payments upon reset, particularly those with FICO scores below 700 who "are going to experience a payment shock which is going to be difficult if not impossible for them to manage"; and (3) | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 340:14-342:13); Dean Dec. ¶19, Ex. 17 (SEC Inv. Test. Ex. 214)<br><br>Q    In the first paragraph, you state, "In a discussion with both Stan and Dave, it came to my attention that the majority of pay options being originated by us, both wholesale and retail, are based upon stated income.  There's also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  To your knowledge, was the discussion you had with Mr. Kurland and Mr. Sambol the first time that you were made aware that the majority of the pay options being originated by Countrywide were based upon stated income? |
| "we know or can reliably predict what's going to happen in the next couple of years" so the company must | A    Yes, I was -- yes, that's what prompted this E-mail.<br>Q    Did you read that as -- were you |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| act quickly to address these issues. | concerned about that? |
| | A   Yes. |
| | Q    Why were you concerned about it? |
| | A    Well, stated income  was a product used for many years for self-employed people who couldn't verify, or day laborers where it was impossible to get W-2s or the ordinary type  of information you get  to verify income. And when  I said  that  -- and  I used the  word "majority."  I assume that's what they told me, that many or the majority of loans coming in as pay options were stated income.  It was a concern to me. |
| | Q    Why was it a concern? |
| | A    Because it didn't sound right to me as to -- why would they do it on stated income?   Why wouldn't they go through the normal documentation process? |
| | Q    Did any credit concerns come to mind based upon the fact that majority of these loans were based upon |
| | stated income? |
| | A    That's the concern. |
| | Q     The use of stated income is a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | credit concern? |
| | A   Well, because you don't know for sure what the income is.  It could be the right income, the stated income could be correct or it could not be correct.  not verified.  And so the extent that you have less documentation to verify income, there's a greater risk. |
| | Q   Risk of what? |
| | A   Risk of default. |
| | Q   And do you know why that is? |
| | A   There's a risk of default, but not certainty of default, so it's -- because if you're -- if someone tells me they're making  X and I rely upon  it versus me going out to  the employer and verifying that  they're making X,  there's a difference, qualitative difference in that information.   Therefore, the risk is there.  I'm not saying that the end result would be worse, but the initial risk is higher, it seems to me. |
| 509.   On July 10, 2006, upon reviewing data on an internal flash report, Mozilo sent an e-mail in which he observed that "it appears to me that the loans (payoptions) with neg[ative] | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 395:3-20); Dean Decl., ¶17, Ex. 15 (SEC Inv. Test. Ex. 45)<br>Q   I hand you what's been marked as Government Exhibit 45.  It's a series of |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| am[ortization] have a higher delinquency rate than our standard book of business.  If that is the case, this is quite alarming because of the very low payment requirements of a neg am loan."  In addition, Mozilo learned that, from September 2005 through June 2006, the percentage of Pay-Option borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%.  This was the key metric by which Mozilo measured the performance of the Pay-Option portfolio. | e-mails Bates-numbered CFC 2007B, as in boy, 277227 through 277232. (SEC Exhibit 45 was referred to.) BY MR. PUATHASNANON: Q    Take your time reviewing the document, and when you're ready, please let me know, Mr. Mozilo. A    Okay. Q    First of all, Mr. Mozilo, what is a flash report? A    It's a -- I believe a monthly record of delinquencies -- delinquency trends. Q    Did you regularly receive flash reports? A    I did. Q    And that would be for the different products offered by Countrywide? A    As I recall, the flash report included all products. |
| 510.   On August 16, 2006, Mozilo received an e-mail from board member Robert Donato, asking whether the company anticipated any significant problems with the Pay-Option portfolio.  Mozilo responded that rising interest rates would cause the loans to reset much faster than the borrowers | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 448:7-20);Dean Decl., ¶27, Ex. 25 (Inv. Test. Ex. 539) Q    I'm handing you what was marked as Government Exhibit 539.  It's a single page, Bates-numbered CFC2007A362338. A    All right. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| expected with accompanying payment shock.  The only solution, Mozilo told Donato, was to refinance the loans before reset, but this would be difficult, in light of decreasing home values and rising interest rates.  Only unlikely events, such as a dramatic rise in home values or a dramatic drop in interest rates, would alleviate future payment shock. | Q    Who's e-mail address is capbob12 -- <br> A    Bob Donatto. <br> Q    Bob Donatto who was a member of the board? <br> A    That's correct. <br> MS. DEAN:  You know, I think you might have cut Mr. Puathasnanon off.  So just for the record, the e-mail address we're referring to is capbob1235@aol.com. <br> THE WITNESS:  1225. <br> MS. DEAN:  Okay.  But that is Mr. Donatto's e-mail. <br> THE WITNESS:  That's correct. |
| 511.   On September 13, 2006, Mozilo told investors at a fixed income investor day: "[t]o help protect our bond holder customers, **we engage in prudent underwriting guidelines"** **with respect to Pay-Option loans.** | McCoy Decl., ¶43, Ex. 41 (CFC2007826813- 826885 at 826829) |
| 512.   On September 25, 2006, Mozilo met with Sambol to discuss the pay-option loan portfolio. | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 361:19-362:16); Dean Decl., ¶20, Ex. 18 (Inv. Test. Ex. 221). <br> Q    Let me show you Exhibit 221.  Exhibit 221 is a series of E-mails,  one from yourself to Mr. Sambol on September 26th, '06, and then there's an |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | E-mail from Mr. McMurray to you on September 26th, '06.  Can you make sure that doesn't have any writing on it?  (SEC Exhibit 221 was referred BY MR. WYNN: Q    Okay.  Mr. Mozilo, if you could start with the second E-mail on the second page, I think that's what starts the discussion. A    This is September of '07? Q    Yeah.  At the bottom of the first page, there's a September -- MR. BRENNER:  September of '06. BY MR. WYNN: Q    September 26th, '06 E-mail from yourself to Mr. Sambol at 7:15 a.m. A    Right. Q    So do you recall sending this E-mail to Mr. Sambol on September 26th, '06? |
| | A    I don't recall sending it, but obviously I did because it's here. |
| 513.   On September 26, 2006, Mozilo sent an e-mail to Sambol and Sieracki that stated: *[w]e have no way, with any reasonable certainty, to assess the* | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 361:19-362:16); Dean Decl., ¶20, Ex. 18 (Inv. Test. Ex. 221). Q    Let me show you Exhibit 221. Exhibit 221 is a series of E-mails,  one |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| *real risk of holding [Pay-Option] loans on our balance sheet.* **The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.** *In my judgement, as a long time lender, I would always trade off fico for equity. The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.* (emphasis added) | from yourself to Mr. Sambol on September 26th, '06, and then there's an E-mail from Mr. McMurray to you on September 26th, '06.  Can you make sure that doesn't have any writing on it? (SEC Exhibit 221 was referred<br>BY MR. WYNN:<br>Q    Okay.  Mr. Mozilo, if you could start with the second E-mail on the second page, I think that's what starts the discussion.<br>A    This is September of '07?<br>Q    Yeah.  At the bottom of the first page, there's a September --<br>MR. BRENNER:  September of '06.<br>BY MR. WYNN: |
| Mozilo added that "pay options are currently mispriced in the secondary market and that spread | Q    September 26th, '06 E-mail from yourself to Mr. Sambol at 7:15 a.m.<br>A    Right.<br>Q    So do you recall sending this E- |
| could disappear quickly if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]."  As a result, Mozilo proposed that the Bank | mail to Mr. Sambol on September 26th, '06?<br>A    I don't recall sending it, but obviously I did because it's here. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port[folio]." | |
| and 16, 2006 and 22,999 shares to be sold on November 21, 2006. | |
| 514.   On December 7, 2006, Mozilo circulated a memorandum to all managing directors and the board of directors that analyzed subprime mortgages.  In the memorandum, Mozilo observed:<br><br>• Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV, and making interest only, stated income, and piggyback second loans available to subprime borrowers;<br><br>• Countrywide expected that subprime loans originated in | Dean Decl., ¶21, Ex. 19 (Inv. Test. Ex. 277) |
| 2006 (the "2006 Vintage") would be the worst performing | |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values; <br><br> • the percentage of 60- and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03% respectively), exceeded the percentages from each of the previous six years, and the company expected these percentages to rise because delinquencies climb as loans season; and <br><br> • 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%. | |
| 515.   On January 29, 2007, Mozilo instructed the president of Countrywide Bank to "to explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of Pay options) the bulk to the Pay options on the Bank's balance | McCoy Decl., ¶83, Ex. 273 (Mozilo Inv. Test. 595:15-596:4); Dean Decl., ¶33, Ex. 31 (SEC Inv. Test. Ex. 555). You wrote back to Mr. Garcia, and you wrote, quote, "I would like you, Eric and Ann, to explore with KPMG the potential for selling out, paren, (one |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| sheet and replace them with HELOCS." | time transaction because of the tarred reputation of pay options), closed paren, the bulk to the pay options on the bank's balance sheet and replace them with HELOCs," close quote.  Do you see that?<br><br>A   I do.<br><br>Q   Do you recall in or around January 29th, asking Mr. Garcia, Mr. Sieracki, and Ms. McCallion, to have a conversation with KPMG about whether or not it would be feasible for the bank to sell its portfolio of pay-option ARMs? |
|  | A   I don't recall what happened on January 29th, but it's clear here that on January 29th, I wrote this e-mail. |
| 516.   Mozilo never specifically consulted Susan Bow, the attorney who reviewed his trading plans, as to whether the information he had regarding particular loan products or credit risk constituted material non-public information. | Bendell Decl., ¶4, Ex. 296 (Bow Dep. Tran. 214:15 – 215:20):<br><br>Q.   When you say you asked Mr. Mozilo, do you mean you -- what was the question you asked him?<br><br>A.   Directly, that was part of the process, you know, do you have -- is there any reason that you know of that you shouldn't be trading securities, that type of thing. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  Okay.  And what was his answer? |
| | A.  No.  Or, you know, if there was something that he thought might be an issue, I can't think of anything that ever was, but he would raise it and we would discuss it. |
| | Q.  Can you recall if Mr. Mozilo ever asked you whether or not certain information constituted material and nonpublic information? |
| | A.  I know that we had a direct discussion about Stan Kurland's departure. |
| | Q.  Okay.  Anything else? |
| | A.  From time to time, if we were thinking about doing an acquisition or something like that, then there would be discussion, obviously.  But that was more generalized in terms of making sure anybody who was in the loop didn't trade. |
| | Q.  Okay. |
| | A.  We tried to err on the side of, you know, being conservative. |
| | Q.  Can you recall any other instances where Mr. Mozilo asked you whether or not certain information constituted |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | nonpublic and material information? |
|  | A.  No, not specifically. |
| 517.   In evaluating the existence of material non-public information, Susan Bow relied on Mozilo and Sieracki. | Bendell Decl., ¶4, Ex. 296 (Bow Dep. Tran. 213:24 – 214:14) <br> Q.  Okay.  And prior to approving any of Mr. Mozilo's plans, did you ever conduct any type of investigation to determine whether or not Mr. Mozilo |
|  | was in possession of material, nonpublic information? <br> A.  Yes. <br> Q.  Explain that investigation. <br> A.  I would ask him as part and parcel of that.  I would often talk to Eric Sieracki as to whether or not -- again, this usually was in a time period right after a filing had been made.  So, you know, there was a great deal of clarity in the marketplace.  So I was really, you know, doing an additional layer of check on top of that.  And I probably asked Sandy Samuels, my supervisor, people who might know of a concern. |
| 518.   Countrywide Securities maintained a website with information regarding MBS securitizations.  The website was intended for investors in | McCoy Decl., ¶84, Ex. 274 (Riordan Dep. Tran. 72:19-73:13) <br> Q.  Are you familiar with something called the "Lewtan website"? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Countrywide securitizations rather than equity investors, and was only accessible with a password, which had to be obtained from Countrywide Securities. | A.   Yes.<br><br>Q.   Can you tell us what that is?<br><br>A.   It was a website that the mortgage investor relations group used as a result of -- I think it was Reg AB to post deal-specific information.<br><br>Q.   What do you mean by "Reg AB"? |
|  | A.   I don't remember the exact information behind Reg AB, but it was an SEC regulation.  I really couldn't recall what.<br><br>Q.   Do you have a general understanding of what that was?<br><br>A.   I really can't recall.  I wasn't as familiar with that one.<br><br>Q.   And what did you mean in your answer when you referred to something called "deal-specific information"?<br><br>A.   So this would have been mortgage-backed securities.<br><br>* * *<br><br>McCoy Decl., ¶84, Ex. 274 (Riordan Dep. Tran. 75:2-76:7)<br><br>Q.   Now, if you go to the next page from the one we were reading from of the e-mail, which is -56211, did you -- do you see at the bottom of the text, it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | reads: "We would want to make sure that if an equity investor requested a password, that they weren't being denied by CSC if they weren't a trading customer"?  Do you see that? A.  Right. |
| | Q.  Do you understand or can you tell us what that means? THE WITNESS:  Countrywide Securities Corporation was a broker/dealer.  And they had analysts that wrote research reports, much like the sell-side analysts that I mentioned before that the equity investor relations department catered to.  And so because they sold their research to their institutional investors, they felt their data and their research was proprietary.  And so the Lewtan website was theoretically for their clients, and so we didn't control the access to the Lewtan website.  And so the process was the investor had to log in and request access, and then that e-mail went directly to them.  So this was meaning that if our equity investors were wanting access, but CSC was saying they |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | weren't one of their institutional investor clients. |
| | * * * |
| | McCoy Decl., ¶44, Ex. 234 (Adler Dep. Tran. 200: 5-7) |
| | Q.  Okay.  Did the investor website at Countrywide require a password to access? |
| | A.  Yes, I believe so. |
| | * * * |
| | McCoy Decl., ¶51, Ex. 241 (Bigelow Dep. Tran. 145:12-146:7) |
| | Q.  Earlier today you were asked about something called the Lewtan Web site. Do you recall that? |
| | A.  Yes. |
| | Q.  Did you, yourself, ever personally access the Web site? |
| | A.  I don't know.  I don't think I did. |
| | Q.  Do you know whether or not it was password protected? |
| | A.  It was password protected initially. I think it -- yeah, I -- I don't recall.  I think there was some changes to the rules over that over time, but I don't -- I'm not -- I never accessed it personally, so I'm not sure. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | Q.  Okay.  Fair enough. And I just want to make sure the record's clear, so you -- you believe it was password protected for at least some portion of the time but that may have changed.  Is that right? |
|  | A.  Yes, I think so. |
| 519.   Sieracki and Sambol attended a December 12, 2005 CCRC meeting, in which they were informed that the internal audit group had found that "controls over underwriting policy exceptions in CMD that do not sufficiently mitigate risk." | Dean Decl., ¶159, Ex. 157 (Aguilera Depo. Ex. 160 at 4999) |
| 520.   Sieracki attended a June 28, 2005 CCRC meeting in which he was provided with information regarding Countrywide's credit risk. | Bendell Decl., ¶19, Ex. 311 (Sieracki Response to RFA No. 45); Dean Decl., ¶68, Ex. 66 (Inv. Test. Ex. 618); McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 270:5-10, 270:20-271:9) Q   I have handed you what has been marked as Exhibit 618.  Exhibit 618 is a copy of a set of corporate credit risk committee minutes dated June 28, 2005, and it has been Bates stamped KPMG-XXTCC-000054519 through 54524. And I'll give you a moment to look this over. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A   Should I go to the end of the document?<br><br>* * *<br><br>Q   Mr. Sieracki, have you had a chance to look at Exhibit 618? |
| | A   Yes.<br>Q   First off, I wanted to ask if you recalled actually attending this particular meeting of the corporate credit risk committee?<br>A   I can't say that I do, but I see that I was marked in attendance.<br>Q   Okay.  And according to this particular legend, it indicates -- there's a V after your name which seems to indicate that you were a voting member of the committee?<br>A   That's correct.<br>Q   Did that change over time?<br>A   No.  Apparently, I was a voting member the entire time.  My frequency of attendance increased over time. |
| 521.   At the June 28, 2005 CCRC meeting, attended by Sieracki, the chief operating officer noted that Countrywide was taking on "too much" balance sheet risk, and had taken on | Dean Decl., ¶68, Ex. 66 (Inv. Test. Ex. 618 at 54521 – 54522) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| "unacceptable risk" from non-owner occupied loans made at 95% combined loan to value ratios, which were an exception to | |
| Countrywide's then-existing underwriting guidelines. | |
| 522.   At the June 28, 2005 CCRC meeting, Sieracki was also informed by Risk Management that non-conforming loan programs accounted for 40% of Countrywide's loan originations and that subprime production had tripled, rising from 4% to 14% of total production. | Dean Decl., ¶68, Ex. 66 (SEC Inv. Test. Ex. 618 at 54521) |
| 523.   At that same meeting, Risk Management reported to the committee on evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications, and the increasing credit risks associated with Pay-Option ARM loans, for example, noting that since interest rates had risen but the start rate for such loans had remained unchanged, more negative amortization was "guarantee[d] along with "bigger payment shock." | Dean Decl., ¶68, Ex. 66 (Inv. Test. Ex. 618) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| 524.   At the June 28, 2005, CCRC meeting, Sieracki was also informed that 1/3 of the loans referred from CLUES missed major guidelines and another 1/3 missed minor guidelines. Moreover, the presentation informed the committee that exceptions loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines. | Dean Decl., ¶68, Ex. 66 (Inv. Test. Ex. 618 at 54522) |
| 525.   Sieracki and Sambol attended a June 22, 2006 CCRC meeting during which they were informed that although the start rate on Pay Option ARM loans had been increased in April 2006 by 25 bps, over the last year fully indexed rates had risen by 280 basis points, thus "driving up potential pay shock and decreasing time to recast." The materials presented reflected that upon recast, borrowers with 30 year and 40 year POA loans could experience pay shocks of 113% and 157%, respectively. | Bendell Decl., ¶19, Ex. 311(Sieracki Response to RFA No. 58; Dean Decl., ¶176, Ex. 174 (6/22/06 CFCCRC Meeting Presentation); Dean Decl., ¶175, Ex. 173 (6/22/06 CFCCRC Meeting Minutes) |
| 526.   In materials distributed at a March 12, 2007 meeting of the credit risk committee attended Sieracki and | Bendell Decl., ¶19, Ex. 311 (Sieracki Response to RFA No. 65) Dean Decl., ¶134, Ex. 132 (Depo. Ex. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Sambol, Risk Management reported that 12% of the loans reviewed by Countrywide in its internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside of Countrywide's already wide underwriting guidelines.  An additional 14% of the loans audited had document deficiencies. | 397)<br>Dean Decl., ¶135, Ex. 133 (Depo. Ex. 398 at 42-43).<br><br>McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 84:18-84:22)<br>Q.  So, again, have you ever seen Exhibit 398 before?<br>A.  I believe that I have.  I was in attendance at the meeting so it's likely that I did. |
| 527.   On May 29, 2007, Sieracki and Sambol attended a Credit Risk Committee Meeting wherein they were informed that even as Countrywide had been purportedly tightening guidelines, "loans continue[d] to be originated outside guidelines" without "formal guidance or governance."   The presentation also included a recommendation from the credit management department that two divisions "cease to grant exceptions where no major competitor is offering the guideline," thereby highlighting for Sieracki and Sambol the existence of | Dean Decl., ¶57, Ex. 55 (Depo. Ex. 2002)<br>Dean Decl., ¶178, Ex. 176 (Depo. Ex. 2003 at 57) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| that practice, even as Countrywide was supposedly tightening guidelines. | |
| 528.   Sieracki was also made aware that Countrywide's loss models which it used to calculate its Allowance for Loan and Lease Losses were underpredicting. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 61:4-61:14) Did you become aware at this point, in the late 2006 time period, that the model that Countrywide was using to predict its allowance for loan and lease losses was underpredicting default rates? A   There was a manual adjustment that was affected to the model.  I was aware. Q   And that adjustment was made because the model was underpredicting? A   In our back testing, looking at what the model predicted versus what actually happened, we found that it was underpredicting. McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 66:15-67:2) Did you ever attend a credit committee meeting where the topic of loss models underpredicting losses at Countrywide came up? A.  I can't recall a specific meeting, but that was not an unusual phenomena for models to be slow to react to various environmental conditions. And |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | management didn't just run a model and apply that number.  Judgment was applied and the propriety of the calculation was considered.  So we routinely had models over and underpredicting that we would back-test and determine the integrity of and, if necessary, make an adjustment. |
| | * * * |
| | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 75:22-76:7) |
| | Q.  Okay.  But you were aware that the models, or at least some of the models that underlay the ALLL reserve methodology, were underpredicting losses? |
| | MS. PHILLIPS:  Objection.  Vague, foundation. |
| | THE WITNESS:  I was generally aware.  Models aren't always precisely right, and that's why you have personnel with expertise that evaluate the output and make sure that when all is said and done, that you get to the right place. |
| 529.   Sieracki was also aware that the Office of the Comptroller of the Currency had commented that | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 76:16-77:4 ) |
| | Q.  In March of 2007, were you aware |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Countrywide Bank's models were underpredicting losses underlying the Allowance for Loan and Lease Losses. | of the OCC commenting on the underprediction of models related to ALLL?<br><br>MR. SIEGEL:  Misstates the document by not including the OCC's conclusion.<br><br>THE WITNESS:  I generally recall the issue of reserve is okay; models might not be spot-on.<br><br>BY MR. BENDELL:<br><br>Q.  Right.  But my question is, do you recall the OCC expressing that issue, or discussing that issue?<br><br>A.  I generally recall that.<br><br>MS. PHILLIPS:  Objection.  Vague as to "that." |
| 530.   Sieracki never reported the information he learned on the CCRC to the Disclosure Committee. | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 162:22-163:23)<br><br>Did you ever report to the members of the disclosure committee information that you had learned in a credit committee meeting?<br><br>MS. WEISS:  Objection.  Overbroad, unlimited as to time and subject matter.<br><br>MR. SIEGEL:  It's vague and compound.  You mean information that he learned exclusively in a credit committee meeting as opposed to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | something he may have heard at a credit committee meeting and a hundred other places?  I think the question is --<br>MS. WEISS:  Vague as to the word "report."<br>THE WITNESS:  Repeat the question, please.<br>(The record was read by the reporter as follows:  "Q.  Did you ever report to the members of the disclosure committee information that you had learned in a credit committee meeting?")<br>THE WITNESS:  I'm unaware of any specific examples, but I may have.  As a matter of fact, I now recall that we talked earlier today about my inviting Mr. Hendry to the credit committee meeting.  And it's my belief that he was on the disclosure committee.  So here's an example of me inviting a member of the disclosure committee who is not a member of the credit committee to the meeting. |
| 531.   Sieracki purports to have relied on his subordinates to the exclusion of his own knowledge gained through | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 144:24-146:25)<br>Q.  My question is a little bit more |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| participation in operating committees, such as CERC. | specific.  Did you draw on the information that you obtained by |
| | attending various operational meetings in doing your work on the SEC disclosures of Countrywide? |
| | MS. PHILLIPS:  Same objections as before and now I added asked and answered. |
| | MS. WEISS:  And same objection. Overbroad, unlimited as to time and scope and subject matter. |
| | THE WITNESS:  Trying to be more responsive, I would learn things day-to-day that would perhaps in general educate me and enhance my understanding of the issues and put me in a better position to understand what the proper disclosures were, but at no time could I usurp the authority of experts within a particular area that I didn't manage and that I didn't understand as well as them.  I needed to rely on them.  So, yes, I might learn something, but that might not necessarily make me more of an authority than the subject matter expert that ran that operation, that supervised |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the people, that personally reviewed every day what went on in that area. |
| | BY MR. BENDELL:<br><br>Q.  What do you mean by "usurp the authority"?<br><br>A.  If there was an issue in the broker-dealer that may or may not require disclosure, I wouldn't be a better authority than the CEO of the broker-dealer or the CFO.  They might want to confer with me and discuss something with me, but they would be the ones having access to whether or not there was a disclosure issue.  They would be the experts to determine whether or not it was material or not.  I could have an opinion, but I wouldn't be as much of an authority as them.  So just -- if I went to one of their meetings, that didn't automatically make me more of an expert than them was the point I perhaps inarticulately was trying to make.  So even though it might have improved my knowledge, that didn't make me the ultimate authority.<br><br>Q.  What do you mean by "ultimate authority"? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  In any particular -- I used the broker-dealer, for example.  I wouldn't necessarily -- if I went to one meeting and learned about some issues at the broker-dealer, I wouldn't necessarily be a better authority about what proper disclosures were out of the broker-dealer than the CFO and CEO of the broker-dealer.  I might be more informed and more effective, but I am less of an authority than them.  McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 151:15-152:14) Q.  Now, in the process of conducting your read of an SEC filing, were you informed in that process by information that you had obtained by attending operational meetings?  A.  Perhaps.  MR. SIEGEL:  Asked and answered.  I'm sorry.  THE WITNESS:  My apologies.  Perhaps.  I learned things every day that I hoped to accumulate and retain and enhance my understanding of what was going on.  Very dynamic organization.  BY MR. BENDELL: |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  So among the information that you gathered on a day-to-day basis was information you obtained in operational meetings such as the credit risk committee meeting?<br>A.  Right.  And maybe this is another way to try to make my earlier point. When I go from novice to semi-intermediate, that doesn't put me on the council of all high authorities about a topic.  It enhances my appreciation and understanding, but it doesn't necessarily make me an expert.  And I wanted those experts to be giving me input. |
| 532.   In March of 2006, Sieracki was made aware of Mozilo's concerns regarding the subprime 80/20 product which was discussed in relation to HSBC's decision to compel CFC to "buy-back" certain 80/20 loans it had purchased from CFC. | McCoy Decl., ¶25, Ex. 215 (Kuelbs Depo. Ex. 969 (3/27/2006 e-mail from Mozilo to Sambol, Sieracki, McMurray, et al.)) |
| 533.   Sieracki was also aware in June of 2006 of evidence within Countrywide that the stated incomes of borrowers were contradicted by IRS records obtained regarding those borrowers. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 368:14-368:19)<br>Q   Okay.  Mr. Mozilo goes on to make the comment that there is some evidence that the information the borrowers were providing relative to their income does |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | not actually match up with IRS records. Were you aware of that fact in June of 2006?<br><br>A    In general. |
| 534.   Sieracki agreed with Mozilo's view that the Company faced difficulty in assessing the "real risk" of holding Pay Option ARM loans. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 421:13-422:9)<br><br>Q    Well, Mr. Mozilo makes some comments with respect to the Pay Option ARM loan in this e-mail and I wanted to know -- I just want to go through them one at a time and ask if you agree with them, or if you agreed with them at the time in the September 2006 time period.   In his paragraph number 2, he wrote that the company had no way with any reasonable certainty to assess the real risk of holding Pay Option ARM loans on its balance sheet.  And then he goes on to say that the only history that was available was World Savings and their portfolio was fundamentally different because they were focused on equity and Countrywide was focused on FICO. Would you have agreed with Mr. Mozilo's statement that the company had no way to assess with any |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | reasonable certainty the real risk of holding Pay Option loans on its balance sheet in September of 2006? |
| | A   I don't know that I would go as far as "no way," but it was a difficult task. |
| | Q   Do you believe there was some uncertainty with respect to the ability to predict future performance of those loans in the September of '06 time period? |
| | A   Of course, there was some uncertainty. |
| | * * * |
| | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 425:5-425:23) |
| | Q   Well, Mr. Mozilo wrote in this e-mail that he believed the company was "flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."  Would you have agreed with that characterization of the Pay Option portfolio? |
| | A   "Flying blind" probably aren't the words I would have chosen.  **You know, there is a degree of difficulty to assessing how these loans will** |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | **perform** in view of these factors.  I would agree with that.  I don't think |
| | Carlos Garcia would agree that we were flying blind.   But again, that's for effect.  And that's to -- there has been a trend here of Mr. Mozilo suggesting -- and again, I referenced that he was a traditional mortgage banker, he was more of an FHA/VA guy from the beginning.  He competed against this product for decades before he began to originate it.  And his style was to inspire conversation.  He knew he had a very bright management team, but he wanted to make sure that all considerations were made.  (Emphasis Added) |
| 535.   Sieracki was aware that Mozilo directed Countrywide management to explore selling the Pay Option ARM loans held by Countrywide Bank. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 370:13-371:2)<br>Q   Mr. Mozilo then makes some prescriptions about what should be done, including attempting to sell out some of the loans in the bank where FICO scores are below 700.  Were you aware that Mr. Mozilo wanted to sell Pay Option loans out of the bank's held for investment portfolio in the June 2006 time period? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A    Not in June of '06. |
| | Q    When did you first become aware of that? |
| | A    That Mr. Mozilo wanted to sell the Pay Option ARM portfolio? |
| | Q    Yes. |
| | A    My recall is September of '06, shortly -- it was precipitated by the Golden West sale announcement and he expressed an interest.  I was in a meeting and I specifically recall him suggesting that we needed to consider that. |
| 536.   Sieracki participated in meetings among Countrywide management to explore pursuing Mozilo's suggestion to sell the Pay Option ARM loans. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 427:5-428:21)<br><br>Q    As a result of his thoughts that both the loan was mispriced in the secondary market and that it was impossible to assess the risk, he recommends at the bottom of this e-mail that the company should begin selling all newly originated Pay Options and to start rolling off the existing loans currently held for investment.  Did you participate in any follow-on discussions with either Mr. Mozilo, Mr. Garcia or Mr. Sambol about the feasibility of selling the Pay |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Option loans in the bank's portfolio? |
| | A   My recall on this topic is that a meeting was, as a result of the Golden West sale and the discussion of consideration of the sale of the portfolio, a meeting was established and the principal players in the meeting were Sambol, Bartlett and Garcia.  They were going to be the three decisioners about the fate of the Pay Option ARM portfolio.  My recall is that I was not included on the invite to the meeting.  I went to Bartlett and intervened and got myself invited.  And I remember the first meeting being in the east atrium on the third floor of headquarters.  And the conclusion, to fast forward, was that a lot of analysis needed to be done and that this was not an, okay, we'll be done with this in a week and dispatch these analysts to do this and we'll look at that and we'll be done; it was understood this was going to be a significant project.  And my recall is also that Bartlett came to me and said, this is going to be a difficult issue to resolve, I'm going to ask you to step aside just |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | because you're not directly involved and we'll keep you posted; you don't need to be in the meeting flow.  So that was the only meeting I attended on the topic, was the kickoff meeting.  And, to the best of my knowledge, I was completely excluded from e-mail traffic on it.  And I would do my best to stay abreast of what the thought process was in lunchroom conversations, hallway conversations, stopping by somebody's office, running into them, how do we look on this, and I was not offended by the -- you know, we're going to streamline the meeting group just to make more progress.  Because those were the three principals.  Sambol is the chief operating officer, Bartlett is the chief investment officer, and Garcia as the bank chairman at the time.<br>***<br>McCoy Decl., ¶49, Ex. 239 (Bartlett Dep. Tran. 293:17-298:11)<br>MR. BENDELL:  Q.  Mr. Bartlett, getting back to where we were when we broke yesterday evening, I would like to talk some more about the reasons for |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | your recommendation in the fall of 2006 to shrink the bank.  Was one of the |
| | reasons that you recommended shrinking the bank because you thought that, because of the market prices for pay option ARM loans, Countrywide could extract most of the reward associated with pay option ARM loans while reducing credit risk? MR. TU:  Objection.  Leading. THE WITNESS:  I believe at that time my views were based upon what the market was doing.  I think -- for most mortgage-backed securities I believe that the kind of more credit risky tranches of securities were trading at pretty tight spreads. Pay option loans were trading at high prices, and so the yield on those loans was low.  And so there wasn't as much room for credit losses left over to cover the risk that those losses could increase from where they had been in the past. MR. BENDELL: Q.  Now, that reasoning, the -- fair to call that a risk/reward analysis? A.   Yes, I would say so. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  That risk/reward analysis, did you express -- did you express that reasoning to Mr. Mozilo in the fall of 2006? |
| | A.  I don't know.  There was -- I remember the statement I made that we should shrink the bank.  I don't remember what I said after that in detail. But we engaged in a process of discussing what the investment strategy should be.  Certain strategies at the bank were put on hold and then reinstituted in different forms at later dates. |
| | Q.  And do you have any reason to believe that you -- let me take a step back.  Yesterday you described the discussions or the debate surrounding the bank's investment strategy as healthy.  Do you have any reason to believe that you held back any of your reasoning from that healthy debate? |
| | A.  I don't recall. |
| | Q.  Is that something that you typically would do, hold back some of your reasoning in a discussion of strategy? |
| | A.  Generally not. |
| | Q.  I think I asked you if you expressed |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the risk/reward analysis reasoning to Mr. Mozilo.  Let me just be thorough and ask, did you express that to Mr. Sambol? |
| | A.  I don't recall. |
| | Q.  Did you express that risk/reward analysis to Mr. Sieracki? |
| | A.  Both of those gentlemen I think heard the results of the analysis that was done in the fall. And so in that context they would have been exposed to some of the risk/reward information that was put together that formed the analysis that was the foundation for some of the decisions that were made. |
| | MR. DROOYAN:  When you said both those gentlemen, there are three people we have been talking about.  Which both were you talking about? |
| | THE WITNESS:  Sorry.  Mr. Sambol and Mr. Sieracki were involved in at least seeing the results of that analysis, or hearing about it.  I believe Eric was at one of the meetings where that was discussed, and I think Dave was exposed to it. |
| | MR. BENDELL: |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Q.  And which meeting is it that you have in mind that Eric Sieracki was at? |
| | A.   There was a -- I think -- I am not sure if this was the final meeting where conclusions were reached, but there was a dinner meeting at a restaurant in Calabasas.  And there was the bank, and I think John McMurray, and myself, and I think Eric was there.  We discussed kind of the work that had been done, and we looked at here is the risk matrix, if you will, for each of the products.  And it was really more of a -- the yield that would be made in the ROEs, I believe, on those investments, in the context of changing prepay and interest rate environments, and, excuse me, credit environments.  Q.   Now, so is it the case that there was an initial meeting regarding the topics of the -- sorry -- regarding the topic of the evaluation of the -- reevaluation of the bank's investment strategy, and that's a meeting that took place in roughly September or October of 2006 at Countrywide's offices?  A.   Well, the meeting that I can |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | remember was the one where I said the bank should be shrunk.  I think I |
| | described that we had also looked at buying back stock as one of the options. And then there were follow-up meetings to try to do the work that was necessary to form the conclusions that were reached.  And I believe there may have been a meeting after that one later that day that took place where we were trying to figure out, okay, who is going to do what and what are the steps involved, and then we tasked people to do those things.  And then there were other meetings.  The only one I can remember -- there may have been more than one, but there was -- the one that I can remember is there was this dinner meeting where there was some, you know, discussion about the work that had been done. Q.   All right.  Well, I just want to, I think -- I know you testified a fair amount about this in your SEC testimony.  But just to get it all clear in the record in this case, the initial meeting that you described, that meeting |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | was attended by, among other people, Mr. Mozilo; is that right? |
| | A.   That's correct. |
| | Q.   And Mr. Sieracki also attended that meeting? |
| | A.   Yes. |
| | Q.   And Mr. Sambol. |
| | A.   Yes. |
| | * * * |
| | McCoy Decl., ¶49, Ex. 239 (Bartlett Dep. Tran. 298:24-299:16) |
| | Q.   And then you mentioned a meeting at a restaurant.  That's some weeks later -- |
| | A.   Yes. |
| | Q.   -- after the initial? |
| | A.   I believe so. |
| | Q.   At the restaurant meeting was Mr. Mozilo there? |
| | A.   I don't believe so. |
| | Q.   What about Mr. Sieracki? |
| | A.   I think so. |
| | Q.   And -- and Mr. Sambol? |
| | A.   I don't recall. |
| | Q.   And this dinner meeting -- this is at the restaurant FINS; is that right? |
| | A.   That's what I recall.  It was at a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | restaurant called FINS. |
| | Q.   And that's in Calabasas? |
| | A.   Yes. |
| 537.   On January 29, 2007, Sieracki was again made aware of Mozilo's continued desire to explore selling Pay Option loans.  Sieracki was copied on an e-mail from Mozilo instructing him and other Countrywide executives to " explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of Pay Options) the bulk of the Pay Options on the Bank's balance sheet and replace them with HELOCS [Home Equity Lines of Credit]." | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 214:16-216:13); Bendell Decl., ¶25 Ex. 317 (Inv. Test. Ex. 117). <br><br> Q   Did you ever become aware that Angelo Mozilo decided that he wanted to sell the portfolio of pay-option ARMs that were held for investment by the bank? <br><br> A   I know he expressed sentiments along those lines. For example, I think it was January of '07 when we had conversation with KPMG about if we sold the pay option portfolio, if we would impair our HFI standing.  And in a theoretical manner, we did some discovery about whether or not there was, in fact, a way to say that there was a strategy change, and if we could pursue a strategy which would involve the sale of pay-option ARMs, retention of HELOCs as an alternative, and does that impair HFI accounting for the HELOCs.  And that was a theoretical exercise that -- you know, obviously, we |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | never sold the pay-option ARM portfolio. |
| | Q   Mr. Sieracki, I'm handing you what's been previously marked as Exhibit 117, which, for the record, is an e-mail, or a series of e-mails Bates stamped CFC2007A476468 through 472.  The first e-mail on the first page is dated February 9th, 2007 and is directed to Anne McCallion from Angelo Mozilo, and the cc's are Dave Sambol and Eric Sieracki. (SEC Exhibit 117 was referred to.) BY MS. DEAN: Q   Have you ever seen Exhibit 117 before? A   I have, and this is the item that I just referred to in my prior comment. Q   Okay.  So you recall that in -- I think you said in January of 2007 -- A   Yeah, and I think if you look at the first e-mail, it would have been the last week of January. Q   Okay.  But you recall that there was some discussion with KPMG about whether or not Countrywide could sell the pay-option ARM loans in the bank's |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | portfolio; is that right? |
| | A    Yes.  As I just commented. |
| | Q    Okay.  And if you turn to the page that's Bates stamped ending in 470. |
| | A    Okay. |
| | Q    There's an e-mail there starting pretty close to the top of the page from Angelo Mozilo to Carlos Garcia dated January 29th at 5:20 p.m.  Do you see that? |
| | A    I do. |
| | Q    And Eric Sieracki is indicated as one the carbon copy recipients.  Do you see that? |
| | A    I do. |
| | Q    Do you recall receiving this e-mail? |
| | A    I do. |
| 538.   Sieracki was aware of the risk of payment shock inherent in Pay Option ARM loans present when they would reset (and require fully amortizing payments) in the future. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 295:20-296:6) Did Mr. Mozilo ever express that particular concern to you with respect to the Pay Option ARM loans in the bank's held for investment portfolio? A    The reset risk? Q    Yes. A    I may have heard him raise that issue, and it was an issue that had been |

709

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | discussed and I will refer to our prior conversation about this.  December 31, '07, I recall our K anticipating 60 million of resets in '08 and 3 billion in '09.  So it was a risk inherent in the product that was actually never manifested because we didn't get to that potentially significant payment shock period. |
| 539.   Sieracki was also aware of Mozilo's determination that World Savings' portfolio of Pay Option-type loans was not comparable with Countrywide's due to one's focus on equity versus the other's focus on FICO score. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 374:22-375:12)<br><br>Q   Were you aware that Mr. McMurray had told Mr. Garcia as early as July of 2005 that the World Savings portfolio and the Countrywide portfolio were fundamentally different because World Savings was focused on low loan to value versus high FICO score?<br><br>A   I match that expression more with Mr. Mozilo than Mr. McMurray.  I don't recall hearing Mr. McMurray raise that concept.  And I can't place a chronological link to here's when I heard Mozilo say it.  But I match that expression of FICO versus equity to Angelo.<br><br>Q   So at some point, you do recall |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | hearing Mr. Mozilo say, the two portfolios were not compatible because one was underwritten focusing on equity and the other was underwritten focusing on FICO scores? |
|  | A   I remember him making that assertion.  I wasn't in a position to opine as to whether or not that was true. |
|  | * * * |
|  | McCoy Decl., ¶ 90, Ex. 280 (Sieracki Dep. Tran. 61:2-61:12) |
|  | Q.  From whatever source, did you become aware during the time that you were the CFO of Countrywide that World Savings had tighter CLTV guidelines for Pay Option loans than Countrywide did? |
|  | MS. WEISS:  Objection.  Assumes facts not in evidence. |
|  | THE WITNESS:  I generally recall people referring to this issue of Countrywide focusing more on FICOs and World focusing more on LTVs, generally. |
| 540.   On November 8, 2006, Sieracki attended a Countrywide Enterprise Risk Committee meeting in which he | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 467:14-469:13)  Q   Let me hand you what has |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| was informed about increases in the volume of Suspicious Activity Reports being filed related to mortgage fraud. | previously been marked as Exhibit 758. |
| | Exhibit 758 is a multiple page document Bates stamped KPMG06FYA007-000104 through 229.  And the heading on the first page is Countrywide Executive Risk Committee, November 8, 2006.  Have you ever seen Exhibit 758 before? |
| | A   I believe that I have. |
| | Q   And were you a member of the Countrywide Executive Risk Committee? |
| | A   I was and I attempted to make it a regular habit to attend those meetings. |
| | Q   What was the function of the executive risk committee? |
| | A   It was the overarching risk administration committee.  And I wouldn't necessarily refer to them as subcommittees, but other committees within the organization, such as ALCO, credit committee, operational risk committee, would report up to the executive risk committee.  The executive risk committee could give leadership, direction, input to those committees in the administration of their |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | responsibilities. |
| | Q    Turn to page 9 of this document. It's actually the one that ends in Bates stamp number 112.  This is a set of executive risk committee minutes for October 3, 2006.  And the first two paragraphs at the top of the page, there's a discussion about a presentation by Mr. McMurray.  I'd just ask you to read those paragraphs and then I will ask you a couple questions about them. |
| | A    The top two? |
| | Q    Yes, please.  (The witness examined the document.) |
| | THE WITNESS:  Okay. |
| | BY MS. DEAN: |
| | Q    Do you recall being present at the October 3, 2006, credit -- or executive risk committee meeting? |
| | A    I can't say I know for certain.  But I believe that I was there. |
| | Q    Okay.  Actually, if we go back to page 6, which is where the minutes start, you are identified as an individual who was present in the first paragraph.  It says – |
| | A    Okay, but this is November 8 and |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that's about the prior meeting. |
| | Q    Right.  We're looking at the October 3 minutes. |
| | A    Oh, I'm sorry.  I'm sorry.  Okay. |
| | Q    That's okay.  So the minutes start at page 6 of the document and page 9, which is where I directed your attention, is just the fourth page of the minutes of the October 3 meeting. |
| | A    I expected that I was there.  It would be rare for me to miss a CERC meeting. |
| | * * * |
| | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 478:22-479:7) |
| | Q    Okay.  One of the observations here is that the case volume is trending upward and then the second observation is that the volume of suspicious activity reports that were filed had also been trending upward.  Were you aware that the volume of suspicious activity reports that the company was filing had been trending upward in 2006? |
| | A    I was at this meeting.  This is the executive summary.  It's reasonable to assume that the chief internal auditor |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | would have gone over these issues in the executive summary. |
| 541.   Sieracki received Mozilo's December 7, 2006 memo explaining the widening of subprime guidelines that had taken place and the poor expected performance of 2006 vintage subprime loans, but then testified that he was unaware of a variety of guideline expansions discussed therein. | Bendell Decl., ¶19, Ex. 311 (Sieracki Response to RFA No. 68; McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 512:15-512:23) Q   Let me hand you what has been previously marked as Exhibit 277. Exhibit 277 is a multiple page e-mail Bates stamped CFC2007829058 through 067, dated December 7, 2006. And it is directed to the board of directors and EMDs, SMDs and MDs of Countrywide Financial Corporation from Angelo Mozilo.  And my first question is going to be have you ever seen Exhibit 277 before? A   I believe that I saw this document and scanned this document. * * * McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 513:15-514:12) Q   At the second page of this particular memo, there's a discussion about the performance of various loan vintages. Specifically, apparently, the Wall Street Journal article asserted that the 2006 |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | vintage was anticipated to be one of the worst vintages on record.  And Mr. Mozilo indicates that he actually believed -- he was in agreement with that particular assertion and he stated that he believed that poor performance would be driven by a combination of wider guidelines and the transitional economic environment.  Prior to receiving this particular memo, did you yourself have any insight into the performance of the 2006 vintage of loans -- subprime loans underwritten at Countrywide? <br><br>A   I generally recall knowledge that '06 was going to be a troublesome vintage.  I can't discern timing before this and how much I knew at that time. <br><br>Q   Can you tell me, if you know, why there was a belief that the 2006 vintage d be, as you put it, troublesome? <br><br>A   The issues that would have driven that belief, and I'm trying to recall now, would probably have related to LTVs, documentation levels and real estate valuation levels in general. <br><br>* * * |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 515:5-517:11) |
| | Q   Well, if you look immediately below the table that's on page 2, in this particular memo, Mr. Mozilo wrote, "From the low set by the 2002 vintage, performance has deteriorated in each successive year as a result of guideline expansion."  Would you have agreed with that statement in December of 2006? |
| | A   I would not have felt qualified to know exactly what guideline expansion took place and render such an opinion.  I would, instead, rely on subject matter experts. |
| | Q   If you turn to page 3 of Exhibit 277, there's a discussion of guideline expansion.  And the first paragraph indicates that "consistent with the broader industry, we have expanded our subprime menu over recent years" and it goes on to say, "industry guidelines have expanded in a variety of dimensions including increased availability of reduced documentation, higher leverage, i.e., lower |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | downpayment or equity requirements, increased prevalence of piggybacks, first plus second lien loans, higher loan amounts and interest only."  In December of 2006, were you, generally speaking, aware of that widening of underwriting guidelines at Countrywide? |
|  | A    Generally aware. |
|  | Q    Okay.  Mr. Mozilo went on to write that the products that were being offered were typically offered in combination with each other, which created a layered risk.  Were you also aware that Countrywide was writing loans that had layered risk characteristics in December of 2006? |
|  | A    I don't have a specific recall of layered risk being a concept that was discussed. |
|  | Q    In the table that follows that paragraph, there's a comparison of the Countrywide subprime product offerings between -- and the comparison is between what was offered in 2001 versus what was being offered in 2006.  And just to focus on one metric, the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | maximum loan size for a subprime loan in 2001 was $400,000 and in 2006 it was a million dollars.  Were you aware of that particular expansion in the underwriting guidelines? |
| | A    I was not. |
| | Q    And then at the bottom of that chart, there's an indication that interest only and 100 percent piggyback loans were not available to borrowers in 2001 but by 2006, they were offered to borrowers with a minimum of a 560 FICO score. Were you aware of that expansion of the underwriting guidelines in December of 2006? |
| | A    I was not. |
| | Q    With respect to documentation type, if you look at the table at the bottom of this page which is headed Subprime Production Mix Trends, the third line item there for stated documentation indicates that in 2001, only 13 percent of subprime loans were offered on a stated documentation basis, but by 2006, 36 percent of subprime loans were being offered on a stated documentation basis. Were you aware of that expansion of the |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | underwriting guidelines in December of 2006? |
|  | A    I was not. |
| 542.   Sieracki claims not to have detailed knowledge of the guidelines that were in place at Countrywide. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 538:11-538:19)<br><br>Q    Mr. Sieracki, I am handing you what has now been marked as Exhibit 703.  And 703 is a single-page e-mail string Bates stamped CFC2007B659331.  The e-mail at the top of the page is dated March 2, 2007, from Eric Sieracki to Vijay LaLa.  And there line is Summary of CHL Subprime Tightenings.  Mr. Sieracki, have you ever seen Exhibit 703 before?<br><br>A    Yes.<br><br>* * *<br><br>McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 539:13-540:11)<br><br>Q    Okay.  There are -- in Mr. LaLa's e-mail to you, which is also dated March 2, 2007, he broke out the list of changes chronologically by month.  And if you focus on the changes under the heading January '07 or 01/07, one of the changes, it's the fourth one down, is that in January of 2007, Countrywide began |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | requiring two years of bankruptcy seasoning on 100 percent financed loans. And Mr. LaLa notes that, prior to that guideline change, they had only required one day. Prior to receiving this e-mail, had you been aware that Countrywide was willing to make loans to borrowers at 100 percent financing even though the borrower was only one day out of bankruptcy? |
| | A   I was unaware of that. I can't even attest to how detailed my review was of this list of changes that they sent. I was more interested in validating the fact it was happening, as opposed to rendering an opinion, because I wasn't a subject matter expert, on what underwriting guidelines were in the market, or intervening in what was not my responsibility. So I'm not sure that I spent a lot of time reading this and then following up with Vijay to understand exactly what all of this meant. And I would be unable to tell you if in fact that was a secondary market standard or if that was not; I wouldn't know. |
| 543.   During the first quarter of 2007, | McCoy Decl., ¶90, Ex. 280 (Sieracki |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Sieracki was aware of layered risk driving poor performance in reduced documentation loans. | Dep. Tran. 87:19-88:3) <br> Do you have -- whether it was in this particular credit committee meeting or otherwise, was there any source of information by which you learned of layered risk driving poor performance in reduced documentation loans in the first part of -- in the first quarter of 2007? <br> MS. PHILLIPS:  Objection.  Vague. <br> THE WITNESS:  I was generally aware of this phenomena, frankly, because of things we were disclosing. |
| 544.   On January 2, 2007, John McMurray sent Sieracki and others an e-mail outlining why loan delinquencies would increase and the expected impact of those delinquencies on Countrywide's financial results. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 525:2-525:6); Bendell Decl., ¶26, Ex. 318 (Inv. Test. Ex. 245. <br> Q   Okay.  Have you ever seen Exhibit 245 before? <br> A   I had a policy of looking at my e-mails, so I suspect that I did.  I can't tell you I remember the day I looked at that almost two years ago, but I suspect that I did. <br> * * * <br> McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 528:24-529:13) |
|  | Q   Okay.  And as you sit here today, do you have any recollection of asking |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | Mr. Sieracki to prepare the analysis that's contained in the January 2, 2007, e-mail? |
| | A   Mr. McMurray? |
| | Q   I'm sorry, did I say you again?  I'm sorry.  As you sit here today, do you have any recollection of asking Mr. McMurray to prepare the analysis that's contained in the January 2, 2007, e-mail? |
| | A   I don't specifically have a recall, no. |
| | Q   Having seen it in January of 2007, would you have considered it important to include the information contained in his e-mail in the MD&A discussion in the year end 2006 10-K? |
| | A   I would consider it important to consider his input.  Absolutely. |
| | * * * |
| | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 531:7-531:21) |
| | Q   Well, let me ask you this.  I mean, since you believe you received Mr. McMurray's January 2, 2007, e-mail.  Having received it, would you have |
| | perceived it to be your responsibility to make sure that his comments made it |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | into the MD&A discussion in the 10-K? A   I perceive it to be his responsibility to work with my staff to make sure that it got in there.  And if he was dissatisfied with their performance, that he should report that to me. Q   Well, when you received a draft of the 10-K -- well, let me ask you this because I don't think I did.  Did you have any role in reviewing Exhibit 41? A   I would have read a draft.  I would have signed the document and I would have signed the certification relating to the document. |
| 545.   Sieracki took no steps specifically directed to ensure the inclusion of the points from McMurray's January 2, 2007 e-mail in Countrywide's soon-to-be filed Form 10-K for 2006. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 532:19 -533:22) Q   In conjunction with your review of the 10-K for the period ended December 31, 2006, did you make any effort to see that the information that Mr. McMurray had provided you on January 2, 2007, was incorporated in the document? A   I made provision for staff to work with him, receive his comments and negotiate language in the document. |
| | Q   And when you say you made provision for that, did you make a |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | provision for that outside the normal course of events?  In other words, did you respond to this January 2 e-mail by directing your staff to incorporate the comments?   Or are you just referring to the general practice? |
|  | A   I'm referring to the general practice. I don't specifically recall this memo. And I don't specifically recall referring it to Mr. Sambol.  I don't recall anything about the process of this being incorporated into this document because I wouldn't have been involved in the preparation of it.  I would have read this. I don't recall Mr. McMurray suggesting at 10-K certification time that he was dissatisfied.  This was an organization of 60,000 people.  He was a senior executive. He was charged with the responsibility of signing a certification. So I was not his boss and I would not have been responsible for defending someone not being responsive to his efforts.  If he was dissatisfied, he could have come to me.  I do not recall him |
|  | coming to me and saying, I have bona fide points that I think need to be in here |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | and they're not getting in.  His boss, I don't remember his boss coming to me and saying, McMurray is not getting traction. |
| 546.   Sieracki did not review the MD&A templates that were submitted | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 257:21-258:17)<br><br>Q    Did you, yourself, ever review any of the MD&A questionnaires that were circulated in advance of the filings of any of Countrywide's periodic filings between the end of 2005 and the end of 2007?<br>A    I did not personally review those. My staff would have handled that.  A general note, my staff was very competent and, as they solved issues and resolved problems, they generally wouldn't report -- unless they were very significant and they felt there was some level of sensitivity, they generally wouldn't report resolved problems.  So it would only be when there was an issue that required resolution, my involvement in that resolution, that I |
| | would generally be advised.  An exception is the aforementioned incident |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | after the -- again, I believe it's the second quarter of '07 earnings call, when it was mentioned in passing to me that Mr. McMurray had an addendum to his certification.  That would be an example, a rare example of a resolved problem where, Eric, here's what happened.  But I did not personally review, generally speaking, MD&A questionnaires.  That was handled by my competent staff. |
| 547.   Sieracki does not recall any conversations with anyone at Countrywide regarding considering additional disclosures regarding Countrywide's underwriting. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 555:9-555:23)<br>Q   I know I've asked you several times in conjunction with the individual filings whether there was any discussion internally about whether the company should be making additional disclosures about the types of products that it was underwriting.  In general, from January 1 of 2005 to the filing of the 10-K for year end 2007, do you ever recall any discussion with any individual at Countrywide in which there was consideration of whether the company |
| | should be making additional disclosures about the kinds of loans it was |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | underwriting? |
| | A    You know, as I sit here now, I can't recall any.  I was not the likely target of proposing policy changes about disclosures in the Q.  I wouldn't be the first person that people would think of going to on that topic.  But the honest answer to your question is that I don't recall any . . . . |
| 548.   Sieracki did not have access to sufficient information to determine whether a particular loan was an exception loan. | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 107:15-107:23) Did you have any way when you were the chief financial officer of Countrywide to determine whether a particular loan was an exception loan or a nonexception loan? A.  Did I have the personal expertise, or access to information? Q.  Access to information. A.  I'm not aware of any information that I had access to that would have told me that, no. |
| 549.   When asked about any consultations he may have had with a lawyer on the disclosure committee regarding credit risk disclosures, Sieracki asserted the attorney-client | McCoy Decl., ¶90, Ex. 280 (Sieracki Dep. Tran. 192:11-193:3) Q.  Mr. Sieracki, did you have occasion personally to seek advice Mr. Udovic regarding credit risk disclosure? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| privilege and refused to answer. | MS. WEISS:  So I think that reluctantly, I am going to need to ask you not to respond to that pending further instruction from the company, so I will instruct you not to answer, not because I wouldn't like you to answer, but because I think we have now crossed into a gray area on the privilege. MR. BENDELL:  But the basis for the instruction is attorney-client privilege; is that correct? MS. WEISS:  It would be, yes. BY MR. BENDELL: Q.  And, Mr. Sieracki, are you going to follow your attorney's instruction and refuse to answer that question? A.  I am afraid I need to follow instructions. |
| 550.   When asked whether her advice was sought regarding disclosures of expanded underwriting guidelines, deteriorating loan quality or increased probability of defaults and delinquencies related thereto, Bow asserted the attorney client privilege and refused to answer. | Bendell Decl., ¶4, Ex. 296 (Bow Dep. Tran. 348:14-349:19): Q.   (BY MR. WYNN) Ms. Bow, is it accurate to say that no one ever approached you and asked whether or not Countrywide needed to disclose explicitly in its SEC filings that its underwriting guidelines were expanding? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. McDERMOTT:  Same instruction. |
| | MS. WEISS:  Same objection. |
| | Q.   (BY MR. WYNN)  Ms. Bow, is it also accurate to say that no one ever pushed you and asked whether or not Countrywide needed to disclose in its SEC filings that the quality of its loans was deteriorating? |
| | MR. McDERMOTT:  Instruct the witness not to answer based on the assertion of the privilege by the company pending resolution by the court. |
| | Q.   (BY MR. WYNN)  Mr. Bows -- Ms. Bow, I'm sorry -- is it correct to say that no one asked you whether or not Countrywide needed to disclose that as a result of it having widened its |
| | underwriting guidelines the probability of its loans going into default or serious delinquency were increasing? |
| | MR. McDERMOTT:  Please don't answer the question. |
| | MR. WYNN:  Just to be clear -- the record is clear, you are instructing her not to answer on the basis of Countrywide's privilege? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | MR. McDERMOTT:  That's correct. Just to move things along, she's not going to respond to any questions such as that. |
| 551.   KPMG reviewed the MD&A portion of Countrywide's filings solely to ensure that information therein was consistent with the information contained in the financial statements. | McCoy Decl., ¶92, Ex. 282 (Taylor Dep. Tran. 147:3 – 148:12) Q.  And then with respect to the rest of the 10-K filing, the parts other than the financial statements, who, in your understanding, KPMG or some other party, has primary responsibility for the accuracy of the rest of the 10-K filing other than the financial statements? A.  Again, it's management's responsibility. Q.  Now, what was your primary purpose in reading the portions of the 10-K filings of Countrywide during the audit engagements, the portions other than the financial statements? A.  The primary purpose was to comply with the auditing standards that -- SAS-8 and SAS-98 that require that we read information outside of the financial statements contained in documents that contain the financial statements to make a determination that there's no |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | information contained therein that's materially inconsistent with the information in the audited financial statements. Q.  So is it fair to say that the primary purpose is to make sure that what's in the other sections of the -- actually let me rephrase that.  Was that primary purpose that you just described also your purpose when you read the management discussion and analysis section in particular of Countrywide's 10-Ks? A.  That -- what I stated pertains to the entire forepart, all portions of it. Q.  Now, if that was your primary purpose in reading the nonfinancial statement portions of the – of |
|  | Countrywide's 10-Ks, what were your other purposes, if any? A.  I don't think there were primary or secondary.  I think the purpose was to comply with the auditing standard. |
| 552.   KPMG did not opine on the accuracy of Countrywide's MD&A disclosures. | McCoy Decl., ¶92, Ex. 282 (Taylor Dep. Tran. 150:14 – 152:3) Q.  Was one of -- one of the items that you understood KPMG was supposed to |

| SEC Statement | Evidence Cited by SEC |
|---|---|
|  | provide as part of the audit services was an opinion on whether the financial statements presented fairly, in accordance with U.S. GAAP, the financial condition of Countrywide; is that fair?<br>A.  Yes, I think that's fair.<br>Q.  Now, did you also have any understanding as to whether, as part of the audit engagement, KPMG was to provide any additional opinion about the fairness of presentation of items outside of the audited financial statements?<br>A.  No.  We were also engaged to do the audit of the effectiveness of internal control over financial reporting, but we weren't engaged to do anything beyond that. |
|  | Q.  And did you provide Countrywide with an opinion on the overall fair -- the overall accuracy of their MD&A disclosures in their 10-K filings?<br>MR. JABLON:  Objection.  Vague and ambiguous.<br>BY MR. BENDELL:<br>Q.  If you understand the question, go ahead and answer. |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A.  Well, we didn't issue any opinions on MD&A, no.<br><br>Q.  And then the same question for the MD&A sections of the 10-Ks where you conducted reviews.  I know there's no audited opinion to go along with it, but just what I am asking about is the 10-Qs.  So my question is:  For the 10-Q filings by Countrywide during the time that you were the audit engagement partner and quarterly reviews were going on, did you -- did KPMG provide an opinion about the accuracy of the MD&A disclosures in those 10-Qs?<br><br>MR. GIGOUNAS:  Same objection.<br>MR. JABLON:  Objection.<br><br>THE WITNESS:  We didn't provide any opinion on those items, no. |
| 553.   Sieracki was aware by December 2006 that guidelines at Countrywide were expanding. | McCoy Decl., ¶91, Ex. 281 (Sieracki Inv. Test. 515:15-516:3)<br><br>Q.   If you turn to page 3 of Exhibit 277, there's a discussion of guideline expansion.  And the first paragraph indicates that "consistent with the broader industry, we have expanded our subprime menu over recent years" and it goes on to say, "industry guidelines |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | have expanded in a variety of dimensions including increased availability of reduced documentation, higher leverage, i.e., lower downpayment or equity requirements, increased prevalence of piggybacks, first plus second lien loans, higher loan amounts and interest only." <br><br> In December of 2006, were you, generally speaking, aware of that widening of underwriting guidelines at Countrywide? <br> A    Generally aware. |
| 554.   In an April 26, 2005 earnings call Mozilo said that "We don't see any change in our protocol relative to the quality of loans that we're originating." | Bendell Decl., ¶22, Ex. 314 (Transcript of April 26, 2005 Earnings Call) |
| 555.   In a July 26, 2005 earnings call Mozilo stated that he was "not aware of any change of substance in [Countrywide's] underwriting policies" and that Countrywide had not "taken any steps to reduce the quality of its underwriting regimen." | McCoy Decl., ¶5, Ex. 195 (Transcript of July 26, 2005 Earnings Call) |
| 556.   In that same July 26, 2005 earnings call, Mozilo touted the high quality of Countrywide's Pay-Option | *Id.* |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| ARM loans by stating that "[t]his product has a FICO score exceeding 700. . . . the people that Countrywide is accepting under this program . . . are of much higher quality. . . that [sic] you may be seeing . . . for some other lender." | |
| 557.   In a January 31, 2006 earnings call Mozilo stated that "It is important to note that [Countrywide's] loan quality remains extremely high." | Bendell Decl., ¶24, Ex. 316 (Transcript of January 31, 2006 Earnings Call) |
| 558.   In an April 27, 2006 earnings call Mozilo stated that  Countrywide's "pay option loan quality remains extremely high"  and that Countrywide's "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period." | Bendell Decl., ¶23, Ex. 315(Transcript of April 27, 2006 Earnings Call) |
| 559.   At the May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference, Mozilo told the audience that despite recent scrutiny of Pay-Option loans, "Countrywide views the | Dean Decl., ¶172, Ex. 170 (Transcript of May 31, 2006 Sanford Bernstein Presentation) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| product as a sound investment for our Bank and a sound financial management tool for consumers." Mozilo added that the "performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments." | |
| 560.   At a Fixed Income Investor Forum on September 13, 2006, Mozilo told investors that "[t]o help protect our bond holder customers, we engage in prudent underwriting guidelines" with respect to Pay-Option loans. | Dean Decl., ¶43, Ex. 41 (Transcript of September 13, 2006  Investor Forum) |
| 561.   Sambol sub-certified Countrywide's Forms 10-Q for Q1, Q2, and Q3 of fiscal year 2005 and Form 10-K for fiscal year 2005. | McCoy Decl., ¶ 105, Ex.295 (Sambol Inv. Test., 477:12-23, 480:24-481:8, 486:16-23; 491:18-25)<br><br>Q   Mr. Sambol, I'm handing you what has been marked as Exhibit 194.  For the record, Exhibit 194 is a copy of the Form 10Q for Countrywide Financial Corporation for the period ended March 31st, 2005.  Did you -- have you ever seen Exhibit 194 before?<br><br>A   I can't recall.<br><br>Q   Okay.  Did you have any role in the review or preparation of Exhibit 194? |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | A   Not in the preparation, but perhaps, you know, in the -- I believe I did in the review, along the lines that I described earlier, to review and sign the sub-cert applicable to the areas of my oversight. |
| | Q   I'm handing you now what has been previously marked as Exhibit 195, which, for the record, is a copy of the Form 10Q for Countrywide Financial Corporation for the period ended June 30, 2005.  And I'll ask you if you've ever seen Exhibit 195 before? |
| | A   I presume that I did. |
| | Q   Okay.  Did you have any role in finalizing or preparing Exhibit 195? |
| | A   Not preparing, but only reviewing for the purpose of signing the sub-cert. |
| | Q   One-ninety-six is a copy of the Form 10Q for the period ended September 30, 2005, for Countrywide Financial Corporation.  Mr. Sambol, have you ever seen Exhibit 196 before? |
| | A   I believe I have. |
| | Q   Okay.  And did you have any role in preparing or finalizing Exhibit 196? |
| | A   Only reviewing it for the sub-cert. |
| | Q   Do you have any reason to believe |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | that you did not sub-certify the Countrywide Financial Corporation Form 10K for the year ended December 31st, 2005?<br><br>A    Sorry, repeat that?<br><br>Q    Do you have any reason to believe that you did not sub-certify the Countrywide Financial Corporation 10K for the period ended December 31st, 2005?<br><br>A    No. |
| 562.   Sambol sub-certified Countrywide's Forms 10-Q for Q1 and Q2 2006. | McCoy Decl., ¶ 105, Ex.295 (Sambol Inv. Test., 496:20-497:8, 501:11-503:5)<br><br>Q    Mr. Sambol, I'm handing you what was previously marked as Exhibit 233. This is a copy of the Form 10Q for Countrywide Financial Corporation for the period ended March 31st, 2006. And I'll ask you if you've ever seen Exhibit 233 before?<br><br>A    Yes.<br><br>Q    Okay.  And did you have any role in its preparation or finalization?<br><br>A    Only a review, in connection with my sub-cert requirement.<br><br>Q    Okay.  And do you believe that you sub-certified some portion of the 10Q |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | for the period ended March 31st, 2006? |
| | A   Yes, I have no reason to believe otherwise. |
| | Q   I am handing you what was previously marked as Exhibit 1033. This is a copy of the Form 10Q for the period ended June 30th, 2006, for Countrywide Financial Corporation. Have you ever seen Exhibit 1033 before? |
| | A   Yes. |
| | Q   Did you have any role in the filing of Exhibit 1033? |
| | A   Only my required review purpose of executing the sub-cert. |
| | Q   Can I just ask you, generally speaking, what your practice would have been with respect to the review that you did for certifying a 10Q? |
| | A   I would focus on those sections relating to my areas of responsibility and read them, just for the purpose of determining whether there's any inaccuracy that I could identify.  And that would be how I would describe it. |
| | Q   And can you tell me again what |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | those areas would have been? |
| | A   Would have been the, you know, Loan Production segment, and any, you know, disclosures or content relating to that -- the Loan Servicing segment, the Capital Market segment.  And then, beginning in -- in probably the second quarter of 2006, you know, I would have reviewed the banking information segment, as well. |
| | Q   Okay.  And to your knowledge, did you sub-certify the 10Q for the second quarter of 2006? |
| | A   I -- I don't recall specifically, but I have no reason to believe I didn't. |
| | Q   Okay. |
| | (SEC Exhibit No. 191 was referred to.) |
| | BY MS. DEAN: |
| | Q   Let me hand to you what's been marked as Exhibit 191, which, for the record, is a single-page document, Bates stamped KPMG-06QR2-001-000364, and it's entitled, "Senior Management Certifications For Second Quarter 2006 Form 10Q Filing."  I think if you look on this document, the sixth name from |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| | the top is Dave Sambol -- <br> A   Mm-hmm. <br> Q    -- and it looks like, according to this chart, you would have signed the certification in August of 2006.  Does that refresh your recollection as to whether or not you would have certified the Form 10Q for the second quarter of 2006? <br> A   Yeah, it appears I did. |
| 563.   At a May 24, 2005 investor day presentation, Sambol reassured analysts that Countrywide addressed the higher credit risk associated with adjustable rate mortgage programs by requiring different underwriting criteria such as "higher credit scores or lower loan to value ratios. | McCoy, Decl., ¶ 96, Ex. 286 (transcript of May 24, 2005 analyst meeting) |
| 564.   At a September 13, 2006 Fixed Income Forum, Sambol downplayed Countrywide's participation originating subprime loans by falsely stating that Countrywide had been "on the sidelines" in the subprime market. | Dean Decl., ¶ 43, Ex. 42 (transcript of September 13, 2006 Fixed Income Investor Forum) |
| 565.   Reacting to concerns from a loan production division that the no 80/20 exceptions policy has placed | McCoy Decl., ¶95, Ex. 285 (Depo. Ex. 2008) |

| SEC Statement | Evidence Cited by SEC |
|---|---|
| Countrywide in "a very disadvantageous position relative to the non-prime market," Sambol tells the head of the division in February 2006 that he will talk to the chief risk officer to "narrow the scope of the non exception policy." | |

Dated:  August 16, 2010          Respectfully submitted,


                                  /s/ Spencer E. Bendell
                                  John A. McCoy III
                                  Spencer E. Bendell
                                  Lynn M. Dean
                                  Sam S. Puathasnanon
                                  Paris A. Wynn
                                  Attorneys for Plaintiff
                                  Securities and Exchange Commission