**UNITED STATES DISTRICT COURT**          **PRIORITY SEND**
**CENTRAL DISTRICT OF CALIFORNIA**

### CIVIL MINUTES -- GENERAL

Case No.   **CV 09-3994-JFW (MANx)**          Date: September 16, 2010

Title:          Securities and Exchange Commission -v- Angelo Mozilo, et al.

---

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

Shannon Reilly                          None Present
Courtroom Deputy                        Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**    **ATTORNEYS PRESENT FOR DEFENDANTS:**
          None                                    None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER DENYING DEFENDANT DAVID SAMBOL'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION [filed 8/2/2010; Docket No. 155];**

                                  **ORDER GRANTING IN PART, DENYING IN PART DEFENDANT ERIC P. SIERACKI'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION [filed 8/2/2010; Docket No. 156];**

                                  **ORDER GRANTING IN PART, DENYING IN PART DEFENDANT ANGELO MOZILO'S MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION [filed 8/2/2010; Docket No. 157]**

       On August 2, 2010, Defendant David Sambol filed a Motion for Summary Judgment or Summary Adjudication. On August 2, 2010, Defendant Eric P. Sieracki filed a Motion for Summary Judgment or Summary Adjudication. On August 2, 2010, Defendant Angelo Mozilo filed a Motion for Summary Judgment or Adjudication. On August 16, 2010, Plaintiff Securities and Exchange Commission (the "SEC") filed its Oppositions. On August 23, 2010, Defendants Sambol, Sieracki, and Mozilo filed their Replies. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument. These matters were, therefore, removed from the Court's August 30, 2010 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

                                             Initials of Deputy Clerk __sr__

## I.   PROCEDURAL AND FACTUAL BACKGROUND[1]

The SEC's Complaint alleges that three senior executives of Countrywide Financial Corporation ("Countrywide") committed securities fraud, and that Countrywide's former chairman of the board and chief executive officer engaged in insider trading.  Essentially, the Complaint alleges that Defendants Mozilo, Sambol, and Sieracki (collectively "Defendants") made misleading statements and omissions from 2005 through 2007, reassuring investors that Countrywide was mainly a maker of quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices.  However, during this same time period, Countrywide allegedly undertook an unprecedented loosening or expansion of its underwriting guidelines, to the point of virtually abandoning its guidelines by matching products offered by any competitor, writing riskier and riskier loans, and making exceptions to its already lax underwriting guidelines.  As a result, the SEC alleges that Defendants defrauded Countrywide's investors.

### A.   Defendants

#### 1.   Angelo Mozilo

Angelo Mozilo was a founder of Countrywide, and served as its chairman of the board and chief executive officer ("CEO") from Countrywide's formation in 1969 until it was acquired by Bank of America in 2008.  He signed the Forms 10-K for the years ended 2005, 2006, and 2007, the Sarbanes-Oxley certifications, and each of the offerings alleged in the Complaint which incorporated the most recent Form 10-K.  From November 2006 through August 2007, pursuant to 10b5-1 plans adopted in late 2006 and amended in early 2007, Mozilo exercised stock options and sold the underlying shares resulting in total proceeds of over $140 million.

---

[1]This factual background is in large part a restatement of the Court's November 3, 2009 Order denying Defendants' Motions to Dismiss, which summarized the allegations of the Complaint.  For the most part, this factual background is undisputed or irrelevant to the Court's ruling on Defendants' Motions for Summary Judgment.  Those facts that are relevant to the Court's ruling are discussed in detail *infra*.  Citations to "Statement of Facts" or "SF"  refer to the facts and supporting evidence set forth in Defendants' Corrected Joint Statement of Uncontroverted Facts and Conclusions of Law [Docket No. 214], the SEC's Statement of Genuine Issues of Material Fact [Docket No. 302], and Defendants' Joint Response to Plaintiff SEC's Statement of Genuine Issues of Material Fact and Joint Reply in Support of Defendants' Joint Statement of Uncontroverted Facts [Docket No. 322], which consist of 571 paragraphs and a total of 1031 pages.  The parties have filed extensive objections to the evidence supporting the Statement of Facts.  Many of the objections are not well-taken, inconsistent with Ninth Circuit law on the admissibility of evidence at the summary judgment stage, and simply added to the Court's burden in reviewing the voluminous documents submitted in connection with these motions.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.").  To the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections for the purposes of these motions for summary judgment.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relevant to the Court's rulings.

### 2.    David Sambol

David Sambol was Countrywide's president and chief operating officer ("COO") from
September 2006 until Countrywide was acquired by Bank of America in 2008.  Sambol was
Countrywide's executive managing director for business segment operations from April 2006 until
September 2006, and executive managing director and chief of mortgage banking and capital
markets from January 2004 until April 2006.  Sambol was a member of Countrywide's Board of
Directors from 2007 until July 2008.  He signed the Forms 10-Q for the third quarter of 2006 and all
of the quarters in 2007, the Form 10-K for the year ended 2007, and each of the offerings alleged
in the Complaint which incorporated the most recent Form 10-K.

### 3.    Eric Sieracki

Eric Sieracki was Countrywide's chief financial officer ("CFO") from the first quarter of 2005
until Countrywide was acquired by Bank of America in 2008.  He signed all of the Forms 10-Q and
10-K beginning in the first quarter of 2005 and throughout 2007, and each of the offerings alleged
in the Complaint which incorporated the most recent Form 10-K.  Sieracki bought, rather than sold,
Countrywide stock during the relevant time period.

### B.    Overview of Countrywide's Business and Lending Practices

Countrywide was a mortgage lender based in Calabasas, California, originating, selling, and
servicing both prime and subprime (or "nonprime") mortgage loans.[2]  By 2005, Countrywide was the
largest U.S. mortgage lender in the United States, originating over $490 billion in mortgage
loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.  Countrywide recognized
pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006,
respectively, and a pre-tax loss of $1.5 billion in its loan production division in 2007.

As alleged in the Complaint, Countrywide pooled most of the loans it originated and sold
them in secondary mortgage market transactions, either selling them through whole loan sales or
securitization.  In whole loan sales, Countrywide sold the loans to investors and recorded gains on
the sales.  In securitizations, Countrywide sold interests in the pooled loans, i.e., mortgage-backed
securities ("MBS").  The sale of mortgages into the secondary market was administered by
Countrywide's capital markets division, and was an important source of revenue and liquidity for
Countrywide.  In 2005, Countrywide recognized $451.6 million in pre-tax earnings from capital
market sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in
pre-tax earnings from that division, representing 12.8% of its pre-tax earnings, and in 2007 it
recognized $14.9 million in pre-tax earnings from that division, reporting a pre-tax loss overall.

Historically, Countrywide's primary business involved originating prime conforming loans
that qualified for sale to the Government Sponsored Entities ("GSEs").  However, beginning as

---

[2]On July 1, 2008, Countrywide merged with Bank of America and is now a wholly owned
subsidiary of Bank of America.  Countrywide's remaining operations and employees have been
transferred to Bank of America, and Bank of America ceased using the Countrywide name in April
2009.

Initials of Deputy Clerk  _sr_

early as 2003, Countrywide systematically moved away from its historical core business of prime mortgage underwriting, and aggressively loosened or expanded its underwriting guidelines and wrote more non-conforming, subprime, and home equity loans.

Specifically, Countrywide adopted a "matching strategy," which committed the company to offering any product or matching any underwriting guideline available from at least one "competitor," which included subprime lenders.  In other words, if Countrywide did not have a product offered by a competitor, Countrywide invoked the matching strategy and added that product to Countrywide's menu.  For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, Countrywide would reduce its minimum to 560 in order to match its competitor and make the loan.  Countrywide also had a no-brokering policy, which precluded Countrywide's loan officers from referring risky loan applicants to other brokers or institutions.  In addition, Countrywide made a high number of exceptions to its already expanded underwriting guidelines, thereby writing a high number of so-called "exception" loans.

Because of the matching strategy and the loosening of Countrywide's underwriting guidelines, Countrywide's product mix changed, and included more loans with a high risk of default, such as loans with high loan to value ratios, Adjustable Rate Mortgage ("ARM") loans, interest only loans, reduced documentation loans, and loans with layered risk factors.  For example, Countrywide offered the Pay-Option ARM loan, which allowed borrowers to choose among four payment options: (1) a minimum payment which was insufficient to cover accruing interest; (2) an interest-only payment; (3) a fully amortizing payment with a thirty year pay-off; and (4) a fully amortizing payment with a twenty year pay-off.   If the minimum payment was selected, the accruing interest was added to the loan's principal balance, otherwise known as negative amortization.  Countrywide's Pay-Option ARM loans typically permitted negative amortization until the principal balance reached 115% of the original loan balance, at which time the payment would reset to an amount necessary to repay principal and interest during the remaining term of the loan. This resulted in a much higher monthly payment and, as described by Countrywide, "payment shock" to many of its borrowers.  Even if the borrower never reached the 115% threshold, the loan would typically reset after five years to a higher, fully amortizing payment.

Countrywide also offered the "80/20" loan, which allowed a borrower with a subprime FICO score to simultaneously take out two loans to purchase a home: a first lien loan (typically 80% of the purchase price), and a second lien loan (typically 20% of the purchase price).  Because the borrower financed the entire purchase price, the borrower had no equity in the home, which substantially increased the risk that the borrower would default on the loan.

As a result of Countrywide's matching strategy and expansion of its underwriting guidelines, Countrywide was able to dramatically increase its market share between 2003 and 2007. However, because of the increasingly poor quality of loans originated by Countrywide from 2004 though 2007, Countrywide faced a greater risk of defaults and delinquencies than it had in the past, and a greater risk that these loans could not be profitably sold into the secondary mortgage market.

C.    Alleged Misrepresentations and Omissions

Initials of Deputy Clerk  _sr_

The mere fact that Countrywide allegedly engaged in a risky or flawed business strategy does not violate the securities laws.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp.2d 1132, 1144 (C.D. Cal. 2008) ("The federal securities laws do not create liability for poor business judgment or failed operations.").  Rather, liability attaches when false or misleading statements or omissions are made in connection with the offer or sale of securities.  *Id.*

The SEC alleges that Defendants made misleading statements in periodic filings and during earnings calls, conferences, and investor presentations, that reassured investors that Countrywide was mainly a maker of quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices. The alleged misleading statements can be separated into three main categories: (1) statements regarding the quality of Countrywide's underwriting guidelines and loan production; (2) statements regarding Countrywide's Pay-Option ARM loans; and (3) statements describing Countrywide's loans as "prime" or "nonprime."

1.  Misleading statements regarding the quality of Countrywide's underwriting guidelines and loan production

The SEC alleges that Defendants made various misleading statements regarding the quality of Countrywide's underwriting guidelines and loan production.

For example, in Countrywide's Forms 10-K for 2005, 2006, and 2007, Countrywide stated that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud."

In Countrywide's Form 10-K for 2005, Countrywide also stated: "We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages. . . . We make significant investments in personnel and technology to ensure the quality of our mortgage loan production."  A nearly identical representation appears in Countrywide's 2006 Form 10-K.

In addition to the statements in Countrywide's periodic filings, Defendant Mozilo made numerous public statements from 2005 through 2007, praising the quality of Countrywide's underwriting and distinguishing Countrywide from subprime lenders, stating, for example:

- "[w]e don't see any change in our protocol relative to the quality of loans that we're originating;"
- he "was not aware of any change of substance in [Countrywide's] underwriting policies;"
- "Countrywide had not taken any steps to reduce the quality of its underwriting regimen;"
- Countrywide "backed away from the subprime area because of our concern over credit quality;" and
-  it would be a "mistake" to compare monoline subprime lenders to Countrywide.

Sambol also made a public statement allegedly downplaying Countrywide's participation in originating subprime loans by stating that Countrywide had been "on the sidelines" of the risky subprime market.

Initials of Deputy Clerk  _sr_

The SEC alleges that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were false because Defendants were aware that Countrywide was originating increasing percentages of poor quality, subprime loans that did not comply with Countrywide's already lax underwriting guidelines.

>    2.    Misleading statements regarding Pay-Option ARM loans

The SEC also alleges that Defendants made misleading statements regarding Pay-Option ARM loans.  In 2005 and 2006, Mozilo made public statements touting Countrywide's Pay-Option ARM loans, stating, for example, that:

- "pay option loan quality remains extremely high;"
- Countrywide's "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period;"
- "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for customers;" and
- "Performance profile of [the Pay-Option ARM loan] is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments."

In addition, Countrywide's 2006 Form 10-K stated "[w]e believe we have prudently underwritten" Pay-Option ARM loans.

The SEC alleges that these statements were misleading because Defendant Mozilo and other members of senior management internally expressed grave concerns about the quality or viability of these loans.  For example, on April 4, 2006, in an internal email to Sambol regarding Pay-Option ARM loans, Mozilo stated "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."  Shortly thereafter, on May 19, 2006, Mozilo wrote an email to Sambol and Sieracki, stating that Pay-Option loans presented a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."  On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process.  On September 25, 2006, Mozilo wrote another email to Sambol and Sieracki, stating "[w]e have no way with reasonable certainty, to assess the real risk of holding these loans on our balance sheet."  Indeed, in the fall of 2006, Mozilo even recommended selling Countrywide's portfolio of Pay-Option ARM loans, recognizing the risks of retaining them on Countrywide's balance sheet.

>    3.    Misleading statements describing Countrywide's loans as "prime" or "nonprime"

The SEC alleges that Countrywide's descriptions of its loan categories, "prime non-conforming" and "nonprime," in Countrywide's Forms 10-K for 2005, 2006, and 2007 were misleading because Countrywide did not inform investors that it included loans within its "prime" category with increasing amounts of credit risk, such as loans issued to borrowers with sub-620

Initials of Deputy Clerk _sr_

FICO scores, reduced documentation and stated income loans, loans with loan to value ratios above 95%, and pay-option loans.

### 4.    Omissions

The securities laws make it unlawful "to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b).  Thus, the SEC alleges, in light of the misleading statements described above, that Defendants were required to and failed to disclose material information to investors, including: (1) Countrywide's increasingly lax underwriting guidelines; (2) Countrywide's pursuit of a "matching strategy;" (3) the high percentage of exception loans originated by Countrywide; (4) Countrywide's categorization of loans as "prime" that were made to borrowers with FICO scores well below the industry standard definition of prime credit quality; (5) the high percentage of Countrywide's subprime originations having a loan to value ratio of 100%; and (6) factors that increased the likelihood of default on Countrywide's subprime originations in addition to the subprime credit history of the borrower, such as reduced documentation, stated income piggyback loans, and loan to value ratios in excess of 95%.

### D.    The Claims

The Complaint alleges the following claims for relief: (1) violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); (2) violation of Section 10(b) of the Securities Exchange Act of 1934  ("Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (3) aiding and abetting violations of Section 13(a) of the Exchange Act,15 U.S.C. §78m(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13; and (4) violation of Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14 (against Defendants Mozilo and Sieracki only).

Defendants have each moved for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*  976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*,

477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

In ruling on a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . .."  *Id.* at 255.

## III.    DISCUSSION

### A.    Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder)

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder expressly prohibit misrepresentations and omissions of material fact as well as any manipulative or deceptive devices or conduct which operate as a fraud or deceit upon investors. *See* 15 U.S.C. § 77q(a); 15 U.S.C. §78j(b); 17 C.F.R. § 240.10b-5.  Section 17(a) of the Securities Act prohibits fraud in connection with the offer or sale of securities; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, prohibit fraud in connection with the purchase or sale of securities.[3]

In order to establish a violation of these provisions, the SEC must prove that Defendants made: "(1) a material misstatement or omission (2) in connection with the offer or sale of a security (3) by means of interstate commerce. . . . Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require scienter. . . . Violations of Sections 17(a)(2) and (3) require a showing of negligence." *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) (citations and quotations omitted).

Defendants primarily move for summary judgment on the grounds that: (1) the statements were not misleading or material as a matter of law in light of Countrywide's extensive disclosures; and (2) any inference of scienter is negated as a matter of law in light of Countrywide's extensive disclosures.  In addition, Sieracki argues that the SEC cannot demonstrate scienter because (1) he bought, rather than sold, Countrywide stock during the relevant time period, and (2) he relied in good faith on advice and information he received from Countrywide's in-house lawyers.  Sambol argues that he did not make or substantially participate in the preparation of the statements in Countrywide's SEC filings before the 3Q 2006 10-Q filed in November 2006.

---

[3]The SEC's Securities Act § 17(a) claim is based on Countrywide's filing of two registration statements.  The initial filing was a shelf registration, and it was followed by 180 prospectus supplements identifying the securities offered for sale.  Each of these offerings incorporated one of the allegedly false Form 10-Ks by reference.  Accordingly, the alleged misleading statements in the Forms 10-K serve as a basis for both the claim under Section 10(b) of the Exchange Act and the claim under Section 17(a) of the Securities Act, and therefore the Court will collectively address these claims.

Initials of Deputy Clerk _sr_

1.      The SEC has raised genuine issues of material fact that Defendants'
statements and omissions were misleading and material.

In order to be actionable under Section 17(a) of the Securities Act, Section 10(b) of the
Exchange Act, and Rule 10b-5, the alleged misstatements or omissions must be false or
misleading.  *See* 17 C.F.R. § 240.10b-5(b) ("It shall be unlawful . . . [t]o make any untrue
statement of material fact or to omit to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they were made, not misleading.").
A statement or omission is misleading if it "affirmatively creates an impression of a state of affairs
that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*,
280 F.3d 997, 1006 (9th Cir. 2002).  A statement, although literally true, can be misleading.  *See In
re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (quotations and citation
omitted) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by
the ability of the material to accurately inform rather than mislead prospective buyers.").

In addition, in order to be actionable, the statement or omission must be material.  "It is not
enough that a statement is false or incomplete, if the misrepresented fact is otherwise
insignificant."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  A fact is material if there is a
substantial likelihood that a reasonable investor would consider it important in making an
investment decision.  *See id.* at 231.  Further, "to fulfill the materiality requirement 'there must be a
substantial likelihood that the disclosure of the omitted fact would have been viewed by the
reasonable investor as having significantly altered the 'total mix' of information made available.'"
*See id.* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Both the materiality and misleading nature of a statement or omission are usually questions
for the trier of fact.  *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[W]hether a public
statement is misleading, or whether adverse facts were adequately disclosed is a mixed question
to be decided by the trier of fact."); *id* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S.
438, 450 (1976)) ("Whether an omission is 'material' is a determination that 'requires delicate
assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and
the significance of those inferences to him, and these assessments are peculiarly ones for the trier
of fact.'"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F. 3d 1167, 1178 (9th Cir. 2009) (quotations
and citations omitted) ("Questions of materiality . . . involv[e] assessments peculiarly within the
province of the trier of fact.").  "Therefore, only if the adequacy of the disclosure or the materiality
of the statement is so obvious that reasonable minds could not differ are these issues
appropriately resolved as a matter of law." *Fecht,* 70 F.3d at 1081 (quotations and citations
omitted).

Defendants primarily argue that the alleged statements and omissions were not misleading
or material as a matter of law in light of Countrywide's extensive disclosures about the risk
characteristics of its loan originations in periodic SEC filings, at investor forums, on free company-
sponsored websites, and in prospectus supplements filed by four of Countrywide's indirect
subsidiaries.  Defendants contend that because the SEC's own expert conceded all publicly
available information is reflected in Countrywide's stock price, the omitted facts were known to
investors and thus immaterial as a matter of law.  However, Defendants cannot replace the
traditional analysis of materiality, i.e. whether there is a substantial likelihood that a *reasonable
investor* would view disclosure of the omitted fact as having significantly altered the total mix of

Initials of Deputy Clerk   _sr_

information available, with a "truth in the market" defense (a corollary to the fraud on the market theory of reliance) in this SEC enforcement action.  As the Ninth Circuit stated in *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir. 1989):

> Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public.  Where a plaintiff alleges actual reliance on a particular statement, it does not matter that the *market* is aware of the facts necessary to make the statement not misleading.  The plaintiff may be misled into believing that the stock has been incorrectly valued by the market.

> The situation is different in a fraud on the market case.  In a fraud on the market case, the plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information.  Provided that they have credibly entered the market through other means, the facts allegedly omitted by the defendant would already be reflected in the stock's price; the mechanism through which the market discovered the facts is not crucial.

886 F.2d at 1114 (internal citations omitted).[4]  More recently, in *Miller v. Thane International, Inc.*, 519 F.3d 879 (9th Cir. 2008), the Ninth Circuit reaffirmed that, in an action that does not involve the fraud on the market presumption of reliance, "[i]nvestors are not generally required to look beyond a given document to discover what is true and what is not," explaining:

> In the context of a "fraud on the market" Rule 10b-5 class action, where reliance is presumed based on the price of a stock, availability to the public of truthful information may be relevant to the extent the stock's price has not actually been skewed by any misrepresentations.  However, in an action that does not involve the fraud on the market presumption, that truthful information is available elsewhere does not relieve a defendant from liability for misrepresentations in a given filing or statement.

519 F.3d at 887 n.2 (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114-1115 (9th Cir. 1989)).

Because the SEC in an enforcement action is not required to prove reliance, the "fraud on

---

[4]*See also Kaplan v. Rose*, 49 F.3d 1363, 1381 (9th Cir. 1994) ("The parties' summary judgment papers and the district court's opinion, however discuss materiality as if it were determined by whether the omitted information was credibly available to the market through other sources.  Their discussion combines the fraud on the market theory of establishing reliance with the analysis of an individual statement's materiality.  The two inquiries are closely related but not identical.  A plaintiff who shows reliance under the theory that the market relied on a misrepresentation or omission must also establish materiality by showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information.").

Initials of Deputy Clerk  sr

the market" presumption is not relevant.  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *see also SEC v. Reys*, 2010 WL 1734843, at *4 (W.D. Wash. Apr. 28, 2010) (rejecting defendant's arguments that statements were immaterial as a matter of law because of curative disclosures in the company's SEC filings, stating that the defendant "has cited no published in-circuit case for the proposition that the truth on the market doctrine applies to an SEC enforcement action as opposed to a private securities action based [upon] a theory of 'fraud on the market.'"). Thus, in an SEC enforcement action, omissions by corporate insiders are not rendered immaterial as a matter of law simply because the omitted facts were available to the public elsewhere. Although proof of materiality requires there to be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," the "total mix" of information does not encompass the total universe of information available in the public domain.  Indeed, a reasonable investor is not required to pore through all prior transcripts of earnings calls, review hundreds of prospectus supplements filed by indirect subsidiaries, or "connect the dots" in a company's various SEC filings. *Cf. Miller*, 519 F.3d at 887.  The question is not whether the information is reflected in the company's stock price, but whether the information is so readily available that a reasonable investor would consider it as part of the total mix of information.  Moreover, even if that information is part of the "total mix," the information must be transmitted "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *In re Apple Computer Sec. Litig.*, 886 F.2d at 1116 (discussing the "total mix" of information in a fraud-on-the-market action); *see also Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("[N]ot every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.").   Courts will rarely be able to decide these issues on a motion for summary judgment.

Here, Defendants fail to demonstrate that the statements and omissions alleged by the SEC were not misleading or material as a matter of law.[5]

        (a)    The SEC has raised genuine issues of material fact that Defendants' statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading and material.

The Court concludes that the SEC has raised genuine issues of material fact that Defendants' statements and omissions regarding the quality of Countrywide's underwriting guidelines and loan production were misleading and material.

For example, in Countrywide's Forms 10-K for 2005, 2006, and 2007, Countrywide stated that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." SF 210.  In Countrywide's Form 10-K for 2005, Countrywide also stated: "We ensure our ongoing

---

[5]With respect to the statements that the Court has not specifically addressed, the Court concludes that the SEC has raised genuine issues of material fact that they were misleading and material.

Initials of Deputy Clerk __sr__

access to the secondary mortgage market by consistently producing quality mortgages. . . . We make significant investments in personnel and technology to ensure the quality of our mortgage loan production."  A nearly identical representation appears in Countrywide's 2006 Form 10-K.

The SEC has presented evidence that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading in light of Defendants' failure to disclose, *inter alia*,  that: (1) As a consequence of Countrywide's "matching strategy," Countrywide's underwriting "guidelines" would end up as a composite of the most aggressive guidelines in the market.  McMurray Inv. Test., July 8, 2008, 15:14-16:12, SF 254-256; and (2) Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market.

For example, Countrywide's Chief Risk Officer, John McMurray, explained in his deposition, that Countrywide mixed and matched guidelines from various lenders in the industry, which resulted in Countrywide's guidelines being a composite of the most aggressive guidelines in the industry: "And so, . . . if you match one lender on – on one – on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that – of that two-step match would be more – would be more aggressive than either one of those competitor reference points viewed in isolation."  SF 254.  McMurray repeatedly explained his view and the risks of the matching strategy to others within Countrywide, including Sambol.  SF 252-256, 262-264.

SEC has also presented evidence that Countrywide routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite *any* loan it could sell into the secondary mortgage market.  According to the evidence presented by the SEC, Countrywide typically made four attempts to approve a loan.  Countrywide first used an automated underwriting system known as "CLUES," which applied Countrywide's underwriting guidelines as set forth in Countrywide's technical manuals and loan program guides. SF 279. The technical manuals contained general instructions and principles concerning how loans were underwritten, and the loan program guides contained the specific underwriting guidelines and standards for each loan program or product.   SF 278; McMurray, Inv. Test. 53:11-54:2, July 8, 2008.  CLUES would either approve the loan or "refer" it to a loan officer for manual underwriting. SF 280.  If that loan officer lacked the authority to make an exception to Countrywide's underwriting guidelines, the loan was referred to the Structured Lending Desk, where yet another underwriter, with even more authority to waive guideline requirements, attempted to make the loan.  Adler Dep. 31:23-33:4, July 15, 2010.  If that attempt failed, the loan was referred to Countrywide's Secondary Markets Structured Lending Desk.  SF 282, Adler Dep. 32:9-33:4.  According to the testimony of the Managing Director of Countrywide Home Loans' Secondary Marketing Division, once the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, the sole criterion used for approving the loan was whether or not the loan could be sold into the secondary market.  SF 282.  As a result of this process, a significant percentage (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines.  SF 293-294.  As reported in one Corporate Credit Risk Committee meeting, one third of the loans referred from CLUES missed "major guidelines" and another one third missed "minor" guidelines.   SF 289.  In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines, that Countrywide would originate any loan it could sell, and therefore that the statements regarding the quality of Countrywide's underwriting and loan

Initials of Deputy Clerk __sr__

production were misleading.

A reasonable jury could also conclude that the statements and omissions were material. The materiality of the statements and omissions is supported by the fact that Countrywide's core business, i.e., originating loans for sale into the secondary market, was dependent on continued access to that market and the quality of its loan production. According to the testimony of Countrywide's Chief Risk Officer, if the loans that Countrywide sold to investors as mortgage-backed securities performed poorly, Countrywide's ability to access the secondary mortgage market could be frustrated.  SF 407.  Clearly, a reasonable jury could conclude that Countrywide's consistent practice of ignoring its already aggressive underwriting guidelines which were "designed so that [the] loans [were] salable in the secondary mortgage market" would be an important fact to investors.  SF 4; *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149 (S.D. Cal. 2008) ("[A]s a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors.").

Defendants argue, as they did in their motions to dismiss, that these statements are nonactionable puffery.  As Judge Pfaelzer stated, "[i]n the vast majority of cases such statements would be nonactionable puffery."  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1153 (C.D. Cal. 2008).  However, the SEC's evidence, if believed by the jury, "present[s] the extraordinary case where a company's essential operations were so at odds with the company's public statements that [the statements] . . . are rendered cognizable to the securities laws."  *Id.* at 1144.  *Cf. Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' For example, if a defendant represents that its lending practices are 'conservative' ... the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations."); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (finding statements that company observed standards of high quality credit and underwriting not "mere puffery" where the complaint presented "detailed allegations of practices that utterly failed to meet those standards").

Defendants also argue that the omissions were immaterial as a matter of law based on Countrywide's and Defendants' many disclosures.  Not only do Defendants fail to demonstrate that the information was so readily available that, as a matter of law, a reasonable investor would have considered it in the "total mix" of information, Defendants fail to demonstrate that the disclosures actually conveyed the omitted information with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by Defendants' one-sided representations.  For example, Defendants argue that a reasonable investor would be aware that a significant number of Countrywide's loans were originated as exceptions to its underwriting guidelines because 82 of the prospectus supplements issued by four of its indirect subsidiaries disclosed that "a significant number of the mortgage loans [in this securitization] will have been originated based on underwriting exceptions."  SF 53.  However, a reasonable investor is not required to pore through hundreds of prospectus supplements, consisting of thousands of pages, issued by Countrywide's indirect subsidiaries to determine that the underwriting guidelines touted in its Forms 10-K were routinely ignored in making loans.  Moreover, even if an investor were able to synthesize all of the information in the prospectus supplements, the investor would not be able to determine the extent to which Countrywide was ignoring its underwriting guidelines.  Likewise, although Countrywide repeatedly disclosed that its strategy was to offer the "broadest" product

Initials of Deputy Clerk _sr_

menu in the mortgage industry, Countrywide never disclosed that it employed the strategy in such a way to make its underwriting guidelines a composite of the most aggressive guidelines in the industry.  In addition, although Countrywide disclosed in its 2005 and 2006 Forms 10-K that its "underwriting guidelines . . . have been designed so that these loans are salable in the secondary mortgage market," Countrywide did not disclose that the underwriting guidelines it designed, presumably to ensure prudent underwriting, were routinely ignored, and that the *only* criterion Countrywide used in approving a *particular* loan was whether it could be sold in the secondary mortgage market.

Accordingly, the SEC has raised genuine issues of material fact that Defendants' statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading and material.

      (b)      The SEC has raised genuine issues of material fact that Defendants' statements regarding Pay-Option ARM loans were misleading and material.

The Court concludes that the SEC has raised genuine issues of material fact that Defendants' statements regarding Pay-Option ARM loans were misleading and material.

For example, in its 2006 Form 10-K, Countrywide stated that "[w]e believe we have prudently underwritten" Pay-Option ARM loans.  Similarly, at a May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference, Mozilo stated that "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for customers."  These statements of belief are "factual" misstatements, actionable under the securities laws, if  "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994).  The SEC has presented evidence from which a jury could conclude that these statements were not actually believed by Defendants.  For example, on April 4, 2006, in response to an email informing Mozilo that 72% of Pay-Option borrowers chose to make the minimum payment in February 2006, Mozilo sent an email to Sambol, stating "this is important data that could portend serious problems with this product" and "since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore delinquencies.  We must limit this product to high ficos otherwise we would face both financial and regulatory consequences." SF 502.  On May 19, 2006, Mozilo sent an email to Sambol and Sieracki, concluding that Pay-Option loans continue to present a long term problem "'unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen." SF 505.  On June 1, 2006, Mozilo advised Sambol in an email that he had only recently become aware that the Pay-Option ARM loans originated by Countrywide were largely underwritten on a reduced documentation basis and that there was evidence that the information that borrowers provided with respect to their income did not match up with IRS records. SF 508.  During his SEC investigative testimony, Mozilo candidly admitted that he did not understand why Pay Option ARM loans were not going through the normal documentation process: "Why would they do it on stated income?  Why wouldn't they go through the normal documentation process?"  Mozilo Inv. Test. 341:15-17, Aug. 20, 2008.  He also admitted that the less documentation Countrywide had to verify a borrower's income, the greater the risk of default.  Mozilo Inv. Test. 342:1-4, Aug. 20, 2008.  Moreover, on

September 26, 2006, Mozilo sent an email to Sambol and Sieracki, proposing that Countrywide "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port[folio]." SF 513.   At the time, Countrywide held over 30 billion dollars in pay-option ARM loans in its portfolio.  On January 29, 2007, Mozilo instructed the president of Countrywide Bank "to explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of Pay options) the bulk [of] the Pay Options on the Bank's balance sheet and replace with HELOCS." SF 515.  Based on this evidence, a reasonable jury could conclude that Defendants did not believe that they had prudently underwritten Pay-Option ARM loans or that the loans were a sound investment for Countrywide, and therefore that those statements were false and misleading.

        The Court concludes that a reasonable jury could also find that Mozilo made a false and misleading statement on May 31, 2006, when he stated: "Performance profile of [the Pay-Option ARM loan] is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments."  As Mozilo testified at his deposition, at the time he made the statement, he derived no comfort from World Savings' experience from Pay-Option ARM loans. SF 507.  Mozilo's lack of trust in the loan's history was demonstrated by his now infamous "flying blind" email to Sambol and Sieracki on September 26, 2006, in which he stated:

        We have no way, with any reasonable certainty, to assess the real risk of holding
        [Pay-Option] loans on our balance sheet.  The only history we can look to is that of
        World Savings however their portfolio was fundamentally different than ours in that
        their focus was equity and our focus is fico.  In my judgment, as a long time lender, I
        would always trade off fico for equity. The bottom line is that we are flying blind on
        how these loans will perform in a stressed environment of higher unemployment,
        reduced values and slowing home sales.

SF 513.

        Given that Pay-Option ARM loans represented approximately 14% of Countrywide's total loan production and 46% of Countrywide's loans held for investment for the 2006 fiscal year, a jury could also conclude that these statements regarding Pay-Option ARM loans were material. Indeed, as admitted in Defendants' Joint brief, "[b]ecause [Countrywide] was directly exposed to default risk for [Pay-Option ARM] loans," Countrywide believed it was important to provide extensive disclosures about their credit attributes in its periodic reports.  Joint Memorandum, p. 13.  Further, an analyst testified that he would consider it important that Mozilo did not take any comfort from World Savings' experience with Pay-Option ARM loans.  SF 472.

        Defendants move for summary judgment on the statements regarding Pay-Option ARM loans, on the grounds that Countrywide disclosed the material risks of Pay-Option ARM loans, including the potential for negative amortization, the risk that defaults would increase when the loans "reset,"  the potential for "payment shock," its own lack of experience with the pay-option product, and that substantially all of these loans were underwritten on a reduced documentation basis.

        Whether the disclosed information adequately conveyed the risks of Pay-Option ARM loans or was readily available to a reasonable investor are questions of fact for the jury.  Although

Initials of Deputy Clerk  _sr_

Countrywide disclosed in its second and third quarter 2006 10-Qs that "substantially all" of its pay-option loans were issued on the basis of reduced borrower documentation, Countrywide's 2006 Form 10-K contained no such disclosure.  SF 70.  Moreover, Countrywide failed to disclose in *any* of its SEC filings that it was aware that a significant percentage of borrowers were misrepresenting their income.  Although Mozilo commented on one occasion (in response to a general question from an analyst about fraud in the industry) that he believed that "there's a lot of fraud" with respect to reduced documentation loans, he also reassured investors that he did not think the fraud had "been meaningful in terms of the quality of performance of the loans."  SF 71.   Accordingly, the Court cannot conclude as a matter of law that a reasonable investor would consider this single comment to be part of the "total mix" of information available, or that this comment adequately conveyed all of the material information.  SF 71.

Likewise, the Court cannot conclude as a matter of law that a reasonable investor would consider Mozilo's May 31, 2006 statement, expressing confidence in the historical experience of pay-option loans, immaterial.  Although Countrywide disclosed in its 2005 and 2006 10-Ks that it lacked significant historical experience with Pay-Option ARM loans, a reasonable investor buying stock between May 31, 2006 (when Mozilo made the statement), and March 1, 2007 (when the 2006 10-K was filed) could be misled.[6]

In short, whether Defendants' statements were misleading, or whether the adverse facts regarding Pay-Option ARM loans were adequately disclosed are determinations that "require[ ] delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)  (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

> (c)      The SEC has raised genuine issues of material fact that statements describing Countrywide's loans as "prime" or "nonprime" in Countrywide's Forms 10-K were misleading and material.

The Court concludes that the SEC has raised genuine issues of material fact that the statements describing Countrywide's loans as "prime" or "nonprime" in Countrywide's Forms 10-K were misleading and material.  Although there is no commonly accepted, industry-wide definition of the terms "prime" or "nonprime," it cannot seriously be disputed that Countrywide intended to convey that there was a meaningful distinction between these categories, and specifically, that its "prime" category included loans of a higher quality which would be expected to produce a reliable income stream.  Indeed, although the analyst deposed by the SEC admitted that "prime" was a vague term, he testified that he would expect Countrywide's prime portfolio to be "higher quality loans with FICO scores that would be, you know, high 600s at a minimum, debt-to-income ratios

---

[6]Defendants rely heavily on *SRM Global Fund Limited Partership v. Countrywide Financial Corporation*, 2010 WL 2473595 (S.D.N.Y. Jun. 17, 2010) in support of their argument that Countrywide's lack of historical experience with Pay-Option ARM loans was adequately disclosed to investors.  Defendants' reliance on this case is misplaced.  There, the plaintiff relied on the fraud-on-the-market presumption and did not purchase any Countrywide securities until after Countrywide filed its 2006 Form 10-K.

Initials of Deputy Clerk _sr_

that would be 40 percent or less . . . ." SF 473.   Likewise, SEC Expert Professor Michael LaCour-Little identified five different ways to distinguish between prime and subprime loans, all of which were simply short-hand ways of differentiating between higher quality loans (with lower risk of default) and poorer quality loans (with higher risk of default).[7]  See LaCour-Little Dep. 42:4-43:12, July 28, 2010.

The SEC has presented evidence from which a jury could conclude that Countrywide's use of these loan categories was misleading in light of Countrywide's failure to fully disclose the risk attributes or characteristics of the loans included in its "prime" or higher quality loan category.  For example, Countrywide included Extreme Alt-A loans in its "prime" category, which at an April 6, 2006 Corporate Credit Risk Committee meeting, were described as having "extreme credit risk layering" and "could perform as bad, or worse, than Sub-Prime [loans], potentially impacting the external view of [Countrywide's] prime performance."  SF 374.   In addition, Countrywide included Pay-Option ARM loans, one of Countrywide's riskier products, in its prime category.  SF 65.  The inclusion of Pay-Option ARM loans in Countrywide's prime category, especially in light of Defendants' statements reassuring investors of Countrywide's underwriting discipline and loan quality, was clearly a statement of Defendants' belief that these loans were prudently underwritten and of high quality.   As discussed supra, the SEC has presented evidence to the contrary.

Defendants do not contend that the failure to disclose the risk attributes or characteristics of the loans in its prime category would be unimportant to Countrywide's investors.  Instead, Defendants again contend that, in light of Countrywide's disclosures in its prospectus supplements and in light of other facts known to the market, any omissions from its Form 10-K were immaterial and not misleading.  Again, the Court concludes that whether such disclosures would be considered part of the "total mix" of information available, and whether such disclosures adequately conveyed all of the material information, are questions for the trier of fact.

Accordingly, the Court concludes that the SEC has raised genuine issues of material fact that Defendants' statements describing Countrywide's loans as "prime" or "nonprime" in Countrywide's Forms 10-K were misleading and material.

2.   <u>Sambol made the statements in Countrywide's 2005 Form 10-K.</u>

Sambol argues that he did not make, or substantially participate in the preparation of, the statements in Countrywide's SEC filings before the 3Q 2006 10-Q filed in November 2006.  Sambol does not contest that he made or substantially participated in the preparation of the statements in Countrywide's Forms 10-K for the years ended 2006 and 2007.  The only remaining SEC filing at issue in which an alleged misstatement appears is Countrywide's Form 10-K for the year ended 2005.

On October 27, 2006, Sambol signed a Post-Effective Amendment to a Form S-3 Registration Statement, incorporating the 2005 Form 10-K by reference.  As stated in the Post-

---

[7]Although LaCour-Little opined that he did not believe Countrywide's use of the term "nonprime" in its public disclosures was false or misleading, Defendants understandably did not ask whether he believed Countrywide's use of the term "prime" was misleading.

Initials of Deputy Clerk _sr_

Effective Amendment, "[t]he information incorporated by reference is considered to be part of this prospectus . . .".  Accordingly, because Sambol repeated the misleading statements from the 2005 Form 10-K, he "made" those statements, and can be held liable for them.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000) (holding signers of SEC documents responsible for the statements they sign); *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) (SEC can state a fraud claim under both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act for statements in S-8 form even though the transaction registered did not involve distribution of shares to the public market because the form was publicly disseminated).[8]

### 3.   The SEC has raised genuine issues of material fact that Defendants made the misleading statements or omissions with scienter.

Under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, the SEC must establish that Defendants made the alleged misstatements and omissions with "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud," or at a minimum, deliberate or conscious recklessness.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).  This scienter requirement protects defendants from overreaching by the SEC.

"Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements."  *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010).  "[R]eckless conduct may be defined as . . . an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir, 1990).  Although the Court may consider the objective unreasonableness of a defendant's conduct to raise an inference of scienter, scienter includes a "subjective inquiry" turning on the defendant's "actual state of mind."  *SEC v. Platforms Wireless Int'l Corp.*, __ F.3d __, 2010 WL 3218524, at *13 (9th Cir. Aug. 16, 2010) (citations omitted).  "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity."  *Gebhart v. SEC*, 595 F.3d at 1042.

"Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim."  *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 626 (9th Cir. 1994) (citations omitted) ("Summary judgment on the scienter issue is appropriate only if 'there is no rational basis in the record for concluding that any of the challenged statements were made with the requisite scienter.").

---

[8]Curiously, Sambol cites *Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000), for his position that he did not "make" the statements in the 2005 Form 10-K because he did not substantially participate in the preparation of the 2005 Form 10-K.  However, in *Howard v. Everex Systems, Inc.,* the Ninth Circuit confirmed that an individual can be liable for making a false or misleading statement by signing an SEC filing, even if he did not participate in the drafting of the allegedly false SEC filing.

Initials of Deputy Clerk  _sr_

Here, the SEC has presented evidence from which a reasonable jury could conclude that
Defendants possessed the requisite scienter.  For example, the SEC has demonstrated that
Defendants were aware that Countrywide routinely ignored its underwriting guidelines and that
Defendants understood the accompanying risks:

- As early as May 22, 2005, Countrywide's Chief Risk Officer John McMurray sent an email
  alerting Sambol to the risks of Countrywide's exception policy.  McMurray stated that
  "exceptions are generally done at terms even more aggressive than our guidelines," and
  "[g]iven the expansion in guidelines and growing likelihood that the real estate market will
  cool, this seems like an appropriate juncture to revisit our approach to exceptions and
  reconfirm where we're comfortable and change where we're not."  Additionally, he warned
  that increased defaults would cause repurchase and indemnification requests to rise and the
  performance of Countrywide-issued mortgage-backed securities in the secondary market to
  deteriorate.  SF 287-288.

- On June 28, 2005, Sieracki attended a Corporate Credit Risk Committee meeting, in which
  he was informed that 1/3 of the loans which were referred from CLUES violated "major"
  underwriting guidelines and 1/3 violated "minor" guidelines.  SF 520, 524.  At that same
  June 28, 2005, meeting, Sieracki learned that Countrywide was originating non-owner
  occupied loans with 95% combined loan to value ratios, which were exceptions to
  Countrywide's underwriting guidelines.  Countrywide's chief operating officer opined that
  Countrywide "appear[ed] to have unacceptable risk on [its] balance sheet" from these loans.
  SF 521.

- Mozilo was acutely aware of the breakdown in Countrywide's procedures and the lack of
  compliance with Countrywide's underwriting guidelines as a result of HSBC's demand that
  Countrywide "buy-back" many of the "80/20" loans that it had purchased.  On March 27,
  2006, Mozilo sent an email to several Countrywide executives, including Sieracki and
  Sambol, regarding the corrective measures to be implemented to avoid buy-backs in the
  future, stating: "Sambol will make certain that the people responsible for the origination
  process understand the necessity for adhering to the guidelines for the 100% LTV sub-
  prime product.  This is the most dangerous product in existence and there can be nothing
  more toxic and therefore requires that no deviation from guidelines be permitted irrespective
  of the circumstances." SF 321.  On April 13, 2006, Mozilo sent another email to Sieracki and
  Sambol, stating that he had "personally observed a serious lack of compliance with our
  origination system as it relates to documentation and generally a deterioration in the quality
  of loans originated versus the pricing of those loan[s].  In my conversations with Sambol he
  calls the 100% subprime seconds as the 'milk' of the business. Frankly I consider that
  product line to be the poison of ours."  SF 324.

- On June 22, 2006, Sambol and Sieracki attended a Corporate Credit Risk Committee
  meeting, during which they were informed that in the first quarter of 2006, 23% of its
  subprime first lien loans were originated as an "exception."  SF 313, Dean Declaration, Exh.
  174, p. 4442.

- At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol and
  Sieracki, Risk Management reported that 12% of the loans reviewed through Countrywide's

Initials of Deputy Clerk  _sr_

internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines.  SF 526, Dean Declaration, Exh. 133, p. 3771.

• On May 29, 2007, Sambol and Sieracki attended a Credit Risk Committee Meeting, during which they were informed that even as Countrywide had been purportedly tightening guidelines, "loans continue[d] to be originated outside guidelines" primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding Secondary SLD approvals." SF 527.  The presentation also included a recommendation from the credit management department that two divisions "cease to grant exceptions where no major competitor is offering the guideline."  SF 527.

• Mozilo approved his own loans, pursuant to a program labeled by the media as the Friends of Angelo ("FOA") loans, that were outside of Countrywide's underwriting guidelines.  SF 401.

The SEC has also presented evidence that Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry:

• In a June 24, 2005 email, Countrywide's Chief Risk Officer John McMurray explained to Sambol that "because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the outer boundaries across multiple lenders.  For example, First Franklin is used as a comparison for some guidelines where they are more aggressive (e.g., high LTV/CLTV) and not used where they are less aggressive (e.g. stated doc loans).  As a result, our composite guides are likely among the most aggressive in the industry." SF 253-54.

• On November 2, 2006, Sambol was again made aware of McMurray's concern that when Countrywide's matching strategy was "done across lenders, across products and across guidelines, the composite set of guidelines will be the most aggressive credit in the market." SF 262-263.

• In a February 11, 2007 email, McMurray advised Sambol that he doubted Countrywide's composite matching strategy "would play well with regulators, investors, rating agencies, etc.  To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines."  SF 274-75.

In addition, as discussed *supra*, the SEC has presented evidence from which a jury could conclude that Mozilo did not believe that Countrywide had prudently underwritten Pay-Option ARM loans, and that he shared his concerns regarding Pay Option ARM loans with Sambol and Sieracki.  The SEC has also presented evidence that Sambol and Sieracki acknowledged or agreed with those concerns regarding Pay-Option ARM loans:

• Sieracki testified that he agreed with Mozilo's view that Countrywide faced difficulty in assessing the "real risk" of holding Pay Option ARM loans on Countrywide's balance sheet.

Initials of Deputy Clerk  _sr_

SF 534.

- On May 25, 2006, the chairman of the board of Countrywide Bank reported that he had spoken to Sambol regarding pay option loans: "Spoke with sambol.  He believes historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort.  Sambol is concerned about payment shock at recast and inability to absorb increased payments thru income or refi (due to low equity).  So Sambol believes high cltv loans with no mi, particularly those with high dti are risky.  Maybe also those with low ficos.  If the loans are in markets that have slowed the risk is exacerbated.  He wants us to propose a strawman action plan.  For example, for those segments in the markets that have stopped appreciating, sell the most recent production and stop portfolioing cltv greater than 80 and high dti loans.  For markets that are expected to continue to appreciate, monitor and maybe stop portfolioing high cltv and dti loans."  SF 367.

Moreover, in addition to demonstrating that Defendants were aware of the facts which made their statements misleading, the SEC has presented evidence that Sambol and Sieracki knew that Countrywide's Chief Risk Officer John McMurray firmly believed that Countrywide should include greater credit risk disclosures in its SEC filings.  For example, in January 2007, McMurray sent an email to Sieracki outlining "why delinquencies will increase and the impact this increase will have on [Countrywide's] financial results," and specifically pointed out "widened guidelines" as one of the principal reasons.  SF 453.  McMurray subsequently incorporated this email in his response to the MD&A questionnaire for the 2006 Form 10-K. SF 453.  However, on February 26, 2007, McMurray was advised by Sieracki that Sambol had "slashed" some of his proposed revisions to the credit disclosures in the 2006 Form 10-K, especially those having to do with "widened guidelines for affordability." SF 457.

In addition, between August 4 and August 7, 2007, McMurray exchanged a series of emails with the managing director of financial reporting suggesting revisions to the Form 10-Q for the second quarter of 2007.  SF 458.  In relevant part, McMurray suggested that information regarding the industry's widened underwriting guidelines should be disclosed in the prospective trends section of the 10-Q.  SF 458.  However, on August 7, 2007, the managing director of financial reporting responded to McMurray, stating that he had not made McMurray's changes because he "expect[ed] those changes to be trumped by certain reviewers."  SF 458.  The managing director of financial reporting testified that the reviewers he expected to trump McMurray's suggestions were David Sambol and Countrywide's CIO.  SF 458.  Clearly not satisfied, McMurray then sent a signed certification to Countrywide's SOX officer, but attached a note and email detailing his suggested revisions to the Form 10-Q.  SF 459.  McMurray's comments were then communicated to both Sambol and Sieracki.  SF 460.  Ultimately, Sambol and Sieracki told the Deputy CFO that they did not believe the additional disclosures were necessary or appropriate.  SF 460.

Defendants do not dispute that they were aware of the facts which the SEC alleges made their statements misleading, but instead argue that Countrywide's extensive disclosures negate any inference of scienter as a matter of law.  While the disclosures may undermine the inference of scienter, they are certainly not sufficient to entirely negate it, especially given that the disclosures were incomplete, interspersed with misleading statements, scattered among various SEC filings and earnings calls, and buried in thousands of pages of prospectus supplements.  Sieracki also argues, in relevant part, that the SEC cannot demonstrate scienter because he bought, rather than

Initials of Deputy Clerk  _sr_

sold, Countrywide stock during the relevant time period and because he relied in good faith on advice and information provided by Countrywide's in-house lawyers.  Again, although the evidence presented by Sieracki tends to negate scienter, it does not negate scienter as a matter of law, especially given that there is evidence that he was aware of the facts that made his statements misleading and that he rejected the additional disclosures proposed by Countrywide's Chief Risk Officer.  *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d 920, 944 (9th Cir. 2003) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter."); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992) (defendant corporation's continued investment of millions of dollars in its product and corporate officers' failure to sell their stock during the class period did not negate evidence of scienter); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1154 (C.D. Cal. 2007) ("[I]ndividual defendants' failure to sell Entropin stock, and Entropin's continued funding of Esterom, are not sufficient evidence for the Court to find that defendants did not have scienter."); *Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634, 642 (D.C. Cir. 2008) (finding that defendant cannot rely on the silence of counsel and others to absolve himself of responsibility when non-disclosure presented such an obvious danger of misleading investors.").

Accordingly, the SEC's evidence is sufficient to raise a genuine issue of material fact with respect to Defendants' scienter, and summary judgment is inappropriate.  *See SEC v. Platforms Wireless Int'l Corp.*, __ F.3d __, 2010 WL 3218524, at *13 (9th Cir. Aug. 16, 2010) (citations omitted) ("When the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk.'").

## B.    Mozilo's Insider Trading

As part of its Section 10(b) and Rule 10b-5 claim, the SEC alleges that Mozilo engaged in insider trading, i.e., that he traded in the securities of Countrywide on the basis of material, nonpublic information.  *See United States v. O'Hagan*, 521 U.S. 642, 651 (1997) ("Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.").   "[A] purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale."  17 C.F.R. § 240.10b5-1(b).[9]   The SEC must also prove that Mozilo acted with scienter, i.e., a mental state embracing intent to deceive, manipulate, or defraud, or at a minimum, deliberate or conscious recklessness.  Selective Disclosure and Insider Trading, S.E.C. Release Nos. 33-7881, 34-43154, and IC-24599, 73 SEC Docket 3 , 2000 WL 1201556, at * 22 (August 15, 2000) ("Scienter remains a necessary element for liability under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 10b5-1 does not change this.").

---

[9]*United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) and *SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998), concluding that a trader is not liable unless it shown that he or she "used" the material nonpublic information for trading, pre-date the SEC's adoption of Rule 10b5-1, 17 C.F.R. § 240.10b5-1.

Initials of Deputy Clerk  sr

Although Mozilo's stock sales were made pursuant to Rule 10b5-1 trading plans,[10] the SEC has raised genuine issues of material fact that Mozilo was aware of material, non-public information at the time he adopted or amended these trading plans and that he acted with scienter. On October 27, 2006, Mozilo executed two trading plans, one designed to sell 3,989,588 shares of Countrywide stock and one designed to sell another 91,999 shares.  SF 82-83.  On November 13, 2006, he executed a trading plan designed to sell another 100,000 shares of Countrywide stock. SF 84.  On December 12, 2006, he executed a trading plan designed to sell another 1,389,580 shares of Countrywide stock.  SF 85.  On February 2, 2007, Mozilo amended the December plan to sell an additional 1,393,197 shares (bringing the total number of shares to be sold under the December plan to 2,782,777).  SF 86.  The shares sold pursuant to these trading plans yielded profits to Mozilo of over $140 million.  SF 496.  The SEC has presented evidence from which a jury could find: (1) Mozilo was aware of material, non-public information at the time he adopted or amended these trading plans; (2) Mozilo made misleading statements with scienter during 2006 and 2007, when the plans were adopted and the trades were executed; and (3) these trading plans were significantly out-of-line with his prior trading plans or practices.[11]  From this evidence, a reasonable jury could conclude that Mozilo engaged in insider trading in violation of Section 10(b) and Rule 10b-5.

### C.  Aiding and Abetting Violations of Section 13(a) of the Exchange Act (and Rules 12b-20, 13a-1, and 13a-13 thereunder)

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder require issuers of securities registered pursuant to Section 12 of the Exchange Act, such as Countrywide, to file with the SEC accurate periodic and current reports.  An issuer violates these provisions if it files a report that contains materially false or misleading information.  *SEC v. Yuen*, 2006 WL 1390828, at *41 (C.D. Cal. Mar. 16, 2006).  In addition, Rule 12b-20 requires these reports to contain any "further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17

---

[10]10b5-1 trading plans are designed to allow corporate insiders to "plan future transactions at a time when he or she is not aware of material nonpublic information without fear of incurring liability."  Selective Disclosure and Insider Trading, S.E.C. Release Nos. 33-7881, 34-43154, and IC-24599, 73 SEC Docket 3 , 2000 WL 1201556, at * 33 (August 15, 2000).

[11]Indeed, Mozilo executed the five challenged trading plans/amendments in a three month time period (between October 27, 2006 and February 2, 2007), which were designed to sell 6,964,364 shares of Countrywide stock.  He executed no trading plan in 2005, three trading plans/amendments in 2004 which were each executed four months apart, two trading plans in 2003 which were executed almost exactly six months apart, and two trading plans in 2002 which were executed four months apart.  Moreover, Mozilo's 2002 through 2004 trading plans/amendments were different in character than the plans challenged by the SEC.  The 2002 through 2004 trading plans/amendments were designed to sell stock acquired through the exercise of options expiring less than two years from the date of the plan's adoption or amendment, whereas the challenged trading plans/amendments were designed to sell stock that Mozilo already owned or stock acquired through the exercise of options expiring more than four years from the date of the plan's adoption or amendment.  *See* Lefler Decl. ¶¶ 163-174, Exh. 160-171.

Initials of Deputy Clerk  sr

C.F.R. 240.12b-20.

In order to prove that Defendants aided and abetted a company's violation of these provisions, the SEC must demonstrate that: (1) Countrywide violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; (2) Defendants had knowledge of the primary violation and of his or her own role in furthering it; and (3) Defendants provided substantial assistance in the primary violation. *See Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003).

As the Court already concluded, the SEC has raised genuine issues of material fact that Countrywide's periodic reports contained materially false or misleading statements, and specifically, that Defendants made those false or misleading statements with scienter.   As a result, the SEC has raised genuine issues of material fact that Defendants aided and abetted violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### D.    Violation of Rule 13a-14 of the Exchange Act

In the Fourth Claim for Relief, the SEC alleges that Mozilo and Sieracki violated Rule 13a-14 of the Exchange Act, requiring them to certify that Countrywide's 2005, 2006, and 2007 Forms 10-K did not contain any material misstatements or omissions. *See* 17 C.F.R. § 240.13a-14.

Mozilo and Sieracki move for summary judgment, arguing that a violation of Rule 13a-14 of the Exchange Act cannot be pled as an independent claim for relief.  The Court agrees with the reasoning of *SEC v. Black*, 2008 WL 4394981, at *16-17 (N.D. Ill. Sept. 24, 2008), and concludes that a false Sarbanes-Oxley certification does not state an independent violation of the securities laws.   Accordingly, the Court **GRANTS** Mozilo and Sieracki's Motions for Summary Judgment as to the SEC's Fourth Claim for Relief.

## IV.    CONCLUSION

Defendant David Sambol's Motion for Summary Judgment or Summary Adjudication is **DENIED**.  Defendant Eric P. Sieracki's Motion for Summary Judgment or Summary Adjudication is **GRANTED in part, DENIED in part**.  Defendant Angelo Mozilo's Motion for Summary Judgment or Adjudication is **GRANTED in part, DENIED in part.**  Specifically, the Court **GRANTS** Mozilo's and Sieracki's Motions for Summary Judgment as to the SEC's Fourth Claim for Relief.  In all other respects, Defendants' Motions for Summary Judgment are **DENIED.**

Having survived Defendants' Motions for Summary Judgment, it remains to be seen whether the SEC will be able to convince a jury that Defendants' statements were indeed misleading and material and whether Defendants had the requisite scienter.  Although the Court has its views as to the weight of the evidence, at the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  After the Court makes that determination, the Court has no choice but to allow a jury to resolve these disputes.  Accordingly, this matter will proceed to a jury trial on the currently scheduled date of October 19, 2010.

Initials of Deputy Clerk  _sr_

IT IS SO ORDERED.

Initials of Deputy Clerk __sr__